UNITED STATES
COURT OF FEDERAL CLAIMS

USHIP INTELLECTUAL          )
PROPERTIES, LLC,           )
                           )
             Plaintiff,    )
                           )
v.                         )    Docket No.:   08-537C
                           )
UNITED STATES,             )
                           )
             Defendant.    )

Pages:    1 through 52

Place:    Washington, D.C.

Date:     April 2, 2009

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C.  20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
USHIP INTELLECTUAL          )
PROPERTIES, LLC,            )
                           )
            Plaintiff,      )
                           )
v.                          )   Docket No.:  08-537C
                           )
UNITED STATES,              )
                           )
            Defendant.      )
```

Courtroom 7, Room 508
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday,
April 2, 2009

The parties met, pursuant to notice of the

Court, at 2:05 p.m.

BEFORE:  HONORABLE SUSAN G. BRADEN
         Judge

APPEARANCES:

For the Plaintiff:

CHARLES J. COOPER, Esquire
VINCENT J. COLATRIANO, Esquire
DEREK L. SHAFFER, Esquire
Cooper & Kirk, LLC
1523 New Hampshire Avenue
Washington, D.C.  20036
(202) 220-9660

2

APPEARANCES:      (Cont'd.)

For the Defendant:

SCOTT BOLDEN, Esquire
KIRBY W. LEE, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C.  20530
(202) 307-0262

Also for the Defendant:

MICHAEL F. KIELY, Esquire
U.S. Postal Service
475 L'Enfant Plaza, S.W.
Washington, D.C.  20260
(202) 268-4037

For the Defendant-Intervenor, IBM:

STEVEN CHERNY, Esquire
Kirkland & Ellis, LLP
153 East 53rd Street
New York, New York  10022
(212) 446-4965

Also for the Defendant-Intervenor, IBM:

WILLIAM M. FINK, Esquire
D. SEAN TRAINOR, Esquire
Kirkland & Ellis, LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
(202) 879-5284

1                    P R O C E E D I N G S

2                                              (2:05 p.m.)

3            THE CLERK:  All rise.  The United States

4    Court of Federal Claims is now in session, the

5    Honorable Susan G. Braden presiding.

6            THE COURT:  Hello, all.

7            ALL:  Good afternoon, Your Honor.

8            THE COURT:  Well, I'm your last Judge.

9            MALE VOICE:  Hallelujah.

10           THE COURT:  You have reached the bottom.

11   Here it is.  She who wants to work.  Okay.

12           Who is who from the government?  Where does

13   the line go here?

14           MR. BOLDEN:  Right here, Your Honor.

15           THE COURT:  Okay.

16           MR. BOLDEN:  Good afternoon.  I'm Scott

17   Bolden.  I'm with the Department of Justice

18   representing the United States Postal Service.

19           With me is Kirby Lee, also with the

20   Department of Justice, and Michael Kiely, who is with

21   the Postal Service at this point, but used to work for

22   the Department of Justice.

23           THE COURT:  Okay.

24           MR. BOLDEN:  Thank you.

25           MR. CHERNY:  Good afternoon, Your Honor.

4

1      I'm Steve Cherny from Kirkland & Ellis representing

2      IBM.  With me is Sean Trainor and Tim Fink.

3                 THE COURT:  Okay.  And Mr. Cooper?

4                 MR. COOPER:  Your Honor, yes.  Thank you.

5      And my colleagues are Vince Colatriano --

6                 MR. COLATRIANO:  Good afternoon, Your Honor.

7                 THE COURT:  Yes.

8                 MR. COOPER:  -- and Derek Shaffer.

9                 MR. SHAFFER:  Good afternoon, Your Honor.

10                 THE COURT:  Vince, you have a new haircut.

11                 MR. COLATRIANO:  Yes.

12                 THE COURT:  I haven't seen you probably in

13      about three years.

14                 MR. COLATRIANO:  It's been a while.

15                 THE COURT:  Well, I haven't aged a bit.  All

16      right.  I appreciate you coming in.  I didn't mean to

17      have you spend the money to come in to do this, but I

18      want to get off on a good start on things.

19                 The government.  A couple things.  One is

20      have you talked to Mr. Fargo?  I don't know what

21      you're doing, how you're going to be working with

22      Kirkland & Ellis, but let me clue you in on what

23      happened in our last patent trial.

24                 The government basically was filing joint

25      briefs with the Defendant, and basically they were

5

1     being typed in the Intervenor's law firm.  I put a

2     stop to that.  If the government doesn't want to do

3     their own briefs, as far as I'm concerned you all can

4     go to District Court.

5              MR. BOLDEN:  Your Honor?

6              THE COURT:  I don't want to see any briefs

7     with -- I expect you to be representing your client

8     yourself.

9              MR. BOLDEN:  Yes.

10              THE COURT:  Not delegating that job to

11     somebody else.

12              MR. BOLDEN:  Yes, Your Honor.  I understand.

13              THE COURT:  You are in deep trouble with me

14     if I find that you're doing the opposite.

15              MR. BOLDEN:  I did speak with Mr. Fargo

16     about it.  I also reviewed the Honeywell --

17              THE COURT:  I sure he remembered our

18     memorable meeting on that.

19              MR. BOLDEN:  Yes, I think so.  We will be

20     doing our own briefs.  If there is a situation where

21     we think a joint brief or some other joint filing --

22              THE COURT:  There's no situation in which

23     there's a joint brief.  The United States represents

24     the United States.

25              MR. BOLDEN:  Yes.

6

1                THE COURT:  Okay.  You may have similar

2    views on something, but you have a job to do yourself,

3    okay?

4                These other people are Intervenors, and

5    obviously that goes to my next question.  Are you in a

6    position where you're indemnifying the government,

7    which is why you're here?

8                MR. CHERNY:  Your Honor, we haven't resolved

9    the indemnification issue yet.  The government has

10   asked for indemnification.

11               THE COURT:  I'm sure they have.

12               MR. CHERNY:  Yes.  As a result, neither of

13   the parties has worked out any indemnification issues

14   yet.  We decided that we would put that aside to see

15   what happens.

16               THE COURT:  But you don't have it in

17   whatever agreement you have with the government?

18               MR. CHERNY:  There are indemnification

19   provisions.

20               THE COURT:  There are?

21               MR. CHERNY:  The question goes to whether

22   the provision would cover this.

23               Obviously that's something to be worked out

24   afterwards, and the parties have decided that we'll

25   work that out after we see how the case works out in

7

```
 1   terms of any potential liability ruling and damages
 2   and such so we have a better sense of whether the
 3   indemnification covers it or not.
 4        THE COURT:  Okay.  Don, you're not going to
 5   be able to help me at all I know.  Who do I have that
 6   works at Kirkland & Ellis that we had lunch with in
 7   San Francisco?
 8        Andrew.  Whoever is in San Francisco, Andrew
 9   is an associate of yours.  He does IP work, worked for
10   me in Michigan.  His name will come back to me.  And
11   Ellen Kim or Lin --
12        MR. CHERNY:  Yes.
13        THE COURT:  -- is in your Washington office,
14   and she also worked for me, just so everybody knows
15   for full disclosure purposes.
16        I've known Mr. Cooper since he was in the
17   Justice Department in the Reagan Administration, and
18   he tried a case before me the first year I was on the
19   bench about six years ago.  Six years ago?  My
20   goodness.  How time flies.
21        Okay.  What else do I need to disclose?  I
22   think that's it.
23        MR. CHERNY:  Your Honor?
24        THE COURT:  And I know Ken Starr really
25   well, so you can call him up and ask him all about me.
```

Heritage Reporting Corporation
(202) 628-4888

8

```
 1              MR. CHERNY:  I wasn't going to talk about
 2    Ken Starr.  I was actually going to say to the extent
 3    that we're disclosing things, I actually hosted you
 4    three years ago at the Judge's dinner and so --
 5              THE COURT:  Where?
 6              MR. CHERNY:  I was at Latham & Watkins at
 7    the time, and I'm pretty sure at the New York --
 8              THE COURT:  Was this in New York?
 9              MR. CHERNY:  Correct.
10              THE COURT:  Well, it was obviously a
11    memorable dinner.  Obviously I had enough to eat.
12              MR. CHERNY:  I remember it.  But anyway, let
13    me tell you it was a great dinner.
14              THE COURT:  Did I say hey, Sailor, new in
15    town or something?
16              All right.  Well, that's good to know, but I
17    try to get all these things out in the beginning so
18    there are no major surprises later on.  I don't have
19    anybody going to Kirkland this year, although I do
20    send all of my incoming clerks out to Pepperdine.
21              MR. CHERNY:  Okay.
22              THE COURT:  Ken runs a clerk camp out there
23    for all the people coming in in the country, and I pay
24    for my clerks to go myself.
25              It's a wonderful experience.  They get to
```

Heritage Reporting Corporation
(202) 628-4888

1    meet appellate clerks and trial clerks.  It's not all

2    conservative judges or scholars and things.  It's a

3    really nice mix and the kids have a good time, plus

4    they love the school out there.  I don't know how

5    those people study.  It's gorgeous.

6         Okay.  So we've got all that out of the way

7    for those.  I had another matter.  We just finished a

8    fee thing for Kirkland.  Who was the lawyer on that?

9         MALE VOICE:  Richard Ryland I think.

10        THE COURT:  Ryland, yes.  We gave you a huge

11   amount of money.

12        MR. CHERNY:  Thank you.

13        THE COURT:  You didn't even ask for your

14   paralegal fees, which you could have gotten the last

15   time after the Supreme Court reversed the Federal

16   Circuit on that, but in any event Mr. Ryland has

17   litigated before us.

18        He's a good lawyer.  I put in the materials

19   in the opinion.  Basically I thought he did the best

20   legal work or your firm did of everybody.  I thought

21   they did a really nice job.  He did a lot of work on

22   that case.  So we've got all that done.

23        Here's how I like to work.  First of all,

24   we're going to talk about the schedule.  I don't know

25   what you've done with Judge Damich, but I want to get

1    a sense of do we need this much time to get the case

2    moving?

3              I'm pretty informal in this regard.  Don't

4    file junk motions, okay?  Extensions for time,

5    discovery disputes, particularly interrogatories.  You

6    know, I can't stand those things.  Interrogatories are

7    worthless anyway.  All you get is the names and

8    addresses of people.  It's just a useless waste of

9    time for people to fight over that stuff.

10             Pick up the phone and call my law clerk,

11   Deanna, who is assigned this case.  Don Long is my

12   other clerk who's here.  Deanna went to Georgetown

13   Law.  She has an offer from Davis?

14             THE CLERK:  Sullivan & Cromwell.

15             THE COURT:  Sullivan & Cromwell.  But she's

16   decided to go to the Justice Department for a couple

17   of years and fool around, and the folks in the New

18   York firm love her and they're going to wait to see if

19   that's what she wants to do or not.

20             Don Long is a graduate of Columbia and

21   University of Texas Law School, and he's a really big

22   guy, so I'll send him off to get you.  We're going to

23   have six interns in the office this summer, so we're

24   up and ready to have some fun and do things.

25             But pick up the phone and call.  If you feel

1    you want to do something in writing, try a letter if

2    you want to put something out.  We have these

3    wonderful machines now, which you may know, that we

4    wheel into chambers instead of a full-time court

5    reporter, and we transcribe everything and then we can

6    even order a transcript if you want.  If you don't

7    want, it doesn't make any difference.

8         But I generally on discovery stuff will rule

9    right then.  I mean, I'll let you make your argument,

10   et cetera, but I don't want to slow down the

11   litigation since you guys are kind of beginning your

12   discovery process on junky stuff.  I mean, all of you

13   are experienced litigators.  There's a way of getting

14   to the nub of things.

15        I forgot.  Don, would you go get me Steve's

16   thing and make copies?  Have Karen make a bunch of

17   copies and bring them all down.

18        My brother-in-law is Steve Sussman, and he

19   came to speak to the Court.  He was really

20   interesting.  He gave a handout of something he does

21   in his firm, which I'd like to have you take a look

22   at, which is things to resolve up front.

23        I don't know if we're going to get into much

24   privileged stuff, but he has a pretty good idea about

25   that, which is you pick 10 documents.  Each side gets

12

```
 1    10 or 20 and that's it.  You can figure out which ones
 2    those are.
 3            It works on everybody's side, but he's found
 4    that he's never found anybody who hasn't agreed to do
 5    it.  He's found it makes things much faster and more
 6    efficient and pleasant, frankly, in terms of the
 7    process.  He litigates a lot of big cases much bigger
 8    than this.  So I'll give you his little handout and
 9    then you can think about it.  It might be useful.
10            I have done patent work in private practice.
11    So you know, I have only tried one case since I've
12    been here, which was the Honeywell case.  I'm sure
13    you've looked at the 400 pages of prose that are
14    written.  I learned a lot about managing the case from
15    that, and I will do some things somewhat differently
16    this time, but on the whole I think it went along
17    swimmingly.  It's up on appeal in the Federal Circuit,
18    so we'll see what happens.
19            It was interesting.  I don't know what
20    they're arguing upstairs now, but neither party seemed
21    to care much about what I did in the claim
22    construction.  It was much interesting.  They all
23    seemed to be pretty happy, but they're probably mad
24    now.  I don't know.
25            Okay.  Also I have a good fairy rule.
```

1    Everybody gets three wishes, okay, and you can use

2    your wish at any time.  You don't get another three

3    wishes, but the concept is basically litigation is not

4    perfect and mistakes get made or something happens and

5    you need a break.  So invoke your wishes wisely, but

6    you get three wishes.  You don't get another three

7    wishes.

8              Are you using one now?

9              MR. COOPER:  No, Your Honor, but before you

10   leave your subject do those go by side or by party?  I

11   hope they go by side.

12             THE COURT:  No.  You get three, they get

13   three and they get three.

14             MR. COOPER:  Oh, well.  That's what I was

15   hoping the answer would not be.

16             THE COURT:  No, because they're different on

17   the other side.  If they're not, then the government

18   is not doing their job.

19             MR. CHERNY:  I don't suppose you get to wish

20   to win, Your Honor?

21             THE COURT:  What?

22             MR. CHERNY:  I don't suppose you get to wish

23   to win?

24             THE COURT:  You can do that.  I mean, is

25   that one of yours?

14

1          The concept is I'd like to keep it civil.

2    We had a very contentious situation in the last one.

3    In fact, we had one of the counsel went to leap and

4    almost slugged the government's counsel during trial,

5    I mean literally, and I had to stand up.  I literally

6    stood up and said halt.  I didn't know what else to

7    do.

8          But it was nasty.  People didn't get along

9    well.  Not the government's people.  It was just one

10   group, private group, but it was not a pleasant

11   situation and I had to relieve him from representing

12   his client on the witness we were working on at that

13   point because I really felt it wasn't fair to his

14   client.  He had really lost control completely.

15          In the afternoon -- I knew that he had

16   prepared for the expert, and I didn't think it was

17   fair to do that -- I brought the marshals in and told

18   him if he so much as raised his voice he was out of

19   here.

20          So I wanted to share that up front with you

21   because I think I put up with much more abuse than I

22   really deserved because I really didn't want to get

23   involved with the personality stuff.  I wanted to kind

24   of keep moving in the trial.

25          So I want to start off on a light and happy

1    note.  It's expensive to litigate these cases, so

2    maybe if we can start thinking collectively about how

3    we can kind of move it along because no matter what I

4    do you've got another couple years ahead of you

5    upstairs, although you might want to look.

6              If you look at the website this week, Chief

7    Judge Michel has put on the website a group of

8    statistics about the Court.  I don't know if you've

9    seen them or not, but it's really interesting.  They

10   have really fallen in terms of how they're doing much

11   better, much faster in their cases coming out.  They

12   do an analysis with all of the other Circuits, so you

13   guys who litigate other places.  I thought it was

14   pretty interesting.

15             Okay.  Before we get to the schedule, I

16   asked a question about your third affirmative defense.

17             MR. CHERNY:  Yes, Your Honor.

18             THE COURT:  Which I'm trying to figure out

19   exactly what that is.  It's obviously invalidity, but

20   is there anything else in there?

21             MR. CHERNY:  No, Your Honor.

22             THE COURT:  Okay.

23             MR. CHERNY:  To answer the question you

24   posed I think in the email was I understand that some

25   lawyers try to shoehorn inequitable conduct on their

    1    validity, but we have not.

    2            THE COURT:  Okay.

    3            MR. CHERNY:  My understanding is inequitable

    4    conduct is an unenforceability defense.  Invalidity

    5    from my perspective has always been just compliance

    6    with the statute, and all we're saying here is that we

    7    believe the patents are invalid, and 102 is

    8    anticipation and 103 is obviousness --

    9            THE COURT:  Okay.  Yes.

   10            MR. CHERNY:  -- and 112 is the form of the

   11    patent that deals with that defense, enablement and

   12    such.

   13            THE COURT:  While Don is passing out your

   14    handout here, I spoke at the New York Intellectual

   15    Property Bar Association on Friday.  You all didn't

   16    know that I was going to be your Judge then.  I was

   17    really honored to do it because they never ask Judges

   18    from our Court to do it.

   19            I spoke about inequitable conduct.  I can

   20    get you -- Don or somebody can give you -- my

   21    comments, but I had some discussions as a Trial Judge,

   22    but what I thought the Trial Judges ought to do is

   23    forget about what the Federal Circuit does or doesn't

   24    do with the test, the ever-evolving back and forth

   25    test or whatever.  We don't know whether Tettleson's

1    cert petition is going to be granted, which they're

2    supposed to look at it I think on the 27th to see if

3    the Supreme Court decides to take that.

4           But I made three suggestions.  I'll just

5    throw them out to you so if you guys are doing other

6    patent cases, which I think is pretty good.  I had

7    some really good feedback, particularly from the

8    Circuit members who thought this is pretty good.

9           If it was inequitable conduct, what I want

10   and I'm going to have from now on is to have that

11   placed -- that defense or that portion of the answer

12   is going to go under seal at the beginning --

13          MR. CHERNY:  Okay.

14          THE COURT:  -- so that no game is being

15   played with the other side.  I've called it the

16   defense of last resort --

17          MR. CHERNY:  Okay.

18          THE COURT:  -- which is the first thing I

19   would do is have a hearing with you today to find out

20   what's your basis under Rule 11 for filing.

21          MR. CHERNY:  Okay.

22          THE COURT:  I want to see your cards or some

23   of your cards.  If you didn't have anything then I

24   would dismiss it right now.  Do you see what I'm doing

25   on the defense?

1          MR. CHERNY:  I understand, Your Honor.

2          THE COURT:  And the last thing is basically

3     do the whole thing, the trial whether it's before a

4     jury or whatever, and wait and to hold off on

5     discovery and everything else in an equitable hunt

6     until the very last.

7          Only then, if that's the last thing the

8     Defendant has left to hold onto, then I suggest that

9     the Judges allow discovery and really supervise that

10    discovery and issue a separate opinion put under seal

11    because when the plaintiff is small or medium sized

12    even a charge like that imposes -- and I talked to a

13    number of lawyers about this before.  It could impose

14    between $1 and between $5 or $6 million just on that

15    defense alone on discovery.

16         Second of all, if you're a medium to small

17    sized company, particularly if you're privately held,

18    you can't borrow any money.  It's going to be a big

19    problem for you.  No one wants to acquire somebody who

20    may get socked with something like that.

21         The lawyer's fees issue alone apparently is

22    crippling.  They had a guy discuss one of his cases,

23    which I thought was really interesting.  He had a

24    small plaintiff and the lawyer's fee assessment had

25    been made, and they were not really sure whether they

1    could pull the money together in time.

2        Fortunately he went off and filed his appeal

3    like immediately, like within 20 or 30 days after the

4    judgment, and he got it tried and decided two days

5    before the payment was due.

6        The prosecuting lawyer, there were

7    disbarment proceedings against him for being involved

8    in fraud, so it came that close basically to ruining a

9    professional's life plus the livelihood of a small

10   company.  If the Federal Circuit had not done that he

11   would have had to go back and try to get all the stuff

12   undone.

13       So I was trying to think of ideas how the

14   Trial Judges could save the defense.  Human nature

15   being what it is, I'm sure that the people engage in

16   fraud in the Patent Office.  I don't know how much

17   it's done.  It's probably not done by really big

18   companies such as your client because they have too

19   much to lose if they ever get hit.

20       MR. CHERNY:  I can swear that IBM never

21   commits that.

22       THE COURT:  Yes, but they would be messed up

23   big-time because they've got to go back over there all

24   the time.  It's probably the bad conduct is by other

25   types of folks would be my guess and probably people

Heritage Reporting Corporation
(202) 628-4888

1    who are not really well represented and they're

2    playing around a little bit.

3         But it was amazing to me, in preparing for

4    this, just to listen to war stories people had.  That

5    was the worst one I heard, but it's a serious problem

6    because people are pleading all the time now.  The

7    Federal Circuit, all they're working on is the test.

8    That does nothing to help anybody.  Even if they

9    decide later on it's flawed it doesn't do anything to

10    help anybody.

11         So I'm trying to come up with some ideas

12    about that.  If you have any ways you can find for me

13    to speak other places about it, I really want to talk

14    to other Trial Judges about it.  It's more work for

15    them, which they don't like, and most of them are

16    giving their cases to Magistrates anyway.

17         MR. CHERNY:  Your Honor, may I address?  One

18    point that I'd like to say is that --

19         THE COURT:  So I'm happy that we don't have

20    to deal with this, but I wanted to give you my little

21    sermon on it.

22         MR. CHERNY:  And in the context of that, we

23    didn't plead inequitable conduct.  We didn't have an

24    inequitable conduct defense to assert at this point,

25    and we certainly didn't want to put something in there

1    just as a placeholder.

2            Obviously if during discovery something

3    comes up --

4            THE COURT:  If you find something we'll talk

5    about it.

6            MR. CHERNY:  We understand your procedure.

7            THE COURT:  You'll come and see me.

8            MR. CHERNY:  Correct.  That's what I'm

9    saying.

10           THE COURT:  I'm not big on these procedural

11   orders.  I know Judge Damich has a huge thing.  I've

12   never read it all.  You know, every case is different.

13           MR. CHERNY:  Of course.

14           THE COURT:  And I don't want to do something

15   so we've got to shove stuff into something that I

16   think up or dream up and think it's good.

17           I'm trying to work through with you, sleeves

18   rolled up, to kind of understand what we're doing,

19   okay?

20           MR. CHERNY:  We appreciate that.

21           THE COURT:  All right.  Okay.  That's good

22   news.  So let's go to the calendar, what you've agreed

23   to now, and then anything else you want to ask me

24   about.  Then you can all go home and go to work.

25           You're about ready to begin your fact

1    discovery, I take it?

2            MR. CHERNY:  Correct, Your Honor.

3            THE COURT:  Okay.  All right.  And you're

4    going to give me a claim chart in July.  That's good.

5            MR. BOLDEN:  Your Honor, if I may interrupt

6    briefly?

7            THE COURT:  Sure.

8            MR. BOLDEN:  One thing that the parties I

9    think need to have resolved before fact discovery

10   begins in earnest is there is a dispute related to

11   Rule 26 initial disclosures.

12           We met with the early meeting of counsel and

13   we put our dispute into the JPSR.  Everybody gets

14   along very well and amicably, but this was just an

15   issue that we couldn't resolve as far as the specific

16   timing as to the different parts of the initial

17   disclosure.

18           So I think before fact discovery begins in

19   earnest it would probably be useful to resolve the

20   Rule 26 issue first.

21           THE COURT:  Do you want to stand over here

22   or stand over there and just tell me what the problem

23   is?

24           MR. BOLDEN:  Yes.  I think it's simple

25   enough to go ahead and give you the Defendant's

1    position on it --

2              THE COURT:  Sure.

3              MR. BOLDEN:  -- which is simply that under

4    Rule 26 there's initial disclosures that should be

5    made at a certain time.

6              One of Judge Damich's last things that he

7    did when he was still Judge is he said since there is

8    a dispute --

9              THE COURT:  He's still a Judge.  He's just

10   not your Judge.

11             MALE VOICE:  Our Judge.

12             MR. BOLDEN:  Our Judge.  He said in his

13   order that since there's a dispute then the parties

14   wouldn't have to put forward any initial disclosures

15   until after the status conference with him.

16             But I think the position of the Defendant is

17   is that two weeks after today the parties should just

18   go ahead and follow the rule and do their initial

19   disclosures.  I believe -- and of course they can

20   speak to it as well -- Plaintiff's position is that

21   the categories of initial disclosures, the witnesses,

22   the documents and damages, should be staggered outward

23   and done at different times.

24             THE COURT:  You don't know yet who all of

25   your witnesses are going to be here.  You think you

1    probably have a good idea, but you don't necessarily

2    know?

3              MR. BOLDEN:  That's correct.  That's always

4    been the case with Rule 26, and I believe the parties

5    just go ahead and supplement once they find out

6    witnesses.

7              THE COURT:  Right.  Right.

8              MR. BOLDEN:  That's correct.

9              THE COURT:  Hopefully we'll move quickly

10   enough nobody will die.

11             MR. CHERNY:  Hopefully.

12             THE COURT:  Or lapse into Alzheimer's.  Yes,

13   Mr. Cooper?

14             MR. COOPER:  Yes, ma'am.  I actually think

15   that this dispute has been largely superseded by the

16   calendar because we are fine with the two week issue

17   except the issue of initial disclosures concerning

18   calculation of damages, which is something that --

19             THE COURT:  You don't know that either yet.

20             MR. COOPER:  -- we won't know what we think

21   for quite a while, so we'd like to --

22             THE COURT:  You don't have an expert yet

23   probably, do you?

24             MR. COOPER:  That's correct.

25             THE COURT:  Yes.  Okay.

1          MR. CHERNY:  Your Honor, even though Mr.

2    Bolden and I have separate positions, although I think

3    they coincide here, we're not asking, and perhaps it

4    didn't come out at the early meeting of counsel.

5    We're not asking for a calculation of damages.  We're

6    asking for the damages theory, which I think is what

7    the initial disclosures contemplated.

8          Because obviously going forward in terms of

9    taking discovery, we need to know what their theory

10   is.  Are the damages based on how much money?  These

11   have to do, by the way, with automated postal kiosks.

12   If you go into some post offices they have these

13   postal kiosks there.

14          THE COURT:  Right.  I used one this morning

15   in the post office.

16          MR. CHERNY:  Okay.

17          THE COURT:  And my worker here does.

18          MR. CHERNY:  Okay.  The reason we're here is

19   IBM manufactures them for the government.  And so

20   we're not asking for them to say the damages are $368

21   million or whatever to the penny.  All we were asking

22   for was the theory.

23          Now, on the other side, and which we'll get

24   into when we talk about the schedule, we also have a

25   dispute about the schedule as to bifurcation or not,

1    and I don't know what the Court's view is.

2           So obviously if the Court resolves

3    bifurcation and says that we should decide liability

4    first and then damages then it becomes a nonissue, but

5    if damages are in the case then our view is that --

6           THE COURT:  No.  I mean, look what I did in

7    Honeywell.  We did claim construction.  We did

8    liability, infringement.  Then we did defenses.

9           MR. CHERNY:  Okay.

10          THE COURT:  We never got to damages, okay,

11   although I let them put on damage testimony when we

12   did the defenses.  I take that back.  I think we had a

13   break for two weeks or something and then they did

14   damages, but just so they could get some breathing

15   room between.

16          We did four proceedings, and we could have

17   probably put them into three.  I think I gave them

18   time because they asked for it.  They were tired or

19   somebody had to take a vacation or something.  But I

20   did three opinions.

21          MR. CHERNY:  Okay.  I apologize.  I was on

22   the road when we changed over from Judge Damich to

23   Your Honor.

24          THE COURT:  Lightning.

25          MR. CHERNY:  It was very, very fast.  In

27

1    fact, I was on my way to Court in Arizona when I got

2    the email about that you'd like to hear it and so I

3    haven't had a chance to look at the <u>Honeywell</u> case.

4          THE COURT:  That's okay.  It's the only

5    thing you've got out there to work with.

6          I think that is a good way of doing it for

7    upstairs because they can take a look, first of all --

8          MR. CHERNY:  I agree.

9          THE COURT:  -- at what was done on the claim

10   construction.  Then they can take a look at the

11   liability.  In that case I found a little

12   infringement.  I did find infringement of the doctrine

13   of equivalence.

14         MR. CHERNY:  Okay.

15         THE COURT:  Now, I had talked about this

16   with counsel.  It seems to me sometimes if you find

17   the doctrine of equivalence then the obviousness

18   defense is almost usually triggered.  I don't know if

19   that's been your experience or not.

20         MR. CHERNY:  I understand what you're

21   saying, Your Honor.

22         THE COURT:  Yes.  But that's kind of the way

23   we proceeded under that.

24         MR. COOPER:  If I could just interject, Your

25   Honor?  I guess our issue goes not just to how the

1    issues may be presented to the Court but how we should

2    take discovery and prepare ourselves for presenting

3    the issues.

4         THE COURT:  You ought to just get your claim

5    construction stuff done first.

6         MR. COOPER:  Absolutely.  I think everybody

7    agrees on that.

8         THE COURT:  Your men are still alive and all

9    that type of thing and around.  Yes.  Okay.

10        MR. COOPER:  Yes.

11        MR. CHERNY:  And we agree.

12        MR. COOPER:  To my knowledge.  But yes, we

13   certainly agree that the claim construction is all

14   going to work towards preparing as soon as we can for

15   the Court's --

16        THE COURT:  Yes.  But once we finish that,

17   and I did the same thing in <u>Honeywell</u>.  I mean, I did

18   90 days after the last brief comes in I issue an

19   opinion.  If you watch on the website, you'll see like

20   I am on the money.

21        Even with small cases and stuff, they don't

22   get any better over time and it forces us to focus and

23   not drag it out forever.  I mean, I'm not writing

24   scripture for all time here.  You know, it's pretty

25   clunky work, and so I think that the sooner I get it

```
 1    done the better and then we can do reconsideration or
 2    something if you want to do that.
 3              I didn't have that in the other case.  They
 4    didn't seem to care after I did it.  They fought a
 5    lot, but they didn't care.
 6              MR. CHERNY:  Your Honor, it sounds like, I
 7    mean, I'm in agreement in terms of the perspective of
 8    let's go forward and do discovery.  Let's get through
 9    the claim construction.
10              THE COURT:  If I need to do claim
11    construction, that also should be a juncture for you
12    all to kind of size up your situation --
13              MR. CHERNY:  I think so.
14              THE COURT:  -- and see whether or not you
15    can cut a deal.
16              MR. CHERNY:  I agree.
17              THE COURT:  You don't need me maybe to do
18    the rest of it.
19              MR. CHERNY:  And in fact if we're not
20    spending a lot of time and money doing damage
21    discovery, it probably would actually make it easier
22    to do that because --
23              THE COURT:  Yes.
24              MR. CHERNY:  -- we'll be able to invest less
25    money and time.
```

1          MR. COOPER:  I would like to interject that

2    I guess our major disagreement in terms of how we

3    should proceed is whether or not the discovery, as

4    opposed to any proceedings that occur

5    contemporaneously or after discovery, should proceed

6    in a bifurcated way so that it's strictly liability

7    discovery and not until liability has been decided do

8    we go into damage discovery.

9          THE COURT:  That's all right.

10          MR. COOPER:  Well, okay.

11          THE COURT:  Do you want to do it all at

12    once?

13          MR. COOPER:  Well, we believe that it would

14    yield some serious inefficiencies if we tried to

15    confine discovery to liability without the damages

16    issues and that --

17          THE COURT:  You're trying to figure out what

18    you've got to work with in terms of damages?

19          MR. COOPER:  As well, yes.  Yes, Your Honor.

20    And if we postpone until after liability has been

21    decided getting any damages information we think

22    that's going to --

23          THE COURT:  It's going to have to work with

24    you too then.

25          MR. COOPER:  That would retard any potential

Heritage Reporting Corporation
(202) 628-4888

1    there may be after claim construction to put together

2    a settlement.

3                THE COURT:  But then that needs to be a two-

4    way street then.

5                MR. COOPER:  Absolutely.

6                THE COURT:  It's costing yourself.

7                MR. COOPER:  We understand that too, and

8    that's I guess the bitter with the sweet here.  But I

9    think what both sides are trying to do is psych out

10   what the most efficient way is to proceed, and we just

11   disagree.

12               THE COURT:  Well, let's do the claim

13   construction first.

14               MR. CHERNY:  Yes.

15               THE COURT:  Then we'll deal with whether you

16   want to do your damage stuff with your liability.

17               MR. COOPER:  Well, we also certainly think

18   that we need to take discovery to be --

19               THE COURT:  On claim construction?  How much

20   discovery are you going to need to do on claim

21   construction?

22               MR. COOPER:  We're not sure about that, Your

23   Honor.

24               THE COURT:  I'm not either.  You're

25   construing the doxine vetter, and there may be some

1    other related patents out there, people you want to

2    talk to, but I don't know what type of discovery

3    you're thinking about.

4              MR. COOPER:  And, Your Honor, your <u>Honeywell</u>

5    decision does provide some very useful guidance in

6    terms of intrinsic --

7              THE COURT:  I don't know if it provides

8    useful guidance or not, but I'm just thinking

9    practically speaking --

10             MR. COOPER:  Extrinsic.

11             THE COURT:  -- if you're construing the

12   words of the patent the inventor, the specs.  I mean,

13   you can look.  I mean, you don't have a lot of places

14   to look for discovery.

15             MR. COOPER:  Agreed, Your Honor.

16             MR. CHERNY:  If I might interject, Your

17   Honor?

18             THE COURT:  It's your case.  I'm not boxing

19   you in, but I would do that first.  Get that done and

20   under your belt so then you know what we're working

21   with here.

22             MR. COOPER:  Your Honor, we totally agree

23   with that.

24             THE COURT:  Okay.

25             MR. COOPER:  And we should have this <u>Markman</u>

1    hearing as soon as we can get it prepared.

2            THE COURT:  Okay.

3            MR. COOPER:  But there may well be documents

4    in Defendant's possession with respect to how they

5    have interpreted our patents as they --

6            THE COURT:  Well, there's no problem with

7    that, but that has nothing to do with damages I don't

8    think.

9            MR. COOPER:  True.

10           THE COURT:  Okay.  So you don't do damages

11   until we get through construction.  Okay.

12           MR. COOPER:  And so will discovery until

13   that point be limited to discovery that's relevant to

14   claims construction?

15           THE COURT:  Yes.  Yes.  And if you find out

16   that there's something -- I don't know -- you

17   absolutely have to get your hands on give me a call.

18   How is that?

19           MR. COOPER:  That is fair enough, Your

20   Honor.

21           THE COURT:  That way we don't have to do

22   orders like this.  Just give me a call about what the

23   particular problem is if you find something.  I don't

24   want to think so far ahead we make up rules -- do you

25   see what I'm saying -- to deal with problems we may or

1    may not have.

2            MR. COOPER:  Fair enough.  Yes, Your Honor.

3            THE COURT:  Do you see?

4            MR. BOLDEN:  Your proposal is reasonable to

5    the government, Your Honor.

6            THE COURT:  Pardon me?

7            MR. BOLDEN:  I said your proposal is

8    reasonable to the government, Your Honor.

9            THE COURT:  Yes.  I mean, get out there and

10   let's get to step one.  There shouldn't be a whole

11   bunch of stuff I don't think.

12           Maybe they've got tomes about your

13   invention.  I have no idea.  Maybe they've had

14   graduate students spending hours writing papers about

15   it.  I don't know.  Ask them.  They'll tell you.

16   Okay?

17           MR. CHERNY:  Yes, Your Honor.

18           THE COURT:  Yes.  Because I want to kind of

19   keep it -- if we do that right then you all take a

20   look at the time construction and you figure out well,

21   I don't know if I want to mess with this or not.  And

22   they're not going to know what their damages theories

23   are for a bit.

24           MR. CHERNY:  Of course.

25           THE COURT:  They're class lawyers.  They

1    want flexibility.

2            MR. CHERNY:  Of course.  And although Mr.

3    Cooper said it was bitter and sweet, USHIP is a much

4    smaller entity so the bitter for us in terms of

5    producing tons of damages stuff before we get to the

6    claim construction is I think more bitter than it is

7    to Mr. Cooper and so I think that the Court --

8            I mean, it definitely balances the fact that

9    claim construction is something we all need to do and

10   that if we get past that then we may have to get to

11   the damages aspect.

12           THE COURT:  And if you find something that

13   you think falls outside of that that you absolutely

14   have to get your hands on then call me up.

15           MR. CHERNY:  Of course.

16           THE COURT:  I'll send Don over there to go

17   get it.

18           MR. CHERNY:  To date we haven't had any

19   problems.  I can give my word of honor that it's very

20   unlikely that there will be any lunging over the

21   table.

22           THE COURT:  I have no idea what your honor

23   is, so I don't want to know.

24           MR. CHERNY:  The point of that is regardless

25   of what my honor is worth, we actually get along

1     pretty well in terms of negotiating things so I don't

2     think there will be an issue in terms of working

3     things out.

4              THE COURT:  All right.

5              MR. COOPER:  I agree with that

6     representation.

7              THE COURT:  We're going to be ready.  You

8     want to have -- well, let me go back to what I was

9     doing here just for a second here.  So we get the

10    claim chart in July.  You're going to do your

11    discovery this summer.  It's always good to do

12    discovery on a boat fishing with beer.  It moves along

13    much better.

14             Okay.  You're going to meet and whatever

15    you're going to call claim construction experts.

16    Okay.  All right.  Then we have the filing of the

17    statement and then deadline of joinder of additional

18    parties.  Are we expecting someone else here?

19             MR. BOLDEN:  No, Your Honor.  I think that

20    was just in Judge Damich's special procedures order

21    and so we supplied a date.

22             THE COURT:  Well, I had somebody show up

23    actually.  L-3 showed up in our case.  After

24    infringement they popped up.  Where they were is

25    beyond me, but they decided they needed to show up so

1    we let them on in.

2            All right.  Thirty-five days before the

3    hearing, 21 days before the hearing.  My goodness.  Do

4    you want to go that far out?  Let me look at my

5    calendar.

6            I have a trial, a two week trial in October,

7    which it might take two weeks.  I don't know.  And

8    then I have a week and a half in November.  Believe it

9    or not, they want me to go to Hawaii.  It's a Navy

10   thing.

11           MALE VOICE:  Tough break, Your Honor.

12           MR. CHERNY:  Can we go with you, Your Honor?

13           THE COURT:  Yes.  I was thinking why don't

14   we all go to Hawaii?

15           Your experts are located where, Mr. Cooper?

16   Where is your inventer and all those?  Do you have

17   somebody in mind?

18           MR. COOPER:  They're scattered right now.

19           THE COURT:  They're scattered.  We'll have

20   Don round them up.  He's from Texas.  He can get them

21   all in one place.

22           Okay.  Your folks are where?

23           MR. CHERNY:  In terms of experts, I'm not

24   yet sure whether there's a need for experts.

25           THE COURT:  I don't know.

1           MR. CHERNY:  I mean, most of the Courts

2   don't entertain experts for claim construction, but we

3   put it on here because I guess we were dealing with a

4   form order that required us to fill in the blanks.

5           As for fact witnesses, to the extent any of

6   them would be relevant --

7           THE COURT:  Right.

8           MR. CHERNY:  -- they're scattered around the

9   country and up in Canada.

10          THE COURT:  Okay.  My month of December is

11  free, although people like to go off with their kids

12  and stuff like that.

13          I mean, I would kind of like to get a trial

14  date for the claim construction, which shouldn't take

15  -- I think ours lasted longer than it should have.  I

16  probably spent four days or something, but they

17  brought in experts and I listened to them.

18          I'll have to go back and look at my opinion,

19  but I know that I didn't pay any attention to them in

20  the end.  Do you know what I'm saying?

21          MR. COOPER:  Your Honor, absolutely.  We

22  welcome an aggressive schedule, and if the proceeding

23  will be limited to claim construction and our

24  discovery between now and then would be limited to

25  factual information relevant and telling on claim

1    construction we don't see a reason why we couldn't get

2    it ready for trial by December if the Court has --

3            THE COURT:  If you want to do it earlier

4    than that we can do it too.  I mean, I can do it in

5    September, although I'll have a new set of law clerks

6    coming in, and they have to kind of find their pencils

7    and stuff and get them sharpened and go to training

8    school here and all that type of thing.

9            MR. CHERNY:  Your Honor, unfortunately I

10   have a trial in September.

11           THE COURT:  Okay.

12           MR. CHERNY:  December is fine if all we're

13   talking about is claim construction.

14           THE COURT:  Why don't you all find some time

15   in December that looks good for you because I have it

16   open right now.

17           MR. CHERNY:  I'm happy to talk to Mr. Cooper

18   about that.

19           THE COURT:  We'll do it here.  Is that okay?

20   In D.C.?

21           MR. CHERNY:  Of course.

22           THE COURT:  Well, I don't know where your

23   people are.  They're moving to Hawaii.

24           MR. CHERNY:  Hawaii would be great.  The

25   only thing I would say, Your Honor, and I'd be happy

1     to talk to Mr. Cooper about it.  I've never been to a

2     claim construction proceeding that lasted four days.

3                THE COURT:  Well, I got myself into this,

4     you see, because it was my first one and they all

5     wanted to have people.  The Plaintiff had two experts,

6     and I think Lockheed Martin had one, maybe two.  I

7     can't remember.  I'd have to go back and look.

8                But in the end -- you know, it was all

9     interesting, but I didn't do anything with it, so it

10    was a waste of time.  Now I'm not going to tell you

11    you can't have somebody.  Do you see what I'm saying?

12               MR. CHERNY:  Of course.  Neither side here

13    contemplates experts for the claim construction

14    proceeding.

15               THE COURT:  Okay.  All right.  You know, it

16    was here, so I wasn't sure.  This is just because this

17    is exactly the way that Damich does this thing?

18               MR. CHERNY:  Yes.  That's the reason why

19    that the form is laid out.

20               THE COURT:  Yes.  Well, we're going to draw

21    a line, and anything after all this other stuff I

22    don't want to read below that.  I mean, let's just get

23    a date for the claim construction.

24               MR. BOLDEN:  Your Honor, I would like to go

25    ahead and point out that this schedule that you're

1    looking at is sort of an idealized schedule proposed

2    by Plaintiff in the joint preliminary status report.

3           THE COURT:  Okay.

4           MR. BOLDEN:  So it doesn't necessarily take

5    into account if one of the parties needs an extension

6    of time.

7           THE COURT:  Right.  Right.  That's why I'd

8    rather put together a schedule in pieces.

9           MR. BOLDEN:  Understood, Your Honor.

10           THE COURT:  And you've got give room within

11    that.  You figure it out.  I mean, I don't want you

12    calling me every three days saying I need three days,

13    I need four days, I need five days.  I mean, call the

14    clerk to say you're going to be late for a few days.

15           MR. CHERNY:  Your Honor?

16           THE COURT:  I don't want to issue orders.

17    We can make a little notation in the file.  That's it.

18           MR. CHERNY:  Your Honor, would it be

19    helpful?  I mean, obviously our early meeting of

20    counsel was done in the context of thinking it was

21    Judge Damich.

22           THE COURT:  Yes.  I understand.

23           MR. CHERNY:  No, no.  Would it be helpful

24    for Mr. Bolden and Mr. Cooper and I to sit down and

25    perhaps now that we know what you're contemplating in

1    terms of the schedule and perhaps discuss perhaps like

2    a form of the Markman hearing that might make sense

3    given what we've all heard from you and propose it to

4    you?

5             THE COURT:  If he's ready.  It's your case.

6             MR. CHERNY:  Because I don't think we've

7    coordinated.

8             MR. COOPER:  No.  I think Mr. Cherny makes

9    an excellent proposal.

10            THE COURT:  Okay.  But I don't know what

11   orders are -- I haven't looked.  I didn't see an order

12   on this thing.  You just filed it in March.  He didn't

13   issue an order on this, did he?

14            MR. CHERNY:  No, no, no.

15            THE COURT:  So this is not in stone yet?

16            MR. CHERNY:  No.

17            THE COURT:  Good.

18            MR. CHERNY:  This was one of the proposals.

19            THE COURT:  Yes.  Okay.  So why don't you

20   guys figure out what you want.  You don't have to do

21   so many different things.  I mean, you don't have to

22   have your meet and confer dates.  I mean, I don't need

23   to be ordering all that mess.

24            MR. CHERNY:  I think we can sit down and

25   talk about a streamlined version of this --

1          THE COURT:  Yes.  You know what I'm saying.

2     Yes.

3          MR. CHERNY:  -- keeping in mind what you've

4     told us in terms of what you want.

5          MR. COOPER:  With your guidance, if you have

6     some time in December we will fill in the blanks up

7     until December.

8          THE COURT:  Yes, because I want to do it as

9     soon as possible for you so you both can take a look

10    at it.

11         MR. COOPER:  Yes.

12         THE COURT:  Then you can maybe sit down and

13    settle the case or -- I don't know --

14         MR. CHERNY:  Perfect, Your Honor.

15         THE COURT:  -- do something else.

16         MR. CHERNY:  Perfect.  I'm happy with that.

17         THE COURT:  Now, let me tell you something I

18    will do, though.  I did this, and I thought it worked

19    really well last time.  GW has a lot of really smart

20    kids that are in the patent world in law school there.

21         MR. CHERNY:  Yes, ma'am.

22         THE COURT:  What I did, and I know Mr.

23    Cooper had met some of the kids that were with me.  In

24    that particular situation I was working with a piece

25    of aircraft.  I mean, night vision goggles are used up

44

1    in the planes to see out and all that type of thing.

2           So I had a bunch of military kids who worked

3    with equipment in chambers as interns, and it was

4    really wonderful because most of them already had

5    passed the patent bar I think.  They hadn't finished

6    law school yet, but they'd already been admitted to

7    the patent bar.  Technical stuff.  They had worked

8    with the equipment, which is wonderfully helpful.

9           I don't know if I'm going to find anybody

10   that's worked with the postal equipment or not, but I

11   may find it's a mechanical engineer thing.  I'll

12   probably look for somebody or two.

13          I'll tell you how I did the claim

14   construction.  I wrote the claim construction and then

15   circulated it to all of them.

16          MR. COOPER:  Under seal, as I recall.

17          THE COURT:  No, no, no.

18          MR. COOPER:  No?

19          THE COURT:  It was in my chambers.  I

20   circulated it to the people that were the technical

21   people in my chambers and the law clerks.  James was

22   with us that one year.  He was a Marine.  I don't

23   think he used this or not.  Maybe he did.  I can't

24   remember.

25          And so I wrote for them until we got a

 1    consensus, and I thought that was a good way of doing

 2    it because, I mean, I wanted to get my hands around

 3    writing the decision myself.  I didn't want to give it

 4    to some -- law clerks don't know enough yet to do this

 5    type of thing unless they really have a lot of

 6    background, and we don't hire law clerks that have

 7    been patent people like they do upstairs.

 8         So I felt really comfortable that I had done

 9    a good job by the time we were finished with it, and I

10    will probably do that again this time.  I'm not using

11    like inside technical advisors.  They're not telling

12    me this versus that, but it helps me.  You know, I did

13    do well in physics, but I don't have a scientific

14    background so I wanted to have a little adult

15    supervision over me.

16         They knew that that was their job; that they

17    were not there to please me or to do anything in one

18    direction.  You know, we had two or three that took a

19    while for me to understand their problem with what I

20    was doing, and I thought that was a good way of

21    approaching it.  I'll do that this time.  You'll meet

22    them when I find them.  They'll be here, and you'll

23    get to look at them.

24         But I do work collectively, and the reason

25    Don is here -- they'll both be gone, but the way we

1    work in chambers is everybody works on every opinion.

2    It may get assigned to me.  I may get the first draft,

3    or maybe the first draft may be one of them, and then

4    we work collectively until we get a consensus on the

5    document.

6            I think it's a really good experience for

7    them and it's a good experience for me because we look

8    at different things.  So that's how we go about doing

9    our work.  For something like this, I'm not going to

10   delegate this to the law clerk.  I mean, the first

11   drafts are going to be my drafts.  I'll be the one

12   with the shovel and the pick and making mistakes

13   probably, but that's my prerogative.

14           Okay.  So you guys are going to talk about a

15   trial date.  Anything else you wanted me to do today?

16           MR. CHERNY:  It would actually be more

17   helpful, because I don't have my schedule with me.  I

18   think December is probably fine, but I would just be

19   happy to sit with Mr. Bolden and Mr. Cooper and just

20   sit down and see if we could just come up with

21   something that works in terms of --

22           Because again, I don't think it will take

23   four days, but if we both think it will be one day

24   that probably will be helpful to figure out where to

25   put it or arrange.  If that works for you, Mr. Cooper?

1           MR. COOPER:  It does.  I think we've focused

2      on December because the Court suggested that it has

3      some open space in your calendar.

4           There are other times even prior to that,

5      but I certainly respect the fact that Mr. Cherny has a

6      trial in September.  That may be off the table, but if

7      the Court has any other guidance --

8           THE COURT:  Where is your trial?

9           MR. CHERNY:  The Southern District of New

10     York.

11          THE COURT:  Who is your Judge?

12          MR. CHERNY:  Rakoff.

13          THE COURT:  Is it a patent case?

14          MR. CHERNY:  Yes, ma'am.

15          THE COURT:  You're lucky you're getting a

16     Judge.

17          MR. CHERNY:  I'm sorry?

18          THE COURT:  You're lucky to get a Judge.

19          MR. CHERNY:  I feel lucky.

20          THE COURT:  No, no.  You really area.  I

21     mean, where IBM is located -- which district is that?

22          MR. CHERNY:  Southern District of New York.

23          THE COURT:  It's in the Southern District

24     too?

25          MR. CHERNY:  Right.

1          THE COURT:  Somebody was telling me that

2    you're missing a Judge in that area or two District

3    Court Judges?

4          MR. CHERNY:  It's hard to say.  There's 60

5    Judges in the District or 60 --

6          THE COURT:  I was at Fordham for a dinner

7    that Breyer was honored at in the fall.  I sat next to

8    one of the Judges there, and he said the docket in is

9    it White Plains was a big mess --

10          MR. CHERNY:  Correct.

11          THE COURT:  -- because they have not had a

12    Judge up there for a really long time.

13          MR. CHERNY:  Yes.  I think Judge Brieant was

14    up in White Plains and then moved.

15          THE COURT:  Yes, and they've been trying to

16    get people to take some of the cases, but the civil

17    cases just are not being assigned.

18          MR. CHERNY:  Yes.

19          THE COURT:  So you're lucky.  I was on the

20    west coast last week and had lunch with Judge Breyer's

21    brother, Chuck.

22          MR. CHERNY:  Yes.

23          THE COURT:  There everything goes to the

24    Magistrates.

25          MR. CHERNY:  Yes.

Heritage Reporting Corporation
(202) 628-4888

1          THE COURT:  They're not trying anything.

2    Judge Lamberth gave a speech, and I don't think they

3    get very many patent cases over there, but the *Legal*

4    *Times* said they reported his speech as being that they

5    were not going to hear any civil cases until

6    September.  What he said, because I was there, was a

7    year from now was the earliest date for a civil trial.

8          One of the other things I said in New York

9    was, and this is my view only.  I do not speak for any

10   other Judge in this Court or certainly not for the

11   Court as a whole, but I would like to see Congress

12   amend this Patent Act and give us jurisdiction to hear

13   bench trials by consent because actually most of the

14   Judges on the Court have tried at least one or two

15   patent cases, and we watch what they do upstairs all

16   the time.  It's like reading tea leaves, but we really

17   attune to that.

18         We have several, like Judge Lettow was

19   actually a patent examiner and a couple people have

20   taught or had practical experience as well in private

21   practice before coming on the bench.  Because if

22   people are going to Magistrates, I think we

23   collectively could have a comparative advantage.

24         MR. CHERNY:  Your Honor, I know I've spent a

25   lot of time in the District of Delaware.  They're one

1    Judge down over there.  Chief Judge Sleet has been

2    sending out cases to Judges in the Eastern District of

3    Pennsylvania and District of New Jersey.

4            THE COURT:  Any places, yes.

5            MR. CHERNY:  And I'm sure that with Judges

6    of the Court of Claims --

7            THE COURT:  We have legislation to do that.

8            MR. CHERNY:  I mean, I think that they could

9    appoint you almost as Special Masters by designation.

10           THE COURT:  I don't know about that.  I

11   mean, I don't know what the constitutional -- if

12   there's an issue with that because we're Article I

13   Judges, and I think they have a special thing.

14           To send it to other District Court Judges is

15   a different can of worms, but I just think it would be

16   an interesting pilot project.  If no one comes,

17   there's nothing we can do about it.

18           MR. CHERNY:  Yes.

19           THE COURT:  But I suspect if people look at

20   some of the jurisprudence from the Court in the patent

21   area we do pretty well upstairs in terms of how we're

22   treated in those cases, so maybe they will get some

23   business.

24           All right.  I'll leave you all to talk.

25           MR. CHERNY:  That would be great, Your

51

1   Honor.

2           THE COURT:  And you know Deanna's phone

3   number, right?  She's been in touch with you.  Don is

4   there.  You know, I'm always there.

5           MR. CHERNY:  Thank you, Your Honor.

6           THE COURT:  Good.  Let's get to work.  I'm

7   real interested.  I went to the post office today.

8           MR. COOPER:  Well, then you see that the --

9           THE COURT:  You'll be seeing me taking one

10  out with a screwdriver.

11          MR. CHERNY:  Thank you, Your Honor.

12          MR. COOPER:  Thank you very much.

13          THE COURT:  You're welcome.  All right.  Sit

14  down and go to work.

15          (Whereupon, at 2:55 p.m., the hearing in the

16  above-entitled matter was concluded.)

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

52

<u>REPORTER'S CERTIFICATE</u>

DOCKET NO.:        08-537C

CASE TITLE:        USHIP Intellectual Properties v. U.S.

HEARING DATE:      April 2, 2009

LOCATION:          Washington, D.C.


        I hereby certify that the proceedings and

evidence are contained fully and accurately on the

tapes and notes reported by me at the hearing in the

above case before the United States Court of Federal

Claims.


                        Date:  April 2, 2009


                        _____

                        Mona McClellan
                        Official Reporter
                        Heritage Reporting Corporation
                        Suite 600
                        1220 L Street, N.W.
                        Washington, D.C.  20005-4018