## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| USHIP INTELLECTUAL PROPERTIES, LLC, | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) | **Case No.: 08-537 C** |
| THE UNITED STATES, | ) |  |
|  | ) | **Judge Susan G. Braden** |
| Defendant, | ) |  |
|  | ) |  |
| And | ) |  |
|  | ) |  |
| INTERNATIONAL BUSINESS MACHINES CORP., | ) |  |
|  | ) |  |
| Third-Party Defendant. | ) |  |
|  | ) |  |

### PLAINTIFF'S OPENING BRIEF ON CLAIM CONSTRUCTION

Charles J. Cooper
Vincent J. Colatriano
Derek L. Shaffer
David Lehn
Jesse M. Panuccio
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Telephone:  (202) 220-9600
Facsimile:   (202) 220-9601
Email:  ccooper@cooperkirk.com

November 18, 2009                    Counsel for Uship Intellectual Properties, LLC

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................x

INTRODUCTION AND BACKGROUND ..............................................................................1

ANALYSIS.........................................................................................................................3

**I.   GENERAL CLAIM CONSTRUCTION PRINCIPLES** ................................................3

**II.  U.S. PATENT NO. 4,900,905 ('905 PATENT) – CLAIM 12** ..........................................9

Preamble:     *A method of processing and collecting mail with, and otherwise operating a self-contained computerized apparatus comprising the steps of:* ..........................................................................9

Limitation 1: *displaying information associated with the use of the apparatus such as the instructions for the use of said apparatus;* ..................................12

Limitation 2: *receiving an item to be mailed;*.........................................................13

Limitation 3: *weighing the item to be mailed;* .......................................................17

Limitation 4: *admitting data relating to the item to be mailed such as the address to which the item is to be mailed;*..................................................18

Limitation 5: *determining the required postage for the item to be mailed;*....................21

Limitation 6: *accepting and verifying payment for such postage;* ................................22

Limitation 7: *providing machine readable information concerning the item to be mailed on the item to be mailed, such as the zip code to which said item is to be mailed;* ..........................................................................22

Limitation 8: *storing the item to be mailed for subsequent pick up.*................................24

**III. U.S. PATENT NO. 5,481,464 ('464 PATENT)** .............................................................25

**A.   Claim 7** ................................................................................................26

Preamble:     *An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services:  said automated unit comprising:* ................................................26

Limitation 1: *means for weighing the item to be shipped;*.............................................33

i

Limitation 2:   *means for inputting information relating to the destination to which the item is to be shipped;* ........................................................33

Limitation 3A:*control means for analyzing the inputted information and calculating the fee for shipment of the item;*..............................................36

Limitation 3B:*said control means further including means for receiving credit card information and*......................................................................39

Limitation 3C:*said control means further including . . . means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines;* ..............................................................39

Limitation 4:   *means for securely storing said item until the item is collected by said commercial delivery service;* ...................................................44

Limitation 5:   *means for storing the inputted information once said item is disposed in said secured storage means, said information storage means including means for displaying a manifest;* ...............................................46

**B.      Claim 9** ....................................................................................49

Limitation:    *The integrated, automated, unattended unit of claim 7 wherein said means for storing said information further includes means for communicating said information to a remote location staffed by a human operator.*...........................................................................50

**C.      Claim 10** ..................................................................................51

Limitation:    *The integrated, automated, unattended unit of claim 9 wherein said unit includes a pivotable door that serves as a slide when said door is opened, said slide serving to transport the item to a storage area for secure storage.* ................................................................................51

**D.      Claim 11** ..................................................................................54

Limitation:    *The integrated, automated, unattended unit of claim 10 wherein said door serves to secure said storage area when said door is opened.*..........54

**E.      Claim 12** ..................................................................................55

Limitation:    *The integrated, automated, unattended unit of claim 7 wherein said means for receiving said credit card information comprises a magnetic card reader.*..................................................................................55

**F.      Claim 15** ..................................................................................55

Limitation:       *The integrated, automated, unattended unit of claim 12 wherein said card reader is adapted to read credit cards issued by any of a plurality of credit card companies and wherein said fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction.*..........................................55

**G.      Claim 16** ...................................................................................................58

Limitation:       *The integrated, automated, unattended unit of claim 15 wherein said fee communicating means includes means for validating said credit card prior to issuing the shipping label.* ....................................................58

**H.      Claim 17** ...................................................................................................61

Limitation:       *The integrated, automated, unattended unit of claim 16 wherein said validating means further includes means for determining the type of card and the expiration date of the card.*....................................................61

**I.       Claim 18** ...................................................................................................62

Limitation:       *The integrated, automated, unattended unit of claim 17 wherein said validating means further includes means for determining whether the card is listed as a bad card.* ....................................................................62

**J.       Claim 19** ...................................................................................................63

Preamble:         *An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services:  said automated unit comprising;* ...............................................64

Limitation 1:     *means for weighing the item to be shipped;*...............................................65

Limitation 2:     *means for inputting information relating to the destination to which the item is to be shipped;* ...............................................................................65

Limitation 3:     *control means for analyzing the inputted information and calculating the fee for shipment of the item; said control means further including means for communicating and assessing the shipment fee to the account of the person, said means for communicating the shipment fee being by telephone lines;* ........................................................................................66

Limitation 4:     *means for securely storing said item until the item is collected by said commercial delivery service;* ....................................................................67

Limitation 5:     *means for storing the inputted information once said item is disposed in said secured storage means, said information storage means including means for transmitting a manifest to a remote location;* ..........................67

**K.      Claim 20** ........................................................................................................69

Limitation:      *The integrated, automated, unattended unit of claim 19 wherein said
fee communicating means includes means for validating said account
prior to issuing the shipping label.* ..........................................................69

**L.      Claim 21** ........................................................................................................69

Limitation:      *The integrated, automated, unattended unit of claim 19 including means
for printing a hard copy of said account charge for said person.* .............69

**M.      Claim 28** ........................................................................................................71

Preamble:      *An integrated, automated, unattended unit for collecting and securely
holding items for collection and shipment by commercial delivery
services:  said automated unit comprising:* ...............................................71

Limitation 1:      *means for weighing the item to be shipped;* ...............................................72

Limitation 2:      *means for inputting information relating to the destination to which
the item is to be shipped;* .........................................................................73

Limitation 3:      *control means for analyzing the inputted information and calculating
the fee for shipment of the item; said control means further including
means for communicating and assessing the shipment fee to the account
of the person, said means for assessing comprising means for printing a
hard copy of said account charge for said person;* ...................................73

Limitation 4:      *means for securely storing said item until the item is collected by said
commercial delivery service;* ...................................................................75

Limitation 5:      *means for storing the inputted information once said item is disposed in
said secured storage means, said information storage means including
means for displaying a manifest.* ..............................................................75

**N.      Claim 29** ........................................................................................................75

Limitation:      *The integrated, automated, unattended unit of claim 28 wherein said fee
communicating means includes means for validating said account prior
to issuing the shipping label.* ...................................................................76

**O.      Claim 30** ........................................................................................................76

Limitation:      *The integrated, automated, unattended unit of claim 28 including means
for communicating said account charge to a remote location.* .................76

**P.      Claim 34** ........................................................................................................77

Preamble:       *An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services:  said automated unit comprising:* ...............................................77

Limitation 1:   *means for inputting information relating to the destination to which the item is to be shipped;* ........................................................................78

Limitation 2:   *control means for analyzing the inputted information and calculating the fee for shipment of the item; said control means further including means for communicating and assessing the shipment fee to the account of the person, said means for communicating the shipment fee being by telephone lines;* ...................................................................................79

Limitation 3:   *means for securely storing said item until the item is collected by said commercial delivery service;* ...................................................................80

Limitation 4:   *means for storing the inputted information once said item is disposed in said secured storage means, said information storage means including means for transmitting information that may be used to prepare a manifest to a remote location.* ...................................................80

**IV.   U.S. PATENT NO. 5,831,220 ('220 PATENT)** .............................................81

   **A.     Claim 1** ...............................................................................................81

Preamble:       *A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of:* ............................................................81

Limitation 1:   *receiving payment information from a customer;* ....................................88

Limitation 2:   *receiving package type information identifying a parcel or envelope to be mailed;* ................................................................................................88

Limitation 3:   *weighing said parcel or envelope to be mailed;* ......................................90

Limitation 4:   *receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed;* ............................91

Limitation 5:   *computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer;* ......................................................................93

Limitation 6:   *receiving an indication of the delivery service option desired by the customer;* ...........................................................................................96

Limitation 7:   *printing a shipping label including at least said destination printed thereon;* ..........................................................................................96

Limitation 8:   *printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer;* ............................................................97

Limitation 9:   *validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed; and* ......................................98

Limitation 10: *an attendant of said customer storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.* ...........................................101

**B.**   **Claim 3** ........................................................................................101

Preamble:   *An automated shipping machine for use in mailing parcels and envelopes, comprising:* .........................................................101

Limitation 1:   *means for receiving payment information from a customer;* ..................102

Limitation 2:   *a scale for weighing a parcel or envelope to be mailed;* .......................103

Limitation 3:   *processing means for receiving package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, for computing from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer, and for receiving an indication of the delivery service option desired by the customer;* ...............................................................................103

Limitation 4:   *means responsive to said processing means for printing a shipping label including at least said destination printed thereon and for printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; and* ......................................................107

Limitation 5:   *means for validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said printing means, whereby a validated parcel or envelope is taken by an attendant for storage in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.* .....................109

**V.**   **U.S. PATENT NO. 6,105,014 ('014 PATENT)** ............................................111

**A.**   **Claim 1** ........................................................................................111

Preamble:   *A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of:* ...........................................111

Limitation 1:    *receiving payment information from a customer;* ...................................114

Limitation 2:    *receiving package type information identifying a parcel or envelope to be mailed;* ......................................................................................114

Limitation 3:    *weighing said parcel or envelope to be mailed;* .....................................115

Limitation 4:    *receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed;* ..............................116

Limitation 5:    *computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer;* .........................................................117

Limitation 6:    *receiving an indication of the delivery service option desired by the customer;* .................................................................................................118

Limitation 7:    *printing a tracking bar code label including at least said destination;* ...118

Limitation 8:    *printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer;* ............................................................119

Limitation 9:    *validating receipt of said parcel or envelope as the parcel or envelope for which said tracking bar code label was printed; and* .......................120

Limitation 10:  *storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.* ......................................................................................121

**B.      Claim 2** ...................................................................................................122

Preamble:       *An automated shipping machine for use in mailing parcels and envelopes, comprising:* ......................................................................123

Limitation 1:    *means for receiving payment information from a customer;* ..................124

Limitation 2:    *a scale for weighing a parcel or envelope to be mailed;* .......................124

Limitation 3:    *a processor which receives package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, computes from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer, and*

*receives an indication of the delivery service option desired by the customer;* .................................................................................124

Limitation 4: *a printer responsive to said processor so as to print a tracking bar code label identifying at least said destination and to print a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; and* ..........................................................128

Limitation 5: *means for validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said printer, whereby a validated parcel or envelope is taken by an attendant for storage in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.* ......................129

**VI.  U.S. PATENT NO. 6,917,924 ('924 PATENT)** ...........................................130

**A.  Claim 1** ...........................................................................131

Preamble: *A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of:* ...........................................131

Limitation 1: *receiving payment information from a customer;* ....................................133

Limitation 2: *receiving package type information including the dimensions of a parcel or envelope to be mailed;* ......................................................133

Limitation 3: *weighing said parcel or envelope to be mailed;* ....................................136

Limitation 4: *receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed;* ..............................137

Limitation 5: *computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer;* ........................................................138

Limitation 6: *receiving an indication of the delivery service option desired by the customer;* ..................................................................139

Limitation 7: *printing a tracking bar code label identifying at least said destination;* .139

Limitation 8: *printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer;* ..........................................................140

Limitation 9: *validating receipt of said parcel or envelope as the parcel or envelope for which said tracking bar code label was printed; and* ......................141

Limitation 10: *storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up for delivery.*..............141

**B.    Claim 2** ...............................................................................................143

Preamble:     *An automated shipping machine for use in mailing parcels and envelopes, comprising:* ........................................................143

Limitation 1:   *means for receiving payment information from a customer;* ..................144

Limitation 2:   *a scale for weighing a parcel or envelope to be mailed;* ........................144

Limitation 3:   *a processor which receives package type information including the dimensions of said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, computes from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer, and receives an indication of the delivery service option desired by the customer;* ..................................................................................144

Limitation 4:   *a printer responsive to said processor so as to print a tracking bar code label identifying at least said destination and to print a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; and* .....................................................................................148

Limitation 5:   *means for validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said printer, whereby a validated parcel or envelope is stored in a secure storage area until said parcel or envelope is subsequently picked up for delivery.* ...........................................................................149

TESTIMONY AT CLAIM CONSTRUCTION HEARING .....................................151

CONCLUSION...................................................................................................151

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page**

*Abbott Laboratories v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009)..................................6, 8, 16

*Altiris Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003) ................................9, 18

*Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364 (Fed. Cir. 2001)........................................44, 46

*Decisioning.com v. Federated Department Stores, Inc.*, 527 F.3d 1300 (Fed. Cir. 2008) .............7

*In re Donaldson Co.*, 16 F.3d 1189 (Fed. Cir. 1994).....................................................................39

*DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342 (Fed. Cir. 2008) ...........................................6, 15

*Eolas Techs, Inc. v. Microsoft Corp.*, 399 F.3d 1325 (Fed. Cir. 2005) .........................................7

*Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335 (Fed. Cir. 2009)...................................................8, 16

*Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004).....................35, 44, 46, 48

*Helifix Ltd. v. Blok-Lok, Ltd.,* 208 F.3d 1339 (Fed. Cir. 2000).....................................................15

*Honeywell International, Inc. v. United States*, 66 Fed. Cl. 400 (2005)......................................3, 4

*Kara Technology Inc. v. Stamps.com, Inc.*, No. 2009-1027,
    2009 U.S. App. LEXIS 21120 (Fed. Cir. 2009) .......................................................................7

*Liebel-Flarsheim Co. v. Mallinckrodt Inc.*, 358 F.3d 898 (Fed. Cir. 2004) ..................................7

*Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir. 2004)...............42, 43

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ......................................................3

*Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363 (Fed. Cir. 2009)..............................7

*Michaels of Oregon Co. v. Clean Gun,* LLC, 2002 U.S. Dist. LEXIS 20371 (D. Or. 2002) ........15

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ......................................8, 16

*Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005)............................................ *passim*

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298 (Fed. Cir. 1999) ...............................9

*Rowe v. Dror*, 112 F.3d 473 (Fed. Cir. 1997).................................................................................9

*S3 Inc. v. nVidia Corp.*, 259 F.3d 1364 (Fed. Cir. 2001).............................................................39

x

*SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys. Inc.*, 242 F.3d 1337 (Fed. Cir. 2001).6, 43

*Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375 (Fed. Cir. 2005)....................................................8

*Symantec Corp. v. Computer Associates Int'l, Inc.*, 522 F.3d 1279 (Fed. Cir. 2008)

*TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256 (Fed. Cir. 2008)................................................9, 42

*Uniloc USA, Inc. v. Microsoft Corp.*, 290 Fed. Appx. 337 (Fed. Cir. 2008).................................7

*University of Pittsburgh v. Hedrick*, 573 F.3d 1290 (Fed. Cir. 2009) ...................................3, 8, 16

*Voda v. Cordis Corp.*, 536 F.3d 1311 (Fed. Cir. 2008) ........................................................6, 8, 16

*Wavetronix v. EIS Electronic Integrated Systems*, 573 F.3d 1343 (Fed. Cir. 2009)........................4

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322 (Fed. Cir. 2006) .......5, 24

## **Other**

35 U.S.C. § 112 ¶ 6 ....................................................................................................... 35

28 U.S.C. § 1498(a) ....................................................................................................1, 2

*Chisum on Patents* § 18.03(2)(b)(iii)(A) ...............................................................5, 24

*American Heritage College Dictionary* (1985) ...............................................10, 11, 14

*Random House Unabridged Dictionary* (2d ed. 1993).......................................... *passim*

*Random House Webster's College Dictionary* (1997)........................................... *passim*

USPS, "A Consumer's Guide to Postal Services and Products" (1986)........................................94

USPS, "Domestic Postal Rates and Fees (Simplified)" (2001) ....................................................94

## INDEX OF EXHIBITS

Exhibit A          Uship Patent 4,900,905

Exhibit B          Uship Patent 5,481,464

Exhibit C          Uship Patent 5,831,220

Exhibit D          Uship Patent 6,105,014

Exhibit E          Uship Patent 6,917,924

Exhibit F          Uship Patent 5,656,799

Exhibit G          PTO Final Rejection, 10/17/07, Application 10/363,737

Exhibit H          5/2/2008 Notice of Abandonment

Exhibit I          Random House Webster's College Dictionary (1997)

Exhibit J          The American Heritage Dictionary (1985)

Exhibit K          Random House Unabridged Dictionary (1993)

Exhibit L          Uship Patent 4,900,905 Prosecution History

Exhibit M          Uship Patent 5,340,948 Notice re "Restriction Requirement"

Exhibit N          Uship Patent 5,656,799 Prosecution History

Exhibit O          United States Postal Service, A Consumer's Guide to Postal Services
                   and Products

Exhibit P          United States Postal Service, Domestic Postal Rates and Fees (Simplified)

Pursuant to the Court's August 4, 2009 and November 16, 2009 scheduling orders, Plaintiff, Uship Intellectual Properties, LLC ("Plaintiff" or "Uship"), hereby respectfully submits its opening brief addressing the proper construction of the patent claims identified in its April 30, 2009 identification of asserted claims.

## INTRODUCTION AND BACKGROUND

This matter is an action, under 28 U.S.C. § 1498(a), by which Uship seeks "the recovery of [its] reasonable and entire compensation" for the Government's unauthorized use or manufacture of inventions covered by patents held by Uship.  In essence, section 1498(a) provides a remedy for conduct by the Government that, if undertaken by a private party, would amount to patent infringement under the patent laws of the United States.  Uship contends that the Government, acting through the United States Postal Service ("USPS"), has engaged in conduct that infringes multiple patents held by Uship relating to the self-service mailing/shipping industry.

Uship currently holds a portfolio of patents, issued between 1990 and 2005, for various methods and devices related to the shipping of items through the use of automated mailing/shipping kiosks.  Uship was assigned certain of these patents by, and is in that sense the successor-in-interest to, predecessor companies that were among the pioneers of the automated mailing/shipping kiosk industry.  During the 1990s, in large part on the basis of the patents at issue in this case, Uship's predecessors deployed, in hundreds of locations across the United States, some of the very first self-service shipping kiosks.

Over the last several years, the USPS has deployed, in thousands of post offices and other locations around the country, its own line of automated mailing/shipping kiosks (many of which were designed and manufactured pursuant to the USPS's contracts with International Business

1

Machines Corporation ("IBM").[1]  It is Uship's contention that the manufacture, deployment, and use of the USPS automated mailing/shipping kiosks result in the infringement of multiple claims of Uship's patents, and that Uship is therefore entitled, under 28 U.S.C. § 1498(a), to recover its reasonable and entire compensation for the unauthorized use and manufacture of the inventions disclosed in Uship's patents.  Moreover, although knowledge and intent are by no means required elements of a claim under section 1498(a), it is Uship's contention that the USPS has known of Uship's patent portfolio for years even while it continued infringing.  In this regard, it is noteworthy that the United States Patent and Trademark Office ("PTO") rejected a USPS patent application that was directed toward an automated mailing/shipping kiosk, and the PTO did so primarily on the basis of U.S. Patent 6,105,014, one of the patents that Uship is asserting in this action.[2]

In April of this year, Uship identified to the Government and to IBM 23 claims, from five separate patents, that Uship contends have been infringed by the Government.  As discussed below, four of those five patents are related, in that they are a part of a family of patents and derive from a common "grandparent" patent.  The fifth patent, which is also the oldest patent at issue in this action, is a stand-alone patent.[3]  The purpose of this submission is to assist the Court in construing the meaning and scope of these 23 Uship patent claims that Uship is currently asserting against the Government.

---

[1] Because the Government has suggested that, under the contracts between the USPS and IBM, IBM may be required to indemnify the Government for any liability it incurs for the infringement of Uship's patents, IBM has intervened in this matter as a third-party defendant.

[2] *See* PTO Final Rejection, dated October 17, 2007, for U.S. Patent Application 10/363,737 (attached as Exhibit G).  The USPS subsequently allowed its rejected patent application to be deemed abandoned.  *See* PTO Notice of Abandonment, dated May 2, 2008 (attached as Exhibit H).

[3] The five Uship patents at issue are attached as Exhibits A-E.

2

As reflected in the November 2, 2009 Joint Claim Construction Statement filed by the parties, Uship, the Government, and IBM have been able to reach agreement on the proper construction of many terms and limitations appearing in these 23 claims.  As that Statement also reflects, however, numerous other claim terms and limitations remain disputed.  Uship respectfully submits that its proposed constructions of these disputed terms comport, far more closely than do the Government's and IBM's proposed interpretations, with both the ordinary and customary meaning these terms would have to a person of ordinary skill in the art, and with the relevant patent specifications and other so-called "intrinsic" evidence.

<u>**ANALYSIS**</u>

## I.    <u>GENERAL CLAIM CONSTRUCTION PRINCIPLES</u>

As this Court has recognized, it is "settled that the meaning and scope of a patent's claims are issues of law to be determined by a federal trial judge."  *Honeywell Int'l, Inc. v. United States*, 66 Fed. Cl. 400, 421 (2005); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996); *University of Pittsburgh v. Hedrick*, 573 F.3d 1290, 1296 (Fed. Cir. 2009).   In a number of decisions, and most prominently in its *en banc* decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit has summarized and discussed many of the general principles that are to govern a court's analysis and determination of the meaning of a patent claim.

As an initial matter, "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips*, 415 F.3d at 1312 (quotation marks omitted).  Moreover, in determining the metes and bounds of the invention as defined by the claim, the words of the claim "are generally given their ordinary and customary meaning."  *Id.*  Such ordinary and customary meaning is "the meaning that the [claim]

term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Id.* at 1313. For purposes of this inquiry, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*; *see also id.* at 1321 ("Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent.").

The Federal Circuit in *Phillips* also made clear that "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In such cases, "general purpose dictionaries may be helpful" in confirming the ordinary meaning of claim terms. *Id.*[4] Sometimes, however, the meaning of a claim term as understood by persons of skill in the art is not "immediately apparent." *Id.* In such cases, and "because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* (quotation marks omitted). Such "sources" fall into two general categories: "intrinsic" and "extrinsic" evidence."

Sources of intrinsic evidence include the claims, the remainder of the specification, and the patent's prosecution history. *Honeywell*, 66 Fed. Cl. at 422. Observing that the "claims themselves provide substantial guidance as to the meaning of particular claim terms," the Federal

---

[4] *See also id.* at 1322 ("Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation."); *id.* at 1322-23 (judges "may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.") (quotation marks omitted); *Wavetronix v. EIS Electronic Integrated Systems*, 573 F.3d 1343, 1355 (Fed. Cir. 2009) (same).

Circuit noted in *Phillips* that the "context in which a term is used in the asserted claim," including its juxtaposition with other terms in the same claim, "can be highly instructive."  415 F.3d at 1314.  In addition, other asserted and unasserted claims "can also be valuable sources of enlightenment as to the meaning of a claim term," both because "the usage of a term in one claim can often illuminate the meaning of the same term in other claims," and because  "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms."  *Id.* at 1314[5]; *see also Chisum on Patents* § 18.03(2)(b)(iii)(A) ("Courts presume that different words and phrases within a claim and among claims in the same patent have a different meaning."); *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1328 (Fed. Cir. 2006) ("Under this court's case law, the same terms appearing in different claims in the same patent . . . should have the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims.") (citations and quotation marks omitted).

Because patent claims "do not stand alone," they must be read "in view of the specification, of which they are a part."  *Id.* at 1315 (quotation marks omitted).  Indeed, not only is the specification "always highly relevant to the claim construction analysis," it is typically "the single best guide to the meaning of a disputed term."  *Id.* (quotation marks omitted).  Claim terms should therefore "be construed so as to be consistent with the specification."  *Id.* at 1316 (quotation marks omitted).  Examples of the application of this general principle include instances where "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," and instances in which the specifica-

---

[5] As an example of the latter point, the *Phillips* court cited the principle that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  415 F.3d 1314-15.

5

tion "may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* at 1316. In either instance, the inventor's lexicography, as revealed and manifested in the specification, governs. *Id.* With respect to purported disclaimers or disavowals of claim scope, however, the disclaimer must be clear and unambiguous before it will be allowed to restrict or narrow claim coverage. *See, e.g., Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008).

In utilizing the specification as a claim construction tool, moreover, a court must be careful to distinguish between, on the one hand, using the specification to help interpret a claim and, on the other hand, importing limitations from the specification into the claim. The former practice is not only proper, it is, as discussed above, considered one of the most important aspects of claim construction. The latter practice, on the other hand, is improper. *See, e.g., Phillips*, 415 F.3d at 1323. Indeed, reading a limitation from the specification into the claims is considered "one of the cardinal sins of patent law." *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys. Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). Thus, the Court of Appeals has "consistently adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification will not be read into claims, and that interpreting what is *meant* by a word *in* a claim is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1347 (Fed. Cir. 2008) (quotation marks omitted) (emphases in original); *see also Voda*, 536 F.3d at 1320; *Abbott Laboratories v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009).

An especially disfavored example of the improper importation of limitations into claims is the attempt to artificially confine claims to the specification's discussion of preferred or other types of "embodiments" of the invention. As the Federal Circuit emphasized in *Phillips* and nu-

6

merous other decisions, "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323); *see also Decisioning.com, Inc.  v. Federated Department Stores, Inc.*, 527 F.3d 1300, 1309 (Fed. Cir. 2008) (invention in that case not limited to preferred embodiment discussed in specification); *Uniloc USA, Inc. v. Microsoft Corp.*, 290 Fed. Appx. 337, 343 (Fed. Cir. 2008) (same); *Martek Biosciences Corp.v. Nutrinova, Inc.*, 579 F.3d 1363, 1380-81 (Fed. Cir. 2009) (same).  "The claims, not specification embodiments, define the scope of patent protection.  The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims."  *Kara Technology Inc. v. Stamps.com, Inc.*, No. 2009-1027, 1028, 2009 U.S. App. LEXIS 21120 at *13 (Fed. Cir. 2009); *see also Eolas Techs, Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1336 (Fed. Cir. 2005) ("absent a clear disclaimer in the specification, the embodiments in the specification do not limit broader claim language").  *See generally Liebel-Flarsheim Co. v. Mallinckrodt Inc.*, 358 F.3d 898, 906-09 (Fed. Cir. 2004).

The final traditional source of intrinsic claim construction evidence is the patent's prosecution history – *i.e.*, the record of the proceedings before the PTO leading up to the issuance of the patent.  As the Federal Circuit has noted, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Phillips*, 415 F.3d at 1317.  Once again, however, courts must exercise caution in assessing just how much weight to accord to statements found in a patent's prosecution history: "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks

the clarity of the specification and thus is less useful for claim construction purposes." *Id.*  In

part for this reason, the prosecution history can be utilized to restrict or narrow the scope of a

claim term only when the prosecution history reflects an unambiguous and unmistakable intent

on the part of the patentee to so restrict or narrow the scope of the term.[6]

A court conducting a claim construction analysis may also consider relevant extrinsic

evidence, "which consists of all evidence external to the patent and prosecution history, includ-

ing expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317

(quotation marks omitted).  Both the Court of Appeals and this Court have stressed, however,

that, for several reasons, such extrinsic evidence is considerably less reliable than intrinsic evi-

dence.  *See Phillips*, 415 F.3d at 1318-19 (discussing limitations of extrinsic evidence); *Honey-

well*, 66 Fed. Cl. at 422 ("intrinsic evidence is the most significant source of the legally operative

meaning of disputed claim language") (quotation marks omitted).  Thus, "while extrinsic evi-

dence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in

determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (quo-

tation marks omitted).  And extrinsic evidence cannot properly be used to support a claim con-

struction that conflicts with the construction mandated by the intrinsic evidence.  In short, "ex-

trinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation

---

[6] *See, e.g., Voda*, 536 F.3d at 1321 ("This court has emphasized, however, that in order to disavow claim scope during prosecution, 'a patent applicant must clearly and unambiguously express surrender of subject matter.'") (quoting *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005)); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003) ("[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable."); *Abbott Laboratories*, 566 F.3d at 1289 ("[O]wing in part to the inherent ambiguities of prosecution history, the doctrine of prosecution disclaimer only applies to unambiguous disavowals."); *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1343 (Fed. Cir. 2009) (holding that patentee's statements during prosecution were "not clear and unmistakable enough to invoke the doctrine of prosecution history disclaimer"); *University of Pittsburgh*, 573 F.3d at 1296-97.

of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

## II.     U.S. PATENT NO. 4,900,905 ('905 PATENT) – CLAIM 12

The application for the '905 patent was filed on August 1, 1988, and the patent itself issued on February 13, 1990.  The '905 patent contains 15 claims: two independent device claims, one of which has nine dependent claims; and one independent method claim that has three dependent claims.  Uship is currently asserting, and seeking the construction of, Claim 12, the independent method claim.

> **Preamble:**  *A method of processing and collecting mail with, and otherwise operating a self-contained computerized apparatus comprising the steps of:*

There is no need for the Court to separately construe the terms used in the preamble to Claim 12.  Because the body of the claim fully and intrinsically identifies all of the limitations of the claimed invention, and because the preamble merely encapsulates the main limitations found in the body of the claim and gives context to those claims by describing the invention's purpose and principal use, the preamble should not be considered a limitation and is of little if any significance to the claim construction inquiry.  *See, e.g., Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1305 (Fed. Cir. 1999).[7]

---

[7] *See also Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997) ("where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation"); *Symantec Corp. v. Computer Associates Int'l, Inc.*, 522 F.3d 1279, 1288-89 (Fed. Cir. 2008) ("[I]n general, the purpose of a claim preamble is to give context for what is being described in the body of the claim; if it is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a rejection), we do not construe it to be a separate limitation."); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371-72 (Fed. Cir. 2003).

Although, as just explained, there is no need for the Court to separately construe the Claim 12 preamble, we have, in an abundance of caution, proposed constructions for certain of the key terms found within the preamble.  The parties have agreed that the terms "processing," "collecting," and "mail" should be interpreted in accordance with their plain meaning.  Uship has proposed the following constructions for the remaining key terms from the preamble.

> **Uship's Proposed Construction:**
>
> **"*operating*":**  manually using
>
> **"*self-contained computerized apparatus*":**  a group or combination of instruments, machinery, tools, or materials having a particular function or functions, which group or combination is complete in itself, and with at least some of those functions, or portions of those functions, being controlled, directed, or processed by means of a computer or similar device

Neither the Government nor IBM has proposed its own interpretation of the term "operating."  Neither has either party specifically objected to Uship's proposed construction of that term, which is fully consistent with the ordinary understanding of that term[8] and with the intrinsic evidence.  *See, e.g.,* abstract (noting that machine's functions are "being operated directly by a customer" and that input means are "operated by the customer"); specification 1:57-65 (describing how customer can utilize the machine, including by "manually enter[ing]" data on keyboard); 3:39-40 (referring to device which "can be simply operated by a customer").

Turning to the term "self-contained computerized apparatus," Uship's construction is

---

[8] *See, e.g., Random House Webster's College Dictionary* (1997) at 915 (listing following definitions of "operate":  "3. to perform some process of work or treatment" and "to manage or use (a machine, device, etc.)"); *American Heritage College Dictionary* (1985) at 871 (defining "operate" as "4.1 [t]o run or control the functioning of:  *operate a machine*") (emphasis in original).

once again based on the ordinary and common understanding of the term's constituent words: "self-contained"[9]; "computerize"[10]; and "apparatus."[11]  It is also fully consistent with the abstract and specification, which refer repeatedly to the use of an "automated" machine or device, and which reference the use of a central processing unit in connection with the operation of the apparatus.  *See, e.g.,* abstract; specification 1:22-23; 5:34-44.

The Government's proposed construction of this term – "a device or a group of devices having a particular function or functions, which group is complete in itself, and which functions are controlled or carried out by means of a computer" – is in some respects similar to Uship's, but it suffers from at least two deficiencies that render it inferior to Uship's construction.  First, the Government's reference to "a device or group of devices" is (depending upon how the Government would define the word "device") potentially artificially restrictive.  To that extent, the general definition of "apparatus" – *i.e.,* a group or combination of instruments, machinery, tools, or materials – is more descriptive and should therefore be adopted.

Second, and more importantly, the Government's proposed construction can be read to suggest that *all* of the apparatus' functions need to be controlled or carried out by a computer.

---

[9] *See, e.g., Random House Webster's College Dictionary* (1997) at 1173 ("1. containing in oneself or itself all that is necessary; independent"); *American Heritage College Dictionary* (1985) at 1112 ("1. [p]ossessing within oneself or itself all that is necessary; self-sufficient").

[10] *See, e.g., Random House Webster's College Dictionary* (1997) at 271 ("1. to control, process, or store by means of a computer. 2b. to equip with or automate by computers"); *American Heritage College Dictionary* (1985) at 304 ("1. To process or store (information) with or in an electronic computer or system of computers.  2. To furnish with a computer or computer system").

[11] *See, e.g., Random House Webster's College Dictionary* (1997) at 64 ("1. a group or combination of instruments, machinery, tools, or materials having a particular function"); *American Heritage College Dictionary* (1985) at 120 ("1.  The totality of means by which a designated function is performed or a specific task executed. 2. a. A Machine. b. A group of machines used together or in succession to accomplish a task.").

There is no support for such an understanding of the term.  To begin with, any such understanding would be inconsistent with the definition of "computerize," which does not under any fair reading require that a computer must control *every* facet of the operation of an apparatus.  Moreover, any such understanding simply cannot be reconciled with several of the steps required under Claim 12 that cannot be fully controlled or carried out by a computer.  *See, e.g.,* Limitation 8 (storing the item to be mailed) (discussed *infra* p.at 24-25); Limitation 3 (weighing the item to be mailed) (discussed *infra* p.at 17-18); Limitation 2 (receiving the item to be mailed) (discussed *infra* p.at 13-17).  In short, the Government's construction is at odds with the rest of the claim, which is reason enough for it to be rejected.[12]

IBM has construed the preamble to refer to "a series of steps for processing and collecting mail with, and otherwise operating a one-stop, fully integrated, automated apparatus."  Certain features of this construction are both vague and untethered to the language of the preamble.  For example, IBM does not explain what it means by such formulations as "one-stop" and "fully integrated"; nor does it attempt to tie those formulations to the term "self-contained computerized apparatus" (or any other term in the preamble).

| |
|---|
| **Limitation 1:**  *displaying information associated with the use of the apparatus such as the instructions for the use of said apparatus;* |

The parties have agreed upon a joint proposed construction for this limitation:

---

[12] To the extent the Government is indeed suggesting that *all* functions must be controlled by a computer, that suggestion may be explained by the Government's apparent view that all claims of the '905 patent, including Claim 12, require that the shipping machine take complete control of the item being mailed, with the customer literally never touching the package again.  We address this argument below, *infra* p.at 14-17.

> **Joint Proposed Construction:**
>
> ***"displaying information associated with the use of the apparatus such as the instructions for the use of said apparatus":*** showing or presenting data on an electronic device that exhibits visual content concerning operation of the apparatus
>
> ***"instructions for the use of said apparatus":*** directions for operating the apparatus

**Limitation 2:** *receiving an item to be mailed;*

Uship has proposed the following constructions for this limitation:

> **Uship's Proposed Construction:**
>
> ***"receiving":*** accepting
>
> ***"item to be mailed":*** item to be sent or delivered by the USPS or a company or service that engages in the transportation of letters, parcels, envelopes, and/or packages from one location to another location

Taking these terms in reverse order, there can be little doubt that the term "item to be mailed" refers expansively to just about any item that is customarily capable of being sent or delivered by the USPS or any other company or service that engages in the transportation of letters, parcels, envelopes, and/or packages from one location to another location. *See, e.g.*, specification 1:53-56 (describing "mailing" as "almost all kinds of postcards, envelopes, and packages"); *see also id.* 1:27 (referring to "envelopes, package mailings"); 3:59 (referring to "postcards, envelopes, and postal packages"). Neither the Government nor IBM has suggested in their constructions of Limitation 2 that "item to be mailed" should be read more narrowly.

Where the parties differ on this limitation has primarily to do with the meaning of "re-

ceiving." Uship submits that this term should be construed in accordance with its ordinary and common meaning of "accepting," "taking," or "getting." *See, e.g.*, *Random House Webster's College Dictionary* (1997) at 1085 ("17. to take, get, accept, or meet with something"); *American Heritage College Dictionary* (1985) at 1032 ("13.1 to acquire or get something"). The Government and IBM, on the other hand, wish to invest this term with significant additional meanings. Under the established principles of claim construction discussed earlier, however, the Government's and IBM's efforts to load "receiving" with new meanings cannot withstand minimal scrutiny.

The Government interprets this limitation as "taking in an item, inserted by a user, within the self-contained computerized apparatus." IBM goes even further, and interprets it as "accepting into the self-contained computerized apparatus an item to be mailed, after which the apparatus takes over with minimal consumer input." It appears, from the context and the support cited by the Government and IBM, that those parties envision a scenario in which a letter or package is *inserted into* the shipping device, after which the customer essentially relinquishes all control over the item and the device performs all subsequent tasks and exclusively handles and manipulates the item. Needless to say, this is a considerable amount of baggage to load upon the solitary word "receiving."

To be sure, there is some support in the specification and the drawings for the proposition that at least some claims of the invention could be embodied by a device that performs along the lines suggested by the Government's and IBM's proposed constructions. *See, e.g.,* specification 6:26-44. To the extent that the Government and IBM are basing their constructions on these types of statements from the specification, however, they have crossed over the line from using the specification to help interpret a claim into the forbidden territory of seeking to import limita-

tions from the specification into the claim. *See Phillips*, 415 F.3d at 1323. This use of the specification is especially suspect where, as here, the construction offered by the Government and IBM on the basis of their reading of the specification is not even arguably linked to any claimed ambiguity in the straightforward language used in this claim limitation.

Moreover, even assuming *arguendo* that the intrinsic evidence makes clear that all of the unasserted *device* claims in the '905 patent are required to operate along the lines suggested by the Government and IBM, it is still improper for those parties to "interpret" the *independent method* claim of Claim 12 as necessarily operating in the same manner. The Federal Circuit made this clear just last year in *DSW*. In that decision, the Court of Appeals rejected a claim construction in which the trial court read certain method claims to include certain limitations and features found within device claims appearing in the same patent:

> In sum, the trial court did not construe or clarify the meaning of actual words in [method] claims 4-6, but improperly read into them a new limitation not required by the claim language, specification, or prosecution history. Because claims 4-6 are unambiguous, contain limitations other than the disputed claim terms, and are directed to a method for using an apparatus, not to its structure or assembly, *it was improper for the trial court to import limitations from the apparatus and system claims into the method claims.*

*DSW*, 537 F.3d at 1348 (emphasis added).[13] It is equally improper for the Government and IBM

---

[13] The district court in *Michaels of Oregon Co. v. Clean Gun,* LLC, 2002 U.S. Dist. LEXIS 20371, *26 (D. Or. 2002), offered a similar analysis based on its reading of Federal Circuit precedent:

> A method claim may "read on," or encompass, more than one device. If a method can be practiced without the specific tools claimed or described in the specification, then the method claim is not limited to any particular device. *See, e.g., Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1349 (Fed. Cir. 2000) (holding that the method claim was not limited to the specific tool described in the specification, even though the PTO issued a restriction requirement and the applicant narrowed the claims at issue to the method claim). In other words, *a method claim is not necessarily limited to the specific apparatus device or embodiment in the patent specification.* A method claim can be infringed by the practice of the method with a device claimed in the patent, described in the specification, or any other device. (emphasis added).

to seek to import perceived limitations from the unasserted device claims of the '905 patent into the independent method Claim 12.

IBM in its proposed claim construction statement cites passages from the '905 patent's prosecution history as support for its proposed construction of this (and virtually every other) limitation of Claim 12.  Specifically, IBM relies upon an August 1989 submission by the applicant in which the applicant discusses certain features of the apparatus claims of the patent application.  '905 Patent Pros. History, Amendment (Aug. 14, 1989) at 9-13 (G001674-78) (attached as Exhibit L).  Once again, however, even assuming that these statements regarding the *apparatus* claims describe a device that comports with IBM's (and the Government's) proposed claim constructions, it is improper for IBM to seek to limit the scope of the independent *method* claim of Claim 12 on the basis of those statements.

The only statement in the applicant's submission that relates directly to the method claim is a single sentence: "Independent Claim 28 [which ultimately became Claim 12] is drawn to the method of operating a computerized apparatus which corresponds to the operation of the mail collecting and telecommunication apparatus as set forth in the present invention."  *Id.* at 10 (G001675).  IBM will likely argue that this statement amounts to a disclaimer or disavowal by the applicant of any scope for the method claim that does not adhere exactly to the scope of the patent's device claims.  But this single sentence does not even come close to the types of "clear," "unambiguous," and "unmistakable" disavowals of claim scope that are required before a court may restrict the otherwise appropriate scope of a claim limitation.  *See, e.g., Voda*, 536 F.3d at 1321;  *Omega Eng'g,* 334 F.3d at 1325-26; *Abbott Laboratories*, 566 F.3d at 1289; *Ecolab, Inc.*, 569 F.3d at 1343; *University of Pittsburgh*, 573 F.3d at 1296-97.  The statement at issue indicates, at most, only that the method claim "corresponds" in some unspecified respects to the de-

vice claims.  It nowhere states that *all* of the limitations in the device claims necessarily apply to the method claim, or that the method claimed can *never* be performed in a manner that does not track in every single respect the operation of the device embodiment discussed in the device claims.  In short, this statement from the prosecution history simply cannot bear the weight that IBM apparently seeks to place upon it.

| Limitation 3:  *weighing the item to be mailed;* |
| --- |

Uship has proposed the following construction for this limitation:

| **Uship's Proposed Construction:** |
| --- |
| *"weighing":*   determining or ascertaining the weight of a thing, by use of a balance, scale, or other mechanical device[14] |

It is clear from the intrinsic evidence that the invention contemplates that the shipping machine will utilize a scale to weigh the item to be mailed.  *See, e.g.*, specification 1:10-11 (referring to "electronic weighing device" and "electronic scale[]"); 6:52-53 (referring to scale weighing device).  The parties agree on that much.

One would think that this relatively simple six-word limitation would be interpreted in accordance with its plain language and would not be the subject of dispute between the parties. Unfortunately, that is not the case.  As with Limitation 2, the Government and IBM seek, in the guise of "interpreting" this claim, to read additional limitations into this straightforward step in the method claim.  Thus, the Government interprets this limitation as follows: "after the mail is

---

[14] Because it is clear, from the parties' discussions, that they agree on the meaning of "weight," Uship has slightly revised this proposed construction in order to remove a reference to the meaning of "weight."

accepted within the self-contained computerized apparatus, obtaining the weight of a mail item by use of a scale without requiring any handling of the mail item by the operator." Along similar lines is IBM's interpretation: "after the mail is accepted into the apparatus, weighing the item to be mailed without the possibility for a customer to influence the weighing."

Needless to say, this six-word limitation does not say *anything* about such matters as when the weighing step occurs,[15] or whether that step requires "handling" of the item, or whether there is a "possibility" for the customer to "influence" the weighing. Obviously, none of these concepts is inherent in the simple word "weighing." Once again, the Government's and IBM's proposed constructions are not constructions at all, but rather an improper attempt to artificially confine the scope of this limitation by going far beyond its plain language and by importing limitations from the specification or the '905 patent's device claims into this method claim. For the reasons discussed above, *supra* p.14-17, the Government's and IBM's proposed constructions should be rejected.

| **Limitation 4:** *admitting data relating to the item to be mailed such as the address to which the item is to be mailed;* |
| :--- |

Uship has proposed the following constructions for this limitation:

| **Uship's Proposed Construction:** |
| :--- |
| *"admitting":*  receiving or obtaining through use of one or more means of inputting or transmitting information, including but not limited to devices such as keyboards, touch screens, card readers, scales, etc. |

---

[15] The normal rule for method patents is that, absent contrary indication, the steps of a method claim do not need to be performed in a particular order. *Cf. Altiris*, 318 F.3d at 1370-71.

| | |
|---|---|
| ***"data":*** | information or individual items of information |
| ***"relating to":*** | referring to, pertaining to, associated with, regarding, concerning, or about |
| ***"address":*** | information signifying or pertaining to the place or the name of the place where a person, organization or the like is located or may be reached |

From the parties' respective proposals, it does not appear that the Government or IBM have any particular objection to Uship's proposed construction of the terms "data" and "relating to," which in any event correspond to the ordinary and customary understanding of those terms. We will therefore focus our discussion on the remaining terms from this limitation.

With respect to the term "admitting," it is evident from context and from the specification that the patent contemplates some method by which a customer can input information into the shipping machine. *See, e.g.,* abstract (referring to "input means"); *see also* specification 1:59-60 (customer can enter information on a keyboard); 2:6 (referring to "destination data entered on the keyboard"); 5:30 (referring to keyboard); 6:55-57 (referring to entry of date by keyboard); 6:64 (same). Our proposed construction of "admitting" accurately captures this understanding of the invention. Notably, although we believe our proposed construction is more precise and is therefore preferable, IBM's proposed interpretation is not inconsistent with what we have proposed, in that it contemplates data being "entered by the customer" through some means.

The Government's construction of this term, on the other hand, suffers from several serious flaws. First, its interpretation of "admitting" – "acknowledging the collection of" – is inconsistent with the claim language and the intrinsic evidence discussed above. Second, the Government goes on to specify the types of data that are to be admitted: "data concerning mailing weight, mailing destination, and, additionally, mailing classification data." With the possible

exception of "mailing destination," which is at least arguably related to the term "address," none of these terms are mentioned or even referenced in the limitation. The Government is therefore once again improperly importing new limitations into the claim.

With respect to the term "address," the Government's proposed construction suffers from a defect that, although no less fatal to its position, is in one sense the opposite of the flaw in its proposed construction of "admitting." Whereas for "admitting" the Government's construction improperly seeks to import limitations from the specification, for "address" the Government's construction effectively ignores, and conflicts with, the specification. The Government defines "address" as "information identifying the specific location where a person or organization receives mail."[16] To the extent this definition's use of the term "specific location" suggests that the customer must input complete address information (*e.g.*, name, street address, city, state, zip code) for the recipient of the item being mailed, it cannot be reconciled with the specification, which discusses the need to enter only "required data about the mailing's destination" and goes on to explain that the "data to be entered . . . *may comprise* the mailing's country of destination, the zip code, and a variety of special requests such as registered mail, express mail, etc., or any other data required by company standards." Specification 6:55, 6:64-68 (emphasis added). The specification thus (1) establishes that the invention does not specify the types of information relating to the address that must be inputted, and (2) refutes any suggestion that complete addressing information must be entered. It also expressly contemplates that the precise particulars of what is to be inputted will necessarily depend on what is "required by company standards." For the Government nonetheless to contend that proper construction admits of *only one* type of address information (presumably, the type USPS does not require as part of its "company stan-

---

[16] IBM's proposed construction merely repeats, and does not define, the word "address."

dards") is both disingenuous and irreconcilable with the specification.  In contrast, Uship's proposed construction, which does not require the inputting of complete addressing information, follows from the intrinsic evidence.

| Limitation 5:  *determining the required postage for the item to be mailed;* |
| --- |

Uship has proposed the following constructions for this limitation:

| **Uship's Proposed Construction:** |
| --- |
| *"determining":*  ascertaining through calculation or otherwise |
| *"required postage":*   the charge for the service of conveyance and/or delivery of a letter, parcel, envelope, and/or package to be mailed |

Neither the Government nor IBM has raised any specific objections to Uship's proposed constructions of the above terms, which are consistent with both the ordinary understanding of those terms and the specification.  *See, e.g.*, specification 2:4-5 (postage is "automatically calculated"); 7:3-4 (referring to charge being calculated by device).  But both the Government and IBM have proposed constructions for this limitation as a whole that venture well beyond its plain language.  According to the Government, this limitation should be interpreted as follows: "automatically calculating the charge for the service of delivery of a mail item based on mailing weight data and destination data without requiring any handling of the mail item by the user." And IBM has offered the following proposed construction: "calculating a charge based on the mailing weight, the destination and any special requests, and any instructions stored in the machine's memory, with no possibility for an incorrect postage being calculated."

Obviously, the Government and IBM are not basing many of the limitations and condi-

tions found in their proposals – *e.g.,* "mailing weight data," "destination data," no "handling" by the user, "special requests," etc. – on any language actually found within Limitation 5.  Rather, the Government and IBM are once again engaging in an improper attempt to artificially restrict the scope of this limitation by going far beyond its plain language and by importing limitations from the specification or the '905 patent's device claims into this method claim.  For the reasons discussed above, *supra* p.14-17, the Government's and IBM's proposed constructions should be rejected.

---

**Limitation 6:**  *accepting and verifying payment for such postage;*

---

The parties have agreed upon a joint proposed construction for this limitation:

> **Joint Proposed Construction:**
>
> **"accepting and verifying payment for such postage":**  receiving payment and confirming that the payment received corresponds to the charge calculated for delivery of the mail item

---

**Limitation 7:**  *providing machine readable information concerning the item to be mailed on the item to be mailed, such as the zip code to which said item is to be mailed; and*

---

The parties agree that two terms within this limitation – "machine readable information" and "concerning" – should be read in accordance with their plain meaning and do not need to be further construed.  The parties differ, however, on what this limitation means when it calls for "**providing** [such machine readable information] **on**" the item to be mailed.  With respect to that aspect of this limitation, Uship has proposed the following construction:

> **Uship's Proposed Construction:**
>
> **"providing … on":**  printing either directly on the item to be mailed or on a label which may be applied to the item to be mailed

The Government and IBM, on the other hand, have proposed constructions of this term that would require the shipping machine to automatically either print or affix the machine reada-ble information *directly* on the item, such that the customer does not handle the item at all during this step.[17]  The Government and IBM are presumably basing their proposals on the specifica-tion's discussion of devices that are configured to operate in such a manner.  Once more, howev-er, this is not the proper way to construe this independent method claim, but is instead an effort to artificially restrict the scope of this limitation by straying beyond its plain language and by importing limitations from the specification or the '905 patent's device claims into this method claim.  For the same reasons many of their other Claim 12 constructions must fail, *see supra* p.14-17, this one must fail as well.

The Government's and IBM's constructions also suffer from other critical defects.  For example, as noted above, their constructions effectively read "providing . . . on" as though it said "providing *directly* on."  Not only do these constructions therefore attempt to add language that is not in the claim term, they ignore other claims in this patent that, in contrast, actually use the formulation that the Government and IBM read into this one.  Claim 6, for example, discusses a device that includes means for printing a bar code "directly on the item to be mailed."  *See also*

---

[17] The Government reads this limitation as follows:  "automatically affixing or printing machine readable information that concerns at least the mailing's destination on a surface of the item to be mailed without requiring any handling of the mail item by the operator."  IBM's con-struction is similar:  "the apparatus prints or affixes on the item to be mailed machine readable information with no consumer handling being necessary."

specification 2:13-17 (same).  The Government's and IBM's constructions render the term "directly" as used in Claim 6 little more than surplusage.  Such a construction is disfavored.  *See Chisum on Patents* § 18.03(2)(b)(iii)(A) ("Courts . . . presume that all words in a claim have meaning and that a word or phrase in the claim should not be so interpreted so as to render other words and phrases in the claim superfluous.") (footnotes omitted).[18]

| Limitation 8:  *storing the item to be mailed for subsequent pick up.* |
| --- |

With respect to this final limitation of Claim 12, Uship has proposed the following construction of the key term:

| Uship's Proposed Construction: |
| --- |
| *"storing":*  holding an item in a place for subsequent use or disposition |

Like such limitations as Limitation 2 ("receiving" the item) and Limitation 3 ("weighing" the item), this limitation appears to be quite straightforward; one would be forgiven for assuming that its interpretation in accordance with the ordinary meaning of its operative term would not prove particularly controversial.  As with those other limitations, however, the Government and IBM seek to read this limitation in the light of their overall conception of this invention as requiring the machine to take over completely from the customer almost as soon as the customer releases the item to be mailed.  Thus, in the guise of "interpreting" this limitation, the Government and IBM proceed to import additional limitations and conditions.  According to the Gov-

---

[18] *Cf. Wilson*, 442 F.3d at 1329 (fact that term "insert" is described as "rigid" in one claim implies that when used in other claims, "insert" "does not inherently carry a 'rigid' limitation") (citing *Phillips*, 415 F.3d at 1314).

ernment, this limitation requires the shipping machine to "hold[] the item in a place for subsequent use or disposition without requiring any handling of the mail item by the operator."  IBM is even more explicit, as it reads this limitation as "automatically moving the item into a storage area within the self-contained apparatus for subsequent pick-up, with no consumer handling being necessary."

Once again, the Government's and IBM's proposed constructions are not constructions at all, but rather improper attempts to artificially confine the scope of this limitation by going far beyond its plain language and by importing limitations from the specification or the '905 patent's device claims into this method claim.  *See supra* p.14-17.  The Government's and IBM's attempt to read limitations from the device claims into this independent method claim is in one sense even more transparently suspect here, because other unasserted device claims in the '905 patent *explicitly* provide for the very limitation that the Government and IBM attempt to conjure up for Claim 12.  The Claim 1 device claim, for example, includes a limitation calling for "transport means coupled to said computer means for transporting the item to be mailed from said receiving means to a storage area for subsequent pick-up."  Specification 11:11-13.  No such language, or anything remotely resembling such language, can be found in Claim 12.  *Cf. Phillips*, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.").

## III.   U.S. PATENT NO. 5,481,464 ('464 PATENT)

The application for the '464 patent was filed on February 18, 1994, and the patent issued on January 2, 1996.  The patent was a continuation of U.S. Patent No. 5,340,948, which was, in turn, a continuation-in-part of U.S. Patent No. 5,233,532 (both of which patents are currently held by Uship).  The '464 patent contains 34 claims, nine of which are independent claims.

Uship is currently asserting, and seeking the construction of, four of the independent claims and twelve of the dependent claims.  These claims employ many of the same or similar terms.

A.   **Claim 7**

> **Preamble:   *An integrated, automated, unattended unit for collecting and secure-ly holding items for collection and shipment by commercial delivery services:  said automated unit comprising:***

As discussed above in connection with the '905 patent, there is no need for the Court to separately construe the terms used in the preamble to Claim 7 of the '464 patent.  Because the body of the claim fully and intrinsically identifies all of the limitations of the claimed invention, and because the preamble merely encapsulates the main limitations found in the body of the claim and states the invention's purpose and intended use, the preamble should not be considered a limitation and is of little if any significance to the claim construction inquiry.  Nonetheless, we have, in an abundance of caution, proposed constructions for certain of the key terms found within the preamble.

> **Uship's Proposed Construction:**
>
> *"integrated":*   brought together or incorporated into a unified or interre-lated whole or system

The intrinsic evidence confirms that this is the correct meaning.  For example, the draw-ings contain figures illustrating three embodiments of the invention.  *See* Figures 1-4 (illustrating the first preferred embodiment; Figure 6 (illustrating a second embodiment); Figures 7-9 (illu-strating a third embodiment).  As explained further in the specification, the first and third embo-diments depict the invention as having a collection of elements that are brought together or in-corporated into a unified whole, which is contained within an "outer housing" (12 or 212).  *E.g.*,

specification 3:40-4:3, 10:55-11:18.  But the second embodiment depicts the invention's elements as an interrelated system of disparate elements, where "an adjunct packaging supply unit 120 is positioned to one side of the system 10."  Specification 10:46-47.  The term "integrated," therefore, contemplates an invention whose elements may, but need not, be physically combined or attached to one another.  The proposed interpretation also reflects the ordinary and customary meaning of the term "integrated," as confirmed by general purpose dictionaries.  *See Random House Unabridged Dictionary* 990 (2d ed. 1993) ("integrated": "1. combining or coordinating separate elements so as to provide a harmonious, interrelated whole … 2. organized or structured so that constituent units function cooperatively").

The Government's proposed interpretation of "integrated" is unduly restrictive because, *inter alia*, it does not allow for the elements of the invention to work in a cooperative but physically distinct system.  IBM provides no interpretation of "integrated," effectively confirming that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

> **Uship's Proposed Construction:**
>
> *"automated":*  employing a technique, method, or system of operating and controlling a task by highly automatic means, as by electronic devices, thereby reducing human intervention to a minimum

This interpretation is founded in large part upon the specification.  The patent's embodiments illustrate an invention that, to a significant but not exclusive extent, uses machines or electronic devices rather than a person to perform requisite tasks.  For example, the specification describes an embodiment containing a "control system," such as a "central processing unit (CPU)," which coordinates various input and output devices.  Specification 3:50-67, 5:50-6:25; *see also* 10:62-11:7 (same); "control means," *infra* p.36-37 ('464 Claim 7).  These aspects of the inven-

tion are also illustrated in the figures.  *See, e.g.*, Figures 1-6 (illus. 16, 22, 24, 26, 28, 30, 90, 102, 104, 106, 108); Figures 7-8, 10 (illus. 90, 102,104, 106, 108, 218, 222, 224, 226, 230).  The proposed interpretation also employs the ordinary and customary meaning of the term "automated," as confirmed by general purpose dictionaries.  *See Random House Unabridged Dictionary* 141 ("automation": "1. the technique, method, or system of operating or controlling a process by highly automatic means, as by electronic devices, reducing human intervention to a minimum.  2. a mechanical device, operated electronically, that functions automatically, without continuous input from an operator").

The Government's proposed interpretation of "automated" is vague or incoherent because, *inter alia*, it seems to imagine an invention that *entirely* supplants humans.  The invention obviously requires some level of human intervention.  IBM substitutes "automatically" for "automated," but they are not interchangeable.  Although an "automated" unit is characterized by "automatic" techniques, methods, or systems of operation or control, "automatic" alone fails to capture the fullness of the term "automated," as described above, and focuses more on how the process begins.  *See Random House Unabridged Dictionary* 140 ("automatic": "1. having the capability of starting, operating, moving, etc., independently … 4. occurring spontaneously").

> **Uship's Proposed Construction:**
>
> *"unattended":*  not accompanied by an attendant or the like; capable of being used by a customer without assistance from an attendant or operator

This interpretation uses the ordinary and customary meaning of the term "unattended," as confirmed by general purpose dictionaries.  *See Random House Unabridged Dictionary* 2053 ("unattended": "4. not taken in charge; not watched over … 5. not accompanied, as by an attendant or companion").  Nothing in the specification indicates that the apparatus *requires* the pres-

ence of an attendant or operator to assist customers.

Although the Government's proposed interpretation of "unattended" mirrors the first part of Uship's proposed interpretation, it omits the second part – that the invention is "capable of being used by a customer without assistance from an attendant or operator" – and therefore fails to capture two further characteristics of the invention.  First, the reason why the invention is unattended is that the invention does not require the intervention of a human operator other than the customer.  Second, although an attendant is unnecessary, the claim does not preclude the presence of an attendant.  IBM provides no interpretation of "unattended," and thus confirms that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

> **Uship's Proposed Construction:**
>
> ***"unit":*** a machine, part, or system of machines having a special purpose; an apparatus

The specification and accompanying figures indicate that an object of the invention is to provide a "system" for collecting items to be shipped.  This system is portrayed in the specification as having myriad components, all working harmoniously toward the system's purpose.  *See, e.g.*, specification 2:7, 10, 17, 21, 26, 31, 51; 3:40-4:3, 10:55-11:18; Figures 1-10.  This proposed interpretation also conforms to the ordinary and customary meaning of the term "unit," as shown by general purpose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 2074 ("unit": "1. a single thing or persons.  2. any group of things or persons regarded as an entity … 9. a machine, part, or system of machines having a specified purpose; apparatus").

The Government's proposed interpretation of "unit" is unduly restrictive because, *inter alia*, it does not allow for the invention to exist as a system of components.  IBM provides no interpretation of "unit," thus confirming that the ordinary and customary meaning, as reflected in

Uship's proposed interpretation, is valid.

| Uship's Proposed Construction: |
| --- |
| *"collecting":*  gathering together; accepting |

This interpretation accords with the specification, which refers repeatedly to a system for "accepting" items, *see, e.g.*, specification 2:7, 13, 17, 22, 26, 31, 51, 3:45, and with the ordinary and customary meaning of the term, as shown in general purpose dictionaries, *see, e.g., Random House Unabridged Dictionary* 403 ("collect": "1. gather together; assemble … 2. to accumulate; make a collection of").  Neither the Government nor IBM has specifically objected to this proposed interpretation, thus confirming that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

| Uship's Proposed Construction: |
| --- |
| *"securely holding":*  containing an item in a manner designed to ensure that the item is safe from interception by unauthorized persons |

This interpretation accords with the specification, which describes a storage apparatus for items that is secured against "unauthorized access."  *See, e.g.*, specification 2:7, 13, 17, 22, 26, 31, 33-36, 46-56, 3:46-47, 4:25-26, 5:35-38, 11:8-13; *see also* Figures 1, 3, and 6-9.  It is also in line with the ordinary and customary meaning of the terms, as shown in general purpose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 910 ("hold": "9. to contain or be capable of containing"; "secure": "4. in safe custody or keeping … 8. safe from penetration or interception by unauthorized persons").  Neither the Government nor IBM has specifically objected to this proposed interpretation, thus confirming that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

> **Uship's Proposed Construction:**
>
> ***"items":***  parcels, envelopes, letters, packages and like items

The specification refers numerous times to the invention's field being related to the shipment of parcels, envelopes, letters, packages, and similar items.  *See, e.g.*, specification 1:15, 19, 32-33, 37, 42.  Neither the Government nor IBM disputes this proposed interpretation, thus confirming its validity.

> **Uship's Proposed Construction:**
>
> ***"collection":***  the act of gathering items together or accepting

This interpretation is consistent with the interpretation proposed for the similar word "collecting."  *See* "collecting," *supra* p.30 ('464 Claim 7); *see also Random House Unabridged Dictionary* 403 ("collection": "the act of collecting").  Neither the Government nor IBM has specifically objected to this proposed interpretation.

> **Uship's Proposed Construction:**
>
> ***"shipment":***  the act of sending by use of the USPS or a company or service that engages in the transportation of items[19] from one location to another location

This interpretation reflects the specification, which refers repeatedly to terms such as the "commercial shipping and delivering industry," "commercial delivery services," "commercial carriers," "delivery services," and the like, and does so without indicating an intention to exclude

---

[19] Uship's initial proposal to the Government and IBM referred to "parcels and envelopes," where it now refers to "items."  Uship makes this change in order to clarify that "shipment" is not limited to the transportation of parcels and envelopes.

the USPS or its delivery or shipment services from the scope of the claim.  *See, e.g.*, specifica-

tion 1:11-2:34, 2:51-52, 3:45-47; 6:33-34.  Further, the PTO acknowledged during prosecution of

the parent patent (5,340,948) that that patent's claims were "drawn to a postal system for

processing parcels for mailing."  PTO Notice re "Restriction Requirement" (G000581) (Jun. 4,

1993) (attached as Exhibit M).   This interpretation of "shipment" also reflects the ordinary and

customary meaning of the term, as confirmed by general purpose dictionaries.[20]

Neither the Government nor IBM has specifically objected to this proposed interpreta-

tion, thus confirming its validity

---

**Uship's Proposed Construction:**

*"commercial delivery services":*  businesses, organizations, or other enti-
ties, including the USPS, that engage in the shipment of
items from one location to another location

---

This interpretation reflects the specification, which, *inter alia*, does not indicate an inten-

tion to exclude the USPS or its delivery or shipment services from the scope of the claim.  *See*

"shipment," *supra* p.31 ('464 Claim 7).  It also reflects the ordinary and customary meaning of

the terms "commercial," "delivery," and "services," as confirmed by general purpose dictiona-

ries.[21]  Neither the Government nor IBM disputes this proposed interpretation, thus confirming

---

[20] *See, e.g., Random House Unabridged Dictionary* 1766 ("shipment": "1. an act or in-
stance of shipping freight or cargo"; "ship": "8. to put or take on board a ship or other means of
transportation; to send or transport by ship, rail, truck, plane, etc.").

[21] *See, e.g., Random House Unabridged Dictionary* 411, 528, 1750 ("commercial": "3.
prepared, done, or acting with sole or chief emphasis on salability, profit, or success"; "deli-
very": "1. the carrying and turning over of letters, goods, etc., to a designated recipient or reci-
pients"; "service": "3. the providing or a provider of accommodation and activities required by
the public, as maintenance, repair, etc. … 4. the organized system of apparatus, appliances, em-
ployees, etc., for supplying some accommodation required by the public: *a television repair ser-
vice*").

its validity.

| Limitation 1:  *means for weighing the item to be shipped;* |
| --- |

The parties have agreed upon a joint proposed construction regarding the function and structure of this limitation, but they have not expressly agreed on the meaning of the term "shipped."

| **Joint Proposed Construction:** |
| --- |
| *"means for weighing the item to be shipped"*: |
| **Function**: weighing the item to be shipped; |
| **Corresponding structure**: electronic scale shown in illustration 22 or 222 |

| **Uship's Proposed Construction:** |
| --- |
| *"shipped"*:  the state of being sent by use of the USPS or a company or service that engages in the transportation of items[22] from one location to another location |

This interpretation of "shipped" accords with the proposed interpretation of "shipment." *See* "shipment," *supra* p.31 ('464 Claim 7).

| Limitation 2:  *means for inputting information relating to the destination to which the item is to be shipped;* |
| --- |

---

[22] Uship's initial proposal to the Government and IBM referred to "parcels and envelopes," where it now refers to "items."  Uship makes this change in order to clarify that "shipment" is not limited to the transportation of parcels and envelopes.

> **Uship's Proposed Constructions:**
>
> **"means for inputting":**  structure, material, or steps used for entering data into a central processing unit (CPU)[23] for processing or storage, such as a keyboard, touch pad, touch screen, or similar device
>
> **"information relating to the destination":**  data relating to the location to which the item to be shipped is to be shipped, such as the zip code for that location

These interpretations reflect the ordinary and customary meanings of these terms, as confirmed by general purpose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 540, 980, 985 ("information": "8. *Computers* … b. data at any stage of processing (input, output, storage, transmission, etc.)"; "input": "10. *Computers.* to enter (data) into a computer for processing"; "destination": "1. the place to which a person or thing travels or is sent").  They also reflect the use of these terms in the specification, which details how data is entered into the system.  *See, e.g.*, specification 2:38-41, 58-61, 5:50-6:13, 7:20-25, 13:13-15; Figures 5, 10.  The specification also indicates that the requisite information relating to the destination may, but need not, include the recipient's zip code, or may, but need not, include the recipient's address.  *Compare* 7:20-25 (first embodiment: "system 100 displays a screen which requests the customer to enter the desired zip code of the item which is to be mailed") *with* specification 13:13-15 (third embodiment: the customer enters complete addressing information through the keyboard").  Neither the Government nor IBM disputes these proposed interpretations here.  The Government,

---

[23] Uship's initial proposal to the Government and IBM referred to a "computer memory unit," where it now refers to a "central processing unit."  Without intending to change the meaning of its proposed interpretation, Uship makes this change in order to conform its interpretation more closely to the specification, which refers to a "central processing unit (CPU)."

however, substitutes the word "place" for the word "destination," without explanation.  In the context of other patents at issue in this action, the Government maintains that the "destination" must include the recipient's complete address, not just the zip code.  Whether by substituting "place" for "destination" or otherwise, if the Government intends to assert that "destination" as used in the '464 patent requires the recipient's complete address, the Government's proposed interpretation would contradict the clear terms of the specification, as just shown.  Uship discusses this issue in greater detail below in the context of the '220 patent.  *See infra* p.91-92 ('220, Claim 1); *see also* specification 8:9-12 ("control system … instructs the customer to take the label from the printer, to write the mailing address onto the label [and] to place the label on the package").

In addition, this is a "means-plus-function" claim limitation.  Because the claim is "expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, [it] shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112 ¶ 6.  As the Court of Appeals has instructed, "[t]he court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations."  *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1333 (Fed. Cir. 2004) (quotation marks omitted).  "The first step in construing a means-plus-function claim limitation is to define the particular function of the claim limitation. … The next step . . . is to look to the specification and identify the corresponding structure for that function."  *Id*. at 1333-34.

Here, the function is "inputting information."  The corresponding structure in the specification includes, alternatively, a key pad (28), a keyboard (226), and a mechanism that recognizes voices and is adapted to be controlled by the spoken words (not shown).  *See, e.g.*, specification

35

2:38-41, 58-61, 3:66, 5:50-6:13, 7:20-25, 13:13-15; *see also, e.g.*, Figures 5, 10.  The Government and IBM identify two of the corresponding structures in the specification, namely, the key pad (28) and the keyboard (226).  Insofar as the Government and IBM omit other corresponding alternative structures, such as the voice-recognition mechanism, and equivalents thereof, their proposed interpretations are unduly restrictive.

| **Limitation 3A:**  *control means for analyzing the inputted information and calculating the fee for shipment of the item;* |
| --- |

| **Uship's Proposed Construction:**<br><br>*"control means":*  structure, material, or steps used for controlling the operation of certain features of the claimed invention, involving the use of a central processing unit (CPU) and associated hardware and software |
| --- |

Uship's proposed interpretation reflects the specification, which refers to a "control structure," "control system," or "controller" being "in communication with," coordinating, and operating various inputs and outputs of the apparatus.  *See, e.g.*, abstract; specification 2:41-46, 61-66, 5:62-6:13, 7:50-54; Figures 5, 10.  This interpretation also reflects the ordinary and customary meaning of the term "control."  *See, e.g., Random House Unabridged Dictionary* 442 ("control": "12. a device for regulating and guiding a machine … "); *see also id*. 443 ("controller": "5. Also called **control unit, processor**. *Computers*. the key component of a peripheral device, as a terminal, printer, or external storage unit, that contains the circuitry necessary to interpret and execute instructions fed into the device").  Neither the Government nor IBM specifically objects to this interpretation.

This limitation is also a means-plus-function limitation subject to § 112 ¶ 6, and therefore

36

the claim must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.  The function here is "control."  The specification explains that the "control system" (100) includes "a central processing unit (CPU) 102[,] which is in two-way communication with a program logic controller (PLC) 104," and associated hardware and software.  *See* specification 5:61-6:25; *see also* abstract; specification 2:41-44, 2:61-64, 6:39-57, 7:50-54, 8:3-4, 8:45-47.  Figures 5 and 10 illustrate this control means by showing the CPU and PLC receiving inputs, communicating with each other, and sending outputs.

The Government's and IBM's proposed corresponding structures are unduly restrictive.  Both would include the key pad, the keyboard, and the scale, but those structures in fact correspond to the "means for inputting information," *see supra* p.35-36 ('464 Claim 7), and the "means for weighing the item to be shipped," *see supra* p.33 ('464 Claim 7).

> **Uship's Proposed Construction:**
>
> *"analyzing":*  processing or examining
>
> *"calculating":*  determining by mathematical methods; computing
>
> *"fee for shipment":*  the price or sum quoted or charged to ship an item to the designated location/address

The specification makes clear that the "fee" for shipment is the price or sum to be charged in order to carry out the shipment of the item.  *See, e.g.*, specification 6:33-7:58 (discussing process by which shipping fees are determined); *see also* "shipment," *supra* p.31 ('464 Claim 7).  The specification also describes how the control means analyzes the inputted information by processing and examining it to determine the indicated or selected destination, weight, and commercial delivery service, and how the control means then calculates the shipping fee by computing it based upon that inputted information.  *See, e.g.*, specification 6:33-58, 7:23-27, 41-

58. These interpretations also reflect the ordinary and customary meanings of these terms.[24] Neither the Government nor IBM provides any interpretation of the terms within this limitation, thereby confirming that the ordinary and customary meaning, which is reflected in Uship's proposed interpretations, is valid.

As this is a means-plus-function limitation subject to § 112 ¶ 6, it must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. The functions here are "analyzing the inputted information and calculating the fee for shipment." The specification explains that the "control means," which was just discussed, analyzes the inputted information and calculates the shipping fee. *See* specification, 5:61-6:25; *see also* abstract specification, 2:41-44, 2:61-64, 6:39-57, 7:50-54, 8:3-4, 8:45-47; "control means," *supra* p.36-37 ('464 Claim 7). The specification further states that the "control system is programmed to interface with potential customers" by "load[ing] the appropriate zone and weight charts for all client delivery services" and "the corresponding fee files which correspond to each client delivery service at that desired location" into the PLC. Specification, 6:31-36. With these charts and files, the control means is capable of analyzing the inputted information and calculating the fee.

IBM asserts that the specification "lacks sufficient structure for analyzing the inputted information and calculating the fee." To be sure, "[a]lthough … one may use means-plus-function language in a claim, one is still subject to the requirement [of 35 U.S.C. § 112 ¶ 2] that a claim

---

[24] *See, e.g., Random House Unabridged Dictionary* 74, 295, 705-06 ("analyze": "1. to separate (a material or abstract entity) into constituent parts or elements; determine the elements or essential features of (opposed to *synthesize*) … 3. to examine carefully and in detail so as to identify causes, key factors, possible results, etc."; "calculate": "1. to determine or ascertain by mathematical methods; compute"; "fee": "1. a charge or payment for professional services … 2. a sum paid or charged for a privilege: *an admission fee*"); "shipment," *supra* p.31 ('464 Claim 7).

'particularly point out and distinctly claim' the invention." *In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc).  "Therefore, if one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language." *Id.*  "The requirement that the claims 'particularly point[] out and distinctly claim[]' the invention is met when a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification.  If the claims when read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more." *S3 Inc. v. nVidia Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001) (quotation marks omitted).  Coupling the control means with the programming just described – which both IBM and the Government ignore – adequately discloses to a person skilled in the art what is meant by the language of this means-plus-function limitation.

| Limitation 3B:  *said control means further including means for receiving credit card information and* |
|---|

The parties have agreed upon a joint proposed construction for this means-plus-function limitation:

| Joint Proposed Construction: |
|---|
| *"means for receiving credit card information"*: |
| **Function**: to receive credit card information; |
| **Corresponding structure**: card reader (30, 230) |

| Limitation 3C:  *said control means further including . . . means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the* |
|---|

39

*shipment fee being by telephone lines;*

**Uship's Proposed Construction:**

*"means for communicating and assessing":* structure, material, or steps used for transmitting data between the claimed invention and the customer's credit card company (or that company's agents) and for charging the fee for shipment to the customer's credit card account, involving the use of communication lines such as telephone lines and related hardware and software

This interpretation reflects the use of these terms in the specification. As just described, the invention calculates the applicable shipping fee and obtains the necessary payment identity information from the customer. *See* "control means for analyzing the inputted information and calculating the fee for shipment of the item," *supra* p.36-37 ('464 Claim 7); "means for receiving credit card information," *supra* p.39 ('464 Claim 7). As the specification further describes, the apparatus must then transmit the shipping information and payment identity information to the customer's credit card company so that the fee can be charged to the customer's credit card account, and it would use telephone lines or equivalent technology to do so. *See, e.g.*, specification 2:41-46, 61-65, 6:59-7:8, 7:48-58. This interpretation also uses the ordinary and customary meaning of the terms "communicating" and "assessing," as confirmed by general purpose dictionaries. *See, e.g., Random House Unabridged Dictionary* 125, 414 ("communicate": "1. to impart knowledge of; make known … 2. to give to another; impart; transmit"; "assess": "3. to impose a tax or other charge on."). The Government and IBM have not specifically objected to Uship's proposed meaning of these terms, and thus the Government and IBM accept as valid the ordinary and customary meaning, which is embodied in Uship's proposed interpretations.

> **Uship's Proposed Construction:**
>
> ***"account":*** a business relation in which credit is used

The specification refers to "payment identity information from the customer, *e.g.*, a bank card," and to a "credit or debit card account."[25]  *E.g.*, specification 2:45-46, 2:65, 5:57-62, 7:51-52.  This interpretation also conforms to the ordinary and customary meaning of the term "account," as confirmed by general purpose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 13 ("account": "7. an amount of money deposited with a bank, as in a checking or savings account … 8. Also called **charge account**. an accommodation or service extended by a business to a customer or client permitting the charging of goods or services … 11. *Com[merce]*. a. a business relation in which credit is used.").  Neither the Government nor IBM disputes this proposed interpretation, thus confirming that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

> **Uship's Proposed Construction:**
>
> ***"telephone lines":*** a wire circuit connecting two or more points or stations in a telephone system, or the system itself

This interpretation uses the ordinary and customary meaning of the related terms, as found in general purpose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 1117 ("line": "26. *Telecommunications*. … b. a wire circuit connecting two or more pieces of electric apparatus, esp. the wire or wires connecting points or stations in a telegraph or telephone system,

---

[25] For convenience, Uship uses the term "credit" to include "debit" throughout this brief. The specification makes clear that the system would treat credit and debit cards interchangeably. *See* specification 7:51-52 ("credit or debit card account").

or the system itself").  The specification similarly uses the term in the ordinary and customary way.  *See* specification 7:1-5 (discussing use of telephone line in order to communicate payment identity information and shipping fees in order to charge customer's account); Figure 10.  Neither the Government nor IBM disputes this proposed interpretation, thus confirming that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

This is a means-plus-function limitation, but it is only partially subject to § 112 ¶ 6.  The "means . . . for assessing" comprises the control means, as discussed above, for analyzing the inputted information and calculating the fee for shipment of the item and the means for receiving credit card information, which are disclosed in the specification.  *See* "control means for analyzing the inputted information and calculating the fee for shipment of the item," *supra* p.36-37 ('464 Claim 7); "means for receiving credit card information," *supra* p.39 ('464 Claim 7).  In order to assess the charge, of course, the system must then transmit the shipping information and payment identity information to the customer's credit card company.  *See, e.g.*, specification 2:41-46, 61-65, 6:59-7:8, 7:48-58.

Contrary to the Government's and IBM's assertion, however, the "means for communicating" is *not* a means-plus-function limitation subject to § 112 ¶ 6.  A "claim limitation that actually uses the word 'means' invokes a rebuttable presumption that § 112 P 6 applies."  *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) (quotation marks omitted).  But "[i]f, in addition to the word 'means' and the functional language, the claim recites sufficient structure for performing the described functions in their entirety, the presumption of § 112 P 6 is overcome – the limitation is not a means-plus-function limitation."  *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008); *see also Phillips*, 415 F.3d at 1311.  "In considering whether a claim term recites sufficient structure to avoid application of section 112 P

42

6, [the Court of Appeals] ha[s] not required the claim term to denote a specific structure.  Instead, [it] ha[s] held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Lighting World*, 382 F.3d at 1359-60.  Under this standard, it cannot be gainsaid that "telephone lines," as recited in the claim, provides a sufficient structure to overcome the presumption that § 112 ¶ 6 applies.  Specifically, the claim limitation states that "telephone lines" are the "means for communicating the shipment fee."  *See also* specification 7:1-5 (discussing use of telephone line in order to communicate payment identity information and shipping fees in order to charge customer's account); Figure 10.  As just explained, the term "telephone lines" is used in common parlance and by persons of skill in the art to designate structure, though it may cover a broad class of structures.

By treating this claim limitation as a means-plus-function limitation subject to § 112 ¶ 6, the Government and IBM commit "one of the cardinal sins of patent law": reading the structure of an embodiment described in the specification into the claim.  *SciMed Life*, 242 F.3d at 1340; *see also Phillips*, 415 F.3d at 1323 (*en banc*) ("we have repeatedly warned against confining the claims to those embodiments").  They maintain that the telephone line must be "dedicated," and the Government further maintains that the telephone line must communicate "with a central location for processing charges."  One of the embodiments in the specification certainly contains those particular structures.  *See* specification 7:1-4 ("The [card] reader 30 may be connected to a dedicated telephone line that communicates with a central location for processing charges on the bank card.").  But the claim does not.  Because this limitation is not subject to § 112 ¶ 6, these particular features noted by the Government and IBM may provide a "guide" to interpreting the

43

claim, but they do not limit it.  *See Phillips*, 415 F.3d at 1315.

Even if this "means for communicating" limitation were subject to § 112 ¶ 6, the claim would still not be limited by requirements of having a "dedicated" telephone line or having to communicate "with a central location for processing charges."  Under the "second step" of the means-plus-function analysis described above, "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."  *Golight*, 355 F.3d at 1334.  "Section 112 paragraph 6 does not permit incorporation of structure from the written description beyond that necessary to perform the claimed function."  *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369-70 (Fed. Cir. 2001) (quotation marks omitted); *see also, e.g.*, *Golight*, 355 F.3d at 1334 ("these structures are superfluous to our claim construction analysis because they are not required for performing the claimed function").  The claimed function can be performed without a "dedicated" telephone line and without communicating "with a central location."  Those structures, therefore, do not limit this claim.

| Limitation 4:  *means for securely storing said item until the item is collected by said commercial delivery service;* |
| --- |

| **Uship's Proposed Construction:** <br><br> *"means for securely storing":*  structure, material, or steps used to hold or contain an item in a manner designed to ensure that the item is safe from interception by unauthorized persons |
| --- |

This interpretation reflects the description of the invention in the specification and the ordinary and customary meaning of the terms, as confirmed by general purpose dictionaries.  *See* "securely holding," *supra* p.30 ('464 Claim 7); specification 51-52; *Random House Unabridged*

*Dictionary* 1877 ("store": "12. to deposit in a storehouse, warehouse, or other place for keep-ing").  Neither the Government nor IBM disputes that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

This is a means-plus-function claim, and therefore the claim must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents the-reof.  The function is "securely storing the item."  The corresponding structure in the specifica-tion is "storage area" (*see, e.g.*, illustration 14 in the first and second embodiments, and illustra-tions 211, or 212, and 276 in a third embodiment) combined with "a security mechanism" that prevents unauthorized access, such as an appropriately conceived door.  Specification 2:33-36, 51-56, 3:46-47, 4:25-26, 5:35-38, 11:40-41; *see also* Figures 1, 3, and 6-9.

The Government and IBM drastically overdefine the structure of this function.  The Gov-ernment and IBM would read into this limitation many structures that, though perhaps related, are unnecessary to securely store the items.  For example, drawing from the first embodiment, the Government and IBM would read into the limitation the pair of inner doors (52, 54) and a stepper motor (58); drawing from the third embodiment, they would read into the limitation a single inner door (246) and a stepper motor (248).  Although these inner doors may help secure the item in the storage area, they are not necessary to perform that function; the outer housing combined with a structure like the system's "dump drop," which uses "a pivotable door or drawer which has a handle and is similar to the drawers on commercial drop-boxes or those which are used by the U.S. Postal Service," specification 5:35-38, provides adequate security for the storage area.  Because the stepper motor merely operates the inner doors, it too is unneces-sary to perform the claimed function.  Further, IBM would include a temporary holding space (240) described in the third embodiment, but that structure patently has nothing to do with secur-

45

ing the storage area; it defines a temporary space for the item *before* the item is moved into the secure storage area. *See* specification 11:8-14, 37-41. And the Government and IBM would read into the limitation many structures whose purpose is merely to convey the item into the storage area and then to distribute the item appropriately within the storage area, including the outer door (42) and guide structure (74) from the first embodiment and outer door (234), ramp (266), powered conveyer (242), and passive parcel distribution device (264) from the third embodiment. Specification 4:18-25, 4:48-51, 11:8-12:36. Indeed, by referring to an "improved security deposit system" in the context of the third embodiment, the specification makes explicit that none of the structures unique to the third embodiment that the Government and IBM included in their proposed interpretations is necessary to secure the storage area. Specification 11:8-9. In sum, because the additional structures cited by the Government and IBM are unnecessary to perform the claimed function, they are not properly read as limiting the claim. *See Asyst Techs.*, 268 F.3d at 1369-70; *Golight*, 355 F.3d at 1334.

> **Uship's Proposed Construction:**
>
> *"collected":* gathered or taken

This interpretation accords with the proposed interpretation of "collecting" discussed above. *See* "collecting," *supra* p.30 ('464 Claim 7).

> **Limitation 5:** *means for storing the inputted information once said item is disposed in said secured storage means, said information storage means including means for displaying a manifest;*

> **Uship's Proposed Construction:**
>
> *"means for storing":* structure, material, or steps used for putting or retaining data in a computer memory unit, involving the use

> of a central processing unit (CPU) and associated hardware and software
>
> **"*inputted information*":**  data that has been entered into a computer memory unit for processing or storage

These interpretations use the ordinary and customary meaning of these terms, as confirmed by general purpose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 1877 ("store": "13. *Computers*. to put or retain (data) in a memory unit"); "means for inputting," *supra* p. 35-36 ('464 Claim 7); "information relating to the destination," *supra* p.34-35 ('464 Claim 7). They also reflect the use of these terms in the specification, as discussed below.  *See also id*. Neither the Government nor IBM disputes that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

This is a means-plus-function limitation, and it therefore must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. The function is "storing the inputted information."   The specification discloses that the corresponding structure for this function is the control means, that is, the central processing unit (CPU) (102), the program logic controller (PLC) (104), and associated hardware and software.  Specification 5:62-6:1, 8:46-47; *see also* "control means," *supra* p.36-37 ('464 Claim 7); specification 10:26-30; Figures 5, 10.

The Government and IBM generally agree with Uship's definition of the corresponding structure of this claim limitation, but they maintain that certain sensors are also part of the corresponding structure.  As shown in the discussion of the next term, they are mistaken.

> **Uship's Proposed Construction:**
>
> **"*once said item is disposed*":**  whenever the item to be shipped is put in a particular or suitable place

This interpretation reflects the ordinary and customary meaning of the terms "once" and "disposed," as reflected in general purpose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 568, 1352 ("once": "11. if or when at any time; if ever. 12 whenever; as soon as"; "dispose": "3. to put in a particular or suitable place").

Under the guise of means-plus-function analysis and § 112 ¶ 6, the Government and IBM would incorrectly read into the claim limitation further particularities of the embodiments of the claim – specifically certain sensors and related devices.  To be sure, the embodiments describe an invention that stores the inputted information in the CPU "[w]hen the first sensor 112 (or the third sensor 116 in the case of the dump drop) senses the presence of an envelope, parcel or package."  Specification 8:43-47.  The Government's and IBM's treatment of the sensors as structures corresponding to the function here derives from their erroneous view that the phrase "once said item is disposed" is in fact part of this means-plus-function claim limitation.  As noted above, the function in this limitation is "storing the inputted information."  The inputted information is in fact stored from the moment it is first inputted, long before the item is disposed. The phrase "once said item is disposed" merely indicates that the system continues to store the information after the item has been disposed; but the phrase is not itself an expression of the function, and therefore structures described in the specification that might correspond to the phrase must not be read into the limitation.  *See Phillips*, 415 F.3d at 1323; *Golight*, 355 F.3d at 1334.  Because the sensors are not means for storing inputted information but rather for detecting when a package is disposed in a certain part of the apparatus, they are not corresponding structures to the pertinent function and thus do not limit the claim.

| **Uship's Proposed Construction:** |
| --- |

> *"displaying":*  showing or presenting
>
> *"manifest":*  a listing of transactions involving the claimed invention which
> pertain to a particular commercial delivery service

The ordinary and customary usage of the terms "displaying" and "manifest," as shown by general purpose dictionaries, are reflected in these interpretations.[26]  These interpretations are also reflected in the specification's usage of these terms.  The specification repeatedly uses the term "display" to indicate that information is being shown or presented.  *See, e.g.*, specification 6:42-43, 50-58, 7:8-10, 7:20-23, 7:39-41, 9:17-19, 29-31, 10:31-44.  And the specification explicitly defines "manifest" as a "listing of all transactions which pertain to the particular commercial delivery service."  Specification 10:33-34.  Neither the Government nor IBM disputes these proposed interpretations.

This is a means-plus-function limitation subject to § 112 ¶ 6, such that the claim must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.  Accordingly, the corresponding structure, material, or acts in the specification are a manifest printer (90, 280) or a video display terminal (24).  Specification 5:27-32, 6:1-3, 10:31-44, 12:41-46; Figures 1-6, 8-10.  The Government's and IBM's proposed interpretations are inadequate because they omit the video display terminal (even though it is explicitly referenced in the specifications) as an alternative structure corresponding to this function.

### B.   Claim 9

Claim 9 is dependent upon Claim 7 but contains several new terms.

---

[26] *See, e.g., Random House Unabridged Dictionary* 568, 1169 ("display": "1. to show or exhibit; make visible … 6. *Computers*. to output (data) on a CRT or other screen"; "manifest": "6. a list of the cargo carried by a ship, made for the use of various agents and officials at the ports of destination. 7. a list or invoice of goods transported by truck or train. 8. a list of the cargo or passengers carried on an airplane.").

> **Limitation:** *The integrated, automated, unattended unit of claim 7 wherein said means for storing said information further includes means for communicating said information to a remote location staffed by a human operator:*

> **Uship's Proposed Construction:**
>
> *"means for communicating":* structure, material, or steps used for transmitting data from the claimed invention to another location, involving the use of communication lines such as telephone lines and related hardware and software

As discussed above, this interpretation reflects the use of the term in the specification and the ordinary and customary meanings of the term. *See* "means for communicating and assessing," *supra* p.40 ('464 Claim 7). The Government and IBM do not specifically object to Uship's proposed interpretation, and thus the Government and IBM accept as valid the ordinary and customary meaning, which is embodied in Uship's proposed interpretations.

This is a means-plus-function limitation, meaning the claim must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. The function is "communicating said information to a remote location." The Government and IBM protest that this limitation lacks sufficient corresponding structure. But, as shown above, the specification adequately discloses that the corresponding structure includes the control means and the means for communication, such as telephone lines, and related hardware and software. *See* "means for communicating and assessing," *supra* p.40 ('464 Claim 7).

> **Uship's Proposed Construction:**
>
> *"remote location":* a place removed from the site in which the claimed invention is deployed

50

This interpretation of the term "remote location" reflects the specification itself, which refers to "a remote location such as a central office for the carrier," specification 9:58-60, and the term's ordinary and customary meaning, as confirmed by general purpose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 1128, 1630 ("remote": "1. far apart; far distant in space; situated at some distance away"; "location": "1. a place of settlement, activity, or residence … 2. a place or situation occupied.").  The Government apparently agrees with this interpretation – it uses the phrase "a place removed from the site in which the unit is deployed" – and IBM offers no express disagreement.

> **Uship's Proposed Construction:**
>
> ***"staffed by a human operator":***  utilizing the services of an employee or agent of a business or organization

This interpretation reflects the ordinary and customary meaning of these terms, as confirmed by general purpose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 1358, 1853 ("staff": "1. to provide with a staff of assistants or workers"; "operator": "1. a person who operates a machine, apparatus, or the like … 3. a person who manages a working or industrial establishment, enterprise, or system").  Neither the Government nor IBM disputes this interpretation, thus confirming its validity.

C.     Claim 10

Claim 10 is dependent upon Claim 9 but contains several new terms.

> **Limitation:**   ***The integrated, automated, unattended unit of claim 9 wherein said unit includes a pivotable door that serves as a slide when said door is opened, said slide serving to transport the item to a storage area for secure storage.***

The parties have agreed upon a joint proposed construction for one term in this limitation.

> **Joint Proposed Construction:**
>
> **_"pivotable door":_**  door for receiving items into the unit that opens and
> shuts by turning on a pivot

The parties disagree about the proper construction of other terms in this limitation.

> **UShip's Proposed Construction:**
>
> **_"serves as a slide":_**  operates as a smooth surface on which items can glide
> or pass smoothly; operates as a chute

This interpretation reflects the manner in which the term "slide" (and the related term "chute") is used in the specification.  *See, e.g.*, specification 5:32-46, 12:9-13; Figures 1, 4, 8-9. It also reflects the ordinary and customary meaning of the term "slide" found in general purpose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 1798 ("slide": "12. a smooth sur-face for sliding on, esp. a type of chute in a playground … 22. any of various chutes used in log-ging, mining, or materials handling.").

The Government asserts that a "slide" must be "downward-inclined" and have "a flat bed."  To be sure, the specification depicts slides that are inclined downward and have a flat bed, *see* specification 12:21-25, but nothing in the claim *requires* that the slide have those features. Indeed, as the specification and drawings depict, a pivotable door that serves as a slide may nei-ther be downward-inclined nor have a flat bed.  *See* specification 5:32-46; Figures 1, 4 (illustra-tions 92, 98).  The Government is thus improperly reading into the claim a particular embodi-ment described in the specification.  IBM does not propose an interpretation of "serves as a slide," and therefore presumably assents to the term's ordinary and customary meaning, which is

reflected in Uship's interpretation.

> **Uship's Proposed Construction:**
>
>    ***"transport":***  to move or convey an item from one place to another

This interpretation reflects the manner in which the specification uses the term, *see, e.g.*, specification 1:19-21, 12:2-4, which in turn reflects its ordinary and customary meaning, *see, e.g., Random House Unabridged Dictionary* 2012 ("transport": "1. to carry, move, or convey from one place to another"). The Government's proposed interpretation is the same as Uship's except that it omits the alternative "move." Insofar as "move" may capture an aspect of "transport" not captured by "convey," the Government's interpretation is inadequate. IBM does not propose an interpretation of "transport," and therefore presumably assents to the term's ordinary and customary meaning, which is reflected in Uship's interpretation.

> **Uship's Proposed Construction:**
>
> ***"storage area":***  a place in which an item is deposited or held for subsequent use or disposition

This interpretation reflects the specification's usage of the term "storage area." For example, the specification refers to "storage area 14 for holding items such as packages or parcels." Specification 3:46-48, *see also* specification 11:40-41; specification 2:7-8, 22, 26-7, 31-36, 47-56, 67-7:1; Figures 3, 8-9; interpretation of "securely holding," *supra* p.30 ('464 Claim 7); "means for securely storing," *supra* p.44-46 ('464 Claim 7). This interpretation also reflects the ordinary and customary meaning of "storage area," as confirmed by general purpose dictiona-

ries.[27]

The Government's proposed interpretation would require that the storage area be "within the outer housing of the unit."  This proposal does not seem to account for the possibility, discussed above, that the elements of the invention could exist in a cooperative, interrelated, but physically disparate system.  *See* "integrated," *supra* p.26-27 ('464 Claim 7).  IBM does not propose an interpretation of "storage area," and therefore presumably assents to the term's ordinary and customary meaning, which is reflected in Uship's interpretation.

> **Uship's Proposed Construction:**
>
> **"*secure storage*":**  holding an item in a manner designed to ensure that the item is safe from interception by unauthorized persons

The basis for this interpretation is similar to the basis for the interpretations Uship has proposed for the related terms "securely holding," *supra* p.30 ('464 Claim 7), and "means for securely storing," *supra* p.44-46 ('464 Claim 7).  The Government's proposal is unduly restrictive insofar as it would require that the storage area be completely "inaccessible to unauthorized persons," whereas the limitation requires only that the item be held safe from interception from unauthorized persons.  IBM does not specifically object to this proposed interpretation, thus confirming that the ordinary and customary meaning, as reflected in Uship's proposal, is valid.

**D.    Claim 11**

Claim 11 is dependent upon Claim 10.

> **Limitation:   *The integrated, automated, unattended unit of claim 10 wherein***

---

[27] *See, e.g., Random House Unabridged Dictionary* 110, 1877 ("storage": "2. capacity or space for storing. 3. a place, as a room or building, for storing"; "area": "1. any particular extent of space or surface; part … 3. any section reserved for a specific function.").

> **said door serves to secure said storage area when said door is opened.**

The parties have agreed upon a joint proposed construction for the only new term in this limitation:

> **Joint Proposed Construction:**
>
> **"serves to secure":**  operates to bar access to the storage area through the door opening

**E.**   **Claim 12**

Claim 12 is dependent upon Claim 7.

> **Limitation:**   **The integrated, automated, unattended unit of claim 7 wherein said means for receiving said credit card information comprises a magnetic card reader.**

The parties have agreed upon a joint proposed construction for the following term in this limitation.

> **Joint Proposed Construction:**
>
> **"magnetic card reader":**  Plain Meaning – comprises a magnetic card reader.

**F.**   **Claim 15**

Claim 15 is dependent upon Claim 12, and adds several new terms.

> **Limitation:**   **The integrated, automated, unattended unit of claim 12 wherein said card reader is adapted to read credit cards issued by any of a plurality of credit card companies and wherein said fee communicating**

> ***means is adapted to communicate selectively with the credit card
> company issuing the card being used in the transaction.***

> **Uship's Proposed Construction:**
>
> ***"adapted to read":***  made suitable, revised, or modified to obtain or scan
> data from an external storage medium and to place such da-
> ta in the memory of a computer or similar device

This interpretation reflects the ordinary and customary meaning of these terms, as con-
firmed by general purpose dictionaries.[28]  It also conforms to the specification's use of these

terms.  *See* Specification 5:65-66 (magnetic card reader is input to CPU); specification 6:62-65

("After the customer has passed the magnetic card through reader, control system evaluates the

information received from card reader …."); specification 7:9 ("the information read from the

card").

The Government proposes to give "adapted to read" its plain meaning, confirming that

the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

IBM would interpret "adapted to read" to mean "compatible with."  That interpretation is unne-

cessarily imprecise.

> **Uship's Proposed Construction:**
>
> ***"any of a plurality":***  each[29] of a group of more than one

---

[28] *See, e.g., Random House Unabridged Dictionary* 22, 1606 ("adapt": "1. to make suita-
ble to requirements or conditions; adjust or modify fittingly"; "read": "16. *Computers.* to obtain
(data, programs, or control information) from an external storage medium or some other source
and place in memory.").

[29] Uship's initial proposal to the Government and IBM referred to "one of a group,"
where it now refers to "each of a group."  Uship makes this change simply in order to clarify its
interpretation.

This interpretation embodies the ordinary and customary meaning of these words.  The Government purports to propose that the clause be given its "plain meaning," but in fact the Government's proposal might alter its meaning.  The Government proposes to interpret "any of a plurality" to mean "more than one."  The Government's proposal could be understood to mean, incorrectly, that each credit card capable of being read by the card reader must have been issued by multiple credit card companies.  IBM's interpretation is unduly restrictive because it would require that the cards be "commercial bank" cards rather than "credit cards."  IBM thus attempts improperly to read an embodiment from the specification into the claim.  *See* specification 6:60-62 ("system 10 is selectively compatible with several different commercial bank cards").

---

**Uship's Proposed Construction:**

*"adapted to communicate selectively":*  made suitable, revised, or modified to transmit data from the claimed invention to one location among other possible locations, depending upon the source of the data

---

This interpretation reflects the use of these terms in the specification, *see* "means for communicating and assessing," *supra* p.40 ('464 Claim 7); "adapted to read," *supra* p.56 ('464 Claim 15); specification 6:60-62 ("If desired, system 10 is selectively compatible with several different commercial bank cards."), and the ordinary and customary meaning of these terms, as confirmed by general purpose dictionaries, *see Random House Unabridged Dictionary* 1734 ("select": "1. to choose in preference to another or others; pick out … 2. to make a choice; pick.").  The Government proposes to give this term its plain meaning, confirming that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.  IBM incorrectly treats this limitation as a means-plus-function limitation subject to § 112 ¶ 6.  Accord-

ing to IBM, the function is "to communicate selectively with the credit card company issuing the card being used in the transaction" and the corresponding structure is "magnetic card reader 30 or 230 and a dedicated telephone line."  In this claim, "said fee communicating means" refers to the "means for communicating and assessing" in Claim 7 of this patent, which was interpreted *supra* p.40.  The further limitation in this claim – "adapted to communicate selectively" – is not itself a means-plus-function limitation but merely a qualification of the "means for communicating and assessing."  By repeating here its proposed interpretation of "means for communicating and assessing," IBM in effect fails to propose an interpretation of "adapted to communicate selectively."

---

**Uship's Proposed Construction:**

**"card being used in the transaction":**  the credit card that is being used in the particular transaction

---

This interpretation reflects the usage of these terms in the specification.  *See, e.g.*, specification 6:57-7:6, 7:51-54, 8:63-65, 9:30-32.  The Government proposes to give this clause its plain meaning, confirming that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.  Similarly, IBM offers no interpretation of this term and therefore confirms that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

G.   <u>Claim 16</u>

Claim 16 is dependent upon Claim 15, and again adds several new terms.

---

**Limitation:**   *The integrated, automated, unattended unit of claim 15 wherein said fee communicating means includes means for validating said credit card prior to issuing the shipping label.*

---

> **Uship's Proposed Construction:**
>
> **"*means for validating*":**  structure, material, or steps used for ascertaining or confirming the validity or authenticity of

The proposed interpretation reflects the specification's usage of the term.  *See, e.g.*, specification 6:63-66 ("determines whether or not the card information meets certain predetermined characteristics"), 7:1 ("'bad' card"), 7:4 ("validation of the card"), 7:9-12 ("If the information read from the card does not meet the necessary criteria, ....  If the card information is approved ....").  It also reflects the ordinary and customary meaning of the term, as confirmed by general purpose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 2102 ("validate": "1. to make valid; substantiate; confirm.").  Neither the Government nor IBM has specifically objected to this proposed interpretation, thus confirming that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

This is a means-plus-function limitation subject to § 112 ¶ 6, and it therefore must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.  The function here is "validating said credit card."  The corresponding structure in the specification includes the "control means," *see supra* p.36-37 ('464 Claim 7), and the "means for receiving credit card information," *see supra* p.39 ('464 Claim 7), as well as the "magnetic card reader," *supra* p.55 ('464 Claim 12).  *See also* specification 6:62-7:2, 7:12.  The specification also refers to the "necessary criteria" by which to ascertain or confirm the validity or authenticity of the credit card, which criteria may be preprogrammed into or otherwise stored in the control means or may be received from an outside source at the time of validation via the means for communicating.  Specification 6:62-7:5, 7:8-12; *see also* "means for communicating and assessing," *supra* p.40 ('464 Claim 7).

59

The Government's proposed interpretation is unduly restrictive in several respects.  It omits the alternative card reader (230).  It would require the predetermined criteria to be "stored in CPU memory," even though the specification does not state that the criteria would necessarily be so stored.  And the Government would require that the structure include a "dedicated" telephone line and that it communicate "with a central location for processing charges"; but, as explained above, the Government is attempting to improperly read a particular embodiment into the claim limitation.  *See supra* p.43-44 ('464 Claim 7).  IBM contends that this claim limitation lacks sufficient corresponding structure, but IBM acknowledges only the control system (100) and the magnetic card reader (30 or 230); the additional structure just described ensures that this limitation has sufficient corresponding structure.

> **Uship's Proposed Construction:**
>
> *"issuing":*  printing or publishing

This interpretation reflects the specification, which repeatedly indicates that the invention will "print" the shipping label.  *See, e.g.*, specification 8:3-4, 7; 13:17-19; *see also Random House Unabridged Dictionary* 1015 ("issue": "24. to mint, print, or publish for sale or distribution").  Neither the Government nor IBM disputes this proposed interpretation.

> **Uship's Proposed Construction:**
>
> *"shipping label":*  a slip of paper, cloth, or other material, marked or inscribed, for attachment to an item to indicate information relating to the shipping or delivery of that item, such as the destination to which the item is to be shipped

This interpretation reflects the specification's use of the term "shipping label."  *See, e.g.*,

specification 8:1-13 (discussing mailing label); 13:17-19 (discussing address label).  This inter-

pretation also reflects the ordinary and customary meaning of "label," as shown in general pur-

pose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 1071 ("label": "1. a slip of

paper, cloth, or other material, marked or inscribed, for attachment to something to indicate its

… destination"); *see also* "shipment," *supra* p.31 ('464 Claim 7).  Neither the Government nor

IBM disputes this proposed interpretation, thus confirming that the ordinary and customary

meaning, as reflected in Uship's proposed interpretation, is valid.

**H.**   **Claim 17**

Claim 17 is dependent upon Claim 16.

| |
|---|
| **Limitation:**   *The integrated, automated, unattended unit of claim 16 wherein said validating means further includes means for determining the type of card and the expiration date of the card.* |

| |
|---|
| **Uship's Proposed Construction:**<br><br>*"means for determining":*  structure, material, or steps used for ascertaining |

This interpretation reflects the specification's usage of the term.  *See* specification 6:62-

7:1; *see also* "means for validating," *supra* p.59 ('464 Claim 16).  It also reflects the ordinary

and customary meaning of "determine," as shown in general purpose dictionaries.  *See, e.g.,*

*Random House Unabridged Dictionary* 542 ("determine": "2. to conclude or ascertain, as after

reasoning, observation, etc.").  Neither the Government nor IBM disputes this proposed interpre-

tation, thus confirming that the ordinary and customary meaning, as reflected in Uship's pro-

posed interpretation, is valid.

This is a means-plus-function limitation subject to § 112 ¶ 6.  The function here is "de-

termining the type of card and the expiration date of the card."  In disclosing the corresponding

structure, the specification indicates that the system may be programmed or otherwise instructed

to collect information relating to certain characteristics of the card, including the type of card and

the expiration date of the card.  *See* specification 6:62-7:1; *see also* "means for validating," *supra*

p.59 ('464 Claim 16).

The Government repeats its first proposed interpretation of the "means for validating,"

but explicates the "predetermined characteristics" mentioned in its prior proposed interpretation

as "predetermined card type and expiration date information."  To the extent the Government's

first interpretation of "means for validating" was inadequate, *see supra* p.59, its interpretation

here fares no better.  Similarly, IBM repeats its proposed interpretation of "means for validating"

and reiterates that the claim "lacks sufficient structure."  But, much as with respect to "means for

validating," IBM has ignored several structural references; considered together, these references

adequately disclose the meaning of the claim.  *See Supra* p.60.

## I.   <u>Claim 18</u>

Claim 18 is dependent upon Claim 17.

| Limitation:   ***The integrated, automated, unattended unit of claim 17 wherein said validating means further includes means for determining whether the card is listed as a bad card.*** |
| --- |

| Uship's Proposed Construction: <br><br> ***"means for determining":***  structure, material, or steps used for ascertaining |
| --- |

This interpretation of "means for determining" accords with our proposed interpretation

of "means for determining" discussed for Claim 17.  *See supra* p.61 ('464 Claim 17).

> **Uship's Proposed Construction:**
>
> **"*listed as a bad card*":**  identified or designated as a credit card that is no
> longer valid or for which the charge would exceed its credit
> limit

This interpretation reflects the clause's usage in the specification and the ordinary and customary meaning of its terms, as shown in general purpose dictionaries.[30]  Neither the Government nor IBM disputes this proposed interpretation, thus confirming that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

This is a means-plus-function limitation subject to § 112 ¶ 6.  The function here is "determining whether the card is listed as a bad card."  The corresponding structure, as disclosed by the specification, includes the "means for validating," *see supra* p.59 ('464 Claim 16), and an accessible list of "bad" cards.  *See* specification 6:66-7:1.  The Government's and IBM's proposed interpretations are inadequate for the same reasons that their proposed interpretations for "means for determining" were inadequate.  *See supra* p.61 ('464 Claim 17).

## J.     Claim 19

Claim 19 is an independent claim.  As with the other independent claims, we provide interpretations of the preamble in an abundance of caution, not because the Court need separately construe it.  Because all but one of the terms identified below – "means for transmitting," in limitation 5 – have already been addressed above in the context of other claims under the '464 pa-

---

[30] *See* specification 6:66-7:1 ("control system 100 . . . determines whether or not the card information meets certain predetermined characteristics. Those characteristics may be the type of card, the expiration date, and whether the card is listed in the CPU memory as a 'bad' card"). *See also Random House Unabridged Dictionary* 153-54, 1121 ("list": "6. to set down together in a list; make a list of … 7. to enter in a list, directory, catalog, etc. … 8. to place on a list of persons to be watched, excluded, restricted, etc."; "bad": "4. inadequate or below standard; not satisfactory for use … 6. invalid, unsound, or false … 31. *Com[merce]*. deemed uncollectible or irrecoverable and treated as a loss: *a bad debt* … 33. counterfeit; not genuine.").

tent, we present below our proposed constructions, and refer the Court to our previous arguments

in support of those constructions.

> **Preamble:   *An integrated, automated, unattended unit for collecting and secure-ly holding items for collection and shipment by commercial delivery services:  said automated unit comprising,***

---

**Uship's Proposed Construction:**

*"integrated":*  brought together or incorporated into a unified or interre-lated whole or system (discussed *supra* p.26-27 ('464 Claim 7))

*"automated":*  employing a technique, method, or system of operating and controlling a task by highly automatic means, as by elec-tronic devices, thereby reducing human intervention to a minimum (discussed *supra* p.27 ('464 Claim 7))

*"unattended":*  not accompanied by an attendant or the like; capable of being used by a customer without assistance from an atten-dant or operator (discussed *supra* p.28 ('464 Claim 7))

*"unit":*  a machine, part, or system of machines having a special purpose; an apparatus (discussed supra p.29 ('464 Claim 7))

*"collecting":*  gathering together; accepting (discussed *supra* p.30 ('464 Claim 7))

*"securely holding":*  containing an item in a manner designed to ensure that the item is safe from interception by unauthorized persons (discussed *supra* p.30 ('464 Claim 7))

*"items":*  parcels, envelopes, letters, packages and like items (discussed *supra* p.31 ('464 Claim 7))

*"collection":*  the act of gathering items together or accepting (discussed supra p.31 ('464 Claim 7))

*"shipment":*  the act of sending by use of the USPS or a company or ser-vice that engages in the transportation of items[31] from one

---

[31] Uship's initial proposal to the Government and IBM referred to "parcels and envelopes," where it now refers to "items."  Uship makes this change in order to clarify that "shipment" is not limited to the transportation of parcels and envelopes.

> location to another location (discussed *supra* p.31 ('464 Claim 7))
>
> **"commercial delivery services":**  businesses, organizations, or other entities, including the USPS, that engage in the shipment of items from one location to another location (discussed *supra* p.32 ('464 Claim 7))

**Limitation 1:**  *means for weighing the item to be shipped;*

> **Joint Proposed Construction:**
>
> **"means for weighing":**
>
> > **Function**: weighing the item to be shipped;
> >
> > **Corresponding structure**: electronic scale shown in illustration 22 or 222 (discussed *supra* p.33 ('464 Claim 7))
>
> **Uship's Proposed Construction:**
>
> **"shipped":**  the state of being sent by use of the USPS or a company or service that engages in the transportation of items[32] from one location to another location (discussed *supra* p.33 ('464 Claim 7))

**Limitation 2:**  *means for inputting information relating to the destination to which the item is to be shipped;*

> **Uship's Proposed Construction:**
>
> **"means for inputting":**  structure, material, or steps used for entering data into a central processing unit (CPU)[33] for processing or sto-

---

[32] Uship's initial proposal to the Government and IBM referred to "parcels and envelopes," where it now refers to "items."  Uship makes this change in order to clarify that "shipment" is not limited to the transportation of parcels and envelopes.

[33] Uship's initial proposal to the Government and IBM referred to a "computer memory unit," where it now refers to a "central processing unit."  Without intending to change the

rage, such as a keyboard, touch pad, touch screen, or similar device (discussed *supra* p.35-36 ('464 Claim 7))

***"information relating to the destination":*** data relating to the location to which the item to be shipped is to be shipped, such as the zip code for that location (discussed *supra* p.34-35 ('464 Claim 7))

**Limitation 3:** *control means for analyzing the inputted information and calculating the fee for shipment of the item; said control means further including means for communicating and assessing the shipment fee to the account of the person, said means for communicating the shipment fee being by telephone lines;*

**Uship's Proposed Construction:**

***"control means":*** structure, material, or steps used for controlling the operation of certain features of the claimed invention, involving the use of a central processing unit (CPU) and associated hardware and software (discussed *supra* p.36-37 ('464 Claim 7))

***"analyzing":*** processing or examining (discussed *supra* p.37 ('464 Claim 7))

***"calculating":*** determining by mathematical methods; computing (discussed *supra* p.37 ('464 Claim 7))

***"fee for shipment":*** the price or sum quoted or charged to ship an item to the designated location/address (discussed *supra* p.37 ('464 Claim 7))

***"means for communicating and assessing":*** structure, material, or steps used for transmitting data between the claimed invention and the customer's credit card company (or that company's agents) and for charging the fee for shipment to the customer's credit card account, involving the use of communication lines such as telephone lines and related hardware and

meaning of its proposed interpretation, Uship makes this change in order to conform its interpretation more closely to the specification, which refers to a "central processing unit (CPU)" but not to a "computer memory unit."

software (discussed *supra* p.40 ('464 Claim 7))

*"account":*  a business relation in which credit is used (discussed *supra* p.41 ('464 Claim 7))

*"telephone lines":*  a wire circuit connecting two or more points or stations in a telephone system, or the system itself (discussed *supra* p.41 ('464 Claim 7))

**Limitation 4:   *means for securely storing said item until the item is collected by said commercial delivery service;***

**Uship's Proposed Construction:**

*"means for securely storing":*  structure, material, or steps used to hold or contain an item in a manner designed to ensure that the item is safe from interception by unauthorized persons (discussed *supra* p.44-46 ('464 Claim 7))

*"collected":*  gathered or taken (discussed *supra* p.46 ('464 Claim 7))

**Limitation 5:   *means for storing the inputted information once said item is disposed in said secured storage means, said information storage means including means for transmitting a manifest to a remote location;***

**Uship's Proposed Construction:**

*"means for storing":*  structure, material, or steps used for putting or retaining data in a computer memory unit, involving the use of a central processing unit (CPU) and associated hardware and software (discussed *supra* p.47 ('464 Claim 7))

*"inputted information":*  data that has been entered into a computer memory unit for processing or storage (discussed *supra* p.47 ('464 Claim 7))

*"once said item is disposed":*  whenever the item to be shipped is put in a particular or suitable place (discussed *supra* p.48 ('464

Claim 7))

*"manifest":* a listing of transactions involving the claimed invention which pertain to a particular commercial delivery service (discussed *supra* p.49 ('464 Claim 7))

*"remote location":* a place removed from the site in which the claimed invention is deployed (discussed *supra* p.51 ('464 Claim 9))

**Uship's Proposed Construction of new term:**

*"means for transmitting":* structure, material, or steps used for sending or communicating data, involving the use of communication lines such as telephone lines and related hardware and software

Uship's proposed interpretation of "means for transmitting" accords with the usage of the term "transmit" in the specification, *see, e.g.*, specification 9:58-60 ("The system 10 may be capable of transmitting the manifest to a remote location such as a central office for the carrier"), and the term's ordinary and customary meaning as shown in general purpose dictionaries. *See, e.g., Random House Unabridged Dictionary* 2011 ("transmit": "1. to send or forward, as to a recipient or destination; dispatch; convey. 2. to communicate, as information or news."); *see also* "means for communicating and assessing," *supra* p.40 ('464 Claim 7). Neither the Government nor IBM has specifically objected to this proposed interpretation, thus confirming that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

This is a means-plus-function limitation, meaning the claim must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. The function is "transmitting a manifest to a remote location." Although the Government and IBM protest that this means-plus-function limitation lacks sufficient corresponding structure,

the structure is adequately disclosed as the "means for communicating," which we have already

discussed.  *See* "means for communicating and assessing," *supra* p.40 ('464 Claim 7).

### K.      Claim 20

Claim 20 is dependent upon Claim 19 and introduces no new terms.

> **Limitation:   *The integrated, automated, unattended unit of claim 19 wherein said fee communicating means includes means for validating said account prior to issuing the shipping label.***

> **Uship's Proposed Construction:**
>
> ***"means for validating":***  structure, material, or steps used for ascertaining or confirming the validity or authenticity of (discussed *supra* p.59 ('464 Claim 16))
>
> ***"account":***  a business relation in which credit is used (discussed *supra* p.41 ('464 Claim 7))
>
> ***"issuing":***  printing or publishing (discussed *supra* p.60 ('464 Claim 16))
>
> ***"shipping label":***  a slip of paper, cloth, or other material, marked or inscribed, for attachment to an item to indicate information relating to the shipping or delivery of that item, such as the destination to which the item is to be shipped (discussed *supra* p.60 ('464 Claim 16))

### L.      Claim 21

Claim 21 is dependent upon Claim 19 and introduces several new terms.

> **Limitation:   *The integrated, automated, unattended unit of claim 19 including means for printing a hard copy of said account charge for said person.***

The parties have agreed upon a joint proposed construction regarding the function and

structure of this limitation, but they have not expressly agreed on the meaning of some of the terms contained therein.

> **Joint Proposed Construction:**
>
> **"means for printing":**
>
> > **Function**: printing a hard copy of said account charge for said person;
> >
> > **Corresponding structure**: printer 26

> **Uship's Proposed Construction:**
>
> **"hard copy":**  computer output printed on paper; a printout

This interpretation of "hard copy" uses the ordinary and customary meaning of the term "hard copy," as confirmed by general purpose dictionaries.  *See, e.g., Random House Unabridged Dictionary* 871 ("hard copy": "1. copy, as computer output printed on paper, that can be read without using a special device.").  It also reflects the specification's usage of printing.  *See, e.g.*, specification 2:22-25 (referring to a system that "can give a verified deposit of receipt to a customer"), 8:65-66 (referring to "verified deposit of receipt").  Neither the Government nor IBM disputes this proposed interpretation, thus confirming that the ordinary and customary meaning, as reflected in Uship's proposed interpretation, is valid.

> **Uship's Proposed Construction:**
>
> **"said account charge":**  an entry in the customer's account of money due

This interpretation of "said account charge" reflects the specification's usage of that term. *See, e.g.*, specification 7:3-4, 51-52; *see also* "account," *supra* p.41 ('464 Claim 7); "means for communicating and assessing," *supra* p.40 ('464 Claim 7).  It also uses the ordinary and custo-

70

mary meaning of the term "charge," as confirmed by general purpose dictionaries.  *See, e.g.,*

*Random House Unabridged Dictionary* 347 ("charge": "30. a pecuniary burden, encumbrance,

tax, or lien; cost; expense; liability to pay . . . .").  Neither the Government nor IBM specifically

objects to this proposed interpretation.

M.   <u>Claim 28</u>

Although claim 28 is an independent claim, it introduces no terms not found in one or

more of the claims already discussed.  Although the Court need not separately construe the

preamble, as with the other independent claims, we provide an interpretation of the preamble in

an abundance of caution.

| **Preamble:**  *An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services:  said automated unit comprising:* |
|---|

| **Uship's Proposed Construction:** |
|---|
| *"integrated":*  brought together or incorporated into a unified or interrelated whole or system (discussed *supra* p.26-27 ('464 Claim 7)) |
| *"automated":*  employing a technique, method, or system of operating and controlling a task by highly automatic means, as by electronic devices, thereby reducing human intervention to a minimum (discussed *supra* p.27 ('464 Claim 7)) |
| *"unattended":*  not accompanied by an attendant or the like; capable of being used by a customer without assistance from an attendant or operator (discussed *supra* p.28 ('464 Claim 7)) |
| *"unit":*  a machine, part, or system of machines having a special purpose; an apparatus (discussed supra p.29 ('464 Claim 7)) |
| *"collecting":*  gathering together; accepting (discussed *supra* p.30 ('464 Claim 7)) |
| *"securely holding":*  containing an item in a manner designed to ensure that the item is safe from interception by unauthorized persons |

71

> (discussed *supra* p.30 ('464 Claim 7))
>
> **"items":**  parcels, envelopes, letters, packages and like items (discussed *supra* p.31 ('464 Claim 7))
>
> **"collection":**  the act of gathering items together or *accepting* (discussed *supra* p.31 ('464 Claim 7))
>
> **"shipment":**  the act of sending by use of the USPS or a company or service that engages in the *transportation* of items[34] from one location to another location (discussed *supra* p.31 ('464 Claim 7))
>
> **"commercial delivery services":**  businesses, organizations, or other entities, including the USPS, that engage in the shipment of items from one location to another location (discussed *supra* p.32 ('464 Claim 7))

| Limitation 1:  *means for weighing the item to be shipped;* |
| --- |

The parties have agreed upon a joint proposed construction regarding the function and structure of this limitation, but they have not expressly agreed on the meaning of the term "shipped."

> **Joint Proposed Construction:**
>
> **"means for weighing":**
>
> > **Function**: weighing the item to be shipped;
> >
> > **Corresponding structure**: electronic scale shown in *illustration* 22 or 222 (discussed *supra* p.65 ('464 Claim 7))

---

[34] Uship's initial proposal to the Government and IBM referred to "parcels and envelopes," where it now refers to "items."  Uship makes this change in order to clarify that "shipment" is not limited to the transportation of parcels and envelopes.

**Uship's Proposed Construction:**

*"shipped":*  the state of being sent by use of the USPS or a company or service that engages in the transportation of items[35] from one location to another location (discussed *supra* p.65 ('464 Claim 7))

---

**Limitation 2:**  *means for inputting information relating to the destination to which the item is to be shipped;*

---

**Uship's Proposed Construction:**

*"means for inputting":*  structure, material, or steps used for entering data into a central processing unit (CPU)[36] for processing or storage, such as a keyboard, touch pad, touch screen, or similar device (discussed *supra* p.65 ('464 Claim 7))

*"information relating to the destination":*  data relating to the location to which the item to be shipped is to be shipped, such as the zip code for that location (discussed *supra* p.66 ('464 Claim 7))

---

**Limitation 3:**  *control means for analyzing the inputted information and calculating the fee for shipment of the item; said control means further including means for communicating and assessing the shipment fee to the account of the person, said means for assessing comprising means*

---

[35] Uship's initial proposal to the Government and IBM referred to "parcels and envelopes," where it now refers to "items."  Uship makes this change in order to clarify that "shipment" is not limited to the transportation of parcels and envelopes.

[36] Uship's initial proposal to the Government and IBM referred to a "computer memory unit," where it now refers to a "central processing unit."  Without intending to change the meaning of its proposed interpretation, Uship makes this change in order to conform its interpretation more closely to the specification, which refers to a "central processing unit (CPU)" but not to a "computer memory unit."

*for printing a hard copy of said account charge for said person;*

**Uship's Proposed Construction:**

*"control means":*  structure, material, or steps used for controlling the operation of certain features of the claimed invention, involving the use of a central processing unit (CPU) and associated hardware and software (discussed *supra* p.66 ('464 Claim 7))

*"analyzing":*  processing or examining (discussed *supra* p.66 ('464 Claim 7))

*"calculating":*  determining by mathematical methods; computing (discussed *supra* p.66 ('464 Claim 7))

*"fee for shipment":*  the price or sum quoted or charged to ship an item to the designated location/address (discussed *supra* p.66 ('464 Claim 7))

*"means for communicating and assessing":*  structure, material, or steps used for transmitting data between the claimed invention and the customer's credit card company (or that company's agents) and for charging the fee for shipment to the customer's credit card account, involving the use of communication lines such as telephone lines and related hardware and software (discussed *supra* p.66 ('464 Claim 7))

*"account":*  a business relation in which credit is used (discussed *supra* p.67 ('464 Claim 7))

*"means for printing":*

**Function**: printing a hard copy of said account charge for said person;

**Corresponding structure**: printer 26 (discussed *supra* p.70 ('464 Claim 21))

*"hard copy":*  computer output printed on paper; a printout (discussed *supra* p.70 ('464 Claim 21))

*"said account charge":*  an entry in the customer's account of money due (discussed *supra* p.70 ('464 Claim 21))

**Limitation 4:**   *means for securely storing said item until the item is collected by said commercial delivery service;*

**Uship's Proposed Construction:**

*"means for securely storing":*  structure, material, or steps used to hold or contain an item in a manner designed to ensure that the item is safe from interception by unauthorized persons (discussed *supra* p.44-46 ('464 Claim 7))

*"collected":*  gathered or taken (discussed *supra* p.46 ('464 Claim 7))

**Limitation 5:**   *means for storing the inputted information once said item is disposed in said secured storage means, said information storage means including means for displaying a manifest.*

**Uship's Proposed Construction:**

*"means for storing":*  structure, material, or steps used for putting or retaining data in a computer memory unit, involving the use of a central processing unit (CPU) and associated hardware and software (discussed *supra* p.47 ('464 Claim 7))

*"inputted information":*  data that has been entered into a computer memory unit for processing or storage (discussed *supra* p.47 ('464 Claim 7))

*"once said item is disposed":*  whenever the item to be shipped is put in a particular or suitable place (discussed *supra* p.48 ('464 Claim 7))

*"displaying":*  showing or presenting (discussed *supra* p.48 ('464 Claim 7))

*"manifest":*  a listing of transactions involving the claimed invention which pertain to a particular commercial delivery service (discussed *supra* p.49 ('464 Claim 7))

## N.   Claim 29

Claim 29 is dependent upon Claim 28 and introduces no new terms.

**Limitation:** *The integrated, automated, unattended unit of claim 28 wherein said fee communicating means includes means for validating said account prior to issuing the shipping label.*

**Uship's Proposed Construction:**

*"means for validating":* structure, material, or steps used for ascertaining or confirming the validity or authenticity of (discussed *supra* p.59 ('464 Claim 16))

*"issuing":* printing or publishing (discussed *supra* p.60 ('464 Claim 16))

*"shipping label":* a slip of paper, cloth, or other material, marked or inscribed, for attachment to an item to indicate information relating to the shipping or delivery of that item, such as the destination to which the item is to be shipped (discussed *supra* p.60 ('464 Claim 16))

## O.   Claim 30

Claim 30 is dependent upon Claim 28 and contains some terms for which no construction has yet been discussed.

**Limitation:** *The integrated, automated, unattended unit of claim 28 including means for communicating said account charge to a remote location.*

**Uship's Proposed Construction:**

*"means for communicating":* structure, material, or steps used for transmitting data from the claimed invention to another location, involving the use of communication lines such as telephone lines and related hardware and software

This interpretation of "means for communicating" accords with the proposed interpretation of "means for communicating," *supra* p.50 ('464 Claim 9), and "means for communicating and assessing," *supra* p.40 ('464 Claim 7).

76

> **Uship's Proposed Construction:**
>
> *"said account charge":*  an entry in the customer's account of money due
>     (discussed *supra* p.70 ('464 Claim 21))
>
> *"remote location":*  a place removed from the site in which the claimed
>     invention is deployed (discussed *supra* p.51 ('464 Claim 9))

This is a means-plus-function limitation.  The function is "communicating said information to a remote location."  The corresponding structure was identified above.  *See* "means for communicating and assessing," *supra* p.40 ('464 Claim 7).

## P.    Claim 34

Claim 34 is an independent claim that introduces no terms not found in one or more of the claims previously discussed.  As with the other independent claims, we provide interpretations of the preamble solely in an abundance of caution.

> **Preamble:**  *An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services:  said automated unit comprising:*

> **Uship's Proposed Construction:**
>
> *"integrated":*  brought together or incorporated into a unified or interrelated whole or system (discussed *supra* p.26-27 ('464 Claim 7))
>
> *"automated":*  employing a technique, method, or system of operating and
>     controlling a task by highly automatic means, as by electronic devices, thereby reducing human intervention to a
>     minimum (discussed *supra* p.27 ('464 Claim 7))
>
> *"unattended":*  not accompanied by an attendant or the like; capable of
>     being used by a customer without assistance from an attendant or operator (discussed *supra* p.28 ('464 Claim 7))
>
> *"unit":*  a machine, part, or system of machines having a special purpose;
>     an apparatus (discussed *supra* p.29 ('464 Claim 7))

***"collecting":***  gathering together; accepting (discussed *supra* p.30 ('464 Claim 7))

***"securely holding":***  containing an item in a manner designed to ensure that the item is safe from interception by unauthorized persons (discussed *supra* p.30 ('464 Claim 7))

***"items":***  parcels, envelopes, letters, packages and like items (discussed *supra* p.31 ('464 Claim 7))

***"collection":***  the act of gathering items together or accepting (discussed *supra* p.31 ('464 Claim 7))

***"shipment":***  the act of sending by use of the USPS or a company or service that engages in the transportation of items[37] from one location to another location (discussed *supra* p.31 ('464 Claim 7))

***"commercial delivery services":***  businesses, organizations, or other entities, including the USPS, that engage in the shipment of items from one location to another location (discussed *supra* p.32 ('464 Claim 7))

---

**Limitation 1:**  *means for inputting information relating to the destination to which the item is to be shipped;*

---

**Uship's Proposed Construction:**

***"means for inputting":***  structure, material, or steps used for entering data into a central processing unit (CPU)[38] for processing or storage, such as a keyboard, touch pad, touch screen, or similar device (discussed *supra* p.35-36 ('464 Claim 7))

---

[37] Uship's initial proposal to the Government and IBM referred to "parcels and envelopes," where it now refers to "items."  Uship makes this change in order to clarify that "shipment" is not limited to the transportation of parcels and envelopes.

[38] Uship's initial proposal to the Government and IBM referred to a "computer memory unit," where it now refers to a "central processing unit."  Without intending to change the meaning of its proposed interpretation, Uship makes this change in order to conform its interpretation more closely to the specification, which refers to a "central processing unit (CPU)" but not to a "computer memory unit."

*"information relating to the destination"*:  data relating to the location to which the item to be shipped is to be shipped, such as the zip code for that location (discussed *supra* p.34-35 ('464 Claim 7))

**Limitation 2:**   *control means for analyzing the inputted information and calculating the fee for shipment of the item; said control means further including means for communicating and assessing the shipment fee to the account of the person, said means for communicating the shipment fee being by telephone lines;*

**Uship's Proposed Construction:**

*"control means"*:  structure, material, or steps used for controlling the operation of certain features of the claimed invention, involving the use of a central processing unit (CPU) and associated hardware and software (discussed *supra* p.36-37 ('464 Claim 7))

*"analyzing"*:  processing or examining (discussed *supra* p.37 ('464 Claim 7))

*"calculating"*:  determining by mathematical methods; computing (discussed *supra* p.37 ('464 Claim 7))

*"fee for shipment"*:  the price or sum quoted or charged to ship an item to the designated location/address (discussed *supra* p.37 ('464 Claim 7))

*"means for communicating and assessing"*:  structure, material, or steps used for transmitting data between the claimed invention and the customer's credit card company (or that company's agents) and for charging the fee for shipment to the customer's credit card account, involving the use of communication lines such as telephone lines and related hardware and software (discussed *supra* p.40 ('464 Claim 7))

*"account"*:  a business relation in which credit is used (discussed *supra* p.41 ('464 Claim 7))

*"telephone lines"*:  a wire circuit connecting two or more points or stations in a telephone system, or the system itself (discussed *supra* p.41 ('464 Claim 7))

**Limitation 3:**  *means for securely storing said item until the item is collected by said commercial delivery service;*

**Uship's Proposed Construction:**

*"means for securely storing":*  structure, material, or steps used to hold or contain an item in a manner designed to ensure that the item is safe from interception by unauthorized persons (discussed *supra* p.44-46 ('464 Claim 7))

*"collected":*  gathered or taken (discussed *supra* p.46 ('464 Claim 7))

**Limitation 4:**  *means for storing the inputted information once said item is disposed in said secured storage means, said information storage means including means for transmitting information that may be used to prepare a manifest to a remote location;*

**Uship's Proposed Construction:**

*"means for storing":*  structure, material, or steps used for putting or retaining data in a computer memory unit, involving the use of a central processing unit (CPU) and associated hardware and software (discussed *supra* p.47 ('464 Claim 7))

*"inputted information":*  data that has been entered into a computer memory unit for processing or storage (discussed *supra* p.47 ('464 Claim 7))

*"once said item is disposed":*  whenever the item to be shipped is put in a particular or suitable place (discussed *supra* p.48 ('464 Claim 7))

*"means for transmitting":*  structure, material, or steps used for sending or communicating data, involving the use of communication lines such as telephone lines and related hardware and software (discussed *supra* p.68 ('464 Claim 19))

*"manifest":*  a listing of transactions involving the claimed invention which pertain to a particular commercial delivery service (dis-

> cussed *supra* p.49 ('464 Claim 7))
>
> *"**remote location**":*  a place removed from the site in which the claimed invention is deployed (discussed *supra* p.51 ('464 Claim 9))

## IV.   U.S. PATENT NO. 5,831,220 ('220 PATENT)

The application for the '220 patent was filed on April 22, 1997, and the patent itself issued on November 3, 1998.  The patent was a continuation of U.S. Patent No. 5,656,799 (the '799 patent), which was itself a continuation in part of U.S. Patent No. 5,340,948 (the '948 patent), which was, in turn, a continuation-in-part of U.S. Patent No. 5,233,532.  All of these ancestor patents are currently held by Uship.  The '220 patent therefore shares common ancestry with the '464 patent, through the '948 patent.

The '220 patent contains two independent claims, each of which has one dependent claim.  Uship is currently asserting, and seeking the construction of, the two independent claims: Claim 1, a method claim; and Claim 3, a device claim.  These claims employ many similar terms.

### A.   Claim 1

> **Preamble:**  *A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of:*

As discussed above in connection with the '905 and '464 patents, there is no need for the Court to separately construe the terms used in the preamble to Claim 1 of the '220 patent.  Because the body of the claim fully and intrinsically identifies all of the limitations of the claimed invention, and because the preamble merely encapsulates the main limitations found in the body of the claim and states the invention's purpose and intended use, the preamble should not be considered a limitation and is of little to no significance to the claim construction inquiry.  *See supra*

p.9.[39]   Nevertheless, in an abundance of caution, Uship has proposed constructions for certain of

the key terms found within the preamble.

| |
|---|
| **Uship's Proposed Construction:** |
| *"mailing":*   sending by use of the USPS or a company or service that engages in the transportation of parcels and envelopes from one location to another location |

Neither the Government nor IBM has attempted to define "mailing," and both parties are

therefore content to rely on the commonly understood meaning of the term.  Sensibly, neither the

Government nor IBM disputes that the term covers the activities of the USPS.  For that reason, it

is not critical in this proceeding that the term "mailing" be definitively construed beyond con-

firming the common-sense proposition that it covers USPS activities.

Having said that, we must nevertheless point out that the intrinsic evidence makes crystal

clear that the term "mailing" encompasses all commercial delivery services, not just the USPS.

For example, the abstract refers to terms such as "commercial carrier," "commercial carriers,"

and "each carrier," thereby indicating that "mailing" is not limited to mailing by use of a single

entity such as the USPS.  Similarly, numerous passages in the specification make clear that the

invention relates to the "commercial shipping and delivering industry," to "commercial carriers,"

to "delivery service[s]," and to "commercial delivery service[s]," thus making clear that "mail-

---

[39] Notably, although the Government and IBM have purported to offer proposed con-
structions for at least some of the terms found in the preamble to Claim 1, it is apparent, upon
inspection, that those constructions do not attempt to actually define any of the terms found with-
in the preamble, but instead purport to summarize the limitations found in the body of the claim.
This is especially true of IBM's proposed "construction," which IBM does not even pretend to
tie to any particular substantive term found in the preamble.  Rather, IBM's construction refers to
steps – such as the preparation of mailing labels, validation of receipt, and storage of an item for
subsequent pick-up – that can be found only in the limitations that follow the preamble.  IBM
has, in effect, merely summarized the limitations found in the body of the claim, thus confirming
that there is no need for the Court to separately construe Claim 1's preamble.

ing" encompasses more than one possible delivery service and is therefore not limited to mailing

through the USPS.[40]

---

**Uship's Proposed Construction:**

*"parcels and envelopes":*  the items to be mailed through use of the method
claimed in the invention, including without limitation packages
or other objects wrapped or packed up to form a small bundle,
as well as flat paper or cardboard containers for letters or thin
packages

---

The intrinsic evidence demonstrates rather convincingly that the term "parcels and enve-

lopes" is not intended to be read restrictively, but is instead to be read as encompassing any item

mailed through use of the method claimed in the invention.  Thus, numerous passage in the spe-

cification make clear that term "parcels and envelopes" refers to the "parcel[s], package[s], let-

ter[s] or other item[s] for shipment," and that it includes such items as "packages of different

shapes and sizes," "small envelopes and similar items," "item[s] being shipped,"  "a letter, a pak

or a package or any other package type," "object to be mailed" and "thin letter[s]."[41]   In fact, the

specification explicitly notes that although the specification "speaks alternatively of mailing par-

cels, packages, or envelopes, those skilled in the art will appreciate that these terms may be used

interchangeably within the scope of the invention as defined by the appended claims."  Specifi-

---

[40] *See, e.g.,* specification 1:15-16;  1:21; 1:23-31; 1:37; 1: 40; 1:55; 2:3; 2:8; 2:13; 2:22-
23; 2:25; 2:29; 2:38; 2:53; 2:54; 3:1; 3:3-3:4; 3:19-20; 3:25-26; 3:35-36; 3:39; 3:54; 4:8; 5:27-28;
5: 56; 5:62; 6:65; 7:5-6; 8:6-8; 9:20; 11:1; 11:13-14; 11:26; 11:56; 13:64-65; 15:33; 20:9; 21:8-
11; 24:56; 25:6-7; 27:64; 28:31-32.

[41] *See e.g.,* specification  1:18-20; 2:17-19; 5:27; 5:34; 5:40; 6:5; 6:29; 6:38; 6:43; 6:47;
6:52-53; 6:56; 6:60; 6:65; 7:12-13; 8:14; 8:18; 8:22; 8:24; 9:4-10; 9:34; 9:40-41; 9:52; 9:62;
9:65; 10:2; 10:8; 10:13-15; 10:19; 10:44; 11:24; 11:26-27; 11:32; 11:35; 11:40-41; 11:44-45;
11:47-50; 13:21; 13:23; 13:26-28; 13:45; 13:48-51; 13:54; 13:57-58; 14:37-38; 14:52; 14:59-60;
14:63; 14:65; 15:1; 15:8-9; 15:15-16; 15:20; 15:27; 15:32; 15:44; 15: 55; 15:66; 16:3; 16:14;
16:16; 16:22; 16:31-32; 16:44; 16:52-53; 16:59; 16:67; 17:9-10; 17:13; 17:17; 18:30; 19:49;
20:8; 21:46; 24:55; 25:2; 27:28-29; 28:17-18.

cation 29:62-67.

Neither the Government nor IBM has disputed that the term "parcels and envelopes" refers to all items that are to be mailed using the method of the invention.  Indeed, neither the Government nor IBM has attempted to define the term "parcels and envelopes"; both parties therefore appear content to rely on the commonly understood meaning of the term.  That meaning is fully consistent with Uship's proposed construction, as the terms "parcel" and "envelope" are commonly understood to refer to a broad range of items that can be mailed or shipped through standard delivery/shipping services.[42]

> **Uship's Proposed Construction:**
>
> ***"automated shipping machine":***  an apparatus or device consisting of interrelated parts with separate functions, used in the performance of the task of mailing parcels and envelopes, and employing a technique, method, or system of operating and controlling that task by highly automatic means, as by electronic devices, thereby reducing human intervention to a minimum

Uship contends that the term "automated shipping machine" should be construed in accordance with the ordinary and common understanding of its constituent terms.  There is no real dispute between the parties as to the meaning of the word "shipping" as used in this term, as it is clear that "shipping" is considered to be a synonym of "mailing," as discussed above.  The component of this term that is the subject of some dispute is "automated . . . machine."  Uship's proposed construction of this term is consistent with its ordinary and common meaning, as confirmed by contemporaneous general purpose dictionaries.  For example, "automated" is defined

---

[42] This is confirmed by standard definitions of these terms in general purpose dictionaries.  For example, "parcel" is defined as "an object or objects wrapped or packed up to form a small bundle; package." *Random House Webster's College Dictionary* (1997) at 947.  Similarly, "envelope" is defined as a "flat paper container, as for a letter or thin package." *Id.* at 437.

by reference to "automation," which is itself defined as "the technique, method, or system of operating or controlling a process by highly automatic means, as by electronic devices, reducing human intervention to a minimum." *Random House Webster's College Dictionary* (1997) at 90. And "machine" is defined as "an apparatus consisting of interrelated parts with separate functions, used in the performance of some kind of work." *Id.* at 787.

The specification further confirms this understanding of "automated shipping machine." In particular, the specification underscores both that the invention contemplates the use of a machine that employs several automatic processes and that the invention nevertheless contemplates at least some activity by human actors – *i.e.,* customers and, in some embodiments, attendants such as employees of businesses where the machine is deployed.[43]

Neither the Government's nor IBM's proffered constructions of this term should be adopted. The Government proposes the following construction:

> Each step of the method requires use of a shipping machine automatically controlled by mechanical or electronic devices that take the place of humans, unless the step explicitly states otherwise.

This construction suffers from several defects. First, it is vague and serves, if anything, to obscure the "automated shipping machine" term rather than define or clarify it. Moreover, to the

---

[43] *See e.g.* specification 1: 15-21 ("More specifically, this invention relates to an automated unit for preparing an appropriate mailing label, for validating receipt from a customer of a parcel, package, letter or other item for shipment, and/or for collecting and holding parcels, packages, letters and other items for pick-up by one or more commercial delivery services."); 24:58-60 (describing system of one embodiment as being "operated by the customer"); 25:8-12 ("The embodiment . . . thus differs from the previous embodiments in that it is semi-attended, i.e., a clerk is needed to take the parcel or envelope from the customer, to store the parcel or envelope in a secure storage area, and to validate receipt of the parcel or envelope."); 25:46-51 ("Obviously, this system is substantially simplified from the embodiments described above since the storage and validation process is performed by an attendant. However, the system retains the benefits of the unattended systems described above in that convenience to the customer is greatly enhanced.").

extent the contours of this proposed interpretation can be ascertained, it cannot be reconciled with the intrinsic evidence.

What, for example, does it mean for the machine to "take the place of humans"?   This formulation suggests that for each step at issue, the shipping machine performs *all* aspects of that step, and the customer or attendant has *no* role at all to play.   But the specification by no means supports such a rigid – and, indeed, absurdist – bifurcation of the respective roles played by the machine, on the one hand, and by persons, on the other.   To take one obvious example, the speci-fication specifically contemplates that the customer initiates the step of weighing the item to be mailed by physically placing the item on a scale.   *See, e.g.* specification 8:16-18.   This step there-fore obviously involves *some* activity by the customer, so no one could understand that the ma-chine "takes the place of humans" in connection with this step.   Nor is the Government saved by its proffered exception for those activities for which "the step explicitly states otherwise," be-cause the "weighing" step of Claim 1 ("weighing said parcel or envelope to be mailed") does not "explicitly" call for the involvement of the customer.   Similarly, the specification makes clear that, for at least some embodiments of the invention, the "validation" step is performed by a per-son such as a retail clerk, specification 25:2-12, even though the validation step ("validating re-ceipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed") does not "explicitly" call for human involvement.

The Government will apparently attempt to support its proposed construction by refer-ence to a statement made by the applicant during the prosecution of the predecessor '799 patent. The Government has pointed to the applicant's February 7, 1996 response to a PTO Office Ac-tion requesting the applicant to elect between method and apparatus claims set forth in its appli-cation.   In its response, the applicant stated that it

disagrees with the Examiner's suggestion that the process claimed in independent method claims 1 and 72 can be performed by hand.  Both of these claims specifically recite in the preamble a method of mailing parcels and envelopes "using an automated shipping machine" rather than specifically reciting at each step that the step is performed by the automated shipping machine.  Applicant submits that if the method were performed by hand as the Examiner suggests, then it would not use an automated shipping machine as set forth in the preamble.

'799 Patent Pros. History, Amendment and Response to Restriction Requirement (Feb. 7, 1996) at 2 (G002346) (attached as Exhibit N).

Even assuming, for purposes of the claim construction analysis, that this statement made during the prosecution of the '799 patent should be attributed to the '220 patent, it does not support the Government's analysis.  This statement confirms only that the method claim contemplates some use of an automated shipping machine.  It does not address the pertinent inquiry here:  what does the use of an automated shipping machine mean and entail?  It certainly does not suggest that steps performed by the machine are performed without *any* involvement by humans, as implied by the Government's "takes the place of humans" formulation.  The Government's reliance on this statement merely begs, rather than answers, the relevant claim construction question before the Court.

At least the Government's proposed construction purports to relate back to the preamble language at issue.  That is more than can be said about IBM's proposed construction, which does not attempt to interpret the preamble but instead imports concepts from the body of the claim into the preamble:

A series of steps for mailing parcels and envelopes using an automated unit that prepares an appropriate mailing label, validates receipt from a customer of a parcel and envelope, and/or collects and holds parcels and envelopes for pick-up by one or more commercial delivery services.

Obviously, the preamble itself says nothing about preparing mailing labels, validating receipt of items, or collecting and holding items for pick-up.  What IBM has done is take some (but only

some) of the steps described in the body of Claim 1 and import them into a preamble that does

not itself purport to specifically describe those steps.  This is not proper claim interpretation.

| Limitation 1:  *receiving payment information from a customer;* |
|---|

The parties have agreed upon a joint proposed construction for this limitation:

| **Joint Proposed Construction:**<br><br>*"receiving payment information from a customer":*  the automated shipping machine obtains data relating to the customer's chosen method of payment |
|---|

| Limitation 2:  *receiving package type information identifying a parcel or envelope to be mailed;* |
|---|

| **Uship's Proposed Construction:**<br><br>*"receiving":*  accepting or obtaining through use of one or more means of inputting or transmitting information, including but not limited to devices such as keyboards, touch screens, card readers, scales, etc. |
|---|

Several limitations of Claim 1 (as well as Claim 3) of the '220 patent refer to steps in

which the automated shipping machine "receives" information relating to the shipping transac-

tion, whether it be payment information, shipping information, or, as in this limitation, "package

type" information.  The intrinsic evidence confirms the common sense proposition that the ship-

ping machine would "receive" such information through one or more methods of inputting or

transmitting data.  To take one example, the abstract refers to "a unit, such as a magnetic card

reader, for accepting payment by a customer," and also refers to a "control system that accepts

address information from the customer through a key pad." The specification is replete with references to various methods of inputting or transmitting data. *See, e.g.,* specification 3:46 (referring to "input device for inputting information"); 4:13-14 (same); 7:29-40 (describing control system which receives various inputs); 8:52-59 (describing step of entering zip code information); 5:42-44 (referring to customer interface area, which "includes a CRT video display terminal, a printer, a key pad, and a magnetic card reader"); 18:22-23 (referring to "touch screen display which also enables the customer to input information"); 20:35-39 (discussing inputting by customer of shipping information).[44]

Neither the Government nor IBM has proposed a separate construction of this term. It appears from the Government's proposed constructions of several limitations that include the word "receiving," however, that the Government interprets the terms as involving the shipping machine "obtain[ing]" data or information.

> **Uship's Proposed Construction:**
>
> ***"package type information identifying a parcel or envelope to be mailed":*** data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the claimed invention

---

[44] *See also id.* 8:19-21 (describing control system receiving input from, *inter alia*, scale); 8:29-41 (describing control system receiving input from magnetic card reader); 14:39-41 ("customer enters complete addressing information through the keyboard"); 15:39-49 ("Customer interface area includes a display device such as a CRT, a keyboard, a label printer, and credit card reader."); 17:57-18:26 (describing control system utilizing various inputs for information); 20:35-39 (discussing inputting by customer of shipping information); 21:18-21 (discussing selection by customer of desired service option); 25:15-22 (discussing various inputs to control system, including CRT, keyboard, scale, and magnetic card reader); 25:63-26:18 (same); 27:8-10 (customer provides payment information); 27:54-28:8 (entry of shipping information). *See also* specification 3:6-7 ("a device for receiving payment information from a customer"); 5:43-47 ("a magnetic card reader . . . Instead of card reader, the system could alternatively include other means for payment, or for indentifying the customer for later billing."); 19:23-29 (customer is instructed to insert credit or debit card into the magnetic card reader to provide necessary payment and identification information.).

Although the '220 patent does not specifically define the term "package type informa-tion," the specification provides examples indicating that the term refers to data relating to the characteristics or properties of the parcel or envelope to be mailed.  Thus, the specification notes that "package types include a letter, a pak, or a package or any other package type which may be accepted by the delivery service."  Specification 20:7-9; *see also id.* 27:26-32 (same).

While citing the same passages from the specification, the Government proposes a con-struction that seeks to equate "package type information" with "data relating to the structure" of the item.  The Government's formulation is both inherently imprecise and, to the extent its mean-ing can be ascertained, inconsistent with the intrinsic evidence.  The Government has not ex-plained what it means by "structure," but the term implies that the shipping machine obtains data relating to the physical structure of the item, such as its exact size or how it is assembled or con-structed.  *Cf. Random House Webster's College Dictionary* (1997) at 1278 (defining "structure" as "the manner in which something is constructed" or "the manner in which the elements of any-thing are organized or interrelated").  This formulation is unsupported by the record.

IBM's proposed construction defines "package type information" as "data from the cus-tomer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier."  This construction is more consistent with the specification than is the Government's proposal.  However, it is unduly restrictive to the extent that it seeks to limit the claim term to the examples provided in the specification; it improperly seeks, in that regard, to import limitations from the specification.

**Limitation 3:  *weighing said parcel or envelope to be mailed;***

90

The parties have agreed upon a joint proposed construction for this limitation:

> **Joint Proposed Construction:**
>
> *"weighing said parcel or envelope to be mailed":*  the automated shipping machine obtains the weight of the parcel or envelope to be mailed by use of a scale

> **Limitation 4:**  *receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed;*

With the exception of one important term, the parties have agreed upon a joint proposed construction for this limitation:

> **Joint Proposed Construction:**
>
> *"receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed":*  the automated shipping machine obtains data relating to shipping from the customer including at least the destination of said parcel or envelope to be mailed

The feature of this limitation with respect to which the parties continue to disagree relates to the term "destination."  Uship has proposed the following construction of that term:

> **Uship's Proposed Construction:**
>
> *"destination":*  data relating to the location to which the item to be mailed is to be mailed, such as the zip code for that location

Both the Government and IBM, on the other hand, have proposed constructions of destination" that would require the customer to input additional information – including the name and

street address – into the shipping machine.[45]  The Government's and IBM's position cannot be squared with the intrinsic evidence.

To be sure, the specification indicates that, *for certain embodiments* of the invention, the invention contemplates the customer inputting complete addressing information, including such items as the street address in addition to the zip code.  *See, e.g.,* specification 14:39-41 (customer enters "complete addressing information").  What the government and IBM overlook, however, is that the specification's discussion of *other* embodiments makes clear that nothing more than the zip code needs to be inputted by the customer.  The specification's discussion of the very first embodiment, for example, indicates that the customer will be prompted only to "enter the desired zip code of the item which is to be mailed."  Specification 8:54.  The specification makes clear as can be that full address information need not be inputted:  it contemplates that, later in the very same process associated with this embodiment, the shipping machine would print a shipping label, on which the customer would be instructed to "write the mailing address."  *Id.* 9:41.  As such, there can be no question that this embodiment does not contemplate, let alone require, the customer to input a name and street address into the shipping machine in the first instance.  By focusing on the discussion in the specification of particular embodiments, the Government and IBM have made the dual and related errors, condemned in *Phillips* and numerous other decisions, of seeking to import limitations from the specification into the claim and seeking to limit the invention to particular embodiments.  *See Phillips*, 415 F.3d at 1323; *supra* p.6-7.

---

[45] Interestingly, neither the Government nor IBM specifies what they mean by "name," or whose "name" they believe needs to be inputted.  IBM's construction suggests that the customer needs to input the "name" of the "location" to which the item is be mailed, but IBM never explains what constitutes the "name" of a "location."  Similarly, the Government proposes that the customer needs to input the "name" of the "place" to which the item is to be mailed, without ever describing what constitutes the "name" of a "place."

> **Limitation 5:** *computing from said package type information, shipping infor-*
> *mation, and weight information, a delivery date and cost for de-*
> *livery of said parcel or envelope to said destination via each de-*
> *livery service option available to said customer;*

**Uship's Proposed Construction:**

*"computing":* determining, reckoning, or calculating

*"weight information":* data relating to weight of the item to be mailed.
*See* definition of "weighing" above.

*"delivery date":* the projected or estimated date on which items to be
mailed through the claimed invention are to be received
at the designated location/address, expressed either as
the specific month, day, and year when the item is ex-
pected to be received at the designated location or the
number of days it is estimated to take for items to be
mailed through the claimed invention to arrive at the
designated location/address for delivery.

*"cost for delivery":* the price(s) quoted to mail the item to the designated
location/address

*"delivery service option available":* the choices of different methods of
mailing parcels and envelopes to a chosen or desired lo-
cation/address that are open to or presented to a custom-
er using the claimed invention

Neither the Government nor IBM has offered its own separate construction of the terms

"computing," "weight information," "cost for delivery," and "delivery service option available"

as used in this claim limitation. They also have not indicated any particular objection to Uship's

proposed constructions of these terms. Indeed, those parties' proposed constructions of the limi-

tation as a whole either simply restate the claim terms or use synonyms that correspond closely

to our proposals.[46]   For that reason, we will not discuss at length in this brief our proposed con-

structions of these terms, and will focus instead on the claim term about which there does appear

to be a substantial dispute between the parties: "delivery date."

Uship contends that "delivery date" means the projected or estimated date on which the

item to be mailed is to be delivered, expressed *either* as a specific calendar date *or* as the number

of days it is estimated to take for the items to be delivered.  This understanding of the term is

consistent with the ordinary understanding of those skilled in the art, as delivery times in the

commercial shipping industry are often expressed in terms of the expected length of time it will

take for an item to be delivered (*e.g.,* overnight delivery, second-day delivery, etc.).  *See, e.g.,*

USPS, "A Consumer's Guide to Postal Services and Products" (1996) (attached as Exhibit O)

(describing estimated times to ship items under various service options); USPS, "Domestic Post-

al Rates and Fees (Simplified)" (2001) (attached as Exhibit P) (same).[47]

---

[46] The Government, for example, uses "calculates," and IBM uses "determines," as  syn-
onyms for "computing."

[47] This understanding of "delivery date" is further underscored by the prosecution history
of the predecessor '799 patent, which contains a similar limitation.  In a March 11, 1996 Office
Action addressing the application that ultimately led to the issuance of the '799 patent, the PTO
had the following to say about another predecessor patent, the '532 patent:

> The ['532] patent does not specifically state that the customer is advised of the
> shipping cost for each and every service available, nor does the patent specifically
> claim calculating the delivery date for the package.  However, the examiner takes
> official notice that the two options were available from the U.S. Post Office and
> therefore would have been obvious to one of ordinary skill in the art at the time
> the invention was made to program a shipping machine to include these two well
> known standard options.

'799 Patent Pros. History, PTO Office Action (March 11, 1996) at 2 (G002352) (attached as Ex-
hibit Q).  Notably, there is no evidence that the USPS at this time did anything other than indi-
cate to customers the estimated number of days it would take to deliver items through most of its
offered delivery options.  Accordingly, the PTO effectively acknowledged that providing such
information to customers was sufficient to constitute calculating the "delivery date."

The Government and IBM apparently disagree that it is sufficient for the delivery date to be expressed as either a specific calendar date or as the expected number of days it will take for delivery to occur.  The Government would restrict the definition to the "expected calendar date of delivery," while IBM would also require the machine to calculate and express the "day of the week" of the expected delivery.  Both parties rely on statements made in the specification, discussing specific possible embodiments of the invention, that suggest that the machine's software may take account of "weekends, holidays, and other days in which no delivery service is available" in determining the expected date of delivery.  *See, e.g.,* specification 21:7-9.  The Government's and IBM's reliance on such statements fails on at least three levels.  First, it improperly seeks to import limitations from the specification into the body of the claim.  Second, it improperly seeks to restrict the claimed invention to certain embodiments discussed in the specification.  And third, by relying on a discussion of the contents of software for a particular embodiment, it improperly seeks to restrict a method claim to features that are more appropriately viewed as pertaining to the structure of a device claim.

The Government and IBM also seek to rely on the specification's statement, in connection with a discussion of a fourth embodiment of the invention, that the machine will display the "date of expected delivery, what day of the week that will be, and total shipping costs for each selection."  Specification 28:34-36.  In addition to suffering from the same defects as the other statements from the specification relied upon by the Government and IBM, this statement does not help the Government or IBM for at least two additional reasons.  First, it is discussing what the machine will "display," and not what it means for the machine to compute the delivery date.  By relying on this statement, the Government and IBM are once again seeking to import additional limitations into the claim.  Second, this statement is quite explicitly drawing a distinction

between the "date of expected delivery" and "what day of the week that will be."  The statement

therefore refutes, rather than supports, any argument that the expected delivery date includes the

day of the week.

| **Limitation 6:**  *receiving an indication of the delivery service option desired by the customer;* |
|---|

The parties have agreed upon the following joint proposed construction for this limita-

tion:

| **Joint Proposed Construction:** |
|---|
| *"receiving an indication of the delivery service option desired by the customer":*   the automated shipping machine obtains the customer's chosen method of delivery |

| **Limitation 7:**  *printing a shipping label including at least said destination printed thereon;* |
|---|

Although the parties have agreed upon a joint proposed construction for this limitation,

they continue to disagree about the meaning of one of the terms in the limitation and construc-

tion.  The parties' joint proposed construction is as follows:

| **Joint Proposed Construction:** |
|---|
| *"printing a shipping label including at least said destination printed thereon":*   the automated shipping machine prints at least said destination on a shipping label |

The parties continue to disagree as to the meaning of "destination."  For the reasons dis-

cussed above in connection with the construction of Limitation 4, *see supra* p.91-92, Uship contends that "destination" should be construed as "data relating to the location to which the item to be mailed is to be mailed, such as the zip code for that location."  For the same reasons, the Government's and IBM's insistence that "destination" should be construed as requiring complete addressing information should be rejected.[48]

| Limitation 8: | *printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer;* |
|---|---|

Although the parties have agreed upon a joint proposed construction for this limitation, they continue to disagree on the meaning of one of the terms in the limitation and construction. The parties' joint proposed construction is as follows:

> **Joint Proposed Construction:**
>
> *"printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer":*  the automated shipping machine prints at least the cost of delivering the parcel or envelope to said destination with the customer's chosen method of delivery

Once again, the parties continue to disagree as to the meaning of "destination."  For the reasons discussed above in connection with the construction of Limitation 4, *see supra* p.91-92, Uship contends that "destination" should be construed as "data relating to the location to which

---

[48] We must further note that any suggestion that the invention requires the machine to *print* complete addressing information on the shipping label is flatly contradicted by the specification, which discloses, in discussing one particular embodiment, that once the label is printed the customer will be instructed "to *write* the mailing address onto the label."  Specification 9:39-42 (emphasis added).

the item to be mailed is to be mailed, such as the zip code for that location."

| Limitation 9:  *validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed; and* |
|---|

| Uship's Proposed Construction: |
|---|
| *"validating receipt":*  determining or confirming that the package to be mailed has been received for storage and/or shipment |

The parties have not been able to reach agreement on the proper construction of this limitation.  Although the record clearly establishes, in our view, that this step requires only that it be determined that the item to be mailed has been received for storage or shipment, the Government and IBM will apparently contend that the invention requires much more.  Indeed, it appears from the Government's proposed construction, and from the support cited by IBM for its proposed construction, that both defendants will suggest that the invention requires that the shipping machine itself verify, through the use of sophisticated sensors or similar devices, that the item being received is the same item for which a shipping label was printed.[49]  The intrinsic evidence, and in particular the specification, do not support the Government's and IBM's constructions.

To be sure, we can readily agree that the specification, and certain drawings, indicate that, for some embodiments of the invention, the shipping machine may utilize sensors and other devices to confirm that the same package for which a label was printed is received.  But the spe-

---

[49] The Government's proposed construction is as follows:  "the automated shipping machine confirms that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed by obtaining data concerning the parcel or envelope."  IBM's proposed construction is as follows: "verifying that the package being mailed is the same package for which the shipping label was printed."

cification makes explicit that such elaborate steps are *not* required for validation to occur.  The

most substantial discussion of validation is found in the specification's discussion of a third em-

bodiment of the invention:

> At this point, a very important validation step is performed.  In particular, the sys-
> tem 310 determines at step 536 whether it has received the correct package.  This
> step is critical since it verifies that the customer did not perform a package switch
> or forget to replace the package in the intermediate storage area 334 for shipment.
> *Such validation may be accomplished in several different ways in accordance*
> *with the invention.*  For example, in a simple embodiment, photo cell sensor 344
> may simply detect whether *any* package has been placed on the conveyor belt
> 340.  *If so, it is presumed that the package on the conveyor belt 340 is the appro-*
> *priate package with the appropriate label.*  On the other hand, in accordance with
> a preferred embodiment of the invention, the package is automatically reweighed
> and/or redimensioned once the customer has closed the outer door 330 (and hence
> the parcel or envelope cannot be accessed by the customer).  If the reweighing
> and redimensioning results in approximately the same readings as when the pack-
> age was previously weighed and dimensioned, it is presumed that the package
> placed on the conveyor belt 340 is the same package for which the label was
> printed.

Specification 21:43-64 (emphases added).

This passage – which appears in the specification's discussion of the embodiment with

the *most sophisticated and elaborate sensor and storage system* – thus makes clear both that va-

lidation of receipt may be "accomplished in several different ways," and, perhaps more impor-

tantly, that it is not necessary for the shipping machine itself to confirm that the exact same

package has been received.  Thus, under this embodiment, it is sufficient that the machine deter-

mine that "any" package be received, in which case it will be "presumed" that the package is the

appropriate one.  To the extent, therefore, that the Government and IBM are suggesting that the

machine use sophisticated sensor or other related systems to confirm that the exact same package

has been received, they are, once again, committing the "cardinal sin" of importing limitations

from the specification into the claim, *SciMed*, 242 F.3d at 1340, and the related sin of confining

the invention to a particular embodiment discussed in the specification.  The sin here is especial-

ly egregious considering that the Government and IBM have seized upon the specification for the most sophisticated and elaborate sensor/storage embodiment of all, which itself makes clear that, even as to that, validation need not be as involved as the Government and IBM would now claim; it follows *a fortiori* that efforts by Government and IBM to superimpose their artificially begrudging notion of validation upon the construction of the claim itself and all embodiments thereunder is misconceived.

Elsewhere the specification discloses that it is not necessary for the shipping machine itself to perform the validation step at all.  The specification's discussion of the fourth embodiment makes clear that after a shipping label is printed and applied to the item, the item is then taken to an attendant such as a retail clerk "who validates receipt of the package and provides an appropriate receipt to the customer."  Specification 25:2-5; *see also id.* 25:42-44; 29:17-22 (same).  And just in case this point was not made explicitly enough in the above passages, the specification goes on to stress once again that, "[o]bviously, this system is substantially simplified from the embodiments described above since the storage and *validation process is performed by an attendant.*"  Specification 25:47-49 (emphasis added).  Indeed, there is no indication in the patent that the validation step must be completed by the attendant before the customer leaves.  The specification itself therefore utterly refutes the Government's proposed construction, which requires that the "automated shipping machine" itself perform the validation step.  *Cf.* '220 patent Claim 3 (noting limitation of "means for validating receipt of said parcel or envelope … , whereby a validated parcel or envelope is taken by an attendant for storage …").[50]

---

[50] That the validation step does not require an elaborate system operating within the shipping machine is further supported by a comparison of this claim to Claim 30 of the predecessor '799 patent (attached as Exhibit F), which calls for "a validation area for accepting said parcel or envelope, *said validation area being inaccessible by said customer* . . .." (emphasis added).  Notably, neither Claim 1 nor Claim 3 of the '220 patent contains a similar limitation.

| Limitation 10: | *an attendant of said customer storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.* |
|---|---|

The parties have agreed upon the following joint proposed construction for this limitation:

| Joint Proposed Construction: | |
|---|---|
| | *"an attendant of said customer storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person":* a person assisting the customer stores the validated parcel or envelope in a secure storage area until a commercial delivery person picks up the parcel or envelope |

## B.    Claim 3

Claim 3 of the '220 patent, a device claim, contains many similar limitations to, and many of the exact same claim terms as, Claim 1.  As such, many of Uship's proposed claim constructions track its proposed constructions for Claim 1, as do many of its arguments in support of those claims.

| Preamble: | *An automated shipping machine for use in mailing parcels and envelopes, comprising:* |
|---|---|

As with Claim 1, there is no need for the Court to separately construe Claim 3's preamble, since the body of the claim fully and intrinsically identifies all of the limitations of the invention, and because the preamble merely encapsulates the main limitations found in the body of the claim and states the invention's purpose and intended use.  *See supra* p.9, 82.  Nevertheless,

101

in an abundance of caution, Uship has proposed constructions for the key preamble terms.

> **Uship's Proposed Construction:**
>
> ***"automated shipping machine":***  an apparatus or device consisting of interrelated parts with separate functions, used in the performance of the task of mailing parcels and envelopes, and employing a technique, method, or system of operating and controlling that task by highly automatic means, as by electronic devices, thereby reducing human intervention to a minimum
>
> ***"mailing":***  sending by use of the USPS or a company or service that engages in the transportation of parcels and envelopes from one location to another location
>
> ***"parcels and envelopes":***  the items to be mailed through use of the method claimed in the invention, including without limitation packages or other objects wrapped or packed up to form a small bundle, as well as flat paper or cardboard containers for letters or thin packages

These constructions are the same as Uship's proposed constructions for the same terms in the Claim 1 preamble.  For that reason, and because the Government's and IBM's proposed constructions for the preamble closely track their constructions for the Claim preamble (and suffer from the same defects), Uship's constructions should be adopted for the reasons discussed in the section addressing the Claim 1 preamble.  *See supra* p.81-88.

> **Limitation 1:  *means for receiving payment information from a customer;***

The parties have agreed upon a joint proposed construction for this means-plus-function limitation:

> **Joint Proposed Construction:**
>
> **"*means for receiving payment information from a customer*":**

> **Function**:   to receive data relating to the customer's chosen me-
> thod of payment
>
> **Corresponding Structure**:  card reader (30, 230, 328, 712)

---

**Limitation 2:  *a scale for weighing a parcel or envelope to be mailed;***

The parties have agreed that this limitation may be construed in accordance with its plain meaning.

---

**Limitation 3:   *processing means for receiving package type information identi-
fying said parcel or envelope to be mailed, shipping information
from said customer including at least a destination of said par-
cel or envelope to be mailed, for computing from said package
type information, shipping information, and weight information
from said scale, a delivery date and cost for delivery of said par-
cel or envelope to said destination via each delivery service op-
tion available to said customer, and for receiving an indication
of the delivery service option desired by the customer;***

This Claim 3 limitation utilizes many of the same terms and concepts found in various limitations of Claim 1, including Limitation 2 (receiving package type information), Limitation 4 (receiving shipping information; destination), Limitation 5 (computing delivery date and cost of delivery), and Limitation 6 (receiving indication of desired delivery service option).  Uship has proposed the following constructions for the key terms in this limitation:

> **Uship's Proposed Construction:**
>
> *"processing means":*   structure, material, or steps used to carry out opera-
> tions on data or programs, involving the use of a central
> processing unit (CPU) and associated hardware and soft-

ware

***"package type information":***  data relating to the characteristics or proper-
ties of the parcel or envelope to be mailed through use of
the claimed invention

***"identifying":***  relating to, pertaining to, or associated with

***"shipping information":***  data relating to the method by which the item to
be mailed is to be mailed and/or to the location to which
the item is to be mailed

***"destination":***  data relating to the location to which the item to be mailed
is to be mailed, such as the zip code for that location

***"computing":***  determining, reckoning, or calculating

***"weight information":***  data relating to weight of the item to be mailed.
*See* definition of "weighing" above

***"delivery date":***  the projected or estimated date on which items to be
mailed through the claimed invention are to be received at
the designated location/address, expressed either as the
specific month, day, and year when the item is expected
to be received at the designated location or the number of
days it is estimated to take for items to be mailed through
the claimed invention to arrive at the designated loca-
tion/address for delivery

***"cost for delivery":***  the price(s) quoted to mail the item to the designated
location/address

***"delivery service option available":***  the choices of different methods of
mailing parcels and envelopes to a chosen or desired
location/address that are open to or presented to a cus-
tomer using the claimed invention

***"indication":***  a communication or input; something serving to indicate

***"delivery service option":***  a method of mailing parcels and envelopes to a
chosen or desired location/address

***"desired":***  requested; expressed preference from among available options

Given the overlap between the terms used in this limitation and various limitations of

Claim 1, as well as the corresponding overlap between Uship's proposed constructions of those

common terms, much of our discussion of those Claim 1 limitations – including our analysis in support of the adoption of Uship's proposed construction of such disputed terms as "package type information," "destination," and "delivery date" – squarely applies here.[51]   Moreover, Although neither the Government nor IBM has offered its own separate construction of such terms as "computing," "weight information," "shipping information," "identifying," "cost for delivery," "delivery service option," and "delivery service option available" as used in this claim limitation, neither has the Government or IBM indicated any particular objection to Uship's proposed constructions of these terms.  Indeed, as with the corresponding limitations from Claim 1, those parties' proposed constructions of the limitation as a whole either simply restate these claim terms or use synonyms that correspond closely to our proposals.  *See supra* p.93-94.   For that reason, we will not discuss at length in this brief our proposed constructions of these terms, and will focus instead on the meaning of the one term from this limitation that is not found in Claim 1: "processing means."

The term "processing means" is linked to several different functions discussed in this limitation: receiving package type information and shipping information; computing a delivery date and cost of delivery, and receiving an indication of the customer's desired delivery service option.  In context it is clear that "processing means" refers to structure or material used to carry out operations on data or programs, involving the use of a CPU and associated hardware and software.  In short, "processing means" refers to the control system used to run many features of the shipping machine.

The specification and drawings contain numerous references to several different configurations of the control system for the shipping machine under several different embodiments of

---

[51] *See, e.g., supra* p.89-90 ("package type information"); *id.* at 91-92 ("destination"); *id.* at 94-96 ("delivery date").

the invention.[52]  As set out in the specification, that control system includes various different associated structures and devices used to accomplish many of the tasks identified in this limitation, such as various input devices (*e.g.*, keyboards, keypads, and touch screen displays) used to receive package type and shipping information as well as the customer's desired shipping option,[53]

_____

[52] *See, e.g.,* Figure 5, illustrating control system for one embodiment, including CPU which is in communication with program logic controller and which includes various inputs and outputs (discussed at, *inter alia*, specification 7:29-40); Figure 10, illustrating control system for another embodiment; Figure 17, illustrating control system for another embodiment (discussed at, *inter alia*, specification 17:57-18:26); Figure 21, illustrating control system for another embodiment (discussed at, *inter alia*, specification 25:53-26:27).  *See also* illus. 16 in Figures 1-2 and 6, showing "customer interface area" in one embodiment (discussed at, *inter alia*, specification 5:30-50); illus. 24, 28, 30 in Figures 1-3 and 6, showing CRT video display terminal, key pad, and magnetic card reader in one embodiment (discussed at, *inter alia*, specification 5:42-45); illus. 218 in Figure 7, showing "customer interface area" in one embodiment (discussed at, *inter alia*, specification 12:17-30); illus. 222, 224, 226, 230 in Figures 7-8, showing scale, CRT, keyboard, and magnetic card reader in one embodiment (discussed at, *inter alia*, specification 12:20-28; 14:39-41); illus. 318 in Figures 11-12, showing "customer interface area" in one embodiment (discussed at, *inter alia*, specification 15:37-42); illus. 322, 324, 328 Figure 12, showing display device such as a CRT, keyboard, and credit card reader in one embodiment (discussed at, *inter alia*, specification 15:39-42); illus. 702, 704, 706, 712 in Figure 20, showing CRT, keyboard, scale, and magnetic card reader in one embodiment (discussed at, *inter alia*, specification 25:15-22).

[53] *See, e.g.,* abstract (referring to "a control system that accepts address information from the customer through a key pad"); specification 3:46 (referring to "input device for inputting information"); 4:13-14 (same); 7:29-40 (describing control system in one embodiment which receives various inputs of the fees different services would charge); 8:52-59 (describing step of entering zip code information); 9:18-21 ("At this point, a menu may appear, and the customer can specify which commercial delivery service he or she would like to use by entering the appropriate information through key pad."); 14:39-41 ("customer enters complete addressing information through the keyboard"); 5:42-44 (referring to customer interface area, which "includes a CRT video display terminal, a printer, a key pad, and a magnetic card reader"); 15:39-49 ("Customer interface area includes a display device such as a CRT, a keyboard, a label printer, and credit card reader."); 17:57-18:26 (describing control system utilizing various inputs for information); 18:22-23 (referring to "touch screen display which also enables the customer to input information"); 19:7-12 ("The customer then touches the appropriate portion of the touch screen of CRT to initiate operation of the system.  The system software then guides the customer through the shipping transaction[.]"); 20:35-39 (discussing inputting by customer of shipping information); 21:18-21 (discussing selection by customer of desired service option); 25:15-22 (discussing various inputs to control system, including CRT, keyboard, scale, and magnetic card reader); 25:63-26:18 (same); 27:54-28:8 (entry of shipping information).  The specification also refers to cus-

and various files loaded onto the control system for use in performing such tasks as the computa-

tion of delivery costs.[54]

| | |
|---|---|
| **Limitation 4:** | *means responsive to said processing means for printing a ship-ping label including at least said destination printed thereon and for printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said desti-nation via the delivery service chosen by said customer; and* |

The parties were not able to reach agreement on a proposed construction for this limita-

tion.  Uship's proposed construction of those claim terms not elsewhere defined is as follows:

**Uship's Proposed Construction:**

*"means … for printing":*  structure, material, or steps used to produce text or data in alphanumeric or graphic form on paper or other material

*"responsive":*  acting in response

*"shipping label":*  a slip of paper, cloth, or other material, marked or in-scribed, for attachment to an item to indicate information relating to the mailing of that item, such as the destination to which the item is to be mailed

*"shipping receipt":*  a printed acknowledgement of having received pay-ment as specified for the mailing of an item through use of the claimed invention

---

tomers using a "key pad," "keyboard," or "touch screen" to select the delivery service option. *See, e.g.*, specification 7:44; 8:47; 9:20-21; 12:23; 14:41; 19:15; 20:49-50; 21:15-22.

[54] *See, e.g.,* specification 3:49-51 (referring to "control system for calculating a shipment fee for the parcel from at least the weight and destination information"); 4:3-5 (same); 7:29-40 (describing control system); 9:12-22 (discussing, for one embodiment, the process by which con-trol system calculates shipping fees/charges for the item to be mailed); 18:55-19:6 (describing programming of processor in one embodiment); 26:28-51 (same); 21:4-13 (describing computa-tion by control system of cost of delivery and expected delivery date); 28:30-36 (same).

> *"**amount**":*  the total cost or price incurred in the transaction(s) at issue
>
> *"**cost of delivering**":*  the price to mail the item to the designated location/address
>
> *"**delivery service chosen**":*  the method of mailing parcels and envelopes to a chosen or desired location/address selected by the customer

Although the parties were not able to agree on a proposed construction, it appears that only a few terms from this limitation warrant substantive analysis.  Neither the Government nor IBM has offered its own separate construction of such terms as "responsive," "shipping label," "shipping receipt, "amount," "cost of delivering," and "delivery service chosen," as used in this claim limitation; nor has the Government or IBM indicated any particular objection to Uship's proposed constructions of these terms.  *See supra* p.96-97.

With respect to the term "means . . . for printing," it is clear from the intrinsic evidence that the patent calls for a printer or printers that are capable of printing shipping labels and shipping receipts and that are actuated by the control system (*i.e.*, the "processing means").  The specification drawings also disclose sufficient structure for such printing means.  *See, e.g.,* illus. 26 in Figures 2, 3, 5, and 6, showing printer in one embodiment (discussed at, *inter alia*, specification 5:43, 9:33-37; 10:25-27); specification 14:43-45 (discussing printer for another embodiment); illus. 326 in Figure 12, showing printer in another embodiment (discussed at, *inter alia*, specification 15:41); illus. 714 in Figures 20-21, showing printer in another embodiment (discussed at, *inter alia*, specification 26:20).[55]

---

[55] *See also* specification 25:32-36 ("The customer then uses the system of the invention . . . to generate an appropriate shipping label and receipt."); 9:33-34 ("control system will actuate printer to print a mailing label for the package.").  The specification also refers to a "label printer" as part of the customer interface area.  *See* specification 5:44; 15:41; 14:43-45.  *See also id.*

Finally, the parties continue to disagree as to the meaning of "destination."  For the reasons discussed above in connection with the construction of Claim 1, Limitation 4, *see supra* p.91-92, Uship contends that "destination" should be construed as "data relating to the location to which the item to be mailed is to be mailed, such as the zip code for that location."  For the same reasons, the Government's and IBM's insistence that "destination" should be construed as requiring complete addressing information should be rejected

| | |
|---|---|
| **Limitation 5:** | *means for validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said printing means, whereby a validated parcel or envelope is taken by an attendant for storage in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.* |

The parties have reached agreement on the second half of this limitation – the "whereby" clause:

| |
|---|
| **Joint Proposed Construction:** |
| *"whereby a validated parcel or envelope is taken by an attendant for storage in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person":*  whereby an attendant stores the validated package in a secure storage area until the commercial delivery person picks up the parcel or envelope for delivery |

However, due to their continuing disagreement over the meaning of the "validation" step called for under this invention, the parties have not been able to reach agreement on the first half of the limitation.  Uship has proposed the following construction for the operative term in the

10:25-27 (printing of receipt); 22:61-63 (same); 29:8-15 (same); 28:57 ("The label is then printed[.]");.

first half of Limitation 5:

> **Uship's Proposed Construction:**
>
> **"*means for validating receipt*":**   structure, material, or steps for determining or confirming that the package to be mailed has been received for storage and/or shipment

There does not appear to be any dispute that the term "validating receipt" as used in this limitation has the same meaning as that term has in the context of Limitation 9 of Claim 1.  For the reasons discussed in more detail in the section discussing Claim 1, Limitation 9, Uship contends that the record both convincingly establishes that this term refers only to the determination that the item has been received for storage or shipment and convincingly refutes the Government's and IBM's position that the invention requires that the shipping machine itself verify, through the use of sophisticated sensors or similar devices, that the item is the same one for which a shipping label was printed.  *See supra* p.98-101.

It is true that this limitation, unlike the Claim 1 "validating receipt" limitation, refers to "means" for performing the "validating receipt" step.  The Government and IBM apparently want to argue from this that the invention is confined to certain structures, identified in connection with the specification's discussion of certain embodiments, that the shipping machine contemplated by those embodiments employs to detect the presence or the weight/dimensions of the item to be mailed.  *See, e.g.,* specification 21:38-22:10; *see also* Figures 15A-D (illustrating various sensor systems used in one particular embodiment).  What the Government and IBM overlook, however, is that the specification also fully discloses *other* ways in which validation can be performed without using such sophisticated sensors or related structures – including embodiments in which validation is performed by attendants.  *See supra* p.99-101.  *Cf.* specification 25:47-49 ("Obviously, this system is substantially simplified from the embodiments discussed

above since the storage and *validation process is performed by an attendant.*") (emphasis added).

Indeed, the "whereby" clause of this limitation itself contemplates that validation can be per-

formed by an attendant.

## V.      U.S. PATENT NO. 6,105,014 ('014 PATENT)

The application for the '014 patent was filed on September 29, 1998, and the patent itself

issued on August 15, 2000.  The patent was a continuation of the '220 patent.

The '220 patent contains two independent claims, both of which are being currently as-

serted by Uship: Claim 1, a method claim; and Claim 2, a device claim.  Claims 1 and 2 employ

many similar claim terms, and also closely correspond to Claims 1 and 3, respectively, of the

'220 patent.  In fact, with certain exceptions noted below, these claims employ many of the same

terms employed by the corresponding method and device claims of the '220 patent.  And, again

with certain exceptions, the specification for the '014 patent very closely tracks the specification

for the '220 patent.  For all these reasons, Uship has proposed claim constructions for the '014

patent that closely track its proposed constructions for the corresponding terms in the '220 pa-

tent.[56]  Where appropriate, Uship, to avoid needless repetition, will merely summarize its argu-

ments in support of its proposed constructions for terms that closely track the'220 patent, and

will refer the Court to its earlier full discussion of such proposed constructions.

### A.      Claim 1

| Preamble: *A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of:* |
| --- |

---

[56] We note that both the Government and IBM have themselves also proposed many con-
structions for claim terms in the '014 patent that correspond closely to their proposed construc-
tions of the same or similar terms from the '220 patent.

Although for the same reasons discussed in connection with prior patents, there is no need for the Court to separately construe the Claim 1 preamble of the '014 patent, we have, in an abundance of caution, proposed constructions for certain of the key terms found within the preamble.

---

**Uship's Proposed Construction:**

*"mailing"*:   sending by use of the USPS or a company or service that engages in the transportation of parcels and envelopes from one location to another location

*"parcels and envelopes"*:   the items to be mailed through use of the method claimed in the invention, including without limitation packages or other objects wrapped or packed up to form a small bundle, as well as flat paper or cardboard containers for letters or thin packages

*"automated shipping machine"*:   an apparatus or device consisting of interrelated parts with separate functions, used in the performance of the task of mailing parcels and envelopes, and employing a technique, method, or system of operating and controlling that task by highly automatic means, as by electronic devices, thereby reducing human intervention to a minimum

---

Uship's proposed constructions for the above terms track its proposed constructions for the same terms in the '220 patent, and our argument for the adoption of our proposals, and the rejection of the Government's and IBM's proposals, is the same. *See supra* p.81-88. We add here only that the specification for the '014 patent provides the same strong support for our proposed constructions as did the specification for the '220 patent. With respect to "mailing," for example, the abstract to the '014 patent refers to terms such as "commercial carrier," "commercial carriers," and "each carrier," thus indicating that "mailing" is not limited to mailing by use of a single entity such as the USPS. Similarly, numerous passages in the specification make clear that the invention relates to the "commercial shipping and delivering industry," to "com-

mercial carriers,," to "delivery service[s]," and to "commercial delivery service[s]," thus making clear that "mailing" encompasses more than one possible delivery service and is therefore not limited to mailing through the USPS.[57]

Similarly, with respect to the claim term "parcels and envelopes," numerous passages in the specification demonstrate that that term refers to the "parcel[s], package[s], letter[s] or other item[s] for shipment," and that it includes such items as "packages of different shapes and sizes," "small envelopes and similar items," "item[s] being shipped," "a letter, a pak or a package or any other package type," "object to be mailed" and "thin letter[s]."[58]  *See also* specification 29:61-64 (terms "parcels," "packages," and "envelopes" may be used interchangeably).

Finally, with respect to the term "automated shipping machine," the specification underscores both that the invention contemplates the use of a machine that employs several automatic processes and that the invention nevertheless contemplates at least some activity by human actors – *i.e.,* customers and, in some embodiments, attendants such as employees of businesses where the machine is deployed.  *See, e.g.,* specification 1:15-21; 24:58-60; 25:7-11; 25:46-51.

| Limitation 1:  *receiving payment information from a customer;* |
| --- |

---

[57] *See, e.g.,* specification 1:16-17;  1:22; 1:24-31; 1:37; 1:40; 1:55; 2:3; 2:8; 2:13; 2:23-24; 2:26; 2:29; 2:38; 2:53; 2:54; 3:1; 3:3-3:4; 3:19-20; 3:25-26; 3:35-36; 3:39; 3:54; 4:8; 5:27-28; 5:56; 5:62; 6:65; 7:5-6; 8:6-8; 9:20; 11:1; 11:13-14; 11:26; 11:56; 13:61-62; 15:28; 20:2; 21:2-5; 24:55; 25:5-6; 27:61; 28:28-29.

[58] *See e.g.,* specification  1:18-20; 2:17-19; 5:27; 5:35; 5:41; 6:4; 6:29; 6:38; 6:43; 6:47; 6:52-53; 6:56; 6:60; 6:65; 7:12-13; 8:14; 8:17-18; 8:22; 8:24; 9:4-10; 9:34; 9:41-42; 9:52; 9:62; 9:65; 10:2; 10:8; 10:12-15; 10:19; 10:44; 11:25; 11:27-28; 11:32; 11:35; 11:40-41; 11:44-45; 11:47-50; 13:18; 13:20; 13:23-25; 13:42; 13:45-47; 13:51; 13:54-55; 14:33-34; 14:48; 14:55-56; 14:59; 14:61; 14:64; 15:4-5; 15:11-13; 15:16; 15:23; 15:27; 15:40; 15:50; 15:61; 15:65; 16:9; 16:11; 16:17; 16:26-27; 16:39; 16:48-49; 16:54; 16:62; 17:4-5; 17:8; 17:12; 18:24; 19:42;  20:6; 21:41; 24:54; 24:61; 24:67-25:1; 27:26-27; 28:16-17.

The parties have agreed upon a joint proposed construction for this limitation:

> **Joint Proposed Construction:**
>
> *"receiving payment information from a customer":*  the automated shipping machine obtains data relating to the customer's chosen method of payment

> **Limitation 2:**  *receiving package type information identifying a parcel or envelope to be mailed;*

> **Uship's Proposed Construction:**
>
> *"receiving":*  accepting or obtaining through use of one or more means of inputting or transmitting information, including but not limited to devices such as keyboards, touch screens, card readers, scales, etc.
>
> *"package type information identifying a parcel or envelope to be mailed":*  data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the claimed invention

Uship's proposed constructions for the above terms track its proposed constructions for the same terms in the '220 patent, and our argument for the adoption of our proposals is the same.  *See supra* p.88-90.  We add here only that the '014 specification provides the same strong support for our proposed constructions as did the specification for the '220 patent.  With respect to the term "receiving," for example, the specification confirms that the shipping machine "receives" information through one or more methods of inputting or transmitting data.  Thus, the abstract refers to "a unit, such as a magnetic card reader, for accepting payment by a customer," and also refers to a "control system that accepts address information from the customer through a

key pad."  The specification contains numerous references to various methods of inputting or

transmitting data.  *See, e.g.,* specification 3:46 (referring to "input device for inputting informa-

tion"); 4:13-14 (same); 7:29-40 (describing control system which receives various inputs); 8:52-

59 (describing step of entering zip code information); 5:42-45 (referring to customer interface

area, which "includes a CRT video display terminal, a printer, a key pad, and a magnetic card

reader[ ]"); 18:16-17 (referring to "touch screen display which also enables the customer to input

information"); 20:28-32 (discussing inputting by customer of shipping information).[59]

Similarly, with respect to "package type information," the specification provides exam-

ples that indicate that the term refers to data relating to the characteristics or properties of the

parcel or envelope to be mailed.  Thus, the specification notes that "package types include a let-

ter, a pak, or a package or any other package type which may be accepted by the delivery ser-

vice."  Specification 19:67-20:2; *see also id.* 27:24-30 (same).

| Limitation 3:  *weighing said parcel or envelope to be mailed;* |
|---|

The parties have agreed upon a joint proposed construction for this limitation:

---

[59] *See also id.* 8:19-21 (describing control system receiving input from, *inter alia*, scale);
8:29-41 (describing control system receiving input from magnetic card reader); 14:35-37 ("cus-
tomer enters complete addressing information through the keyboard"); 15:35-44 ("Customer in-
terface area includes a display device such as a CRT, a keyboard, a label printer, and credit card
reader."); 17:52-18:20 (describing control system utilizing various inputs for information);
21:13-15 (discussing selection by customer of desired service option); 25:14-21 (discussing vari-
ous inputs to control system, including CRT, keyboard, scale, and magnetic card reader); 25:61-
26:16 (same); 27:5-7 (customer provides payment information; 27:51-28:5 (entry of shipping
information).  *See also* specification 3:6-7 ("a device for receiving payment information from a
customer"); 5:44-48 ("a magnetic card reader . . . Instead of card reader, the system could alter-
natively include other means for payment, or for indentifying the customer for later billing.");
19:17-23 (customer is instructed to insert credit or debit card into the magnetic card reader to
provide necessary payment and identification information.).

> **Joint Proposed Construction:**
>
> **"*weighing said parcel or envelope to be mailed*":**  the automated shipping machine obtains the weight of the parcel or envelope to be mailed by use of a scale

> **Limitation 4:** *receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed;*

With the exception of one important term, the parties have agreed upon a joint proposed construction for this limitation:

> **Joint Proposed Construction:**
>
> **"*receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed*":**  the automated shipping machine obtains data relating to shipping from the customer including at least the destination of said parcel or envelope to be mailed

As with the '220 patent, the parties here disagree only over the term "destination."  Uship has proposed the following construction of that term:

> **Uship's Proposed Construction:**
>
> **"*destination*":**  data relating to the location to which the item to be mailed is to be mailed, such as the zip code for that location

Once again, this proposed construction tracks Uship's proposed construction of "destination" for the '220 patent, and our argument for the adoption of our proposal is the same.  *See supra* p.91-92.  We add here only that although the '014 specification, like the '220 specification, indicates that, *for certain embodiments* of the invention, the invention contemplates the customer

116

inputting complete addressing information, *see, e.g.,* specification 14:35-37, the specification's discussion of *other* embodiments makes clear that nothing more than the zip code need be inputted by the customer. *See, e.g.,* specification 8:52-59; *see also id.* 9:41 (customer instructed to write mailing address on label).

| **Limitation 5:** | *computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer;* |
|---|---|

**Uship's Proposed Construction:**

*"computing":*  determining, reckoning, or calculating

*"weight information":*  data relating to weight of the item to be mailed. *See* definition of "weighing" above.

*"delivery date":*  the projected or estimated date on which items to be mailed through the claimed invention are to be received at the designated location/address, expressed either as the specific month, day, and year when the item is expected to be received at the designated location or the number of days it is estimated to take for items to be mailed through the claimed invention to arrive at the designated location/address for delivery.

*"cost for delivery":*  the price(s) quoted to mail the item to the designated location/address

*"delivery service options available":*  the choices of different methods of mailing parcels and envelopes to a chosen or desired location/address that are open to or presented to a customer using the claimed invention

Uship's proposed constructions for the above terms track its proposed constructions for the same terms in the '220 patent, and our argument for the adoption of our proposals, and the

rejection of the Government's and IBM's proposals, is the same.  *See supra* p.93-96.

| **Limitation 6:**  *receiving an indication of the delivery service option desired by the customer;* |
| :-- |

The parties have agreed upon a joint proposed construction for this limitation:

| **Joint Proposed Construction:** |
| :-- |
| *"receiving an indication of the delivery service option desired by the customer":*  the automated shipping machine obtains the customer's chosen method of delivery |

| **Limitation 7:**  *printing a tracking bar code label identifying at least said destination;* |
| :-- |

Although the parties have agreed upon a joint proposed construction for this limitation, they continue to disagree on the meaning of one of the terms in the limitation and construction. The parties' joint proposed construction is as follows:

| **Joint Proposed Construction:** |
| :-- |
| *"printing a tracking bar code label identifying at least said destination":*  the automated shipping machine prints a label including a bar code enabling a delivery service to keep track of a parcel or envelope, the bar code identifying at least said destination |

The parties continue to disagree as to the meaning of "destination."  For the reasons discussed above, *see supra* p.91-92, Uship contends that "destination" should be construed as "data relating to the location to which the item to be mailed is to be mailed, such as the zip code for

that location."  For the same reasons, the Government's and IBM's insistence that "destination" should be construed as requiring complete addressing information should be rejected.[60]

| |
|---|
| **Limitation 8:**  *printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer;* |

Although the parties have agreed upon a joint proposed construction for this limitation, they continue to disagree on the meaning of one of the terms in the limitation and construction. The parties' joint proposed construction is as follows:

| |
|---|
| **Joint Proposed Construction:**<br><br>*"printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer":*  the automated shipping machine prints at least the cost of delivering the parcel or envelope to the destination with the customer's chosen method of delivery |

Once again, the parties continue to disagree as to the meaning of "destination."  For the reasons discussed above, *see supra* p.91-92, Uship contends that "destination" should be construed as "data relating to the location to which the item to be mailed is to be mailed, such as the zip code for that location."

---

[60] Moreover, as with the '220 patent, we note that any suggestion that the invention requires the machine to *print* complete addressing information on the shipping label is contradicted by the specification, which discloses, in connection with its discussion of one embodiment, that once the label is printed the customer will be instructed "to *write* the mailing address onto the label."  Specification 9:41-42 (emphasis added).

**Limitation 9:**  *validating receipt of said parcel or envelope as the parcel or envelope for which said tracking bar code label was printed; and*

**Uship's Proposed Construction:**

*"validating receipt":*  determining or confirming that the package to be mailed has been received for storage and/or shipment

Uship's proposed constructions for the term "validating receipt" tracks its proposed construction for the same term in the '220 patent, and our argument for the adoption of our proposals is the same.  *See supra* p.98-101.  We add here only that the '014 specification provides the same strong support for our proposed construction as did the specification for the '220 patent.  In particular, although it is true that the specification and certain drawings indicate that, for some embodiments of the invention, the shipping machine will utilize sensors and other devices to confirm that the same package for which a label was printed is received, the specification also makes clear that such elaborate steps are *not* required for validation to occur.  Indeed, the specification stresses both that validation of receipt may be accomplished in several different ways, and that it is not necessary that the shipping machine itself confirm that the exact same package has been received.  It is instead sufficient that the machine determine that "any" package be received, in which case it will be "presumed" that the package is the appropriate one.  *See, e.g.,* specification 21:44-60.  Finally, just like the '220 specification, the '014 specification discloses that it is not necessary for the shipping machine to itself perform the validation step at all; validation, instead, can be performed by an attendant such as a retail clerk.  *See, e.g.,* specification 24:64-67; 25:40-44; 29:14-19.

> **Limitation 10:** *storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.*

This limitation differs somewhat from Limitation 10 of Claim 1 of the '220 patent.  Uship has proposed the following constructions of the key terms of this limitation:

> **Uship's Proposed Construction:**
>
> **"*storing*":**  to deposit or take in an item in a place for subsequent use or disposition
>
> **"*validated*":**  determined or confirmed to be the package to be mailed
>
> **"*secure*":**  safe from interception by unauthorized persons
>
> **"*storage area*":**  a place in which an item is deposited or held for subsequent use or disposition
>
> **"*commercial delivery person*":**  an employee or agent of the company or service used to mail the item to be mailed through the use of the claimed invention

Although neither the Government nor IBM has offered its own separate construction of the above terms as used in this claim limitation (with the exception of "validated," which both parties address in connection with Limitation 9), the Government and IBM have not indicated any particular objection to Uship's proposed constructions of these terms (again, with the exception of "validated").  Indeed, those parties' proposed constructions of the limitation as a whole either simply restate the claim terms or use synonyms that correspond closely to our proposals.[61]

---

[61] It is unsurprising that neither the Government nor IBM expresses specific objections to Uship's proposed construction of some of the constituent terms of this limitation, for Uship's construction corresponds closely to the ordinary and common meaning of those terms, as confirmed by the standard definitions found in general purpose dictionaries.  *See, e.g., Random House Webster's College Dictionary* (1997) at 1271 (defining "store" as "to deposit in a storehouse or other place for keeping" and "to take in or hold supplies or articles, as for future use");

For that reason, we will not discuss at length in this brief our proposed constructions of these terms, and will focus instead on the deficiencies of the Government's and IBM's constructions.

The Government's construction requires that the "automated shipping machine" itself store the item to be mailed. Although IBM's proposed construction is not explicit, it appears from the support relied upon by IBM, as well as its proposed construction of the Claim 1 preamble, that it too may be taking the position that the patent requires the shipping machine itself to store the item to be mailed. Any such contention, however, cannot be squared with the intrinsic evidence. In fact, the Government's explicit, and IBM's implicit, position is flatly contradicted by the specification, which could not be more clear that the shipping machine itself is *not* necessarily required to perform the storage step. *See, e.g.,* specification 25:4-6 (for one embodiment, retail clerk "places the package in an appropriate location for subsequent pick-up by a commercial carrier"); 25:40-44 (customer deposits item with attendant, who stores package in secure area); 29:16-18 (same). As the specification says, the system disclosed in one embodiment "is substantially simplified from the [other discussed embodiments] since the storage and validation process is performed by an attendant." Specification 25:45-47. And the drawing that relates to this embodiment (Figure 20) depicts a shipping machine *without a storage unit*. The Government's and IBM's constructions, by focusing on the embodiments in which the item to be mailed is stored within the shipping machine, improperly seek both to read limitations from the specification into the claim and to artificially confine the invention to particular embodiments.

## B.   Claim 2

Claim 2 of the '014 patent, a device claim, contains many similar limitations to, and

---

*id*. (defining "storage" as "capacity or space for storing" and "a place, as a room or building, for storing"); *id*. at 1170 (defining "secure" as "safe from penetration or interception from unauthorized persons").

many of the exact same claim terms as, Claim 1.

| **Preamble:** | *An automated shipping machine for use in mailing parcels and envelopes, comprising:* |
|---|---|

Although for the same reasons discussed above, there is no need for the Court to separately construe the Claim 2 preamble, we have, in an abundance of caution, proposed constructions for certain of the key terms found within the preamble.

**Uship's Proposed Construction:**

*"automated shipping machine":*   an apparatus or device consisting of interrelated parts with separate functions, used in the performance of the task of mailing parcels and envelopes, and employing a technique, method, or system of operating and controlling that task by highly automatic means, as by electronic devices, thereby reducing human intervention to a minimum

*"mailing":*   sending by use of the USPS or a company or service that engages in the transportation of parcels and envelopes from one location to another location

*"parcels and envelopes":*   the items to be mailed through use of the method claimed in the invention, including without limitation packages or other objects wrapped or packed up to form a small bundle, as well as flat paper or cardboard containers for letters or thin packages

These constructions are the same as Uship's proposed constructions for the same terms in the Claim 1 preamble.  For that reason, and because the Government's and IBM's proposed constructions for the preamble closely track their constructions for the Claim 1 preamble, and thus suffer from the same defects, Uship's constructions should be adopted for the reasons discussed in the section addressing the Claim 1 preamble.  *See supra* p.81-88, 113.

> **Limitation 1:  *means for receiving payment information from a customer;***

The parties have agreed upon a joint proposed construction for this means-plus-function limitation:

> **Joint Proposed Construction:**
>
> ***"means for receiving payment information from a customer":***
>
> > **Function:**  to receive data relating to the customer's chosen method of payment from a customer
> >
> > **Corresponding Structure:**  card reader (30, 230, 328, 712)

> **Limitation 2:  *a scale for weighing a parcel or envelope to be mailed;***

The parties have agreed that this limitation may be construed in accordance with its plain meaning.

> **Limitation 3:  *a processor which receives package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, computes from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer, and receives an indication of the delivery service option desired by the customer;***

The parties have agreed upon a joint proposed construction for the last phrase in this limitation:

> **Joint Proposed Construction:**
>
> **"*and receives an indication of the delivery service option desired by the customer"*:** a processor configured to obtain the customer's chosen method of delivery

This Claim 2 limitation utilizes many of the same terms and concepts found in various limitations of Claim 1, including Limitation 2 (receiving package type information), Limitation 4 (receiving shipping information; destination), Limitation 5 (computing delivery date and cost of delivery), and Limitation 6 (receiving indication of desired delivery service option).  Uship has proposed the following constructions for the key terms in this limitation:

> **Uship's Proposed Construction:**
>
> **"*processor"*:**  a computer or similar device used to carry out operations on data or programs, involving the use of a computer processing unit (CPU) and associated hardware and software
>
> **"*package type information"*:**  data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the claimed invention
>
> **"*identifying"*:**  relating to, pertaining to, or associated with
>
> **"*shipping information"*:**  data relating to the method by which the item to be mailed is to be mailed and/or to the location to which the item is to be mailed
>
> **"*destination"*:**  data relating to the location to which the item to be mailed is to be mailed, such as the zip code for that location
>
> **"*computes"*:**  determines, reckons, or calculates
>
> **"*weight information"*:**  data relating to weight of the item to be mailed.  *See* definition of "weighing" above
>
> **"*delivery date"*:**  the projected or estimated date on which items to be mailed through the claimed invention are to be received at the designated location/address, expressed either as the specific month, day, and year when the item is expected to be

> received at the designated location or the number of days it is estimated to take for items to be mailed through the claimed invention to arrive at the designated location/address for delivery
>
> ***"cost for delivery":*** the price quoted to mail the item to the designated location/address
>
> ***"delivery service option available":*** the choices of different methods of mailing parcels and envelopes to a chosen or desired location/address that are open to or presented to a customer using the claimed invention

Given the overlap between the terms used in this limitation and various limitations of Claim 1, as well as the corresponding overlap between Uship's proposed constructions of those common terms, much of our discussion of those Claim 1 limitations – including our analysis in support of the adoption of Uship's proposed constructions of such disputed terms as "package type information," "destination," and "delivery date" – squarely applies here.[62]   Moreover, although neither the Government nor IBM has offered its own separate construction of such terms as "computing," "weight information," "shipping information," "identifying," "cost for delivery," "delivery service option," and "delivery service option available" as used in this limitation, the Government and IBM have not indicated any particular objection to Uship's proposed constructions of these terms.   Indeed, as with the corresponding limitations from Claim 1, those parties' proposed constructions of the limitation as a whole either simply restate these claim terms or use synonyms that correspond closely to our proposals.  *See supra* p.93-94, 117-18. For that reason, we will not discuss at length in this brief our proposed constructions of these terms, and will focus instead on the meaning of the one term from this limitation that is not

---

[62] *See, e.g., supra* p.89-90, 114-15 ("package type information"); *id.* at 91-92, 117 ("destination"); *id.* at 94-96, 117-18 ("delivery date").

found in Claim 1: "processor."

The term "processor" is linked to several different functions discussed in this limitation: receiving package type information and shipping information; computing a delivery date and cost of delivery; and receiving an indication of the customer's desired delivery service option.  In context it is clear that "processor" refers broadly to a computer or similar device used to carry out operations on data or programs, involving the use of a CPU and associated hardware and software.  In short, as reflected in the specification, and as seen with the term "processing means" in Claim 3 of the '220 patent, "processor" refers to the control system used to run many features of the shipping machine.

The specification and drawings contain numerous references to several different configurations of the control system for the shipping machine under several different embodiments of the invention.[63]  As set out in the specification, that control system includes various different associated structures and devices used to accomplish many of the tasks identified in this limitation, such as various input devices (*e.g.*, keyboards, keypads, and touch screen displays) used to re-

---

[63] *See, e.g.,* Figure 5, illustrating control system for one embodiment, including CPU which is in communication with program logic controller and which includes various inputs and outputs (discussed at, *inter alia*, specification 7:26-37); Figure 10, illustrating control system for another embodiment; Figure 17, illustrating control system for another embodiment (discussed at, *inter alia*, specification 17:52-18:20); Figure 21, illustrating control system for another embodiment (discussed at, *inter alia*, specification 25:51-26:25).  *See also* illus. 16 in Figures 1-2 and 6, showing "customer interface area" in one embodiment (discussed at, *inter alia*, specification 5:29-50); illus. 24, 28, 30 in Figures 1-3 and 6, showing CRT video display terminal, key pad, and magnetic card reader in one embodiment (discussed at, *inter alia*, specification 5:43-45); illus. 218 in Figure 7, showing "customer interface area" in one embodiment (discussed at, *inter alia*, specification 12:17-29); illus. 222, 224, 226, 230 in Figures 7-8, showing scale, CRT, keyboard, and magnetic card reader in one embodiment (discussed at, *inter alia*, specification 12:19-29; 14:39-41); illus. 318 in Figures 11-12, showing "customer interface area" in one embodiment (discussed at, *inter alia*, specification 15:35-42); illus. 322, 324, 328 Figure 12, showing display device such as a CRT, keyboard, and credit card reader in one embodiment (discussed at, *inter alia*, specification 15:35-42); illus. 702, 704, 706, 712 in Figure 20, showing CRT, keyboard, scale, and magnetic card reader in one embodiment (discussed at, *inter alia*, specification 25:14-21).

ceive package type and shipping information as well as the customer's desired shipping option,[64]

and various files loaded onto the control system for use in performing such tasks as the computa-

tion of delivery costs.[65]

| | |
|---|---|
| **Limitation 4:** | *a printer responsive to said processor so as to print a tracking bar code label identifying at least said destination and to print a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; and* |

The parties have agreed upon a joint proposed construction for this limitation:

---

[64] *See, e.g.,* abstract (referring to "a control system that accepts address information from the customer through a key pad"); specification 3:46 (referring to "input device for inputting information"); 4:13-14 (same); 7:29-39 (describing control system in one embodiment which receives various inputs of the fees different services would charge); 8:52-59 (describing step of entering zip code information); 9:18-21 ("At this point, a menu may appear, and the customer can specify which commercial delivery service he or she would like to use by entering the appropriate information through key pad."); 14:36-37 ("customer enters complete addressing information through the keyboard"); 5:43-45 (referring to customer interface area, which "includes a CRT video display terminal, a printer, a key pad, and a magnetic card reader"); 15:35-37 ("Customer interface area includes a display device such as a CRT, a keyboard, a label printer, and credit card reader."); 17:56-18:20 (describing control system utilizing various inputs for information); 18:16-17 (referring to "touch screen display which also enables the customer to input information"); 19:3-6 ("The customer then touches the appropriate portion of the touch screen of CRT to initiate operation of the system.  The system software then guides the customer through the shipping transaction[.]"); 20:30-38 (discussing inputting by customer of shipping information); 21:13-18 (discussing selection by customer of desired service option); 25:14-21 (discussing various inputs to control system, including CRT, keyboard, scale, and magnetic card reader); 25:61-26:16 (same); 27:53-28:5 (entry of shipping information).  The specification also refers to customers using a "key pad," "keyboard," or "touch screen" to select the delivery service option. *See, e.g.*, specification 7:44; 8:47; 9:20-21; 12:23; 14:37; 19:9; 20:42-52.

[65] *See, e.g.,* specification 3:49-51 (referring to "control system for calculating a shipment fee for the parcel from at least the weight and destination information"); 4:3-5 (same); 7:29-40 (describing control system); 9:12-22 (discussing, for one embodiment, the process by which control system calculates shipping fees/charges for the item to be mailed); 18:55-19:6 (describing programming of processor in one embodiment); 26:28-51 (same); 21:1-11 (describing computation by control system of cost of delivery and expected delivery date); 28:30-36 (same).

> **Joint Proposed Construction:**
>
> **"*a printer responsive to said processor so as to print a tracking bar code label identifying at least said destination and to print a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer*":** a printer configured to respond to a processor and print a shipping label including a bar code enabling a delivery service to keep track of a parcel or envelope, the bar code identifying at least said destination

> **Limitation 5:**   ***means for validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said printer, whereby a validated parcel or envelope is taken by an attendant for storage in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.***

The parties have reached agreement on the second half of this limitation – the "whereby" clause:

> **Joint Proposed Construction:**
>
> **"*whereby a validated parcel or envelope is taken by an attendant for storage in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person*":** whereby an attendant stores the validated parcel or envelope in a secure storage area until the commercial delivery person picks up the parcel or envelope for delivery

As with the '220 patent, however, because the parties disagree about the meaning of the "validation" step called for under this invention, the parties have not been able to reach agreement on the first half of the limitation.  Uship has proposed the following construction for the

129

operative term in the first half of Limitation 5:

> **Uship's Proposed Construction:**
>
> ***"means for validating receipt":***   structure, material, or steps for determining or confirming that the package to be mailed has been received for storage and/or shipment

For the reasons discussed in more detail in the section discussing Claim 1, Limitation 9, Uship contends that the record both convincingly establishes that the term "validating receipt" refers to the determination that the item to be mailed has been received for storage or shipment and refutes the Government's and IBM's position that the invention requires that the shipping machine itself verify, through the use of sophisticated sensors or similar devices, that the item being received is the same one for which a shipping label was printed.  *See supra* p.120.[66]

## VI.   U.S. PATENT NO. 6,917,924 ('924 PATENT)

The application for the '924 patent was filed on April 18, 2000, and the patent itself issued on July 12, 2005.  The patent was a continuation of the '014 patent.

The '924 patent contains two independent claims, both of which are being currently asserted by Uship:  Claim 1, a method claim; and Claim 2, a device claim.  Claim 1 and Claim 2

---

[66] Moreover, although it is true that this limitation, unlike the Claim 1 "validating receipt" limitation, refers to "means" for performing the "validating receipt" step, this does not mean that the claim is limited to only the structure, disclosed in the specification's discussion of certain embodiments, that is used to detect the presence or the weight/dimensions of the item to be mailed.  *See, e.g.,* specification 21:38-22:10; *see also* Figures 15A-D (illustrating various sensor systems used in particular embodiment).  As discussed above in connection with Claim 3 of the '220 patent, what any such suggestion ignores is that the specification also fully discloses *other* ways in which validation can be performed without using such sophisticated sensors or related structures – including embodiments in which validation is performed by attendants.  *Cf.* specification 25:45-49 ("Obviously, this system is substantially simplified from the embodiments discussed above since the storage and *validation process is performed by an attendant.*") (emphasis added).  Indeed, the "whereby" clause of this limitation itself contemplates that validation can be performed by an attendant.  *See supra* p.110-11).

employ many similar claim terms.  Claims 1 and 2 also closely correspond to Claims 1 and 3, respectively, of the '220 patent, and Claims 1 and 2, respectively, of the '014 patent, and with certain exceptions noted below, these claims employ many of the same terms employed by the corresponding method and device claims of those patents.  Indeed, with certain minor exceptions, the specification for the '014 patent very closely tracks the specifications for the '220 and '014 patents.  For all these reasons, Uship has proposed claim constructions for the '924 patent that closely track its proposed constructions for the '220 and '014 patents.  Where appropriate, Uship, to avoid needless repetition, will merely summarize its arguments in support of its proposed constructions for terms that track the '220 and '014 patents, and will refer the Court to its earlier full discussion of such proposed constructions.

A.    <u>**Claim 1**</u>

| Preamble:   *A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of:* |
|---|

Although for the same reasons discussed in connection with the '220 and '014 patents, there is no need for the Court to separately construe the Claim 1 preamble, we have, in an abundance of caution, proposed constructions for certain of its key terms.

| Uship's Proposed Construction: |
|---|
| *"mailing"*:  sending by use of the USPS or a company or service that engages in the transportation of parcels and envelopes from one location to another location |
| *"parcels and envelopes"*:  the items to be mailed through use of the method claimed in the invention, including without limitation packages or other objects wrapped or packed up to form a small bundle, as well as flat paper or cardboard containers for letters or thin packages |
| *"automated shipping machine"*:  an apparatus or device consisting of in- |

> terrelated parts with separate functions, used in the performance of the task of mailing parcels and envelopes, and employing a technique, method, or system of operating and controlling that task by highly automatic means, as by electronic devices, thereby reducing human intervention to a minimum

Uship's proposed constructions for the above terms track its proposed constructions for the same terms in the '220 and '014 patents, and our argument for the adoption of our proposals, and the rejection of the Government's and IBM's proposals, is the same. *See supra* p.81-88. We add here only that the specification for the '924 patent provides the same strong support for our proposed constructions as did the specifications for the '220 and '014 patents. With respect to "mailing," for example, the abstract to the '924 patent refers to terms such as "commercial carrier," "commercial carriers," and "each carrier," thus indicating that "mailing" is not limited to mailing by use of a single entity such as the USPS. Similarly, numerous passages in the specification make clear that the invention relates to the "commercial shipping and delivering industry," to "commercial carriers,," to "delivery service[s]," and to "commercial delivery service[s]," thus making clear that "mailing" encompasses more than one possible delivery service and is therefore not limited to mailing through the USPS.[67]

Similarly, with respect to the claim term "parcels and envelopes," numerous passages in the specification demonstrate that that term refers to the "parcel[s], package[s], letter[s] or other item[s] for shipment," and that it includes such items as "packages of different shapes and sizes," "small envelopes and similar items," "item[s] being shipped," "a letter, a pak or a package or

---

[67] *See, e.g.,* specification 1:15-16;  1:21; 1:23-31; 1:37; 1: 40; 1:55; 2:3; 2:8; 2:13; 2:22-23; 2:25; 2:29; 2:38; 2:53; 2:54; 3:1; 3:3-3:4; 3:19-20; 3:25-26; 3:35-36; 3:39; 3:54; 4:8; 5:27-28; 5: 56; 5:62; 6:65; 7:5-6; 8:6-8; 9:20; 11:1; 11:13-14; 11:26; 11:56; 13:64-65; 15:33; 20:9; 21:9-11; 24:65; 25:15-16; 28:11; 28:51-52.

any other package type," "object to be mailed" and "thin letter[s]."[68]  *See also* specification 30:20-25 (terms "parcels," "packages," and "envelopes" may be used interchangeably).

Finally, with respect to the term "automated shipping machine," the specification underscores both that the invention contemplates the use of a machine that employs several automatic processes and that the invention nevertheless contemplates at least some activity by human actors – *i.e.,* customers and, in some embodiments, attendants such as employees of businesses where the machine is deployed.  *See, e.g.,* specification 1:15-21; 24:58-60; 25:17-21; 25:56-61.

| Limitation 1:  *receiving payment information from a customer;* |
|---|

The parties have agreed upon a joint proposed construction for this limitation:

| Joint Proposed Construction: |
|---|
| *"receiving payment information from a customer":*  the automated shipping machine obtains data relating to the customer's chosen method of payment |

| Limitation 2:  *receiving package type information including the dimensions of a parcel or envelope to be mailed;* |
|---|

| Uship's Proposed Construction: |
|---|

───────────────

    [68] *See e.g.,* specification  1:18-20; 2:17-19; 5:27; 5:34; 5:40; 6:5; 6:29; 6:38; 6:43; 6:47; 6:52-53; 6:56; 6:60; 6:65; 7:12-13; 8:14; 8:18; 8:22; 8:24; 9:4-10; 9:34; 9:40-41; 9:52; 9:62; 9:65; 10:2; 10:8; 10:13-15; 10:19; 10:44; 11:24; 11:26-27; 11:32; 11:35; 11:40-41; 11:44-45; 11:47-50; 13:21; 13:23; 13:26-28; 13:45; 13:48-51; 13:54; 13:57-58; 14:37-38; 14:52; 14:59-60; 14:63; 14:65; 15:1; 15:8-9; 15:15-16; 15:20; 15:27; 15:32; 15:44; 15: 55; 15:66; 16:3; 16:14; 16:16; 16:22; 16:31-32; 16:44; 16:52-53; 16:59; 16:67; 17:9-10; 17:13; 17:17; 18:30; 19:49; 20:8; 21:48; 24:64-65; 25:10-11; 27:43-44; 28:3.

> *"receiving":*   accepting or obtaining through use of one or more means of inputting or transmitting information, including but not limited to devices such as keyboards, touch screens, card readers, scales, etc.
>
> *"package type information":*   data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the claimed invention
>
> *"dimensions":*   data relating to the magnitude or size of an item, including data relating to the length, width, and/or height of that item

Two of the above terms – "receiving" and "package type information" – appear in the '220 and '014 patents, and Uship's proposed constructions for those two terms, as well as its arguments in support of those proposed constructions, track its proposed constructions and arguments with respect to the '220 and '014 patents. *See supra* p.88-90, 115-16.  We add here only that the '924 specification provides the same strong support for our proposed constructions as did the specification for the '220 and '014 patents.  With respect to the term "receiving," for example, the specification confirms that the shipping machine "receives" information through one or more methods of inputting or transmitting data.  Thus, the abstract refers to "a unit, such as a magnetic card reader, for accepting payment from a customer," and also refers to a "control system that accepts address information from the customer through a key pad."  The specification contains numerous references to various methods of inputting or transmitting data.  *See, e.g.,* specification 3:46 (referring to "input device for inputting information"); 4:13-14 (same); 7:29-40 (describing control system which receives various inputs); 8:52-59 (describing step of entering zip code information); 5:42-44 (referring to customer interface area, which "includes a CRT video display terminal, a printer, a key pad, and a magnetic card reader"); 18:16-17 (referring to "touch screen display which also enables the customer to input information"); 20:35-39 (discuss-

ing inputting by customer of shipping information).[69]

Similarly, with respect to "package type information," the specification provides examples that indicate that the term refers to data relating to the characteristics or properties of the parcel or envelope to be mailed.  Thus, the specification notes that "package types include a letter, a pak, or a package or any other package type which may be accepted by the delivery service."  Specification 20:7-9; *see also id.* 27:40-46 (same).

The one term from this limitation that is new to the '924 patent is "dimensions," which is considered a species of "package type information."  Uship contends that this term should be construed to mean "data relating to the magnitude or size of an item, including data relating to the length, width, and/or height of that item."  The Government interprets this term slightly more narrowly, as meaning "data relating to the length, width, and height of the parcel or envelope."  IBM has not offered a construction of this term.

Uship believes that its proposed construction of "dimensions" is more faithful to both the ordinary understanding of that term and to the purpose of the invention than is the Government's more restrictive definition.  As an initial matter, general purpose dictionaries demonstrate that the common and ordinary understanding of the term is not limited to measurements of length,

---

[69] *See also id.* 8:19-21 (describing control system receiving input from, *inter alia*, scale); 8:29-41 (describing control system receiving input from magnetic card reader); 14:39-41 ("customer enters complete addressing information through the keyboard"); 15:39-49 ("Customer interface area includes a display device such as a CRT, a keyboard, a label printer, and credit card reader."); 17:57-18:26 (describing control system utilizing various inputs for information); 21:18-21 (discussing selection by customer of desired service option); 25:24-31 (discussing various inputs to control system, including CRT, keyboard, scale, and magnetic card reader); 26:6-28 (same); 27:19-21 (customer provides payment information); 28:1-24 (entry of shipping information).  *See also* specification 3:6-7 ("a device for receiving payment information from a customer"); 5:43-49 ("a magnetic card reader . . . Instead of card reader, the system could alternatively include other means for payment, or for indentifying the customer for later billing."); 19:23-39 (customer is instructed to insert credit or debit card into the magnetic card reader to provide necessary payment and identification information.).

width, and height, but also includes information relating to the scope, magnitude, or size of an item.[70] Perhaps more importantly, although the specification's discussion of certain embodiments does in fact refer to measurements of an item's length, width, and height, *see, e.g.,* specification 3:9-10; 3:16-17; 5:40-41; 8:13-14; 16:14-15, it also makes clear that the animating concern of this feature of the invention has to do with oversized packages that the shipping machine or shipping service may have problems handling. *See, e.g.,* specification 20:18-20 (discussing potential problems with "oversized" packages). Thus, the specification suggests that so long as information relating to the general size of the item, such as whether the item is too large to fit within a storage unit, is obtained, precise length, width, and height measurements are not required.

Notably, the specification's discussion of a shipping machine that can be used under a fourth embodiment of the invention notes that "*[p]referably,* a measuring grid 710 is also provided on the surface . . . to enable the customer to readily determine the measurements of the parcel." Specification 25:27-29 (emphasis added). The fact that the specification indicates that a grid for determining length, width, and height measurements is merely "prefer[red]" rather than required confirms that "dimensions" does not itself require such measurements. The Government's contrary reading improperly imports limitations from the specification into the claim.

| **Limitation 3:** *weighing said parcel or envelope to be mailed;* |
|---|

The parties have agreed upon a joint proposed construction for this limitation:

---

[70] *See, e.g., Random House Webster's College Dictionary* (1997) at 368 (defining "dimension" as, among other things, "a measurement in length, width, and thickness"; "scope"; and "magnitude; size").

> **Joint Proposed Construction:**
>
> **"*weighing said parcel or envelope to be mailed"*:**   the automated shipping machine obtains the weight of the parcel or envelope to be mailed by use of a scale

> **Limitation 4:**  *receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed;*

With the exception of one important term, the parties have agreed upon a joint proposed construction for this limitation:

> **Joint Proposed Construction:**
>
> **"*receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed"*:**   the automated shipping machine obtains data relating to shipping from the customer including at least the destination of said parcel or envelope to be mailed

As with the '220 and '014 patents, the parties here disagree only over the term "destination."  Uship has proposed the following construction of that term:

> **Uship's Proposed Construction:**
>
> **"*destination"*:**   data relating to the location to which the item to be mailed is to be mailed, such as the zip code for that location

Once again, this proposed construction tracks Uship's proposed construction of "destination" for the '220 and '014 patents, and our argument for the adoption of our proposal is the same.  *See supra* p.91-92.  We add here only that although the '924 specification, like the '220 and '014 specifications,  indicates that, *for certain embodiments* of the invention, the invention

137

contemplates the customer inputting complete addressing information, *see, e.g.,* specification

14:39-41, the specification's discussion of *other* embodiments makes clear that nothing more

than the zip code need be inputted by the customer.  *See, e.g.,* specification 8:52-59; *see also id.*

9:41 (customer instructed to write mailing address on label).

---

**Limitation 5:**  *computing from said package type information, shipping infor-mation, and weight information, a delivery date and cost for de-livery of said parcel or envelope to said destination via at least two delivery service options available to said customer;*

---

**Uship's Proposed Construction:**

*"computing":*  determining, reckoning, or calculating

*"weight information":*  data relating to weight of the item to be mailed.  *See* definition of "weighing" above.

*"delivery date":*   the projected or estimated date on which items to be mailed through the claimed invention are to be received at the designated location/address, expressed either as the specific month, day, and year when the item is expected to be received at the designated location or the number of days it is estimated to take for items to be mailed through the claimed invention to arrive at the designated loca-tion/address for delivery.

*"cost for delivery":*  the price(s) quoted to mail the item to the designated location/address

*"delivery service options available":*  the choices of different methods of mailing parcels and envelopes to a chosen or desired loca-tion/address that are open to or presented to a customer using the claimed invention

---

Uship's proposed constructions for the above terms track its proposed constructions for

the same terms in the '220 and '014 patents, and our argument for the adoption of our proposals,

and the rejection of the Government's and IBM's proposals, is the same.  *See supra* p.93-96.

| Limitation 6:  *receiving an indication of the delivery service option desired by the customer;* |
|---|

The parties have agreed upon the following joint proposed construction for this limitation:

| **Joint Proposed Construction:**<br><br>*"receiving an indication of the delivery service option desired by the customer":*  the automated shipping machine obtains the customer's chosen method of delivery |
|---|

| Limitation 7:  *printing a tracking bar code label identifying at least said destination;* |
|---|

Although the parties have agreed upon a joint proposed construction for this limitation, they continue to disagree on the meaning of one of the terms in the limitation and construction. The parties' joint proposed construction is as follows:

| **Joint Proposed Construction:**<br><br>*"printing a tracking bar code label identifying at least said destination":*  the automated shipping machine prints a label including a bar code enabling a delivery service to keep track of a parcel or envelope, the bar code identifying at least said destination |
|---|

The parties continue to disagree as to the meaning of "destination."  For the reasons discussed above, *see supra* p.91-92, Uship contends that "destination" should be construed as "data

relating to the location to which the item to be mailed is to be mailed, such as the zip code for

that location."  For the same reasons, the Government's and IBM's insistence that "destination"

should be construed as requiring complete addressing information should be rejected.[71]

| Limitation 8: | *printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer;* |
|---|---|

Although the parties have agreed upon a joint proposed construction for this limitation,

they continue to disagree on the meaning of the term "destination" in the limitation and construc-

tion.  The parties' joint proposed construction is as follows:

> **Joint Proposed Construction:**
>
> *"printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer"*:  the automated shipping machine prints at least the cost of delivering the parcel or envelope to said destination with the customer's chosen method of delivery

For the reasons discussed above, *see supra* p.91-92, Uship contends that "destination"

should be construed as "data relating to the location to which the item to be mailed is to be

mailed, such as the zip code for that location."

---

[71] Moreover, as with the '220 and '014 patents, any suggestion that the invention requires the machine to *print* complete addressing information on the shipping label is contradicted by the specification, which discloses, in connection with its discussion of one embodiment, that once the label is printed the customer will be instructed "to *write* the mailing address onto the label." Specification 9:41 (emphasis added).

> **Limitation 9:** *validating receipt of said parcel or envelope as the parcel or envelope for which said tracking bar code label was printed; and*

> **Uship's Proposed Construction:**
>
> *"validating receipt":* determining or confirming that the package to be mailed has been received for storage and/or shipment

Uship's proposed constructions for the term "validating receipt" tracks its proposed constructions for the same term in the '220 and '014 patents, and our argument for the adoption of our proposals is the same. *See supra* p.98-101, 120. We add here only that the '924 specification provides the same strong support for our proposed constructions as did the specifications for the '220 and '014 patents. In particular, although it is true that the specification, and certain drawings, contemplate that, for some embodiments of the invention, the shipping machine will utilize sensors and other devices to confirm that the same package for which a label was printed is received, the specification also makes clear that such elaborate steps are *not* required for validation to occur. Indeed, the specification stresses both that validation of receipt may be accomplished in several different ways, and that it is not necessary that the shipping machine itself confirm that the exact same package has been received. It is instead sufficient that the machine determine that "any" package be received, in which case it will be "presumed" that the package is the appropriate one. *See, e.g.,* specification 21:44-60. Finally, just like the '220 and '014 specifications, the '924 specification discloses that it is not necessary for the shipping machine to itself perform the validation step at all; validation, instead, can be performed by an attendant such as a retail clerk. *See, e.g.,* specification 24:59-62; 25:32-40; 29:41-46.

| Limitation 10: | *storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up for delivery.* |
|---|---|

This limitation differs somewhat from Limitation 10 of Claim 1 of the '220 patent, and also differs slightly from Limitation 10 of the '014 patent.  Uship has proposed the following constructions of the key terms of this limitation:

| **Uship's Proposed Construction:** |
|---|
| *"storing":*  to deposit or take in an item in a place for subsequent use or disposition |
| *"validated":*  determined or confirmed to be the package to be mailed |
| *"secure":*  safe from interception by unauthorized persons |
| *"storage area":*  a place in which an item is deposited or held for subsequent use or disposition |
| *"delivery":*  the carrying and turning over of parcels and envelopes to a designated recipient or address/location |

Although neither the Government nor IBM has offered its own separate constructions of the above terms as used in this claim limitation (with the exception of "validated," which both parties address in connection with Limitation 9), they have not indicated any particular objection to Uship's proposed constructions of these terms (again, with the exception of "validated").  For that reason, we will not discuss at length in this brief our proposed constructions of these terms. *See also supra* p.121.

As with the similar limitation found in Claim 1 of the '014 patent, the Government's construction (and, it appears, IBM's construction) of this limitation requires that the "automated shipping machine" itself store the item to be mailed.  For the reasons discussed in more detail in

connection with the '014 patent, any such contention cannot be squared with the intrinsic evidence. *See supra* p.122.   We add here only that the Government's and IBM's position is flatly contradicted by the '924 specification, which clearly establishes that the shipping machine itself is *not* necessarily required to perform the storage step.  *See, e.g.,* specification 25:14-16; 25:51-58; 29:42-47; *see also* Figure 20 (depicting shipping machine without a storage unit).

**B.**    **Claim 2**

Claim 2 of the '924 patent, a device claim, contains many similar limitations to, and many of the exact same claim terms as, Claim 1.

| |
|---|
| **Preamble:**   *An automated shipping machine for use in mailing parcels and envelopes, comprising:* |

Although for the same reasons discussed above, there is no need for the Court to separately construe the Claim 2 preamble, we have, in an abundance of caution, proposed constructions for certain of the key terms found within the preamble.

| |
|---|
| **Uship's Proposed Construction:** |
| *"automated shipping machine":*  an apparatus or device consisting of interrelated parts with separate functions, used in the performance of the task of mailing parcels and envelopes, and employing a technique, method, or system of operating and controlling that task by highly automatic means, as by electronic devices, thereby reducing human intervention to a minimum |
| *"mailing":*   sending by use of the USPS or a company or service that engages in the transportation of parcels and envelopes from one location to another location |
| *"parcels and envelopes":*   the items to be mailed through use of the method claimed in the invention, including without limitation packages or other objects wrapped or packed up to form a small bundle, as well as flat paper or cardboard containers for letters or thin packages |

These constructions are the same as Uship's proposed constructions for the same terms in the Claim 1 preamble.  *See supra* p.81-88, 132-34.

| Limitation 1:  *means for receiving payment information from a customer;* |
| --- |

The parties have agreed upon a joint proposed construction for this means-plus-function limitation:

> **Joint Proposed Construction:**
>
> *"means for receiving payment information from a customer":*
>
> **Function:**   to receive data relating to the customer's chosen method of payment from a customer
>
> **Corresponding Structure:**  card reader (30, 230, 328, 712)

| Limitation 2:  *a scale for weighing a parcel or envelope to be mailed;* |
| --- |

The parties have agreed that this limitation may be construed in accordance with its plain meaning.

| Limitation 3:  *a processor which receives package type information including the dimensions of said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, computes from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer, and receives an indication of the delivery service option desired by the customer;* |
| --- |

144

The parties have agreed upon a joint proposed construction for the last phrase in this limitation:

---

**Joint Proposed Construction:**

*"and receives an indication of the delivery service option desired by the customer":* a processor configured to obtain the customer's chosen method of delivery

---

This Claim 2 limitation utilizes many of the same terms and concepts found in various limitations of Claim 1, including Limitation 2 (receiving package type information; dimensions), Limitation 4 (receiving shipping information; destination), Limitation 5 (computing delivery date and cost of delivery), and Limitation 6 (receiving indication of desired delivery service option). Uship has proposed the following constructions for the key terms in this limitation:

---

**Uship's Proposed Construction:**

*"processor":* a computer or similar device used to carry out operations on data or programs, involving the use of a computer processing unit (CPU) and associated hardware and software

*"information":* data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the claimed invention

*"dimensions":* data relating to the magnitude or size of an item, including data relating to the length, width, and/or height of that item

*"shipping information":* data relating to the method by which the item to be mailed is to be mailed and/or to the location to which the item is to be mailed

*"destination":* data relating to the location to which the item to be mailed is to be mailed, such as the zip code for that location

---

*"computes":*  determines, reckons, or calculates

*"weight information":*   data relating to weight of the item to be mailed.
*See* definition of "weighing" above

*"delivery date":*  the projected or estimated date on which items to be
mailed through the claimed invention are to be received at
the designated location/address, expressed either as the spe-
cific month, day, and year when the item is expected to be
received at the designated location or the number of days it
is estimated to take for items to be mailed through the
claimed invention to arrive at the designated loca-
tion/address for delivery

*"cost for delivery":*  the price(s) quoted to mail the item to the designated
location/address

*"delivery service option available":*   the choices of different methods of
mailing parcels and envelopes to a chosen or desired loca-
tion/address that are open to or presented to a customer us-
ing the claimed invention

Given the overlap between the terms used in this limitation and various limitations of

Claim 1, as well as the corresponding overlap between Uship's proposed constructions of those

common terms, much of our discussion of those Claim 1 limitations – including our analysis in

support of the adoption of Uship's proposed construction of such disputed terms as "package

type information," "dimensions," "destination," and "delivery date" – squarely applies here.[72]

Moreover, although neither the Government nor IBM has offered its own separate constructions

of such terms as "computing," "weight information," "shipping information," "identifying,"

"cost for delivery," and "delivery service option available" as used in this claim limitation, the

Government and IBM have not indicated any particular objection to Uship's proposed construc-

tions of these terms.  *See supra* p.93-94, 137-38.   For that reason, we will not discuss at length

---

[72] *See, e.g., supra* p.89-90, 134-35 ("package type information"); *id.* at 135-36 ("dimen-
sions"); *id.* at 91-92, 137-38 ("destination"); *id.* at 94-96, 138-39 ("delivery date").

in this brief our proposed constructions of these terms, and will focus instead on the meaning of the one term from this limitation that is not found in Claim 1: "processor."

The term "processor" is also used in Claim 2 of the '014 patent. As with that claim, it is clear from context that the term "processor" as used in this claim refers broadly to a computer or similar device used to carry out operations on data or programs, involving the use of a CPU and associated hardware and software. *See supra* p.127. In short, as reflected in the specification, "processor" refers to the control system used to run many features of the shipping machine.

The specification contains numerous references to several different configurations of the control system for the shipping machine under several different embodiments of the invention.[73] As set out in the specification, that control system includes various different associated structures and devices used to accomplish many of the tasks identified in this limitation, such as various input devices (*e.g.*, keyboards, keypads, and touch screen displays) used to receive package type

---

[73] *See, e.g.,* Figure 5, illustrating control system for one embodiment, including CPU which is in communication with program logic controller and which includes various inputs and outputs (discussed at, *inter alia*, specification 7:29-40); Figure 10, illustrating control system for another embodiment; Figure 17, illustrating control system for another embodiment (discussed at, *inter alia*, specification 17:57-18:26); Figure 21, illustrating control system for another embodiment (discussed at, *inter alia*, specification 25:53-26:27). *See also* illus. 16 in Figures 1-2 and 6, showing "customer interface area" in one embodiment (discussed at, *inter alia*, specification 5:30-50); illus. 24, 28, 30 in Figures 1-3 and 6, showing CRT video display terminal, key pad, and magnetic card reader in one embodiment (discussed at, *inter alia*, specification 5:42-45); illus. 218 in Figure 7, showing "customer interface area" in one embodiment (discussed at, *inter alia*, specification 12:17-30); illus. 222, 224, 226, 230 in Figures 7-8, showing scale, CRT, keyboard, and magnetic card reader in one embodiment (discussed at, *inter alia*, specification 12:20-28; 14:39-41); illus. 318 in Figures 11-12, showing "customer interface area" in one embodiment (discussed at, *inter alia*, specification 15:37-42); illus. 322, 324, 328 Figure 12, showing display device such as a CRT, keyboard, and credit card reader in one embodiment (discussed at, *inter alia*, specification 15:39-42); illus. 702, 704, 706, 712 in Figure 20, showing CRT, keyboard, scale, and magnetic card reader in one embodiment (discussed at, *inter alia*, specification 25:15-27).

and shipping information as well as the customer's desired shipping option,[74] and various files

loaded onto the control system for use in performing such tasks as the computation of delivery

costs.[75]

| | |
|---|---|
| **Limitation 4:** | *a printer responsive to said processor so as to print a tracking bar code label identifying at least said destination and to print a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; and* |

The parties have agreed upon a joint proposed construction for this limitation:

---

[74] *See, e.g.,* abstract (referring to "a control system that accepts address information from the customer through a key pad"); specification 3:46 (referring to "input device for inputting information"); 4:13-14 (same); 7:29-40 (describing control system in one embodiment which receives various inputs of the fees different services would charge); 8:52-59 (describing step of entering zip code information); 9:18-21 ("At this point, a menu may appear, and the customer can specify which commercial delivery service he or she would like to use by entering the appropriate information through key pad."); 14:39-41 ("customer enters complete addressing information through the keyboard"); 5:42-45 (referring to customer interface area, which "includes a CRT video display terminal, a printer, a key pad, and a magnetic card reader"); 15:39-49 ("Customer interface area includes a display device such as a CRT, a keyboard, a label printer, and credit card reader."); 17:57-18:26 (describing control system utilizing various inputs for information); 18:22-23 (referring to "touch screen display which also enables the customer to input information"); 19:7-12 ("The customer then touches the appropriate portion of the touch screen of CRT to initiate operation of the system. The system software then guides the customer through the shipping transaction[.]"); 20:35-39 (discussing inputting by customer of shipping information); 21:18-21 (discussing selection by customer of desired service option); 25:24-32 (discussing various inputs to control system, including CRT, keyboard, scale, and magnetic card reader); 25:63-26:18 (same); 27:54-28:8 (entry of shipping information). The specification also refers to customers using a "key pad," "keyboard," or "touch screen" to select the delivery service option. *See, e.g.*, specification 7:44; 8:47; 9:20-21; 12:23; 14:41; 19:15; 20:49-50; 21:15-22.

[75] *See, e.g.,* specification 3:49-51 (referring to "control system for calculating a shipment fee for the parcel from at least the weight and destination information"); 4:3-5 (same); 7:29-40 (describing control system); 9:12-22 (discussing, for one embodiment, the process by which control system calculates shipping fees/charges for the item to be mailed); 18:55-19:6 (describing programming of processor in one embodiment); 26:28-51 (same); 21:4-13 (describing computation by control system of cost of delivery and expected delivery date); 28:30-36 (same).

**Joint Proposed Construction:**

*"a printer responsive to said processor so as to print a tracking bar code label identifying at least said destination and to print a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer":*  a printer configured to respond to a processor and print a shipping label including a bar code enabling a delivery service to keep track of a parcel or envelope, the bar code identifying at least said destination

**Limitation 5:**   *means for validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said printer, whereby a validated parcel or envelope is stored in a secure storage area until said parcel or envelope is subsequently picked up for delivery.*

Uship has proposed the following constructions for the key terms in the limitation:

**Uship's Proposed Construction:**

*"means for validating receipt":*  structure, material, or steps for determining or confirming that the package to be mailed has been received for storage and/or shipment

*"shipping label":*  tracking bar code label

*"validated":*  determined or confirmed to be the package to be mailed

*"stored":*  kept or held

*"secure":*  safe from interception by unauthorized persons

*"storage area":*  a place in which an item is deposited or held for subsequent use or disposition

*"delivery":*  the carrying and turning over of parcels and envelopes to a designated recipient or address/location

For the reasons discussed in the section discussing Claim 1, Limitation 9, Uship contends that the record both convincingly establishes that the term "validating receipt" refers to the determination that the item to be mailed has been received for storage or shipment and refutes the Government's and IBM's position that the invention requires that the shipping machine itself verify, through the use of sophisticated sensors or similar devices, that the item being received is the same item for which a shipping label was printed.  *See supra* p.141.[76]

For similar reasons, the Government's and IBM's apparent contention that this limitation requires that the "automated shipping machine" itself store the item to be mailed, cannot, for the reasons discussed in more detail in connection with the '014 patent, be squared with the intrinsic evidence.  *See supra* p.122.  Once again, any such contention is plainly refuted by the '924 specification, which clearly establishes that the shipping machine itself is *not* necessarily required to perform the storage step.  *See, e.g.,* specification 25:14-16; 25:51-58; 29:42-47; *see also* Figure 20 (depicting shipping machine without a storage unit).

For the remaining terms used in this limitation, we refer the Court to our discussion of these terms as used in other limitations of the Uship patents.  *See supra* p.120-22, 142-43.

---

[76] Moreover, although it is true that this limitation, unlike the Claim 1 "validating receipt" limitation, refers to "means" for performing the "validating receipt" step, this does not mean that the claim is limited to only the structure, disclosed in the specification's discussion of certain embodiments, that is used to detect the presence or the weight/dimensions of the item to be mailed.  *See, e.g.,* specification 21:38-22:10; *see also* Figures 15A-D (illustrating various sensor systems used in particular embodiment).  As discussed above in connection with Claim 3 of the '220 patent and Claim 2 of the '014 patent, what any such suggestion ignores is that the specification also fully discloses *other* ways in which validation can be performed without using such sophisticated sensors or related structures – including embodiments in which validation is performed by attendants.  *Cf.* specification 25:56-58 ("Obviously, this system is substantially simplified from the embodiments discussed above since the storage and *validation process is performed by an attendant.*") (emphasis added).

## TESTIMONY AT CLAIM
## CONSTRUCTION HEARING

The Court's scheduling order requires Uship to provide a summary of the testimony it expects to offer at the claim construction hearing.  At this time, Uship does not anticipate that it will seek to offer witness testimony at the hearing.  However, because neither the Government nor IBM has yet filed a brief on claim construction, it is not possible for Uship at this time to fully anticipate the arguments those parties may raise in support of their own proposed claim constructions or the evidence they may seek to rely upon to bolster those arguments.  Depending upon the arguments and evidence relied upon by the Government and IBM in their claim construction briefs, it is theoretically possible that Uship may decide to offer limited testimony at the claim construction hearing.  In the interest of providing as much advance disclosure as it is possible for Uship to provide before seeing the Government's and IBM's briefs, Uship states that in such a case, it can foresee the possibility of offering testimony by Kenneth Liles, the co-inventor of the '220, '014, and '924 patents, with respect to one or more of the following topics:  (1) customary practices in the mailing/shipping industry at the time Uship's inventions were conceived and implemented; (2) the customary and ordinary understanding within the art of terms used in the relevant Uship patents at that time; and (3) the operation of Uship's own line of mailing/shipping kiosks and how such operation related to the inventions disclosed in Uship's patents.

## CONCLUSION

For the reasons discussed above, Uship respectfully requests the Court to adopt both the parties' joint proposed constructions as to certain claim terms and Uship's proposed constructions of those claim terms on which the parties have not reached agreement.

November 18, 2009

Respectfully submitted,

/s/ Charles J. Cooper
_____

Charles J. Cooper
COOPER & KIRK, PLLC
Vincent J. Colatriano
Derek L. Shaffer
David Lehn
Jesse Panuccio
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Telephone:  (202) 220-9600
Facsimile:   (202) 220-9601
Email:  ccooper@cooperkirk.com

*Counsel for Uship Intellectual Properties, LLC*

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 18th day of November, 2009, I caused to be served by the Court's electronic filing system copies of the foregoing on the following counsel:

Scott David Bolden
U. S. Department of Justice
Civil Div. - Commercial Litigation Br.
1100 L Street, NW
8th Floor
Washington, DC 20530
(202) 307-0262
Fax: (202) 307-0345
Email: scott.bolden@usdoj.gov

Steven C. Cherny
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022
(212) 446-4800
Fax: (212) 446-4900
Email: scherny@kirkland.com

          /s/David Lehn