IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| USHIP INTELLECTUAL PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | No. 08-537 C |
| | ) | |
| Defendant, | ) | Judge Susan G. Braden |
| | ) | |
| and | ) | |
| | ) | |
| INTERNATIONAL BUSINESS MACHINES | ) | |
| CORPORATION, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

---

**DEFENDANT'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION**

---

TONY WEST
Assistant Attorney General

JOHN J. FARGO
Director

Of Counsel:                         SCOTT BOLDEN
GARY L. HAUSKEN                      Senior Trial Counsel
DAVID M. RUDDY                       Commercial Litigation Branch
Department of Justice                Civil Division
MICHAEL F. KIELY                     Department of Justice
United States Postal Service         Washington, DC  20530
                                     Telephone:    (202) 307-0262
January 6, 2010                      Facsimile:    (202) 307-0345

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

TABLE OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     CLAIM CONSTRUCTION STANDARDS ARE STRAIGHTFORWARD . . . . . . . . . . 5

     MEANS-PLUS-FUNCTION CLAIMS ARE LIMITED TO THE
     CORRESPONDING STRUCTURE IN THE SPECIFICATION . . . . . . . . . . . . . . . . . . . 9

     USHIP MISAPPLIES SETTLED LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

         A.    The Federal Circuit Rejected Uship's Claim Construction
               Methodology in <u>Phillips</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

         B.    The Preamble Limits the Claims Where it Recites Essential Structure
               or it Breathes Life into the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

         C.    Uship Should Be Barred from Offering the Irrelevant Testimony
               of a Co-Inventor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CLAIM CONSTRUCTION ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     I.     PUSIC 4,900,905 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

         A.    Preamble Limitations ('905/12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

         B.    "Receiving an Item to Be Mailed" ('905/12) . . . . . . . . . . . . . . . . . . . . . 18

         C.    "Weighing the Item to Be Mailed" ('905/12) . . . . . . . . . . . . . . . . . . . . 26

         D.    "Admitting Data Relating to the Item to Be Mailed . . ." ('905/12) . . . . 28

         E.    "Determining the Required Postage for the Item
               to be Mailed" ('905/12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

F.  "Providing Machine Readable Information Concerning the Item to Be Mailed on the Item to Be Mailed . . ." ('905/12) . . . . . . . . . . . . . 32

G.  "Storing the Item to Be Mailed for Subsequent Pick-Up" ('905/12)  . . . 35

II.  RAMSDEN 5,418,464 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A.  Preamble Limitations ('464/7, 19, 28, 34) . . . . . . . . . . . . . . . . . . . . . . . . 37

1.  "integrated" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

2.  "automated" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

3.  "unattended" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

4.  "unit" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B.  "Means for Inputting Information Relating to the Destination to Which the Item Is to Be Shipped" ('464/7, 19, 28, 34) . . . . . . . . . . . 42

C.  "Control Means for Analyzing the Inputted Information and Calculating the Fee for Shipment of the Item" ('464/7, 19, 28, 34) . . . . 44

D.  "Means for Communicating and Assessing the Shipment Fee . . ." ('464/7, 19, 28, 34) . . . . . . . . . . . . . . . . . . . . . . . . . . 47

E.  "Means for Securely Storing Said Item until the Item Is Collected by Said Commercial Delivery Service" ('464/7, 19, 28, 34) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

F.  "Means for Storing the Inputted Information Once Said Item Is Disposed in Said Secured Storage Means" ('464/7, 19, 28, 34) . . . . . 53

G.  "Means for Displaying a Manifest" ('464/7, 28) . . . . . . . . . . . . . . . . . . 56

H.  "Means for Communicating Said Information to a Remote Location Staffed by a Human Operator" ('464/9), "Means for Transmitting a Manifest to a Remote Location" ('464/19), and "Means for Transmitting Information That May Be Used to Prepare a Manifest to a Remote Location" ('464/34) . . . . . . . . . . . . . . . . . . . . . . 57

I.  Pivotable Door Limitations ('464/10) . . . . . . . . . . . . . . . . . . . . . . . . . . 61

J.  Credit Card Company Limitation ('464/15) . . . . . . . . . . . . . . . . . . . . . 63

K.      "Means for Validating . . ." Limitations ('464/16, 20, 29)  . . . . . . . . . . 64

L.      "Means for Determining the Type of Card and the Expiration
        Date of the Card" ('464/17) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

M.      "Means for Determining Whether the Card Is Listed as
        a Bad Card" ('464/18) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

N.      "Means for Communicating Said Account Charge to a
        Remote Location" ('464/30)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

III.    RAMSDEN & LILES 5,831,220; 6,105,014; 6,917,924 . . . . . . . . . . . . . . . . . 70

A.      "Destination," "Package Type Information," and "Delivery Date"  . . . . 71

B.      Method Claims ('220/1; '014/1; '924/1)  . . . . . . . . . . . . . . . . . . . . . . . . . 76

        1.      Preamble ('220/1; '014/1; '924/1) . . . . . . . . . . . . . . . . . . . . . . . 77

        2.      "Receiving Package Type Information . . ."
                ('220/1; '014/1; '924/1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

        3.      "Computing from Said . . . Information, a Delivery Date
                and Cost . . ." ('220/1; '014/1; '924/1)  . . . . . . . . . . . . . . . . . . . 80

        4.      "Validating Receipt of Said Parcel or Envelope as
                the Parcel or Envelope for Which Said . . . Label
                Was Printed" ('220/1; '014/1; '924/1) . . . . . . . . . . . . . . . . . . . 82

        5.      "Storing a Validated Parcel or Envelope in a Secure
                Storage Area until Said Parcel or Envelope Is
                Subsequently Picked up . . ." ('014/1; '924/1) . . . . . . . . . . . . . 84

C.      Apparatus Claims ('220/3; '014/2; '924/2) . . . . . . . . . . . . . . . . . . . . . . . 86

        1.      Preamble ('220/3; '014/2; '924/2) . . . . . . . . . . . . . . . . . . . . . . . 86

        2.      "Processing Means for Receiving Package Type
                Information . . ." ('220/3) and "A Processor Which Receives
                Package Type Information . . ." ('014/2; '924/2)  . . . . . . . . . . . 88

        3.      "Processing Means for Computing . . ." ('220/3) and
                "A Processor Which . . . Computes . . ." ('014/2; '924/2) . . . . . . 91

4.   "Processing Means . . . for Receiving an Indication of the
Delivery Service Option . . ." ('220/3) . . . . . . . . . . . . . . . . . . . . . 94

5.   "Means Responsive . . . for Printing . . ." ('220/3) . . . . . . . . . . 95

6.   "Means for Validating Receipt . . ." ('220/3; '014/2, '924/2) . . . 97

7.   "Whereby a Validated Parcel or Envelope is Stored
in a Secure Storage Area . . ." ('924/2) . . . . . . . . . . . . . . . . . . . 101

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

## TABLE OF AUTHORITIES

**CASES**

Application of Prater,
    415 F.2d 1393 (CCPA 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Astrazeneca AB v. Mut. Pharm. Co.,
    384 F.3d 1333 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 27

Asyst Techs., Inc. v. Empak, Inc.,
    268 F.3d 1364 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 48, 50

Atmel Corp. v. Information Storage Devices, Inc.,
    198 F.3d 1374 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

B. Braun Medical, Inc. v. Abbott Labs.,
    124 F.3d 1419 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 57, 59

Bell & Howell Document Mgmt. Prods. v. Altek Sys.,
    132 F.3d 701 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Bell Communications Research, Inc. v. Vitalink Communications Corp.,
    55 F.3d 615 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 16

Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,
    334 F.3d 1294 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Callicrate v. Wadsworth Mfg.,
    427 F.3d 1361 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 41

Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,
    296 F.3d 1106 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 100

Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.,
    289 F.3d 801 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 38, 87

Chimie v. PPG Indus. Inc.,
    402 F.3d 1371 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Computer Docking Station Corp. v. Dell, Inc.,
    519 F.3d 1366 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Curtiss-Wright Flow Control Corp. v. Velan, Inc.,
   438 F.3d 1374 (Fed. Cir. 2006)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 84, 98

Cybor Corp. v. FAS Techs., Inc.,
   138 F.3d 1448 (Fed. Cir. 1998) (*en banc*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 50

Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.,
   412 F.3d 1291 (Fed. Cir. 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Digital Biometrics, Inc. v. Identix, Inc.,
   149 F.3d 1335 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

DSW, Inc. v. Shoe Pavilion, Inc.,
   537 F.3d 1342 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fonar Corp. v. Gen. Elec. Co.,
   107 F.3d 1543 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Furnace Brook LLC v. Overstock.com, Inc.,
   230 Fed. Appx. 984 (Fed. Cir. 2007) (*nonprecedential*) . . . . . . . . . . . . . . . . . . . . 44

Hockerson-Halberstadt, Inc. v. Converse Inc.,
   183 F.3d 1369 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 32

Honeywell Int'l, Inc. v. ITT Indus., Inc.,
   452 F.3d 1312 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re Cruciferous Sprout Litigation,
   301 F.3d 1343 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

In re Donaldson Co.,
   16 F.3d 1189 (Fed. Cir. 1994) (*en banc*) . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 59, 60

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,
   381 F.3d 1111 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Lockheed Martin Corp. v. Space Systems/Loral, Inc.,
   324 F.3d 1308 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Loral Fairchild Corp. v. Sony Electronics Corp.,
   181 F.3d 1313 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Markman v. Westview Instruments, Inc.,
   52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) . . . . . . . . . . . . . 7, 12

NeoMagic Corp. v. Trident Microsystems, Inc.,
        287 F.3d 1062 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co.,
        521 F.3d 1351 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Omega Eng'g, Inc. v. Raytek Corp.,
        334 F.3d 1314 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Ormco Corporation v. Align Technology, Inc.,
        498 F.3d 1307 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Phillips v. AWH Corp.,
        415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Pitney Bowes, Inc. v. Hewlett-Packard Co.,
        182 F.3d 1298 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

Regents of University of Cal. v. Dakocytomation Cal., Inc.,
        517 F.3d 1364 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.,
        242 F.3d 1337 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Seachange Int'l, Inc. v. C-COR, Inc.,
        413 F.3d 1361 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Springs Window Fashions LP v. Novo Indus., L.P.,
        323 F.3d 989 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 79

SRI Int'l v. Matsushita Elec. Corp. of Am.,
        775 F.2d 1107 (Fed. Cir. 1985) (*en banc*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Texas Digital Systems, Inc. v. Telegenix, Inc.,
        308 F.3d 1193 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S. Surgical Corp. v. Ethicon, Inc.,
        103 F.3d 1554 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Vitronics Corp. v. Conceptronic, Inc.,
        90 F.3d 1576 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

Vivid Technologies, Inc. v. American Science & Engineering, Inc.,
        200 F.3d 795 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,
   520 U.S. 17 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**STATUTES**

28 U.S.C. § 1498 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

35 U.S.C. § 112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## TABLE OF EXHIBITS

| Exhibit | Document | Appendix Page |
|---------|----------|---------------|
| A | Asserted Patent No. 4,900,905 (Pusic) | A1 |
| B | Asserted Patent No. 5,481,464 (Ramsden) | A30 |
| C | Asserted Patent No. 5,831,220 (Ramsden, Liles) | A50 |
| D | Asserted Patent No. 6,105,015 (Ramsden, Liles) | A95 |
| E | Asserted Patent No. 6,917,924 (Ramsden, Liles) | A139 |
| F | Patent No. 5,065,000 (Pusic) | A184 |
| G | Patent No. 5,233,532 (Ramsden) | A198 |
| H | Patent No. 5,656,799 (Ramsden, Liles) | A211 |
| I | Patent No. 3,761,682 (Wetzel et al.) | A259 |
| J | Mailomat Documents | A283 |
| K | Webster's Third New International Dictionary, Unabridged (1993) | A285 |
| L | Webster's Ninth New Collegiate Dictionary (1990) | A294 |
| M | McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed. 2003) | A303 |
| N | Prosecution History for Patent No. 4,900,905 (excerpted) | A307 |
| O | Prosecution History for Patent No. 5,656,799 (excerpted) | A322 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| USHIP INTELLECTUAL PROPERTIES, LLC,   ) | |
| )| |
| Plaintiff,   ) | |
| )| |
| v.   ) | |
| )| |
| THE UNITED STATES,   ) | No. 08-537 C |
| )| |
| Defendant,   ) | Judge Susan G. Braden |
| )| |
| and   ) | |
| )| |
| INTERNATIONAL BUSINESS MACHINES   ) | |
| CORPORATION,   ) | |
| )| |
| Third-Party Defendant.   ) | |

## DEFENDANT'S RESPONSIVE BRIEF ON CLAIM CONSTRUCTION

Pursuant to the Court's Revised Scheduling Order of November 16, 2009, Defendant, the United States ("the government"), hereby submits its claim construction brief in response to Plaintiff's Opening Brief on Claim Construction, filed November 18, 2009.


## INTRODUCTION

This is a suit brought under 28 U.S.C. § 1498(a) by Plaintiff Uship Intellectual Properties, LLC ("Uship") for the government's alleged infringing use of the Automated Postal Center, a self-service postal kiosk deployed by the United States Postal Service. Uship asserts infringement of 23 claims of five patents. The supplier of accused devices, International Business Machines Corporation ("IBM"), joined the case to assert its interest in this litigation. Consistent with the Court's orders, the parties exchanged proposed claim construction statements; met and conferred on the proper construction of the claim terms at issue; and submitted a Joint Claim Construction

-1-

Statement ("JCCS") to this Court.  The issue of the proper construction of the disputed limitations of the asserted claims is now before the Court.

## STATEMENT OF THE QUESTION PRESENTED

What is the proper construction of the disputed limitations of the asserted claims of U.S. Patent Nos. 4,900,905; 5,481,464; 5,831,220; 6,105,014; and 6,917,924?

## BACKGROUND

Uship characterizes the technology claimed in the patents-in-suit as "relat[ing] to the shipping of items through the use of automated mailing/shipping kiosks."  Uship Brief at 1.  Despite Uship's claim that its "predecessor companies . . . were among the pioneers of the automated mailing/shipping kiosk industry" during the early 1990s, the idea of an automated postal kiosk was not novel when the first asserted patent was filed in 1988.  Indeed, Pitney-Bowes Postage Meter Company had created a self-service postal kiosk approximately fifty years prior to the filing date of the first asserted patent.  See Figure 1; A283-84[1].  In addition, the development of automated kiosk technology reached a significant milestone with the introduction of the networked Automatic Teller Machine ("ATM") during the late-1960s and early-1970s.  See, e.g., A259-82 (U.S. Patent No. 3,761,682).

The prosecution histories of the patents-in-suit are convoluted, but highly relevant to the proper construction of the asserted claims.  On April 10, 1991, Gary Ramsden filed a patent application for a "System for Mailing and Collecting Items."  That application, which later matured

---

[1] "A___" refers to the corresponding page number in the attached Appendix.



## The "MAILOMAT"

. . . is a coin-operated U. S. mailbox for people who have letters to mail—and no stamps. It is a "self-service postoffice" that mails your letters without need of adhesive stamps.

To mail a letter you (1) drop money in coin slot (2) dial correct postage denomination (3) insert letter in letter slot. The machine does the rest; automatically takes your letter, *prints* postage and postmark on it, and holds it for collection . . . provides postage from 1c to 32c, including Air Mail, Special Delivery, etc., with no premium for postage. *Metered* mail needs less postoffice handling, often catches earlier trains and planes, starts on its way sooner.

The "Mailomat" is a pre-war invention of Pitney-Bowes Postage Meter Co., Stamford, Conn., now converted to war production; was developed in cooperation with the U. S. Post Office Dept. to facilitate public use of the mails in post office lobbies, railway terminals, etc. Manufacturing will begin when the war is won. Try this new "stampless" postal service now. Use this card to say "hello" to that boy in Service. And when using the mails these days, at home or office, remember to *mail early and often* . . . to help clear the track for war mail . . . and to help the P. O. help you!



**Figure 1.** An example of a self-service postal kiosk unveiled in Manhattan's General Post Office in May 1939.

into U.S. Patent No. 5,233,532, was the ancestor to a family of related patents (collectively, "the Ramsden patents"). See Figure 2; see also A198-210 (U.S. Patent No. 5,233,532). That initial application spawned four out of the five patents-in-suit: U.S. Patent Nos. 5,481,464 ("the '464 patent"); 5,831,220 ("the '220 patent"); 6,105,014 ("the '014 patent"); and 6,917,924 ("the '924 patent").[2] The rights in the applications that matured into these four patents-in-suit were assigned to a company named U-ship, Inc.[3]

---

[2] Kenneth Liles is listed as a co-inventor with Gary Ramsden of the '220, '014, and '924 patents.

[3] The manufacturing company known as U-ship, Inc. changed its name several times. For the sake of simplicity, "U-ship, Inc." includes at least: United Shipping & Technology, Inc.; U-ship, Inc.; U-ship USA, Inc; and U-ship International, Inc.



**Figure 2.** An "ancestry chart" of patents relevant to the asserted claims. The patents containing the asserted claims are highlighted.

During the prosecution of some of the Ramsden patents, U-ship, Inc. sought ownership of

an earlier family of patents relating to automated kiosks. On August 11, 1997, an inventor named

Pavo Pusic transferred ownership of this earlier family (collectively, "the Pusic patents") to U-ship,

Inc. This earlier family includes the fifth patent-in-suit: U.S. Patent No. 4,900,905. See Figure 2.

Subsequently, U-ship, Inc. transferred ownership of the Ramsden and Pusic patents to a company

named The Intelligent Kiosk Company. On September 12, 2003, The Intelligent Kiosk Company

transferred ownership of the patents to the Plaintiff, Uship Intellectual Properties, LLC. Upon

information and belief, Plaintiff is an entity that exists solely to hold and enforce the rights to the Ramsden and Pusic patents.

On July 23, 2008, Uship filed its Complaint against the government in this Court. Uship brought its suit under 28 U.S.C. § 1498(a) for the government's alleged infringing use of the Automated Postal Center, a self-service postal kiosk manufactured by IBM and deployed by the United States Postal Service.

**LEGAL STANDARD**

**CLAIM CONSTRUCTION STANDARDS ARE STRAIGHTFORWARD**

Claim construction is a question of law. See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*). The scope of a patented invention is defined by the words of the claims. See Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Courts must construe any disputed claim terms from the perspective of "a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1313; Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004).

Beyond these initial concepts, the Federal Circuit has established other principles that are important to note in this case. In particular, five key principles, as identified below, provide additional guidance with respect to identifying the relevant disputed terms and arriving at the proper construction:

**First, a court should construe the disputed claim terms, but has no obligation to construe terms that are not subject to a legitimate disagreement.** See U.S. Surgical Corp. v.

Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("The Markman decisions do not hold that the trial judge must repeat or restate every claim term . . . .  Claim construction is a matter of resolution of disputed meanings . . . [i]t is not an obligatory exercise in redundancy."); see also O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims"); Vivid Techs., Inc. v. American Sci. & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999) ("only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").  A party's request for a construction of an undisputed claim term should be rejected as wasteful of judicial and party resources.

*Second*, **courts interpret claim terms in context, and not as isolated elements.**  For example, the United States Court of Appeals for the Federal Circuit has explained that "[p]roper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation." Hockerson-Halberstadt, Inc. v. Converse Inc., 183 F.3d 1369, 1374 (Fed. Cir. 1999); see also Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1299 (Fed. Cir. 2003) ("While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.").

*Third*, **a court must interpret claim terms by reference to the intrinsic evidence.**  See Phillips, 415 F.3d at 1313 ("the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").  The intrinsic evidence includes three main parts:

- **The claims** – "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms . . . . the context in which a term is used in the asserted claim can be highly instructive." Id. at 1314.

- **The specification** – The claims, however, "must be read in view of the specification, of which they are a part." Id. at 1315 (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996)). The Federal Circuit stressed the primacy of the specification, stating that it

  > is **always highly relevant** to the claim construction analysis. Usually, it is dispositive; it is **the single best guide** to the meaning of a disputed term.

  Phillips, 415 F.3d at 1315 (emphasis added).

- **The prosecution history** – The claims should also be interpreted in light of the prosecution history, because it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. at 1317 (citing Vitronics, 90 F.3d at 1582-83).

**Fourth, a court may consider extrinsic evidence, but intrinsic evidence is controlling.** Extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." Phillips, 415 F.3d at 1317. Because of the inherent unreliability of extrinsic evidence, such as dictionaries, extrinsic evidence "cannot overcome art-specific evidence of the meaning of a claim term." Id. at 1321-22.

**Fifth, a patentee's description of the invention may narrow the construction of a claim term.** Where the specification uniformly highlights a particular feature of the invention as a critical, important, or otherwise distinguishing aspect, claim terms related to such features are not entitled to an overly broad scope that fails to account for these necessary characteristics. See Astrazeneca AB v. Mut. Pharm. Co., 384 F.3d 1333, 1339-40 (Fed. Cir. 2004); Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1378-79 (Fed. Cir. 2006) (construing claim term "adjustable" to require adjustability where this feature was described as a "critical aspect" of the invention); see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001) (narrowly interpreting claims based on the patentee's description of the invention in its specification "even though the language of the claims, read without reference to the specification, might be considered broad").

In SciMed, the Federal Circuit clarified that a narrow interpretation was dictated by the context of the specification and no overt definition of the disputed term was necessary:

> While it is true, of course, that the claims define the scope of the right to exclude and that the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim, the written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.

Id. at 1344 (citations omitted). Accordingly, "when the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment." Chimie v. PPG Indus. Inc., 402 F.3d 1371, 1379 (Fed. Cir. 2005); see also Honeywell Int'l, Inc. v. ITT Indus., Inc., 452 F.3d 1312, 1318 (Fed. Cir. 2006) (construing claim term to include fuel filter because "[o]n at least four occasions, the written description refers to the

fuel filter as 'this invention' or 'the present invention'"); <u>SciMed</u>, 242 F.3d at 1343 (construing term

to include feature characterized as "the present invention.").


## MEANS-PLUS-FUNCTION CLAIMS ARE LIMITED TO THE CORRESPONDING STRUCTURE IN THE SPECIFICATION

A "means-plus-function" claim limitation serves as "a purely functional placeholder in which

structure is filled in by the specification." <u>Phillips</u>, 415 F.3d at 1311.  Claim terms that are drafted

in "means-plus-function" format are in a special category of claim construction that is governed by

Paragraph 6 of Section 112 of Title 35:

> An element in a claim for a combination may be expressed as a means . . . for performing a specified function without the recital of structure . . . and such claim shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.

35 U.S.C. § 112 ¶ 6.  In 1994, an *en banc* panel of the Federal Circuit held that the "broadest

reasonable interpretation" for means-plus-function limitations is the interpretation "statutorily

mandated in" Paragraph 6 of Section 112.  <u>In re Donaldson Co.</u>, 16 F.3d 1189, 1193-95 (Fed. Cir.

1994) (*en banc*).  In this case, 17 of the 23 asserted claims are phrased in a manner that potentially

invokes this provision.

A patentee's use of the word "means" raises a rebuttable presumption that the claim

limitation is a "means-plus-function" limitation governed by Paragraph 6 of Section 112.  <u>See</u>

<u>Callicrate v. Wadsworth Mfg.</u>, 427 F.3d 1361, 1368 (Fed. Cir. 2005).  If Paragraph 6 of Section 112

applies, a court must apply a two-step process to construe the limitation.  First, the court must

identify the recited function.  <u>See</u> <u>Asyst Techs., Inc. v. Empak, Inc.</u>, 268 F.3d 1364, 1369 (Fed. Cir.

2001).  The recited function "must be construed to include the limitations contained in the claim

language."  Lockheed Martin Corp. v. Space Systems/Loral, Inc., 324 F.3d 1308, 1319 (Fed. Cir.

2003).  Second, the court must identify the corresponding structure in the specification.  See Asyst,

268 F.3d at 1369.  "[S]tructure disclosed in the specification is 'corresponding' structure only if the

specification or prosecution history clearly links or associates that structure to the function recited

in the claim."  B. Braun Medical, Inc. v. Abbott Labs., 124 F.3d 1419, 1424 (Fed. Cir. 1997).  If the

specification does not identify structure corresponding to the recited function, the claim is indefinite

pursuant to Paragraph 2 of Section 112.  See Donaldson, 16 F.3d at 1195.


## USHIP MISAPPLIES SETTLED LAW

### A.    The Federal Circuit Rejected Uship's Claim Construction Methodology in Phillips

Uship critically errs throughout its Brief by construing the disputed terms with the same

methodology advanced in Texas Digital and rejected by an *en banc* panel of the Federal Circuit in

Phillips.  See Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202-04 (Fed. Cir.

2002), compare with Phillips, 415 F.3d at 1319-20.  In many constructions, Uship cites definitions

provided by general purpose dictionaries as the initial and primary source for ordinary meaning.

See, e.g., Uship Brief at 34, 41-42, 44-45, 47, 49, 56, 70.  As a result, Uship relegates the

specification to a secondary role as a check on the dictionary definition.  The Federal Circuit

explicitly rejected this approach in Phillips:

> [Texas Digital] suggested a methodology for claim interpretation in which the
> specification should be consulted only after a determination is made, whether based
> on a dictionary, treatise, or other source, as to the ordinary meaning . . . .  Even then,
> recourse to the specification is limited to determining whether the specification
> excludes one of the meanings derived from the dictionary, whether the presumption
> in favor of the dictionary definition of the claim term has been overcome by "an
> explicit definition of the term different from its ordinary meaning," or whether the

inventor "has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." . . . **That approach, in our view, improperly restricts the role of the specification in claim construction**.

Phillips, 415 F.3d at 1320 (emphasis added). Starting with the broad dictionary definition and failing to "appreciate how the specification implicitly limits that definition" will result in "systematic overbreadth" and "unduly expansive" constructions. Id. at 1321. Despite the Federal Circuit's warning, this is exactly the approach taken by Uship.

**B.     The Preamble Limits the Claims Where it Recites Essential Structure or it Breathes Life into the Claim**

Even though Uship disputes many of the claim terms in the preambles to the asserted claims, Uship contends that none of the preambles serve as a limitation. Uship's contention is contradicted by established Federal Circuit precedent, which holds that "a preamble limits the claimed invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." In re Cruciferous Sprout Litigation, 301 F.3d 1343, 1347 (Fed. Cir. 2002) (citations omitted). Therefore, determining the import of a claim's preamble requires an analysis of the particular language as used in the overall context of the claim:

> [A] claim preamble has the import that the claim as a whole suggests for it. In other words, when the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects.

Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 620 (Fed. Cir. 1995).

Under this framework, Federal Circuit cases establish that the preamble is limiting on the scope of the claim in circumstances pertinent to the patents-in-suit here. In particular, "dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it

indicates a reliance on both the preamble and claim body to define the claimed invention." <u>Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.</u>, 289 F.3d 801, 808 (Fed. Cir. 2002) (<u>citing</u> <u>Bell Communications</u>, 55 F.3d at 620). Similarly, "when the preamble is essential to understand limitations or terms in the claim body, the preamble limits claim scope." <u>Id.</u> (<u>citing</u> <u>Pitney Bowes, Inc. v. Hewlett-Packard Co.</u>, 182 F.3d 1298, 1306 (Fed. Cir. 1999)). Finally, reference and reliance on the preamble during prosecution supports the conclusion that the preamble is limiting. <u>See</u> <u>Cruciferous Sprout Litigation</u>, 301 F.3d at 1347-48 (finding the preamble limiting where the patentee relied upon the preamble phrase "rich in glucosinolates" during prosecution).

### C. Uship Should Be Barred from Offering the Irrelevant Testimony of a Co-Inventor

Finally, Uship purports to reserve the right offer "testimony by Kenneth Liles, the co-inventor of the '220, '014, and '924 patents." Uship Brief at 151. Uship's request must be rejected. First, Uship's late request violates this Court's scheduling orders, because Uship failed to provide this notice when it served its Proposed Claim Construction Statement on August 14, 2009. <u>See</u> Order dated August 4, 2009, at 1-2 (stating that Uship's statement must contain "an identification of any extrinsic evidence (including but not limited to expert testimony) that Uship intends to use to support its proposed interpretation"); <u>see also</u> Order dated May 18, 2009, at 1-2. Second, Uship has not provided any written report by Mr. Liles. <u>See generally</u> RCFC 26(a)(2). Finally, and most importantly, an inventor's self-serving testimony is rarely, if ever, relevant to the proper construction of a claim term. <u>See</u> <u>Markman</u>, 52 F.3d at 983; <u>Bell & Howell Document Mgmt. Prods. v. Altek Sys.</u>, 132 F.3d 701, 706 (Fed. Cir. 1997). Accordingly, Uship should be barred from offering Mr. Liles's testimony during the claim construction hearing.

## CLAIM CONSTRUCTION ARGUMENTS

**I.     PUSIC 4,900,905**

U.S. Patent No. 4,900,905 ("the '905 patent") issued on February 13, 1990 and was originally filed as application No. 07/226,778 on August 1, 1988.  The issued patent contains 15 claims, only one of which, claim 12, is being asserted by Uship in this case.  As the title explains, the '905 patent is directed to an "automated mail collecting and telecommunication machine."  Similarly, the specification generally explains that "[an] object of the present invention is to improve the entire mailing process from the point of acceptance to the point of delivery for almost all kinds of postcards, envelopes, and packages . . . ."  A23 ('905 Spec. 1:50-55).

Throughout the written description, the '905 patent emphasizes the automated, computer controlled aspects of the invention, which has the advantage of eliminating human interaction with the mailing system once instructions and a mailing item are provided.  For example, the specification provides:

> The present invention enables mail collecting procedures to be performed directly by a customer who inserts the mailing and manually enters the instructions and data on a keyboard by following the displayed instructions.  Therefore, there is no need for any employees to operate the present invention.

Id.  The patentee touted other automated features that required no user or operator interaction, such as the ability to weigh and calculate postage.  For instance, another specification passage provides:

> the present invention enables the electronic weighing of a mailing to be performed automatically and securely, without the possibility for a customer to influence the weighing, and the postage is automatically calculated according to the mailing weight data and the destination data entered on the keyboard.

Id. ('905 Spec. 2:1-6).  Moreover, the description later emphasizes that mail sorting and tracking functions are enacted "without any manual labor involved."  Id.

These automated features are reinforced by, and consistent with, the specification's description of the "machine" embodying the present invention.  See, e.g., A24 ('905 Spec. 4:25-28) (providing that "FIG. 1 is a perspective view of the **machine** housing"); A25 ('905 Spec. 5:3-4) (providing that "FIG. 11 is a block diagram of the **machine**"); A25 ('905 Spec. 5:14-20) (generally describing "the **machine**'s processes"); and A25 ('905 Spec. 5:32-33) (referencing "the **machine** housing 1" of FIG. 1) (bold emphasis added).  According to the context of the specification and drawings, once the machine receives a piece of mail, there is no possibility for a customer to further handle or touch the mail item.  For example, an annotated version of FIG. 1 of the '905 patent is reproduced below to illustrate the independent, self-contained nature of the automated mail collecting machine:



**Figure 3**.  FIG. 1 of the '905 patent illustrates the independent, self-contained mail collecting machine.

As depicted above, the machine includes an external housing 1, which defines an insertion slot 12 for receiving mail.  As will be described in more detail below with reference to the particular language of claim 12, once an item is received within machine housing 1 through insertion slot 12, the machine takes over (by operation of its CPU (item 37 of FIG. 11)) and the customer cannot influence or affect the mailing process.

### A.     Preamble Limitations ('905/12)

| '905 Independent Claim 12 *Disputed Preamble* A method of processing and collecting mail with, and otherwise operating a self-contained computerized apparatus, comprising the steps of: | | |
| --- | --- | --- |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **operating** - manually using<br><br>**self-contained computerized apparatus** - a group or combination of instruments, machinery, tools, or materials having a particular function or functions, which group or combination is complete in itself, and with at least some of those functions, or portions of those functions, being controlled, directed, or processed by means of a computer or similar device | **operating a self-contained computerized apparatus**: a device or a group of devices having a particular function or functions, which group is complete in itself, and which functions are controlled or carried out by means of a computer | A series of steps for processing and collecting mail with, and otherwise operating a one-stop, fully integrated, automated apparatus |

Uship contends that "[t]here is no need for the Court to separately construe the terms used in the preamble of claim 12."  Uship Brief at 9.  According to Uship, the preamble merely describes the invention's purpose with the body of the claim fully and intrinsically identifying all the limitations and with the preamble merely encapsulating the main limitations found in the body.  This is not the case.  The body of claim 12 fails to "fully and intrinsically" identify all the claim limitations and Federal Circuit precedent supports the conclusion that this preamble deserves construction.

The preamble of claim 12 introduces the term "a self-contained computerized apparatus," and therefore provides antecedent basis for the claim body's subsequent references to "the apparatus" and "said apparatus."  <u>See</u> A29 ('905 Claim 12) (reciting "displaying information associated with the use of **the apparatus** . . . ." and "instructions for the use of **said apparatus**") (emphasis added).  Without reference to the preamble, there is no antecedent basis for these limitations in the claim body.

As noted above, "dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention." <u>Catalina Marketing</u>, 289 F.3d at 808 (<u>citing</u> <u>Bell Communications</u>, 55 F.3d at 620).  Similarly, "when the preamble is essential to understand limitations or terms in the claim body, the preamble limits claim scope." <u>Id.</u> (<u>citing</u> <u>Pitney Bowes</u>, 182 F.3d at 1306).

In this case, one must consult the preamble to understand what the subsequent claim terms "the apparatus" and "said apparatus" mean.  Only by reference to the preamble does the reader learn that "the apparatus" and "said apparatus" refer to the more descriptive "self-contained computerized apparatus."  Thus, the preamble is essential to understanding limitations in the body of the claim and therefore serves as a limitation on the scope of claim 12.

As to the proper meaning of "a self-contained computerized apparatus," unlike Uship's proposed construction, the government's construction is more consistent with both the automated and independent characteristics of the '905 patent specification as well as the cited dictionary definitions.  First, Uship acknowledges the specification's repeated reference to an "automated" device or machine. <u>See</u> Uship Brief at 11.  In addition, Uship cites as support dictionary definitions of "computerize" that reflect control by a computer, rather than manual user operation. <u>See</u> <u>id.</u> at

-16-

11 n.10.  For example, the definitions Uship relies on explicitly provide that "computerize" means "to control, process, or store **by means of a computer**," "to equip with or **automate by computers**," and "[t]o process or store (information) with or in **an electronic computer** or system of computers."  Id. (emphasis added).  Likewise, the government's cited dictionary definition of "computerize" is "to carry out, control, or produce **by means of a computer**."  See A297 (Webster's Ninth New Collegiate Dictionary 271 (1990)) (emphasis added).

Uship's construction, however, provides that merely "some of," or discrete "portions of" the apparatus's functions are "controlled, directed, or processed by means of a computer . . . ."[4]  See Uship Brief at 10.  In support, Uship argues that certain steps of claim 12 cannot be controlled or carried out by a computer, implying that these functions are free to be performed by people.  See id. at 12.  Similarly, in its brief, Uship seeks to isolate the word "operating" in the preamble and interprets that word as synonymous with "manually using."  See id. at 10.  Again, this line of reasoning by Uship appears to imply that the apparatus's functions are controlled manually rather than automatically.

First, Uship's construction improperly reads the word "operating" in isolation.  In context, the claim language preceding "a self-contained computerized apparatus," reads: "[a] method of processing and collecting mail with, and otherwise operating . . . ."  A29 ('905 Claim 12).  The use of the word "otherwise" makes clear that the word "operating" is intended as an alternative modifier for the general purpose/intended use language of "processing and collecting mail."  Moreover, the words "operate" or "operating" do not appear in the body of claim 12.  As such, Uship's proposed

---

[4]  Uship's construction suffers from another defect due to its reference to a "computer or similar device," which is hopelessly vague and ambiguous on its face and unhelpful in clarifying the meaning of the claim language.

construction of the word "operating" should in no way imply that the apparatus's functions are free to be performed manually.

Second, Uship's argument, and its related preamble construction, is at odds with the underlying context of the specification, which consistently provides that once a customer inserts the mailing and enters the instructions and data on a keyboard, the computer-controlled apparatus allows for no further operator interaction.  See A23 ('905 Spec. 1:50-55; 2:1-6; 2:21); see also A1 ('905 Abstract) (disclosing that the machine's functions "all apply[] the same automated means").  Moreover, none of the steps in the body of claim 12 requires or contemplates any active steps on the part of the operator or employee.  See A27-28 ('905 Spec. 10:50-11:14).  The method is fully performed by the apparatus through its computer.

Accordingly, the government's proposed construction that the self-contained computerized apparatus's "functions are controlled or carried out by means of a computer," is consistent with the underlying specification.  In addition, this construction provides appropriate context to the preamble language, which the body of the claim relies upon for antecedent basis.

## B.    "Receiving an Item to Be Mailed" ('905/12)

| '905 Independent Claim 12  *Disputed Limitation*  receiving an item to be mailed; | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **receiving** - accepting  **item to be mailed** - item to be sent or delivered by the USPS or a company or service that engages in the transportation of letters, parcel[s], envelopes, and/or packages from one location to another location | taking in an item, inserted by a user, within the self-contained computerized apparatus | accepting into the self-contained computerized apparatus an item to be mailed, after which the apparatus takes over with minimal consumer input |

-18-

The government's construction of this term provides that the item to be mailed is "tak[en] in . . . within the self-contained computerized apparatus."  By contrast, Uship's construction of "accepting" and its supporting arguments suggest that any acceptance of the mail item, whether by a delivery employee or simply by delivery at a mailing facility, meets this claim limitation.  Uship's analysis is devoid of any context or connection with the specification text and drawings of the '905 patent, and thus runs contrary to <u>Phillips</u>.

As to the specification, the text supports the government's construction over Uship's.  The only description of this "receiving" step in the specification is as follows:

> The **mail collection process** will be described first. Referring now to FIGS. 1, 2, 3, 4, 5, and 15, if a customer enters an instruction that the mail collection process is desired, the instruction on how to insert a mailing is displayed on LCD 8 and the solenoid 13 **opens the insertion sliding door as shown in FIG. 2**. The customer then inserts the mailing **into the scale insertion slot 12**, FIG. 2, and as soon as the loading photosensor 30, FIG. 4, detects the incoming mailing, the electromotor 27 is activated and its transmission mechanism 28 drives the first transport conveyor 25 which turns over its transmission cylinders 29, FIG. 4, and **carries the mailing toward the right border of the insertion slot 12 as shown in FIG. 5**. When the second loading sensor 31, FIG. 4, detects the mailing's edge, the electromotor 27 stops, thereby causing the first transport conveyor 25 to stop and the mailing is left positioned in front of the printing window 122, as shown in FIGS. 3 and 4, and behind the mailing pressing panel 16, as shown in FIGS. 2 and 5.

A25 ('905 Spec. 6:25-44) (emphasis added).  No other description is provided detailing receipt of the mailing item.  FIG. 2 of the '905 patent, referenced in the above specification passage, presents a top view of the automated machine's inside mechanisms, whereas FIG. 5 provides a perspective

view including the insertion slot's (12) rear wall.  See A24 ('905 Spec. 4:29-34, 46-49).  Annotated versions of these figures are provided below detailing the insertion slot 12 where receipt of the mailing item occurs within the self-contained computerized apparatus.

As seen in FIG. 2, the solenoid 13 opens an insertion sliding door, which then allows for receipt of the mailing item within insertion slot 12.

FIG. 5 then depicts receipt of the mailing item within the internal channel of the insertion slot 12 for progression along first transport conveyor 25.[5]  The specification fails to provide any other receipt mechanisms or processes for receiving a mailing item.  No description or figures contemplate or suggest that any further handling or manipulation of the mailing item is possible as suggested by Uship's overly broad construction of "receiving."  Accordingly, the



**Figure 4**.  A top view of the automated machine's mechanisms.



**Figure 5**.  A perspective view of the automated machine's mechanisms.

_____

[5] While insertion slot reference numeral 12 is absent from FIG. 5, both the brief description of the drawings and the mailing process description in column 6 confirm insertion slot 12's presence in that figure.  See A24, 25 ('905 Spec. 3:46-49; 6:38).

government's construction of "receiving" is correct in view of the specification as <u>Phillips</u> requires.
<u>See</u> <u>Phillips</u>, 415 F.3d at 1315-16 ("The construction that stays true to the claim language and most
naturally aligns with the patent's description of the invention will be, in the end, the correct
construction.").

Rather than relying on the intrinsic evidence, Uship accuses the government of improperly
importing limitations from the apparatus claims into asserted method claim 12.  <u>See</u> Uship Brief at
15.  Uship's argument is flawed for at least three reasons.  First, the government's construction of
the receiving step, as <u>Phillips</u> requires, is founded on and read in view of the specification.  As noted
above, the only specification portions relevant to the receiving step, and the only portions relied
upon by the government, concern "**the mail collection process**," and are not somehow limited to
the apparatus claims as Uship suggests.  <u>See</u> A25 ('905 Spec. 6:25-26) (emphasis added).  Second,
since the preamble expressly requires the use of a "self-contained, computerized apparatus," the
method claim must be construed in a context that accounts for this language.  Finally, the <u>DSW</u> case
cited by Uship is distinguishable since, unlike that case, the government's construction here is
required by each of the claim language, the specification, and, as explained below, the prosecution
history. <u>See</u> Uship Brief at 15; <u>DSW, Inc. v. Shoe Pavilion, Inc.</u>, 537 F.3d 1342, 1347-48 (Fed. Cir.
2008).

In addition, the prosecution history supports the government's construction over Uship's.
"The prosecution history constitutes a public record of the patentee's representations concerning the
scope and meaning of the claims, and competitors are entitled to rely on those representations when
ascertaining the degree of lawful conduct, . . . [t]hus, in construing the claim[s],  [Courts] consider
the prosecution history to determine whether the patentee disclaimed or disavowed subject matter,

narrowing the scope of the claim terms." Seachange Int'l, Inc. v. C-COR, Inc., 413 F.3d 1361, 1372 (Fed. Cir. 2005) (citations omitted). "Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language." Id. at 1372-73.

On page 16 of its brief, Uship suggests that certain statements by the applicant during prosecution of the '905 patent are irrelevant to understanding the meaning of the terms of claim 12. In particular, Uship claims that prosecution statements presented in an amendment, relate only to apparatus claims and, therefor, it is improper to consider these statements in construing method claim 12. Uship, however, ignores clear statements in the prosecution history that directly implicate the scope of claim 12. In doing so, Uship once again misapplies settled principles of claim construction.

In the amendment, the applicant cancelled all pending prosecution claims (application claims 1-16) and presented new claims 17-31 in response to a prior art rejection from the USPTO. See A307-21 (G1666-79, G1767). The applicant began his remarks by introducing three new independent claims, application claims 17, 27, and 28, with the last claim corresponding to issued claim 12, the asserted claim-in-suit here. See A321 (G1767). In introducing this claim, the applicant explained that "Claim 28 is drawn to the method of operating a computerized apparatus which corresponds to the operation of the mail collecting and telecommunication apparatus as set forth in the present invention." A316 (G1675). Uship argues that this statement "indicates, at most, only that the method claim 'corresponds' in some unspecified respects to the device claims." Uship Brief at 16-17. However, Uship improperly ignores the remaining statements in the prosecution history and fails to account for their broad impact on the processes of issued claim 12. See, e.g.,

<u>Computer Docking Station Corp. v. Dell, Inc.</u>, 519 F.3d 1366, 1379 (Fed. Cir. 2008) ("the totality of the prosecution history informs the disavowal inquiry") (citations omitted).

The next paragraph is absolutely critical, and it broadly characterizes the entire invention by stating:

> The **present invention**, as set forth in its **new claims**, discloses a "one-stop" mailing apparatus which is specifically adapted for use by individual consumers. Once a consumer enters an envelope or package into the receiving means of the disclosed apparatus, the apparatus takes over and with minimal consumer input weighs the item, calculates the postage required, accepts and verifies payment for the required postage, provides the item with machine readable information, and then stores the item for subsequent pick-up.

A316 (G1675).

In the following paragraph, the applicant distinguishes apparatus claim 17 over the Wright reference – a prior art patent disclosing a postage metering terminal – by focusing on the secure weighing means limitation presented in that claim.  <u>See id.</u>  The subsequent paragraph continues to distinguish the Wright reference, but presents arguments that broadly distinguish "the present invention" over Wright, with a particular emphasis on the system's method steps.  A317 (G1676).

That paragraph provides that:

> Furthermore, in Wright et al. the item to be mailed or a label for the same have to be manually and laboriously handled numerous times as they are moved from the scale to the printer and then again to a storage location. **The present invention** allows for the item to be mailed to be inserted into the apparatus after which the apparatus **performs** all the weighing, calculating, printing, and storing **functions** with no further consumer handling being necessary.

<u>Id.</u> (emphasis added).  These statements are not limited to any apparatus claim features.  No structural features are discussed.  Instead, these statements are clearly directed to the overall processes and functions (i.e., the "weighing, calculating, printing, and storing" steps) of the invention.  To be sure, it is the invention's "perform[ance]" and "functions" that are relied upon.

The applicant concludes the distinguishing remarks with a final statement clarifying the global nature of his comments distinguishing the prior art:

> None of the references relied upon by the Examiner, whether taken singly or collectively, either disclose or suggest the apparatus for collecting an item to be mailed as claimed in new Claim 17 or the mail collecting and telecommunication apparatus as claimed in new claim 27 or the method of operating a computerized apparatus as claimed in new Claim 28 of the present invention.

A318 (G1677).  Thus, the applicant differentiated the entire invention, and not merely particular claims, on the basis that the invention's *performance* obviates the need for any consumer handling of the mail item after insertion.  Accordingly, method claim 12 *is* implicated and "competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct" and the meaning of claim language.  Springs Window Fashions LP v. Novo Indus., L.P., 323 F.3d 989, 993-96 (Fed. Cir. 2003).

The Federal Circuit's analysis and ruling in Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335 (Fed. Cir. 1998) is instructive.  In that case, an asserted patent claim was construed to require a particular feature, which was only explicitly recited in non-asserted claims.  In particular, an asserted claim was construed to require the step of generating arrays of "active area" since the applicants expressly relied on that feature when presenting "global comments made to distinguish the applicants' 'claimed invention' from the prior art."  Id. at 1347.  In more narrowly construing the asserted claim, the Federal Circuit relied on the fact that the applicants' remarks were not limited in scope and "were made without reference to a particular claim."  Id.  In requiring the narrowing construction, the Federal Circuit provided that:

> [t]he public has a right to rely on such definitive statements made during prosecution. Notice is an important function of the patent prosecution process, as reflected by [35 U.S.C. § 112] and recently confirmed by the Supreme Court [in Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17 (1997)]  Absent qualifying language in

the remarks, arguments made to obtain the allowance of one claim are relevant to interpreting other claims in the same patent.

Id. at 1347-48.

Just as in Digital Biometrics, the applicant of the '905 patent presented remarks during prosecution to distinguish the entire invention from the prior art.  Moreover, the facts supporting disclaimer are even more convincing in this case than in Digital Biometrics.  First, the '905 applicant also made global remarks that broadly distinguished "the present invention."  Second, unlike the patentee in Digital Biometrics, the '905 applicant's remarks directly implicated features recited in the asserted method claim.  That is, by referencing the system's "perform[ance]" and "functions", method claim 12 was clearly implicated.  Accordingly, in distinguishing the prior art to obtain allowance of the claims, the applicant clearly disclaimed any interpretation of claim 12 that allows for consumer handling of the mail item as it proceeds from insertion to final storage.

Thus, the public has a right to rely on these remarks in determining the proper scope of the claims of the '905 patent.  Since the applicant relied on these remarks to obtain allowance of claim 12, it is legally impermissible for Uship to now ignore their import for purposes of this litigation.  As explained in Springs Window Fashions, "[t]he public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.  A patentee may not state during prosecution that the claims do not cover a particular device and then change position [during litigation]. . . ."  323 F.3d at 995.  Accordingly, Uship's construction should be rejected.

### C.     "Weighing the Item to Be Mailed" ('905/12)

| '905 Independent Claim 12 *Disputed Limitation* weighing the item to be mailed; | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **weighing** - determining or ascertaining the weight of a thing (i.e. the force that gravitation exerts upon that thing), by use of a balance, scale, or other mechanical device | after the mail is accepted within the self-contained computerized apparatus, obtaining the weight of a mail item by use of a scale without requiring any handling of the mail item by the operator | after the mail is accepted into the apparatus, weighing the item to be mailed without the possibility for a customer to influence the weighing |

Unlike Uship's interpretation of this limitation, the government's proposed construction provides that "after the mail is accepted within the self-contained apparatus," the item's weight is obtained "without requiring any handling of the mail item by the operator."  Once again, the government's construction comports with the intrinsic evidence, whereas Uship's does not.  In fact, beyond conceding that the specification references the use of a scale, Uship fails to acknowledge the import of any context provided by the specification, or the limiting statements in the prosecution history.  See Uship Brief at 17-18.

For example, the background of the specification provides that "the present invention enables the electronic weighing of a mailing to be performed automatically and securely, **without the possibility for a customer to influence the weighing**."  A23 ('905 Spec. 2:1-6) (emphasis added). As the specification details, this is accomplished by isolating the mail item from the customer's influence within the mailing apparatus.

Once the mail item is received within insertion slot 12, a first sensor 30 detects the mailing item, whereupon first transport conveyor 25 "carries the mailing toward the right border of the insertion slot 12 as shown in FIG. 5."  A25 ('905 Spec. 6:38).  Next, a second sensor 31 detects the mailing item further along the insertion slot, the conveyor stops such that "the mailing is left

-26-

positioned in front of the printing window 122, as shown in FIGS. 3 and 4, and behind the mailing pressing panel 16, as shown in FIGS. 2 and 5." Id. ('905 Spec. 6:41-44).  With the mailing item so positioned, the scale weighing device is activated to obtain the item's weight.  See id. ('905 Spec. 6:50-54).  As the specification further explains, "the insertion slot 12, the transport conveyor mechanisms 25, 27, 28, and 29, and the mailing pressing mechanisms 14, 15, and 16 are all mounted on the electronic scale device 26 so that they do not influence the weight calculation of the mailing during the mailing procedure."  Id. ('905 Spec. 6:51).  FIGS. 2-5 comprehensively illustrate the relative positions of the mailing item, the scale device 26, and the printing window 122 when the weighing step occurs.

This process is also reflected in the flowchart of FIG. 15, which confirms that the weighing step (indicated by the flowchart step labeled "scale activated") is performed only after the mailing item is received and detected.  Beyond this example, no alternative weighing procedures are disclosed for meeting the specification's goal of "automatically and securely . . . [weighing a mailing] . . . **without the possibility for a customer to influence the weighing**."  A23 ('905 Spec. 2:1-6) (emphasis added).

Uship's proposed construction attempts to expand the scope of this step beyond the proper context of the specification.  As Uship's construction expressly allows for the possibility of a customer to influence the weighing, it is at odds with the underlying specification.  Accordingly, this limitation is not entitled to the expanded scope Uship's construction dictates since it fails to account for the feature of preventing customer influence.  See Astrazeneca, 384 F.3d at 1339-40.

The prosecution history likewise confirms that this step is performed (1) after the receiving step and (2) with no consumer handling or influence, as properly reflected in the government's

proposed construction.  As described above regarding the receiving step, the applicant distinguished the present invention over the Wright reference on the basis that Wright required manual labor and repeated handling of the mail item, whereas the present invention did not.  The applicant's statements expressly dictate how he interpreted the process sequence and operator handling.  The relevant statement provides that:

> [t]he present invention allows for the item to be mailed to be inserted into the apparatus **after which** the apparatus performs all the weighing, calculating, printing, and storing functions **with no further consumer handling being necessary**.

A317 (G1676) (emphasis added).  Uship cannot now advocate for a different sequence[6] or an interpretation of "weighing" that allows for consumer handling of the mail item as it proceeds from insertion to final storage.

### D.    "Admitting Data Relating to the Item to Be Mailed . . ." ('905/12)

| '905 Independent Claim 12<br>*Disputed Limitation*<br>admitting data relating to the item to be mailed such as the address to which the item is to be mailed; | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **admitting** - receiving or obtaining through use of one or more means of inputting or transmitting information, including but not limited to devices such as keyboards, touch screens, card readers, scales, etc.<br><br>**data** - information or individual items of information<br><br>**relating to** - referring to, pertaining to, associated with, regarding, concerning, or about | **admitting data relating to the item to be mailed:** acknowledging the collection of data concerning mailing weight, mailing destination, and additionally, mailing classification data.<br><br>**the address to which the item is to be mailed:** information identifying the specific location where a person or organization receives mail | receiving data entered by the customer relating to the item to be mailed, including the address to which the item is to be mailed |

---

[6]  Steps of a method claim will be construed to require a specific sequence where such a sequence is dictated by virtue of the specification and the prosecution history.  See Loral Fairchild Corp. v. Sony Electronics Corp., 181 F.3d 1313, 1322 (Fed. Cir. 1999).

| **address** - information signifying or pertaining to the place or the name of the place where a person, organization or the like is located or may be reached | | |
|---|---|---|

The plain language of this disputed claim term provides: "admitting data relating to the item to be mailed such as the address to which the item is to be mailed."  A29 ('905 Claim 12).  This limitation invites the obvious question:  what is the proper scope and meaning of the language "data relating to the item to be mailed . . ."?  The presence of "such as" in the limitations is unhelpful in determining the scope and meaning of this claim since the subsequent language is, by grammatical necessity, a mere example.  As required by Philips, the government's construction is guided by the context of the specification.  See id. at 1315 ("[The specification] is **the single best guide** to the meaning of a disputed term.") (emphasis added).  By contrast, Uship's construction, once again, merely isolates discrete words and fails to offers any meaningful answer to the pertinent inquiry.

The specification contemplates mailing weight data and destination data, which both clearly "relat[e] to the item to be mailed," as the claim requires.  See A25-26 ('905 Spec. 6:64-7:4).  The specification also contemplates "special requests such as registered mail, express mail, etc.," id.; characteristics which also qualify as data concerning the mailing item.  The government accounts for this category by virtue of "mailing classification data."  As to "any other data required by company standards," nothing in the intrinsic evidence connects this category to information "relating to the item to be mailed" as required by the claim.  No further context is provided as to what "data required by company standards" entails.  Thus, it serves as no meaningful guide for claim interpretation.  As such, Uship's construction is divorced from the context of the specification and should be rejected.

-29-

Uship also criticizes the government's interpretation of the claim term "address to which the item is to be mailed."  See Uship Brief at 19-20.  Beyond the claims themselves, the word "address" appears only once in the '905 patent specification.  See A25 ('905 Spec. 6:58-60) ("[T]he mailing has to be inserted in such a way that the address written on its face comes behind the transparent glass window 7 . . . ").  With no clarifying context found in the claims or specification, the government proposes a definition supported by extrinsic evidence.  As between the government's and Uship's proposal, Uship's is far more vague since it encompasses information merely "signifying or pertaining to" a location.  By contrast, the government's proposal is more definitive since it at least requires "information identifying [a] specific location."

### E.    "Determining the Required Postage for the Item to be Mailed" ('905/12)

| '905 Independent Claim 12 *Disputed Limitation* determining the required postage for the item to be mailed; | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **determining** - ascertaining through calculation or otherwise<br><br>**required postage** - the charge for the service or conveyance and/or delivery of a letter, parcel, envelope, and/or package to be mailed | automatically calculating the charge for the service of delivery of a mail item based on mailing weight data and destination data without requiring any handling of the mail item by the user | calculating a charge based on the mailing weight, the destination and any special requests, and any instructions stored in the machine's memory, with no possibility for an incorrect postage being calculated |

The government's construction of this "determining" step differs from Uship's in that it calls for (1) "automatically calculating" the service charges and (2) provides that this calculation is "based on mailing weight data and destination data without requiring any handling of the mail item by the user."  Again, Uship's proposal runs contrary to the third claim construction principle detailed in the introduction to this Brief.  As a result, Uship's construction is devoid of context from the

intrinsic evidence and expands the scope of this term beyond the framework of the specification and prosecution history.

> For example, the background of the specification provides that:

> The present invention enables the electronic weighing of a mailing to be performed automatically and securely, without the possibility for a customer to influence the weighing, and **the postage is automatically calculated according to the mailing weight data and the destination data** entered on the keyboard. Therefore, according to **the process of the present invention, there is no possibility for a higher or lower postage being calculated** and since each mailing can be returned to the customer in the case of insufficient postage paid or data entered**, no further check as to whether the postage was paid is necessary**.

A23 ('905 Spec. 2:1-12) (emphasis added). Later specification passages confirm that the postage calculations are based on the mailing weight data obtained from scale weighing device 26 and the destination data entered. See A25-26 ('905 Spec. 6:52 - 7:10). Thus, the specification expressly describes the present invention, including its process, in terms of *automatically* calculating postal charges based on (1) the mailing weight data obtained and (2) the destination data entered. The above text explicitly discloses the advantage resulting from this feature as ensuring "there is no possibility for a higher or lower postage being calculated," thereby eliminating any further need to confirm proper postage payment.

Consistent with the advantages touted in the specification passages cited above, the prosecution history confirms that the applicant understood the determining step as requiring automatic calculation. To be sure, the applicant's statements expressly included "calculating" in the litany of functions performed by the invention "with no further consumer handling being necessary." A317 (G1676). Uship cannot now argue the calculation is somehow performed by an operator or otherwise contradicts the prosecution history, since the applicant argued to the contrary during prosecution. The government's construction is consistent with the intrinsic evidence.

F.     **"Providing Machine Readable Information Concerning the Item to Be Mailed on the Item to Be Mailed . . ." ('905/12)**

| **'905 Independent Claim 12** | | |
|---|---|---|
| *Disputed Limitation* | | |
| providing machine readable information concerning the item to be mailed on the item to be mailed, such as the zip code to which said item is to be mailed; and | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **providing . . . on** - printing either directly on the item to be mailed or on a label which may be applied to the item to be mailed | automatically affixing or printing machine readable information that concerns at least the mailing's destination on a surface of the item to be mailed without requiring any handling of the mail item by the operator | the apparatus prints or affixes on the item to be mailed machine readable information with no consumer handling being necessary |

Uship argues that the government's construction of this term is wrong for two reasons. First, it claims that the government's language improperly reads "'providing . . . on' as though it said 'providing *directly* on,'" which they argue unnecessarily imports limitations from the specification. Uship Brief at 23. Second, Uship argues that this implicit importation of the word "directly," is erroneous since it allegedly renders the single word "directly" in dependent apparatus claim 6 superfluous. However, when the claims are read in proper context, as advised in Hockerson-Halberstadt, 183 F.3d at 1374, nothing in the government's construction renders the language of dependent claim 6 redundant.[7] Moreover, by focusing on the single word "directly," isolated from the surrounding language in claim 6, Uship advocates for a construction of claim 12 that is unsupported by the written description or prosecution history.

---

[7]   Even if dependent claim 6 were rendered superfluous, the principle Uship relies on is merely a guideline superseded by the context of the intrinsic evidence.  See Regents of University of Cal. v. Dakocytomation Cal., Inc., 517 F.3d 1364, 1375 (Fed. Cir. 2008) ("While it is true that dependent claims can aid in interpreting the scope of claims from which they depend, they are only an aid to interpretation and are not conclusive.' Indeed, the presumption created by the doctrine of claim differentiation is 'not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history.'") (citations omitted).

Uship's arguments misconstrue the import of the government's construction.  In particular, Uship wrongly conflates the concept of *printing a laser readable bar code directly on* the item to be mailed in apparatus claim 6, with the language of method claim 12 reading "providing machine readable information . . . on the item to be mailed."  Uship ignores the fact that claim 6 is directed to more specific subject matter than the providing step of claim 12.  While claim 6 plainly concerns "*printing* [a] *laser readable bar code* directly on the mailing item," claim 12 requires neither printing nor a laser readable bar code.  A28-29 ('905 Claims 6 and 12) (emphasis added). Accordingly, the government's construction does not *require* that "machine readable information," be directly printed on the mailing item.  Instead, the government's construction mandates only that the machine readable information be automatically provided on the surface of the mailing item, without requiring any handling of the mail item by the operator.  The example of a label highlights this distinction and exposes Uship's misunderstanding.

Consider, for example, the situation where machine readable information is provided "directly on" a mailing label and that mailing label is, in turn, subsequently affixed to the surface of the mailing item.  In such a case, although the machine readable information is *directly* provided on the mailing label, it is only *indirectly* provided on the mailing item.  What the intrinsic evidence (reflected in the government's construction) requires, however, is that this exemplary label be *automatically* affixed, applied, or otherwise attached to the surface of the mailing item by the machine, *without requiring any handling of the mail item by the operator*.

The context of the specification also dictates the automatic completion of the providing step without operator handling.  See A26 ('905 Spec. 7:27 - 8:15).  As explained therein, once the

-33-

required charge is received, the mailing pressing unit is activated, which "pushes forward the

transparent pressing panel 16." Id.  The specification continues:

> According to the process of the present invention, the panel 16 presses the mailing
> to the insertion slot's rear wall 121 and firmly secures it there so that the rear side of
> the mailing leans against printing window 122, FIGS. 3 and 4, in a flat fashion so
> that the bar code can be printed . . . and when the mailing is pressed, the thermal
> transfer printing head 21, shown in FIGS. 2 and 3, prints the bar code on the part of
> the mailing which leans against the printing window 122 as shown in FIGS. 3 and
> 4.

Id. ('905 Spec. 7:31-42).  Figure 2 of the '905 patent (shown in Figure 4, above) illustrates the

movement of the mail pressing panel 16 in order to secure the mailing item against rear wall 121 and

in alignment with printing window 122.[8]  By this arrangement, machine readable information is

automatically provided on the mailing item without any operator handling.

The prosecution history likewise confirms that this step is performed with no consumer

handling or influence, as properly reflected in the government's proposed construction.  As

described above regarding the receiving step, the applicant distinguished the present invention over

the Wright reference on the basis that Wright required repeated handling of the mail item as it

proceeded from a "scale to the printer and then again to a storage location," whereas the present

invention did not.  A317 (G1676).  The applicant's statements made clear that the invention

"performs all the weighing, calculating, printing, and storing functions with no further consumer

handling being necessary."  Id. (G1676).  Uship cannot now advocate for an interpretation of

---

[8]  As FIG. 2 is a top view, it does not illustrate the location of printing window 122.
However, FIGS. 3 and 4 clearly depict the location of window 122.

"providing" that allows for consumer handling of the mail item as it proceeds from insertion to final

storage.[9]

### G.     "Storing the Item to Be Mailed for Subsequent Pick-Up" ('905/12)

| '905 Independent Claim 12<br>*Disputed Limitation*<br>storing the item to be mailed for subsequent pick-up. | | |
| --- | --- | --- |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **storing** - holding an item in a place for subsequent use or disposition | holding an item in a place for subsequent use or disposition without requiring any handling of the mail item by the operator | automatically moving the item into a storage area within the self-contained apparatus for subsequent pick-up, with no consumer handling being necessary. |

As is clear from the parties' constructions, the government's proposal for the "storing" step

differs from Uship's in that it provides that an item is held "without requiring any handling of the

mail item by the operator." Just as with the "weighing," "determining," and "providing," steps

detailed above, the intrinsic evidence dictates that the "storing" step account for the prosecution

history statements and supporting specification disclosure requiring "no further consumer handling,"

after receipt of the mailing item. A317 (G1676). Again, Uship's construction is erroneous since

it fails to account for this feature.

In distinguishing Wright, the applicant criticized the necessity for the mailing items "to be

manually and laboriously handled numerous times as they are moved from the scale to the printer

---

[9] Finally, Uship's proposed interpretation is implicitly contradicted by an unasserted patent filed by the inventor the same day he filed the '905 patent. In U.S. Patent No. 5,065,000 ("the '000 patent"), the inventor disclosed a computerized mailing apparatus that could print a mailing label that could be "manually stuck on a mailing" if the "automated electronic [labeling] means" was "unsuitable." See A184 ('000 Abstract); A193, 195 ('000 Spec. 2:20-25; 6:48-60). Given that the '905 patent was filed on the same day without this disclosure, the clear implication is that the inventor chose not to claim manually applying the mailing label in the asserted patent.

**and then again to a storage location**," in that reference.  Id. (emphasis added).  By contrast, the applicant expressly provided that the invention of the '905 patent **"performs** all the weighing, calculating, printing, and **storing functions with no further consumer handling being necessary**."  Id. (emphasis added).  As detailed above, Uship cannot now, after issuance of the patent, advocate for broader construction than the prosecution statements dictate.

Moreover, the government's construction is consistent with the '905 patent specification, which confirms that no operator handling is entailed in storing the mailing item for subsequent pick-up.  The specification describes the storing step as follows:

> According to the process of the present invention, the second transport conveyor 32 starts rotating simultaneously with the first transport conveyor 25 and drives the mailing into the storage cassette 23 as shown in FIGS. 8 and 9. Within a predetermined period of time after the mailing disappears from the sight of the second loading sensor 31, FIG. 4, the storage cassette's solenoid 36 pushes the cassette 23 forward, causing the mailing to drop into a storage box, as shown in FIG. 9, where the mailing is stored for subsequent pick up.

A26 ('905 Spec. 8:25-34).

As detailed in the specification and as seen in Figures 6, 8, and 9, once the mailing enters storage cassette 23, solenoid 36 activates to swing the storage cassette 23 away from second transport conveyor 32.  This causes the mailing item to drop into a storage box (not shown) by force of gravity and without any operator handling.

Accordingly, the government's construction is consistent with and dictated by the intrinsic evidence whereas Uship's does not.  Thus, Uship's proposal for the "storing" step should be rejected.

## II.      RAMSDEN 5,418,464

U.S. Patent No. 5,481,464 ("the '464 patent") issued on January 2, 1996 and was originally

filed as application No. 198,872 on February 18, 1994.  The issued patent contains 34 claims, and

Uship asserts that the government has infringed 16 of them.  As described in the specification, the

"invention relates to an automated, unattended unit for collecting and holding parcels, letters and

other items for one or more commercial delivery services."  A41 ('464 Spec. 1:13-16).  All of the

16 asserted claims are apparatus claims, and most of them include means-plus-function limitations

pursuant to Paragraph 6 of Section 112 of Title 35.

### A.      Preamble Limitations ('464/7, 19, 28, 34)

| '464 Independent Claim 7 '464 Independent Claim 19 '464 Independent Claim 28 '464 Independent Claim 34 *Disputed Preamble Limitations* All:               An <u>integrated, automated, unattended unit</u> for collecting and securely holding items for collection and shipment by commercial delivery services: said automated unit comprising, | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **integrated** - brought together or incorporated into a unified or interrelated whole or system **automated** - employing a technique, method, or system of operating and controlling a task by highly automatic means, as by electronic devices, thereby reducing human intervention to a minimum **unattended** - not accompanied by an attendant or the like; capable of being used by a customer without assistance from an attendant or operator **unit** - a machine, part, or system of machines having a special purpose; an apparatus | **integrated**: incorporated into a unified whole **automated**: automatically controlled by mechanical or electronic devices that take the place of humans **unattended**: not accompanied by an attendant or the like **unit**: a single device | An unattended unit for automatically collecting and securely holding items for collection and shipment by commercial delivery services |

| | | |
|---|---|---|
| **collecting** - gathering together; accepting | | |
| **securely holding** - containing an item in a manner designed to ensure that the item is safe from interception by unauthorized persons | | |
| **items** - parcels, envelopes, letters, packages, and like items | | |
| **collection** - the act of gathering items together or accepting | | |
| **shipment** - the act of sending by use of the USPS or a company or service that engages in the transportation of parcels and envelopes from one location to another location | | |
| **commercial delivery services** - businesses, organizations, or other entities, including the USPS, that engage in the shipment of items from one location to another location | | |

The preambles in asserted independent claims 7, 19, 28, and 34 are identical. As an initial matter, these preambles limit the scope of the claims because the applicant relied on the preamble to define the claimed invention. See Catalina Marketing Int'l, 289 F.3d at 808. In the specification, the applicant characterized "[t]his invention" as relating to the "automated, unattended unit" identified in the preamble. A41 ('464 Spec. 1:12-16). Similarly, the patent abstract states that "an integrated, automated, unattended unit" is the invention that is being disclosed. A30 ('464 Abstract). Furthermore, the preamble also provides antecedent bases for the claims. See A47-48 ('464 Claim 7) ("said commercial delivery service"); A48 (Claim 10) ("said unit"); Catalina Marketing Int'l, 289 F.3d at 808.

-38-

### 1.    "integrated"

Turning first and foremost to the '464 patent itself, the patent abstract equates "integrated"

with the incorporation of different subparts into a single unit:

> Disclosed is **an integrated, automated, unattended unit** for collecting and securely
> holding items . . ., **the unit including** *[subpart 1]* a scale for weighing the item to
> be shipped, *[subpart 2]* a computer for inputting information relating to the
> destination to which the item is to be shipped and for analyzing the inputted
> information including calculating the fee for shipment of the item, *[subpart 3]* a card
> reader for receiving bank credit card information and for communicating and
> assessing the shipment fee to the account of the person, and *[subpart 4]* secured
> storage, the computer being adapted for communicating the shipment fee by
> telephone lines.

A30 ('464 Abstract) (emphasis, annotations added).  Thus, according to the abstract, the unit is

"integrated" because the scale, the computer, the card reader, and the secured storage have been

incorporated into the unit.  In addition, as acknowledged by Uship, the first and third embodiments

of the invention disclose a collection of elements that are incorporated into a unified whole within

an "outer housing."  Uship Brief at 26; <u>see also</u> A42 ('464 Spec. 3:30-4:3); A45-46 ('464 Spec.

10:55-11:18). Thus, integrated means "incorporated into a unified whole." This construction is also

supported by extrinsic evidence.[10]

Uship's construction of "integrated" finds no support in the specification, and is far broader

than the cited extrinsic dictionary definition.  First, the second embodiment does not support an

expanded definition.  The "adjunct packaging supply unit" described in the embodiment is explicitly

---

[10]   <u>See</u> A289 (integrated: "1: characterized by integration: a: composed of separate parts
united together to form a more complete, harmonious, or coordinated entity" <u>Webster's Third New
International Dictionary, Unabridged</u> 1174 (1993));

   <u>see also</u> A299 (integrate: "1: to form, coordinate, or blend into a functioning or unified
whole: UNITE . . . 3b: to incorporate into a larger unit" <u>Webster's Ninth New Collegiate Dictionary</u>
628 (1990)).

described as "positioned to one side of the system."  '464 Spec. 10:45-55.  Second, Uship's use of

the words "brought together" and "system" have no support in either the intrinsic or extrinsic

evidence.

### 2.      *"automated"*

The word "automated" appears repeatedly throughout the claims, but otherwise the word

appears only once in the patent abstract and once in the patent specification.  See A47-49 ('464

Claims 7-21, 28-34); A30 ('464 Abstract); A42 ('464 Spec. 1:13-16).  Despite Uship's claim that

its interpretation of "automated" is "founded in large part upon the specification," the single use of

the word in the specification is fleeting and ambiguous.  Since the intrinsic evidence does not reveal

the meaning of the word, the relevant extrinsic evidence should be consulted.

The relevant dictionary definitions support the conclusion that "automated" means

"automatically controlled by mechanical or electronic devices that take the place of humans."  For

example, a general-purpose dictionary defines "automate" to be "automatically controlled . . . by

mechanical or electronic devices that take the place of human organs of observation, effort, and

decision."[11]  Uship's, IBM's, and the government's definitions all appear to agree that "automated"

requires "automatic operation and control."  Despite Uship's claim that its definition is founded

---

[11]    See A296 (automate: "1: to operate by automation"; automation: "3: automatically
controlled operation of an apparatus, process, or system by mechanical or electronic devices that
take the place of human organs of observation, effort, and decision" Webster's Ninth New Collegiate
Dictionary 118 (1990));

        see also A287 (automate: "to operate by automation : mechanize through automation :
convert to largely automatic operation : make automatic : AUTOMATIZE" Webster's Third New
International Dictionary, Unabridged 148 (1993)).

upon the specification, it appears that it simply copied the first definition of "automation" from a general-purpose dictionary. See Uship Brief at 27-28, compare with Uship Brief Ex. K at 141. The Court, however, should adopt the government's definition because Uship based its definition on "automation," rather than the definition for "automated."

### 3. *"unattended"*

Contrary to "automated," the word "unattended" is explicitly discussed in the specification, leading to the conclusion that "unattended" means "not accompanied by an attendant or the like":

> Some delivery services operate **unattended** drop-boxes . . . . Such schemes, however, cannot provide full insurance protection or verification that the package was in fact mailed, since **no attendant is present** to verify that the letter was actually placed in the box. In addition, present-day **unattended** drop-boxes generally are not suitable for accepting packages because **packages need to be pre-weighed and sized** before they can be accepted for shipment.

A41 ('464 1:31-43) (emphasis added). Thus, according to the specification, "unattended" means "no attendant is present."[12] In an effort to reduce the issues before the Court, the government adopted the first part of Uship's proposed definition that means essentially the same thing: "not accompanied by an attendant or the like."

The second part of Uship's proposed definition finds no support in the intrinsic evidence or the extrinsic evidence cited by Uship. Indeed, as noted by Uship, its proposed definition of "unattended" "does not preclude the presence of an attendant." Uship Brief at 29. Thus, Uship's interpretation should be rejected because it would essentially eliminate a claim term. See, e.g., Callicrate, 427 F.3d at 1369 (reading out the "preformed" limitation resulted in an overbroad claim construction).

---

[12] See also A292 (unattended: "1. Not attended : a: lacking a guard, escort, caretaker, or other watcher" Webster's Third New International Dictionary, Unabridged 2482 (1993)).

### 4. *"unit"*

The word "unit" appears repeatedly throughout the claims, but otherwise the word appears infrequently in the patent abstract and in the patent specification.  See '464 A47-49 (Claims 7-21, 28-34); A30 ('464 Abstract).  Where it does appear in the specification, "unit" is revealed to be "a single device" operating with a specific set of functions.  See, e.g., A43 ('464 Spec. 5:63) (a central processing unit); A45 ('464 Spec. 10:46-47) (an adjunct packaging supply unit); A46 ('464 Spec. 12:48) (a climate control unit); A46 ('464 Spec. 12:63) (an air conditioner unit).  This definition of "unit" is also supported by the extrinsic evidence.[13]

Uship's definition, which largely copies the ninth definition of "unit" provided by the Random House Unabridged Dictionary, is sound to the extent that it references a single "apparatus," but Uship errs by arguing that a "unit" is equivalent to a "system of machines," and by substituting the word "special" for "specified" in the dictionary definition.  Neither argument is supported by the specification or the extrinsic evidence.

### B.     "Means for Inputting Information Relating to the Destination to Which the Item Is to Be Shipped" ('464/7, 19, 28, 34)

| |
|---|
| **'464 Independent Claim 7** |
| **'464 Independent Claim 19** |
| **'464 Independent Claim 28** |
| **'464 Independent Claim 34** |
| *Disputed Independent Claim Limitation* |
| means for inputting information relating to the destination to which the item is to be shipped; |

---

[13] See A293 (unit: "1a(1): the first natural number : a number that is the least whole number and is expressed by the numeral 1 (2): a single thing (as a magnitude or number) that constitutes an undivided whole . . . 2d: a piece or complex of apparatus serving to perform one particular function" Webster's Third New International Dictionary, Unabridged 2500 (1993));

see also A302 (unit: "1a: the first and least natural number: ONE . . . 3c: a piece or complex of apparatus serving to perform one particular function" Webster's Ninth New Collegiate Dictionary 1291 (1990)).

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for inputting** - structure, material or steps used for entering data into a computer memory unit for processing or storage, such as a keyboard, touch pad, touch screen or similar device<br><br>**information relating to the destination** - data relating to the location to which the item to be shipped is to be shipped, such as the zip code for that location | **[Means-plus-Function] Function:**<br>to input information relating to the place to which the item is to be shipped<br>**Corresponding Structure:**<br>keypad (28); keyboard (226) | **function:** inputting information relating to the destination to which the item is to be shipped<br>structure: keypad 28 or keyboard 226 |

Each of the asserted independent claims in the '464 patent contains the identical limitation "means for inputting information relating to the destination to which the item is to be shipped." Given the identical language in each of the claims, the limitations should be interpreted the same.

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112. See Means-Plus-Function Section, *supra* page 9. The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation. Uship agrees. See Uship Brief at 35.

Second, the function recited in the claim is "inputting information relating to the destination to which the item is to be shipped." Within this function, the government construes "the destination to which the item is to be shipped" to be "the place to which the item is to be shipped." The parties dispute the meaning of that claim term, and that dispute is discussed in detail in Section III.A below.

Third, the specification identifies a total of two structures that correspond to the recited function:

1. keypad (28) (See A44 ('464 Spec. 7:21-28)); and

2. keyboard (226) (See A41, 47 ('464 Spec. 2:38-41, 13:12-15)).

-43-

No other structures discussed in the specification correspond to the function of "inputting information relating to the place to which the item is to be shipped."

Uship's proposed construction of this limitation is flawed with respect to both function and means. First, Uship truncates the function of this limitation to "inputting information", effectively reading out the function claim limitation relating to the type of information that is being inputted. See Lockheed Martin Corp., 324 F.3d at 1319. Second, most of the structures identified by Uship have no basis in the specification. See Uship Brief at 34 ("touch pad, touch screen, or similar device"). Perhaps recognizing the lack of support for its previous construction, Uship now proposes that the

> corresponding structure in the specification includes, alternatively, a key pad (28),
> a keyboard (226), and a mechanism that recognizes voices and is adapted to be
> controlled by spoken words (not shown).

Uship Brief at 35. Thus, Uship agrees that corresponding structure includes key pad (28) and keyboard (226). The single vague reference to a generic voice-control "mechanism," however, is insufficient to provide corresponding structure. See Fonar Corp. v. Gen. Elec. Co., 107 F.3d 1543, 1551-52 (Fed. Cir. 1997) (holding that a group of nonspecific "other wave forms" could not constitute corresponding structure); see also Furnace Brook LLC v. Overstock.com, Inc., 230 Fed. Appx. 984, 988 (Fed. Cir. 2007) (*nonprecedential*). Thus, the corresponding structure should be limited to key pad (28) and keyboard (226).

### C.   "Control Means for Analyzing the Inputted Information and Calculating the Fee for Shipment of the Item" ('464/7, 19, 28, 34)

| |
|---|
| **'464 Independent Claim 7** |
| **'464 Independent Claim 19** |
| **'464 Independent Claim 28** |
| **'464 Independent Claim 34** |
| *Disputed Independent Claim Limitation* |

control means for analyzing the inputted information and calculating the fee for shipment of the item;

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **control means** - structure, material or steps used for controlling the operation of certain features of the claimed invention, involving the use of a computer processing unit (CPU) and associated hardware and software<br><br>**analyzing** - processing or examining<br><br>**calculating** - determining by mathematical methods; computing<br><br>**fee for shipment** - the price or sum quoted or charged to ship an item to the designated location/address | **[Means-plus-Function]**<br>**Function:**<br>to analyze the inputted information relating to the place to which the item is to be shipped, and to calculate the shipment fee<br>**Corresponding Structure:**<br>control system (100) including: (1) CPU (102) in two-way communication with PLC (104); and (2) CPU (102) connected to scale (22) and keypad (28) / keyboard (226)<br><br>**Program Logic Controller:**<br>A control device that employs the hardware architecture of a computer and a relay ladder diagram language. | **function:** analyzing the inputted information and calculating the fee for shipment of the item<br>**structure:** control system 100, including CPU 102 and PLC 104, and connections to key pad 28 (or keyboard 226) and electronic scale 22 (or 222) [lacks sufficient structure for analyzing the inputted information and calculating the fee] |

Each of the asserted independent claims in the '464 patent contains the identical limitation "control means for analyzing the inputted information and calculating the fee for shipment of the item." Given the identical language in each of the claims, the limitations should be interpreted the same.

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112. The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation. Uship agrees. See Uship Brief at 36-37.

Second, this disputed limitation contains two different recited functions. The functions recited are "**analyzing** the inputted information and **calculating** the fee for shipment of the item." (emphasis added). The antecedent basis for "the inputted information" referred to in this function is the information relating to the place to which the item is to be shipped, discussed above in Section II.B. Thus, for a means to correspond to both functions, it must: (1) analyze the inputted

information relating to the place to which the item is to be shipped ("analysis function"); and (2) calculate the shipment fee ("calculate function").  Contrary to its initial construction, Uship appears to agree that "[t]he functions here are 'analyzing the inputted information and calculating the fee for shipment.'"  See Uship Brief at 38.

Third, the specification identifies only one structure capable of performing both the analysis and calculate functions.  That structure is depicted in Figures 5 and 10, and consists of a "control system" that receives input from both a scale and a keypad (or keyboard), and then calculates the fee from that information.  See A35, 40 ('464 Figs. 5, 10); A41 ('464 Spec. 2:41-43, 61-63).  The analysis function requires that the control system be connected to both a scale and a keypad (or keyboard); otherwise, the control system would be incapable of obtaining the necessary information from which to calculate the shipment fee.  See A41 ('464 Spec. 2:41-43) ("a controller for calculating a shipment fee for the parcel, the controller being in communication with the scale and the keyboard"); A41 ('464 Spec. 2:61-63) ("control structure for calculating a shipment fee for the parcel, the control structure being in communication with the scale and the keyboard").

The control system itself, however, is defined by the specification as a central processing unit ("CPU") in two-way communication with a program logic controller ("PLC").[14]  See A43 ('464 Spec. 5:62-65).  As such, the control system is essentially a special-purpose computer.  Given this description in the specification, the only structure capable of performing both the analysis and

---

[14] "Program logic controller" appears to be a term of art that is not explicitly defined in the specification, although its functions include receiving input from the CPU, a power supply, a keyboard, and photocell sensors.  See A43 ('464 Spec. 6:4-26).  A relevant technical dictionary states that a programmable controller is:  "A control device, normally used in industrial control applications, that employs the hardware architecture of a computer and a relay ladder diagram language.  Also known as program logic controller."  A305 (McGraw-Hill Dictionary of Scientific and Technical Terms 1680 (6th ed. 2003)).

calculate functions is:   a control system (100) that includes: (1) CPU (102) in two-way communication with PLC (104); and (2) CPU (102) connected to scale (22) and keypad (28) / keyboard (226).

Uship's proposed structure for the means is erroneous because it excludes the connections to both a scale and a keypad (or keyboard).  Without these connections to the input and weighing devices, the control system cannot perform the analysis function.  Instead, Uship argues that structure is simply a control system that has "fee files" loaded into the PLC.  See Uship Brief at 38. While this type of structure could perform the calculate function (if the loaded PLC was in two-way communication with the CPU, as described in the specification), this structure could not perform the analysis function, and must be rejected as insufficient.

### D.     "Means for Communicating and Assessing the Shipment Fee . . ." ('464/7, 19, 28, 34)

| | | |
|---|---|---|
| **'464 Independent Claim 7** | | |
| **'464 Independent Claim 19** | | |
| **'464 Independent Claim 28** | | |
| **'464 Independent Claim 34** | | |
| *Disputed Independent Claim Limitation* | | |
| '464/7: | | means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines; |
| '464/19, /34: | | means for communicating and assessing the shipment fee to the account of the person, said means for communicating the shipment fee being by telephone lines; |
| '464/28: | | means for communicating and assessing the shipment fee to the account of the person |

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for communicating and assessing** - structure, material or steps used for transmitting data between the claimed invention and the customer's credit card company (or that company's agents) and for charging the fee for shipment to the customer's credit card account, involving the use of communication lines such as telephone lines and | means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines: **[Means-plus-Function] Function:** to communicate and assess the shipment fee to the account of the person owning the | means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines: **function:** communicating and assessing the shipment fee to the account of the person owning the credit card |

-47-

| related hardware and software | credit card | **structure:** magnetic card reader 30 |
|---|---|---|
| | **Corresponding Structure:** | or 230 connected to a dedicated |
| **account** - a business relation in | control system (100) including | telephone line |
| which credit is used | CPU (102) connected to card reader | |
| | (30), and card reader (30) | |
| **telephone lines** - a wire circuit | connected to a dedicated telephone | |
| connecting two or more points or | line that communicates with a | |
| stations in a telephone system, or | central location for processing | |
| the system itself | charges on the card | |

Each of the asserted independent claims in the '464 patent contains the very similar limitation that begins "means for communicating and assessing the shipment fee . . .". Given the similar language in each of the claims, the limitations should be interpreted similarly.

First, the disputed limitation is a means-plus-function limitation that is subject to Paragraph 6 of Section 112. The limitation uses the word "means", raising the presumption that this is a means-plus-function limitation. With respect to claims 7, 19, and 34, Uship disagrees, claiming that the disclosure of "telephone lines" causes the limitation to be "only partially subject to" Paragraph 6 of Section 112. See Uship Brief at 42.[15] As discussed below, however, since "telephone lines" are incapable of performing both recited functions, and because claim 28 does not specifically disclose "telephone lines," the appropriate approach is to incorporate telephone lines within structure that does correspond to the functions.

Second, this disputed limitation contains two different recited functions. The functions recited in the claims are "**communicating** and **assessing** the shipment fee to the account of the person." A47-49 ('464 Claims 7, 19, 28, 34) (emphasis added). See Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 296 F.3d 1106, 1114-15 (Fed. Cir. 2002) (holding that the claim language required a single means to both "monitor" and "activate"); Asyst Techs., 268 F.3d at 1372 (holding

---

[15] Uship does not specifically address the absence of the recited "telephone lines" structure in claim 28. See Uship Brief at 73.

that the "fourth means" must both "control" and "transmit").

Third, in Claims 7, 19, and 34, the claim itself recites some structure – "said means for communicating the shipment fee being by telephone lines." The claim language itself implies that the telephone lines are incapable of performing the assessing function. Turning to the specification, only one structure is identified as being capable of performing <u>both</u> the communicating and assessing functions:

> System 10 may be compatible with at least one commercial bank card . . . . After the customer has passed the magnetic card through reader 30, control system 100 evaluates the information received from card reader 30 . . . . **The reader 30 may be connected to a dedicated telephone line that communicates with a central location for processing charges on the bank card**.

A43 ('464 Spec. 6:59-7:4) (emphasis added). Other than this structure, no other structure in the specification corresponds to "communicating and assessing the shipment fee to the account of the person." Accordingly, the corresponding structure is: card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card.[16]

Uship's proposed construction of this limitation is flawed with respect to both the functions and the means. First, Uship truncates the functions of this limitation to "communicating" and "assessing," reading out "to the account of the person"[17]. <u>See</u> Uship Brief at 40; <u>Lockheed Martin Corp.</u>, 324 F.3d at 1319. Second, the only means capable of communicating and assessing the shipment fee to the customer's account is a card reader connected to a dedicated telephone line that

---

[16]   The government's initial construction included "control system (100) including CPU (102) connected to card reader (30)" within the corresponding structure; upon review, that structure is unnecessary here because the claim language makes it clear that the control means incorporates the communicating and assessing means.

[17]   Claim 7 reads "to the account of the person owning the credit card"; Claims 19, 28, and 34 omit "owning the credit card" from this limitation.

communicates with a central location for processing charges.  See, e.g., Asyst Techs., 268 F.3d at 1372 (holding that the "fourth means" must both "control" and "transmit", thus the corresponding structure "consists of the entire complex" that performs both functions).  Uship errs by reading out the dedicated telephone line connected to the card reader that communicates with a central location. See, e.g., Cybor Corp., 138 F.3d at 1458 n.7 (noting that it is error to read out of the scope of corresponding structure any necessary structure shown in the specification).

E.   **"Means for Securely Storing Said Item until the Item Is Collected by Said Commercial Delivery Service" ('464/7, 19, 28, 34)**

| '464 Independent Claim 7 '464 Independent Claim 19 '464 Independent Claim 28 '464 Independent Claim 34 *Disputed Independent Claim Limitation* means for securely storing said item until the item is collected by said commercial delivery service; | | |
| --- | --- | --- |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **means for securely storing** - structure material or steps used to hold or contain and item in a manner designed to ensure that the item is safe from interception by unauthorized persons<br><br>**collected** - gathered and taken | **[Means-plus-Function]** **Function:** to securely store said item until the item is collected by said commercial delivery service **Corresponding Structure:** storage area (14) defined within outer housing (12), security mechanism (50), a pair of inner doors (52, 54); or storage area (276) defined within outer housing (211), outer door (234), inner door (246), ramp (266) | **function:** moving the item into the secured area for storage until the item is collected by said commercial delivery service; **structure:** outer door 42; inner doors 52 and 54, stepper motor 58, secure zone 14, guide structure 74 OR outer door 234, temporary holding space 240, inner door 246, stepper motor 248, secure zone 276, powered conveyer 242, passive parcel distribution device 264. |

Each of the asserted independent claims in the '464 patent contains the identical limitation "means for securely storing said item until the item is collected by said commercial delivery service."  Given the identical language in each of the claims, the limitations should be interpreted the same.

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112.  The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation.  Uship agrees.  See Uship Brief at 45.

Second, the function recited in the claim is "securely storing said item until the item is collected by said commercial delivery service."  Thus, the claim language of the function anticipates:  (1) moving the item into secure storage; and (2) keeping the item in secure storage until it is collected.

Third, the specification identifies a total of two structures that correspond to the recited function:

1.      storage area (14) defined within outer housing (12), security mechanism (50), a pair of inner doors (52, 54); or

2.      storage area (276) defined within outer housing (211), outer door (234), inner door (246), ramp (266).

The specification of the '464 patent discloses two preferred embodiments which identify different structures that securely store items until they are collected by a commercial delivery service.  Each of the embodiments repeatedly stress that a storage area, defined within the outer housing of the unit, is key to securely storing items until collection.  See, e.g., A41 ('464 Spec. 2:34-36, 54-56) (describing first and second aspects of the invention that both use an "inner surface [of the outer housing] defining a storage area which is constructed and sized to store a multiplicity of parcels"); A42 ('464 Spec. 3:44-46) ("a first embodiment of the invention . . . includes an outer housing 12 which defines a storage area 14 for holding items"); A46 ('464 Spec. 11:39-40) (the third embodiment stores items "within a storage area 276 defined within outer housing 211").  Uship

-51-

agrees that a storage area, defined within the outer housing of the unit, is a necessary structure for performing the recited function.  See Uship Brief at 45 ("the outer housing combined with [other structures] provides adequate security for the storage area").

Each of the relevant embodiments combines different structures with the internal storage area to secure items until subsequent collection.  According to the first preferred embodiment in the specification:

> To prevent unauthorized access to storage area 14, a security mechanism 50 includes a pair of inner doors 52, 54 which are openable and closable by an inner door closing mechanism 56.

A42 ('464 Spec. 4:26-29).  Thus, corresponding structure in the first embodiment includes at least: a storage area (14) defined within outer housing (12), a security mechanism (50), and a pair of inner doors (52, 54).  According to the third[18] preferred embodiment in the specification:

> an improved security deposit system 238 includes a sliding outer door 234 . . . . Improved security deposit system 238 utilizes a temporary holding space 240 which is partially defined by sliding outer door 234 and a hinged inner door 246

A46 ('464 Spec. 11:8-13).  The third embodiment also discloses that ramp 266 serves to secure the secure storage area.  See A46 ('464 Spec. 12:6).  Thus, corresponding structure in the third embodiment includes at least:  a storage area (276) defined within outer housing (211), an outer door (234), an inner door (246), and a ramp (266).

Once again, Uship's proposed construction of this limitation is flawed with respect to both function and means.  First, Uship truncates the function of this limitation to "securely storing the item", effectively reading out the function claim limitation "until the item is collected by said

---

[18] The second preferred embodiment does not disclose a corresponding structure to the recited function.  See A45 ('464 Spec. 10:44-55).

commercial delivery service." See Lockheed Martin Corp., 324 F.3d at 1319.  Second, Uship did

not disclose any corresponding means at all in its initial disclosure, as required by Court Order.  In

its Brief, Uship claims for the first time that "[t]he corresponding structure in the specification is

'storage area' combined with 'a security mechanism'".  Uship Brief at 45.  As noted previously,

Uship concedes that with respect to the corresponding structure, the storage area is defined within

the outer housing.  See id. (specifically citing outer housing "211", as corresponding structure, and

arguing that the outer housing is necessary to secure the storage area).  Uship's concession, however,

ignores that the specification requires additional structure to perform the recited function.

### F. "Means for Storing the Inputted Information Once Said Item Is Disposed in Said Secured Storage Means" ('464/7, 19, 28, 34)

| | | |
|---|---|---|
| **'464 Independent Claim 7**<br>**'464 Independent Claim 19**<br>**'464 Independent Claim 28**<br>**'464 Independent Claim 34**<br>*Disputed Independent Claim Limitation*<br>means for storing the inputted information once said item is disposed in said secured storage means, | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **means for storing** - structure, material, or steps used for putting or retaining data in a computer memory unit, involving the use of a computer processing unit (CPU) and associated hardware and software<br><br>**inputted information** - data that has been entered into a computer memory unit for processing or storage<br><br>**once said item is disposed** - whenever the item is put in particular or suitable place | **[Means-plus-Function]**<br>**Function:**<br>to store the inputted information relating to the place to which the item is to be shipped after the item is disposed in said secured storage means<br>**Corresponding Structure:**<br>control system (100) including: (1) CPU (102) with CPU memory in two-way communication with PLC (104); and (2) PLC (104) connected to first sensor (112) or third sensor (116) | **function:** the inputted information (relating to the destination) is stored once the machine determines that the item was disposed in the secured storage means<br>**structure:** first sensor 112 and control system 100, including CPU 102 |

Each of the asserted independent claims in the '464 patent contains the identical limitation

"means for storing the inputted information once said item is disposed in said secured storage

means." Given the identical language in each of the claims, the limitations should be interpreted the same.

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112. The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation. Uship agrees. <u>See</u> Uship Brief at 47.

Second, the function recited in the claim is "storing the inputted information once said item is disposed in said secured storage means." The antecedent basis for "the inputted information" referred to in this function is the information relating to the place to which the item is to be shipped, discussed above in Section II.B.

Third, the specification identifies only one structure capable of performing this function. In fact, only once sentence in the specification discusses this function and the corresponding structure:

> When the first sensor 112 (or the third sensor 116 in the case of the dump drop) senses the presence of an envelope, parcel or package, control system 100 stores information relating to the transaction in CPU 102.

A44 ('464 Spec. 8:43-47). Other than this single reference, the text of the specification never again mentions storing inputted information when the item is disposed in the secure storage means. In FIG. 5, the patent provides a diagram of the structure described above:



**Figure 6.** The '464 patent provides a diagram of the structure described in the specification: "When the first sensor 112 (or the third sensor 116 in the case of the dump drop) senses the presence of an envelope, parcel or package, control system 100 stores information relating to the transaction in CPU 102." A35 ('464 Fig. 5) (highlighting added); A44 ('464 Spec. 8:43-47).

Thus, as described in the specification and as depicted in Figure 5, the only structure capable of storing inputted information is control system (100) including: (1) CPU (102) with CPU memory in two-way communication with PLC (104); and (2) PLC (104) connected to first sensor (112) or third sensor (116).

Uship again errs by truncating the function of this limitation to "storing the inputted information", effectively reading out two function claim limitations: (1) the type of inputted information; and (2) the phrase "once said item is disposed in said secured storage means." See Lockheed Martin Corp., 324 F.3d at 1319. Despite the unequivocal structural disclosure in the specification, Uship argues, without citation to the specification or any other support, that "[t]he inputted information is in fact stored from the moment it is first inputted, long before the item is disposed." Uship Brief at 48. As a result, according to Uship, the "once said item is disposed" claim language actually has nothing to do with the disposal of the item – a result that is simultaneously unsupported and illogical.

## G.      "Means for Displaying a Manifest" ('464/7, 28)

| **'464 Independent Claim 7** <br> **'464 Independent Claim 28** <br> *Disputed Independent Claim Limitation* <br> said information storage means including <u>means for displaying a manifest</u>. | | |
| --- | --- | --- |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **displaying** - showing or presenting <br><br> **manifest** - a listing of transactions involving the claimed invention which pertain to a particular commercial delivery service | **[Means-plus-Function]** <br> **Function:** <br> to display a listing of all transactions which pertain to the particular commercial delivery service <br> **Corresponding Structure:** <br> manifest printer (90, 280) <br><br> **manifest:** a listing of all transactions which pertain to the particular commercial delivery service | **function:** displaying a listing of all transactions which pertain to the particular commercial delivery service <br> **structure:** manifest printer 90, 280 |

Asserted independent claims 7 and 28 contain the identical limitation "means for displaying a manifest." Given the identical language in each of the claims, the limitations should be interpreted the same.

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112. The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation. Uship agrees. <u>See</u> Uship Brief at 49.

Second, the function recited in the claim is "displaying a manifest." The parties agree[19] that a "manifest" within the meaning of this patent means "a listing of all transactions which pertain to the particular commercial delivery service." This definition comes directly from the specification. <u>See</u> A45 ('464 Spec. 10:34-35).

---

[19] Uship includes the clause "involving the claimed invention" in its definition of "manifest" without explanation.

Third, the specification identifies only one structure capable of performing this function – a manifest printer.  This printer is discussed in two relevant portions of the specification:

> The second option is to print the package history log.  If this option is selected, control system 100 will print the log of all packages which have been accepted by the system 10 on the manifest printer 90.

A45 ('464 Spec. 9:15-20); see also A46 ('464 Spec. 12:44-46) ("Manifest printer 280 performs the same function as [described previously].")  Accordingly, the structure that corresponds to the function of displaying a manifest is manifest printer (90, 280).

Uship, however, argues without merit that video display terminal (24) also corresponds to the recited function because "it is explicitly referenced in the specifications [*sic*]."  Uship Brief at 49.  Uship is correct that video display terminal (24) is referenced many times in the specification, but Uship incorrectly implies that the video display terminal is explicitly linked to displaying a manifest.  It is not, and Uship fails to support its argument with any citation to the specification.  See B. Braun Medical, 124 F.3d at 1424 ("[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.").

### H.    "Means for Communicating Said Information to a Remote Location Staffed by a Human Operator" ('464/9), "Means for Transmitting a Manifest to a Remote Location" ('464/19), and "Means for Transmitting Information That May Be Used to Prepare a Manifest to a Remote Location" ('464/34)

| '464 Dependent Claim 9 | | |
|---|---|---|
| *Disputed Dependent Claim Limitation* | | |
| The integrated, automated, unattended unit of claim 7 wherein said means for storing said information further includes <u>means for communicating said information to a remote location staffed by a human operator</u>. | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **means for communicating** - structure, material or steps used for transmitting data between the claimed invention to another | **[Means-plus-Function] Function:** to communicate the stored information relating to the place to | **function:** communicating said information to a remote location staffed by a human operator **structure:** [lacks sufficient |

| | | |
|---|---|---|
| location, involving the use of communication lines such as telephone lines and related hardware and software<br><br>**remote location** - a place removed from the site in which the claimed invention is deployed<br><br>**staffed by a human operator** - utilizing the services of an employee or agent of a business or organization | which the item is to be shipped to a place removed from the site in which the unit is deployed that is staffed by a human operator<br>**Corresponding Structure:**<br>*The means-plus-function limitation lacks sufficient corresponding structure* | structure for communicating the information to a remote location staffed by a human operator] |

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112. The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation. Uship agrees. <u>See</u> Uship Brief at 50.

Second, the function recited in the claim is "communicating said information to a remote location staffed by a human operator." The antecedent basis for "said information" referred to in this function is the "inputt[ed] information relating to the destination to which the item is to be shipped," discussed above in Section II.B with respect to claim 7 of the '464 patent. The phrase "remote location" is not defined in the specification, but if the phrase is necessary to construe, Uship and the government generally agree that it is "a place removed from the site in which the unit is deployed." <u>See</u> Uship Brief at 50-51.

Third, the specification fails to identifies any structure that communicates the stored inputted destination information to a remote location staffed by a human operator. To the extent that the manifest contains the inputted destination information, the specification mentions this function only once, in passing, without disclosing any specific structure:

> The system 10 may be capable of transmitting the manifest to a remote location such as a central office for the carrier.

A45 ('464 Spec. 9:57-60). This meager disclosure is incapable of providing corresponding

structure.  See generally Atmel Corp. v. Information Storage Devices, Inc., 198 F.3d 1374, 1382

(Fed. Cir. 1999) ("Fulfillment of the § 112, ¶; 6 tradeoff cannot be satisfied when there is a total

omission of structure.  There must be structure in the specification.").  Accordingly, the claim is

indefinite pursuant to Paragraph 2 of Section 112.  See Donaldson, 16 F.3d  at 1195.

Uship again errs by truncating the function of this limitation to "communicating", reading

out "said information to a remote location staffed by a human operator."  See Lockheed Martin

Corp., 324 F.3d at 1319.  By cutting out this limitation, Uship broadly incorporates everything that

"communicates" in the specification, such as "telephone lines, and related hardware and software."

Uship Brief at 50.  Significantly, no structure, including the telephone lines, is ever linked to

"communicating said information to a remote location staffed by a human operator."  '464 Claim

9; B. Braun Medical, 124 F.3d at 1424.

| '464 Independent Claim 19 | | |
| *Disputed Independent Claim Limitation* | | |
| said information storage means including means for transmitting a manifest to a remote location. | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **means for transmitting:** structure, material, or steps used for sending or communicating data, involving the use of communication lines such as telephone lines and related hardware and software<br><br>**manifest:** a listing of transactions involving the claimed invention which pertain to a particular commercial delivery service<br><br>**remote location:** a place removed from the site in which the claimed invention is deployed | [Means-plus-Function]<br>**Function:**<br>to transmit a listing of all transactions which pertain to the particular commercial delivery service to a place removed from the site in which the unit is deployed<br>**Corresponding Structure:**<br>*The means-plus-function limitation lacks sufficient corresponding structure* | **function:**  transmitting a manifest to a remote location.<br>**structure:** [lacks sufficient structure for transmitting a manifest to a remote location] |

| '464 Independent Claim 34 *Disputed Independent Claim Limitation* said information storage means including <u>means for transmitting information that may be used to prepare a manifest to a remote location</u>. | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **means for transmitting** - structure, material, or steps used for sending or communicating data, involving the use of communication lines such as telephone lines are related hardware and software<br><br>**manifest** - a listing of transactions involving the claimed invention which pertain to a particular commercial delivery service<br><br>**remote location** - a place removed from the site in which the claimed invention is deployed | **[Means-plus-Function]**<br>**Function:**<br>to transmit information that may be used to prepare a listing of all transactions which pertain to the particular commercial delivery service to a place removed from the site in which the unit is deployed<br>**Corresponding Structure:**<br>*The means-plus-function limitation lacks sufficient corresponding structure* | **function:** transmitting a manifest to a remote location.<br>**structure:** [lacks sufficient structure for transmitting information for preparing a manifest to a remote location] |

The analysis of the "means for transmitting . . ." limitations of independent claim 19 and independent claim 34 is very similar to the analysis of the limitation of dependent claim 9, discussed immediately above.  First, these limitations are means-plus-function limitations subject to Paragraph 6 of Section 112.  Second, the recited function in claim 19 is "transmitting a manifest to a remote location" and the recited function in claim 34 is "transmitting information that may be used to prepare a manifest to a remote location."  Third, as noted previously, the sole specification reference fails to disclose any corresponding structure for either similar function:

> The system 10 may be capable of transmitting the manifest to a remote location such as a central office for the carrier.

A45 ('464 Spec. 9:57-60).  As a result, the claims are indefinite pursuant to Paragraph 2 of Section 112.  <u>See</u> <u>Donaldson</u>, 16 F.3d  at 1195.

## I.   Pivotable Door Limitations ('464/10)

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **'464 Dependent Claim 10**<br>*Disputed Dependent Claim Limitation*<br>The integrated, automated, unattended unit of claim 9 wherein said unit includes a pivotable door that serves as a slide when said door is opened, said slide serving to transport the item to a storage area for secure storage. | | |
| **serves as a slide** - operates as a smooth surface on which items can glide or pass smoothly; operates as a chute<br><br>**transport** - to move or convey an item from one place to another<br><br>**storage area** - a place in which an item is deposited or held for subsequent use or disposition<br><br>**secure storage** - holding an item in a manner designed to ensure that the item is safe from interception by unauthorized persons | **serves as a slide:** operates as a downward-inclined chute with a flat bed<br><br>**serving to transport:** operating to convey from one place to another<br><br>**a storage area:** a space for storing items within the outer housing of the unit<br><br>**for secured storage:** stored in a manner that is inaccessible to unauthorized persons | The integrated, automated, unattended unit has a [pivotable door] that has a slide to transport the item to the secure storage area of the unit. |

Claim 10 of the '464 patent does not invoke means-plus-function treatment under Paragraph 6 of Section 112. Uship and the government, however, dispute the proper construction of three of the limitations in this dependent claim.[20]

First, the phrase "serves as a slide" should be interpreted to mean "operates as a downward-inclined chute with a flat bed." Turning first to the specification, the pivotable door is discussed at length in one key paragraph:

> Dump drop 92 includes a pivotable door or drawer which has a handle 98 and is similar to the drawers on commercial drop-boxes or those which are used by the U.S. Postal Service. . . . Positioned beneath the pivotable drawer is an **inclined low friction chute 94 which inclines downwardly** to a location above a collection space 96. When an envelope is placed in the pivotable drawer of dump drop 92 and the drawer is allowed to pivot back to its closed position, an envelope will fall onto the

---

[20] Uship's construction of "transport" is essentially the same as the government's definition of "serving to transport."

incline chute 94 and **slide downwardly**, finally dropping into the collection space
96.

A43 ('464 Spec. 5:34-46) (emphasis added); see also A34 ('464 Fig. 4) (depicting above).  Even

though the "sliding" in this paragraph is taking place on low friction chute 94, rather than on the

pivotable door itself, the specification clearly associates a "slide" with "an inclined low friction

chute which inclines downwardly."  This implicit definition in the specification is strongly supported

by extrinsic evidence, such as technical and general purpose dictionaries.  See A306 (slide: "1. A

sloping chute with a flat bed.  McGraw-Hill Dictionary of Scientific and Technical Terms 1949 (6th

ed. 2003)).''[21]  Uship's proposed construction is unduly expansive, essentially equating "slide" with

"a smooth surface."  Because Uship's expansive definition is unsupported by the intrinsic evidence,

and because its construction would necessarily include items that are clearly not slides – such as air

hockey tables and horizontal panes of glass – the Court should adopt the government's construction

of this phrase.

Second, "a storage area" should be construed to mean "a space for storing items within the

outer housing of the unit."  The claims and the specification repeatedly and consistently define the

storage area as being within the outer housing of the unit, for the purpose of storing items.  See, e.g.,

A47 ('464 Claim 1) ("a storage area defined by said outer housing"); A41 ('464 Spec. 2:34-36, 53-

56) ("the inner surface [of the outer housing] defining a storage area which is constructed and sized

to store a multiplicity of parcels"); A42 ('464 Spec. 3:45-47) (the first embodiment "includes an

---

[21]  See also A291 (slide: "5c: a sloping trough down which objects are carried by gravity"
Webster's Third New International Dictionary, Unabridged 2142 (1993));

A301 (slide: "4c: a sloping trough down which objects are carried by gravity" Webster's
Ninth New Collegiate Dictionary 1108 (1990)).

outer housing 12 which defines a storage area for holding items"); A46 ('464 Spec. 11:40-41) ("a storage area 276 defined within outer housing 211"). Uship's construction errs by failing to acknowledge that the storage area is defined by the outer housing of the unit, and its definition finds no support in the specification. Indeed, when citing the specification, Uship selectively quotes the specification to the Court to omit the key phrase "an outer housing 12 which defines." See Uship Brief at 53; compare with A42 ('464 Spec. 3:45-47).

Finally, "for secured storage" should be construed to mean "stored in a manner that is inaccessible to unauthorized persons." The specification equates "secure" with specific measures taken to render the packages inaccessible to unauthorized persons. See A46 ('464 Spec. 12:4-5) ("the secure zone, where the parcel is stored until it is picked up"); A46 ('464 Spec. 12:38-40) ("Door 278 is preferably secured by a combination or code type lock, which can be opened by authorized personnel"). This definition also parallels the extrinsic evidence.[22] Uship fails to find support for its definition in the specification.

## J.    Credit Card Company Limitation ('464/15)

| '464 Dependent Claim 15 | | |
| --- | --- | --- |
| *Disputed Dependent Claim Limitation*<br>The integrated, automated, unattended unit of claim 12 wherein said card reader is adapted to read credit cards issued by any of a plurality of credit card companies and wherein said fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction. | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **adapted to read** - made suitable, | *Plain Meaning* - the card reader is | The magnetic card reader is |

_____

[22] See A290 (secure: "2c: affording safety : INVIOLABLE . . . e: strong, stable, or firm enough to ensure safety : SOLID, UNASSAILABLE" Webster's Third New International Dictionary, Unabridged 2053 (1993));

A300 (secure: "1a: to relieve from exposure to danger : act to make safe against adverse contingencies b: to put beyond hazard of losing or of not receiving : GUARANTEE" Webster's Ninth New Collegiate Dictionary 1062 (1990)).

| | | |
|---|---|---|
| revised, or modified to obtain or scan data from an external storage medium and to place such data in the memory of a computer or similar device<br><br>**any of a plurality** - one of a group of more than one<br><br><br>**adapted to communicate selectively** - made suitable, revised, or modified to transmit data from a claimed invention to one location among other possible locations, depending upon the source of the data<br><br>**card being used in the transaction** - the credit card that is being used in the particular transaction | adapted to read credit cards issued by more than one credit card company and the fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction | selectively compatible with several different commercial bank cards<br><br><br>**function**: to communicate selectively with the credit card company issuing the card being used in the transaction;<br>**structure**: magnetic card reader 30 or 230 and a dedicated telephone line |

With respect to dependent claim 15 of the '464 patent, the government contends that the ordinary meaning of the claim language, as understood by a person of skill in the art, is readily apparent. See Phillips, 415 F.3d at 1314. Accordingly, there is no need for the Court to construe any limitations within this claim.

### K.      "Means for Validating . . ." Limitations ('464/16, 20, 29)

| '464 Dependent Claim 16<br>'464 Dependent Claim 20<br>'464 Dependent Claim 29 | | |
|---|---|---|
| *Disputed Dependent Claim Limitation* | | |
| '464/16: | The integrated, automated, unattended unit of claim 15 wherein said fee communicating means includes <u>means for validating said credit card prior to issuing the shipping label</u>. | |
| '464/20: | The integrated, automated, unattended unit of claim 19 wherein said fee communicating means includes <u>means for validating said account prior to issuing the shipping label</u>. | |
| '464/29: | The integrated, automated, unattended unit of claim 28 wherein said fee communicating means includes <u>means for validating said account prior to issuing the shipping label</u>. | |

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for validating** – structure, material, or steps used for ascertaining or confirming the validity or authenticity of | **[Means-plus-Function]**<br>**Function:**<br>to validate the credit card used in the transaction prior to issuing the | **function:** validating the credit card prior to issuing the shipping label;<br>**structure:** control system 100 connected to magnetic card reader |

| | | |
|---|---|---|
| **issuing** – printing or publishing<br><br>**shipping label** – a slip of paper, cloth, or other material, marked or inscribed for attachment to an item to indicate information relating to the shipping or delivery of that item, such as the destination to which the item is to be shipped | shipping label<br>**Corresponding Structure:**<br>control system (100) including CPU (102) with predetermined card characteristics stored in CPU memory, and CPU (102) connected to card reader (30);<br>**or**<br>control system (100) including CPU (102) connected to card reader (30), and card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card | 30 or 230 [lacks sufficient structure for validating the credit card prior to issuing the shipping label] |

Asserted dependent claims 16, 20, and 29 contain the similar limitation "means for validating said [credit card / account] prior to issuing the shipping label." Given the similar language in each of the claims, the limitations should be interpreted similarly.

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112. The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation. Uship agrees. See Uship Brief at 59.

Second, the function recited in claim 16 is "validating said credit card prior to issuing the shipping label." The functions recited in claims 20 and 29 is "validating said account prior to issuing the shipping label." The antecedent bases for "said credit card" and "said account" referred to in the functions are provided by the corresponding independent claims.

Third, the specification identifies two different structures capable of "validating said [credit card / account] used in the transaction prior to issuing the shipping label":

    1.      control system (100) including CPU (102) with predetermined card characteristics stored in CPU memory, and CPU (102) connected to card reader (30); or

    2.      control system (100) including CPU (102) connected to card reader (30), and card

-65-

reader (30) connected to a dedicated telephone line that communicates with a central

location for processing charges on the card.

These two corresponding structures are disclosed in one single passage in the specification:

> *[Structure 1:]* After the customer has passed the magnetic card through reader 30, control system 100 evaluates the information received from card reader 30 and determines whether or not the card information meets certain predetermined characteristics.  Those characteristics may be the type of card, the expiration date, and whether the card is listed in the CPU memory as a "bad" card.  *[Structure 2:]* The reader 30 may be connected to a dedicated telephone line that communicates with a central location for processing charges on the bank card.  The validation of the card may also be processed over the telephone line.

A43-44 ('464 Spec. 6:59-7:5) (annotations added).  The validation of the credit card is not discussed

anywhere else in the text of the specification.  Essentially, the specification discloses an "internal"

structure where the validation of the card is accomplished between the control system,

predetermined characteristics in memory, and the card reader; and an "external" structure where the

validation of the card is accomplished between the control system, the card reader, and a dedicated

telephone line between the card reader and a central location for processing charges.

Uship again errs by truncating the function of this limitation to "validating said credit card",

reading out "prior to issuing the shipping label."  See Lockheed Martin Corp., 324 F.3d at 1319.

Despite failing to initially disclose any corresponding structure pursuant to this Court's Order, Uship

now appears to agree that the corresponding structure includes at least the control system, the card

reader, and criteria which "may be preprogrammed into or otherwise stored in the control means or

may be received from an outside source at the time of validation."  Uship Brief at 59.  Uship's

muddled construction, however, opaquely references "means" and "criteria" – a circular and

unhelpful approach to identifying the corresponding structure.  Accordingly, the Court should

construe this means plus function limitation in light of the two explicit structures identified in the specification.

### L.     "Means for Determining the Type of Card and the Expiration Date of the Card" ('464/17)

| '464 Dependent Claim 17 |
| --- |
| *Disputed Dependent Claim Limitation*<br>The integrated, automated, unattended unit of claim 16 wherein said validating means includes <u>means for determining the type of card and the expiration date of the card</u>. |

| Uship Constructions | Government Constructions | IBM Constructions |
| --- | --- | --- |
| **means for determining** - structure, material, or steps used for ascertaining | **[Means-plus-Function]**<br>**Function:**<br>to determine the type of card and the expiration date of the card<br>**Corresponding Structure:**<br>control system (100) including CPU (102) with predetermined card type and expiration date information stored in CPU memory, and CPU (102) connected to card reader (30) | **function:** determining the type of card and the expiration date of the card;<br>**structure:** control system 100 connected to magnetic card reader 30 or 230 [lacks sufficient structure for determining the type of card and the expiration date of the card] |

The construction of Claim 17 is very similar to the construction of Claim 16, immediately above. First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112. The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation. Uship agrees. See Uship Brief at 61.

Second, the function recited in the claim is "determining the type of card and the expiration date of the card." Uship agrees. See Uship Brief at 61-62. No further construction of this function is necessary.

Third, the specification identifies a single structure capable of "determining the type of card and the expiration date of the card": a control system (100) including CPU (102) with predetermined card type and expiration date information stored in CPU memory, and CPU (102)

connected to card reader (30). This structure is disclosed in the specification citation quoted above. See A43-44 ('464 Spec. 6:59-7:5).

Despite failing to initially disclose any corresponding structure pursuant to this Court's Order, Uship now appears to agree that the corresponding structure includes at least "the system . . . programmed or otherwise instructed to collect information relating to certain characteristics of the card, including the type of card and the expiration date of the card." Uship Brief at 62. Accordingly, the Court should construe this means plus function limitation in light of the specific structure identified in the specification.

### M.   "Means for Determining Whether the Card Is Listed as a Bad Card" ('464/18)

| '464 Dependent Claim 18 | | |
|---|---|---|
| *Disputed Dependent Claim Limitation* | | |
| The integrated, automated, unattended unit of claim 17 wherein said validating means further includes <u>means for determining whether the card is listed as a bad card</u>. | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **means for determining** - structure, material, or steps used for ascertaining<br><br>**listed as a bad card** - identified or designated as a credit card that is no longer valid or for which the charge would exceed its credit limit | **[Means-plus-Function]**<br>**Function:**<br>to determine whether the card is listed as a bad card<br>**Corresponding Structure:**<br>control system (100) including CPU (102) with list of invalid cards stored in CPU memory, and CPU (102) connected to card reader (30) | **function:** determining whether the card is listed as a bad card;<br>**structure:** control system 100 connected to magnetic card reader 30 or 230 [lacks sufficient structure for determining if the card is a bad card] |

The construction of Claim 18 is very similar to the construction of Claims 16 and 17, above. First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112. Uship agrees. See Uship Brief at 63.

Second, the function recited in the claim is "determining whether the card is listed as a bad card." Uship agrees. See Uship Brief at 61-62. No further construction of this function is necessary.

Third, the specification identifies a single structure capable of "determining whether the card is listed as a bad card":  a control system (100) including CPU (102) with list of invalid cards stored in CPU memory, and CPU (102) connected to card reader (30).  This structure is disclosed in the specification citation quoted above.  <u>See</u> A43-44 ('464 Spec. 6:59-7:5).

Despite failing to initially disclose any corresponding structure pursuant to this Court's Order, Uship now appears to agree that the corresponding structure includes at least "an accessible list of 'bad' cards" together with the "means for validating."  Uship Brief at 63.  Accordingly, the Court should construe this means plus function limitation in light of the specific structure identified in the specification.

### N.    "Means for Communicating Said Account Charge to a Remote Location" ('464/30)

| **'464 Dependent Claim 30** |||
|---|---|---|
| *Disputed Dependent Claim Limitation* <br> The integrated, automated, unattended unit of claim 28 including <u>means for communicating said account charge to a remote location</u>. |||
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **means for communicating** - structure, material or steps used for transmitting data between the claimed invention to another location, involving the use of communication lines such as telephone lines and related hardware and software <br><br> **said account charge** - an entry in the customer's account of money due <br><br> **remote location** - a place removed from the site in which the claimed invention is deployed | **[Means-plus-Function]** <br> **Function:** <br> to communicate and assess the account charge to a remote location <br> **Corresponding Structure:** <br> control system (100) including CPU (102) connected to card reader (30), and card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges | **function:** communicating the account charge to a remote location owning <br> **structure:** magnetic card reader 30 or 230 connected to a dedicated telephone line |

First, the disputed limitation is a means-plus-function limitation that is subject to Paragraph 6 of Section 112.  The limitation uses the word "means", raising the presumption that this is a means-plus-function limitation.  Uship agrees.  See Uship Brief at 77.

Second, this disputed limitation contains a one recited functions.  The function recited in the claim is "communicating said account charge to a remote location."[23]  The antecedent basis for "said account charge" is the shipment fee that was assessed to the account of the person in claim 28.

Third, the specification provides only one structure that communicates the assessed shipment fee to a remote location:

> System 10 may be compatible with at least one commercial bank card . . . .  After the customer has passed the magnetic card through reader 30, control system 100 evaluates the information received from card reader 30 . . . .  **The reader 30 may be connected to a dedicated telephone line that communicates with a central location for processing charges on the bank card**.

A43-44 ('464 Spec. 6:59-7:4) (emphasis added).  Accordingly, the corresponding structure is:  card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card.[24]

## III.     RAMSDEN & LILES 5,831,220; 6,105,014; 6,917,924

U.S. Patent Nos. 5,831,220 ("the '220 patent"), 6,105,014 ("the '014 patent"), and 6,917,924 ("the '924 patent") issued on November 3, 1998, August 15, 2000, and July 12, 2005 respectively.

---

[23]  Thus, the "and assess" language in the government's initial construction of the recited function is unnecessary.

[24]  The government's initial construction included "control system (100) including CPU (102) connected to card reader (30)" within the corresponding structure; upon review, that structure is unnecessary here because the claim language makes it clear that the control means incorporates the communicating and assessing means.

Each of the patents are very similar – they have nearly identical specifications as a result of being derived from consecutive continuation applications from a common ancestor.  Uship has asserted that the government has infringed two claims from each of the three patents.  Of the two claims from each patent, one claim is a method claim and the other claim is an apparatus claim.  Each of the method claims in the three patents is worded nearly identically, and each of the apparatus claims in the three patents is worded nearly identically.  As a result of this parallelism across the three patents, the government has:  (1) analyzed key disputed claim terms common to every one of the asserted claims;  (2) grouped the three method claims together for analysis;  and (3) grouped the three apparatus claims together for analysis.

### A.      "Destination," "Package Type Information," and "Delivery Date"

The asserted claims of the '220, '014, and '924 patents repeatedly use certain claim terms that the parties dispute.  This Brief will address these claim terms first because they appear in many of the other disputed limitations in these three patents.

| '220 Independent Claims 1, 3<br>'014 Independent Claims 1, 2<br>'924 Independent Claims 1, 2<br>*Disputed Independent Claim Limitation*<br>destination of the parcel or envelope to be mailed;<br>said destination | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **destination** - data relating to the location to which the item to be mailed is to be mailed, such as the zip code for that location | **destination of the parcel or envelope to be mailed; and said destination** - the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place | **destination** - name, street address, and zip code |

A first key disputed term that appears in every asserted claim of the '220, '014, and '924 patents is "destination of the parcel or envelope to be mailed."  In addition, many limitations within

each of the asserted claims use the phrase "said destination" after the initial claim term.  Thus, the initial claim term provides antecedent basis for the subsequent uses of "said destination."

According to the specification of the '220, '014, and '924 patents, the destination of the item to be mailed should be construed as "the place or location to which the item is to be mailed; including at least the name, street address, and zip code of the place."  The government's proposed construction is strongly supported by a passage in the specification that indicates that the destination includes characteristics such as name, street address, and zip code:

> For example, a screen is displayed which requests the customer to enter **the zip code of the destination of the item to be mailed**.  In a preferred embodiment, an automatic zip code check routine is invoked for automatically providing the **destination city and state** from the zip code information . . . .  The customer is . . . then asked to input the **destination name and destination street address** for the item to be shipped. The zip code and other destination information is preferably inputted into the system via the keyboard 324, although the information may also be provided via the touch screen of CRT 322.  The zip code and other information may be evaluated against certain criteria . . . .  This process is repeated until the **destination name, street address**, value and contents are properly entered.

A88 ('220 Spec. 20:36-65) (emphasis added).  Thus, according to the specification, characteristics of the destination include at least a "destination name," a "destination street address," and a destination zip code.  Other characteristics of the destination may also include the destination city and state.  After the destination (including these characteristics) has been inputted by the customer, the automated shipping machine creates a shipping label – with the destination – which is applied to the item and inserted into the machine:

> In a preferred embodiment, the system 310 may automatically provide, or the customer may elect to provide, tracking information on the label of the parcel or envelope being shipped. This is accomplished by printing a bar code on the label in addition to the destination information . . . .

> Once all of the label information has been verified by the customer, the label is printed and applied to the parcel or envelope by the customer. The customer is then

> instructed to reposition the parcel or envelope on markings 342 of the conveyor belt
> 340 (if the package was removed to apply the label) and to close the outer door 330.

A89 ('220 Spec. 21:27-31). After that, if the customer wants to ship another item, the automated

shipping machine "repopulates the input fields in order to minimize the customer's input time (since

more than one package is often sent to the same destination)." A89 ('220 Spec. 22:50-53). In each

case, the patent indicates that the destination is the ultimate place to which the item is to be shipped,

which must include characteristics such as the name, address, and zip code. This construction is also

supported by the relevant extrinsic evidence.[25]

Despite the significant support in the specification for this construction, Uship broadly

defines "destination" to be essentially equivalent to a zip code. See generally Uship Brief at 91-92.

Uship's definition is flatly contradicted by the specification, which comprehends the zip code to be

a single characteristic of the destination and not equivalent to the destination. See A88 ('220 Spec.

20:36-39) ("the zip code of the destination of the item to be mailed"); see also A82 ('220 Spec. 8:55-

58) ("The customer then enters the destination zip code through key pad 28 . . . ."). Uship argues

that the first embodiment simply accepts a zip code, rather than the destination. This is true, but

Uship's argument misses the point. The definition of "destination of the parcel or envelope to be

mailed" cannot be changed because the first embodiment functions with less than a destination.

Accordingly, the Court should interpret "destination of the parcel or envelope to be mailed" and

---

[25] See A288 (destination: "3: a place which is set for the end of a journey or to which something is sent" Webster's Third New International Dictionary, Unabridged 614 (1993));

A298 (destination: "3: a place to which one is journeying or to which something is sent" Webster's Ninth New Collegiate Dictionary 345 (1990)).

"said destination" to mean "the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place."

| '220 Independent Claims 1, 3<br>'014 Independent Claims 1, 2<br>'924 Independent Claims 1, 2<br>*Disputed Independent Claim Limitation*<br>package type information | | |
| --- | --- | --- |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the claimed invention | data relating to the structure of the parcel or envelope | data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier. |

A second key disputed term that appears in every asserted claim of the '220, '014, and '924 patents is "package type information."  According to the specification, "package type information" appears to be a unique phrase used by the patentee to encompass the physical shape and structure of the parcel or envelope:

> Once photo cell sensor 344 detects the presence of the parcel or envelope 378, the customer is instructed at step 512 to select a package type.  For example, package types include a letter, a pak or a package or any other package type which may be accepted by the delivery service.

A88 ('220 Spec. 20:5-9).  Other than the discussion above, the specification is silent as to the meaning of "package type information," and the parties have cited no other relevant intrinsic or extrinsic evidence.  The constructions provided to by the government and by IBM are both true to the disclosure in the specification.

Uship's definition, on the other hand, is impermissibly broad in that "data relating to the characteristics or properties" of the item bears no relation to the package type examples provided in the specification.  For example, the color or weight of the package would read on Uship's construction, yet neither characteristic relates to the specification disclosure.

-74-

| '220 Independent Claims 1, 3<br>'014 Independent Claims 1, 2<br>'924 Independent Claims 1, 2<br>*Disputed Independent Claim Limitation*<br>a delivery date . . . of said parcel or envelope to said destination | | |
| --- | --- | --- |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| the projected or estimated date on which items to be mailed through the claimed invention are to be received at the designated location/address, expressed either as the specific month, day, and year when the item is expected to be received at the designated location or the number of days it is estimated to take for items to be mailed through the claimed invention to arrive at the designated location/address for delivery | the expected calendar date of delivery of the parcel or envelope | the expected delivery date, including the day of the week |

A final key disputed term that appears in every asserted claim of the '220, '014, and '924 patents is "a delivery date . . . of said parcel or envelope to said destination."  In two critical passages, the specification defines this claim term to be an expected calendar date of delivery:

> Once all of the shipping information has been properly entered, the delivery date and cost for each delivery service available to the customer is computed at step 526.  **In computing the delivery date, the software takes into account weekends, holidays and other days in which no delivery service is available when calculating for each service when the package can be expected to be delivered** . . . .  The delivery date and cost for all available service options are then displayed to the customer on the CRT 322.

A89 ('220 Spec. 21:4-26) (emphasis added).

> After the shipping and package information is entered, system 700 then rates the package by computing the delivery date and cost for each delivery service at step 838 . . . .  The displayed information includes **the date of expected delivery, what day of the week that will be**, and total shipping costs for each selection.

A92 ('220 Spec. 28:31-40) (emphasis added).  Accordingly, "a delivery date . . . of said parcel or envelope to said destination" must mean "the expected calendar date of delivery of the parcel or

envelope."  The government's proposed definition would encompass the specification's disclosure of a date calculation that "takes into account weekends, holidays and other days" and the "day of the week" of expected delivery.  Uship acknowledges the specification's specific focus on "weekends, holidays, and other days in which no delivery service is available," but argues that the government and IBM are importing limitations from the specification.  Uship Brief at 95.  Uship, however, fails to acknowledge the clear import of the actual claim language, which explicitly calls for computing "a delivery date."  Uship finds absolutely no valid intrinsic or extrinsic support for expanding the definition of "delivery date" to encompass "the number of days it is estimated to take for items to be mailed through the claimed invention to arrive."  Uship's previously-undisclosed reliance upon extrinsic Postal Service documents to support its definition is no more than a thinly-veiled attempt to construe claim terms in light of the accused device.  See NeoMagic Corp. v. Trident Microsystems, Inc., 287 F.3d 1062, 1074 (Fed. Cir. 2002) ("It is well settled that claims may not be construed by reference to the accused device") (citing SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc)).  Furthermore, the documents do not define "a delivery date."  Finally, "a delivery date" cannot be expanded to encompass Uship's definition as a result of an unrelated statement by the USPTO during the examination of the great-grandfather application to the '220 patent.  See Uship Brief at 94 n.47.

**B.    Method Claims ('220/1; '014/1; '924/1)**

As reflected in the "ancestry chart" in Figure 2, each of these patents are continuation applications of a common parent application.  Therefore, they share a common specification and present identical drawings.  The only significant difference is reflected in each patent's introductory

reference to related applications.[26]  Uship asserts independent method claim 1 from each these three

patents.  As these three claims are nearly identical, they will be treated comprehensively except

where the claim language differs.

### 1.  Preamble ('220/1; '014/1; '924/1)

| '220 Independent Claim 1<br>'014 Independent Claim 1<br>'924 Independent Claim 1<br>*Disputed Preamble Limitation*<br>A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of: | | |
| --- | --- | --- |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **mailing** - sending by use of the USPS or a company or service that engages in the transportation of parcels and envelopes from one location to another location<br><br>**parcels and envelopes** - the items to be mailed through use of the method claimed in the invention, including without limitation packages or other objects wrapped or packed up to form a small bundle, as well as flat paper or cardboard containers for letters or thin packages<br><br>**automated shipping machine** - an apparatus or device consisting of interrelated parts with separate functions, used in the performance of the task of mailing parcels and envelopes, and employing a technique, method or system of operating and controlling that task by highly automatic means, as by electronic devices, thereby reducing human an intervention to a minimum | **A method . . . using an automated shipping machine**: Each step of the method requires use of a shipping machine automatically controlled by mechanical or electronic devices that take the place of humans, unless the step explicitly states otherwise | A series of steps for mailing parcels and envelopes using an automated unit that prepares an appropriate mailing label, validates receipt from a customer of a parcel and envelope, and/or collects and holds parcels and envelopes for pick-up by one or more commercial delivery services |

---

[26]  Accordingly, all citations to the specification of these patents herein will reflect the specific text of the '220 patent with the understanding that same text in the other two patents may appear slightly beyond the corresponding location in the '220 patent.

Uship's proposed interpretation for the preamble reflects that the claimed "automated shipping machine" operates "by highly automatic means . . . , thereby reducing human intervention to a minimum." However, the government's construction is more definitive in that it calls for each step of the method claim to require "use of a shipping machine automatically controlled by mechanical or electronic devices that take the place of humans, unless the step explicitly states otherwise." Unlike Uship's, the government's proposal properly accounts for the prosecution history and the appropriate meaning of the word "automated."

Statements during prosecution of U.S. Patent No. 5,656,799, from which the '220, '014, and '924 patents originated, either directly or indirectly,[27] indicate exactly how the inventors interpreted the method claim preamble language, "using an automated shipping machine." See A93 ('220 Claim 1). It is proper to consider the prosecution of earlier related applications since "prosecution disclaimer may arise from disavowals made during the prosecution of ancestor patent applications." Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1333 (Fed. Cir. 2003). "When the application of prosecution disclaimer involves statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed, those statements in the familial application are relevant in construing the claims at issue." Ormco Corporation v. Align Technology, Inc., 498 F.3d 1307, 1314 (Fed. Cir. 2007).

During prosecution of the '799 patent, the inventors accused the Patent Examiner of improperly ignoring this same preamble language in erroneously issuing a restriction requirement. The statements bear repeating in their entirety. The relevant remarks read as follows:

---

[27] See Figure 2. The '799 patent is the direct parent of the '220 patent and the indirect parent of the '014 and the '924 patents. Since the '220, '014, and '924 patents descending from the '799 patent are pure continuations, each specification has the same content.

> Applicant disagrees with the Examiner's suggestion that the process claimed in independent method claims 1 and 72 can be performed by hand.  **Both of these claims specifically recite in the preamble** a method of mailing parcels and envelopes "using an automated shipping machine" **rather than specifically reciting at each step that the step is performed by the automated shipping machine.** Applicant submits that if the method were performed by hand as the Examiner suggests, then it would not use an automated shipping machine as set forth in the preamble.

A327 (G2346) (emphasis added).  Uship somehow maintains that this statement does not address the meaning of the preamble language "using an automated shipping machine."  See Uship Brief at 87.  Any common sense reading of the statements prove otherwise.

The applicants explicitly disputed the interpretation that the claimed process can be performed by hand.  As support, they explain that "if the method were performed by hand . . . it would not use an automated shipping machine as set forth in the preamble."  The inventors understood this preamble language to require any action performed by the automated shipping machine to presumptively exclude manual performance.

Since the applicants argued that each step of the method would be "performed by the automated shipping machine" in the absence of any other specific recitation, the claims must be interpreted accordingly.  Accordingly, unless a step explicitly calls for a human, the step must be "performed by the automated shipping machine."  Uship cannot simply ignore the unambiguous declarations by the applicants during prosecution.  See Springs Window Fashions, 323 F.3d at 995. ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.  A patentee may not state during prosecution that the claims do not cover a particular device and then change position [during litigation]. . . .").  The Court should reject Uship's construction since it fails to account for these declarations.

### 2.     *"Receiving Package Type Information . . ." ('220/1; '014/1; '924/1)*

**'220 Independent Claim 1**
**'014 Independent Claim 1**
**'924 Independent Claim 1**
*Disputed Independent Claim Limitation*

| | |
|---|---|
| 220, 014: | receiving package type information identifying a parcel or envelope to be mailed; |
| 924: | receiving package type information including the dimensions of a parcel or envelope to be mailed; |

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **package type information** - data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the claimed invention<br><br>**identifying** - relating to, pertaining to, or associated with<br><br>**parcel or envelope** - see above<br><br>**mailed** - see mailing | the automated shipping machine obtains data relating to the structure of the parcel or envelope | **package type information:** data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier. |

Consistent with the preamble interpretation, the government's proposal provides that the automated shipping machine obtains data relating to the structure of the parcel or envelope. This limitation incorporates the construction of "package type information" in Section III.A above and the requirement that the step be performed by the automated shipping machine from the preamble.

The '924 patent adds to this limitation the phrase "including the dimensions of [a parcel or envelope]." The specification confirms that this data includes information relating to the height, length, **and** width of the package. See A175 ('924 Spec. 16:13-14). As such, to the extent Uship's proposal only calls for receipt of only one dimension, it should be rejected.

### 3.     *"Computing from Said . . . Information, a Delivery Date and Cost . . ."* ('220/1; '014/1; '924/1)

**'220 Independent Claim 1**
**'014 Independent Claim 1**
**'924 Independent Claim 1**
*Disputed Independent Claim Limitation*

| 220: | computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer; |
|---|---|
| 014, 924: | computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer; |

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **computing** - determining, reckoning, or calculating<br><br>**weight information** - data relating to weight of the item to be mailed. See definition of weighing above.<br><br>**delivery date** - the projected or estimated date on which items to be mailed through the claimed invention are to be received at the designated location/address, expressed either as the specific month, day, and year when the item is expected to be received at the designated location or the number of days it is estimated to take for items to be mailed through the claimed invention to arrive at the designated location/address for delivery.<br><br>**cost for delivery** - the price(s) quoted to mail the item to the designated location/address<br><br>**delivery service option available** - the choices of different methods of mailing parcels and envelopes to a chosen or desired location/address that are open to be presented to a customer using the claimed invention. | the automated shipping machine calculates the expected calendar date of delivery and cost for delivery of the parcel or envelope to said destination for each available delivery service option, as a function of the package type information, shipping information, and weight information<br><br>**said destination** - the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place | the machine determines an expected delivery date, including the day of the week, and associated cost for each delivery service based on the package type information, shipping information, and weight information<br><br>**package type information:** data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier. |

Consistent with the preamble interpretation, the government's proposal provides that the automated shipping machine calculates the expected calendar date of delivery and cost for delivery of the parcel or envelope to said destination for each available delivery service option, as a function of the package type information, shipping information, and weight information.  This limitation

incorporates the construction of "said destination," "a delivery date," and "package type information" in Section III.A above; as well as the requirement that the computing step be performed by the automated shipping machine from the preamble.

Uship's construction once again interprets isolated claim terms out of context. Thus, Uship's proposal leaves the impression that this computing step can somehow be achieved on the basis of information not amounting to the combination of the package type information, shipping information, and weight information. As the specification, see A89, 92 ('220 Spec. 21:4-26; 28:30-40), and the claims themselves provide, this must be reflected in the scope and meaning of this claim.[28]

> ### 4.    "Validating Receipt of Said Parcel or Envelope as the Parcel or Envelope for Which Said . . . Label Was Printed" ('220/1; '014/1; '924/1)

| '220 Independent Claim 1 '014 Independent Claim 1 '924 Independent Claim 1 *Disputed Independent Claim Limitation* 220:          validating receipt of said parcel or envelope as the parcel or envelope for which said shipping              label was printed; 014, 924:     validating receipt of said parcel or envelope as the parcel or envelope for which said tracking              bar code label was printed; and | | |
| --- | --- | --- |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **validating receipt** - determining or confirming that the package to be mailed has been received for storage and/or shipment | the automated shipping machine confirms that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed by obtaining data concerning the parcel or envelope | verifying that the package being mailed is the same package for which the shipping label was printed |

----

[28]  As reflected in the plain language of these limitations, the '220 patent is more narrow in that it requires the system to compute a delivery date and cost for *each* delivery service option available. These limitations in the '014 and '924 patents differ slightly in that they only call for computing a delivery date and cost for *at least two* of the delivery options available.

Consistent with the preamble interpretation, the government's proposal provides that the automated shipping validates receipt of said parcel or envelope as the parcel or envelope for which the [shipping / tracking bar code] label was printed. This limitation incorporates the requirement that the validation step be performed by the automated shipping machine from the preamble.

Uship's construction of this step is improper in that it overlooks the underlying purpose of this step as dictated by the intrinsic evidence. Uship's construction merely provides for confirming or determining that the package is received for shipping or storage. This interpretation omits, thereby eviscerating, the true function of this step, which the specification characterizes as an "important" and "critical" feature. In particular, this critical validation feature requires that the system confirm the package received for storage be the same package for which the shipping label was previously printed. The automated shipping machine accomplishes this function by obtaining additional data concerning the package presented for storage (whether by subsequent detection or by some other means, such as re-dimensioning or re-weighing).

For example, after the shipping label is printed, the specification explains the validation step as follows:

> At this point, **a very important validation step is performed**. In particular, the system 310 determines at step 536 whether it has received the correct package. This step **is critical since it verifies that the customer did not perform a package switch or forget to replace the package in the intermediate storage area 334 for shipment**. Such validation may be accomplished in several different ways in accordance with the invention. For example, in a simple embodiment, photo cell sensor 344 may simply detect whether any package has been placed on the conveyor belt 340. If so, it is presumed that the package on the conveyor belt 340 is **the appropriate package with the appropriate label**. On the other hand, in accordance with a preferred embodiment of the invention, the package is automatically reweighed and/or redimensioned once the customer has closed the outer door 330 (and hence the parcel or envelope cannot be accessed by the customer). If the reweighing and redimensioning results in approximately the same readings as when the package was previously weighed and dimensioned, it is presumed that the

> package placed on the conveyor belt 340 is **the same package for which the label was printed**.

A89 ('220 Spec. 21:38-22:10) (emphasis added).  Thus, the specification confirms that the purpose of the validation step is to verify receipt of the same package for which the shipping label was printed (thereby preventing a package switch and assuring the presence of the package).  And, this verification requires that the automated shipping machine perform additional detection, which then either confirms or refutes receipt of the appropriate package and label.  Moreover, the specification makes clear that this feature is comprehensive and not limited to discrete embodiments as reflected by the specification's reference to both more simple and preferred embodiments.

Unlike the government's construction, Uship fails to correlate the confirmation with the previously printed shipping receipt.  Thus, Uship's proposal does nothing to account for or prevent a package switch from occurring.  It merely requires a confirmation of receipt for storage.  Such a construction is disfavored since it ignores the purpose and function of this critical feature.  See Curtiss-Wright Flow Control, 438 F.3d at 1379-80 (interpreting a limitation more narrowly to account for a feature the specification described as a "critical aspect").  Accordingly, the government's construction should be adopted.

5. **"Storing a Validated Parcel or Envelope in a Secure Storage Area until Said Parcel or Envelope Is Subsequently Picked up . . ." ('014/1; '924/1)**

| '014 Independent Claim 1<br>'924 Independent Claim 1<br>*Disputed Independent Claim Limitation* | | |
|---|---|---|
| 014: | storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person. | |
| 924: | storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up for delivery. | |

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **storing** - to deposit or take in an | the automated shipping machine | storing the validated package in a |

| | | |
|---|---|---|
| item in a place for subsequent use or disposition<br><br>**validated** - determined or confirmed to be the package to be mailed<br><br>**secure** - safe from interception by unauthorized persons<br><br>**storage area** - a place in which an item is deposited or held for subsequent use or disposition<br><br>**commercial delivery person** - an employee or agent of the company or service used to mail the item to be mailed through the use of the claimed invention | stores the validated parcel or envelope in a secure storage area until a commercial delivery person picks up the parcel or envelope | secure storage area until the commercial delivery person picks up the package for delivery |

Consistent with the preamble interpretation, the government's proposal provides that the automated shipping machine stores the validated parcel or envelope in a secure storage area until it is subsequently picked up. This limitation incorporates the requirement that the storage step be performed by the automated shipping machine from the preamble.

Once again, Uship's construction presents an interpretation of isolated words in the claim out of context. Accordingly, its construction fails to account for the automated aspect of this step as dictated by the intrinsic evidence. Unlike claim 1 of the '220 patent, the language of claim 1 in the '014 and the '924 patents does not call for an "attendant of said customer" to perform the storing function. Compare A138 ('014 Claim 1), A182 ('924 Claim 1) with A93 ('220 Claim 1). Accordingly, these two claims implicitly exclude the "semi-attendant" embodiment of FIGS. 20-22C. See A136 ('014 Spec. 25:7-12). Consistent with the prosecution history and the automated nature of the invention as described in the intrinsic evidence, the storing step requires performance and control by and through the automated shipping machine. This feature is not reflected in Uship's construction.

-85-

For example, the specification details this storing step as relying solely on automated aspects of the shipping machine.  <u>See</u> A134 ('014 Spec. 21:35-22-50).  No human intervention is necessary. Instead, storage is automatically controlled by virtue of mechanisms controlled by the shipping machine such as, conveyor belt 340, inner door, 336, and slide lift motor 380.  Consistent with the context of the specification, however, the government's construction acknowledges that a delivery service employee picks up the parcel or envelope.  <u>See</u> A135 ('014 Spec. 23:48-52).  Such human interaction should not be confused with the highlighted automated features of the invention allowing for full performance of the storage step by the shipping machine.  As Uship's construction fails to account for these features, it should be rejected.

### C.    Apparatus Claims ('220/3; '014/2; '924/2)

As reflected in the "ancestry chart" in Figure 2, each of these patents are continuation applications of a common parent application.  Therefore, they share a common specification and present identical drawings.  The only significant difference is reflected in each patent's introductory reference to related applications.[29]  Uship asserts the apparatus claim from each these three patents. As these three claims are nearly identical, they will be treated comprehensively except where the claim language differs.

#### 1.    Preamble ('220/3; '014/2; '924/2)

| |
|---|
| **'220 Independent Claim 3** |
| **'014 Independent Claim 2** |
| **'924 Independent Claim 2** |
| *Disputed Preamble Limitation* |
| 220, 014, 924:    An automated shipping machine for use in mailing parcels and envelopes, comprising: |

---

[29]  Accordingly, all citations to the specification of these patents herein will reflect the specific text of the '220 patent with the understanding that same text in the other two patents may appear slightly beyond the corresponding location in the '220 patent.

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **automated shipping machine** - an apparatus or device consisting of interrelated parts with separate functions, used in the performance of the task of mailing parcels and envelopes, and employing a technique, method or system of operating and controlling that task by highly automatic means, as by electronic devices, thereby reducing human an intervention to a minimum | **automated shipping machine**: a shipping machine automatically controlled by mechanical or electronic devices that take the place of humans | An automated unit that prepares an appropriate mailing label, validates receipt from a customer of a parcel and envelope, and/or collects and holds parcels and envelopes for pick-up by one or more commercial delivery services |
| **mailing** - sending by use of the USPS or a company or service that engages in the transportation of parcels and envelopes from one location to another location | | |
| **parcels and envelopes** - the items to be mailed through use of the method claimed in the invention, including without limitation packages or other objects wrapped or packed up to form a small bundle, as well as flat paper or cardboard containers for letters or thin packages | | |

The preambles in asserted '220 Claim 3, '014 Claim 2, and '024 Claim 2 are identical.  As an initial matter, these preambles limit the scope of the claims because the patentees relied on the preamble to define the claimed invention.  See Catalina Marketing Int'l, 289 F.3d at 808.  In the specifications, The patentees characterized "[t]his invention" as relating to "an automated unit" for shipping purposes.  A79 ('220 Spec. 1:16-22); A124 ('014 Spec. 1:16-22); A168 ('924 Spec. 1:16-22).

As discussed above in Section II.A.2, the proper definition of "automated" is "automatically controlled by mechanical or electronic devices that take the place of humans."  The interpretation of the remainder of the preamble limitation is straightforward.

2.    *"Processing Means for Receiving Package Type Information . . ." ('220/3) and "A Processor Which Receives Package Type Information . . ." ('014/2; '924/2)*

| '220 Independent Claim 3 |||
|---|---|---|
| *Disputed Independent Claim Limitation* |||
| processing means for receiving package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, |||
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **processing means** - structure, material, or steps used to carry out operations on data or programs, involving the use of a computer processing unit (CPU) and associated hardware and software<br><br>**package type information** - data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the claimed invention<br><br>**identifying** - relating to, pertaining to, or associated with<br><br>**shipping information** - data relating to the method by which the item to be mailed is to be mailed and/or to the location to which the item is to be mailed | [Means-plus-Function]<br>**Function:**<br>to receive package type information identifying said parcel or envelope to be mailed, and to receive data relating to shipping from said customer including at least the destination of said parcel or envelope to be mailed<br>**Corresponding Structure:**<br>microprocessor (382, 718) connected to CRT (322, 702) and/or connected to keyboard (324, 704) | **function:**  receiving data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier, and other shipping information from said customer including at least a name, street address, and zip code of where said parcel or envelope is being mailed<br>**structure:** keyboard 28/226/324/704 (or touch screen 332) and connections to microprocessor |

Independent claim 3 of the '220 patent contains the limitation "processing means for receiving package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed."

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112.  The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation.  Uship appears to implicitly agree.  <u>See</u>

-88-

Uship Brief at 105 (stating that "processing means" is linked to different functions and proposing corresponding structure).

Second, the first function recited for the processing means in claim 3 is "receiving package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed."  "Package type information" and "a destination of said parcel or envelope to be mailed" are discussed above in Section III.A.

Third, the specification identifies two structures that specifically perform this "receiving information" function:

1.      microprocessor (382, 718) connected to keyboard (324, 704); and

2.      microprocessor (382, 718) connected to CRT (322, 702).

These corresponding structures are derived directly from the specification.  See A88 ('220 Spec. 20:34-50) ("The . . . information is preferably inputted into the system via the keyboard 324, although the information may also be provided via the touch screen of CRT 322."); A92 ('220 Spec. 27:26-28:8) (discussing use of keyboard 704 and CRT 702 to input the information).

Uship's proposed construction of this limitation is flawed with respect to corresponding means.  Uship unhelpfully argues that the "control system includes various different associated structures and devices used to accomplish many of the tasks identified."  Uship Brief at 106.  Even though Uship offers an example of several devices that can receive information in a parenthetical, that example is open-ended and completely untethered to the structures that correspond to the recited function in the specification.

**'014 Independent Claim 2**
**'924 Independent Claim 2**
*Disputed Independent Claim Limitation*

014:  a processor which receives package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed,

924:  a processor which receives package type information including the dimensions of said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed,

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **processor** - a computer or similar device used to carry out operations on data or programs, involving the use of a computer processing unit (CPU) and associated hardware or software<br><br>**package type information** - data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the claimed invention<br><br>('924) **dimensions** - data relating to the magnitude or size of an item, including data relating to the length, width, and/or height of that item<br><br>**identifying** - relating to, pertaining to, or associated with<br><br>**shipping information** - data relating to the method by which the item to be mailed is to be mailed and/or to the location to which the item is to be mailed | a processor configured to obtain data relating to the physical structure of the parcel or envelope [('924) including data relating to the length, width, and height of the parcel or envelope,]<br><br>obtain data relating to shipping from the customer including at least the place to which the parcel or envelope is to be mailed, | a processor which receives data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier, and other shipping information from said customer including at least a name, street address, and zip code of where said parcel or envelope is being mailed |

The apparatus claims in the '220, '014, and '924 patents are very similar, but one difference is that the '014 and '924 patents claim "a processor" rather than the "processing means" of the '220 patent.  Thus, while the "processor" of the '014 and '924 patents performs nearly identical functions, the processor limitations in the '014 and '924 patents are not subject to "means-plus-function" treatment under Paragraph 6 of Section 112 of Title 35.  The specific claim terms of "package type

-90-

information" and "a destination of said parcel or envelope to be mailed" are discussed above in

Section III.A.  Other than those specific claim terms, there is no need for the Court to construe these

"a processor which receive package type information . . ." limitations in the '014 and '924 patents.

### 3. *"Processing Means for Computing . . ." ('220/3) and "A Processor Which . . . Computes . . ." ('014/2; '924/2)*

| '220 Independent Claim 3 | | |
|---|---|---|
| *Disputed Independent Claim Limitation* | | |
| processing means . . . for computing from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer, | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **computing** - determining, reckoning, or calculating | **[Means-plus-Function]** **Function:** to compute the expected calendar date of delivery and cost for delivery of the parcel or envelope to the place to which the parcel or envelope is to be mailed for each available delivery service option, as a function of the package type information, shipping information, and weight information | **function:** computing the expected delivery date, including the day of the week, and cost for each delivery service from the package type information, shipping information, and weight information has been entered |
| **weight information** - data relating to weight of the item to be mailed. See weighing above. | | |
| **delivery date** - the projected or estimated date on which items to be mailed through the claimed invention are to be received at the designated location/address, expressed either as the specific month, day, and year when the item is expected to be received at the designated location or the number of days it is estimated to take for items to be mailed through the claimed invention to arrive at the designated location/address for delivery. | **Corresponding Structure:** microprocessor (382, 718) loaded with fee files connected to: (1) scale (356, 706); and (2) CRT (322, 702) and/or keyboard (324, 704) | **structure:** microprocessor 382/718 programmed with appropriate zone and weight charges, the delivery services available, and the fee files corresponding to each client delivery services, as depicted in Figure 18(A) from steps 512-526 and Figure 22(A&B) between 810 and 838. |
| | | **package type information:** data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier. |
| **cost for delivery** - the price(s) quoted to mail the item to the designated location/address | | |

Independent claim 3 of the '220 patent contains the limitation "processing means . . . for

computing from said package type information, shipping information, and weight information from

said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer."

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112. The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation. Uship appears to implicitly agree. See Uship Brief at 105 (stating that "processing means" is linked to different functions and proposing corresponding structure).

Second, the second function recited for the processing means in claim 3 is "computing from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer." "Package type information," "delivery date," and "said destination" are discussed above in Section III.A.

Third, the specification identifies a single structure that specifically performs this "computing" function: microprocessor (382, 718) loaded with fee files connected to: (1) scale (356, 706); and (2) CRT (322, 702) and/or keyboard (324, 704). This corresponding structure is derived directly from the specification. See A87-88 ('220 Spec. 18:65-19:4); A91 ('220 Spec. 26:43-51) (microprocessor loaded with fee files).

Other than acknowledging that the corresponding structure includes "various files loaded onto the control system for use in . . . computation of delivery costs," Uship fails to identify any other corresponding structure. Uship Brief at 107. Accordingly, the Court should adopt the government's construction of this limitation.

| '014 Independent Claim 2<br>'924 Independent Claim 2<br>*Disputed Independent Claim Limitation*<br>014, 924:     computes from said package type information, shipping information, and weight information<br>              from said scale, a delivery date and cost for delivery of said parcel or envelope to said<br>              destination via at least two delivery service options available to said customer, |||
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **computes** - determines, reckons, or calculates<br><br>**weight information** - data relating to weight of the item to be mailed. See weighing above.<br><br>**delivery date** - the projected or estimated date on which items to be mailed through the claimed invention are to be received at the designated location/address, expressed either as the specific month, day, and year when the item is expected to be received at the designated location or the number of days it is estimated to take for items to be mailed through the claimed invention to arrive at the designated location/address for delivery.<br><br>**cost for delivery** - the price quoted to mail the item to the designated location/address<br><br>**delivery service option available** - the choices of different methods of mailing parcels and envelopes to a chosen or desired location/address that are open to be presented to a customer using the claimed invention.<br><br>**indication** - a communication or input; something serving to indicate | a processor configured to calculate an expected calendar date of delivery and cost for delivery of the parcel or envelope to said destination for at least two separate delivery service options, as a function of the package type information, shipping information, and weight information, and | computes the expected delivery date, including the day of the week, and cost for each delivery service from the package type information, shipping information, and weight information that has been entered |

Again, the '014 and '924 patents claim "a processor" rather than the "processing means" of the '220 patent. Thus, while the "processor" of the '014 and '924 patents performs nearly identical functions, the processor limitations in the '014 and '924 patents are not subject to "means-plus-

-93-

function" treatment under Paragraph 6 of Section 112 of Title 35.  The specific claim terms of "package type information," "delivery date," and "said destination" are discussed above in Section III.A.  Other than those specific claim terms, there is no need for the Court to construe these "a processor which computes . . ." limitations.

### 4.    *"Processing Means . . . for Receiving an Indication of the Delivery Service Option . . ." ('220/3)*

| '220 Independent Claim 3 | | |
|---|---|---|
| *Disputed Independent Claim Limitation*<br>processing means . . . for receiving an indication of the delivery service option desired by the customer; | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **delivery service option available -** the choices of different methods of mailing parcels and envelopes to a chosen or desired location/address that are open to be presented to a customer using the claimed invention.<br><br>**indication -** a communication or input; something serving to indicate<br><br>**delivery service option -** a method of mailing parcels and envelopes to a chosen or desired location/address<br><br>**desired -** requested; expressed preference from among available options | **[Means-plus-Function]**<br>**Function:**<br>to receive the customer's chosen method of delivery<br>**Corresponding Structure:**<br>microprocessor (382, 718) loaded with fee files connected to CRT (322, 702) and/or keyboard (324, 704) | **function**: inputting the choice of delivery service option by the customer based on the expected delivery date, including day of the week, and cost that best suit's the customer's need<br>**structure**: keyboard 28/226/324/704 (or touch screen 332) and connections to microprocessor 382 |

Independent claim 3 of the '220 patent contains the limitation "processing means . . . for receiving an indication of the delivery service option desired by the customer."

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112.  The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation.  Uship appears to implicitly agree.  <u>See</u>

-94-

Uship Brief at 105 (stating that "processing means" is linked to different functions and proposing corresponding structure).

Second, the third and final function recited for the processing means in claim 3 is "receiving an indication of the delivery service option desired by the customer."

Third, the specification identifies a single structure that specifically performs this "receiving delivery service option" function: microprocessor (382, 718) loaded with fee files connected to CRT (322, 702) and/or keyboard (324, 704). See A89 ('220 Spec. 21:10-26) (discussing how the microprocessor loaded with fee files calculates the delivery date and cost for all options, allowing the customer to make an informed selection with the CRT and keyboard).

Uship completely fails to identify any structure that corresponds to "receiving an indication of the delivery service option desired by the customer." Accordingly, the Court should adopt the government's construction of this limitation.

### 5.    *"Means Responsive . . . for Printing . . ." ('220/3)*

| '220 Independent Claim 3 | | |
|---|---|---|
| *Disputed Independent Claim Limitation* | | |
| means responsive to said processing means for printing a shipping label including at least said destination printed thereon and for printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; and | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **means . . . for printing** - structure, material or steps used to produce text or data in alphanumeric or graphic form on paper or other material<br><br>**responsive** - acting in response<br><br>**shipping label** - a slip of paper, cloth, or other material, marked or inscribed for attachment to an item to indicate information relating to the mailing of that item, such as the destination to which the item is to | [Means-plus-Function]<br>**Function:**<br>to print a shipping label with said destination, and to print a shipping receipt with the cost of delivery<br>**Corresponding Structure:**<br>label and receipt printer (714) connected to microprocessor (718) | **function:** printing a mailing label including at least the name, street address, and zip code and printing a receipt for an amount including at least the cost of delivering the parcel or envelope to the provided name, street address, and zip code via the delivery service chosen by the customer<br>**structure:** printer 26/326/714 and connections to microprocessor 382 |

| | | |
|---|---|---|
| be mailed<br><br>**shipping receipt** - a printed acknowledgment of having received payment as specified for the mailing of an item through use of the claimed invention<br><br>**amount** - the total cost or price incurred in the transaction(s) at issue<br><br>**cost of delivering** - the price to mail the item to the designated location/address<br><br>**delivery service chosen** - the method of mailing parcels and envelopes to a chosen or desired location/address selected by the customer | | |

Independent claim 3 of the '220 patent contains the limitation "means responsive to said processing means for printing a shipping label including at least said destination printed thereon and for printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer."

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112.  The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation.  Uship appears to implicitly agree.  See Uship Brief at 108 (stating that "the patent calls for a printer or printers that" perform certain functions).

Second, the functions recited for the means in claim 3 are "printing a shipping label including at least said destination printed thereon and for printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer."  Thus, there are two recited "printing" functions – printing a

shipping label **and** printing a shipping receipt.  Any corresponding structure must perform both functions.  "Said destination" is discussed above in Section III.A.

Third, the specification identifies a single structure that specifically performs both "printing" functions:  label and receipt printer (714) connected to microprocessor (718).  <u>See</u> A91 ('220 Spec. 25:21-23); A91 ('220 Spec. 26:19-22).  None of the other printers disclosed in the specification print a label and a receipt.

Uship errs by truncating the function and inflating the corresponding means.  The claim limitation requires a single means that performs both recited functions, and the specification identifies a single printer that performs both functions.  Therefore, Uship's argument that multiple printers can perform these functions is incorrect.

### 6.     *"Means for Validating Receipt . . ." ('220/3; '014/2, '924/2)*

| '220 Independent Claim 3 |
|---|
| '014 Independent Claim 2 |
| '924 Independent Claim 2 |

*Disputed Independent Claim Limitation*

220:             means for validating receipt of said parcel or envelope as the parcel or envelope for which said
                 shipping label was printed by said printing means,

014, 924:        means for validating receipt of said parcel or envelope as the parcel or envelope for which said
                 shipping label was printed by said printer,

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for validating receipt -** structure, material, or steps for determining or confirming that the package to be mailed has been received for storage and/or shipment | **[Means-plus-Function] Function:** to confirm that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed by obtaining data concerning the parcel or envelope **Corresponding Structure:** microprocessor (382) connected to photo cell sensor (344); **or** microprocessor (382) connected to scale (356) and/or dimensioning | **function:**  verifying that the package being mailed is the same package for which the shipping label was printed **structure:** markings 342, conveyor belt 340, outer door 330, intermediate area 334, photo cell sensor 344, microprocessor 382, magnetic lock 254 OR markings 342, conveyor belt 340, outer door 330, intermediate area 334, dimensioning system 346, and weighing system 356 |

| | sensors (346) | |
|---|---|---|

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112.  The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation.  Uship appears to disagree, but offers no evidence to rebut the presumption.  See Uship Brief at 110 (arguing that the Defendants' constructions are limited by the structures, and arguing that the recited function can be performed by attendants).

Second, the function recited in the claims is "validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said [printing means ('220 / printer ('014, '924)]."  The parties dispute the meaning of this function, particularly with respect to the meaning of "validating."  The specification stresses the critical importance of "validating" receipt of the packages:

> At this point, **a very important validation step** is performed.  In particular, the system 310 determines at step 536 whether it has received the correct package.  **This step is critical since it verifies that the customer did not perform a package switch or forget to replace the package in the intermediate storage area 334 for shipment.**

A89 ('220 Spec. 21:43-49) (emphasis added).  Thus, this "critical" and "important" step requires confirmation that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed, by obtaining data concerning the parcel or envelope.  See Curtiss-Wright Flow Control, 438 F.3d at 1379-80 (vacating preliminary injunction against accused infringer because the district court erred in claim construction by failing to account for a feature described in the specification as a "critical aspect").

Third, the specification identifies a total of two structures that correspond to the recited function:

1.      conveyor belt (340), and microprocessor (382) connected to photo cell sensor (344); or

2.      conveyor belt (340), and microprocessor (382) connected to scale (356) and/or dimensioning sensors (346).

No other structures discussed in the specification correspond to the function of validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said [printing means ('220) / printer ('014, '924)]."

> The customer is then instructed to reposition the parcel or envelope on markings 342 of the conveyor belt 340 (if the package was removed to apply the label) and to close the outer door 330. **At this point, a very important validation step is performed.** . . . Such validation may be accomplished in several different ways in accordance with the invention. *[Structure 1:]* For example, in a simple embodiment, <u>photo cell sensor 344</u> may simply detect whether any package has been placed on the <u>conveyor belt 340</u>. If so, it is presumed that the package on the conveyor belt 340 is the appropriate package with the appropriate label. *[Structure 2:]* On the other hand, in accordance with a preferred embodiment of the invention, the package is automatically <u>reweighed and/or redimensioned</u> once the customer has closed the outer door 330 (and hence the parcel or envelope cannot be accessed by the customer). If the reweighing and redimensioning results in approximately the same readings as when the package was previously weighed and dimensioned, it is presumed that the package placed on the <u>conveyor belt 340</u> is the same package for which the label was printed. If there is such a match, <u>microprocessor 382</u> activates magnetic lock 254 at step 542 to lock the outer door 330 to prevent further access to the package by the customer.

A89 ('220 Spec. 21:38-67) (annotations added). In both of the corresponding structures, a

microprocessor and a conveyor belt[30] are required. In the first corresponding structure, the item received sits on the conveyor belt and is detected by a photo cell sensor connected to the microprocessor, thus confirming that the item is the same item for which the label was printed. In the second corresponding structure, the item received sits on the conveyor belt and is reweighed by the scale and/or redimensioned



**Figure 7**. This excerpt from Figure 14 of the '220 patent illustrates the role of conveyor belt 340 and sensor 344 in performing the validating function.

by sensors connected to the microprocessor, thus confirming that the item is the same item for which the label was printed.

Uship's proposed construction of this limitation is completely flawed because it ignores the means-plus-function structure and argues that this limitation can be performed by attendants. As noted previously, the use of the word "means" raises a presumption of means-plus-function treatment, and Uship offers nothing in rebuttal. Furthermore, established Federal Circuit law holds that a human being cannot constitute the "means" of a means-plus-function limitation. See Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc., 412 F.3d 1291, 1300 (Fed. Cir. 2005) (citing Application of Prater, 415 F.2d 1393, 1398 (CCPA 1969)); see also Cardiac Pacemakers, 296 F.3d at 1118-19. Accordingly, the corresponding structure for this validating function should be limited to: (1) conveyor belt (340), microprocessor (382) connected to photo cell sensor (344); or

---

[30] The government's initial construction omitted conveyor belt (340) from the corresponding structure – a review of the intrinsic evidence demonstrates that the belt is required corresponding structure for this means-plus-function limitation.

(2) conveyor belt (340), and microprocessor (382) connected to scale (356) and/or dimensioning

sensors (346).

### 7.       *"Whereby a Validated Parcel or Envelope is Stored in a Secure Storage Area . . ." ('924/2)*

| '924 Independent Claim 2 *Disputed Independent Claim Limitation* whereby a validated parcel or envelope is stored in a secure storage area until said parcel or envelope is subsequently picked up for delivery. | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **validated** - determined or confirmed to be the package to be mailed **stored** - kept or held **secure** - safe from interception by unauthorized persons **storage area** - a place in which an item is deposited or held for subsequent use or disposition **delivery** - the carrying and turning over of parcels and envelopes to a designated recipient or address/location | *Plain Meaning* - where a validated parcel or envelope is stored in a secure storage area until the parcel or envelope is subsequently picked up for delivery | whereby a validated parcel or envelope is stored in a secure storage area until picked up for delivery. |

With respect to the final limitation in claim 2 of the '924 patent, the government contends

that the ordinary meaning of the claim language, as understood by a person of skill in the art, is

readily apparent.  See Phillips, 415 F.3d at 1314.  Accordingly, there is no need for the Court to

construe this limitation.

### CONCLUSION

The disputed claim terms of the '905, '464, '220, '014, and '924 patents should be construed

as set forth above.

Respectfully submitted,

TONY WEST
Assistant Attorney General

JOHN J. FARGO
Director


　s/Scott Bolden

Of Counsel:                          SCOTT BOLDEN
GARY L. HAUSKEN                      Senior Trial Counsel
DAVID M. RUDDY                      Commercial Litigation Branch
Department of Justice                Civil Division
MICHAEL F. KIELY                    Department of Justice
United States Postal Service         Washington, DC  20530
                                     Telephone:    (202) 307-0262
January 6, 2010                      Facsimile:    (202) 307-0345