**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| USHIP INTELLECTUAL PROPERTIES, LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 08-537 C |
| THE UNITED STATES, | ) | Judge Susan G. Braden |
| Defendant, | ) | |
| and | ) | |
| INTERNATIONAL BUSINESS MACHINES, CORP., | ) | |
| Third-Party Defendant. | ) | |

**IBM'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

**Table of Contents**

Page

I.    **INTRODUCTION & BACKGROUND** ..........................................................................1

II.   **LEGAL PRINCIPLES** ..........................................................................................5
      A.   Intrinsic Evidence ..............................................................................7
           1.   Claims .........................................................................................7
           2.   Specification .............................................................................9
           3.   Prosecution History.................................................................11
           4.   Abstract......................................................................................12
      B.   Extrinsic Evidence ................................................................................12
           1.   Dictionaries ...............................................................................13
           2.   Testimony ..................................................................................13
      C.   Means-Plus-Function Claims ...........................................................14

III.  **U.S. PAT. NO. 4,900,905 (PUSIC)** ..........................................................15
      A.   Introduction............................................................................................15
      B.   Claim 12...................................................................................................17
           1.   A method of processing and collecting mail with, and otherwise
                operating a self-contained computerized apparatus, comprising the
                steps of: ......................................................................................17
           2.   displaying information associated with the use of the apparatus
                such as the instructions for the use of said apparatus; ................24
           3.   receiving an item to be mailed;..................................................24
           4.   weighing the item to be mailed;..................................................30
           5.   admitting data relating to the item to be mailed such as the address
                to which the item is to be mailed; ..............................................34
           6.   determining the required postage for the item to be mailed; ....................36
           7.   accepting and verifying payment for said postage;....................37
           8.   providing machine readable information concerning the item to be
                mailed on the item to be mailed, such as the zip code to which said
                item is to be mailed; and ............................................................37
           9.   storing the item to be mailed for subsequent pick-up. ..............41

IV.   **THE RAMSDEN PATENTS** ..........................................................................45

V.    **U.S. PAT. NO. 5,481,464 (RAMSDEN)**..........................................................46
      A.   The Asserted Claims................................................................................48
      B.   Independent Claim 7 [and Dependent Claims 9-12, 15-18] ...................49
           1.   Independent Claim 7 ..................................................................49
           2.   Dependent Claim 9 ......................................................................77
           3.   Dependent Claim 10 ....................................................................79
           4.   Dependent Claim 11 ....................................................................80
           5.   Dependent Claim 12 ....................................................................81
           6.   Dependent Claim 15 ....................................................................81

7.      Dependent Claim 16: The integrated, automated, unattended unit of claim 15 wherein said fee communicating means includes means for validating said credit card prior to issuing the shipping label.................................................................................................................83

8.      Dependent Claim 17: The integrated, automated, unattended unit of claim 16 wherein said validating means includes means for determining the type of card and the expiration date of the card..............84

9.      Dependent Claim 18: The integrated, automated, unattended unit of claim 17 wherein said validating means further includes means for determining whether the card is listed as a bad card..........................85

C.      Independent Claims 19, 28, And 34 And Their Dependent Claims ......................85

    1.      Independent Claim 19 [And Dependent Claims 20 and 21]......................86

    2.      Independent Claim 28 [And Dependent Claims 29 and 30]......................89

    3.      Independent Claim 34 ................................................................................91

**VI.    U.S. PATENT NOS. 5,831,220, 6,105,014, AND 6,917,924 .....................................92**

A.      The '220 patent ....................................................................................................94

    1.      Claim 1 ......................................................................................................94

    2.      Claim 3 ....................................................................................................113

B.      U.S. Pat. No. 6,105,014 (Ramsden et al.) ...........................................................124

    1.      Independent Claim 1 ...............................................................................124

    2.      Independent Claim 2 ...............................................................................126

C.      U.S. Pat. No. 6,917,924 (Ramsden et al.) ...........................................................128

    1.      Independent Claim 1 ...............................................................................128

    2.      Independent Claim 2 ...............................................................................129

**VII.   EXTRINSIC INVENTOR TESTIMONY .....................................................................130**

**VIII.  CONCLUSION ............................................................................................................130**

Table of Authorities

Page(s)

**Cases**

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003) ......................................................................... 8, 103, 112

*Alloc, Inc. v. Int'l Trade Comm'n*,
342 F.3d 1361 (Fed. Cir. 2003) .................................................................................... 11

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003) ......................................................... 31, 34, 64, 65, 66

*Aristocrat Techs. Austl. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008) .............................................................................. Passim

*Asyst Techs, Inc. v. Empak, Inc.*,
268 F.3d 1364 (Fed. Cir. 2001) ............................................................................ 62, 66

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
132 F.3d 701 (Fed. Cir. 1997) ..................................................................................... 13

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) ............................................................................... 72, 75

*Biomedino LLC v. Waters Techs. Corp.*,
490 F.3d 946 (Fed. Cir. 2007) .................................................................. 14, 15, 118, 123

*Cardiac Pacemakers v. St. Jude Medical*,
296 F.3d 1106 (Fed. Cir. 2002) ......................................................................... 74, 78, 123

*DSW, Inc. v. Shoe Pavilion, Inc.*,
537 F.3d 1342 (Fed. Cir. 2008) .................................................................................... 28

*Eaton Corp. v. Rockwell Int'l Corp.*,
323 F.3d 1332 (Fed. Cir. 2003) .................................................................. 18, 19, 38, 50

*Edwards Lifesciences LLC v. Cook, Inc.*,
582 F.3d 1322 (Fed. Cir. 2009) ............................................................................. Passim

*Ekchian v. Home Depot, Inc.*,
104 F.3d 1299 (Fed.Cir. 1997) .................................................................................... 11

*Electro Sci. Indus., Inc. v. Dynamic Details, Inc.*,
307 F.3d 1343 (Fed. Cir. 2002) .............................................................................. 8, 18, 50

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
192 F.3d 973 (Fed.Cir. 1999) ...................................................................................... 12

*Gottschalk v. Benson*,
    409 U.S. 63 (1972)..................................................................... 20

*Halliburton Energy Serv., Inc. v. M–I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)................................................... 63

*Hill–Rom Co., Inc. v. Kinetic Concepts, Inc.*,
    209 F.3d 1337 (Fed. Cir. 2000) .................................................. 12

*Hockerson–Halberstadt, Inc. v. Avia Group Int'l, Inc.*,
    222 F.3d 951 (Fed.Cir. 2000)...................................................... 11

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006).............................................Passim

*Honeywell Int'l, Inc. v. United States*,
    66 Fed. Cl. 400 (2005) ......................................................... 18, 50

*In re Cruciferous Sprout Litig.*,
    301 F.3d 1343 (Fed. Cir. 2002) .................................................... 9

*In re Hyatt*,
    708 F.2d 712 (Fed. Cir. 1983)..................................................... 72

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008) .................................................... 7

*Jonsson v. Stanley Works*,
    903 F.2d 812 (Fed. Cir. 1990)........................................ 47, 99, 108

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
    424 F.3d 1324 (Fed. Cir. 2005) ...........................................Passim

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
    545 F.3d 1340 (Fed. Cir. 2008) ............................... 24, 27, 33, 108

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354 (Fed. Cir. 2004)............................................. 64, 65

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
    324 F.3d 1308 (Fed. Cir. 2003)............................................Passim

*Loral Fairchild Corp. v. Sony Corp.*,
    181 F.3d 1313 (Fed. Cir. 1999)........................................ 25, 31, 34

*Mangosoft, Inc. v. Oracle Corp.*,
    525 F.3d 1327 (Fed. Cir. 2008) ........................................ 12, 22, 27

*Markman v. Westview Instr., Inc.*,
    517 U.S. 370 (1996) ......................................................................... 5, 6, 7, 13, 24

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007) ................................................................ 12, 19, 22

*Medrad, Inc. v. MRI Devices Corp.*,
    401 F.3d 1313 (Fed. Cir. 2005) ...................................................................... 8

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) .................................................................... 24

*Microsoft Corp. v. Multi–Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004) .................................................................... 11

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
    133 F.3d 1473 (Fed. Cir. 1998) ..................................................................... 7, 9

*N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*,
    7 F.3d 1571 (Fed. Cir. 1993) .................................................................. 9, 13, 130

*Netword, LLC v. Centraal Corp.*,
    242 F.3d 1347 (Fed. Cir. 2001) ............................................................. 6,10, 102

*Nystrom v. TREX Co., Inc.*,
    424 F.3d 1136 (Fed. Cir. 2005) .................................................................... 9, 10

*O.I. Corp. v. Tekmar Co., Inc.*,
    115 F.3d 1576 (Fed. Cir. 1997) ..................................................................... 58

*On Demand Machine Corporation v. Ingram Industries, Inc.*,
    442 F.3d 1343 (Fed. Cir. 2006) .................................................................... 95

*Ormco Corp. v. Align Techs., Inc.*,
    498 F.3d 1307 (Fed. Cir. 2005) ................................................................. Passim

*Pause Tech. LLC v. TiVo, Inc.*,
    419 F.3d 1326 (Fed. Cir. 2005) .................................................................. 8, 112

*Phillips v AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................. Passim

*Pitney Bowes, Inc. v. Hewlett Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999) ................................................................. Passim

*PSN Ill., LLC v. Ivoclar Vivadent, Inc.*,
    525 F.3d 1159 (Fed. Cir. 2008) ................................................................. Passim

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ..................................................... 6, 27, 98

*Rheox, Inc. v. Entact, Inc.*,
    276 F.3d 1319 (Fed. Cir. 2002) ...................................................... 11, 12, 43

*SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys.*,
    242 F.3d 1337 (Fed. Cir. 2001)........................................................ Passim

*Seachange Int'l, Inc. v. C–COR, Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005)............................................................. 9, 54

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995) ......................................................... Passim

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
    329 F.3d 823 (Fed. Cir. 2003) ......................................................... 9, 19, 50

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*,
    222 F.3d 958 (Fed. Cir. 2000) ................................................................. 12

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
    529 F.3d 1364 (Fed. Cir. 2008)............................................................... 112

*United States Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997)................................................................. 6

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)............................................................. 7, 11

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
    200 F.3d 795 (Fed. Cir. 1999) ......................................................... 6, 27, 56

*Wang Labs., Inc. v. Am. Online, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999)............................................................... 12

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)............................................. 61, 62, 79, 117

**Statutes**

35 U.S.C. § 112 ................................................................................... Passim

## TABLE OF EXHIBITS

| Exhibit | Document Description |
|---------|---------------------|
| A | U.S. Patent No. 4,900,905 (Pusic) |
| B | Excerpts from U.S. Patent No. 4,900,905 File History |
| C | U.S. Patent No. 5,481,464 (Ramsden) |
| D | Excerpts from U.S. Patent No. 5,233,532 File History |
| E | Excerpts from U.S. Patent No. 5,656,799 File History |
| F | U.S. Patent No. 5,831,220 (Ramsden, Liles) |

## I.     INTRODUCTION & BACKGROUND

On July 23, 2008, Uship Intellectual Properties, LLC ("Uship") sued the United States Post Office in this Court alleging that the Post Office's Automated Postal Center ("APC") infringes eight patents containing 166 claims.  The Post Office purchases the APC from IBM and, at the Post Office's request, the Court issued a notice under Rule 14 of the Rules of the Court of Federal Claims inviting IBM to participate as an interested party.  On January 26, 2009, IBM answered Uship's Complaint and has participated in this action ever since.

Uship, the plaintiff in this action, is a patent holding company.  Although a number of the asserted patents were issued to U-Ship, Inc., that company is not the same as the plaintiff here. U-Ship, Inc., which plaintiff identifies as a "predecessor," allegedly was in the business of selling kiosks.  On the other hand, the plaintiff does not make or sell anything.  It is what is commonly referred to as a non-practicing entity—a company that exists to extract revenues from companies participating in the market.

In April 2009, Uship dropped 3 of the patents it originally asserted and now asserts 23 claims from the five remaining patents.  The patents-in-suit are United States Patent Nos. 4,900,905 ("the '905 patent"); 5,481,464 ("the '464 patent"); 5,831,220 ("the '220 patent"); 6,105,014 ("the '014 patent"); and 6,917,924 ("the '924 patent).  The '905 patent issued to named inventor Pusic and was acquired subsequently by Uship.  The '464 patent issued to named inventor Ramsden and the '220, '014, and '924 patents issued to named inventors Ramsden and Liles; all were assigned to the predecessor U-Ship, Inc. and later assigned to the plaintiff.

On August 14, 2009, Uship provided its proposed terms to be construed, proposed constructions for those terms, and alleged support for its proposed constructions.  On October 9, IBM and the Government responded.  On October 28, at IBM's suggestion, the parties met and conferred in an attempt to limit the number of claim terms for the Court to construe.  On

November 2, the parties filed a Joint Claim Construction Statement setting forth proposed constructions of the claim terms still in dispute and for terms upon which the parties had agreed. On November 18, Uship filed its 151-page opening claim construction brief.[1]  Notably, in its brief,  (1) many of Uship's proposed constructions are different from those disclosed in the parties' Joint Claim Construction Statement, or (2) Uship argues for the first time that certain terms need not be construed.  Regardless, IBM will address the pertinent constructions set forth in Uship's brief.

Uship's claim constructions are fundamentally flawed—they are the product of a claim construction methodology that the Federal Circuit has expressly rejected.  Throughout, Uship begins by offering "ordinary and customary meanings" for disputed terms *derived from general purpose dictionaries* and then (if at all) consults the remaining intrinsic record to see whether it disavows or disclaims some portion of the dictionary definition.  As a result, Uship's proposed constructions are impermissibly abstract and divorced from the patents-in-suit.  There was a brief time when courts employed such a methodology, but that came to an end when the Federal Circuit issued its landmark decision in *Phillips v AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  *Phillips* explicitly held that the "ordinary meaning" of a claim term is best determined by consulting a patent's intrinsic record—not cherry-picked extrinsic dictionary definitions.

*Phillips* recognized that focusing the claim construction inquiry on the intrinsic record is the only way to assure that courts arrive at constructions that are consistent with "what the inventors actually invented and intended to envelop with the claim." *Id*. at 1316.  *Phillips* did so because primary reliance on dictionaries leads to abstract definitions untethered from the

---

[1] Without seeking leave, Uship filed a 151-page brief far in excess of this Court's rule limiting briefs to 40 pages, *see* RCFC 5.4(b)(1).

invention described and claimed in the patent.  *Id*. at 1321.  And that is exactly what Uship urges this Court do: adopt abstract constructions that bear no relationship to the inventions described in the asserted patents or their prosecution histories.  Not only does Uship primarily rely on dictionaries, it impermissibly uses the intrinsic record as merely a check on its dictionary definitions and it reflexively criticizes nearly every citation to the intrinsic evidence as an attempt to read limitations into the claims.  Uship misleadingly confuses reading limitations into the claims with using the intrinsic record, as the Federal Circuit has mandated, to construe the limitations that explicitly appear in the claims.  The Court must, as a matter of law, construe the disputed elements and in doing so it must focus on the intrinsic evidence—the claims, specification and the prosecution histories of the patents-in-suit—not dictionaries.

Uship makes numerous additional claim construction errors as well.  For example, a number of the claims are written in means-plus-function format pursuant to 35 U.S.C. § 112, ¶ 6. Such claims must be construed consistently with the dictates of the statute and the precedent interpreting the statute.  Uship, however, often ignores the fact that terms are written in means-plus-function format or fails to apply the correct methodology in interpreting such claims.  Usually, Uship simply reverts to its default methodology and provides dictionary definitions of means elements even though such structural elements must, as a matter of law, be defined by reference to the specification and cannot be defined using a dictionary.

Moreover, for the first time, Uship argues that the Court should not construe any of the disputed claim preambles.[2]  Without a shred of analysis, Uship repeats the same formula for each preamble alleging "the body of the claim fully and intrinsically identifies all of the limitations of

---

[2] In its Proposed Claim Construction Statement, Uship proposed constructions for the preambles of every asserted claim.  Uship did not deviate from this position during the meet and confer or the parties' Joint Claim Construction Statement.  Until its brief, Uship never alleged that the disputed preambles need not be construed.

the claimed invention," and that "the preamble merely encapsulates the main limitations found in the body of the claim." (*E.g.*, Uship Br. at 26.) This makes no sense, it is exactly because the disputed preambles contain structural elements that appear later in the bodies of the claims that they must, as a matter of law, be construed as limitations.

Uship also asks the Court to construe nearly every other claim term (often providing nothing more than unhelpful synonyms) no matter how innocuous the claim term; and even where the terms are clear on their face or construing the term would not help resolve a claim or defense. This insistence on making the Court construe irrelevant terms resulted in Uship filing a 151 page opening brief to which IBM and the Government must respond. But the Federal Circuit has made clear that claim construction is not an exercise in redundancy, that only terms that matter need be construed and only when the construction would help resolve the case.

IBM is concerned that Uship's insistence on construing nearly every claim term may potentially obfuscate the issues in this action. Accordingly, IBM identifies the following subset of terms it believes are most likely to be dispositive of this action. With respect to the '905 patent:

- The construction of the preamble. *See infra* § III.B.1.b;

- The construction of the "receiving" step. *See infra* § III.B.3;

- The construction of the "weighing" step. *See infra* § III.B.4;

- The construction of the "providing machine readable information . . . on the item" step. *See infra* § III.B.8

- The construction of the "storing" step. *See infra* § III.B.9.

With respect to the '464 patent:

- The construction of the preamble. *See, e.g.*, *infra* § V.B.1.a;

- The "means for securely storing" elements. *See, e.g.*, *infra* § V.B.1.g; and

- The "means for storing the inputted information once said item is disposed" elements.  *See, e.g.*, *infra* § V.B.1.h.

With respect to the '220, '014, and '924 patents:

- The construction of the preambles.  *See, e.g.*, *infra* § VI.A.1.a;

- The construction of the "destination"- and "means for validating"-related limitations.  *See, e.g.*, *infra* § VI.A.1.e;

- The construction of the "computing . . . a delivery date" limitations.  *See, e.g.*, *infra* § VI.A.1.f; and

- The construction of the "validating"-related limitations.  *See, e.g.*, *infra* § VI.A.1.j.

Although the construction of additional limitations may also dispose of this matter, IBM hopes that the foregoing list assists the Court in sifting through the many disputes arising from Uship's choice to needlessly construe most of the terms in the asserted claims.

In sum, Uship's proposed claim constructions result from a number of legally incorrect and often discredited methodologies.  IBM, by contrast, construes the claims by rigorously applying the dictates of *Phillips* and the other controlling Federal Circuit precedent.  IBM has focused on terms that actually need to be construed and each of its proposed constructions is supported by the intrinsic evidence.  IBM submits that resorting to extrinsic evidence is unnecessary—a review of the intrinsic record suffices to construe each of the disputed terms without ambiguity.  IBM respectfully requests that the Court adopt its proposed constructions legal principles of claim construction.

## II.    LEGAL PRINCIPLES

Patent claims serve the function of "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. § 112, ¶ 2.  Accordingly, patent suits often "necessitate[] a determination of what the words in the [patent] claim mean."  *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 374 (1996) (internal citations omitted).  This

determination, called "'[c]laim construction[,]' is the judicial statement of what is and is not covered by the technical terms and other words of the claims." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001). "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (internal citations omitted).

That being said, it is unnecessary under *Markman* for the trial court to construe every term in asserted claims:

> The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term . . . .  Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  ***It is not an obligatory exercise in redundancy.***[3]

*United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Thus, only "[w]hen the meaning or scope of a patent claim is in dispute the court construes the claim as a matter of law." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999).

In construing claims, the Court may look to two categories of evidence: (1) that intrinsic to the patent and (2) that extrinsic to the patent.  The intrinsic record consists of the claims, specification, and the prosecution histories of the patents-in-suit.  The extrinsic record consists of dictionaries, treatises, expert testimony, inventor testimony, and all other sources outside the public record intrinsic to the patent.  The Federal Circuit has indicated a strong preference for constructions based on the intrinsic record.

---

[3] All emphases added unless otherwise noted.

A.      Intrinsic Evidence

The Federal Circuit repeatedly has held that to "determin[e] the meaning of a disputed claim limitation, we look primarily to the intrinsic evidence of record, examining the claim language, the written description, and the prosecution history."  *See, e.g.*, *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008) (citing *Phillips*, 415 F.3d at 1312); *Vitronics Corp. v. Conceptronic*, *Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  ("It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history . . . . Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.").  The extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317.  Focus on extrinsic evidence risks undermining the public notice function of patents. *Id*. at 1319; *see also Markman*, 517 U.S. at 373 ("[A] patent must . . . apprise the public of what is still open to them.").

1.      Claims

Claim terms "are generally given their ordinary and customary meaning." *Id*. at 1312 (internal citations omitted).  That is the "meaning that the term would have to a person of ordinary skill in the art . . . as of the effective filing date of the patent application." *Id*. at 1313.  That ordinary and customary meaning is determined first by reference to the intrinsic evidence. *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) ("[T]he court starts the decision-making process by reviewing the same resources as would [the person of ordinary skill], the patent specification and prosecution history").  Likewise, the Federal Circuit has held that "we must look at the ordinary meaning in the context of the written description and

the prosecution history." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).

Further, the Federal Circuit has stated that "the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003). It is not proper to interpret "a single element in isolation." *Pause Tech. LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005). For example, "[d]ifferences among claims can be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314.

Conversely, it is ***improper*** to rely primarily on extrinsic evidence, such as dictionaries, to ascertain the ordinary meaning of a disputed term. Doing so "focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan ***after reading the entire patent.***" *Id.*

### a.       Preamble

A claim's preamble is the part of the claim that comes before a transitional phrase such as "comprising" or "consisting." The preamble has the "import that the claim as a whole suggests for it." *Pitney Bowes, Inc. v. Hewlett Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (internal citations omitted). In some "circumstance[s], there is no meaningful distinction between the claim preamble and the rest of the claim, for only together do they comprise the 'claim.'" *Id.* For example, when limitations in the body of the claim "rely upon and derive antecedent basis" from the preamble, the preamble limits the claim. *Electro Sci. Indus., Inc. v. Dynamic Details, Inc.*, 307 F.3d 1343, 1348 (Fed. Cir. 2002) (holding that "circuit board" as used in the claims derived antecedent basis from the preamble; therefore the claim was limited by the preamble). Similarly, when the prosecution history indicates reliance on the preamble for

8

patentability, the preamble is a limitation. *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 835 (Fed. Cir. 2003); *see also In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1348 (Fed. Cir. 2002) ("Clear reliance by the patentee on the preamble to persuade the Patent Office that the claimed invention is not anticipated by prior art . . . the preamble is a limitation of the claims.").

### b.      Claim Differentiation

The doctrine of claim differentiation creates a presumption that independent claims do not contain limitations that appear in a dependent claim. *Phillips* at 1314-15. However, the Federal Circuit repeatedly has warned against allowing this "rule of thumb" to trump the intrinsic evidence. *See, e.g.*, *Edwards Lifesciences LLC v. Cook, Inc.*, 582 F.3d 1322, 1332 (Fed. Cir. 2009); *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005). "[T]he doctrine only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) (internal quotations omitted). If the intrinsic record indicates that a term should be construed in a particular manner then the doctrine of claim differentiation must give way. *Multiform Desiccants,* 133 F.3d at 1480 ("[T]he doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence . . . . [C]laims that are written in different words may ultimately cover substantially the same subject matter."). As the Federal Circuit has stated: "[t]he dependent claim tail cannot wag the independent claim dog." *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993).

### 2.      Specification

"The claims, of course, do not stand alone, [but] must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (internal citations omitted). The importance of the specification derives from its statutory role in providing "a written

description of the invention . . . in . . . full, clear, concise, and exact terms . . . ." 35 U.S.C. § 112, ¶ 1.   In light of this statutory directive, the "specification necessarily informs the proper construction of the claims," *Phillips*, 415 F.3d at 1316, and the claims do not have meaning outside of the context of the specification, *Netword*, 242 F.3d at 1352.   Accordingly, "the specification is always highly relevant to the claim construction analysis [and] is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal citations omitted).

The specification provides context for the claims and acts as a dictionary so that one of skill in the art may understand the scope of the claimed invention.   *Id*. at 1321.   Often the specification provides the scope of a claim term by defining "the invention" or explaining how "the present invention" works.   *See, e.g.*, *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (construing "fuel injection system component" as "fuel filter" because the written description indicated that the "invention" was a fuel filter); *SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys.*, 242 F.3d 1337, 1343-45 (Fed. Cir. 2001) (construing "catheter" as "coaxial lumen catheter" based on the written description).   Indeed, when a given structure is characterized as part of "the present invention[, this is] **strong evidence** that the claims should not be read to encompass the opposite structure." *SciMed Life Sys.*, 242 F.3d at 1343.   When the specification consistently uses a term in a specific manner the term is not entitled to a broader scope even though it may have a broader definition in the abstract.   *Edwards Lifesciences LLC*, 582 F.3d at 1330 (construing "graft" to be an "intraluminal graft"); *Nystrom*, 424 F.3d at 1144 (rejecting the dictionary definition of "board" and construing the term to mean "wood board" based on the specification).   In this respect, the Federal Circuit "looks to . . . whether the specification read as a whole suggests that the very character of the invention requires [a] limitation be a part of every embodiment." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361,

1370 (Fed. Cir. 2003); *Microsoft Corp. v. Multi-Tech Sys., Inc*., 357 F.3d 1340, 1348 (Fed. Cir. 2004) (holding that specification statements, including those found in the "Summary of the Invention," that "broadly describe the overall invention[]" are limiting).

### 3.    Prosecution History

"The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed.Cir. 2000).   As "the record before the Patent and Trademark Office[, the prosecution history] is often of ***critical significance*** in determining the meaning of the claims." *Vitronics*, 90 F.3d at 1952.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317

When an applicant makes arguments to the Patent Office to secure issuance of a patent those arguments can be used to define the scope of the patent.  *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002) ("Explicit arguments made during prosecution to overcome prior art can lead to narrow claim interpretations."); *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed.Cir. 1997) ("[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection."); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("[T]he prosecution history limits the interpretation of a claim terms so as to exclude any interpretation that was disclaimed during prosecution.").

Amendments to the claims or arguments to the examiner, which ascribe certain significance to terms in a claim to distinguish prior art cannot be recaptured to effectively ignore what was disclaimed during prosecution. *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1332-

11

33 (Fed. Cir. 2008); *see also MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007) (construing a preamble limitation consistent with arguments to the PTO made to distinguish prior art).  Because the prosecution history is generated after the written description, it can trump the specification.  *Rheox*, 276 F.3d at 1327.  Specifically, if the patent applicant makes narrowing arguments during prosecution, then the patentee cannot later recapture subject matter even if disclosed in the specification.  *Id*.

"[A]rguments made during prosecution regarding the meaning of a claim term are relevant to the interpretation of that term in every claim of the patent absent a clear indication to the contrary." *Southwall Techs.*, 54 F.3d at 1579.  Likewise, the prosecution histories of related patents can limit the scope of claim terms.  *Ormco Corp. v. Align Techs., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2005).  Prosecution history disclaimer "applies with equal force to subsequently issued patents that contain the same claim limitation."  *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed.Cir. 1999).  This applies to continuation-in-part patents as well as continuation patents, so long as the subject matter is the same.  *See Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1384 (Fed. Cir. 1999).

### 4.    Abstract

The Abstract, found on a patent's cover is a "potentially helpful source of intrinsic evidence as to the meaning of claims." *Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.1 (Fed. Cir. 2000).  For this reason, courts have "frequently looked to the abstract to determine the scope of the invention." *Id*.; *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 966 n.2 (Fed. Cir. 2000).

### B.    Extrinsic Evidence

When construing claims, a court may consider certain "extrinsic evidence," including "expert and inventor testimony, dictionaries and learned treatises." *Phillips*, 415 F.3d at 1317

(internal citations omitted).  But the Federal Circuit views "extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1318.  This is because "extrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning." *Id.*  For this reason, extrinsic evidence may not be used in derogation of the "indisputable public records" consisting of the sources of intrinsic evidence. *Id.* at 1319 (internal citations removed).  Accordingly, extrinsic evidence cannot contradict the "construction of the claims based on the specification and prosecution history." *Markman*, 52 F.3d at 981.

### 1.      Dictionaries

Technical dictionaries may sometimes be helpful to a court to understand the underlying technology at issue.  *Phillips*, 415 F.3d at 1318.  On the other hand, "[g]eneral [purpose] dictionaries, in particular, strive to collect all uses of particular words . . . [thus] it is inevitable that the multiple dictionary definitions for a term will extend beyond" the intrinsic evidence. *Id.* at 1321-22.

### 2.      Testimony

Another form of extrinsic evidence is inventor or expert testimony.  Such testimony is suspect because it is "generated at the time of and for the purpose of litigation and thus can suffer from bias." *Id.* at 1318; *see also Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) ("The testimony of an inventor and his attorney concerning claim construction is thus entitled to little or no consideration. The testimony of an inventor is often a self-serving, after-the-fact attempt to state what should have been part of his or her patent application.").  Inventor testimony is particularly unpersuasive, and must be rejected when at odds with the patent and prosecution history. *N. Am. Vaccine*, 7 F.3d at 1577 ("[A]fter-the-fact

testimony [by the inventor] is of little weight compared to the clear import of the patent disclosure itself.").[4]

## C.      Means-Plus-Function Claims

A number of elements or limitations in the asserted claims are written in a special format, called "means-plus-function" format.  By statute, means-plus-function claim elements are construed differently from regular, non-means-plus-function claim elements.  More specifically, means-plus-function elements are expressed as a "***means*** . . . for performing a specified ***function*** without the recital of structure."  35 U.S.C. § 112, ¶ 6.  To construe means-plus-function elements, the first step is to construe the specified function.  *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).  In this regard, the court may not adopt "a function different from that explicitly recited in the claim," *id*. at 1331, and may not broaden the claimed function by construing less than the whole function, *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003).  After construing the function, the second step is to "identify the corresponding structure in the written description that performs that function."  *JVW Enters*., 424 F.3d at 1330.  The claimed means is that ***specific structure*** in the specification that ***clearly corresponds to the claimed function***.  *Biomedino LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 (Fed. Cir. 2007).

Specific structure in return for generic means claiming is "often referred to as the *quid pro quo* for the convenience of employing § 112, ¶ 6."  *Id*. at 948 n.1.  Importantly, if the applicant fails to clearly disclose structure in the specification corresponding to the claimed function, then the applicant has failed to satisfy the statutory "quid pro quo," and, accordingly

---

[4] In this regard, Uship now offers the testimony of Kenneth Liles, a named inventor of the '220, '014, and '924 patents.  As discussed *infra* § VII, such self-serving inventor testimony is untimely, irrelevant, and unhelpful.

the claim is invalid for indefiniteness under § 112, ¶ 6.  *Id*. at 950.  This is true regardless if the knowledge of one of ordinary skill in the art can supply sufficient corresponding structure.  *Id*. at 950-953.  "To conclude otherwise would vitiate the language of the statute."  *Id.*

In view of the Federal Circuit's guiding principles on claim construction, as set forth above, IBM construes the terms of the asserted patents.  Because IBM's constructions are based on the correct principles, whereas Uship's proposals are not, IBM respectfully requests that the Court adopt its constructions.

## III.   U.S. PAT. NO. 4,900,905 (PUSIC)

### A.   Introduction

The '905 patent, entitled "Automated Mail Collecting and Telecommunication Machine," issued on February 13, 1990 to Pavo Pusic.  Uship now asserts only method claim 12.

According to the patent specification, the '905 patent improves on prior art "[c]onventional postage metering and stamping machines" that "have the ability to weigh envelopes, package mailings and to stamp the postage on an envelope."  ('905 patent, 1:25-28.) Indeed, the '905 patent states that an "object of the present invention is to improve the entire mailing process from the point of acceptance to the point of delivery for almost all kinds of postcards, envelopes, and packages."  (*Id.* at 1:52-55.)  To achieve these stated goals, the '905 patent allegedly "provid[es] an ***automated*** machine for the collection and stamping of mail."  (*Id.* at 1:21-23.)  When using the alleged invention of the '905 patent, once a customer "inserts" a "mailing" into the "self-contained computerized apparatus" the described and claimed apparatus takes over the processing of the parcel.  The '905 patent itself describes the alleged invention:

> The ***present invention*** enables the electronic weighing of a mailing to be performed automatically and securely, ***without the possibility for a customer to influence the weighing, and the postage is automatically calculated according to the mailing weight data*** and the destination data entered on the keyboard.  Therefore,

15

according to the process of the ***present invention***, there is no possibility for a higher or lower postage being calculated and since each mailing can be returned to the customer in the case of insufficient postage paid or data entered, no further check as to whether the postage was paid is necessary.

(*Id.* at 2:1-12.)

The patented "invention" is shown in Figure 1 of the '905 patent:



('905 patent, Fig. 1.)  A customer begins the mailing process by selecting the machine for mail (as opposed to another function such as payphone).  (*Id*. at 6:27-28.)  The machine responds by instructing the customer to insert the envelope into slot 12 (shown above).  (*Id*. at 6:31-32.)  Once the machine receives the envelope at 12, the envelope is then transported inside the apparatus (from left to right) until it is positioned on a scale and weighed.  (*Id*. at 6:51-54.)  At this time, the machine requests the customer to enter destination data on keyboard 6 (shown above).  (*Id*. at 6:54-57.)  The machine then computes a postage charge based on weight, destination and any special service.  (*Id*. at 6:68-7:4.)  The machine receives a payment if necessary, using coin slot 2, bill acceptor 3, or card reader 4 (all shown above) and verifies it. (*Id*. at 7:6-19.)  Assuming payment is made, the machine next transports the envelope to a thermal printer so that a machine readable bar code containing, for example, the zip code, is

16

printed on the envelope.  (*Id*. at 7:43-68.)  Finally, in the last step, the machine stores the envelope by transporting the envelope into "a storage box" until subsequent pick-up.  (*Id.* at 8:16-34.)  At no time during this process does the customer handle the envelope.  Thus, the patent describes the alleged invention as both one-stop and as preventing the customer from influencing or affecting the mailing process.

While prosecuting the '905 patent before the PTO, the applicant confirmed that his alleged invention was directed to a method of using a "one-stop" computerized apparatus.  Specifically, when the inventor filed his application, he submitted 16 claims.  The PTO rejected all of those original 16 claims as unpatentable over the prior art.  ('905 Pros. Hist., 4/20/89 O.A. at 2, G001558.)  In response, the inventor cancelled all of the original claims and added 15 new claims (claims 17-32)—of which, newly added claim 28 issued as asserted claim 12—arguing that those new claims were patentable over the prior art.  ('905 Pros. Hist., 8/14/89 Amendment at 2-8, G001667-73.)  Specifically, in asserting that the newly added claims, including asserted claim 12, were different from the prior art cited by the PTO, the patentee argued that:

> ***The present invention, as set forth in its new claims, discloses a "one-stop" mailing apparatus,*** . . . .  Once a customer enters a package into the receiving means of the disclosed apparatus, the apparatus takes over and with minimal consumer input weighs the item, calculates the postage required, accepts and verifies payment for the required postage, provides the item with machine readable information, and then stores the item for subsequent pickup.

('905 Pros. Hist., 8/14/89 App. Remarks at 9-10, G001675.)

      **B.**    **Claim 12**

          **1.**    **A method of processing and collecting mail with, and otherwise operating a self-contained computerized apparatus, comprising the steps of:**

| Joint Proposal of Parties |
|---|
| processing - plain meaning |

17

collecting - plain meaning

mail - plain meaning

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **operating** - manually using<br><br>**self-contained computerized apparatus** - a group or combination of instruments, machinery, tools, or materials having a particular function or functions, which group or combination is complete in itself, and with at least some of those functions, or portions of those functions, being controlled, directed, or processed by means of a computer or similar device | **operating a self-contained computerized apparatus:** a device or a group of devices having a particular function or functions, which group is complete in itself, and which functions are controlled or carried out by means of a computer | A series of steps for processing and collecting mail with, and otherwise operating a one-stop, fully integrated, automated apparatus |

The preamble states that which is claimed: "[a] method of processing and collecting mail with, and otherwise operating a self-contained computerized apparatus." This Court should construe the preamble as "[a] series of steps for processing and collecting mail with, and otherwise operating a one-stop, fully integrated, automated apparatus."

### a.    The Preamble Is A Limitation

In contrast to both its initial claim construction statement and the joint claim construction statement, Uship now argues in its brief that the preamble is not a limitation. (Uship Br. at 9.) Uship's new position is wrong as a matter of law. The preamble is a limitation for at least two independent reasons. First, the preamble to claim 12 is a limitation because limitations in the body of the claim "rely upon and derive antecedent basis" from the preamble.[5] *See Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339-42 (Fed. Cir. 2003); *Electro Sci.*, 307 F.3d at 1348; *Honeywell Int'l, Inc. v. United States*, 66 Fed. Cl. 400, 436 (2005). In *Eaton*, the preamble at

---

[5] Antecedent basis means that any element referred to in a claim as "the" element or "said" element must have been previously identified in the claim. For example, a claim term lacks antecedent basis when it "refers to 'said lever' or 'the lever,' where the claim contains no earlier recitation or limitation of a lever . . . ." *See* Manual of Patent Examining Procedure ("MPEP") § 2173.05(e) ("Lack of Antecedent Basis").

issue defined a "method for controlling an automatic mechanical vehicle driveline system," and the body of the claim recited "steps . . . require[ing] the manipulation of particular structures that are identified and described only by the preamble . . . ." 323 F.3d at 1340. Similarly, here the preamble recites a "self-contained computerized apparatus." The body of the claim then recites the step of "displaying information associated with the use of **_the apparatus_** such as the instructions for the use of **_said apparatus_**." "The apparatus" and "said apparatus" refer to the "self-contained computerized apparatus" in the preamble. As a result, as in _Eaton_, the method calls for method steps manipulating the structure defined by the preamble. Accordingly, the preamble is a limitation that must be construed.

Second, the preamble is a limitation because the inventor explicitly relied on the addition of the preamble during prosecution to distinguish his alleged invention over prior art. *See MBO Labs.*, 474 F.3d at 1330; *Storage Tech.*, 329 F.3d at 835. In *MBO Laboratories*, for example, the applicant represented to the PTO that the difference between his invention and the prior art was found in the preamble term "[a] method of immediately . . . precluding needle-stick injury." 474 F.3d at 1328. The Federal Circuit held the preamble to be a limitation because the applicant specifically relied on the on the "immediate" feature of the preamble in distinguishing the prior art meant that the claims had to be construed to require that preamble feature. *Id*. Similarly, here the applicant amended the preamble, substituting "self-contained computerized apparatus" for "automated machine," and told the Patent Office that:

> **_The present invention, as set forth in its new claims, discloses a "one-stop" mailing apparatus_** . . . . Once a consumer enters an envelope or package into the receiving means of the disclosed apparatus, the apparatus takes over and with minimal consumer input weighs the item, calculates the postage required, accepts and verifies payment for the required postage, provides the item with machine readable information, and then stores the item for subsequent pick-up.

19

('905 Pros. Hist., 8/14/89 App. Remarks at 10, G001675.)  The applicant then argued that claim 28's "one-stop" computerized apparatus was different from the prior art:

> None of the references relied upon by the Examiner, whether taken singly or collectively, either disclose or suggest the apparatus for collecting an item to be mailed as claimed in the new Claim 17 ***or . . . the method of operating a computerized apparatus as claimed in [issued claim 12] of the present invention***.

(*Id*., 8/14/89 App. Remarks at 12, G001677.)  Because Pusic distinguished the "new claims," including asserted claim 12, from the prior art based on the amended preamble's "self-contained apparatus limitation," the preamble is a limitation that must be construed.

### b.        Construction Of The Preamble

IBM's construction of the preamble as "[a] series of steps for processing and collecting mail with, and otherwise operating a one-stop, fully integrated, automated apparatus"  is consistent with the intrinsic evidence, and uses the exact language  the applicant used to describe the "present invention" to the PTO.  The public has a right to rely on the applicant's explicit definition of "the invention."

### i.        Claim Language

Claim 12 is a method claim that recites a series of "steps" for performing a "method of processing and collecting mail with . . . a self-contained, computerized apparatus."  By definition a method claim is written as a series of steps.  *See Gottschalk v. Benson*, 409 U.S. 63, 70 (1972). The limitations that follow are written as steps performed by the self-contained computerized apparatus—"displaying information . . ."; "receiving an item . . ."; "weighing the item . . ."; "admitting data relating to the item . . ."; and concluding with the self-contained computerized apparatus "storing the item to be mailed for subsequent pickup."  The apparatus is "self-contained" because it does everything from receiving the item to storing it.

### ii.        Specification and Abstract

The specification supports IBM's position that the claimed "self-contained computerized apparatus" is a one-stop, fully integrated apparatus, because the description of the "present invention" found in the "SUMMARY OF THE INVENTION" says it is:

> For use as a mail collecting apparatus and according to the present invention, the machine is able to accept postcards, envelopes and postal packages, weigh them by an electronic means, print destination data on them . . . and store them for subsequent pick-up.

('905 patent, 3:57-64; *see also id.* at Abstract ("The ***present invention discloses an automated mail collecting machine*** comprising the functions of an automated, electronically controlled postage meter").)  The specification clearly and unambiguously describes that the claimed "self-contained computerized apparatus" performs the recited steps of accepting mail, weighing the mail, printing destination data on the mail, and then storing the mail for pickup.  It does not describe an "automated" machine where the customer is performing these steps.  This description of the present invention is "strong evidence" that this is the scope of the invention.  *See, e.g.*, *Edwards Lifesciences*, 582 F.3d at 1330 (construing "grafts" as "intraluminal grafts"); *Honeywell Int'l*, 452 F.3d at 1318 (construing "fuel system component" as "fuel filter" because the written description indicated that the "invention" was a fuel filter); *SciMed Life Sys.*, 242 F.3d at 1343.

### iii.       Prosecution History

The prosecution history of the '905 patent is particularly instructive because the applicant added the term "self-contained computerized apparatus" to the claim in an amendment to overcome a rejection by the PTO and then explicitly defined the claimed invention as one where the customer enters the mailing into the claimed apparatus and then the machine takes over "with minimal consumer input."  IBM's proposed construction mirrors the patentee's representation to the PTO defining his claimed invention:

21

> *The present invention, as set forth in its new claims, [including issued claim 12,] discloses a "one-stop" mailing apparatus* . . . . Once a consumer enters an envelope or package into the receiving means of the disclosed apparatus, the apparatus takes over and with minimal consumer input weighs the item, calculates the postage required, accepts and verifies payment for the required postage, provides the item with machine readable information, and then stores the item for subsequent pick-up. Furthermore, *the "one-stop" mailing apparatus as disclosed in the present invention is of a compact, fully integrated, and secure design* so that it can safely, easily, and conveniently located in public areas such as shopping malls, train stations, and airports.

*   *   *

> The [prior art] bulk systems disclosed therein are specifically adapted for use with large amounts of mail in mailrooms . . . and can not [sic] be adapted for use in a public place by an ordinary consumer . . . .  On the other hand, *the present invention discloses just such an apparatus allowing for "one-stop" mailing* by ordinary consumers . . . .

('905 Pros. Hist., 8/14/89 App. Remarks at 10-12, G001675-77.)  The applicant's statement to the PTO is explicit and unequivocal: the present invention is allegedly distinct from the prior art because it is a one-stop, fully-integrated apparatus.  *See Mangosoft*, 525 F.3d at 1332-33 (rejecting a construction that contradicts representations to the PTO); *MBO Labs.*, (construing a preamble limitation consistent with arguments to the PTO made to distinguish prior art).

The prosecution history and the rest of the intrinsic record demonstrate that Pusic's alleged invention was a "one-stop mailing apparatus" that, unlike the accused APC, processes mail with minimal consumer input.  Pusic's words to the PTO leave no doubt as to this conclusion.

### c.    Uship's Construction

Uship for the first time erroneously argues that the preamble is not a limitation. Strangely, Uship cites *Pitney Bowes* and argues that "the preamble merely *encapsulates* the main limitations found in the body of the claim and gives context to those [sic] claims by describing

22

the invention's purpose and principal use." (Uship Br. at 9-10.)  *Pitney Bowes*, however, held that the preamble ***is a limitation because it provides the claim's context***. *See* 182 F.3d at 1306. Moreover, as discussed above, the preamble here is far more than a mere statement of purpose, it discloses the self-contained computerized apparatus that performs the steps of the claimed method and was the basis for distinguishing the prior art.

Uship argues that IBM's construction is vague and "untethered to the language of the preamble," because, for example, "IBM does not explain what it means by 'one-stop' and 'fully integrated.'"  ***But these are the very words that the patent applicant used to describe "the present invention" to the PTO in order to secure allowance of the claims***. Clearly, the applicant and the PTO understood those "vague" words which are clearly defined in the prosecution history as describing a machine which takes over the processing of a parcel with minimal consumer input once the parcel is inserted into the machine.

The only thing vague and untethered is Uship's "back-up" construction of the preamble.[6] Uship's proposal is divorced from the "one-stop mailing apparatus" that Pusic allegedly invented.  Instead of relying on the intrinsic record, Uship relies on general purpose dictionaries and in doing so turns the preamble into a 92 word amalgam of unhelpful, abstract synonyms. For example, instead of construing the entire element, Uship construes each word of "self-contained computerized apparatus" *separately* using a dictionary.  In doing so, Uship strips the words of the preamble from the context provided by the surrounding words of the claim and the rest of the intrinsic evidence.  As a result, Uship's proposal becomes a meaningless abstraction of the type the Federal Circuit criticized in *Phillips*.  415 F.3d at 1321; *See also Kyocera Wireless*

---

[6] Uship now takes the position that its previously proposed constructions were proposed "out of an abundance of caution"—a statement found nowhere in their statements to IBM and the Government.

*Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) ("[T]his court does not interpret claim terms in a vacuum, devoid of the context of the claim as whole.").   Worse, Uship's dictionary definition-based proposed construction of the preamble directly contradicts all of the intrinsic evidence.   *Phillips*, 415 F.3d at 1319 (stating that extrinsic evidence may not be used in derogation of the "indisputable public records" of intrinsic evidence); *Markman*, 52 F.3d at 981 (rejecting extrinsic evidence that contradicts the "construction of the claims based on the specification and prosecution history").

Accordingly, Uship's construction should be rejected.

### 2. displaying information associated with the use of the apparatus such as the instructions for the use of said apparatus;

| Joint Proposal of Parties |
|---|
| **displaying information associated with the use of the apparatus:** showing or presenting data on an electronic device that exhibits visual content concerning operation of the apparatus |
| **instructions for the use of said apparatus:** directions for operating the apparatus |

The parties agreed to this construction, but IBM notes that Uship's new position that the preamble is not a limitation would impermissibly render the claim term "the apparatus" referred to in this limitation meaningless and without antecedent basis.   *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so").

### 3. receiving an item to be mailed;

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **receiving** - accepting<br><br>**item to be mailed** - item to be sent or delivered by the USPS or a company or service that engages in the transportation of letters, parcel[s], envelopes, and/or packages from one location to another location | taking in an item, inserted by a user, within the self-contained computerized apparatus | accepting into the self-contained computerized apparatus an item to be mailed, after which the apparatus takes over with minimal consumer input |

"Receiving an item to be mailed" is the first step in the method performed by the self-contained computerized apparatus as it collects and processes mail.  The intrinsic evidence shows that it is at this "receiving" step that the self-contained computerized apparatus accepts the mail for processing with "minimal consumer input."

### a.    Claim Language

Claim 12's context makes clear that "receiving an item to be mailed" is the first step of mail processing—after displaying instructions—by the self-contained apparatus.  The steps of the claim follow a logical order: receiving "*an* item" to be mailed comes before weighing "*the* item," admitting address data for "*the* item," and so on, until finally the self-contained apparatus stores "*the* item" to be mailed.  This logical sequence of steps is analogous to the claim at issue in *Loral Fairchild Corp. v. Sony Corp.*, where the third step was "forming an insulation layer," while the fourth step was "edges of said implanted barrier regions being aligned with the vertical edges of the insulation layer."  181 F.3d 1313, 1321 (Fed. Cir. 1999).  Because the step of forming "*an* insulation layer" had to come before the step of aligning with "*the* insulation layer," the method steps required a logical order.  *Id.*  Likewise, for this claim, *an item* must be received before *the item* is weighed and *the item* must be weighed before it is stored for mailing.  IBM's proposed construction recognizes this and makes it clear that receiving an item occurs when the self-contained computerized apparatus first accepts the item to be mailed—the apparatus then "takes over" and processes the mail from weighing to storage.

### b.    Specification and Abstract

IBM's construction also is consistent with the invention described in the specification.  The specification clearly describes the self-contained apparatus of the present invention receiving or accepting the item to be mailed in the first step of the process—prior to weighing, the next step in the claimed method.  (*See* '905 patent, 1:57-59 ("***The present invention*** enables

25

mail collecting procedures to be performed directly by a customer who ***inserts the mailing***"),
6:25-30, Fig. 15 (envelope insertion).)   As the specification explains: the customer "inserts" a
mailing and the machine "receives" the mailing.   The fact that the patent specifies that the
customer "inserts" the mail and the machine "receives" the mail supports a construction where
the mail is accepted ***into*** the self-contained computerized apparatus.[7]

### c.   Prosecution History

The prosecution history again is dispositive.   Specifically, as discussed above, the
applicant added a number of new claims to the application in response to a prior art rejection,
including asserted claim 12.   In doing so, the applicant explicitly defined the claimed
invention—including the claimed "receiving" step:

> ***The present invention, as set forth in its new claims, [including
> issued   claim   12,]*** discloses   a   "one-stop"   mailing
> apparatus . . . .  Once a consumer enters an envelope or package
> ***into   the   receiving   means   of   the   disclosed   apparatus,   the
> apparatus takes over*** and with minimal consumer input weighs the
> item, calculates the postage required, accepts and verifies payment
> for the required postage, provides the item with machine readable
> information, and then stores the item for subsequent pick-up. . . .
>
> * * *
>
> The present invention allows for the ***item to be mailed to be
> inserted into the apparatus***, after which the apparatus performs all
> the weighing, calculating, printing and storing functions with no
> further consumer handling being necessary.

('905 Pros. Hist., 8/14/89 App. Remarks at 10-11, G001675-76.)   The applicant, not IBM,
explained what "receiving" means, ***in the context of the present invention***: that the customer
first "enters a package ***into*** the receiving means of the disclosed apparatus" and then "the
apparatus takes over . . . ."   In the last step of the process, the present invention "***then*** stores the

---

[7] Uship acknowledges that the "specification and the drawings" provides "some support" for this
construction.  (Uship Br. at 14 (citing '905 patent, 6:26-44).)

item for subsequent pickup," confirming that the order of the method steps from receiving to storing is mandatory and that the apparatus must perform all of the claimed steps. The applicant's representations to the Patent Office regarding the "present invention" are highly probative of "what the inventors actually invented and intended to envelop with the claim." *Phillips*, 415 F.3d at 1316 (citing *Renishaw*, 158 F.3d at 1250.); *see also Mangosoft*, 525 F.3d at 1332-33 (rejecting a construction that would contradict representations to the examiner). Accordingly, IBM's construction, which clarifies the meaning of the claim step consistent with the intrinsic evidence, is correct.

### d.    Uship's Construction

Uship construes this element, as it does throughout its brief, by taking the words of the disputed element, isolating them in a vacuum, and then construing them in the abstract using dictionaries. As discussed above, the Federal Circuit has rejected this methodology. *See Phillips*, 415 F.3d at 1321 ("[T]oo often [the *Texas Digital*] line of cases has been improperly relied upon to condone the adoption of a dictionary definition entirely divorced from the context of the written description"); *see also Kyocera Wireless*, 545 F.3d at 1347 ("[T]his court does not interpret claim terms in a vacuum, devoid of the context of the claim as whole.")

Specifically, Uship begins by providing a synonym for "receiving":—"accepting." Uship next uses the dictionary to construe the words "an item to be mailed." Putting aside Uship's continued inappropriate overreliance on dictionaries, this is a portion of the disputed element that does not need to be construed because there is nothing unclear or disputed about the meaning of these words, no issues turn on their construction, and asking the Court to replace them with synonyms is a waste of the Court's and the parties' time and resources. *See Vivid Techs.*, 200 F.3d at 804. There is no purpose in asking the Court to replace 4 clear words with 32 less clear words.

Moreover, the issue here is not what "receiving" or "an item to be mailed" mean in the abstract, but what the disputed element "receiving an item to be mailed" means in the context of the overall claim and the invention described in the specification and the prosecution history. Notably absent from Uship's "analysis" *is any reliance on intrinsic evidence*—in fact, Uship only discusses the intrinsic evidence when criticizing IBM's reliance on it.

Uship argues that by construing this element in light of the intrinsic record, where the patentee told the public exactly what "receiving" means, IBM is reading limitations into the claim.  But Uship argues this every time IBM or the Government uses the intrinsic record to ascertain the scope of the alleged invention.  Uship apparently believes patents should issue with only a set of claims and a reference to a dictionary, but that is not the law.  Uship's hostility towards the specification is inconsistent with the Federal Circuit's holding in *Phillips* that the specification is "the single best guide to the meaning of a disputed term."

Uship's fallback argument is that, because claim 12 is a method claim it should not be read to incorporate any apparatus-based limitations.  (Uship Br. at 15-16 (citing *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342 (Fed. Cir. 2008).)  Uship's reliance on *DSW* is misplaced.  In *DSW*, the Federal Circuit held that a specific structural element in an apparatus claim ("module support member comprises a track and . . .  at least one roller") could not be imported into a more "generally phrased" element ("horizontally movably positionable stack divider") in a method claim absent intrinsic evidence that it should be so limited.  537 F.3d at 1345-47.  *DSW does not* stand for the proposition that method claims cannot contain structural limitations—it stands for the proposition that *additional* structural limitations should not be imported from apparatus claims into a method claim. That is not this case.

IBM is not asking the Court to import into claim 12  a specific receiving structure recited in an apparatus claim—IBM seeks to have the Court construe what claim 12 means when it says *the self-contained computerized apparatus receives the item to be mailed*.  It is irrelevant to this claim what structure on the self-contained computerized apparatus does the "receiving," but Uship cannot ignore that asserted method claim 12 *requires* that the claimed "self-contained computerized apparatus" receives the item to be mailed.  As the Federal Circuit has mandated, the Court must therefore construe the term "receiving an item to be mailed" in the context of the rest of the claim as well as the remaining intrinsic record and both make clear that, when the claimed apparatus "receives" the item to be mailed, it accepts the mail into the apparatus so that it may process it with minimal customer input.

Uship also criticizes reliance on the prosecution history because, in its view, the prosecution history only contains "only" a "single sentence" that "directly relates" to method claim 12.  Uship is wrong.  The prosecution history contains several statements "directly relate[d]" to claim 12 (application claim 28).  (Uship Br. at 16 (quoting '905 Pros. Hist., 8/14/89 App. Remarks at 10)).)  One such statement is the one Uship addresses in its brief:

> Independent Claim 28 [now Claim 12] is drawn to the method of operating a computerized apparatus which corresponds to the operation of the mail collecting and telecommunication apparatus as set forth in the present invention.

('905 Pros. Hist., 8/14/89 App. Remarks at 10, G001675.)  This statement fully supports IBM's construction because it makes clear that method claim 12 cannot be divorced from the apparatus described in the patent and that claim 12 is just the method of operating that apparatus.  There are several other statements directed at, among others, claim 12:

> The present invention, *as set forth in its new claims,* discloses a "one-stop" mailing apparatus which is specifically adapted for use by individual consumers. *Once a consumer enters an envelope or package into the receiving means* of the disclosed apparatus, *the*

> *apparatus takes* over and with minimal consumer input weighs the
> item . . . .

('905 Pros. Hist., 8/14/89 App. Remarks at 10, G001675.)   Importantly, the applicant also

explained that its "present invention" was different from the cited prior art Wright reference

because the alleged "present invention," including method claim 12, eliminated the need for the

customer to handle the parcel numerous times:

> Furthermore, in <u>Wright et al.</u> the item to be mailed or a label for
> the same have to be manually and laboriously handled numerous
> times as they are moved from the scale to the printer and then
> again to a storage location.  The ***present invention allows for the
> item to be mailed to be inserted into the apparatus, after which
> the apparatus performs all*** the weighing, calculating, printing and
> storing functions with no further consumer handling being
> necessary.

(*Id*., 8/14/89 App. Remarks at 11, G001676.)   Thus, Uship is wrong that there is only one

statement in the prosecution history that "directly relates" to claim 12.   Instead, as the foregoing

establishes, the applicant specifically described his "present invention" as set forth in all of "the

new claims," including claim 12.   The applicant made these representations to secure allowance

of the claims, the applicant meant what he said, and the PTO relied on the applicant's statements

when it allowed the claims.   Uship cannot now run from those statements.   Indeed, the

unambiguous prosecution history regarding the new claims is a far better indication of the

claim's scope than Uship's dictionaries or self-serving attorney argument.

### 4.        weighing the item to be mailed;

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **weighing** - determining or ascertaining the weight of a thing (i.e. the force that gravitation exerts upon that thing), by use of a balance, scale, or other mechanical device | after the mail is accepted within the self-contained computerized apparatus, obtaining the weight of a mail item by use of a scale without requiring any handling of the mail item by the operator | after the mail is accepted into the apparatus, weighing the item to be mailed without the possibility for a customer to influence the weighing |

30

There are two primary issues with respect to the claimed "weighing" step: (1) the "weighing" step must follow the "receiving" step; and (2) the "weighing" step must prevent the ability of a customer to potentially interfere with the weighing.  The intrinsic evidence mandates both requirements.

### a.  Claim Language

As explained in connection with receiving step, claim 12 itself makes clear that the steps are written in a certain logical order.  *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) ("First, we look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written.").  The receiving step, directed at "***an*** item to be mailed," comes first, before weighing "***the*** item to be mailed."  *See Loral Fairchild*, 181 F.3d at 1321 (holding that the step of forming "an insulation layer" had to come before the step of aligning with "the insulation layer").  Accordingly, receiving—*i.e.*, accepting into the apparatus—must precede weighing, which IBM's construction makes clear.

### b.  Specification and Abstract

The specification also strongly supports both aspects of IBM's construction.  First, before the item can be weighed, it must be "accepted into the apparatus":

> [A]ccording to the ***present invention***, the machine is able ***to accept postcards, envelopes, and postal packages, weigh them*** by an electronic means, print destination data on them in a chosen form of laser readable bar code . . . .

('905 patent, 3:57-61.)  Thus, the description of the "present invention" supports what is already clear, that the claim steps follow a logical order, with weighing coming after the item has been accepted into the apparatus.

The second aspect of IBM's construction requires that the apparatus perform the weighing step with no possibility that the customer can influence the weighing.  This is exactly how the specification describes the "invention":

> "The *present invention enables the electronic weighing of a mailing to be performed automatically and securely, without the possibility for a customer to influence the weighing* . . . there is no possibility for a higher or lower postage being calculated."

(*Id.* at 2:1-9.)  This is not an embodiment, it tells the public how weighing occurs in "the present invention" and explains why the claimed weighing is an alleged beneficial aspect of the invention. This is strong evidence that the claimed apparatus first accepts the package into a place within the apparatus and then weighs it "without the possibility for a customer to influence the weighing."  *See Edwards Lifesciences LLC*, 582 F.3d at 1330; *Honeywell Int'l.*, 452 F.3d at 1318; *SciMed Life Sys.*, 242 F.3d at 1343-45.  Accordingly, because the secure weighing feature is described as the "present invention" and the specification requires that customers not be able to influence the weighing, the claims must be read to include the feature.  *See Edwards Lifesciences LLC*, 582 F.3d at 1329-30 (holding that "graft" was limited to "intraluminal graft," because the "present invention" described that the graft was placed wholly within an artery, thus "the specification assumed that the graft . . . was intended to be within the artery, *or intraluminal*").

### c.    Prosecution History

Conclusively, the applicant *unambiguously disclaimed* during prosecution any scope of weighing that has the potential for operator interference in order to distinguish prior art. Specifically, Pusic distinguished a prior art machine by Wright stating:

> [Wright's] machine is not adapted for use by ordinary consumers and therefore does not include a means for storing the items . . . *nor does it include a secure weighing means* for the items to be mailed.  *A secure weighing means is important in that it prevents*

> *the consumer from influencing in any way the weighing of his*
> *piece of mail*. . . . *[T]he present invention discloses just such an*
> *apparatus* allowing for "one-stop" mailing by ordinary consumers
> mailing a single item of mail and which apparatus be placed in any
> public area due to its secure weighing means.

('905 Pros. Hist., 8/14/89 App. Remarks at 10-13, G011675-78.)  This is a classic disclaimer of

the type the Federal Circuit repeatedly has held binding on all claims claiming "the present

invention."  *See Southwall Techs*., 54 F.3d at 1577-78 (holding that prosecution statement "the

claims . . . specify that the dielectric layer is laid down as a sputter-deposited inorganic

oxide . . . *such layers can be laid down directly* . . ." disclaimed such "laid down indirectly").

Given the applicant's unequivocal disclaimer, it would be improper to construe claim 12 to

construe the claimed "weighing" step to allow for potential customer influence of the weighing

of the package—such "a meaning broader than any indicated in the patents and prosecution

history would be to ignore the totality of the facts of the case . . . ."  *Ormco* at 1314-16 (holding

that prosecution statements distinguishing the invention from the prior art as "fully automated"

operated to limit the scope to not allow "less than fully automated" to be within the scope of the

claims).

### d.    Uship's Construction

Uship's argument that there is no order to the claimed method defies both common sense

and the intrinsic record.  (Uship Br. 17-18.)  In the abstract, the word "weighing" may have a

commonly understood dictionary meaning, but claims are not construed in the abstract or based

on dictionaries.  *Phillips*, 415 F.3d at 1318 ("[E]xtrinsic evidence as less reliable than the patent

and its prosecution history in determining how to read claim terms.").

Instead, the Court must consult the intrinsic record to understand what the "weighing"

step means.  *See Kyocera Wireless*, 545 F.3d at 1347 ("[T]his court does not interpret claim terms

in a vacuum, devoid of the context of the claim as whole.").  The language of claim 12 makes

clear that the claim requires a certain order:  the "weighing" step must follow the "receiving" step.[8]  And the patent applicant, both in the specification and in the prosecution history, made clear that the weighing step eliminates potential customer influence of the weighing.

5.    **admitting data relating to the item to be mailed such as the address to which the item is to be mailed;**

| Uship Constructions | Government Constructions | IBM Constructions |
| --- | --- | --- |
| **admitting** - receiving or obtaining through use of one or more means of inputting or transmitting information, including but not limited to devices such as keyboards, touch screens, card readers, scales, etc.<br><br>**data** - information or individual items of information<br><br>**relating to** - referring to, pertaining to, associated with, regarding, concerning, or about<br><br>**address** - information signifying or pertaining to the place or the name of the place where a person, organization or the like is located or may be reached | **admitting data relating to the item to be mailed:** acknowledging the collection of data concerning mailing weight, mailing destination, and additionally, mailing classification data.<br><br>**the address to which the item is to be mailed:** information identifying the specific location where a person or organization receives mail | receiving data entered by the customer relating to the item to be mailed, including the address to which the item is to be mailed |

The issue with the "admitting" step is whether the term "address" needs to be construed. As it has done with several other terms, Uship unnecessarily construes the term "address," which is clear on its face and need not be construed.

Specifically, Uship contends that address should be construed as **"**information signifying or pertaining to the place or the name of the place where a person, organization or the like is located or may be reached."  Uship's construction is invented out of whole cloth and makes the

---

[8] Uship relies on *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371-72 (Fed. Cir. 2003), but *Altiris* actually supports IBM.  In *Altiris*, the Federal Circuit confirmed that method steps are performed in order if "as a matter of logic or grammar, they must be performed in the order written." 318 F.3d at 1369.  As discussed above, this case closely mirrors *Loral Fairchild*, where the steps had to be performed to make any sense.  *See* 181 F.3d at 1321.

claim less clear.   Indeed, with this construction, even the dictionary is absent from Uship's analysis.   Uship's "construction" is meaningless and impossible to apply—what constitutes information signifying or pertaining to a place or the name of a place?   To the extent it is understandable, an envelope "addressed" as Uship proposes would likely not reach its intended recipient—unless the information contained the actual address as understood by most lay people.

Uship purports to rely on the specification. (Uship Br. at 20.)   Specifically, Uship points to column 6, lines 55 and 64-68 of the '905 patent.   (*Id.*)   Uship, however, ignores that portion of column 6 between the lines it cites, presumably, because that portion does not support Uship's construction.   The full passage states:

> Simultaneously, instructions on how to enter the required data about the mailing's destination on keyboard 6 are displayed and the customer has to enter this data. The customer can read this data from the face of the mailing ***because the mailing has to be inserted in such a way that the address written on its face comes behind the transparent glass window 7*** and the transparent mailing pressing panel 16 and can be read from outside of the machine after the mailing is driven inside the insertion slot 12.

> The data to be entered on keyboard 6 may comprise the mailing's country of destination, the zip code, and a variety of special requests such as registered mail, express mail, etc., or any other data required by company standards.

('905 patent, 6:54-68.)   This passage omitted by Uship contains the word "address"—the only instance the word "address" appears in the specification (aside from the claims).   And "address" in this instance refers to that which a customer already has written on the parcel—*i.e.*, the commonly understood meaning of the term "address."   The "data to be entered" upon which Uship relies refers to information beyond just the "address," including "special requests," "the country of destination," and the like.   Under Uship's argument, the phrase "address" could simply mean the "country of destination," which certainly would not result in an "item to be

mailed" reaching its desired destination.  Nothing in that passage alters the well-understood meaning of the term "address."

If it is necessary to construe "address" in light of Uship's position, IBM agrees with the Government that "address" should be construed as a "specific location where a person or organization receives mail."  This proposed construction comports with common sense—when one addresses an envelope, one sends it to a specific location—and is consistent with the use of the word address in the intrinsic record.

### 6.      determining the required postage for the item to be mailed;

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **determining** - ascertaining through calculation or otherwise<br><br>**required postage** - the charge for the service or conveyance and/or delivery of a letter, parcel, envelope, and/or package to be mailed | automatically calculating the charge for the service of delivery of a mail item based on mailing weight data and destination data without requiring any handling of the mail item by the user | calculating a charge based on the mailing weight, the destination and any special requests, and any instructions stored in the machine's memory, with no possibility for an incorrect postage being calculated |

The only disputed aspect of this limitation is whether the claims require that there be no possibility that incorrect postage can be calculated.  This term goes hand in hand with the previously discussed "receiving" and "weighing" steps.  First, the mailing is received into the apparatus, then the mailing is weighed in a manner that prevents customer interference, and then the apparatus determines the postage in a manner where there is no possibility of incorrect postage being calculated.  The '905 patent makes it clear that the possibility of an incorrect postage calculation is not allowed:

> "The ***present invention*** enables the electronic weighing of a mailing to be performed automatically and securely, without the possibility for a customer to influence the weighing . . . ***there is no possibility for a higher or lower postage being calculated.***"

('905 patent, 2:1-9.)  Thus, IBM's construction is the correct one.

Uship's proposed construction misses the point entirely.  Uship again focuses on dictionary definitions.  Again, the issue is not the meaning of "determining" or "postage" in the abstract, but what does the claim element mean in light of the intrinsic evidence, including the specification, which is "the single best guide" to determining the meaning of the claim.  As the quoted passage above demonstrates, the specification takes the "determining" step out of the abstract and roots it firmly in what Pusic claims to have invented—a method of using a self-contained apparatus that accepts a mailing into the apparatus, weighs the mailing in a manner that prohibits customer interference, and always correctly calculates the correct postage.

**7.      accepting and verifying payment for said postage;**

| Joint Proposal of Parties |
|---|
| receiving payment and confirming that the payment received corresponds to the charge calculated for delivery of the mail item |

**8.      providing machine readable information concerning the item to be mailed on the item to be mailed, such as the zip code to which said item is to be mailed; and**

| Joint Proposal of Parties |
|---|
| machine readable information - plain meaning<br><br>concerning - plain meaning |

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **providing . . . on** - printing either directly on the item to be mailed or on a label which may be applied to the item to be mailed | automatically affixing or printing machine readable information that concerns at least the mailing's destination on a surface of the item to be mailed without requiring any handling of the mail item by the operator | the apparatus prints or affixes on the item to be mailed machine readable information with no consumer handling being necessary |

The dispute with respect to this limitation is whether **"providing machine readable information** concerning the item to be mailed **on the item to be mailed"** means that the apparatus prints or affixes machine readable information on the item without consumer help.  The intrinsic evidence confirms that it does.

### a.      Claim Language

The words of claim 12 make it clear that the self-contained computerized apparatus must "provid[e]" the machine readable information "on" the item to be mailed.  Claim 12 reads: "a method of processing and collecting mail with and otherwise operating a self-contained computerized apparatus comprising the steps of: . . . providing machine readable information concerning the item to be mailed *on the item to be mailed* . . . ."  Claim 12 facially does not allow for the machine to merely print the machine readable information and pass it to the customer to affix on the item to be mailed.  *See Eaton*, 323 F.3d at 1343 (holding that a method claiming steps directed at the manipulation of an automated apparatus could not be performed by hand).  This is consistent with the fact that the other steps are performed within the apparatus, as discussed above, after the item is received by the apparatus.

There are two ways in which the claimed "providing . . . on" step may be performed: (1) the self-contained apparatus can print machine readable information directly on the item; or (2) the self-contained apparatus can print machine readable information on a label which the apparatus affixes to the item.  Although the latter way is not specifically disclosed, each of these ways is consistent with the intrinsic record and IBM's construction.

### b.      Specification and Abstract

The specification supports IBM's construction.  For example, Figure 18 shows the steps of printing a bar code on the envelope.  Likewise, Figure 3 depicts the printing apparatus.  (*See* '905 patent, 7:55-58 ("According to the described procedure, the bar code is printed on the stationary mailing by moving the printing head 21 in all four possible directions").)

### c.      Prosecution History

The prosecution history confirms IBM's proposed construction.  During prosecution, the applicant explained that, in his invention, the self-contained apparatus, not the consumer or other human, provides the machine readable information **on** the item to be mailed:

> **The present invention, as set forth in its new claims,** discloses a "one-stop" mailing apparatus . . . Once a customer enters a package into the receiving means of the disclosed apparatus, **the apparatus takes over and with minimal consumer input** weighs the item, calculates the postage required, accepts and verifies payment for the required postage, **provides the item with machine readable information,** and then stores the item for subsequent pick-up.

('905 Pros. Hist., 8/14/89 App. Remarks at 10, G001675.)  Then, and very importantly, the applicant distinguished his alleged invention over the cited prior art Wright reference because Wright required that the consumer "manually and laboriously handle[]" a "label":

> Furthermore, in Wright et al. the item to be mailed **or a label for the same have to be manually and laboriously handled numerous times** as they are moved from the scale to the printer and then again to a storage location.  **The present invention** allows for the item to be mailed to be inserted into the apparatus, after which **the apparatus performs all the** weighing, calculating, **printing,** and storing **functions with no further consumer handling being necessary.**

(*Id*. at 10-11, G001675-76.)  Thus, it is clear that the applicant differentiated his alleged invention from the prior art based on the fact that the prior art required the consumer to handle the package or the label, whereas his self-contained computerized apparatus eliminated the need for consumer handling including for the purpose of affixing a label.  The applicant's unambiguous representation in the intrinsic record regarding "the present invention" requires that the element be construed such that the apparatus provides the printed machine readable information on the mailing, not the customer.  To construe otherwise would be to allow further "consumer handling"—a construction that Pusic completely disavowed during prosecution.

#### d.        Uship's Construction

Uship advances a results-oriented construction of the claimed "providing . . . on" step that allows the machine to print a label and then pass it to the consumer to affix on the item to be mailed.   Absent from this interpretation is any reference to the claim, the specification, or prosecution history for support—this is not Pusic's invention.   The intrinsic evidence requires the self-contained apparatus perform the claimed "providing . . . on" step, not a person.   Uship is now back-tracking from the statements that the applicant made to the PTO to secure allowance of the claims.   Accordingly, Uship's construction should be rejected.

Uship argues that IBM's construction is incorrect because it allegedly is inconsistent with the doctrine of claim differentiation.   As discussed above *supra* §II.A.1.b, the doctrine of claim differentiation is merely a presumption and cannot trump the clear intrinsic evidence that the machine, not a person, provides the machine readable information on the item to be mailed. Regardless, IBM's construction does not conflict with the doctrine of claim differentiation.

Uship argues that because claim 6 has a limitation requiring "printing said . . . bar code *directly* on the item to be mailed," claim 12 cannot require that the machine provide the machine readable information on the item to be mailed and the claim is therefore broad enough to cover a person providing the machine readable information on the item.   Aside from the fact that Uship's interpretation is wholly at odds with the intrinsic record where the inventor clearly stated that the claimed machine provides the machine readable information on the package with no further consumer handling being necessary, Uship simply misreads claims 6 and 12.

Uship argues that the inventor used the word "directly" to convey that the apparatus performs the step of printing or affixing machine readable information on the item.   But Uship is incorrect.   Claim 6 requires that a bar code be printed *directly on the item*, and, accordingly does not allow for the possibility that printing be done "indirectly" on a label that it then affixes to the

item.  Claim 12's "providing . . . on" limitation is broader and allows the machine to provide any machine readable information (not just a bar code) *on the item*.  Both claims require the machine to provide information on the item to be mailed but claim 6 is limited to the machine printing directly on the item, whereas claim 12 allows the machine to *provide* machine readable information on the item by printing on the package *or* printing on a label that the claimed apparatus then affixes without further consumer handling.  In other words, IBM's proposed construction of claim 12 is already broader than what is required by claim 6, so Uship's reliance on claim 6 and the doctrine of claim differentiation is misplaced.  IBM's argument is fully consistent with dependent claim 6 and the rest of the intrinsic evidence.

### 9.    storing the item to be mailed for subsequent pick-up.

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **storing** - holding an item in a place for subsequent use or disposition | holding an item in a place for subsequent use or disposition without requiring any handling of the mail item by the operator | automatically moving the item into a storage area within the self-contained apparatus for subsequent pick-up, with no consumer handling being necessary. |

The use of "storing" in claim 12 means that the self-contained computerized apparatus moves the item to be mailed into a storage area with no consumer handling being necessary where it awaits pickup.  This is the only construction wholly consistent with the intrinsic evidence.

### a.    Claim Language

The claim language says the item must be stored for subsequent pick-up.  This is the final step performed by the self-contained computerized apparatus.  Because the apparatus is "self-contained," the apparatus, not a customer, moves the processed package into a storage area for subsequent pick up.

41

### b.      Specification and Abstract

The specification confirms that storing in the context of the claimed invention means that the claimed apparatus moves the posted item into a storage area within the machine.   The summary of the invention states:

> *In order to achieve the objectives of the present invention, there are provided means for* . . . the inserting, driving, pressing, bar code printing, and *the storing of the mailing, used for the machine's mail collection purpose which is one object of the present invention.*
>
> *[T]he machine is able to* accept postcards, envelopes . . . weigh them by an electronic means, print destination data on them . . . and *store them for subsequent pickup.*

('905 patent, 3:44-64.)   Thus, the specification makes clear that the "present invention" stores mail by moving the item into a storage area within the self-contained computerized apparatus. This in itself is "strong evidence" that the apparatus, not a human, must perform the storing.   *See Honeywell Int'l*, 452 F.3d at 1318; *SciMed Life Sys.*, 242 F.3d at 1343-45.

### c.      Prosecution History

During prosecution, the applicant made clear to the PTO and the public that the method of claim 12 requires the self-contained computerized apparatus perform the "storing" step without any consumer intervention.   Specifically, the applicant stated:

> *The present invention, as set forth in its new claims,* discloses a "one-stop" mailing apparatus, . . . . *Once a consumer enters an envelope or package into the receiving means of the disclosed apparatus, the apparatus takes over and with minimal consumer input* weighs the item, calculates the postage required, accepts and verifies payment for the required postage, provides the item with machine readable information, *and then stores the item for subsequent pick-up.* . . .

('905 Pros. Hist., 8/14/89 App. Remarks at 10, G001675.)   The applicant's unequivocal description of the claimed invention as performing the storing itself applies to all of the "new

claims" (including claim 12) and, thus, dictates that the proposed construction require that the apparatus moving the item to be mailed into a storage area within that apparatus. *See Rheox*, 276 F.3d at 1327 (holding that the applicant's unequivocal statements to the PTO are controlling).

Pusic also crystallized the point in distinguishing his alleged invention over the Wright prior art reference based on the fact that, in his invention, the apparatus performs the storing whereas, in Wright, human intervention is required to move the item "to a storage location":

> Furthermore, in <u>Wright et al.</u> the item to be mailed or a label for the same have to be manually and laboriously handled numerous times as they are moved from the scale to the printer and then again to a storage location. ***The present invention allows for the item to be mailed to be inserted into the apparatus***, after which ***the apparatus performs all*** the weighing, calculating, printing and ***storing functions with no further consumer handling being necessary.***

('905 Pros. Hist., 8/14/89 App. Remarks at 11, G001676.) In sum, the self-contained "apparatus performs all . . . storing function with no consumer handling being necessary." *See Ormco*, 498 F.3d at 1314-15 (holding that prosecution statements distinguishing the invention from the prior art as "fully automated" operated to limit the scope to not allow "less than fully automated" to be within the scope of the claims); *Rheox*, 276 F.3d at 1327 (holding that the applicant's unequivocal statements to the PTO are controlling). Thus, the "storing" step must be construed as IBM proposes.

### d. Uship's Construction

Uship says storing in claim 12 merely means "holding an item." But Uship cites no support for its proposed construction. Instead, Uship argues that the "storing" step is "straightforward" and so much so that "one would be forgiven for assuming that its interpretation . . . would not prove controversial." (Uship Br. at 24.) But, as with many of the preceding limitations of claim 12, Uship completely ignores the intrinsic evidence.

More specifically, Uship asserts that IBM is reading in limitations from the specification. (Uship Br. at 24-25.)  Uship is wrong.  As described above, both the claim language and the specification support IBM's construction.  Uship's disregard for the prosecution history, which fully supports IBM's construction and discredits Uship's proposal, is notable.  As set forth above, the applicant made specific representations that the apparatus performs the "storing" step "with no consumer handling" and did so to secure allowance of the claims over the prior art. Uship cannot now ignore those statements.

Uship also argues that IBM is improperly limiting method claim 12 to device claim 1. Uship is wrong.   First, Uship misunderstands IBM's proposed construction and the bases therefore—it is not based on claim 1.  Second, Uship is wrong that because device claim 1 uses the terminology "transport means . . . for transporting the item . . . to a storage area," the storing in method claim 12 cannot include the concept of the apparatus moving the item into the storage area.  Device claim 1 is directed at the specific structure for moving the item into storage, which the specification refers to as "transport" structure.  The fact that device claim 1 requires a specific transport structure does not change the fact that the self-contained apparatus stores the mail by moving it into a storage area within the apparatus.   The two claims are entirely consistent—claim 1 requires a particular device for moving the item into storage and claim 12 requires the machine to store the item regardless of the particular transport means.  This is confirmed by the inventor's explicit description of claim 12 as merely being a "method of operating a computerized apparatus which corresponds to the operation of the mail collecting and telecommunication apparatus as set forth in the present invention."  ('905 Pros. Hist., App. 8/14/89 Remarks at 10, G001675.)  Thus, IBM's construction is the correct one.

## IV.    THE RAMSDEN PATENTS

The remaining asserted claims come from one patent issued to Gary Ramsden as the sole inventor (the '464 patent) and three patents issued to Gary Ramsden and Kenneth Liles as joint inventors (the '220, '014, and '924 patents) (collectively, "the Ramsden patents").  The Ramsden patents are all related and the figure below illustrates the genealogy of the Ramsden patents, with the four asserted patents shaded in gray:



As shown above, all of the asserted Ramsden patents purport to descend from the '532 patent and, as a result, the four asserted Ramsden patents share subject matter and written description.  The '220, '014 and '924 patents are all continuation applications and therefore share essentially identical specifications.[9]  The '464 patent is a continuation-in-part application and

---

[9] "A continuation is a second application for the same invention claimed in a prior nonprovisional application and filed before the original prior application becomes abandoned or patented . . . .  The disclosure presented in the continuation must be the same as that of the original application; *i.e.*, the continuation should not include anything which would constitute new matter if inserted in the original application."  MPEP § 201.07.

therefore shares overlapping subject matter with the other three Ramsden patents.[10]  IBM will therefore first construe the disputed terms of the '464 patent, *infra* § V, and then construe the disputed terms of the remaining Ramsden patents, *infra* §§ VI.A-C. Because many of the disputed terms recur throughout the Ramsden patents IBM will avoid repetition and indicate when a term has been previously construed.

## V.       U.S. PAT. NO. 5,481,464 (RAMSDEN)

The '464 patent, entitled "System for Collecting and Shipping Items," issued on January 2, 1996.  The '464 patent describes the patented invention as "an automated, unattended unit for collecting and holding parcels, letters and other items for one or more commercial delivery services."  ('464 patent, 1:13-16 ("Field of the Invention").)  The '464 patent purports to improve upon prior art shipping systems such as "unattended drop boxes" for accepting a "pre-addressed package or letter."  (*Id.* at 1:31-33.)  According to the '464 patent, the prior art devices were inferior because:

> [s]uch [prior art] schemes, however, cannot provide full insurance protection or verification that the package was in fact mailed, since no attendant is present to verify that the letter was actually placed in the box.

(*Id.*at 1:37-40.)  The '464 patent purports to improve on these prior art "schemes" by providing all of the functions of a commercial delivery office in a single, integrated, automated unattended unit:

> Disclosed is an ***integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services,*** the unit including a scale for weighing the item to be shipped, a computer for inputting information relating to the destination to which the item is to be

---

[10] A continuation-in-part is an application filed during the lifetime of an earlier application that repeats some substantial portion or all of the earlier application and *adds matter not disclosed* in the earlier application.  MPEP § 201.08.

> shipped and for analyzing the inputted information including
> calculating the fee for shipment of the item, a card reader for
> receiving bank credit card information . . . , and secured
> storage . . . .

(*Id*., Abstract.)  Figure 1 of the '464 patent depicts the patented shipping unit incorporating these

features:



(*Id*., Fig. 1.)   Consistent with the description of the invention in the specification all of the

asserted claims are directed to an "integrated, automated, unattended unit for collecting and

securely holding items for collection and shipment."  (*Id*., Cl. 7.)

The prosecution history of the '464 patent is consistent with the claims and specification

of the '464 patent.  The Patent Office rejected the original claims in the chain of applications that

issued as the '464 patent as indefinite,[11] because the claim was just "an aggregation of parts."

('532 Pros. Hist., 5/22/92 O.A. at 2, G001144.)  In response, the applicant said:

> Applicant respectfully submits that claim 1 as amended ***is directed
> to an integrated system,*** not "an aggregation of parts," any longer.

---

[11] The '464 patent's prosecution history includes the prosecution histories of its ancestor patents.
*See, e.g.*, *Ormco*, 498 F.3d at 1314-15 ("We have held that prosecution disclaimer may arise
from disavowals made during the prosecution of ancestor patent applications"); *Jonsson v.
Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990) (applying prosecution history evidence from a
patent to a descendent CIP patent).

(*Id*., 10/7/92 App. Remarks at 9, G001137.)  This concept is reflected in the asserted claims of the '464 patent which each define the claimed invention as an ***"integrated, automated, unattended unit"*** to make clear that all of the functionality of the patented system is contained in an integrated unit as opposed to an aggregation of parts.

A.    **The Asserted Claims**

Uship asserts four independent claims[12] of the '464 patent: claims 7, 19, 28, and 34, and a total of 12 dependent claims[13] that "depend" from these independent claims.  The dependent claims each include all the limitations of the independent claim from which they depend and then add an additional limitation.  To assist in parsing the large number of asserted claims, IBM organizes its arguments in four subsections, one for each of the independent claims and the claims that depend from it.

Additionally, there is a great deal of repetition between the disputed elements of the asserted independent claims—claims 7, 19, 28 and 34.  Such limitations are presumed to have the same construction.  *Phillips*, 415 F.3d at 1314-15.  To reduce repetition, therefore, IBM's arguments with respect to disputed terms in claim 7 will not repeated for identical limitations of claims 19, 28, and 34, but will be incorporated by reference in separate sections for those claims.

---

[12] An "independent claim" is "a claim that does not refer back to or depend on another claim." *See* U.S. PTO Glossary.

[13] Dependent claims incorporate all of the limitations of the claims from which they depend.  *See* MPEP § 608.01(n).  A dependent claim can depend from another dependent claim, but a "chain" of dependent claims must ultimately depend from an independent claim.

B.      **Independent Claim 7 [and Dependent Claims 9-12, 15-18]**

1.      **Independent Claim 7**

a.      **An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services: said automated unit comprising,**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **integrated** - brought together or incorporated into a unified or interrelated whole or system | **integrated:** incorporated into a unified whole | An unattended unit for automatically collecting and securely holding items for collection and shipment by commercial delivery services |
| **automated** - employing a technique, method, or system of operating and controlling a task by highly automatic means, as by electronic devices, thereby reducing human intervention to a minimum | **automated:** automatically controlled by mechanical or electronic devices that take the place of humans | |
| **unattended** - not accompanied by an attendant or the like; capable of being used by a customer without assistance from an attendant or operator | **unattended:** not accompanied by an attendant or the like | |
| **unit** - a machine, part, or system of machines having a special purpose; an apparatus | **unit:** a single device | |
| **collecting** - gathering together; accepting | | |
| **securely holding** - containing an item in a manner designed to ensure that the item is safe from interception by unauthorized persons | | |
| **items** - parcels, envelopes, letters, packages, and like items | | |
| **collection** - the act of gathering items together or accepting | | |
| **shipment** - the act of sending by use of the USPS or a company or service that engages in the transportation of parcels and envelopes from one location to another | | |
| **commercial delivery services** - businesses, organizations, or other entities, including the USPS, that engage in the shipment of items from one location to another location | | |

### i.      The Preamble Is A Limitation

Uship incorrectly argues that the preamble is not a limitation.  But the preamble to claim 7 must be construed as a limitation because it reflects the applicant's representation to the Patent Office that the patented invention is an ***integrated unit***—not a mere aggregation of structures. For that reason alone the preamble must be a limitation.  *Storage Tech.*, 329 F.3d at 835; *Cruciferous Sprout*, 301 F.3d at 1348.  Claim 7 would be nothing more than the very aggregation of parts the Patent Office rejected without the concept set forth in the preamble that the structures are part of an integrated unit.  Additionally, limitations in the body of claim 7 as well as a number of the claims that depend from claim 7 "rely upon and derive antecedent basis" from the preamble and therefore the preamble must be a limitation.  *See Eaton*, 323 F.3d at 1340; *Electro Sci.*, 307 F.3d at 1348; *Honeywell Int'l*, 66 Fed. Cl. at 436.  Specifically, claim 7 recites the element: "means for securely storing said item until the item is collected by ***said*** commercial delivery service."  The only antecedent basis in claim 7 for "said commercial delivery service" is the preamble's recitation of "[a]n integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by ***commercial delivery services***."  Likewise, asserted dependent claim 10 claims:

> The integrated, automated, unattended unit of claim 9 wherein ***said unit includes a pivotable*** door that serves as a slide when said door is opened, said slide serving to transport the item to a storage area for secure storage.

('464 patent, Cl. 10.)  Claim 10, which ultimately depends from claim 7, therefore, requires a "pivotable door" to be included in "said unit," *i.e.*, "the integrated, automated, unattended unit"

50

of claim 7.  "Said unit" would be meaningless and without antecedent basis if the preamble is not a limitation.[14]

### ii.      Construction  Of The Preamble

IBM's proposed construction of the preamble as "[a]n unattended unit for automatically collecting  and  securely  holding  items  for  collection  and  shipment  by  commercial  delivery services"  is  consistent  with  the  intrinsic  evidence,  and  emphasizes  that  the  claim  is  directed towards a single, unattended unit that both collects and holds the items for subsequent pickup. Such a construction makes clear that an integrated unit has all the claimed features.

### (A)      Claim Language

The claim language here provides "substantial guidance" as to the scope of the asserted claims.  *See Phillips*, 415 F.3d at 1314.  First, the adjectives "integrated," "automated," and "unattended" all modify the word "unit."  Accordingly, the applicant emphasized that he was claiming a ***unit***—not an aggregation of structures.  The structural limitations that follow are all part of the same unit.

The words of the dependent claims confirm that this is the correct understanding of the scope of the preamble.  For example, dependent claims 10 and 13 both add structural features, *i.e.*, a pivotable door and ramp, into "said unit" of claim 7.  If claim 7 was not claiming a single unit, then these structural limitations would be disaggregated from the claimed invention.

### (B)      Specification and Abstract

The specification also supports construing the claim as a single integrated structural unit:

---

[14] Claim 13 also explicitly relies on the preamble. Claim 13 requires "the integrated, automated, unattended unit of claim 12 wherein ***said unit includes a ramp***, said ramp serving to transport the item from a first zone which serves as a holding space when said item is first placed in the storage area to a zone into which the item is moved for secure storage."  As with claim 10, the "said unit" in question is the "integrated, automated, unattended unit" of claim 7.

> Disclosed is an ***integrated, automated, unattended unit*** for collecting and securely holding items for collection and shipment by commercial delivery services, ***the unit including*** a scale for ***weighing the item to be shipped***, a computer for ***inputting information relating to the destination*** to which the item is to be shipped and for analyzing the inputted information including calculating the fee for shipment of the item, ***a card reader for receiving bank credit card information*** and for communicating and assessing the shipment fee to the account of the person, ***and secured storage***, . . .

('464 patent, Abstract.)   The specification confirms that the words "integrated, automated, unattended unit" mean that the claims are directed at a single machine that does everything—a "unit" including various structures that perform functions identified later in the claim.   And, when a given structure is characterized as part of "the present invention[, this] is ***strong evidence*** that the claims should not be read to encompass the opposite structure." *SciMed Life Sys.*, 242 F.3d at 1343; *see also Edwards Lifesciences LLC*, 582 F.3d at 1330; *Honeywell Int'l*, 452 F.3d at 1318.

### (C)    Prosecution History

As discussed above, in response to an early rejection from the Patent Office, the applicant represented to the Patent Office that his patented invention must be "integrated."   This representation is reflected in the asserted claims by the requirement that the "means" recited in the body of the claim all be "integrated" into a "unit."   As a result of this representation to the Patent Office, the asserted claims cannot be construed to cover a mere "system" made up of an "aggregation of parts" those parts must be integrated into a unit.

### iii.    Uship's Construction

As with the '905 patent, Uship now belatedly argues that the preamble is not a limitation. In support of its new position, Uship argues, without analysis, that "the preamble merely encapsulates the main limitations found in the body of the claim" and "states the invention's

purpose and intended use." (Uship Br. at 26.) As discussed before, the Federal Circuit has held that the preamble is a limitation when the preamble does more than state a purpose or intended use. *See Pitney Bowes*, 182 F.3d at 1306. Likewise, claim 7's preamble does more than state a purpose—it states a structural limitation that provides the antecedent basis for an otherwise unintegrated collection of prior art parts.

Uship again relies exclusively on the dictionary to construe each word in a vacuum while completely ignoring the dictates of *Phillips*. As the Federal Circuit warned:

> The problem is that if the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.

415 F.3d at 1321. Uship separately defines "integrated," "automated," "unattended," and "unit"— without ever trying to construe an "integrated, automated, unattended unit."[15] As a result, the claim—uninformed by the intrinsic evidence—becomes "unduly expansive." *Id.* Putting all of Uship's dictionary definitions together would lead to the conclusion that the invention covers an aggregation of structure no matter how unintegrated, unautomated, or ununified—exactly what the Patent Office originally told the applicant was not patentable.

For example, Uship defines "integrated" as "brought together or incorporated into a unified or interrelated whole or system," but the claims do not claim a "system" they claim a "unit." Uship then defines "unit" as a "machine, part, or system of machines having a special purpose; an apparatus." This is both circular and internally inconsistent. According to Uship, a "unit" is a "system of machines having a special purpose" and an "integrated unit" would be a "system of machines having a special purpose" "brought together or incorporated into

---

[15] Except for "integrated, automated, unattended unit," the rest of the claim should take its ordinary and plain meaning, which is not disputed.

a . . . system." This is circular, makes no sense, and is not the invention described and claimed in the asserted claims. But then Uship also inconsistently defines a unit as "an apparatus." IBM agrees that a unit is *an* apparatus, ***but a "unit" or "an apparatus" is not a system of machines brought together into a system***. Uship plainly is playing the dictionary game in an attempt to avoid the fact that the asserted claims require an integrated unit, not a "system of machines." Uship knows that the accused APC does not integrate all the required functions into a "unit" so it seeks to expand the claimed invention by chaining together abstract definitions to cover a "system of machines" instead of a unit or an apparatus.

But the intrinsic record definitively shows that the asserted claims are not directed to a system and that a unit is not the same as a system. The Federal Circuit has emphasized that "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Here the differences between the asserted claims and the unasserted claims shows that, in the context of the patent, an integrated unit is not the same as a system. Every one of the asserted claims claims an "integrated, automated, unattended *unit*." The unasserted claims, however, claim "[a] ***system*** for accepting and storing items for subsequent pickup by a commercial carrier." ('464 patent, Cl. 24 (unasserted).) When the patentee wanted to claim a system he used the word system, not unit. Each word in a claim is presumed to have meaning, *Seachange*, 413 F.3d at 1368-69, and the fact that the patentee deliberately chose to use the word unit in some claims and system in others strongly indicates that an integrated unit is not a system.

After resorting to the dictionary, Uship halfheartedly cites the specification in support of its proposed construction. But the part of the specification to which Uship points is wholly inapposite to any of the asserted claims. Specifically, Uship points to an alleged embodiment

that has "an adjunct packaging supply unit 120 is positioned to one side of the system 10," ('464 patent, 10:46-47), and then argues that this means that the claimed integrated unit must allow for the possibility of a combination of associated structures.  First, this section refers to a system not a unit and therefore does nothing to define the meaning of the words at issue here—"integrated, automated, unattended unit."  Second, this section explicitly discusses the packaging supply unit as being to one side of the "system."  Third, and most importantly, ***none of the claims that claim an integrated unit require or even mention an adjunct packaging supply unit***.  This is not part of the claimed inventions and does nothing to define what an integrated unit is in the context of the patent.  There is not a single embodiment of the claimed inventions where one of the ***required*** elements is not integrated into a single unit.

Even if Uship found an embodiment that seemed to be outside the scope of the integrated, automated, unattended unit, such an embodiment could not trump the meaning of the claim language—claims may not be artificially broadened to cover every possible embodiment.  *See PSN Ill., LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1166 (Fed. Cir. 2008) ("[There is no] panacea, requiring all claims to cover all embodiments.  Instead, courts must recognize that disclosed embodiments may be within the scope of other allowed but unasserted claims."); *TIP Sys.*, 529 F.3d at 1373 ("[T]he mere fact that there is an alternative embodiment disclosed in the . . . patent that is not encompassed by [a] district court's claim construction does not outweigh the language of the claim").  In sum, Uship is stretching the claims to cover unclaimed features described in the specification in an attempt to broaden the claims beyond their clear meaning to cover the APC.  Accordingly, its proposed constructions of the preamble should be rejected.

**b.**     **means for weighing the item to be shipped;**

| Joint Proposal of Parties |
|---|
| **function:** weighing the item to be shipped<br>**structure:** electronic scale 22 or 222 |

Uship adds a construction of "shipped" as "the state of being sent by use of the USPS or company or service that engages in the transportation of items from one location to another location." IBM's position is that "item to be shipped" is unambiguous and therefore unnecessary to construe. *See Vivid Techs.*, 200 F.3d at 804.

**c.**     **means for inputting information relating to the destination to which the item is to be shipped;**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for inputting** - structure, material or steps used for entering data into a computer memory unit for processing or storage, such as a keyboard, touch pad, touch screen or similar device<br><br>**information relating to the destination** - data relating to the location to which the item to be shipped is to be shipped, such as the zip code for that location | [Means-plus-Function]<br>**Function:**<br>to input information relating to the place to which the item is to be shipped<br>**Corresponding Structure:**<br>keypad (28); keyboard (226) | **function:** inputting information relating to the destination to which the item is to be shipped<br>**structure:** keypad 28 or keyboard 226 |

All parties agree that this is a means-plus-function limitation that must be construed pursuant to § 112, ¶ 6. Claims written in means-plus-function format represent a different form of claiming where instead of identifying structure in a claim, the patentee, by using the word "means," indicates that the claim covers a recited function which is performed by a structure or structures specifically identified in the specification as performing that function. Those structures become part of the claim as the "means." The word "means" by itself is just a structure-less placeholder to be filled in by structure linked to the claimed function in the specification. To construe such a limitation, the court "identif[ies] the corresponding structure in

the written description that performs [the claimed] function." *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).

### i.     Function of "means for inputting information relating to the destination to which the item is to be shipped"

First, "[t]he function is properly identified as the language after the 'means for' clause and before the 'whereby' clause, [if any] . . . ." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003) (holding that "the district court erred by improperly broadening the scope of the claimed function by 'reading out' the limitations contained in the claim language"). Accordingly, the claimed function is "inputting information relating to the destination to which the item is to be shipped." This claimed function is unambiguous; accordingly, no further construction of the claimed function is necessary.

### ii.     Corresponding Structure

Once the claimed function is identified, the next step is to identify the structure in the written description that performs the claimed function, and any equivalents thereof. *See JVW Enters.*, 424 F.3d at 1330. Here, the structure that is disclosed by the specification for "inputting information relating to the destination to which the item is to be shipped" is: "keypad 28 and keyboard 226" as IBM's proposed construction recites. (*See* '464 patent, 7:23-25 ("The customer then enters a destination zip code through key pad 28"), 13:14-15 (inputting information through keyboard 226).) In its brief, Uship seems to agree that "key pad 28 and keyboard 226" are the corresponding structure. (Uship Br. at 35.)

### iii.     Uship's Construction

Uship advances a construction that is wholly at odds with the established law of means-plus-function claiming. First, Uship argues that "inputting information" is the claimed function, and simply omits the rest of the claimed function "relating to the destination to which the item is

57

to be shipped."  In doing so, Uship impermissibly broadens the claim to structures that merely input information instead of those described as inputting information relating to the destination to which the item is to be shipped.  For that reason alone Uship's construction is incorrect. *Lockheed Martin*, 324 F.3d at 1319 ("The function of the limitation :is properly identified as the language after the 'means for' clause.").

More significantly, Uship seeks a construction of the claimed means that cannot be correct as a matter of law.  In the Joint Claim Construction Statement  (D.I. # 34),  Uship urges that the claimed **means** for inputting information relating to the destination to which the item is to be shipped is "structure, material or steps used for entering data into a computer memory unit for processing  or storage, such as a keyboard, touch pad, touch screen or similar device."  This cannot be correct—a means-plus-function limitation cannot cover steps.[16]  Likewise a means-plus-function limitation only covers structure specifically linked in the specification to the claimed function as well as equivalent structures—it does not cover generic structures "such as a keyboard, touch pad, touch screen or similar device."  *See JVW Enters.*, 424 F.3d at 1332 ("In order to qualify as corresponding, the structure must not only perform the claimed function, but the specification must clearly associate the structure with performance of the function").  In this case, the claimed "means" limitation covers the specific structures (and structural equivalents of

---

[16] Despite the fact that Uship agrees this is a means-plus-function limitation, its proposed construction set forth in the table above and in the table in its brief does not reflect the proper analysis.  For example, Uship's construction in the table does not separately construe the function or the corresponding structure.  As another example, Uship asserts that the means-plus-function element covers "steps," which of course it cannot.  *See O.I. Corp. v. Tekmar Co., Inc.*, 115 F.3d 1576, 1582-83 (Fed. Cir. 1997)  ("The word 'means' clearly refers to the generic description of an apparatus element, and the implementation . . . is obviously by structure or material.  We interpret the term "steps" to refer to the generic description of elements of a process, and the term "acts" to refer to the implementation of such steps. . . .  [S]ection 112, ¶ 6, is implicated . . . with respect to steps . . . only when steps plus function without acts are present.).  Accordingly, IBM focuses its analysis on the positions Uship advances in the text of its brief relating to means-plus-function elements.

the identified structures) identified in the specification for inputting information related to the destination.

In its brief, however, Uship seems to agree that specific structures must be identified that correspond to the claimed means and concedes that IBM is correct in construing the corresponding structure to be "keypad 28 and keyboard 226," but argues that IBM leaves out the "voice-recognition mechanism."[17]   Notably, Uship's proposed claim construction says nothing about voice recognition.   Regardless, although the patent contains a single reference to a "mechanism that recognizes voices," the patent provides no indication of what such a mechanism is or how it interfaces with the overall system.   (*See* '464 patent, 5:52-54.)   There is no identification that such a "mechanism" has anything to do with inputting information relating to an item's destination.   Accordingly, it cannot be the structure for the claimed function. *See JVW Enters.*, 424 F.3d at 1332.

Uship also unnecessarily construes facially clear terms within "information relating to the destination."   The meaning of this phrase is clear and not disputed with respect to the '464 patent.   Thus, there is no need to construe this phrase.   *United States Surgical*, 103 F.3d at 1568 ("[Claim construction] is not an obligatory exercise in redundancy").

> d.    **control means for analyzing the inputted information and calculating the fee for shipment of the item;**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **control means** - structure, material or steps used for controlling the operation of certain features of the claimed invention, involving the use of a computer processing unit (CPU) and associated hardware and software | **[Means-plus-Function]**<br>**Function:**<br>to analyze the inputted information relating to the place to which the item is to be shipped, and to calculate the shipment fee<br>**Corresponding Structure:**<br>control system (100) including: (1) | **function:** analyzing the inputted information and calculating the fee for shipment of the item<br>**structure:** control system 100, including CPU 102 and PLC 104, and connections to key pad 28 (or keyboard 226) and electronic scale 22 (or 222) [lacks sufficient |

---

[17] In making this argument, Uship appears to have left out "steps" for "inputting information relating to the destination to which the item is to be shipped," found in its proposed construction.

| **analyzing** - processing or examining | CPU (102) in two-way | structure for analyzing the inputted |
|---|---|---|
| | communication with PLC (104); and | information and calculating the fee] |
| **calculating** - determining by | (2) CPU (102) connected to scale | |
| mathematical methods; computing | (22) and keypad (28) / keyboard | |
| | (226) | |
| **fee for shipment** - the price or sum | | |
| quoted or charged to ship an item to | Program Logic Controller: | |
| the designated location/address | A control device that employs the | |
| | hardware architecture of a computer | |
| | and a relay ladder diagram language. | |

As with the previous limitation, the parties agree that this is a means-plus-function element that must be construed under § 112, ¶ 6.[18]  Accordingly, the function is construed first, followed by identifying the structure that corresponds to the claimed function.

> **i.    Function of "control means for analyzing the inputted information and calculating the fee for shipment of the item"**

The claimed function is: "analyzing the inputted information and calculating the fee for shipment of the item."  *See Lockheed Martin*, 324 F.3d at 1319 ("The function of the limitation "is properly identified as the language after the 'means for' clause.").  This function is clear and unambiguous on its face and requires no construction.

> **ii.    Corresponding Structure**

The parties apparently agree that the corresponding structure is at least control system 100, including CPU 102 and PLC 104.  (*See* Uship Br. at 37.)  Additionally, the connections between control system 100 to keypad 28/keyboard 226 and electronic scale 22/222 are necessary structure "for analyzing the inputted information and calculating the fee."  (*See* '464 patent, Fig. 5.)  The connections are necessary because without them, there is no way for the inputted information at the keypad and scale to get to the control system for analysis.

---

[18] Despite the fact that Uship agrees this is a means-plus-function limitation, its proposed construction set forth in the table above and the table in its brief does not reflect the proper analysis.  Accordingly, IBM focuses its analysis on the positions Uship advances in the text of its brief relating to means-plus-function elements.  *See supra* note 16.

Because the structure corresponding to the claimed function contains a general purpose programmable computer (*i.e.*, the CPU 102 and PLC 104), the claimed structure must include an algorithm or programming structure necessary to implement the claimed function. *See WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999) (holding that the district court erred "by failing to limit the [means-plus-function] claim to the algorithm disclosed in the specification"). But the '464 patent does not disclose an algorithm for "analyzing the inputted information and calculating the fee for shipment of the item." Therefore, the claim is indefinite. *Aristocrat Techs. Austl. v. Int'l Game Tech.*, 521 F.3d 1328, 1337-38 (Fed. Cir. 2008) (citing *WMS Gaming*, 184 F.3d at 1349) (holding that where there is no disclosure of an algorithm necessary to transform "the general purpose microprocessor to a 'special purpose computer programmed to perform the disclosed algorithm,'" the claim is indefinite).

### iii.    Uship's Construction

Uship's construction of this means-plus-function element again is a moving target. On one page of its brief, Uship states that the function is simply "control." (Uship Br. at 37.) This again impermissibly omits part of the claimed function and is clearly wrong. *See Lockheed Martin*, 324 F.3d at 1319. On the next page, Uship asserts that the function is "analyzing the inputted information and calculating the fee for shipment," (*id*. at 38), which is much closer to IBM's correctly proposed function.

Uship then continues its improper exercise in redefining nearly every word of the claim, devoid of context, when those words are unambiguous. Here, Uship defines "analyzing," "calculating," and "fee for shipment" even though there seems to be no dispute about what they mean—which is why IBM proposes that they take their plain meaning without further construction. There is no need to replace these plain English words with a series of less clear synonyms that do nothing to clarify what the inventor intended to envelop with this claim.

61

In its brief, Uship agrees that Control System 100 (including CPU 102 and PLC 104) are corresponding structure, but disagrees with IBM that the means must also include the disclosed interconnections between the means for weighing, the means for inputting information, and the control means.   But the structure must include these interconnections disclosed in the specification because, without them, the claimed unit cannot receive and "analyze the inputted information."  *See Asyst Techs, Inc. v. Empak, Inc.*, 268 F.3d 1364, 1372 (Fed. Cir. 2001).

Uship also asserts that the limitation is not indefinite, but Uship is wrong.  Specifically, Uship points to the '464 patent's vague disclosure of "zone and weight charts" and "corresponding fee files" programmed on PLC 104 as the algorithm required by the case law for a means including a general purpose computer to be sufficiently definite.  (*See* '464 patent, 6:31-38.)  This single vague reference to charts and files is not an algorithm—no programming steps are provided, and not even an example is provided.  This does not even rise to the level of the disclosure that was held inadequate in *Aristocrat*, where even disclosed mathematical tables were insufficient, taken alone, to amount to an algorithm for purposes of § 112, ¶ 6.  *See Aristocrat*, 521 F.3d at 1334-35 ("[Aristocrat] has disclosed, at most, pictorial and mathematical ways of describing the claimed function . . . .  That is not enough . . . to satisfy section 112 paragraph 6.")  Accordingly, the claim is invalid.

However, if this Court believes that the disclosure is adequately definite, then the fee files and weight charts to which Uship refers must become part of the structure of this claim.  *See WMS Gaming*, 184 F.3d at 1349 (holding that the district court erred "by failing to limit the [means-plus function] claim to the algorithm disclosed in the specification").  Uship cannot point to those files and charts as sufficient structure to avoid a finding of indefiniteness and then argue that they are not part of the claim.  As the case law makes clear, it is not enough to claim a means

and then identify an unprogrammed general purpose computer as the corresponding structure. Either there is an algorithm or programming disclosed, at which point the corresponding structure is the computer and the disclosed algorithm, or if there is no such algorithm or programming disclosed, then the claim is indefinite. *Halliburton Energy Serv., Inc. v. M-I LLC*, 514 F.3d 1244, 1256 n.7 (Fed. Cir. 2008) ("For so-called means-plus-function limitations, claim scope is limited to structure disclosed in the specification and equivalents. And if no structure is disclosed, the claim is indefinite.").

> **e.**    **said control means further including means for receiving credit card information and**

| Joint Proposal of Parties |
|---|
| **Function:**<br>to receive credit card information<br>**Corresponding Structure:**<br>card reader (30, 230) |

> **f.**    **said control means further including . . . means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines;**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for communicating and assessing** - structure, material or steps used for transmitting data between the claimed invention and the customer's credit card company (or that company's agents) and for charging the fee for shipment to the customer's credit card account, involving the use of communication lines such as telephone lines and related hardware and software<br><br>**account** - a business relation in which credit is used<br><br>**telephone lines** - a wire circuit connecting two or more points or stations in a telephone system, or the system itself | **means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines:** [Means-plus-Function]<br>**Function:** to communicate and assess the shipment fee to the account of the person owning the credit card<br>**Corresponding Structure:** control system (100) including CPU (102) connected to card reader (30), and card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card | **means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines:**<br>**function:** communicating and assessing the shipment fee to the account of the person owning the credit card<br>**structure:** magnetic card reader 30 or 230 connected to a dedicated telephone line |

This is a means-plus-function element; accordingly, its construction is governed by § 112, ¶ 6.  Accordingly, the function must be construed first, followed by the corresponding structure.

### i.  Function of "communicating and assessing the shipment fee to the account of the person owning the credit card"

The function of this element is "communicating and assessing the shipment fee to the account of the person owning the credit card."  *See Lockheed Martin*, 324 F.3d at 1319.  This term is clear on its face and requires no further construction.

### ii.  Corresponding Structure

The structure that corresponds to this function is: magnetic card reader 30 or 230 connected to a "dedicated telephone line."  ('464 patent, 7:1-4, Fig. 10.)  The dedicated telephone line communicates charges to the "account of the person owning the credit card" as the claim requires.

### iii.  Uship Construction

Uship asserts that this element is not a means-plus-function claim under § 112, ¶ 6, even though it begins with the word means" and every other means term in this claim is conceded to be means-plus-function.  The law is clear that when a term begins with the word "means" there is a presumption that the element should be construed as a means-plus-function element.  *See Altiris*, 318 F.3d at 1375 ("Where a claim uses the word 'means' to describe a limitation, we presume that the inventor used the term advisedly to invoke the statutory mandates for means-plus-function clauses") (internal quotations omitted).  Uship does not overcome this presumption.

Uship cites *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir. 2004), in support of its contention, but *Lighting World* is off point and dealt with the exact

64

opposite situation as here.  In *Lighting World*, the Federal Circuit addressed the opposite burden of overcoming the presumption that a limitation that ***did not*** contain the word "means" was ***not a means-plus-function claim.***  *Id*. at 1363.  It is vastly different to try to construe an element without the word "means," such as "connector assembly" in *Lighting World*, as a means-plus-function element than to construe a term that begins with the word "means" as a non-means-plus-function element.  Proceeding under the wrong premise, Uship quotes further from *Lighting World*:

> [T]o avoid application of section 112 P 6, the Court of Appeals has not required the claim term to denote a specific structure.  Instead, it has held that is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function.

(Uship Br. at 42-43 (quoting 382 F.3d at 1359-60).)  All this means is that if the word ***means*** is not present, then there is a presumption the claim element is not a means-plus-function element and the words in the claim must then be reviewed to see if they are essentially claiming in a means-plus-function format regardless. This statement of law applies to the situation where the presumption is ***against*** applying § 112, ¶ 6.  Here the claim limitation uses the words means, and the presumption is in favor of applying § 112, ¶ 6.

A case that is on point is *Altiris*, which Uship cites earlier in its brief but does not cite for this proposition—even though it is directly on point.  In *Altris*, as here, the patentee argued against applying § 112, ¶ 6 to a limitation that explicitly used the term "means."  *See* 318 F.3d at 1375-76.  The Federal Circuit held that the presumption in favor of applying § 112, ¶ 6 was ***not overcome*** for the following limitation:

> a means of booting said digital computer, said means of booting ***including a first set of commands, said first set of commands resident on said storage device of said digital computer for booting said digital computer,*** and a second set of commands

> resident on a storage device external to said digital computer for
> booting said digital computer.

*Id.* at 1375-76.   Although there was a recital of some structure such as a "digital computer,"

"commands," and a "storage device," the court held that these structures alone did not perform

the function of "booting," and did not overcome the presumption triggered by the inclusion of

the words means.  *Id*. at 1376.  Similarly, in this case, like *Altiris*, there is a partial recitation of

structure, "being by telephone lines," but the telephone lines only serve as the medium for

communication—telephone lines, by themselves, do not communicate anything.  A card reader

connected to the telephone line must be present to "communicate and assess the shipment fee to

the account of the person owning the credit card."  Accordingly, because the "exact structure

used to accomplish the function [does not] appear[] in the claim language," the presumption that

the claimed "means for communicating" is a means-plus-function element is not rebutted, and

Uship's construction should be rejected.  *Id.*

Uship also argues that, even if this is a means-plus-function element, the claimed "means

for communicating" does not require a "dedicated" phone because, *in the abstract*, the claimed

function can be performed without these structures.  (Uship Br. at 44.)  But that is not what is

disclosed in the specification.  Uship cites *Asyst Technologies*, 268 F.3d at 1369-70, for the

proposition that "Section 112 paragraph 6 does not permit incorporation of structure from the

written description beyond that necessary to perform the claimed function."  (Uship Br. at 44.)

*Asyst Techsnologies* is off point.  *Asyst Technologies* addresses the situation where there are a

number of structures identified in the specification as performing a claimed function but only a

subset of those disclosed structures are "necessary" to perform the function.  *See* 268 F.3d at

1372.  The issue here, however, is not whether the function can be performed with a lesser set of

structures disclosed in the specification—***the specification discloses only one structure to***

*perform the claimed function, a dedicated telephone line*.  It may be that someone else might have invented a unit without a dedicated phone line, but that is not what Ramsden disclosed and claimed.  Whether Uship *now* contends a dedicated phone line is necessary is irrelevant.  The specification necessitates the presence of the "dedicated" phone line and there is no other disclosed structure to perform the claimed function.  To allow a patentee to do what Uship attempts would be a license to rewrite a patent after the fact.

Uship also defines various words not in dispute.  For example, "telephone lines" is an unambiguous term and replacing it with "a wire circuit connecting two or more . . . points or stations in a telegraph or telephonic system, or the system itself," (Uship Br. at 42), is unnecessary and an attempt to divorce an ordinary term from its context and broaden its scope. Uship's attempt to confuse this straightforward term should be rejected.

> **g.    means for securely storing said item until the item is collected by said commercial delivery service;**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for securely storing** - structure material or steps used to hold or contain and item in a manner designed to ensure that the item is safe from interception by unauthorized persons<br><br>**collected** - gathered and take | **[Means-plus-Function]**<br>**Function:**<br>to securely store said item until the item is collected by said commercial delivery service<br>**Corresponding Structure:**<br>storage area (14) defined within outer housing (12), security mechanism (50), a pair of inner doors (52, 54);<br>**or**<br>storage area (276) defined within outer housing (211), outer door (234), inner door (246), ramp (266) | **function:** moving the item into the secured area for storage until the item is collected by said commercial delivery service;<br>**structure:** outer door 42; inner doors 52 and 54, stepper motor 58, secure zone 14, guide structure 74<br>OR<br>outer door 234, temporary holding space 240, inner door 246, stepper motor 248, secure zone 276, powered conveyer 242, passive parcel distribution device 264. |

All parties agree that this is a means-plus-function term that is to be construed pursuant to § 112, ¶ 6.[19]  Accordingly, the function must be construed first, followed by the corresponding structure.

### i.    Function of "means for securely storing said item until the item is collected by said commercial delivery service"

The claimed function is: "securely storing said item until the item is collected by said commercial delivery service."  *See Lockheed Martin*, 324 F.3d at 1319.  Accordingly, the unit must perform the step of  moving the item into the secured area for storage until the item is collected by said commercial delivery service.  More importantly, the secure area must be an integrated part of the unit.  The intrinsic evidence supports this construction.

### (A)    Claim Language

The claim language itself makes clear that the "means for securely storing" must move the item to the secured area.  Also, where the applicant intended that the secure storage area not be integral with the rest of the unit, he so specified.  For example, as described *infra* § VI.A.2.f.ii, the applicant specifically claimed "an attendant" who takes the parcel or envelope "for storage in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person."  In this claim, however, the applicant did not claim a separate area or an attendant.  Instead, the applicant claimed an integrated unit that includes "means for securely storing" the item to be picked up.  *See Phillips*, 415 F.3d at 1314 ("Differences among claims can be a useful guide in understanding the meaning of particular claim terms.").

---

[19] Despite the fact that Uship agrees this is a means-plus-function limitation, its proposed construction set forth in the table above and the table in its brief does not reflect the proper analysis.  Accordingly, IBM focuses its analysis on the positions Uship advances in the text of its brief relating to means-plus-function elements.  *See supra* note 16.

**(B)     Specification and Abstract**

The specification also supports IBM's construction of the function.   The invention contemplates the item to be mailed is moved into a storage area.  For example, "a guide structure 74 is provided for guiding an item . . . to a deposit area on the floor of storage area 14."  ('464 patent, 4: 48-51; *see also id.* at 11:52-12:5.)  For the unit to "[g]uid[e] an item" into the storage area it must ***move*** it there.   Accordingly, the applicant understood the invention's means for securely storing to encompass the function of moving the item into secure storage where it is kept for pick-up and that the structures for accomplishing this function must be integral with the unit.

**(C)     Prosecution History**

The prosecution history does not address the meaning of this term.

**ii.     Corresponding Structure**

The corresponding structure of the limitation follows logically from its function.  Two embodiments of the invention have structure corresponding to the function of "securely storing said item until the item is collected by said commercial delivery service."

The first embodiment describes the necessary structure for securely storing as *at least*: outer door 42; inner doors 52 and 54, stepper motor 58, secure zone 14, guide structure 74.  (*See* '464 patent, 4:17-5:20.)  In this embodiment, outer door 42 serves to prevent access to secure area 14, while inner doors 52 and 54 operate in conjunction with stepper motor 58 and guide structure 74 for acting to transport or move the item into the secure area 14.  (*See id.*)  Similarly, the other embodiment described in the '464 patent[20] describes its necessary minimum structure: outer door 234, temporary holding space 240, inner door 246, stepper motor 248, secure zone

---

[20] There is one additional embodiment that is directed solely at the "adjunct packaging supply unit" and that discloses no structure for securely storing packages.  (*See* '464 patent, 10:45-48.)

69

276, powered conveyer 242, passive parcel distribution device 264.   (*See id.* at 11:8-67.) Notably, the structures in both embodiments are part of the claimed integrated unit.

### iii.        Uship's Construction

Once again, Uship misconstrues the functional limitation at issue by asserting that the claimed function is "securely storing the item."  But the ***entire*** function is: "means for securely storing said item until the item is collected by said commercial delivery service."  *See Lockheed Martin*, 324 F.3d at 1319.  Uship's proposed "means for securely storing" is overbroad.  *See id.*

Based on its improper construction of the claimed function, Uship, in its brief, erroneously concludes that the only "necessary" structure is a security area and "an appropriately conceived door."  (Uship Br. at 45-46.)  But an "appropriately conceived door" is not structure for purposes of a means plus function claim—such a claim requires reference to the structures disclosed in the specification.  To support its construction, Uship cites to the structures actually disclosed in the specification Figures 1, 3, and 6-9, (*id*. at 45), they each show the "door" as an integral part of the integrated, automated, and unattended unit.  The other portions of the specification upon which Uship relies describe an "outer housing," which integrates the unit.  ('464 patent, 2:31-34 ("a system for accepting and storing parcel packages . . . includes an outer housing"); 51-56 (same); 3:45-46(same).)  Another passage Uship relies upon describe doors 52, 54, which are shown in Figure 3 as integrated in the interior of the claimed unit.  (*Id*. at 4:25-26.) Yet another passage describes dump drop 92, which is shown in Figure 1 as part of the integrated unit.  And, finally, another passage upon which Uship relies describes that "powered conveyor 242 . . . move[s] a parcel placed within temporary holding space 240 by a customer to a passive parcel distribution device 264 within a storage area 276 defined within outer housing 211."  (*Id*. at 11:40-41.)  These cited structures are corresponding structures for § 112, ¶ 6, but "an appropriately conceived door" is not.  Moreover, these structures make clear that the

corresponding structures must be integrated within the claimed integrated, automated, and unattended unit.

> h.   **means for storing the inputted information once said item is disposed in said secured storage means,**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for storing** - structure, material, or steps used for putting or retaining data in a computer memory unit, involving the use of a computer processing unit (CPU) and associated hardware and software<br><br>**inputted information** - data that has been entered into a computer memory unit<br><br>**once said item is disposed** - whenever the item is put in particular or suitable place | **[Means-plus-Function]**<br>**Function:**<br>to store the inputted information relating to the place to which the item is to be shipped after the item is disposed in said secured storage means<br><br>**Corresponding Structure:**<br>control system (100) including: (1) CPU (102) with CPU memory in two-way communication with PLC (104); and (2) PLC (104) connected to first sensor (112) or third sensor (116) | **function:** the inputted information (relating to the destination) is stored once the machine determines that the item was disposed in the secured storage means<br>**structure:** first sensor 112 and control system 100, including CPU 102 |

All parties agree that this is a means-plus-function term construed pursuant to § 112, ¶ 6.[21]   Accordingly, the function must be construed first, followed by the corresponding structure.

> i.   **Function of "means for storing the inputted information once said item is disposed in said secured storage means"**

The functional part of this limitation is "storing the inputted information once said item is disposed in said secured storage means." *See Lockheed Martin*, 324 F.3d at 1319 ("The function of the limitation "is properly identified as the language after the 'means for' clause."). The function here must be construed as requiring that the previously inputted information relating to the destination to which the item is to be shipped is stored in the disclosed "means" ***once*** the

---

[21] Despite the fact that Uship agrees this is a means-plus-function limitation, its proposed construction set forth in the table above and the table in its brief does not reflect the proper analysis.  Accordingly, IBM focuses its analysis on the positions Uship advances in the text of its brief relating to means-plus-function elements. *See supra* note 16.

item is disposed in the secured storage means.  Such information cannot be stored before the item is stored in the unit or if the item is never stored in the unit.

## (A)     Claim Language

The claim language here is clear and unequivocal and can only be understood one way—information relating to the destination to which the item is to be shipped already has been input into the claimed integrated, automated unattended unit, that previously "inputted information" must now be stored and the event that triggers such information storage is disposal of the item in "the secured storage means."  The information cannot be stored prior to that event.  Any other reading would impermissibly violate the precepts of English grammar.  *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983) ("A claim must be read in accordance with the precepts of English grammar.").  If the previously inputted information were stored before the item was disposed in the storage area or if the item were never disposed, then the word ***once*** would have no meaning and be rendered impermissibly superfluous.  *See Bicon, Inc. v. Straumann Co*., 441 F.3d 945, 950 (Fed. Cir. 2006).

## (B)     Specification and Abstract

The specification confirms the temporal relationship clearly set forth in the claims:

> ***When*** the first sensor 112 (or the third sensor 116 in the case of the dump drop) ***senses the presence of an envelope***, ***parcel or package***, ***control system 100 stores information*** relating to the transaction in CPU 102.

('464 patent, 8:43-47.)  Thus, the inputted information is not stored until the claimed unit determines that the item has been deposited—as IBM's proposed construction of the function makes clear.

## (C)     Prosecution History

The prosecution history does not address the meaning of this term.

### ii.        Corresponding Structure

The structure corresponding to the claimed function is clearly identified in the specification.  As just discussed, the specification provides that "first sensor 112 senses the presence of an envelope" and "control system 100 stores information . . . in CPU 102."  Thus, the structure for storing once said item is disposed, is the sensor 112 for determining that the item has been disposed in the secured storage area, and the control system 100/CPU 102, for doing the actual storage of information as IBM's proposed construction requires.  There is no other structure disclosed that performs the function explicitly required by the claim

### iii.        Uship's Construction

Uship ignores the function expressly set forth in the claim and instead improperly rewrites that function to omit the requirement that the information be stored *once the item has been disposed*.  Uship, instead, construes the claimed function only as "storing the inputted information."  *But that is not what the claims say*—they require a means for storing the inputted information *once said item is disposed in said secured storage means*.  Uship knows that the accused product does not store any information based on when or whether an item is disposed in a storage area so Uship simply removes the portion of the claim requiring that functionality.

*Lockheed Martin* demonstrates why this is wrong as a matter of law.  In that case, the means-plus-function claim at issue was:

> means for rotating said wheel in accordance with a predetermined rate schedule which varies sinusoidally over the orbit at the orbital frequency of the satellite, whereby . . . .

324 F.3d at 1315 (emphasis deleted).  The district court construed the function as only "rotating said wheel," leaving out "in accordance with a predetermined rate schedule which varies over the orbit at the orbital frequency of the satellite." *Id*. at 1318-19.  The Federal Circuit reversed the district court for misconstruing the function.  *Id*. at 1319.  According to the Federal Circuit,

"[t]he function is properly identified as the language after the 'means for' clause and before the 'whereby' clause." *Id*. Uship repeats the mistake of the district court in Lockheed Martin and "improperly broaden[s] the function . . . by 'reading out' the remaining claim limitations." *Id.* at 1319; *see also Cardiac Pacemakers v. St. Jude Medical*, 296 F.3d 1106, 1113 (Fed. Cir. 2002) ("It is equally improper to broaden the scope of the claimed function by ignoring clear limitations in the claim language").

Uship's construction of the corresponding structure is wrong because it is based on its erroneous construction of the function. As a result, Uship's construction of the corresponding structure is incomplete. Uship admits that CPU 102 and PLC 104 (also part of control system 100), are corresponding structure, but without the full function, Uship leaves out the sensor 112 that detects the disposal of the package and allows the unit to store inputted information *once the item is disposed*. The sensor is critical to implementing the properly construed function. As the specification makes clear, it is not until "the first sensor 112 (or the third sensor 116 in the case of the dump drop) senses the presence of an envelope, parcel or package, [that] control system 100 stores information relating to the transaction in CPU 102." ('464 patent, 8:43-48.) Because the sensor is necessary to the claimed function, it must be included as part of the corresponding structure and Uship's construction is wrong.

Uship attempts to avoid the correct analysis by artificially splitting the claimed function into two separate elements: (1) "inputted information"; and (2) "once said item is disposed," and provides abstract dictionary definitions for those words as if they were not a single function. But, as in *Lockheed Martin*, the functional words of this claim element make up a single function in a means-plus-function clause and Uship's attempt to split them and provide an overbroad and abstract series of dictionary definitions is at odds with Federal Circuit law.

74

Uship argues that the words "'once said item is disposed' merely indicates that the system *continues* to store the information after the item has been disposed." (Uship Br. at 48.) But Uship cites no support for its lawyer argument, which obviously is contrary to the plain meaning and the intrinsic evidence. *See Southwall*, 54 F.3d at 1570 ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record . . . and treat the claims as a "nose of wax.").  If the inventor had wanted to claim the invention as Uship now urges, then there would have been no reason to include the words "once said item is disposed in said secured storage means"—all that would be necessary would be the words "means for storing the inputted information" which would allow information to be stored at any time.  But that is not what the patentee invented or claimed and the public has a right to rely on the intrinsic record to determine what is and is not claimed. *See Bicon*, 441 F.3d at 950 ("Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language . . . is merely superfluous, non-limiting elaboration").  Accordingly, Uship's interpretation should be rejected.

> **i.** **said information storage means including means for displaying a manifest.**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **displaying** - showing or presenting<br><br>**manifest** - a listing of transactions involving the claimed invention which pertain to a particular commercial delivery service | **[Means-plus-Function]**<br>**Function:**<br>to display a listing of all transactions which pertain to the particular commercial delivery service<br>**Corresponding Structure:**<br>manifest printer (90, 280)<br><br>**manifest:** a listing of all transactions which pertain to the particular commercial delivery service | **function:** displaying a listing of all transactions which pertain to the particular commercial delivery service<br>**structure:** manifest printer 90, 280 |

All parties agree that this is a means-plus-function term construed pursuant to § 112, ¶ 6.[22] In addition all the parties seem to agree that a manifest is defined in the specification as a "listing of all transactions which pertain to a particular commercial delivery service."

### i.    Function of "means for displaying a manifest"

Although Uship does not interpret the function of this limitation, presumably it is in agreement with IBM and the government that the function is: "displaying a manifest."  When substituting the definition of manifest, this becomes "displaying a listing of all transactions which pertain to the particular commercial service."  The Government advances a very similar construction.

### ii.    Corresponding Structure

The parties seem to agree that the structure corresponding to the function of displaying a manifest is manifest printer 90, 280 disclosed in the specification at Column 5:21-32 and Column 12:44-46.  Uship, however, argues further that the corresponding structure also includes "video display terminal 24."  (Uship Br. at 49.)  But nowhere does the '464 patent ever identify or link in any way the video display 24 as structure for displaying a manifest and, therefore, it cannot be "corresponding structure."  It is not enough for a structure to be disclosed in the specification; the structure must also be linked to the function.  *See JVW Enters., Inc.*, 424 F.3d at 1330 ("In order to qualify as corresponding, the structure must not only perform the claimed function, but the specification must clearly associate the structure with performance of the function").  Uship does nothing more than imagine that the video display terminal could be used

---

[22] Despite the fact that Uship agrees this is a means-plus-function limitation, its proposed construction set forth in the table above and the table in its brief does not reflect the proper analysis.  Accordingly, IBM focuses its analysis on the positions Uship advances in the text of its brief relating to means-plus-function elements.  *See supra* note 16.

to display a manifest, but nothing in the patent indicates that this is part of the invention. Accordingly, IBM's (and the Government's) proposed constructions are correct.

### 2. Dependent Claim 9

Dependent claim 9 depends from claim 7—therefore incorporating all of its limitations— and adds one additional limitation.

<blockquote>

**a.** **The integrated, automated, unattended unit of claim 7 wherein said means for storing said information further includes means for communicating said information to a remote location staffed by a human operator.**

</blockquote>

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for communicating** - structure, material or steps used for transmitting data between the claimed invention to another location, involving the use of communication lines such as telephone lines and related hardware and software<br><br>**remote location** - a place removed from the site in which the claimed invention is deployed<br><br>**staffed by a human operator** - utilizing the services of an employee or agent of a business or organization | **[Means-plus-Function]**<br>**Function:**<br>to communicate the stored information relating to the place to which the item is to be shipped to a place removed from the site in which the unit is deployed that is staffed by a human operator<br>**Corresponding Structure:**<br>*The means-plus-function limitation lacks sufficient corresponding structure* | **function:** communicating said information to a remote location staffed by a human operator<br>**structure:** [lacks sufficient structure for communicating the information to a remote location staffed by a human operator] |

The parties agree that this element a means-plus-function limitation, so the correct construction must adhere to § 112, ¶ 6.[23]  Because there is no structure to satisfy § 112, ¶ 6 the claim is indefinite.

---

[23] Despite the fact that Uship agrees this is a means-plus-function limitation, its proposed construction set forth in the table above and the table in its brief does not reflect the proper analysis.  Accordingly, IBM focuses its analysis on the positions Uship advances in the text of its brief relating to means-plus-function elements.  *See supra* note 16.

### i.      Function of "communicating said information to a remote location staffed by a human operator"

The claimed function is clearly set forth in claim 9—"communicating said information to a remote location staffed by a human operator."  *See Lockheed Martin*, 324 F.3d at 1319.

### ii.     Corresponding Structure

The structure must provide means for communicating said information to a remote location staffed by a human operator.  Although the specification may disclose structure for communicating information to a remote location, it does not disclose any structure corresponding to the part of the function requiring human staffing—because it cannot.  Humans cannot constitute structure for purposes of § 112, ¶ 6.  *Cardiac Pacemakers*, 296 F.3d at 118-19 (holding that humans cannot satisfy the structural requirements of means-plus-function claims).  Accordingly, the claim is indefinite.

### iii.    Uship's Construction

Uship admits that this is a means-plus-function claim element.  First, Uship incorporates unnecessary dictionary definitions from its analysis of "means for communicating and assessing" from claim 7.  (Uship Br. at 50.)  Uship's attempt at redefining these straightforward terms should be rejected.

Second, Uship argues that the specification sets forth sufficient structure for the claimed means element.  (Uship Br. at 50 ("[A]s shown above, the specification adequately discloses that the corresponding structure includes . . . related hardware and software.  *See* 'means for communicating and assessing [in claim 7].'").)  However, Uship's analysis of claim 7 does not describe the "related hardware and software" or any associated software algorithms.  (*See* Uship Br. at 40.)  "Related hardware and software" are not structure under § 112, ¶ 6 and the specification does not provide any algorithm for performing this function.  Therefore, the claim

78

is indefinite and invalid. *Aristocrat Techs. Austl. v. Int'l Game Tech.*, 521 F.3d 1328, 1337-38 (Fed. Cir. 2008) (citing *WMS Gaming*, 184 F.3d at 1349) (holding that where there is no disclosure of an algorithm necessary to transform "the general purpose microprocessor to a 'special purpose computer programmed to perform the disclosed algorithm,'" the claim is indefinite).

### 3.    Dependent Claim 10

Dependent claim 10 depends from claim 9—therefore incorporating all of its limitations— and adds one additional limitation.

> **a.    The integrated, automated, unattended unit of claim 9 wherein said unit includes a pivotable door that serves as a slide when said door is opened, said slide serving to transport the item to a storage area for secure storage.**

| Joint Proposal of Parties |
|---|
| pivotable door - door for receiving items into the unit that opens and shuts by turning on a pivot |

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **serves as a slide** - operates as a smooth surface on which items can glide or pass smoothly; operates as a chute | **serves as a slide:** operates as downward-inclined chute with a flat bed | The integrated, automated, unattended unit has a [pivotable door] that has a slide to transport the item to the secure storage area of the unit. |
| **transport** - to move or convey an item from one place to another | **serving to transport:** operating to convey from one place to another | |
| **storage area** - a place in which an item is deposited or held for subsequent use or disposition | **a storage area:** a space for storing items within the outer housing of the unit | |
| **secure storage** - holding an item in a manner designed to ensure that the item is safe from interception by unauthorized persons | **for secured storage:** stored in a manner that is inaccessible to unauthorized persons | |

The only material dispute for this claim is whether the pivotable door required by this claim must be within the "integrated, automated, unattended unit" of claim 9 [itself dependent on claim 7] or as Uship contends "the elements of the invention could exist in a cooperative, interrelated, but physically disparate system." (Uship Br. at 54.). This is no different than the

underlying dispute regarding what the term "integrated, automated, unattended unit" means. Uship again tries to argue that the claimed " integrated unit" can be made up of elements aggregated into a "physically disparate system"  but as discussed earlier that is wholly inconsistent with the intrinsic record.  *See supra* § V.B.1.a.  The conclusion that all the required elements must be "integrated" into a single "unit" is only bolstered by the patent's discussion of the pivotable door which shows that the pivotable door and storage area are part of the overall integrated unit—not a physically disparate system.



('464 patent, Fig. 4 (pivotable door 92 emphasis added), 5:34-35.)

### 4.      Dependent Claim 11

Dependent claim 11 depends from claim 10—therefore incorporating all of its limitations—and adds one additional limitation.

a. **The integrated, automated, unattended unit of claim 10 wherein said door serves to secure said storage area when said door is opened.**

| Joint Proposal of Parties |
|---|
| **serves to secure said storage area when said door is opened**: operates to bar access to the storage area through the door opening |

### 5.   Dependent Claim 12

Dependent claim 12 depends from claim 7—therefore incorporating all of its limitations—and adds one additional limitation.

a. **The integrated, automated, unattended unit of claim 7 wherein said means for receiving said credit card information comprises a magnetic card reader.**

| Joint Proposal of Parties |
|---|
| **comprises a magnetic card reader:** *Plain Meaning* - comprises a magnetic card reader |

### 6.   Dependent Claim 15

Dependent claim 15 depends from claim 12—therefore incorporating all of its limitations— and adds one additional limitation.

a. **The integrated, automated, unattended unit of claim 12 wherein said card reader is adapted to read credit cards issued by any of a plurality of credit card companies and wherein said fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction.**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **adapted to read** - made suitable, revised, or modified to obtain or scan data from an external storage medium and to place such data in the memory of a computer or similar device<br><br>**any of a plurality** - one of a group of more than one | | The magnetic card reader is selectively compatible with several different commercial bank cards |
| **adapted to communicate selectively** - made suitable, revised, or modified<br><br>**card being used in the transaction** | *Plain Meaning* - the card reader is adapted to read credit cards issued by more than one credit card company and the fee communicating means is adapted to communicate | **function:** to communicate selectively with the credit card company issuing the card being used in the transaction;<br>**structure:** magnetic card reader 30 |

| - the credit card that is being used in the particular transaction | selectively with the credit card company issuing the card being used in the transaction | or 230 and a dedicated telephone line |
|---|---|---|

The analysis of this claim is straightforward as it imposes two additional requirements on claim 12. First, as IBM's construction states, the "card reader is adapted to read credit cards issued by any of a plurality of credit card companies"—this just restates the plain and ordinary terminology of the claim. Uship does not seem to dispute this, although it is difficult to tell because of its unnecessary redefinition of "adapted to read."

The second difference is that the "fee communicating means" has an additional functional requirement: it must be "adapted to communicate selectively with the credit card company issuing the card being used in the transaction." Accordingly, IBM construes the function as: "to communicate selectively with the credit card company issuing the card being used in the transaction." Claim 15 adds an additional functional limitation to the "means for communicating . . . the shipment fee" limitation of claim 7, but the corresponding structure of claim 15 and the "means for communicating . . . the shipment fee" of claim 7 are identical because the '464 patent only describes one corresponding structure for performing both functions.

Uship relies on its incorrect arguments for claims 7's "means for communicating and assessing" to dispute that this is a § 112, ¶ 6 limitation. *See supra* § 1.f.iii. As discussed earlier, Uship contends that the inclusion of "telephone lines" provides sufficient structure to overcome the presumption that the "means for communicating and assessing" is a means-plus-function element. Strangely, Uship identifies no additional structure in this claim that allegedly performs the added function of being "adapted to communicate selectively . . . ." As discussed earlier (*See supra* § 1.f.iii) the recitation of telephone lines does not take claim 7 out of the purview of § 112,

82

¶ 6 and certainly provides insufficient structure in this claim to perform the additional required function.  Accordingly, IBM's proposed construction is correct.

> **7.    Dependent Claim 16: The integrated, automated, unattended unit of claim 15 wherein said fee communicating means includes means for validating said credit card prior to issuing the shipping label.**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for validating** - structure, material, or steps for determining or confirming the validity or authenticity of<br><br>**issuing** - printing or publishing<br><br>**shipping label** - a slip of paper, cloth, or other material, marked or inscribed for attachment to an item to indicate information relating to the mailing of that item, such as the destination to which the item is to be mailed | **[Means-plus-Function]**<br>**Function:**<br>to validate the credit card used in the transaction prior to issuing the shipping label<br>**Corresponding Structure:**<br>control system (100) including CPU (102) with predetermined card characteristics stored in CPU memory, and CPU (102) connected to card reader (30);<br>**or**<br>control system (100) including CPU (102) connected to card reader (30), and card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card | **function:** validating the credit card prior to issuing the shipping label; **structure:** control system 100 connected to magnetic card reader 30 or 230 [lacks sufficient structure for validating the credit card prior to issuing the shipping label] |

The parties agree that this is a means-plus-function limitation, so the correct construction must adhere to § 112, ¶ 6.[24]  Because there is inadequate structure to satisfy § 112, ¶ 6 the claim is indefinite.

> **i.    Function of "validating said credit card prior to issuing the shipping label"**

In this case, the additional limitation is "means for validating said credit card prior to issuing the shipping label."  The function is, thus, "validating said credit card prior to issuing the shipping label."  *See Lockheed Martin*, 324 F.3d at 1319.

---

[24] Despite the fact that Uship agrees this is a means-plus-function limitation, its proposed construction set forth in the table above and the table in its brief does not reflect the proper analysis.  Accordingly, IBM focuses its analysis on the positions Uship advances in the text of its brief relating to means-plus-function elements.  *See supra* note 16.

### ii.      Corresponding Structure

There is no disclosure of structure sufficient to perform the claimed function—the closest thing to any disclosure is the single line: "validation of the card may also be processed over the telephone line." ('464 patent, 7:4-5.)  This is merely a restatement of the function, not a description of the corresponding structure.  Accordingly, claim 16 is indefinite under § 112, ¶ 6.  *See Aristocrat*, 521 F.3d at 1334-35.  There is no disclosure of what structure validates the card and the telephone line is a mere conduit to communicate with the undisclosed mechanism that does validate the card.

### iii.      Uship's Construction

Uship agrees that this is a mean-plus-function limitation.  (Uship Br. at 59.)  Once again, however, Uship fails to understand that this necessarily means that it must be construed to include structure disclosed in the specification that corresponds to the claimed function.  (*See id.* at 60 ("[T]he Government is attempting to improperly read a particular embodiment into the claim limitation").)  By definition, a means-plus-function element must read in embodiments from the specification because the word "means" is merely placeholder for the structure disclosed in the specification.  But, as shown above, the specification does not adequately describe the corresponding structure and, therefore, the claim is invalid—a point that Uship does not directly address.   If the Court rejects IBM's contention, then IBM agrees with the Government's proposed construction of the corresponding structure.

> **8.      Dependent Claim 17: The integrated, automated, unattended unit of claim 16 wherein said validating means includes means for determining the type of card and the expiration date of the card.**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for determining** - structure, material, or steps used for ascertaining | [Means-plus-Function] **Function:** to determine the type of card and the expiration date of the card **Corresponding Structure:** | **function:** determining the type of card and the expiration date of the card; **structure:** control system 100 connected to magnetic card reader |

|  | control system (100) including CPU (102) with predetermined card type and expiration date information stored in CPU memory, and CPU (102) connected to card reader (30) | 30 or 230 [lacks sufficient structure for determining the type of card and the expiration date of the card] |

This analysis for this claim is exactly the same as claim 16, except that here the means for validating necessarily includes determining the type of card and expiration date.  Again, as shown above, the specification does not adequately describe the corresponding structure and, therefore, the claim is invalid—a point that Uship does not directly address.  If the Court rejects IBM's contention, then IBM agrees with the Government's proposed construction of the corresponding structure.

9.      **Dependent Claim 18: The integrated, automated, unattended unit of claim 17 wherein said validating means further includes means for determining whether the card is listed as a bad card.**

| Uship Constructions | Government Constructions | IBM Constructions |
| --- | --- | --- |
| **means for determining** - structure, material, or steps used for ascertaining<br><br>**listed as a bad card** - identified or designated as a credit card that is no longer valid or for which the charge would exceed its credit limit | **[Means-plus-Function]**<br>**Function:**<br>to determine whether the card is listed as a bad card<br>**Corresponding Structure:**<br>control system (100) including CPU (102) with list of invalid cards stored in CPU memory, and CPU (102) connected to card reader (30) | **function:** determining whether the card is listed as a bad card;<br>**structure:** control system 100 connected to magnetic card reader 30 or 230 [lacks sufficient structure for determining if the card is a bad card] |

This analysis for this claim is exactly the same as claim 16, except that here the means for validating necessarily includes the list of bad cards.  Again, as shown above, the specification does not adequately describe the corresponding structure and, therefore, the claim is invalid—a point that Uship does not directly address.  If the Court rejects IBM's contention, then IBM agrees with the Government's proposed construction of the corresponding structure.

C.      **Independent Claims 19, 28, And 34 And Their Dependent Claims**

This section contains IBM's arguments for independent claims 19, 28 and 34 of the '464 patent.  There are a large number of overlapping terms between and among these claims and

previously discussed claim 7. For each of these claims, IBM provides a chart identifying which elements already have been construed and which remaining element(s) require construction.

### 1. Independent Claim 19 [And Dependent Claims 20 and 21]

#### a. Independent Claim 19

| Claim 19 | Arguments |
|---|---|
| An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services: said automated unit comprising, | *Same as claim 7. See supra* § V.B.1.a *(cl. 7)* |
| means for weighing the item to be shipped; | *Same as claim 7. See supra* § V.B.1.b *(cl. 7)* |
| means for inputting information relating to the destination to which the item is to be shipped; | *Same as claim 7. See supra* § V.B.1.c *(cl. 7)* |
| control means for analyzing the inputted information and calculating the fee for shipment of the item; | *Same as claim 7. See supra* § V.B.1.d *(cl. 7)* |
| said control means further including means for communicating and assessing the shipment fee to the account of the person, said means for communicating the shipment fee being by telephone lines; | *Same as claim 7. See supra* § V.B.1.e *(cl. 7)* |
| means for securely storing said item until the item is collected by said commercial delivery service; | *Same as claim 7. See supra* § V.B.1.g *(cl. 7)* |
| means for storing the inputted information once said item is disposed in said secured storage means, | *Same as claim 7. See supra* § V.B.1.h *(cl. 7)* |
| said information storage means including means for transmitting a manifest to a remote location. | *New: See Below* |

Accordingly, only the following limitation must be addressed here—all others are incorporated by reference.

#### i. said information storage means including means for transmitting a manifest to a remote location.

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for transmitting:** structure, material, or steps used for sending or communicating data, involving the | [Means-plus-Function] **Function:** to transmit a listing of all | **function:** transmitting a manifest to a remote location. **structure:** [lacks sufficient structure |

| use of communication lines such as telephone lines and related hardware and software<br><br>**manifest:** a listing of transactions involving the claimed invention which pertain to a particular commercial delivery service<br><br>**remote location:** a place removed from the site in which the claimed invention is deployed | transactions which pertain to the particular commercial delivery service to a place removed from the site in which the unit is deployed<br>**Corresponding Structure:**<br>*The means-plus-function limitation lacks sufficient corresponding structure* | for transmitting a manifest to a remote location] |

The issue with respect to this claim limitation is whether there is sufficient structure for purposes of satisfying § 112, ¶ 6.[25]  Uship agrees that this term must be construed pursuant to § 112, ¶ 6, however, Uship does not provide an identification of the corresponding structure, except to say it includes "telephone lines and related hardware and software."  That is not an adequate recitation of structure for a means-plus-function claim.  A means-plus-function claim requires specific citation to the specification of the disclosed structure corresponding to the claimed function.  *Aristocrat*, 521 F.3d at 1333.  A vague reference to telephone lines, generic hardware and software does not suffice.

IBM agrees that software is required to perform the claimed function.  But, the specification does not provide ***any software*** for performing the claimed function.  The most the specification says is that "[t]he system 10 may be capable of transmitting the manifest to a remote location such as a central office for the carrier."  ('464 patent, 9:58-60.)  This is not structure—it is a restatement of the function; accordingly the claim is invalid for indefiniteness.  *Aristocrat*, 521 F.3d at 1337-38.

---

[25] Despite the fact that Uship agrees this is a means-plus-function limitation, its proposed construction set forth in the table above and the table in its brief does not reflect the proper analysis.  Accordingly, IBM focuses its analysis on the positions Uship advances in the text of its brief relating to means-plus-function elements.  *See supra* note 16.

Uship argues that the "means for transmitting a manifest to a remote location" is "adequately disclosed as 'the means for communicating,' which we have already discussed [Uship Br. at 40."]."  (Uship Br at 68.)  This is incorrect as a matter of law and stems from Uship's fundamental misunderstanding of the requirements of § 112, ¶ 6.  The functional limitation in claim 7 to which Uship refers is "communicating and assessing the shipment fee to the account of the person owning the credit card," which is plainly different than "transmitting a manifest to a remote location."  They are totally different functions and there is no disclosure that the structure identified as performing the "communicating and assessing" function in claim 7 also performs the wholly unrelated function of transmitting a manifest.

The former is communicating and assessing a single credit card charge, which is capable of being performed by the card reader and telephone lines, as explained above, *supra* § V.B.1.f. The latter function is "transmitting a manifest," which, using Uship's definition of manifest, means transmitting a "listing of transactions involving the claimed invention which pertain to a particular commercial delivery service."  They are different and unrelated.  As Uship concedes the latter function requires some software algorithm structure for creating and sending a "listing of transactions."  Because no such structure is disclosed, the claim is indefinite.  *Aristocrat*, 521 F.3d at 1337-38.

### b.    Dependent Claim 20

Dependent claim 20 depends from claim 19—therefore incorporating all of its limitations—and adds one additional limitation.

> **i.    The integrated, automated, unattended unit of claim 19 wherein said fee communicating means includes means for validating said credit card prior to issuing the shipping label.**

*See supra* § V.B.7 (cl. 16)

### c.  Dependent Claim 21

Dependent claim 21 depends from claim 19—therefore incorporating all of its limitations— and adds one additional limitation.

### i.  The integrated, automated, unattended unit of claim 19 including means for printing a hard copy of said account charge for said person.

| Joint Proposal of Parties |
|---|
| **function:**  printing a hard copy of said account charge for said person<br>**structure**: printer 26 |

IBM and the Government do not offer constructions of "hard copy" and "said account charge."  As the ordinary and plain meaning is clear, construction of these terms is unnecessary.

### 2.  Independent Claim 28 [And Dependent Claims 29 and 30]

### a.  Independent Claim 28

| Claim 28 | Arguments |
|---|---|
| An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services: said automated unit comprising, | *Same as claim 7. See supra* § V.B.1.a (cl. 7) |
| means for weighing the item to be shipped; | *Same as claim 7. See supra* § V.B.1.b (cl. 7) |
| means for inputting information relating to the destination to which the item is to be shipped; | *Same as claim 7. See supra* § V.B.1.c (cl. 7) |
| control means for analyzing the inputted information and calculating the fee for shipment of the item; | *Same as claim 7. See supra* § V.B.1.d (cl. 7) |
| said control means further including means for communicating and assessing the shipment fee to the account of the person, said means assessing comprising means for printing a hard copy of said account charge for said person | *New: See Below* |
| means for securely storing said item until the item is collected by said commercial delivery service; | *Same as claim 7. See supra* § V.B.1.g (cl. 7) |
| means for storing the inputted information once said item is disposed in said secured storage means, | *Same as claim 7. See supra* § V.B.1.h (cl. 7) |
| said information storage means including means for displaying a | *Same as claim 7.* |

| manifest. | *See supra* § V.B.1.i (cl. 7) |
|---|---|

Only the following limitation must be addressed here—all others are incorporated by reference:

> **i.** **said control means further including means for communicating and assessing the shipment fee to the account of the person, said means assessing comprising means for printing a hard copy of said account charge for said person;**

| **Joint Proposal of Parties** |
|---|
| **function:** printing a hard copy of the account charge for the person<br>**structure:** printer 26 |

### b. Dependent Claim 29

Dependent claim 29 depends from claim 28—therefore incorporating all of its limitations—and adds one additional limitation.

> **i.** **The integrated, automated, unattended unit of claim 28 wherein said fee communicating means includes means for validating said account prior to issuing the shipping label.**

*See supra* § V.B.7 (cl. 16)

### c. Dependent Claim 30

Dependent claim 30 depends from claim 28—therefore incorporating all of its limitations—and adds one additional limitation.

> **i.** **The integrated, automated, unattended unit of claim 28 including means for communicating said account charge to a remote location.**

| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
|---|---|---|
| **means for communicating** - structure, material or steps used for transmitting data between the claimed invention to another location, involving the use of communication lines such as telephone lines and related hardware | **[Means-plus-Function]**<br>**Function:**<br>to communicate and assess the account charge to a remote location<br>**Corresponding Structure:**<br>control system (100) including CPU (102) connected to card reader (30), | **function:** communicating the account charge to a remote location owning<br>**structure:** magnetic card reader 30 or 230 connected to a dedicated telephone line |

| | and card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges | |
|---|---|---|
| and software<br><br>**said account charge** - an entry in the customer's account of money due<br><br>**remote location** - a place removed from the site in which the claimed invention is deployed | | |

This claim element is redundant with the "means for communicating limitation" of its base claim which is construed *supra* § V.C.2.a.i, and is the same as the similar limitation construed above in claim 7, *see supra* § V.B.1.f.

### 3.      Independent Claim 34

| Claim 34 | Arguments |
|---|---|
| An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services: said automated unit comprising, | *Same as claim 7. See supra* § V.B.1.a (cl. 7) |
| means for inputting information relating to the destination to which the item is to be shipped; | *Same as claim 7. See supra* § V.B.1.c (cl. 7) |
| control means for analyzing the inputted information and calculating the fee for shipment of the item; | *Same as claim 7. See supra* § V.B.1.d (cl. 7) |
| said control means further including means for communicating and assessing the shipment fee to the account of the person, said means for communicating the shipment fee being by telephone lines; | *Same as claim 7. See supra* § V.B.1.f (cl. 7) |
| means for securely storing said item until the item is collected by said commercial delivery service; | *Same as claim 7. See supra* § V.B.1.g (cl. 7) |
| means for storing the inputted information once said item is disposed in said secured storage means, | *Same as claim 7. See supra* § V.B.1.h (cl. 7) |
| said information storage means including means for transmitting information that may be used to prepare a manifest to a remote location. | *New: See Below* |

Only the following limitation must be addressed here—all others are incorporated by reference:

a. said information storage means including means for transmitting information that may be used to prepare a manifest to a remote location.

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for transmitting:** structure, material, or steps used for sending or communicating data, involving the use of communication lines such as telephone lines and related hardware and software<br><br>**manifest:** a listing of transactions involving the claimed invention which pertain to a particular commercial delivery service<br><br>**remote location:** a place removed from the site in which the claimed invention is deployed | **[Means-plus-Function]**<br>**Function:**<br>to transmit information that may be used to prepare a listing of all transactions which pertain to the particular commercial delivery service to a place removed from the site in which the unit is deployed<br>**Corresponding Structure:**<br>*The means-plus-function limitation lacks sufficient corresponding structure* | **function:** transmitting information that may be used to prepare a manifest to a remote location.<br>**structure:** [lacks sufficient structure for transmitting a manifest to a remote location] |

This limitation is similar to claim 19's recitation of "said information storage means including means for transmitting a manifest to a remote location."  The difference between this limitation and the similar one in claim 19 is that in this element the automated shipping machine transmits "information that may be used to prepare a manifest," whereas in claim 19, the automated shipping machine transmits the manifest itself.  Despite the difference, the analysis of the corresponding structure is the same and, as a result, IBM refers the Court to its analysis claim 19, *see supra* § V.C.1.a.i.

## VI.    U.S. PATENT NOS. 5,831,220, 6,105,014, AND 6,917,924

The final patents that need to be construed are the '220, '014 and '924 patents, which issued to Ramsden and Liles.  Uship is asserting 2 claims from each of these patents:  claims 1 and 3 of the '220 patent; claims 1 and 2 of the '014 patent; and claims 1 and 2 of the '924 patent—one method claim and one apparatus claim from each.  All three patents contain nearly identical written descriptions and figures, and, as shown below, all are related to each other as continuations:



The '220, '014, and '924 patents, like the earlier '464 patent, purport to improve upon prior art shipping machines such as "unattended drop boxes," for accepting a "preaddressed package or letter."  ('464 patent, 1:31-33; '220 patent, 1:37-39.)  Accordingly, these patents are also directed at "an automated unit" for shipping packages and share much of the written description with the '464 patent.

The applicants for these patents, however,  focused on the alleged novelty of  the steps of verifying that the package was in (a) in fact mailed; and (b) that the package that was mailed was the one for which a shipping label was printed.  As explained in the "Summary of the Invention," one of the objects of the invention is "***to provide a system*** for accepting and storing items for subsequent pickup by a commercial carrier ***which is capable of giving a verified receipt of an item to be shipped***."  The Summary of the Invention further explains that the claimed invention performs a "validating step" in which the system confirms that the parcel or envelope received in the receiving step is the parcel or envelope for which the shipping label was printed:

> In order to achieve the above and other objects of the invention, a method of mailing parcels and envelopes using an automated shipping machine according to a first aspect of the invention, includes . . . providing a shipping label including at least the destination printed thereon; receiving the parcel or envelope with

the shipping label applied thereto; *validating that the parcel or envelope received in the receiving step is the parcel or envelope for which the shipping label was printed*; securely storing the parcel or envelope in a secure storing area inaccessible to the customer  when it is determined in *the validating step* that the parcel or envelope received in the receiving step is the parcel or envelope for which the shipping label was printed . . .

(220 patent, 2:39-65.)  The Abstract explains that the system will not provide the verified receipt until the validation step occurs. ("The system includes safeguards which prevent unauthorized access to the storage area, and will not provide a receipt to the customer until internal sensors verify deposit of the item")

There is a great deal of overlap among the asserted claims of these patents.  For example all of the asserted claims involve either a step or a means for "validating receipt of said parcel or envelope as the parcel or envelope for which shipping label was printed." (*Id.,* Cls. 1 & 3.) IBM, therefore, will follow the same procedure for the disputed terms in these patents that it did for the '464 patent.  Specifically, IBM will construe the disputed terms in the '220 patent and will then provide charts indicating which terms in the '014 and '924 patents overlap with the '220 claims and identifying any additional terms not found in the '220 patent.

A.    The '220 patent

1.    Claim 1

a.    A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of:

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **mailing** - sending by use of the USPS or a company or service that engages in the transportation of parcels and envelopes from one location to another location<br><br>**parcels and envelopes** - the items to be mailed through use of the method claimed in the invention, including without limitation packages or other objects wrapped or packed up to | **A method . . . using an automated shipping machine:** Each step of the method requires use of a shipping machine automatically controlled by mechanical or electronic devices that take the place of humans, unless the step explicitly states otherwise | A series of steps for mailing parcels and envelopes using an automated mailing label, validates receipt from a customer of a parcel and envelope, and/or collects and holds parcels and envelopes for pick-up by one or more commercial delivery services |

| | | |
|---|---|---|
| form a small bundle, as well as flat paper or cardboard containers for letters or thin packages<br><br>**automated shipping machine** - an apparatus or device consisting of interrelated parts with separate functions, used in the performance of the task of mailing parcels and envelopes, and employing a technique, method or system of operating and controlling that task by highly automatic means, as by electronic devices, thereby reducing human an intervention to a minimum | | |

The preamble states that which is claimed: a "method of mailing parcels and envelopes using an automated shipping machine." As discussed below, the preamble is a limitation that serves to provide the structure: an "automated shipping machine" for performing the claimed steps.

### i.        The Preamble Is A Limitation

Uship now argues that the preamble is not a limitation, but, again, its new position is wrong as a matter of law. The preamble here provides the necessary structure—"*i.e.*, the automated shipping machines"—for the method steps of the claims. If the automated machine is not a limitation then the subsequent steps in the body of the claim represent what postal clerks have done for decades: "receiving payment information from a customer," "receiving package type information," "weighing said parcel or envelope," and so on—that is plainly not the claimed invention. Instead, the invention is a method of using an automated shipping machine—most of the steps must be performed by the claimed machine. Without the preamble, the claims are divorced from the context for the "automated shipping machines" and there is nothing to "state[] the framework of the invention." *See On Demand Machine Corporation v. Ingram Industries, Inc.*, 442 F.3d 1343 (Fed. Cir. 2006) (construing the preamble as a limitation).

Moreover, the applicant chose the last method step to be performed by a human instead of the automated machine: "an attendant of said customer storing a validated parcel," ('220 patent, 30:29-32.)  As required by the preamble, the claim assumes that before the customer gets to the attendant, the automated machine has already processed the item to be mailed.

The prosecution history confirms that the preamble must be a limitation.  The prosecution history of the '220 patent includes its parent, the '799 patent.[26]  In this case, the '799 patent originally contained method claim 72 drawn to a "method of mailing parcels and envelopes using an automated shipping machine"—*the same preamble at issue here*.  The PTO argued that "the process for mailing could be performed by hand."  ('799 Pros. Hist., 12/27/95 O.A. at 2, G002342.)  The applicant disagreed stating:

> . . . Applicant disagrees with the Examiner's suggestion that the process claimed . . . can be performed by hand.  Both of these claims specifically recite in the preamble a method of mailing parcels and envelopes "using an automated shipping machine" rather than specifically reciting at each step that the step is performed by the automated shipping machine.  *Applicant submits that if the method were performed by hand as the Examiner suggests, then it would not use an automated shipping machine as set forth in the preamble*.  Moreover, while the Examiner may ignore limitations in the preamble under certain circumstances when construing the scope of a claim, *Applicant submits that it is improper to read a limitation out of a claim so as to change the claim's classification status merely because such limitation is in the preamble.*

(*Id.*, 2/07/96 Amendment at 2, G002346.)  The PTO, relying upon the applicant's representation, agreed and dropped its argument.

Moreover, during prosecution of the '799 patent, the PTO rejected the title of the application as not being descriptive of the claimed invention.  ('799 Pros. Hist., 3/01/96 O.A. at

---

[26] The '799 patent is the parent of the '220 patent, the grandparent of the '014 patent, and great-grandparent of the '924 patent.

2, G002352.)  In response, the applicant amended the application's title to "Automated Package

Shipping Machine"—the same title of the '220, '014, and '924 patents.   The applicant

represented to the PTO that the new title "is believed to be clearly indicative of the invention to

which the claims are directed."  (*Id.*, 4/10/96 Amendment at 1-2, G002704-05.)  The title, which

the applicant described as "indicative of the invention," mirrors the preamble term "automated

shipping machine."   Accordingly, the prosecution history makes clear that "there is no

meaningful distinction to be drawn between the claim preamble and the rest of the claim, for

only together do they comprise the 'claim.'"  *Pitney Bow*es, 182 F.3d at 1305.

Accordingly, the final piece of intrinsic evidence is unequivocal—the preamble is a

limitation.

### ii.      Construction of the Preamble

IBM's construction of the preamble as "a series of steps for mailing parcels and

envelopes using an automated unit that prepares an appropriate mailing label, validates receipt

from a customer of a parcel and envelope, and/or collects and holds parcels and envelopes for

pick-up by one or more commercial delivery services" is consistent with the intrinsic evidence,

and uses the exact language the applicant used to describe the "present invention" to the PTO.

The public has a right to rely on the applicant's explicit definition of "the invention."

### (A)      Claim Language

"[T]he claims themselves provide substantial guidance" as to the meaning of "[a] method

of mailing parcels and envelopes using an automated shipping machine."  *See Phillips*, 415 F.3d

at 1314.  First, what is being claimed is a method of using a "machine"—not a system of

machines, or a group of machines—but, one machine that performs the steps of: "receiving

payment information from a customer," "receiving package type information," "weighing said

parcel or envelope," and so on.  In other words, the machine performs the steps unless the claim

says otherwise.  This is the only logical reading of the claim—otherwise (as explained above), a human could perform all of the steps.  The fact that the claim explicitly requires the last step to be performed by an attendant strongly suggests that the remaining steps are performed by the "automated shipping machine."

### (B)      Specification and Abstract

The specification confirms that the objects of the invention are achieved by a "method of mailing parcels and envelopes *using an automated shipping machine*," including the steps of "receiving payment," "receiving package type information," "weighing the parcel," and so on— essentially *all* the steps claimed in method claim 1.  ('220 patent, 2:39-3:4.)  Moreover, the specification then reiterates that the "method is *implemented by an automated shipping machine* . . . ."  (*Id.* at 3:5-6.)  Accordingly, the specification aligns with the preamble— the claimed automated shipping machine "implements" the recited method steps.  *See Phillips*, 415 F.3d at 1316 (quoting *Renishaw*, 158 F.3d at 1250 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.").  IBM's proposed construction makes clear that an "automated unit" performs *all* the method steps "for mailing parcels and envelopes," except where the claim explicitly states otherwise.

### (C)      Prosecution History

The prosecution history of the '220 patent confirms that the method steps of claim 1 are implemented by "*an* automated shipping machine"—except when the claim itself says otherwise.  As discussed above, the applicant explicitly represented to the Patent Office that the exact same preamble meant that the steps of the patented method are performed by "*an* automated shipping machine" not by hand.  ("Applicant disagrees with the Examiner's suggestion that the process claimed . . . can be performed by hand . . . .   Applicant submits that if the method were

performed by hand as the examiner suggests, ***then it would not use an automated shipping machine as set forth in the preamble***." ).  ***An*** automated machine is a single machine, not some undifferentiated, indefinite collection of machines or components.  Further, in response to an objection from the PTO, the applicant retitled the invention to "Automated Package Shipping Machine" to "be clearly indicative of the invention to which the claims are directed."  ('799 Pros. Hist., 4/10/96 Amendment at 1-2, G002704-05.)  These words have meaning: the alleged invention and the claims are directed to a single machine.

### iii.    Uship's Construction

Once again, Uship asserts, without analysis, that the preamble is not a limitation.  As before, Uship cites *Pitney Bowes* and repeats its mantra that "the preamble merely encapsulates the main limitations found in the body of the claim and states the invention's purpose and intended use."  (Uship Br. at 81.)  As discussed above, in *Pitney Bowes*, the Federal Circuit held that the preamble was a limitation, because the preamble did much more than state a purpose or intended use.  *See* 182 F.3d at 1306.  Likewise, the preamble here does much more than state a purpose or intended use—it states a structural limitation that provides the machine-based framework for the invention.

Uship dismisses the '799 prosecution history as irrelevant to the '220 patent, but this is contrary to law.  *See, e.g., Ormco*, 498 F.3d at 1314-15 ("We have held that prosecution disclaimer may arise from disavowals made during the prosecution of ancestor patent applications"); *Jonsson*, 903 F.2d at 818 (applying prosecution history evidence from a patent to a descendent CIP patent).

Uship attempts to confuse the issue by asking rhetorically: "what does the use of an automated shipping machine mean and entail"?  (Uship Br. at 87.)  Or the equally philosophical: "What, for example, does it means for the machine to 'take the place of humans'?"  (*Id*. at 86.)

99

But neither the applicant nor the PTO seemed to struggle with these imponderables *when discussing the import of the exact same preamble*.  If anything is unclear it is Uship's argument that its claims now comprise some undefined combination of human and machine steps.  Uship's attempt to confuse the '220 patent's straightforward meaning should be dismissed as self-serving lawyer argument.

Uship also continues its unhelpful practice of redefining words that are not unclear such as "mailing" and "parcels and envelopes."  The one term that does need to be interpreted is, as Uship agrees, "automated shipping machine."  But Uship's continued practice of deconstructing terms of the patent using a dictionary leads inevitably to a hopelessly unbounded construction completely detached from the intrinsic evidence.  In the joint claim chart, Uship construed automated shipping machine as:

> an apparatus or device consisting of interrelated parts with separate functions, used in the performance of the task of mailing parcels and envelopes, and employing a technique, method or system of operating and controlling that task by highly automatic means, as by electronic devices, thereby reducing human an intervention to a minimum.

(Joint Claim Construction Statement, D.I. #34, at 27.)  IBM agrees that *an* automated shipping machine is *an* apparatus, but there is no support for the claimed machine "consisting of interrelated parts with separate functions."

Uship now interprets "automated shipping machine" as:

> [T]he invention contemplates the use of a machine that employs several automatic processes and that the invention nevertheless contemplates at least some activity by human actors—i.e., customers and, in some embodiments, attendants.

(Uship Br. at 85.)  In Uship's current view, therefore, the inventor could have invented a postal clerk using a postage scale to process a package for a customer.  Both of Uship's constructions of

the preamble are wrong as they are unsupported and contrary to the intrinsic record.

Accordingly, Uship's construction of the preamble should be rejected.

**b.      receiving payment information from a customer;**

| Joint Proposal of Parties |
|---|
| the automated shipping machine obtains data relating to the customer's chosen method of payment |

**c.      receiving package type information identifying a parcel or envelope to be mailed;**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **package type information** - data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the claimed invention<br><br>**identifying** - relating to, pertaining to, or associated with<br><br>**parcel or envelope** - see above<br><br>**mailed** - see mailing | the automated shipping machine obtains data relating to the structure of the parcel or envelope | **package type information:** data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier. |

The only disputed term here is "package type information."   The intrinsic evidence confirms that the inventor intended this term to represent the type of package—a letter, pak, or package.

**i.      Claim Language**

The language of the claims themselves provides insight as to "package type information." The phrase appears after the receiving step and before the weighing step:

> receiving payment information from a customer;

> receiving ***package type information*** identifying a parcel or envelope to be mailed;

> weighing said parcel or envelope to be mailed;

('220 patent, 30:4-7.)  Thus "package type information" does not include weight information as the claims require that the automated shipping machine "weigh[]" the parcel ***after*** it receives the

"package type information."  Therefore, "package type information" is information received from the customer that does not include the parcel's weight.

### ii.      Specification and Abstract

The specification goes one step further and actually defines package type as: "a letter, a pak or a package or any other package type."  (*Id.* at 20:7-9.)  Moreover, the package type is information that the customer must input into the automated shipping machine.  (*Id.* at 20:6-10.) Thus, the specification makes clear that the "package type information," a term that has no meaning outside the context of the patent, is nothing more or less than what "type" of package is to be mailed.  *See Phillips*, 415 F.3d at 1315 ("The specification is always highly relevant to the claim construction analysis [and] is the single best guide to the meaning of a disputed term.") (internal citations omitted); *Netword*, 242 F.3d at 1352 ("The claims are directed at to the invention that is described in the specification; they do not have meaning removed from the context in which they arose").

### iii.      Prosecution History

The prosecution history does not address the meaning of this term.

### iv.      Uship's Construction

Uship again seeks to expand the scope of this term far beyond anything supported by the intrinsic evidence.  This time, Uship does not even rely on a dictionary.  Uship's definition, while encompassing the specification's use of "package type"—and, therefore, IBM's proposed construction—also encompasses just about any other conceivable attribute of the package such as its weight and dimensions.  But the specification clearly defines the "package type" as categories of different packages such as an envelope or a package—not an undefined set of "characteristics." Uship's construction—"data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the claimed invention" is hopelessly ambiguous

and undefined.   What "characteristics or properties" are part of the invention? Because this interpretation is wholly untethered to the invention described and claimed in the patent and inconsistent with the intrinsic evidence, it should be rejected.

### d. weighing said parcel or envelope to be mailed;

| Joint Proposal of Parties |
| --- |
| the automated shipping machine obtains the weight of the parcel or envelope to be mailed by use of a scale |

### e. receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed;

| Joint Proposal of Parties |
| --- |
| the automated shipping machine obtains data relating to shipping from the customer including at least the destination of said parcel or envelope to be mailed |

| Uship Constructions | Government Constructions | IBM Constructions |
| --- | --- | --- |
| **destination** - data relating to the location to which the item to be mailed is to be mailed, such as the zip code for that location | destination of the parcel or envelope to be mailed - the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place | **destination -** name, street address, and zip code |

The sole issue in dispute for this limitation is the meaning of "destination" in the context of this claim.[27]  As the intrinsic evidence makes clear, the claimed "destination" includes a name, street address and zip code.

### i. Claim Language

In context, the claimed "destination" does not exist in a vacuum; it is the "destination of said parcel or envelope to be mailed," *i.e.*, the package's delivery destination.  *See Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."); *ACTV*, 346 F.3d at 1088 ("[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.").  A parcel or envelope is delivered to a person or an organization at a ***specific location***;

---

[27] Uship appears to have dropped its proposed construction of "shipping information," which is not disputed by the parties.

accordingly, the claimed "destination" is the name of the person or organization, along with that person's or organization's street address and zip code.

### ii.      Specification and Abstract

The specification uses "destination" consistently with the claims. For example, the specification notes that the "amount of time that it takes a commercial delivery service to deliver an item to its ***destination*** is critical . . . ." ('220 patent, 1:28-30.) The delivery time that is "critical" is the delivery to the intended recipient at their destination—not the delivery to a shipping terminal in the same zip code or city. The specification describes how the automated machine prompts a customer for the destination information:

> . . . a screen is displayed which requests the customer to enter the ***zip code of the destination*** of the item to be mailed. In a preferred embodiment, an automatic zip code check routine is invoked for automatically providing the destination city and state from the zip code information by searching a data base of zip codes. This routine saves the customer from having to enter the city and state information. The customer is next asked whether the recipient's shipping address is a commercial or residential location and then asked to ***input the destination name and destination street address for the item to be shipped. The zip code and other destination information*** is preferably inputted into the system via the keyboard 324 . . .

(*id.* at 20:37-49.) The specification makes clear that the claimed "destination" includes the "destination name," "destination street address," and "zip code and other destination information." The claimed "destination" as used here includes each of these things, as IBM's proposed construction provides.

### iii.      Prosecution History

The prosecution history does not address the meaning of this term.

### iv.     Uship's Construction

Uship argues that the specification supports its construction of "destination" as requiring only generic "data relating to the location, such as a zip code" of shipment and not a specific recipient's address.  Uship contends a zip code by itself must be a "destination" because the first disclosed embodiment requires that only a zip code be entered.  (Uship Br. at 972.)  But this embodiment, which is common to all the Ramsden patents, is covered by other claims, such as claim 7 from the '464 patent where only information *relating to the destination* must be entered. *See PSN Ill.*, 525 F.3d at 1166 ("[D]isclosed embodiments may be within the scope of other allowed but unasserted claims.")  When Ramsden wanted to claim an invention requiring only a zip code as disclosed in the first embodiment he did so by reciting "information relating to the destination."  When he wanted to claim the other disclosed embodiment, which requires the actual shipping address, he specified data "*including at least the destination of said parcel or envelope to be mailed*."  Under Uship's view, data relating to the destination would be the same as data including the destination.  But the law requires the court to note the differences between claims and give meaning to those differences.  *Phillips*, 415 F.3d at 1314 ("Differences among claims can be a useful guide in understanding the meaning of particular claim terms.").

Regardless, Uship's cite to the first embodiment actually supports IBM's construction, because it too indicates that zip code is only a subset of destination information—not a "destination" in its own right.  (*See* '220 patent, 8:55-56 ("The customer then enters the destination zip code through key pad 28").)  Thus, the claimed "destination" is more than the zip code—it is the specific location intended for the parcel or envelope.

      **f.**      **computing from said package type information, shipping information, and weight and date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer;**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **computing** - determining, reckoning, or calculating<br><br>**weight information** - data relating to weight of the item to be mailed. See weighing above.<br><br>**delivery date** - the projected or estimated date on which items to be mailed through the claimed invention are to be received at the designated location/address, expressed either as the specific month, day, and year when the item is expected to be received at the designated location or the number of days it is estimated to take for items to be mailed through the claimed invention to arrive at the designated location/address for delivery.<br><br>**cost for delivery** - the price(s) quoted to mail the item to the designated location/address<br><br>**delivery service option available** - the choices of different methods of mailing parcels and envelopes to a chosen or desired location/address that are open to be presented to a customer using the claimed invention. | the automated shipping machine calculates the expected calendar date of delivery and cost for delivery of the parcel or envelope to said destination for each available delivery service option, as a function of the package type information, shipping information, and weight information<br><br>said destination - the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place | the machine determines an expected delivery date, including the day of the week, and associated cost for each delivery service based on the package type information, shipping information, and weight information<br><br>**package type information**: data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier. |

       The only disputed aspect of this claim limitation regards the meaning of "computing . . . a delivery date . . . for delivery of said parcel or envelope."[28]  The intrinsic evidence confirms that this unambiguously worded limitation means what is says—that the automated shipping machine computes a ***date*** for delivery of the parcel.

---

[28] The other disputed terms, "destination" and "package type information," have already been addressed above.

### i.      Claim Language

Starting with the claim itself, the claimed "delivery date" itself suggests a "date" such as a specific day of the month or specific day of the week.   Moreover, the step is directed at "computing" a delivery date, which strongly implies that the automated shipping machine performs a computational process taking into account information such as the current date, shipping time for a given delivery option, distance to the destination, and the like.

### ii.      Specification and Abstract

The specification confirms this plain reading of the claim language, by explaining how the alleged invention actually computes a delivery date:

> In **computing the delivery date**, **the software takes into account weekends, holidays and other days in which no delivery service is available when calculating for each service when the package can be expected to be delivered**. . . . This allows the customer to make an informed judgment regarding which delivery service is desired on the basis of cost and **projected delivery date.**

('220 patent, 21:6-10.)   The named inventors made clear in the specification that their invention contemplates some kind of actual computation involving the calendar, holidays, and delivery service to provide a "projected delivery date."   Indeed, the computer process shown in Figure 22B contains a step labeled "Compute Delivery Date & Costs For Each Delivery Service."   (*Id.*, Fig. 22B at 838.)   Accordingly, the specification's explanation confirms that claim limitation "computing . . . a delivery date" means just that—computing a date.

### iii.      Prosecution History

The prosecution history does not address the meaning of this term.

### iv.      Uship's Construction

Uship argues that the central issue in dispute is "delivery date," but the central issue is actually the meaning of "computing . . . a delivery date," not "delivery date" "in a vacuum,

devoid of the context of the claim as a whole." *Kyocera*, 545 F.3d at 1347.  After stripping the claimed "delivery date" from the context of the surrounding claim language, Uship proposes that a delivery date could be "expressed *either* as a specific calendar date *or* as the number of days it is estimated to take for the items to be delivered."  (Uship Br. at 94. (emphasis in original).)  This proposed construction is an improper results-oriented attempt to cover the accused APC, which happens to not "compute . . . a delivery date."  *See Southwall*, 54 F.3d at 1570 ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record . . . and treat the claims as a "nose of wax").  Under Uship's view the claimed automated machine cold merely provide an estimate such as 2-3 days and then the customer could compute the "delivery date."  That is inconsistent with the plain meaning of the term at issue and inconsistent with the intrinsic record.

To support its infringement-oriented construction, Uship purports to rely on the prosecution history of the '799 patent.[29]  Uship cites to the examiner's statement that, because the Postal Service "calculat[es] the delivery date for the package," it would have been obvious to add such a feature to the claims of the '532 patent.  (Uship Br. at 94 n.1 (citing '799 Pros. Hist., 3/11/96 O.A. at 2, G002352).)  According to Uship, because "there is no evidence that the USPS at this time did anything other than indicate to customers the estimated number of days it would take to deliver items . . . ," this meant that the PTO essentially considered the Postal Service's alleged practice of just giving a static, estimated number of days the same as computing an actual

---

[29] Interestingly, although Uship favorably cites here to the prosecution history of the '799 patent, earlier in its brief Uship asserted that the Court should ignore the prosecution history of the '799 patent.  *See supra* § VI.A.1.a.iii.  Of course, the prosecution history is equally relevant to all of the Ramsden patents as Uship concedes it is here.  *See, e.g.*, *Ormco*, 498 F.3d at 1314-15 ("We have held that prosecution disclaimer may arise from disavowals made during the prosecution of ancestor patent applications"); *Jonsson*, 903 F.2d at 818 (applying prosecution history evidence from a patent to a descendent CIP patent).

"delivery date." Uship's conclusion does not follow from its premises—there is no evidence the examiner knew what Post Office practice was, and, therefore, no evidence that he considered computing dates equivalent to reciting estimated number of days.

> **g.** **receiving an indication of the delivery service option desired by the customer;**

| Joint Proposal of Parties |
|---|
| the automated shipping machine obtains the customer's chosen method of delivery |

> **h.** **printing a shipping label including at least said destination printed thereon;**

| Joint Proposal of Parties |
|---|
| the automated shipping machine prints at least said destination on a shipping label |

> **i.** **printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer;**

| Joint Proposal of Parties |
|---|
| the automated shipping machine prints at least the cost of delivering the parcel or envelope to  said destination with the customer's chosen method of delivery |

> **j.** **validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed;**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **validating receipt** - determining or confirming that the package to be mailed has been received for storage and/or shipment | the automated shipping machine confirms that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed by obtaining data concerning the parcel or envelope | verifying that the package being mailed is the same package for which the shipping label was printed |

The issue according to Uship is the meaning of "validating receipt." Once again Uship misses the mark—the issue is the construction of  the entire term "validating receipt of said parcel or envelope as said parcel or envelope for which said shipping label was printed" because the words of the claim do not exist in a vacuum.

### i.      Claim Language

The claim language itself is clear and definitive.  First, "validating receipt of said parcel or envelope as said parcel or envelope for which said shipping label was printed" is a method step performed by the automated shipping machine.  Its meaning is clear that the claim requires validation or verification that the claimed automated shipping machine actually received the parcel or envelope for which a shipping label was printed.  This is all the IBM's construction requires—it merely clarifies the claim language and neither broadens nor narrows it.

### ii.      Specification and Abstract

The specification confirms this understanding.  The specification describes the claimed "validation" step as "very important" and sets forth two reasons for the step's importance:

> At this point, a very important ***validation step*** is performed. ***In particular, the system 310 determines at step 536 whether it has received the correct package. This step is critical*** since ***it verifies that the customer did not perform a package switch*** or ***forget to replace the package*** in the intermediate storage area 334 for shipment.

('220 patent, 21:43-48.)  As to preventing "package switch," the specification discloses two embodiments in which the automated shipping machine performs the "validating" step.  The patent refers to the first embodiment as a so-called "simple method":

> For example, in a simple embodiment, photo cell sensor 344 may simply detect whether any package has been placed on the conveyor  belt 340.  If so, it is presumed that the package on the conveyor belt 340 is the appropriate package with the appropriate label.

(*Id.* at 21:50-55.)  The second embodiment, the "preferred embodiment," is more complex:

> On the other hand, in accordance with a preferred embodiment of the invention, ***the package is automatically reweighed and/or redimensioned*** once the customer has closed the outer door 330 (and hence the parcel or envelope cannot be accessed by the customer).  ***If the reweighing and redimensioning results in approximately the same readings*** as when the package was

> previously weighed and dimensioned, ***it is presumed that the*** ***package placed on the conveyor belt 340 is the same package for*** ***which the label was printed.***

(*Id.* at 21:55-64.)  These embodiments are fully consistent with the claim language and with

IBM's proposed construction:  "verifying that the package being mailed is the same package for

which the shipping label was printed."  Accordingly, IBM's proposed construction fully captures

the ordinary meaning of the claimed "validation" step.

### iii.    Prosecution History

The prosecution history does not address the meaning of this term.

### iv.    Uship's Construction

Following its standard practice, Uship construes "validating receipt" in a vacuum and

renders the words that follow it meaningless.  This is demonstrated by taking the literal claim

language:

> validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed

and then substituting Uship's construction of "validating receipt," as follows:

> [determining or confirming that the package to be mailed has been received for storage and/or shipment]  of said parcel or envelope as the parcel or envelope for which said shipping label was printed.

Uship's proposed construction is incoherent, unless everything after "validating receipt" is

ignored.

Uship justifies its overbroad interpretation on the fact that the specification describes two

different embodiments.  Uship asserts that IBM improperly ignores the following "simple"

embodiment:

> [I]n a ***simple embodiment***, photo cell sensor 344 may ***simply detect*** ***whether any package has been placed on the conveyor belt*** 340. If so, it is presumed that the package on the conveyor belt 340 is the appropriate package with the appropriate label.

(*Id.* at 21:51-53.)   But IBM does not ignore this "simple" embodiment; indeed, IBM acknowledges this embodiment above in describing the specification and abstract just as it did at page 63 of its proposed claim construction statement.  In the simple embodiment, the automated shipping machine performs the validating step by confirming that a package has been placed in the shipping machine, and the complex embodiment confirms that it is the same package for which the shipping label was printed.   Under either the "simple" embodiment or the more complex embodiment, the automated shipping machine still performs the "validating" step.

Despite this, Uship argues that IBM's construction is unduly restrictive because the specification describes an embodiment in which an "attendant," not the automated shipping machine, performs the "validating" step.   But, "the mere fact that there is an alternative embodiment disclosed in the . . . patent does not outweigh the language of the claim."   *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008); *see also PSN Ill.*, 525 F.3d at 1166 ("[There is no] panacea, requiring all claims to cover all embodiments.  Instead, courts must recognize that disclosed embodiments may be within the scope of other allowed but unasserted claims.").   This principle is illustrated in the very next limitation, which requires the "attendant" to perform the "storing" step.  *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003 ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." ); *see also Pause Tech. LLC v. Tivo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) (stating that it is improper to interpret "a single element in isolation.").   In other words, where the applicants intended to claim the "attendant" as performing a step, the applicants pointed that out specifically.   Thus, Uship's construction should be rejected.

    **k.** **and an attendant of said customer storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person**

| Joint Proposal of Parties |
| --- |
| a person assisting the customer stores the validated parcel or envelope in a secure storage area until a commercial delivery person picks up the parcel or envelope |

    **2.** **Claim 3**

    **a.** **An automated shipping machine for use in mailing parcels and envelopes, comprising:**

| Uship Constructions | Government Constructions | IBM Constructions |
| --- | --- | --- |
| **automated shipping machine** - an apparatus or device consisting of interrelated parts with separate functions, used in the performance of the task of mailing parcels and envelopes, and employing a technique, method or system of operating and controlling that task by highly automatic means, as by electronic devices, thereby reducing human an intervention to a minimum<br><br>**mailing** - sending by use of the USPS or a company or service that engages in the transportation of parcels and envelopes from one location to another location<br><br>**parcels and envelopes** - the items to be mailed through use of the method claimed in the invention, including without limitation packages or other objects wrapped or packed up to form a small bundle, as well as flat paper or cardboard containers for letters or thin packages | **automated shipping machine:** a shipping machine automatically controlled by mechanical or electronic devices that take the place of humans | An automated unit that prepares an appropriate mailing label, validates receipt from a customer of a parcel and envelope, and/or collects and holds parcels and envelopes for pick-up by one or more commercial delivery services |

The parties' constructions are the same here as they are for claim 1's preamble.

Accordingly, IBM adopts its analysis from claim 1 in full.

    **b.** **means for receiving payment information from a customer;**

| Joint Proposal of Parties |
| --- |
| **Function:**<br>to receive data relating to the customer's chosen method of payment from a customer<br>**Corresponding Structure:**<br>card reader (30, 230, 328, 712) |

    **c.** **a scale for weighing a parcel or envelope to be mailed;**

| Joint Proposal of Parties |
| --- |

Plain Meaning

**d.** **processing means for receiving package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, for computing from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer, and for receiving an indication of the delivery service option desired by the customer;**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **processing means** - structure, material, or steps used to carry out operations on data or programs, involving the use of a computer processing unit (CPU) and associated hardware and software<br><br>**package type information** - data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the claimed invention<br><br>**identifying** - relating to, pertaining to, or associated with<br><br>**shipping information** - data relating to the method by which the item to be mailed is to be mailed and/or to the location to which the item is to be mailed<br><br>**destination** - data relating to the location to which the item to be mailed is to be mailed, such as the zip code for that location | **[Means-plus-Function]**<br>**Function:**<br>to receive package type information identifying said parcel or envelope to be mailed, and to receive data relating to shipping from said customer including at least the destination of said parcel or envelope to be mailed<br>**Corresponding Structure:**<br>microprocessor (382, 718) connected to CRT (322, 702) and/or connected to keyboard (324, 704)<br><br>destination of said parcel or envelope to be mailed - the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place | **function:** receiving data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier, and other shipping information from said customer including at least a name, street address, and zip code of where said parcel or envelope is being mailed<br>**structure:** keyboard 28/226/324/704 (or touch screen 332) and connections to microprocessor |
| **computing** - determining, reckoning, or calculating<br><br>**weight information** - data relating to weight of the item to be mailed. See weighing above.<br><br>**delivery date** - the projected or estimated date on which items to be mailed through the claimed invention are to be received at the designated location/address, expressed either as the specific month, day, and year when the item | **[Means-plus-Function]**<br>**Function:**<br>to compute the expected calendar date of delivery and cost for delivery of the parcel or envelope to the place to which the parcel or envelope is to be mailed for each available delivery service option, as a function of the package type information, shipping information, and weight information<br>**Corresponding Structure:**<br>microprocessor (382, 718) loaded with fee files connected to: (1) scale (356, 706); and (2) CRT (322, 702) | **function:** computing the expected delivery date, including the day of the week, and cost for each delivery service from the package type information, shipping information, and weight information has been entered<br>**structure:** microprocessor 382/718 programmed with appropriate zone and weight charges, the delivery services available, and the fee files corresponding to each client delivery services, as depicted in Figure 18(A) from steps 512-526 and Figure |

114

| | | |
|---|---|---|
| is expected to be received at the designated location or the number of days it is estimated to take for items to be mailed through the claimed invention to arrive at the designated location/address for delivery.<br><br>**cost for delivery** - the price(s) quoted to mail the item to the designated location/address | and/or keyboard (324, 704) | 22(A&B) between 810 and 838.<br><br>**package type information:** data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier. |
| **delivery service option available** - the choices of different methods of mailing parcels and envelopes to a chosen or desired location/address that are open to be presented to a customer using the claimed invention.<br><br>**indication** - a communication or input; something serving to indicate<br><br>**delivery service option** - a method of mailing parcels and envelopes to a chosen or desired location/address<br><br>**desired** - requested; expressed preference from among available options | **[Means-plus-Function]**<br>**Function:**<br>to receive the customer's chosen method of delivery<br>**Corresponding Structure:**<br>microprocessor (382, 718) loaded with fee files connected to CRT (322, 702) and/or keyboard (324, 704) | **function:** inputting the choice of delivery service option by the customer based on the expected delivery date, including day of the week, and cost that best suit's the customer's need<br>**structure:** keyboard 28/226/324/704 (or touch screen 332) and connections to microprocessor 382 |

This is a means-plus-function term construed pursuant to § 112, ¶ 6. Accordingly, the function must be construed first, followed by the corresponding structure.

> **i.** **Function of "receiving package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, for computing from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer, and for receiving an indication of the delivery service option desired by the customer"**

First, the claimed function is "receiving package type information[30] identifying said parcel or envelope to be mailed, shipping information from said customer including at least a

---

[30] The construction of "package type information" is addressed in detail *supra* § VI.A.1.c.

destination[31] of said parcel or envelope to be mailed, for computing from said package type

information, shipping information, and weight information from said scale, a delivery date[32] and

cost for delivery of said parcel or envelope to said destination via each delivery service option

available to said customer, and for receiving an indication of the delivery service option desired

by the customer." *See Lockheed Martin*, 324 F.3d at 1319.

## ii.    Corresponding Structure

Because Uship fails to adhere to the statutory requirements, it is necessary to restate that

the claim includes "the corresponding structure . . . described in the specification."  35 U.S.C.

§ 112, ¶ 6.  In the Parties' Joint Claim Construction Statement, the structure was organized

around the three subparts of the claimed function:

> **(A)    Structure corresponding to "receiving data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier, and other shipping information from said customer including at least a name, street address, and zip code of where said parcel or envelope is being mailed"**

The corresponding structure is keyboard 28/226/324/704 (or touch screen 322) and

connections to microprocessor 382/718.  The specification provides two structures for

performing the above function: the keyboard of the various embodiments, (*see, e.g.*, '220 patent,

14:39-41), or touch screen CRT 322, (*see, e.g.*, *id.* at 20:57-59).  Accordingly, when properly

construed, these are the corresponding structures.

> **(B)    Structure corresponding to "computing the expected delivery date, including the day of the week, and cost for each delivery service from the**

---

[31] The construction of "destination" is addressed in detail *supra* § VI.A.1.e.

[32] The construction of "computing . . . a delivery date" is addressed in detail *supra* § VI.A.1.f.

**package type information, shipping information, and weight information has been entered"**

The corresponding structure is microprocessor 382/718 programmed with appropriate zone and weight charges, the delivery services available, and the fee files corresponding to each client delivery services, as depicted in Figure 18A from steps 512-526 and Figures 22A & B between 810 and 838. Because this portion of the claimed function is directed at the computing function, the structure is the microprocessor (382/718) plus its software. *See WMS Gaming*, 184 F.3d at 1349. In the specification, the software is described with reference to Figure 18A as algorithm steps 512 to 526., (*See, e.g.,* '220 patent, 20:9-21:6 (see below)), Figs. 22A & B as algorithm steps 810-838, 27:26-28:33 (not shown)):



117

**(C)**    **Structure corresponding to "receiving an indication of the delivery service option desired by the customer"**

The structure corresponding to this portion of the claimed function is the same as above for "receiving package type information": keyboard 28/226/324/704 (or touch screen 322) and connections to microprocessor 382/718. *See, e.g.*, *id.* at 21:13-17.

### iii.    Uship's Construction

For this means-plus-function element, Uship ***does not*** acknowledge the applicability of §112, ¶6 and does not attempt to rebut the presumption that §112, ¶6 applies.  Thus, Uship does not offer a construction of the function, and does not propose which corresponding structure comprises the processing means.  In short, Uship fails to follow the statutory framework.  Uship admits that "processing means" "involv[es] the use of a CPU and associated hardware and software."  Although IBM agrees that this is true, Uship's proposed structure is not nearly specific enough to satisfy the statutory bargain provided for by § 112, ¶ 6.  *See Biomedino*, 490 F.3d at 948 & n.1 (Fed. Cir. 2007) ("Thus, in return for generic [means-plus-function] claiming ability, the applicant must indicate in the specification what structure constitutes the means . . . [This] is often referred to as the *quid pro quo* for the convenience of employing § 112, ¶ 6.") (internal citations removed).  Conversely, IBM's proposed construction sets forth the necessary structures.  Because Uship fails to interpret the term within the proper statutory framework, its proposed construction should be rejected.

Uship again offers dictionary-like redefinitions of undisputed terms (e.g. "cost for delivery" and "delivery service option").  Once again, Uship's construction is an unnecessary burden on the Court because these terms are unambiguous and not in dispute.

**e.**    **means responsive to said processing means for printing a shipping label including at least said destination printed thereon and for printing a shipping receipt for an amount**

**including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; and**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means . . . for printing** - structure, material or steps used to produce text or data in alphanumeric or graphic form on paper or other material<br><br>**responsive** - acting in response<br><br>**shipping label** - a slip of paper, cloth, or other material, marked or inscribed for attachment to an item to indicate information relating to the mailing of that item, such as the destination to which the item is to be mailed<br><br>**shipping receipt** - a printed acknowledgement of having received payment as specified for the mailing of an item through use of the claimed invention<br><br>**amount** - the total cost or price incurred in the transaction(s) at issue<br><br>**cost of delivering** - the price to mail the item to the designated location/address<br><br>**delivery service chosen** - the method of mailing parcels and envelopes to a chosen or desired location/address selected by the customer | **[Means-plus-Function]**<br>**Function:**<br>to print a shipping label with said destination, and to print a shipping receipt with the cost of delivery<br>**Corresponding Structure:**<br>label and receipt printer (714) connected to microprocessor (718)<br><br>said destination - the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place | **function:**  printing a mailing label including at least the name, street address, and zip code and printing a receipt for an amount including at least the cost of delivering the parcel or envelope to the provided name, street address, and zip code via the delivery service chosen by the customer<br>**structure:** printer 26/326/714 and connections to microprocessor 382<br><br>**destination -** name, street address, and zip code |

This is a means-plus-function term construed pursuant to § 112, ¶ 6.  Accordingly, the function must be construed first, followed by the corresponding structure.

    **i.**  **Function of "printing a shipping label including at least said destination printed thereon and for printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer"**

The claimed function is "printing a shipping label including at least said destination[33] printed thereon and for printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer." *See Lockheed Martin*, 324 F.3d at 1319.

    **ii.**  **Corresponding Structure**

The corresponding structure is printer 26/326/714 and connections to microprocessor 382/718. (*See* '220 patent, 9:33-37 (describing printer 26 for printing a mailing label), 15:40 (label printer 326), 18:20-21 (printer 326 connection to microprocessor 382), 26:19-20 (describing output from microprocessor 718 to label printer 714).)

    **iii.**  **Uship's Construction**

Again, Uship's continues to burden the Court unnecessarily by interpreting undisputed and unambiguous terms (*e.g.*, "shipping receipt" and "amount"). Uship never mentions the requirements of § 112, ¶ 6, nor does its proposed construction seem to follow the statute's requirements. Because it fails to follow the statute, Uship's proposed construction should be rejected. Finally, Uship does not appear to dispute IBM or Government's proposed constructions of this limitation.

    **f.**  **means for validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said printing means, whereby a validated parcel or envelope is taken by an attendant for storage in a secure storage area until**

---

[33] The construction of "destination" is addressed in detail *supra* § VI.A.1.e.

**said parcel or envelope is subsequently picked up by a commercial delivery person.**

| Joint Proposal of Parties |
|---|
| **whereby a validated parcel or envelope is taken by an attendant for storage in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person** - whereby an attendant stores the validated package in a secure storage area until the commercial delivery person picks up the parcel or envelope for delivery |

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **means for validating receipt** - structure, material, or steps for determining or confirming that the package to be mailed has been received for storage and/or shipment | **[Means-plus-Function]** **Function:** to confirm that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed by obtaining data concerning the parcel or envelope **Corresponding Structure:** microprocessor (382) connected to photo cell sensor (344); **or** microprocessor (382) connected to scale (356) and/or dimensioning sensors (346) | **function:** verifying that the package being mailed is the same package for which the shipping label was printed **structure:** (1) photo cell sensor 344 and microprocessor 382, <u>OR</u> (2) microprocessor 382, and weighing system 356 and/or dimensioning system 346 |

This is a means-plus-function term construed pursuant to § 112, ¶ 6.  Accordingly, the function must be construed first, followed by the corresponding structure.

> **i.** **Function of "validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said printing means"**

The function here is exactly the same as the "validating receipt . . ." step of method claim 1.  The parties agree that it should be construed the same way, therefore, IBM's analysis provided *supra* § VI.A.1.j applies here in full.

> **ii.** **Corresponding Structure**

The specification describes two corresponding structures for performing the claimed function:

> The customer is then instructed to reposition the parcel or envelope on markings 342 of the conveyor belt 340 (if the package was removed to apply the label) and to close the outer door 330.  At this point, a very important validation step is performed. . . . This

121

step is critical since it verifies that the customer did not perform a package switch or forget to replace the package in the intermediate storage area 334 for shipment. Such validation may be accomplished in several different ways in accordance with the invention. For example, **[1]** in a simple embodiment, **photo cell sensor 344** may simply detect whether any package has been placed on the conveyor belt 340. If so, it is presumed that the package on the conveyor belt 340 is the appropriate package with the appropriate label. On the other hand, **[2]** in accordance with a preferred embodiment of the invention, the package is automatically **reweighed and/or redimensioned** once the customer has closed the outer door 330 (and hence the parcel or envelope cannot be accessed by the customer). If the reweighing and redimensioning results in approximately the same readings as when the package was previously weighed and dimensioned, it is presumed that the package placed on the conveyor belt 340 is the same package for which the label was printed. If there is such a match, **microprocessor 382** activates magnetic lock 254 at step 542 to lock the outer door 330 to prevent further access to the package by the customer.

('220 patent, 21:38-67; *see also id.* at 19:66-20:12 (describing the structures for "redimensioning" and/or "reweighing" of parcels as dimensioning system 346 and weighing system 356, respectively).)

In the first, or "simple" embodiment, the automated shipping machine includes a photo sensor 344 that detects whether a package has been placed back in the machine; if so, then it assumes the sensed package is the one for which the shipping label was printed. Thus, photo sensor 344 is a corresponding structure for one embodiment. In the second, or "complex" embodiment, the automated shipping machine contains dimensioning system 346 and weighing system 356 as well as microprocessor 382 with which the machine redimensions and/or reweighs the package to verify that the package is the same as the one for which the shipping label was printed. Thus, microprocessor 382 and redimensioning system 346 and/or weighing system 356 are corresponding structures for this second embodiment.

### iii.      Uship's Construction

Uship cites to its claim 1 arguments for the meaning of "validating receipt."   Again, Uship ignores the requirements of § 112, ¶ 6, which alone is fatal to its construction.   Then Uship criticizes IBM for following the strictures of § 112, ¶ 6:

> Government and IBM apparently want to argue that the invention is confined to certain structures, identified in connection with the specification's discussion of certain embodiments, that the shipping machine contemplated by those embodiments employs to detect the presence or the weight/dimensions of the item to be mailed.

(Uship Br. at 110.)   Absolutely, that is the "quid pro quo" of § 112, ¶ 6.   *Biomedino*, 490 F.3d at 948 ("Thus, in return for generic claiming ability, the applicant must indicate in the specification what structure constitutes the means.").   This criticism is telling of Uship's fundamental misunderstanding of § 112, ¶ 6, both with respect to this claim element and throughout its brief.

Uship's proposed construction is merely: "structure, material, or steps for determining or confirming that the package to be mailed has been received for storage or shipment."   This construction amounts to no more than "a bare statement that known techniques or methods can be used."   *Id*. at 953.   Accordingly, it wrong as a matter of law.

Uship also criticizes IBM's construction as allegedly ignoring other disclosed embodiments, including an embodiment in which an attendant performs the validation (which is contemplated by the whereby clause of this term).   This too is incorrect, however, as humans cannot be structure for § 112, ¶ 6 purposes.   *Cardiac Pacemakers v. St. Jude Medical*, 296 F.3d 1106 (Fed. Cir. 2002) (holding that humans cannot satisfy the structural requirements of means-plus-function claims).   Regardless, the claim limitation specifies that a human attendant stores the validated package not that the attendant validates the package.   As discussed above, *supra* § VI.A.1.j, the claim limitation is directed at an automated shipping machine not a human.

**B.      U.S. Pat. No. 6,105,014 (Ramsden et al.)**

**1.      Independent Claim 1**

| Claim 1 | Arguments |
|---|---|
| A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of: | *Same as '220 patent, claim 1.*<br>*See supra § VI.A.1.a* |
| receiving payment information from a customer; | *Same as '220 patent, claim 1.*<br>*See supra § VI.A.1.b* |
| receiving package type information identifying a parcel or envelope to be mailed; | *Same as '220 patent, claim 1.*<br>*See supra § VI.A.1.c* |
| weighing said parcel or envelope to be mailed; | *Same as '220 patent, claim 1.*<br>*See supra § VI.A.1.d* |
| receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed; | *Same as '220 patent, claim 1.*<br>*See supra § VI.A.1.e* |
| computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer; | *Immaterially different from '220 patent, claim 1.*<br>*See supra § VI.A.1.f* |
| receiving an indication of the delivery service option desired by the customer; | *Same as '220 patent, claim 1.*<br>*See supra § VI.A.1.g* |
| printing a tracking bar code label including at least said destination printed thereon; | *New: See Below* |
| printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; | *Same as '220 patent, claim 1.*<br>*See supra § VI.A.1.i* |
| validating receipt of said parcel or envelope as the parcel or envelope for which said tracking bar code label was printed; and | *Immaterially different from '220 patent, claim 1.*<br>*See supra § VI.A.1.j* |
| storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person. | *New: See Below* |

124

Only the following two limitations must be addressed here—all others are incorporated by reference:

> a.   **printing a tracking bar code label including at least said destination printed thereon;**

| Joint Proposal of Parties |
|---|
| the automated shipping machine prints a label including a bar code enabling a delivery service to keep track of a parcel or envelope, the bar code identifying at least said destination[34] |

> b.   **storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **storing** - to deposit or take in an item in a place for subsequent use or disposition<br><br>**validated -** determined or confirmed to be the package to be mailed<br><br>**secure** - safe from interception by unauthorized persons<br><br>**storage area -** a place in which an item is deposited or held for subsequent use or disposition<br><br>**commercial delivery person** - an employee or agent of the company or service used to mail the item to be mailed through the use of the claimed invention | the automated shipping machine stores the validated parcel or envelope in a secure storage area until a commercial delivery person picks up the parcel or envelope | storing the validated package in a secure storage area until the commercial delivery person picks up the package for delivery |

Uship correctly identifies the dispute as whether the claimed "secure storage area" is part of the claimed automated shipping machine. In both the Government's construction and IBM's construction, the "secure storage area" is part of the claimed automated shipping machine. This construction is supported by the language of the claim itself, including the preamble, and the specification.

---

[34] The parties dispute the meaning of destination, but agree that the arguments are the same as those set forth *supra* § VI.A.1.f.

Uship's construction, however, would permit the claimed "secure storage area" to be an area separate and distinct from the claimed "automated shipping machine."  As support, Uship relies on an embodiment in the specification in which an attendant may perform the storing.  Claim 1 of the '220 patent, however, specifically claims an "attendant of said customer storing a validated parcel in a secure storage area."  Thus, the applicants knew how to claim that particular embodiment.  ('220 patent, 30:29-33 (Cl. 1).)  Moreover, the attended automated shipping machine is just one embodiment out of many—there is no legal requirement that claims be construed to cover every single embodiment.  *See PSN Ill.*, 525 F.3d at 1166 ("[There is no] panacea, requiring all claims to cover all embodiments.  Instead, courts must recognize that disclosed embodiments may be within the scope of other allowed but unasserted claims.").  Claim 1 of the '014 patent is directed to the embodiment where the automated machine stores the item not a human attendant.  Just as the claims requiring storage by a human attendant cannot be read to include storage by the machine—even though such an embodiment is plainly disclosed in the specification—claims directed to storage by the machine cannot be read to cover the embodiment where an attendant performs that step.

### 2.       Independent Claim 2

| Claim 2 | Arguments |
|---|---|
| An automated shipping machine for use in mailing parcels and envelopes, comprising: | *Same as '220 patent, claim 3.* *See supra* § VI.A.2.a |
| means for receiving payment information from a customer; | *Same as '220 patent, claim 3.* *See supra* § VI.A.2.b |
| a scale for weighing a parcel or envelope to be mailed; | *Same as '220 patent, claim 3.* *See supra* § VI.A.2.c |
| a processor which receives package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be | *New: See Below* |

| | |
|---|---|
| mailed, computes from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer, and receives an indication of the delivery service option desired by the customer; | |
| a printer responsive to said processor so as to print a tracking bar code label identifying at least said destination and to print a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; and | *New: See Below* |
| means for validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said printer, whereby a validated parcel or envelope is taken by an attendant for storage in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person. | *Immaterially different from '220 patent, claim 3. See supra § VI.A.2.f* |

Only the following two limitations must be addressed here—all others are incorporated by reference:

> **a.      a processor which receives package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, computes from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer, and receives an indication of the delivery service option desired by the customer;**

| Joint Proposal of Parties |
|---|
| **receives an indication of the delivery service option desired by the customer** - a processor configured to obtain the customer's chosen method of delivery |

This limitation is very similar to the processing means limitation of claim 3 of the '220 patent.  Here the only disputed issues are the constructions of "destination," "package type information," and "computes . . . a delivery date," which the parties agree are the same as those set forth *supra* § VI.A.2.d.

127

> **b.**    **a printer responsive to said processor so as to print a tracking bar code label identifying at least said destination and to print a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; and**

| Joint Proposal of Parties |
|---|
| a printer configured to respond to a processor and print a shipping label including a bar code enabling a delivery service to keep track of a parcel or envelope, the bar code identifying at least said destination |

### C.    U.S. Pat. No. 6,917,924 (Ramsden et al.)

### 1.    Independent Claim 1

| Claim 1 | Arguments |
|---|---|
| A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of: | *Same as '220 patent, claim 1.* *See supra § VI.A.1.a* |
| receiving payment information from a customer; | *Same as '220 patent, claim 1.* *See supra § VI.A.1.b* |
| receiving package type information identifying a parcel or envelope to be mailed; | *Same as '220 patent, claim 1.* *See supra § VI.A.1.c* |
| weighing said parcel or envelope to be mailed; | *Same as '220 patent, claim 1.* *See supra § VI.A.1.d* |
| receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed; | *Same as '220 patent, claim 1.* *See supra § VI.A.1.e* |
| computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer; | *Immaterially different from '220 patent, claim 1.* *See supra § VI.A.1.f* |
| receiving an indication of the delivery service option desired by the customer; | *Same as '220 patent, claim 1.* *See supra § VI.A.1.g* |
| printing a tracking bar code label including at least said destination printed thereon; | *Same as '014 patent, claim 1.* *See supra § VI.B.1.a* |
| printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; | *Same as '220 patent, claim 1.* *See supra § VI.A.1.i* |
| validating receipt of said parcel or envelope as the parcel or envelope for | *Immaterially different* |

128

| | |
|---|---|
| which said tracking bar code label was printed; and | *from '220 patent, claim 1.* *See supra* § VI.A.1.j |
| storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up for delivery. | *Immaterially different from '014 patent, claim 1.* *See supra* § VI.B.1.b |

No additional limitations are addressed herein—all other limitations are incorporated by reference.

## 2.  Independent Claim 2

| Claim 2 | Arguments |
|---|---|
| An automated shipping machine for use in mailing parcels and envelopes, comprising: | *Same as '220 patent, claim 3.* *See supra* § VI.A.2.a |
| means for receiving payment information from a customer; | *Same as '220 patent, claim 3.* *See supra* § VI.A.2.b |
| a scale for weighing a parcel or envelope to be mailed; | *Same as '220 patent, claim 3.* *See supra* § VI.A.2.c |
| a processor which receives package type information including the dimensions of said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, computes from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer, and receives an indication of the delivery service option desired by the customer; | *Immaterially different from '014 patent, claim 2* *See supra* § VI.B.2.a |
| a printer responsive to said processor so as to print a tracking bar code label identifying at least said destination and to print a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; and | *Immaterially different from '014 patent, claim 2.* *See supra* § VI.B.2.b |
| means for validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said printer, whereby a validated parcel or envelope is stored in a secure storage area until said parcel or envelope is subsequently picked up for delivery. | *Immaterially different from '220 patent, claim 3.* *See supra* § VI.A.2.f |

No additional limitations are addressed herein—all other limitations are incorporated by reference.

## VII.   EXTRINSIC INVENTOR TESTIMONY

Uship now apparently offers Kenneth Liles, a named inventor of the '220, '014, and '924 patents, as a testifying witness at the claim construction hearing scheduled for February 16-18, 2010.  Uship never previously identified Mr. Liles as a potential testifying witness.  It is too late for Uship to do so now.  The Court's August 4, 2009 Revised Scheduling Order required Uship, on August 14th to serve on the other parties its proposed claim construction statement, which was to include any expert testimony that Uship intended to use to support its interpretations. Uship never identified Mr. Liles.  Although the claim construction period has gone on for almost 8 months, Uship never served an expert report providing the substance of any testimony it expects to adduce from Mr. Liles, nor have IBM and the Government had an opportunity to depose Mr. Liles.  For these reasons alone Uship cannot, at this late date, propose calling a previously unidentified claim construction witness in a page at the back of its brief.  Regardless, such extrinsic testimony is unhelpful and a distraction from the real issue, viz., *the proper construction of claim limitations at issue using the intrinsic evidence.  See N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993) (rejecting inventor testimony).

## VIII.   CONCLUSION

IBM has offered proposed constructions in accordance with established legal principles concerning, most importantly, the supremacy of intrinsic evidence and section 112, paragraph 6. In contrast, Uship has followed a haphazard dictionary-based analysis that accomplishes nothing except making things as broad and ambiguous as possible to preserve its meritless infringement case.  In addition, IBM has not offered proposed constructions for every single term proposed to

be construed, because in many cases the plain and ordinary meaning is unambiguous and undisputed. Thus, their construction only creates unnecessary ambiguity and burdens the Court. For the reasons discussed herein, IBM respectfully submits that its proposed constructions be adopted.

Date:   January 6, 2010                    Respectfully submitted,

                                           s/ Steven C. Cherny
                                           by s/ Edward Meyers
                                           Steven C. Cherny
                                           KIRKLAND & ELLIS LLP
                                           Citigroup Center
                                           153 East 53rd Street
                                           New York, NY 10022
                                           (212)446-4800

                                           *Attorney for Third-Party Defendant*
                                           ***International Business Machines Corp.***

*Of Counsel:*
D. Sean Trainor
William Fink
Edward H. Meyers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202)879-5000