IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| USHIP INTELLECTUAL PROPERTIES, LLC,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| v.    ) | |
| ) | **Case No.: 08-537 C** |
| THE UNITED STATES,    ) | |
| ) | **Judge Susan G. Braden** |
| Defendant,    ) | |
| ) | |
| And    ) | |
| ) | |
| INTERNATIONAL BUSINESS MACHINES    ) | |
| CORP.,    ) | |
| Third-Party Defendant.    ) | |
| ) | |

## PLAINTIFF'S REPLY BRIEF ON CLAIM CONSTRUCTION

Charles J. Cooper
Vincent J. Colatriano
Derek L. Shaffer
David Lehn
Jesse M. Panuccio
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

January 22, 2010        Counsel for Uship Intellectual Properties, LLC

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... v

ARGUMENT .............................................................................................................. 1

I.      IT IS THE DEFENDANTS, NOT USHIP, WHO ARE MISAPPLYING
        ESTABLISHED CLAIM CONSTRUCTION PRINCIPLES ............................................ 1

II.     U.S. PATENT NO. 4,900,905 ('905 PATENT) – CLAIM 12 ......................................... 14

       Preamble:    *A method of processing and collecting mail with, and otherwise
                 operating a self-contained computerized apparatus comprising the
                 steps of:* ....................................................................................... 14

       Limitation 2:   *receiving an item to be mailed;* ................................................ 19

       Limitation 3:  *weighing the item to be mailed;* ............................................... 21

       Limitation 4:  *admitting data relating to the item to be mailed such as the address
                 to which the item is to be mailed;* ............................................ 22

       Limitation 5:  *determining the required postage for the item to be mailed;* .................... 24

       Limitation 7:  *providing machine readable information concerning the item to be
                 mailed on the item to be mailed, such as the zip code to which said
                 item is to be mailed; and* ......................................................... 25

       Limitation 8:  *storing the item to be mailed for subsequent pick up.* ................................ 27

III.    U.S. PATENT NO. 5,481,464 ('464 PATENT) .................................................... 28

       A.     Claim 7 ................................................................................. 28

       Preamble:    *An integrated, automated, unattended unit for collecting and se-curely
                 holding items for collection and shipment by commercial delivery ser-
                 vices: said automated unit comprising:* .................................... 28

       Limitation 2:  *means for inputting information relating to the destination to which
                 the item is to be shipped;* ......................................................... 33

       Limitation 3A:*control means for analyzing the inputted information and calculating
                 the fee for shipment of the item;* ................................................. 34

i

Limitation 3C: *said control means further including . . . means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines* .................................................................................... 35

Limitation 4: *means for securely storing said item until the item is collected by said commercial delivery service;* ................................................. 40

Limitation 5A: *means for storing the inputed information once said item is disposed in said secured storage means,* ................................................. 41

Limitation 5B: *said information storage means including means for displaying a manifest;* ................................................................................................. 42

B.       Claim 9 ................................................................................................................ 43

Limitation:       *The integrated, automated, unattended unit of claim 7 wherein said means for storing said information further includes means for communicating said information to a remote location staffed by a human operator:* ................................................................................. 43

C.       Claim 10 .............................................................................................................. 44

Limitation:       *The integrated, automated, unattended unit of claim 9 wherein said unit includes a pivotable door that serves as a slide when said door is opened, said slide serving to transport the item to a storage area for secure storage.* ........................................................................................ 44

D.       Claim 15 .............................................................................................................. 45

Limitation:       *The integrated, automated, unattended unit of claim 12 wherein said card reader is adapted to read credit cards issued by any of a plurality of credit card companies and wherein said fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction.* ......................................... 45

E.       Claim 16 .............................................................................................................. 45

Limitation:       *The integrated, automated, unattended unit of claim 15 wherein said fee communicating means includes means for validating said credit card prior to issuing the shipping label.* .................................................... 45

F.       Claim 19 .............................................................................................................. 46

Limitation 5: *means for storing the inputed information once said item is disposed in said secured storage means, said information storage means including means for transmitting a manifest to a remote location;* .......... 46

IV.     U.S. PATENT NO. 5,831,220 ('220 PATENT) ..................................................47

    A.     Claim 1..........................................................................................................48

    Preamble:     *A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of:* ................................................48

    Limitation 2:     *receiving package type information identifying a parcel or envelope to be mailed;* ...........................................................................52

    Limitation 4:     *receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed;* ....................53

    Limitation 5:     *computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer;* .....................................................57

    Limitation 7:     *printing a shipping label including at least said destination printed thereon;* ....................................................................................60

    Limitation 8:     *printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer;* ..................................................60

    Limitation 9:     *validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed; and* ..........................................60

    B.     Claim 3..........................................................................................................64

    Limitation 3:     *processing means for receiving package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, for computing from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer, and for receiving an indication of the delivery service option desired by the customer;* ................................................64

    Limitation 4:     *means responsive to said processing means for printing a shipping label including at least said destination printed thereon and for printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; and* ........................................67

Limitation 5:   *means for validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said printing means, whereby a validated parcel or envelope is taken by an attendant for storage in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.* ...................... 68

V.   U.S. PATENT NO. 6,105,014 ('014 PATENT) ................................................ 70

    A.   Claim 1 ............................................................................................... 70

Limitation 10:   *storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.* ...................................................................................... 70

    B.   Claim 2 ............................................................................................... 72

Limitation 3:   *a processor which receives package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, computes from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer, and receives an indication of the delivery service option desired by the customer;* ...................................................................................... 72

VI.   U.S PATENT NO. 6,917,924 ('924 PATENT) ................................................ 72

Limitation 2:   *receiving package type information including the dimensions of a parcel or envelope to be mailed;* .............................................................. 73

VII.   CO-INVENTOR TESTIMONY AT THE CLAIM CONSTRUCTION HEARING ........ 73

CONCLUSION .......................................................................................................... 75

EXHIBITS

Exhibit R:   United States Patent No. 5,065,000 (dated November 12, 1991)

Exhibit S:   *Random House Unabridged Dictionary* (2d ed. 1993)

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page**

*Acumed LLC v. Stryker Corp.*, 483 F.3d 800 (Fed. Cir. 2007)...................................6, 11

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003)...................................37

*Aristocrat Techs. Australia PTY Ltd. v. International Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008) .............................................................35, 43, 46

*Asyst Technologies, Inc. v. Empak, Inc.*, 268 F.3d 1364 (Fed. Cir. 2001)...................34, 37, 38, 40

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294 (Fed. Cir. 2003).............8, 11, 22

*Cardiac Pacemaker, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106 (Fed. Cir 2002)..............44, 69, 70

*Catalina Marketing International, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002) ...................................................................8

*Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366 (Fed. Cir. 2008)...........................18

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006) ...................56

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*,
    412 F.3d 1291 (Fed. Cir. 2005) .................................................................69

*DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342 (Fed. Cir. 2008) .................................17

*E.I. Du Pont De Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430 (Fed. Cir. 1988)......12

*Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004)......................................38

*Hockerson-Halberstadt, Inc. v. Converse, Inc.*, 183 F.3d 1369 (Fed. Cir. 1999)...........................8

*i4i Limited Partnership v. Microsoft Corp.*, No. 09-1504, 2009 U.S. App. LEXIS 28131
    (Fed. Cir. Dec. 22, 2009) ...................................................................8, 11, 18

*In re Dossel*, 115 F.3d 942 (Fed. Cir. 1997) ................................................... 35, 43, 46

*In re Prater*, 415 F.2d 1393 (CCPA 1969) ..................................................................69

*Invitrogen Corp. v. Biocrest Manufacturing, L.P.*, 327 F.3d 1364 (Fed. Cir. 2003)....................11

*Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340 (Fed. Cir. 2008)...................................8

*L.B. Plastics, Inc. v. Amerimax Home Products, Inc.*, 499 F.3d 1303 (Fed. Cir. 2007).................7

*Lava Trading, Inc. v. Sonic Trading Management, LLC*, 445 F.3d 1348 (Fed. Cir. 2006)...........10

*Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir. 2004) .................7, 36

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308 (Fed. Cir. 2003) ...............42

*Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327 (Fed. Cir. 2008) ...................................................8

*MBO Laboratories, Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007) .........................................................................10, 12, 13, 21

*Micro Chemical, Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250 (Fed. Cir. 1999) ...............39, 40

*Multiform Desiccants, Inc. v. Medzam, LTD*, 133 F.3d 1473 (Fed. Cir. 1998) ...........................56

*NTP, Inc. v. Research In Motions, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005) ...............................12, 21

*Nystrom v. Trex Company, Inc.*, 424 F.3d 1136 (Fed. Cir. 2005) ...........................................8, 56

*Oatey Co. v. IPS Corp.*, 514 F.3d 1271 (Fed. Cir. 2008) ...........................................10, 54, 63, 70

*Old Town Canoe Company v. Confluence Holdings Corp.*, 448 F.3d 1309 (Fed. Cir. 2006) ........7

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) .........................................18

*Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075 (Fed. Cir. 2009) ..................................29

*Personalized Media Communications, L.L.C. v. ITC*, 161 F.3d 696 (Fed. Cir. 1998) .................37

*Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) ...............4, 5, 6, 8, 9, 12, 28, 29, 69
*Pilley v. United States*, 74 Fed. Cl. 489 (2006) ..........................................................................69
*Rambus, Inc. v. Infineon Technologies AG*, 318 F.3d 1081 (Fed. Cir. 2003) ...............................19

*Renishaw PLC v. Marposs Societa Per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998) ...............8, 12, 21

*Restaurant Technologies, Inc. v. Jersey Shore Chicken*, 2010 U.S. App. LEXIS 204
    (Fed. Cir. Jan. 6, 2010) ...........................................................................................................7

*S3 Inc. v. nVIDIA Corp.*, 259 F.3d 1364 (Fed. Cir. 2001) ..........................................................35

*Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361 (Fed. Cir. 2005) .........................................31

*Symantec Corp. v. Computer Associates Int'l, Inc.*, 522 F.3d 1279 (Fed. Cir. 2008) ...................4

*Tate Access Floors, Inc. v. Maxcess Technologies, Inc.*, 222 F.3d 958 (Fed. Cir. 2000) .............11

*TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364 (Fed. Cir. 2008) .............11

*TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256 (Fed. Cir. 2008) ...................................................36

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173 (Fed. Cir. 2006) .......................11

*Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007)...................10

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ...................5, 10, 54, 63, 70

*Vivid Techs., Inc. v. American Sci. & Eng'g, Inc.*, 200 F.3d 795 (Fed. Cir. 1999) .......................2

*Wavetronix v. EIS Electronic Integrated Systems*, 573 F.3d 1343 (Fed. Cir. 2009).......................7

*WMS Gaming Inc. v. International Game Technology*, 184 F.3d 1339 (Fed. Cir. 1999)..............66

## **Other**

35 U.S.C. § 112 ¶ 6...............................................................................................................35

Random House Unabridged Dictionary (2d ed. 1993) ...........................................................39

Webster's College Dictionary (Random House 1997)...........................................................51

Plaintiff Uship Intellectual Properties, LLC ("Uship") hereby respectfully submits its reply to the Government's and intervenor-defendant International Business Machines Corporation's ("IBM") claim construction briefs.[1]  For the reasons discussed below and in our opening brief,[2] Uship respectfully requests the Court to adopt Uship's proposed constructions of those claim terms on which the parties have not reached agreement, and to reject the competing constructions of those terms offered by the Government and IBM.

## ARGUMENT

**I.    IT IS THE DEFENDANTS, NOT USHIP, WHO ARE MISAPPLYING ESTABLISHED CLAIM CONSTRUCTION PRINCIPLES**

In briefs totaling more than 230 pages, the Government and IBM offer proposed constructions of disputed claim terms that conflict not only with Uship's proposed constructions, but often with each other's.  Curiously, the Government and IBM devote scarcely a word in their respective briefs to explaining why their co-defendant's proposed constructions are inferior to their own.  All of their fire, instead, is directed at attacking Uship's proposed constructions.  And attack they do.  Both the Government and IBM accuse Uship of running roughshod over established principles of claim construction.  IBM, in particular, can barely hide its irritation and disdain at the prospect of having to respond to Uship's claim construction arguments, and it therefore opens its response with a lecture bemoaning the outdated, "misleading[]" and "confus[ing]" nature of those arguments, suggesting that Uship is seeking to waste the Court's and the parties' time and to obfuscate the issues, and congratulating itself for "rigorously" applying the correct claim construction principles.  *See* IBM Br. 1-5.

---

[1] For ease of reference, Defendant's Responsive Brief on Claim Construction (Docket 38) (filed Jan. 6, 2010) will be cited herein as "US Br.", and IBM's Responsive Claim Construction Brief (Docket 40) (filed Jan. 6, 2010) will be cited herein as "IBM Br."

[2] For ease of reference, Plaintiff's Opening Brief on Claim Construction (Docket 36) (filed Nov. 18, 2009) will be cited herein as "Uship Br."

As we discuss in more detail below in the context of particular disputed claim terms, the Government's and IBM's accusations are not only wrong but misdirected.  Given the repeated emphasis that both the Government and IBM have given to certain of their criticisms, however, we believe it is appropriate, at the outset, to address those criticisms and to show why, we would respectfully submit, it is not Uship but rather the defendants who are running afoul of the governing precedents respecting claim construction.[3]

*First*, both the Government and IBM complain that Uship is seeking constructions for too many claim terms.  *See* US Br. 5; IBM Br. 4.  We agree that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."  *Vivid Techs., Inc. v. American Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).  We also believe

---

[3] Regrettably, not all of the Government's and IBM's criticisms of Uship pertain to claim construction issues or to any other issue that is arguably relevant to any matter currently under consideration by the Court.  To take one example, IBM asserts that Uship "does not make or sell anything," but is instead "a company that exists to extract revenues from companies participating in the market."  IBM Br. 1; *see also* US Br. 4-5.  As IBM and the Government well know, even were such a charge accurate, it would still have no conceivable bearing on or relevance to the proper construction of Uship's patents.  Because the defendants have chosen to raise the matter, however, Uship feels compelled to set the record straight.  At an appropriate stage in these proceedings, Uship will be prepared to show that when it acquired the patents at issue, Uship had every intention of continuing in and expanding upon its predecessors' business in the automated shipping kiosk industry.  Uship's efforts in this regard, however, which involved, among other things, the investment of considerable amounts of time and money by Uship and its officers, were stymied by what it contends were the infringing practices of the defendants and other companies.  In short, the same conduct that led to this infringement lawsuit is what has prevented Uship from profitably conducting its own business.  IBM's and the Government's attempts to denigrate Uship for not actively participating in their "market" is in this regard adding insult to injury.

In a similar vein, the Government makes a point of asserting that "the idea of an automated postal kiosk was not novel when the first asserted patent was filed in 1988."  US Br. 2.  This issue, again, has no bearing on claim construction, and the Government does not suggest that it does.  We can only assume that the Government is attempting to preview for the Court an invalidity argument that it hopes to present at a later stage in the proceedings.  Once again, at the appropriate time, Uship will be prepared to address and refute such an invalidity argument.  We pause at this point only to note the irony of the Government raising an invalidity argument in its claim construction brief, given how adamant the Government (and IBM) were in insisting, successfully, that discovery and other activities be limited at this stage to claim construction issues.

that IBM has provided a fair summary of those claim terms that are the subject of the most vigorous dispute between the parties.  IBM Br. 4-5.  We are concerned, however, that the defendants' complaints may be more than a little disingenuous.

What goes unmentioned by both the Government and IBM is that when Uship attempted to narrow the parties' dispute by serving an interrogatory requesting the defendants to identify those claim elements and limitations that the defendants conceded were met by the manufacture, deployment, and use of the USPS automated shipping/mailing kiosks, both the Government and IBM refused to answer, contending that the question was premature.  Given the defendants' refusal to provide answers that could have narrowed the issues, Uship therefore needed to assume that *all* claim terms and limitations were the subject of dispute.  Although the parties were able to subsequently reach agreement on the construction of a large number of claim terms, Uship believed it had little choice but to offer proposed constructions on all claim terms on which the parties had not been able to reach agreement.  And because Uship wanted to avoid a situation in which the parties agreed, at the claim construction stage, that certain terms did not need to be construed, only to find out later, at the infringement stage, that due to some undisclosed dispute regarding the meaning of a claim term, the parties disagreed about whether those terms had been satisfied, Uship decided to err on the side of providing more rather than less detail regarding what it believes is the correct meaning of such terms.  Far from "potentially obfuscat[ing] the issues," IBM Br. 4, Uship's approach is designed, we would respectfully submit, to achieve greater efficiencies by minimizing the prospect that disputes regarding the meaning of claim terms are simply kicked down the road to another phase in the litigation.

***Second,*** both defendants criticize Uship for arguing that the preambles of the asserted claims need not be separately construed.  *See, e.g.*, US Br. 11; IBM Br. 3-4.  Notably, neither the

3

Government nor IBM claims that Uship has misstated the law regarding when terms appearing in claim preambles need to be construed. *See, e.g.*, Uship Br. 9. Thus, neither defendant disputes that a preamble should not be construed as a separate limitation "if it is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a rejection)." *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288-89 (Fed. Cir. 2008). For the reasons discussed in our opening brief, and addressed below in connection with our discussion of particular claim preambles, we believe that most, if not all, of the terms in the preambles of the asserted claims amount to little more than summaries of limitations in the bodies of the claims and do not need to be construed. In the final analysis, however, this issue is largely academic, as Uship has also proposed constructions for each preamble in an abundance of caution.[4]

*Third*, both the Government and IBM claim that Uship has ignored the Federal Circuit's instructions, in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), regarding the proper use of dictionaries in the claim construction analysis. According to both defendants, we have employed a discredited pre-*Phillips* approach that impermissibly overemphasizes the role of dictionaries in claim construction and de-emphasizes the role of the intrinsic evidence and most particularly, the specification. *See, e.g.*, US Br. 10-11; IBM Br. 2-3. This is a somewhat awkward argument for the Government, especially, to make, as it has itself relied on dictionary

---

[4] IBM seeks to manufacture some significance from the fact that Uship included constructions for preamble terms in the proposed claim construction statement it provided to the defendants during discovery. *See, e.g.*, IBM Br. 3 & n.2. IBM's suggestion that Uship has somehow changed its position on whether the preambles need to be separately construed is meritless. IBM conveniently overlooks the fact that, under the Court's August 4, 2009 scheduling order (Docket 31), Uship was required only to provide its preferred claim constructions, and was not required to address whether the preambles needed to be construed. The fact that Uship erred on the side of overinclusion by providing its preferred constructions for the preamble terms says nothing, one way or the other, about whether those terms needed to be separately construed.

definitions for numerous of its proposed constructions, but it attempts to square that circle by suggesting that the problem is one of sequencing and emphasis.  US Br. 10.  IBM goes even farther than the Government in its condemnation of Uship's supposed methodology, grudgingly suggesting at one point that only technical dictionaries, but presumably not general purpose dictionaries, may "sometimes be helpful" in claim construction.  IBM Br. 13.

These criticisms are unfounded, and misconstrue both our arguments and the law.  We could not have been clearer in our opening brief that, consistent with *Phillips*, claim terms must be read "in view of the specification, of which they are a part," *Phillips*, 415 F.3d at 1315 (quotation marks omitted), and that the specification is typically "the single best guide to the meaning of a disputed term."  *Id.* (quotation marks omitted).  And far from suggesting that dictionaries are the "primary" source for construing claim terms, we acknowledged that extrinsic evidence, including dictionaries, is considerably less reliable than intrinsic evidence.  *See* Uship Br. 8; *see also Phillips*, 415 F.3d at 1317-19 (discussing limitations of extrinsic evidence).  Consistent with this understanding of the law, Uship has utilized dictionary definitions to help confirm the ordinary meaning of claim terms when a review of the intrinsic evidence indicated, either affirmatively or by implication or silence, that such ordinary meanings were intended.

Despite the Government's and IBM's suggestions to the contrary, the use of dictionary definitions in this manner was not prohibited by *Phillips*.  Far from it: as we noted in our opening brief, Uship Br. 4, such use is actually explicitly *authorized* by *Phillips*:

> As we have noted above, however, we do not intend to preclude the appropriate use of dictionaries.  Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation. . . .  As we said in *Vitronics* [*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996)], judges are free to consult dictionaries and technical treatises "at any time to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does

not contradict any definition found in or ascertained by a reading of the patent documents."

415 F.3d at 1322-23 (citations omitted).[5]  *Phillips* also made clear that "there is no magic formula or catechism for conducting claim construction," *id.* at 1324, and it rejected any notion that a court needs to conduct its analysis in any particular order:

> Nor is the court barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence. . . .  For example, a judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term.

*Id.*

The Federal Circuit has continued to echo what it said in *Phillips* and to categorically reject any suggestion that it is somehow inappropriate to utilize dictionaries to help confirm the ordinary meaning of claim terms in those circumstances in which the intrinsic evidence either indicates that ordinary meaning controls or does not provide specific guidance as to the meaning of the term at issue.  Thus, in *Acumed LLC v. Stryker Corp.*, the court flatly rejected the proposition that "*Phillips* prohibited the district court from beginning its interpretive inquiry by consulting a dictionary."  483 F.3d 800, 809 n.2 (Fed. Cir. 2007).  The court went on to observe that "[a]lthough in *Phillips* we rejected an approach in which a broad dictionary definition is adopted and then whittled down only if contradicted by the specification, we did not prohibit the use of dictionaries in claim construction, nor did we define at what point in the claim construction analysis they may be consulted."  *Id.* (citations omitted).

---

[5]  *See id.* at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. . . . In such circumstances, general purpose dictionaries may be helpful.").

Similarly, in *Old Town Canoe Company v. Confluence Holdings Corporation*, the Federal Circuit noted that the trial court had begun "its analysis by referring to dictionary definitions presented by the parties." 448 F.3d 1309, 1316 (Fed. Cir. 2006). The court saw no problem with this practice, so long as the court grounded its claim construction analysis, to the extent possible, in the intrinsic evidence: "The district court's reference to the dictionary was not an improper attempt to find meaning in the abstract divorced from the context of the intrinsic record but properly was a starting point in its analysis, which was centered around the intrinsic record consistent with *Phillips*." *Id.*; *see also L.B. Plastics, Inc. v. Amerimax Home Prods., Inc.*, 499 F.3d 1303, 1308 (Fed. Cir. 2007); *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1333 (Fed. Cir. 2008).

Indeed, on the same day the defendants filed their briefs criticizing Uship for relying on dictionary definitions, a Federal Circuit panel issued yet another decision repeating *Phillips*' teaching that "courts may rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Restaurant Techs., Inc. v. Jersey Shore Chicken*, No. 09-1176, 2010 U.S. App. LEXIS 204, at *11 (Fed. Cir. Jan. 6, 2010) (nonprecedential decision) (quotation marks omitted); *see also Wavetronix v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1355 (Fed. Cir. 2009) (same).

***Fourth***, both defendants complain that Uship has attempted to construe claim terms "as isolated elements." US Br. 6; *see also* IBM Br. 8. IBM, especially, is repeatedly distressed by Uship's decision to offer proposed constructions for individual terms in certain claims. The defendants' contention is groundless, and reflects a fundamental misunderstanding of claim construction principles. It is absolutely the case, as we argued in our opening brief, *see* Uship Br. 4-8, that, as *Phillips* confirms, claim terms must be analyzed in the context of the intrinsic evi-

dence, including other terms in the same claim, other claims, the specification, and the prosecution history.  *See, e.g.*, *Phillips*, 415 F.3d at 1313, 1321.  But neither as a matter of logic nor as a matter of law does this established principle suggest, much less mandate, that it is somehow inappropriate for a party or a court to attempt to discern the correct meaning of individual claim terms.  *Phillips* itself, of course, focused on the proper construction of a single-word term:  "baffles."  *Id.* at 1324-28.  And numerous other decisions – including many of the cases cited by the defendants – construe similarly supposedly "isolated" terms.[6]  Notably, one of the main decisions relied upon by the Government for the proposition that claim construction requires analysis of the entire claim in its context nevertheless revolved around the proper interpretation of the word "from."  *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999).  And the other decision relied upon by the Government instructs that "[w]hile *certain terms may be at the center of the claim construction debate*, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms."  *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003) (emphasis added).  Because Uship has properly taken the relevant context into account when construing individual terms, its analysis is entirely consistent with governing law.

*Fifth*, in a related criticism, both the Government and IBM contend that Uship's constructions ignore the intrinsic record, and especially the relevant patent specifications.  *See, e.g.*, US Br. 10; IBM Br. 2-3.  And just like the defendants' other arguments, this argument is meritless.  Indeed, what is clear from a reading of the defendants' briefs is that it is not Uship, but

---

[6] *See, e.g.*, *Mangosoft*, 525 F.3d at 1329 ("local"); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 811 (Fed. Cir. 2002) ("such as"); *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) ("different"); *Nystrom v. Trex Co.*, 424 F.3d 1136, 1142 (Fed. Cir. 2005) ("board"); *Renishaw PLC v. Marposs Societa Per Azioni*, 158 F.3d 1243, 1250-51 (Fed. Cir. 1998) ("when"); *i4i Ltd. P'ship v. Microsoft Corp.*, No. 09-1504, 2009 U.S. App. LEXIS 28131, *11 (Fed. Cir. Dec. 22, 2009) ("distinct").

rather the Government and IBM, who are seeking to misuse the intrinsic evidence.

As reflected in our claim constructions and addressed both in our opening brief and below, Uship has followed the teaching of *Phillips* by construing claim terms "so as to be consistent with the specification." 415 F.3d at 1316 (quotation marks omitted). And Uship's constructions properly utilize the specification and embodiments discussed in the specification, where appropriate, to shed additional light on the correct meaning of claim terms. With respect to numerous claim terms, on the other hand, both the Government and IBM have gone far beyond employing the specification to help derive the meaning of claim terms into the forbidden territory of importing limitations from the specification into the claim. Over and over again, the defendants seek to graft onto claims features relating to specific embodiments discussed in the specification where there is no means-plus-function limitation. As *Phillips* recognized, this is one of the "cardinal sins" of claim construction. *Phillips*, 415 F.3d at 1320 (quoting *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)).

There is, admittedly, a fine line between proper and improper uses of the specification, and "the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice." *Phillips*, 415 F.3d at 1323. In this case, however, the Government and IBM have left that line so far behind them in the rearview mirror that there can be little doubt regarding the merit of their position. Although the defendants' misuse of the specification should be readily apparent from even a cursory reading of their arguments, there are a number of critical clues that the defendants are on the wrong side of the line:

o   Again and again, the Government and IBM seek to artificially confine claims to the specification's discussion of preferred or other types of embodiments of the invention. The Fed-

eral Circuit in *Phillips* cited such a practice as the prime example of a construction that falls on the wrong side of the interpretation/importation line, and instructed that "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." 415 F.3d at 1323. A construction confining the claim to specific embodiments is heavily disfavored, and is appropriate only in cases of unambiguous evidence that the inventor intended such a result. *See* Uship Br. 6-7 (citing cases). No such evidence exists in this case.

    o   The Government and IBM also repeatedly commit the mirror-image offense of adopting claim constructions that would *exclude* from their scope certain embodiments of the invention discussed in the specification. Although a claim construction excluding disclosed embodiments is sometimes appropriate when it is clear from the intrinsic evidence either that the inventor disclaimed coverage of those embodiments or that the disclosed embodiment related only to other, unasserted claims – neither of which exception applies here – it is otherwise heavily disfavored. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification."); *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("[W]e have interpreted claims to exclude embodiments of the patented invention where those embodiments are *clearly disclaimed* in the specification . . . or prosecution history.") (emphasis added, citations omitted).[7] The Federal Circuit reaffirmed this principle as recently as last

---

[7] *See also id*. ("At least where claims can reasonably be interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence to the contrary."); *Vitronics*, 90 F.3d at 1583 (construction that would exclude preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support"); *MBO Labs., Inc. v. Becton, Dickinson & Co*., 474 F.3d 1323, 1333 (Fed. Cir. 2007) (same); *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, 445 F.3d 1348, 1353-54 (Fed. Cir. 2006) (rejecting trial court's construction in part because it "exclude[d] embodiments disclosed

month.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 2009 U.S. App. LEXIS 28131, at *14 (Fed. Cir. Dec. 22, 2009) ("Because the claims themselves do not use the word 'file' and *the specification discloses embodiments where the storage format is not a file*, we conclude that 'distinct' does not require storage in separate files.") (emphasis added).

o   Similarly revealing are the defendants' numerous attempts to define the claims by reference to certain supposedly desirable features or benefits of the invention discussed in the specification or prosecution history.  Absent some clear textual support for such a construction, it amounts to an inappropriate importation of limitations into the claims.  *See, e.g.*, *Brookhill-Wilk*, 334 F.3d at 1301 ("Advantages described in the body of the specification, if not included in the claims, are not per se limitations to the claimed invention.") (citations omitted); *i4i Ltd. P'ship*, 2009 U.S. App. LEXIS 28131, at *15 ("[N]ot every benefit flowing from an invention is a claim limitation.").[8]

In a very real sense, the defendants' insistence on reading limitations into the claims from the specification is merely symptomatic of an even more fundamental flaw in their claim construction analysis: the extremely tenuous connection between their proposed constructions and

_____

in the specification"); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1369 (Fed. Cir. 2003) (same); *cf. TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373, 1375 (Fed. Cir. 2008) (rejecting construction that would encompass alternative embodiment where such a construction "would *contradict* the language of the claims," and noting that "claims need not be construed to encompass all disclosed embodiments when the claim language is *clearly limited* to one or more embodiments") (emphases added).

[8] *See also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007) (rejecting construction that "is essentially an assertion that since the patent says [a certain feature] is desirable," claim term "must be construed to cover only embodiments" with that feature; such a construction "is flawed," as "it is an attempt to import a feature from a preferred embodiment into the claims"); *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 966 (Fed. Cir. 2000) (that specification states certain feature is "desirable" does not itself mean the feature is required); *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006) ("When the claim addresses only some of the features disclosed in the specification, it is improper to limit the claim to other, unclaimed features.").

the actual language of the claims at issue.  Ultimately, claim construction begins with the claim

language, *Phillips*, 415 F.3d at 1312, and a court "cannot endorse a construction analysis that

does not identify 'a *textual reference in the actual language of the claim* with which to associate

a proffered claim construction.'"  *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323,

1330-31 (Fed. Cir. 2007) (citing *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985,

990 (Fed. Cir. 1999)) (emphasis added).  As the Federal Circuit has instructed, "a party wishing

to use statements in the written description to confine or otherwise affect a patent's scope must,

at the very least, point to a term or terms in the claim with which to draw in those statements."

*Renishaw*, 158 F.3d at 1248; *see also NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282,

1310 (Fed. Cir. 2005) (same).  Because "the claims define the scope of the right to exclude," a

claim interpretation "must, in the end, accord with the words chosen by the patentee to stake out

the boundary of the claimed property."  *Renishaw*, 158 F.3d at 1248.  It is, in short, improper to

read a limitation from the specification into a claim "wholly apart from any need to interpret

what the patentee meant by particular words and phrases in the claim."  *E.I. Du Pont De Ne-*

*mours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).

> If the requirement that a proffered construction have some "hook" connecting it to actual

claim language, *Renishaw*, 158 F.3d at 1252, is to retain any vitality, then many of the claim

constructions proposed by the defendants must be rejected.  To cite just three examples:

> o   Claim 12 of the '905 patent includes a step calling for "receiving an item to be

mailed."  IBM construes this simple phrase to mean: "accepting into the self-contained comput-

erized apparatus an item to be mailed, after which the apparatus takes over with minimal cus-

tomer input."  IBM Br. 24.

> o   That same claim also includes a step calling for "determining the required postage for

12

the item to be mailed." The Government construes this phrase to mean: "automatically calculating the charge for the service of delivery of a mail item based on mailing weight data and destination data without requiring any handling of the mail item by the user." IBM "construes" it to mean: "calculating a charge based on the mailing weight, the destination and any special requests, and any instructions stored in the machine's memory, with no possibility for an incorrect postage being calculated." IBM Br. 36.

o    The preamble to Claim 1 of the '220 patent refers to "a method of mailing parcels and envelopes using an automated shipping machine." IBM says this means: a "series of steps for mailing parcels and envelopes using an automated unit that prepares an appropriate mailing label, validates receipt from a customer of a parcel and envelope, and/or collects and holds parcels and envelopes for pick-up by one or more commercial delivery services." IBM Br. 94.

If Uship had been asked to invent caricatures of claim "constructions" that ignore the requirement for a "textual reference in the actual language of the claim with which to associate a proffered claim construction," *MBO Labs.*, 474 F.3d at 1330-31 (citation and quotation marks omitted), it would have been hard-pressed to improve upon the above specimens. These claim constructions, and others like them proffered by the defendants, are textbook examples of how to improperly import limitations from specifications into the claims.

*    *    *    *    *

The above points merited treatment at the outset given their centrality to many of the Government's and IBM's claim construction arguments, but they are hardly the only examples of what we would submit are the serious errors that infect the defendants' proposed constructions. Additional such errors are addressed in connection with our discussion of individual asserted claims, to which we now turn. Our discussion of the proper construction of these asserted claims

13

will be limited to a discussion of those claim terms that continue to be disputed by the parties.

## II.      U.S. PATENT NO. 4,900,905 ('905 PATENT) – CLAIM 12[9]

The parties continue to dispute the meaning of a number of limitations and terms contained in this method claim.  The defendants' constructions of the disputed terms suffer from just about all of the flaws discussed above.  Those constructions are almost completely divorced from the actual language of the claims they are supposed to be interpreting, and are instead premised entirely on the defendants' improper attempt to import limitations from the specification and prosecution history into the claim.  Indeed, it is even more clear after reading the Government's and IBM's briefs that, notwithstanding their protestations to the contrary, the defendants are attempting to transform this straightforward method claim into a claim for a very specific type of device.

| **Preamble:**  *A method of processing and collecting mail with, and otherwise operating a self-contained computerized apparatus comprising the steps of:* |
|---|

The Government and IBM argue that the preamble must be separately construed.  As we discussed in our opening brief, Uship Br. 9, because the body of this method claim fully identifies and describes all of the steps of the claim, and because the preamble serves essentially to encapsulate and summarize the limitations appearing in the body, the preamble is not itself a separate limitation in need of construction.  Even assuming, however, that the preamble needs to be separately construed, Uship's proposed construction is far more in keeping with the actual language of the claim and the other intrinsic evidence.

The parties' dispute centers around the meaning of the term "self-contained computerized apparatus."  The defendants' briefs confirm that they construe the preamble to require that

---

[9] A copy of the '905 patent was attached as Exhibit A to our opening brief.

*all* of the apparatus' functions be controlled or carried out by a computer. Indeed, the defendants contend that what claim 12 not only envisions, but mandates, is a shipping machine that takes complete control of the item being mailed, with the customer literally never touching the item again after he or she initiates a shipping transaction. *See, e.g.*, US Br. 15; IBM Br. 16-17; *see also* IBM Br. 20 ("the apparatus is 'self-contained' because it does everything from receiving the item to storing it.").

The defendants' conception of this method claim fails at multiple levels of analysis. Most fundamentally, there is nothing inherent in the term "self-contained computerized apparatus" (or in any of its constituent words)[10] that requires a machine that itself performs *all* functions without any customer involvement or handling after the process is initiated.[11] There are countless devices that are "self-contained" and "computerized" that nevertheless call for the active participation of the person using the device. Arcades are filled with computerized video games that are "self-contained" units, and yet when a customer initiates a transaction by dropping a quarter in the slot, he doesn't then just stand back and watch the unit play by itself. Similarly, modern automobiles are dependent on computers to control most of their functions, and

---

[10] Embracing a theme to which it will return on numerous occasions, IBM complains that we have analyzed the meaning of the individual words in this phrase. IBM Br. 23. But, as it does nearly every time it raises this complaint, IBM never specifies in any way what is wrong with the *substance* of our interpretations of the phrase's constituent words. The most it can muster in this regard is the unsupported and unexplained assertion that our "definition-based proposed construction . . . directly contradicts all the intrinsic evidence." IBM Br. 24. As for the Government, while it does not take issue with the definitions we cite, it contends that its construction is "more consistent" with those definitions, and especially the definition of "computerize." US Br. 16-17. As we addressed in our brief, however, nothing in the term "computerize" inherently requires that a computer must control *every* facet of the operation of an apparatus, which is what the Government's construction mandates. Uship Br. 12.

[11] IBM repeatedly emphasizes the specification of terms such as "fully integrated" and "one-stop," as if such use solves its problem. *See, e.g.*, IBM Br. 17, 20, 22. Just as with "self-contained" and "computerized," however, there is nothing inherent in these terms that would require that the machine take over from the customer and perform all functions without the involvement of the customer.

15

they are certainly "self-contained," but we have not yet arrived at the day where cars routinely drive themselves.  In both of these cases, and countless others, the "self-contained computerized apparatus" still depends upon the active participation of a person who will operate the device.

That brings us to another problem with the defendants' construction.  The preamble refers to a method of "processing and collecting mail with, *and otherwise operating* a self-contained computerized apparatus" (emphasis added).  The preamble therefore obviously contemplates that someone will "operate" the apparatus.  *See* Uship Br. 10.  Under the defendants' construction, the operator is the machine itself.  Defendants' construction thus results in an invention claiming a method by which a self-contained computerized apparatus will operate a self-contained computerized appartus.  Needless to say, this is a very unnatural reading of the claim.  Perhaps that is why IBM pretends the word "operating" is not in the preamble; when it purports to construe the claim language, it replaces the words "and otherwise operating" with an ellipsis.  IBM Br. 20.[12]

No doubt aware that any fair reading of the actual language of Claim 12 overwhelmingly favors adoption of Uship's construction and not their own, the defendants quickly move past the claim language and rely primarily upon the '905 specification and prosecution history.  And to be sure, as we've acknowledged, Uship Br. 14-15, there is support in the specification and the drawings for the proposition that at least some claims of the '905 patent could be embodied by a device that performs along the lines suggested by the defendants' constructions.  The problem, however, is that the defendants are not actually interpreting Claim 12, the *method* claim, but are

---

[12] The Government at least acknowledges that the word "operating" is in the preamble, but it too would rather pretend it wasn't.  The Government suggests that the word "otherwise" demonstrates that "operating" is not intended to have significance apart from the words "processing and collecting mail."  US Br. 17.  If anything, however, the use of "otherwise" indicates that "operating" is a *broader* term than "processing and collecting mail."  In any event, the Government's argument does not support its implicit contention that "operating" is somehow irrelevant to discerning the meaning of the preamble.

16

instead importing into Claim 12 limitations and features from the '905 patent's *device* claims and the specification's description of those devices.  Indeed, despite their assurances to the contrary, one need look no farther than the defendants' reproduction in their briefs of various device drawings, and their lengthy descriptions of the devices and structures depicted in those drawings, to conclude that they are reading the independent method claim of Claim 12 as though it were the device claimed in the unasserted claims of the patent.  *See, e.g.*, US Br. 14-15, 19-20, 26-27, 34, 36; IBM Br. 16-17, 25-26, 38.  By treating the asserted method claim as if it required the same type of device that is discussed in the patent's device claims and specification, the defendants have committed the dual and related sins of importing limitations from the specification and confining the invention to particular embodiments discussed in the specification.[13]

The defendants place especially heavy reliance on the '905 patent's prosecution history, and in particular on an August 1989 submission to the PTO in which the applicant discussed at length certain features of the apparatus claims of the patent application.  '905 Patent Pros. History, Amendment (Aug. 14, 1989) at 9-13 (G001674-78) (attached to our opening brief as Exhibit L).  *See, e.g.*, IBM Br. 19-22; US Br. 21-23.  As we discussed in our opening brief, Uship

---

[13] Moreover, despite their efforts to distinguish *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342 (Fed. Cir. 2008), that decision is directly applicable here, and fatal to the defendants' position.  In that case, as in this one, the patent included a method claim that referenced certain structure ("vertically disposed, horizontally positionable stack divider") as well as a device claim that included a structure (what the court called a "track and roller") that was a species of the structure referenced in the method claim.  The defendant attempted to rely on the specification and prosecution history – during which the applicant successfully overcame a prior art rejection due to the perceived novelty of the "track and roller" limitation – to argue that the structure referenced in the method claim should be limited to the "track and roller" structure.  *Id.* at 1345-46.  The Federal Circuit rejected this argument, holding that it amounted to an improper attempt to import limitations from the specification and to "import limitations from the apparatus and system claims into the method claims."  *Id.* at 1348.  This decision controls here, where the defendants are similarly attempting to rely on the '905 patent's specification and prosecution history to confine the method claim's reference to general structure ("self-contained computerized apparatus") to the specific embodiments of that structure that correspond to the patent's device claims.

Br. 16-17, the statements in this submission that are most supportive of the defendants' view that the shipping machine must itself perform all functions with little if any customer involvement or handling all pertain directly to the patent's *apparatus* claims, and there is no clear indication that these statements necessarily applied to what became Claim 12. Thus, the submission did not amount to the type of clear, unambiguous, and unmistakable disavowal of claim scope that is required before a court may restrict the otherwise appropriate scope of a claim limitation. *See* Uship Br. 16.[14]

We noted in our opening brief the one statement in the applicant's submission that we believed related directly to the method claim: "Independent Claim 28 [which ultimately became Claim 12] is drawn to the method of operating a computerized apparatus which corresponds to the operation of the mail collecting and telecommunication apparatus as set forth in the present invention." Ex. L at 10 (G001675). We demonstrated, however, that this sentence did not come close to an unmistakable disavowal of claim scope, because it indicated, at most, only that the method claim "corresponds" in some unspecified respects to the device claims, and nowhere stated that *all* of the limitations in the device claims necessarily apply to the method claim. *See* Uship Br. 16-17.

The Government and IBM purport to identify additional statements in this submission that they contend indicate that the applicant intended to limit the scope of its method claim to the same type of apparatus discussed in connection with the device claims. These additional state-

---

[14] *Cf. Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003) ("[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable."); *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("[A] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution.") (citations and internal quotation marks omitted); *i4i Limited Partnership*, 2009 U.S. App. LEXIS 28131, at *17 (reviewing prosecution history to determine whether it reveals statements "that unequivocally narrow the claims"); *see also* Uship Br. 8 (citing cases).

ments, however, either appear to relate only to the device claims, are at most ambiguous as to whether they relate to the method claim as well as the device claims (*see, e.g.*, US Br. 23), or add nothing of substance to the sentence discussed above.  There is at least one additional statement identified by the defendants, however, that, if anything, further highlights that the applicant did *not* intend to limit the "self-contained computerized apparatus" referenced in the method claim to the device claim apparatus.  Both the Government and IBM rely on this statement:

> None of the references relied upon by the Examiner, whether taken singly or collectively, either disclose or suggest ***the*** apparatus for collecting an item to be mailed as claimed in new Claim 17 . . . or the method of operating ***a*** computerized apparatus as claimed in new Claim 28 [now Claim 12] of the present invention.

Ex. L at 12 (G001677) (emphases added).  In distinguishing between "the" apparatus claimed in the device claims and the method of operating "a" computerized apparatus claimed in the method claim, this statement establishes that the method claim did not require the operation of the same type of device claimed in the device claims.  At the very least, this statement underscores the lack of a clear and unambiguous disavowal of claim scope, and thus defeats the defendants' efforts to restrict the scope of Claim 12 on the basis of the prosecution history.[15]

| Limitation **2**:  *receiving an item to be mailed;* |
| --- |

The Government interprets this limitation as "taking in an item, inserted by a user, within the self-contained computerized apparatus."  US Br. 18.  According to IBM, it means "accepting into the self-contained computerized apparatus an item to be mailed, after which the apparatus takes over with minimal consumer input."  IBM Br. 24.  Perhaps the first thing to notice when assessing the defendants' constructions is that neither defendant even attempts to connect their

---

[15] For similar reasons, the fact that some of the specification and prosecution history statements relied upon by the defendants refer to the "present invention" does not by itself amount to a clear disclaimer of otherwise applicable claim scope such that those statements must necessarily apply to all claims.  *See, e.g.*, *Rambus, Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1094-95 (Fed. Cir. 2003).

interpretation to the *actual words* of the claim.[16]  This is not surprising, because there is no way one can cram into the word "receiving" such concepts as "insert[ion]" within the apparatus and whether the apparatus "takes over with minimal customer input."  This total disconnect between the defendants' constructions and the actual language of the claim is alone fatal to those constructions.

The Government primarily supports its construction by referring to a passage from the specification that describes the elaborate insertion apparatus contemplated under the apparatus claims, complete with references to drawings that clearly pertain to those apparatus claims.  US Br. 19-20.  *See* specification 4:25-5:6 (describing figures as relating to "the machine").  The Government suggests that the fact that this passage refers to the "mail collection process" means it applies to the method claim, but when read in context there can be no doubt that the passage is referring to the "process" employed by the machine and not to the steps of a method.

Both the Government and IBM also rely heavily on the prosecution history.  US Br. 21-24; IBM Br. 26-27.  As we have already discussed that topic at length, we pause here only to make one additional point that pertains directly to the "receiving" inquiry.  IBM points to the following statement in the prosecution history:  "once a consumer enters an envelope or package into the *receiving means* of the disclosed apparatus, the apparatus takes over . . .."  Ex. L at G001675 (emphasis added).  *See* IBM Br. 26.  Although IBM believes this statement supports its position, it actually further confirms IBM's improper attempt to import limitations from the device claim into the method claim:  "receiving means" is obviously referring to the device claim.  *Cf.* '905 patent Claim 1 (referring to "receiving means").

---

[16] While IBM purports to address the "Claim Language" for this limitation, its discussion is entirely devoted to determining at what point the receiving step should take place, rather than what the receiving step requires.  IBM Br. 25.

| **Limitation 3:  *weighing the item to be mailed;*** |
|---|

The same fatal flaws that infect the defendants' construction of "receiving" infect their constructions of this limitation.  Thus, the Government interprets this six-word limitation as follows: "after the mail is accepted within the self-contained computerized apparatus, obtaining the weight of a mail item by use of a scale without requiring any handling of the mail item by the operator."  US Br. 26.  According to IBM, it means: "after the mail is accepted into the apparatus, weighing the item to be mailed without the possibility for a customer to influence the weighing."  IBM Br. 30.  Once again, the defendants don't even try to tie their interpretations to the claim's *actual words*.[17]  Nor could they even if they had tried, as the English language simply cannot be stretched enough for the word "weighing" to accommodate all of the extraneous elements that the defendants heap upon it.  The defendants are not "construing" here – they are rewriting.  The defendants' constructions must be rejected for this reason alone.  *Cf. MBO Labs.*, 474 F.3d at 1330-31; *Renishaw*, 158 F.3d at 1248; *NTP*, 418 F.3d at 1310.

The Government primarily supports its construction by referring to passages from the specification that describe the elaborate structure contemplated under the apparatus claims, complete with references to drawings that clearly pertain to those apparatus claims, as well as references to such structures as "sensors," "transport conveyors,"  "insertion slots," "mailing pressing mechanisms," and other contraptions that cannot, in any language, be described as "weighing."  US Br. 26-27.  It would be difficult to come up with better evidence that the Government is importing limitations from the specification into the claim.  In context, it is clear that this passage relates not to the simple "weighing" step of method Claim 12, but rather to the means-plus-function limitations of the device claims.  *See, e.g.* Claim 1 ("weighing means coupled to said

---

[17]  IBM's discussion of the "Claim Language" is again entirely devoted to addressing at what point the weighing step should take place.  IBM Br. 31.

computer means and to said receiving means for securely weighing said item to be mailed").

IBM also mentions that the specification refers to what it calls an "alleged beneficial aspect" of the invention in that an item may be "weighed without the possibility for a customer to influence the weighing." IBM Br. 32; *see also* US Br. 26. Of course, the claim at issue refers only to "weighing" the item. This is in contrast to other, unasserted claims, like the aforementioned Claim 1, that refer to "securely weighing" the item and that therefore arguably call for some type of mechanism to allow for secure weighing. Absent such language or anything like it, the defendants' attempt to read this "beneficial aspect" into Claim 12 clearly falls on the wrong side of the interpretation/importation line. *See Brookhill-Wilk*, 334 F.3d at 1301 ("Advantages described in the body of the specification, if not included in the claims, are not per se limitations to the claimed invention.") (citations omitted); *see supra* p.9, 11-12.

Finally, both the Government and IBM also rely heavily on the prosecution history. US Br. 21-24; IBM Br. 26-27, which we have already addressed.

| **Limitation 4:** *admitting data relating to the item to be mailed such as the address to which the item is to be mailed;* |
| --- |

IBM contends that the only issue with respect to this limitation concerns whether the term "address" needs to be construed. IBM therefore presumably has no substantive objection to our construction of the word "admitting," perhaps because, as we noted in our opening brief, our construction was largely consistent with (though, in our view, superior to) IBM's construction as it related to this aspect of the limitation. Uship Br. 19.

As we discussed in our opening brief, the Government's construction suffers from several serious flaws, including that it appears to *require* that certain types of data – "data concerning mailing weight, mailing destination, and, additionally, mailing classification data" – be admitted. *See* Uship Br. 19-20. Because, with the possible exception of "mailing destination," none of

these terms are referenced in the limitation, to the extent the Government's interpretation requires such data to be admitted, it improperly imports new limitations into the claim.

The Government responds not by clarifying whether its construction would require these types of data to be admitted, but rather by explaining where it got its categories of data from in the specification.  US Br. 29.  The Government references in this regard, but does not fully quote, the specification's statement that "[t]he data to be entered on keyboard 6 may comprise the mailing's country of destination, the zip code, and a variety of special requests such as registered mail, express mail, etc., or any other data required by company standards."  *See* specification 6:64-68 (discussed at US Br. 29).  But the Government both leaves out of its discussion the permissive language in this quote ("*may comprise*") and argues that because, in its view, the phrase "any other data required by company standards" did not serve as a "meaningful guide for claim interpretation," the term should be left out of its claim construction.  US Br. 29.  The Government's extremely selective reading of this passage makes no sense.  Far from failing to serve as a "meaningful guide" to construction, the statements ignored by the Government are the very terms that establish that this limitation was *not* designed to itself specify the categories of "data relating to the item to be mailed" that were *required* to be admitted.  Those categories, rather, were to be set by the delivery service in accordance with its own "standards."

Turning to the term "address," the Government still has not clarified whether its definition – "information identifying the specific location where a person or organization receives mail" – requires the customer to input such information as the recipient's name, street address, city, state, and zip code.  US Br. 30.  IBM claims that this term need not be construed, but if it is construed, the Government's construction should be adopted.  IBM Br. 36.  As we discussed in our opening brief, Uship Br. 20, any notion that this limitation requires complete addressing in-

formation to be admitted cannot be squared with the specification, which both establishes that the invention does not specify the types of information relating to the address that must be inputted, and refutes any suggestion that complete addressing information must be entered.  IBM responds by accusing Uship of ignoring the specification's statement that "[t]he customer can read this data from the face of the mailing because the mailing has to be inserted in such a way that the *address written on its face* comes behind the transparent glass window. . . ."  Specification 6:57-60 (emphasis added) (cited at IBM Br. 35).  This statement, of course, does not define "address," but even if it were read, in this context, to refer to complete addressing information, it would, if anything, support our construction, in that it draws a contrast between what's "written" by the customer *on an envelope* and the "data about the mailing's destination" that is inputted *into the machine* by the customer.  Notwithstanding its use of the word "address," it is the latter category, not the former, that is addressed by this limitation, and the specification could not be more clear, as discussed above, that the invention does not itself require all information relating to the destination to be admitted.[18]

| **Limitation 5:** *determining the required postage for the item to be mailed;* |

Once more, the defendants don't even attempt to tie their constructions of this limitation to the claim's *actual words*.  According to the Government, this limitation should be interpreted as: "automatically calculating the charge for the service of delivery of a mail item based on mailing weight data and destination data without requiring any handling of the mail item by the

---

[18] IBM observes that if "address" is limited to the country of destination, the item would not reach its destination.  IBM Br. 35-36.  This is a red herring.  The shipping machine is not a mailman; it does not itself deliver the item.  The delivery service will know where to deliver the item because, as the specification states, the address will be "written" on the item *by the customer*.  The purpose of this limitation is different; it is to call for the entry of the data that, as defined by the delivery service's "standards," may be used to allow the machine to do such things as "determine[e] required postage" (Limitation 5) and "provid[e] machine readable information concering the item to be mailed on the item to be mailed, such as the zip code" (Limitation 7).

user." US Br. 30.  According to IBM, it means: "calculating a charge based on the mailing weight, the destination and any special requests, and any instructions stored in the machine's memory, with no possibility for an incorrect postage being calculated."  IBM Br. 36.  Once again, the defendants are rewriting rather than construing, and their "constructions" must be rejected for this reason alone.  Moreover, in attempting to justify their constructions on the basis of statements in the specification regarding the desirability of devices that would calculate postage in such a way as to eliminate the possibility of the customer handling the item or influencing the calculation, US Br. 31, IBM Br. 36, the defendants are improperly importing limitations, benefits, and desired features from the specification into the claim.  *See supra* p.9, 11-12.

The Government makes a strawman argument when it suggests that we argue that the required calculation is performed by an "operator" or is not performed "automatically."  US Br. 31.  We are not disputing that the machine itself calculates postage.  We are instead objecting to the defendants' efforts to import limitations – such as specifying the criteria that the postage determination much be based upon, insisting that there be "no possibility" for an incorrect calculation, etc. – that are not supported by the claim language

> **Limitation 7:** *providing machine readable information concerning the item to be mailed on the item to be mailed, such as the zip code to which said item is to be mailed; and*

The parties continue to dispute what this limitation means when it calls for "*providing* machine readable information *on*" the item to be mailed.  As discussed in our opening brief, we contend that this limitation calls for printing either directly on the item to be mailed or on a label that may be applied to the item to be mailed.  Uship Br. 22-24.  The Government and IBM, on the other hand, have proposed constructions of this term that would require the shipping machine to automatically either print or affix the machine readable information *directly* on the item, such that the customer does not handle the item at all during this step.  US Br. 32; IBM Br. 37.

25

Because the methodology the defendants have used to construe this limitation replicates the fundamentally flawed approach it has taken with respect to other limitations in this claim, we will not repeat at length our criticisms of that approach but will instead summarize and highlight the multiple errors on which the defendants' constructions were based.  First, they have proposed constructions (*e.g.*, "no consumer handling being necessary," "destination," "without requiring any handling of the mail item by the operator") that have little if any connection to the actual text of this limitation.  Second, they support their constructions of this *method* claim by referring to passages from the specification that describe the elaborate printing structure contemplated under the *apparatus* claims of the patent, complete with references to drawings that clearly pertain to those apparatus claims.  *See* US Br. 33-34; IBM Br. 38.  Third, the defendants rely again on the same prosecution history materials that they relied upon for previous limitations; for the reasons already discussed, the prosecution history does not support their position.

The Government does raise one new argument.  It claims that our construction is "contradicted" by another patent (No. 5,065,000) filed by the '905 inventor on the same day he filed the '905 patent.  US Br. 35 n.9.  In actuality, the '000 patent is strongly *supportive* of our construction.  Independent Claim 1 of the '000 patent included a limitation very similar to Limitation 7 of the '905 patent:  "a printer coupled to the computer for *providing machine readable information concerning the item to be mailed . . . on the item to be mailed.*"  '000 patent specification 7:56-59 (emphasis added).[19]  The '000 patent then added the following dependent Claim 3:

> 3.  The apparatus according to claim 1, wherein *the printer* includes …
>> a first print head for printing said laser readable bar code directly on the item to be mailed; and
>> a second print head for printing said laser readable bar code on an *adhesive label to be stuck on the item to be mailed.*

---

[19] A copy of the '000 patent is attached hereto as Exhibit R.

*Id.* 7:67-8:9 (emphasis added).  Far from contradicting our position, these claims confirm that the operative language in Claim 12 of the '905 patent – "providing machine readable information concerning the item to be mailed on the item to be mailed" – can readily be construed to allow for printing either directly on the item or on a label that may be applied to the item.

| **Limitation 8:**  *storing the item to be mailed for subsequent pick up.* |
| --- |

Here again, in the guise of "interpreting" this limitation, the Government and IBM proceed to import additional limitations and conditions.  According to the Government, this limitation requires the shipping machine to "hold[] the item in a place for subsequent use or disposition without requiring any handling of the mail item by the operator."  US Br. 35.  The government makes no attempt to ground this construction in the language of the claim.  Rather, it once again skips any textual analysis and instead relies on passages from the specification – including statements describing the sophisticated structures contemplated under the apparatus claims, and referencing both drawings pertaining to those apparatus claims and structures like "sensors" and "transport conveyors" – and the prosecution history.  US Br. 35-36.

IBM's construction is, if anything, even more divorced from the actual words used in this limitation, as it reads this limitation as "automatically moving the item into a storage area within the self-contained apparatus for subsequent pick-up, with no consumer handling being necessary."  IBM Br. 41.  Its only effort to connect its reading to the actual text of the claim is to cite the preamble's reference to a "self-contained" apparatus.  *Id.*  Obviously, there is nothing inherent in the term "self-contained" which suggests, much less requires, that the apparatus "automatically mov[e]" an item into storage "with no consumer handling being necessary."  If this constitutes legitimate claim construction, then claim construction has no principled limits.  And IBM's efforts to ground its interpretation in the specification and prosecution history must fail

for the same reason as the Government's similar efforts.[20]

### III.   U.S. PATENT NO. 5,481,464 ('464 PATENT)[21]

#### A.   Claim 7

> **Preamble:**  *An integrated, automated, unattended unit for collecting and se-curely holding items for collection and shipment by commercial de-livery ser-vices: said automated unit comprising:*

Although there is no need to construe the preamble, *supra* p.3-4; Uship Br. 26, Uship has

proposed a construction of the preamble.  IBM declares that Uship's construction "would lead to

the conclusion that the invention covers an aggregation of structure no matter how unintegrated,

unautomated, or ununified."  IBM Br. 53.  On the contrary, as Uship has explained and explains

further below, the components of the invention must be harmonious and interrelated even if not

physically singular and must rely upon machines or electronics to a significant but not exclusive

extent.  *See* Uship Br. 27.

*"integrated … unit."*  The parties' dispute about this phrase comes down to this:  must

the entire invention be contained within a single outer housing.  The Government and IBM com-

plain foremost about Uship's use of dictionary definitions.  As explained above, however, the

Court is not "barred from considering any particular sources or required to analyze sources in

any specific sequence, as long as those sources are not used to contradict claim meaning that is

unambiguous in light of the intrinsic evidence."  *Phillips*, 415 F.3d at 1322-24.  In fact, *Phillips*

---

[20] IBM also responds to our argument that construing the "storing" step to include trans-porting the item into a storage unit cannot be reconciled with Claim 1, which explicitly provides for "transport means . . . for transporting the item to be mailed from said receiving means to a storage area."  Uship Br. 25.  According to IBM, the two claims are "entirely consistent – claim 1 requires a particular device for moving the item into storage and claim 12 requires the machine to store the item regardless of the particular transport means."  IBM Br. 44.  IBM misses the point, which is that it has arbitrarily read the concept of "moving" into a completely different claim term – "storing."  Put simply, Claim 1 confirms the common sense proposition that "stor-ing" and "transporting" are *two different things*.

[21] A copy of the '464 patent was attached as Exhibit B to our opening brief.

even offers this germane example of a legitimate approach to claim construction: "a judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term." *Id*. at 1324.  That is all that Uship is doing with its references to a dictionary here.  The definitions of "integrated" and "unit" illuminate the fact that the ordinary meaning of these terms can refer to an apparatus whose elements are operationally harmonious and physically coordinated but not necessarily physically singular. With this understanding, one can better see that the claim does not require the invention be physically singular.  *See* Uship Br. 26-27, 29.[22]  Such a use of these terms is hardly unprecedented.  *See Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1083-87 (Fed. Cir. 2009) (construing both "data acquisition unit" and "display unit" to encompass "separate physical structures").

The defendants' arguments are largely question begging.  For example, the Government asserts that "the patent abstract equates 'integrated' with the incorporation of different subparts into a single unit," but its authority is nothing more than a sentence that uses the phrases "integrated … unit" and "the unit including" and then lists several components included within the "unit."  US Br. 39.  IBM makes a similar argument based on the same language from the abstract.  *See* IBM Br. 51-52.  Likewise, IBM circularly argues that the claim does not cover "an aggregation of structures" because "the adjectives 'integrated,' 'automated,' and 'unattended' all modify the word 'unit.' "  IBM Br. 51.  IBM again assumes its conclusion when it asserts, without any citation, that the "specification confirms that the words 'integrated, automated, unattended unit' mean that the claims are directed at a single machine that does everything – a 'unit'

---

[22] The Government notes that Uship "substitut[ed] the word 'special' for 'specified' in the dictionary definition" of "unit."  US Br. 42.  This substitution was inadvertent.

including various structures that perform functions identified later in the claim." IBM Br. 52.

IBM also contends that if the claim did not mean "a single unit," then the additional "structural

features" added in dependent claims 10 and 13, namely, a pivotable door and ramp, would some-

how "be disaggregated from the claimed invention." IBM Br. 51. This argument is incoherent,

if not question begging. Like any other structural features of the invention, these structural fea-

tures can be incorporated into the unit as appropriate regardless of whether the unit is physically

singular.

The defendants' other attempts to counter Uship's construction are equally unavailing.

IBM's reliance upon the prosecution history is misplaced. *See* IBM Br. 47-48, 52. In rejecting

Claim 7 as "an aggregation of parts," the PTO did not insist that the invention be physically sin-

gular. Rather, it merely noted that "not all of the recited claim limitations have explicitly recited

interconnections or the disclosed structural relationships, i.e., although the input, control and ac-

cepting means are interconnected[,] the exact location of these devices is not known." IBM Ex.

D at G001144-45. Those interconnections and relationships could exist regardless of whether

the invention was physically singular. In responding to the PTO by inserting the phrase "inte-

grated … unit," the patentee did nothing more than make the requisite connections and relation-

ships clear. *See* IBM Ex. D at G001137.

IBM claims that Uship's proposed constructions of "integrated" and "unit" are "circular

and internally inconsistent" because both refer to a "system." IBM Br. 53-54. Neither of IBM's

pejorative adjectives properly applies, as an elementary grasp of grammar shows: "unit" is a

noun, and, as Uship has shown, can refer to a single machine or a "system of machines"; "inte-

grated" is an adjective, and, as Uship has shown, describes the type of unit, namely, one whose

constituents are "unified" or "interrelated." At worst, "integrated" might be unnecessary in light

of "unit," but the patentee's inclusion of "integrated," even if redundant, was an entirely reasonable attempt to signal to the PTO that the invention was more than an "aggregation of parts."

Comparing Claim 7 to several unasserted claims, IBM maintains that "integrated … unit" as used in Claim 7 cannot encompass a "system" because "[w]hen the patentee wanted to claim a system[,] he used the word system [in the claim], not unit." IBM Br. 54.  To be sure, there is "a presumption that two independent claims have different scope when different words or phrases are used in those claims," but that presumption "is not a hard and fast rule of construction" and thus "[c]laims that are written in different words may ultimately cover substantially the same subject matter."  *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) (quotation marks and citations omitted).  Here, a broader and more careful consideration of the patent shows that the patentee used "unit" to include "system."  The term "system" is used in the title of the patent – "System for Collecting and Shipping Items," and in the three preferred embodiments, *see, e.g.*, specification 3:43-44 ("a system 10, constructed according to a first embodiment of the invention"); *id*. 10:45-47 ("second embodiment" described as being a "system"); *id*. 10:56-57 ("a system 210 constructed according to a third, preferred, embodiment").  It is inconceivable that 18 of the 34 claims in the patent would not be covered by the patent's title or any of the preferred embodiments merely because those claims used "unit" rather than "system." The defendants' frequent reliance upon the preferred embodiments belies such a notion.  Rather, the patent uses "unit" to indicate the physical representation of the "system" that is the invention.

Finally, the Government argues that other uses of "unit" in the abstract and specification "reveal" the term "to be 'a single device.' " US Br. 42.  But none of those uses refers to the invention itself – they refer to its components – and so they are not useful guides because, as Uship has noted repeatedly, "unit" can contemplate *either* a single machine or a system of machines.

31

*"automated."* IBM offers no justification for its construction of "automated." The Government counters Uship's dictionary definition of "automated," Uship Br. 27-28, with a dictionary definition of its own, US Br. 40-41. The Government's objective is to construe the claim to require that the invention entirely supplant human operation. As Uship has explained, that makes no sense. *See* Uship Br. 28. Nor is the Government's dictionary definition somehow superior because it cites the definition of "automate" rather than "automation." The Government studiously relegates to a footnote the definition of "automate" that expressly incorporates by reference the definition of "automation." *See* US Br. 40-41 & n.11. The Government also relegates to a footnote a definition of "automate" that, like Uship's construction, defines the term to mean "convert[ed] to *largely* automatic operation." *Id.* 40 n.11 (emphasis added).

*"unattended."* IBM offers no justification for its construction of "unattended." The Government again tries to eliminate any human involvement by arguing that the "background" section of the specification equates "unattended" with "no attendant is present." US Br. 41. The Government also asserts that Uship's interpretation "would essentially eliminate a claim term." US Br. 41. Those arguments fail for the same reason: as Uship has explained, "unattended" means that the invention is "capable" of being used without an operator, which will sometimes mean no attendant is present but does not preclude the presence of an attendant. Uship Br. 28-29. The Government's construction is therefore inconsistent with the ordinary meaning of the term at issue, and amounts to an improper attempt to import new limitations into the claim. It would also lead to absurd results. Under the Government's view, even if a shipping kiosk is fully capable of being used without the assistance of an attendant, whether this claim is infringed depends wholly upon whether the alleged infringer assigns an employee to hover around the kiosk. When the employee is absent, there is infringement; when he is "present," there is no in-

fringement.

| **Limitation 2:** *means for inputting information relating to the destination to which the item is to be shipped;* |
|---|

After a long windup in which it complains about irrelevant technical defects in Uship's proposed construction, IBM finally gets to its point, which is that a "mechanism that recognizes voices and is adapted to be controlled by the spoken words" is not a corresponding structure for this means-plus-function limitation because "Uship's proposed claim construction says nothing about voice recognition."  IBM Br. 56-59.  But insofar as a voice-recognition mechanism is covered by or is an equivalent structure to "keyboard, touch pad, touch screen, or similar device," it need not have been explicitly included in the construction.  *See* Uship Br. 34-36.  The Government claims that the reference to the voice-recognition mechanism is too "vague" to provide corresponding structure.  US Br. 44.  Similarly, IBM objects on the grounds that "the patent provides no indication of what such a mechanism is or how it interfaces with the overall system," and that "[t]here is no indication that such 'mechanism' has anything to do with inputting information relating to an item's destination."  IBM Br. 59.  But the specification's reference to the voice-recognition mechanism is no less determinate than its references to the keyboard and the keypad, which, the defendants concede, are corresponding structure.  Further, the link between the voice mechanism and the destination information is clear: the sentence after the voice-recognition mechanism is introduced states: "For example, the Name and address of the recipient may be inputted by vocalizing the name and address of the recipient."  Specification 5:55-56.[23]

IBM also contends that Uship improperly construes "information relating to the destina-

---

[23] That the voice-recognition mechanism is used in an example to collect "name and address" does not mean that "information relating to the destination" necessarily requires a full address rather than merely a zip code, as discussed presently.  Obviously, any input structure for collecting a full address is capable of collecting only a zip code.

tion" because the "meaning of this phrase is clear and not disputed."  IBM Br. 59.  This is obviously incorrect because Uship and the Government strongly disagree as to the meaning of that phrase.  *See* US Br. 43.  Uship addresses this issue below.  *See infra* p.53-57 ('220, Claim 1); Uship Br. 34-35.

Finally, the Government opposes inclusion of "touch screen" in the construction, US Br. 44, but as an equivalent structure to a keyboard, keypad, and voice-recognition mechanism, a touch screen is clearly a structure that corresponds to this means.

| **Limitation 3A:**  *control means for analyzing the inputted information and calculating the fee for shipment of the item;* |
|---|

Neither defendant disputes the substance of Uship's construction of the meaning of these terms.  *See* IBM Br. 61.  The only dispute relates to the corresponding structure.

First, the defendants maintain that the structure must include not only the CPU and the PLC, but also the keypad, the keyboard, and the scale.  They reason that without those structures, the control means "would be incapable of obtaining the necessary information from which to calculate the shipment fee."  US Br. 46-47; IBM Br. 60, 62.  On the contrary, as explained above, the keypad, keyboard, and scale are means for *collecting* information, not for processing it once collected.  IBM's own citation confirms Uship's construction: in *Asyst Technologies, Inc. v. Empak, Inc.*, the court held that "notwithstanding that other components of the system enable the data processor to operate in the intended fashion, we do not regard those components – or the connections between those components and the data processor, such as [the communication] line 51 – to be part of the structure that performs the functions identified in the 'data processing means' limitation."  268 F.3d 1364, 1372 (Fed. Cir. 2001), *cited in* IBM Br. 62.

The defendants then contest the sufficiency of the structure for analyzing and calculating. IBM insists that the "zone and weight charts" and "corresponding fee files" do not consist of "an

algorithm – no programming steps are provided, and not even an example is provided." IBM Br. 62. The Government concedes that those charts and files, coupled with the control system, "could perform the calculate function," US Br. 47, but finds the structure nonetheless insufficient to "perform the analysis function." The defendants are overestimating the complexity of the function. If further structure for analyzing the inputted information and calculating the fee were needed, then, as Uship has explained, the specification's references to these charts and files would clearly suffice – no further programming steps need be spelled out beyond the references to these charts and files because "one skilled in the art would know the kind of program to use." *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1337 (Fed. Cir. 2008) (quotation marks omitted); *see* Uship Br. 38-39; *In re Dossel*, 115 F.3d 942, 946-47 (Fed. Cir. 1997) (sufficient structure disclosed where specification did "not disclose exactly what mathematical algorithm will be used to compute the end result, [but did] state that 'known algorithms' can be used to solve standard equations which are known in the art"); *S3 Inc. v. nVIDIA Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001) (quotation marks omitted) (claim sufficiently definite if "a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification.").

> **Limitation 3C:** *said control means further including . . . means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines*

The parties disagree as to whether this limitation requires that a the telephone line be "dedicated" to the unit and whether other structures described in the specification correspond to the function. That disagreement, in turn, revolves around a dispute regarding whether and how the means-plus-function statute (35 U.S.C. § 112 ¶ 6) applies. Uship has established, and the defendants do not dispute, that "[u]se of the word 'means' in claim language creates a presump-

tion that § 112 P 6 applies.  [But] [i]f, in addition to the word 'means' and the functional language, the claim recites sufficient structure for performing the described functions in their entirety, the presumption of § 112 P 6 is overcome – the limitation is not a means-plus-function limitation."  *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008) (citation omitted); *see Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004).  Because the claim here explicitly recites the "telephone lines" as structure for this function and that structure is sufficient, the presumption that this is a means-plus-function limitation is overcome.

The Government concedes that the telephone lines are a means of "communicating," but insists that there must be a single structure that is "capable of performing *both* the communicating and assessing functions," and denies that the lines are sufficient for that dual function because they cannot perform the assessing function.  US Br. 49.  The Government thus grants itself license to read into the claim limitation the specification's description of a dedicated telephone line and a card reader.  The Government may be correct that the claim contemplates a single means to perform both the communicating and assessing functions, but it is wrong to conclude that the telephone lines recited in the claim are not up to the task.  In specifying that the "means for communicating" is the "telephone lines," the claim uses "means for communicating" as a shorthand for "means for communicating and assessing."  This makes sense because the actual debiting of the account is handled by a remote actor responsible for the customer's account; by communicating the charge information to the appropriate remote location, the telephone lines are the mechanism by which the invention causes the fee to be assessed.  Other components of the invention, such as the control means or the card reader, might "enable[]" the communication (and assessment), but they would "not actually perform [that] function[]" and therefore would

not be corresponding structure.  *Asyst*, 268 F.3d at 1371.

Trying to cram this limitation into the means-plus-function mold, IBM goes so far as to deny that the telephone lines are structure corresponding to the means for communicating because they, "by themselves, do not communicate anything."  IBM Br. 66.  IBM obviously has it backwards: the lines perform the communicating, and other devices, such as the control means or card reader, enable the communication.  *Altiris, Inc. v. Symantec Corp.*, which IBM quotes, is not to the contrary because, unlike "telephone lines," there the claim limitation's bald reference to a "set of commands" was "really a restatement of" the means function.  318 F.3d 1363, 1375-76 (Fed. Cir. 2003).  IBM similarly tries in vain to distinguish *Lighting World*'s treatment of when the means-plus-function presumption is overcome.  *See* IBM Br. 64-65; Uship Br. 42-43. IBM argues that *Lighting World* was "off point" because it "dealt with the exact opposite situation as here," namely, overcoming the presumption that a limitation is *not* subject to § 112 ¶ 6 if it does *not* contain the phrase "means for."  IBM Br. 64-65.  According to IBM, these two situations – one presumption for when a claim is subject to § 112 ¶ 6 and one for when it is not – are "vastly different."  IBM Br. 65.  But the Federal Circuit has in fact treated the standard for overcoming the two presumptions as fundamentally the same, remarking: "In deciding whether either presumption has been rebutted, the focus remains on whether the claim as properly construed recites sufficiently definite structure to avoid the ambit of § 112, P 6."  *Personalized Media Commc'ns, L.L.C. v. ITC*, 161 F.3d 696, 704 (Fed. Cir. 1998), *cited in Lighting World*, 382 F.3d at 1360.  As just explained, the phrase "means for communicating the shipment fee [is] by telephone lines" provides sufficient structure to define the "means for communicating" and thus to overcome the presumption that, because it contains the phrase "means for," the limitation is subject to § 112 ¶ 6.

Even if the defendants were correct that this is a means-plus-function limitation, however, their effort to require that the telephone lines be "dedicated" would still fail. As previously established, "Section 112 paragraph 6 does not permit incorporation of structure from the written description beyond that necessary to perform the claimed function." *Asyst*, 268 F.3d at 1369-70 (quotation marks omitted); *see also* Uship Br. 44. And as Uship has explained, there is no need for the telephone line to be "dedicated" to the unit in order for it to communicate (or assess) the shipment fee information. Uship Br. 44. The Government does not address *Asyst*, but IBM maintains that the rule of *Asyst* applies only "where there are a number of structures identified in the specification as performing a claimed function only a subset of which structures are 'necessary' to perform the function." IBM Br. 66-67. *Asyst*, however, says nothing of the sort (IBM notably provides no further explanation of *Asyst*). Rather, *Asyst* and other authority cited by Uship and ignored by IBM make clear that the rule should be taken at its face: if the specification discloses sufficient structure to perform the function, further disclosed structure that is unnecessary to perform the function is not "corresponding structure" under § 112 ¶ 6. *See Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1334-35 (Fed. Cir. 2004) ("[T]o the extent the assembly contains particular structures for permitting rotation through 360 degrees, such as the follower pin 64 and slot 65, these structures are superfluous to our claim construction analysis because they are not required for performing the claimed function.") (citing *Asyst*, 268 F.3d at 1370). But even if the Government's reading of *Asyst* were correct, it would not apply here, because the specification in fact discloses two structures, only one of which includes dedicated lines: whereas the description refers to "a dedicated telephone line," specification 7:1-4, figure 10 shows a telephone line being used to communicate with a remote service center but does not suggest that the

line is "dedicated" to the unit.[24]  *See Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d

1250, 1258-59 (Fed. Cir. 1999) ("When multiple embodiments in the specification correspond to

the claimed function, proper application of § 112, P 6 generally reads the claim element to em-

brace each of those embodiments.").

     This claim limitation could, alternatively, be understood to refer to two separate means,

one for communicating and one for assessing, each with a separate structure.  After all, the word

"means" may be either singular or plural.  *See* Ex. S at 1191 (*Random House Unabridged Dic-*

*tionary* (2d ed. 1993) ("mean[3]": "1. Usually, **means**. (*used with a singular or plural v.*) an

agency, instrument, or method used to attain an end")).  But little of consequence changes under

this approach.  Per the claim limitation, the telephone lines would be the structure for the "means

for communicating," and because that structure is recited in the limitation, the limitation would

not be subject to § 112 ¶ 6.  Therefore, again, there would be no warrant for reading the specifi-

cation's description of a "dedicated" telephone line into this claim limitation.  The structure cor-

responding to the separate "means for assessing" would include not only the card reader, as the

defendants believe, *see* US Br. 49-50; IBM Br. 66, but also the control means, either of which

would suffice.  The specification states that the card reader "*may* be connected" to a telephone

line," specification 7:1-4, but it also shows the telephone line being connected directly to the

control means (CPU), which in turn is connected to the card reader, fig. 10.  Consequently, both

the control means and the card reader could be corresponding structure for the "means for assess-

ing."  *See Micro Chem.*, 194 F.3d at 1258-59 (claim "embrace[s] each" corresponding structure

---

[24] Thus, it is irrelevant that Claim 28 omits from this limitation the reference to telephone
lines.  The specification establishes that, under § 112 ¶ 6, the corresponding structure is an un-
dedicated telephone line.  It is similarly irrelevant that Claims 19, 28, and 34 omit from this limi-
tation the phrase "owning the credit card."  That qualification is obviously implicit in the refer-
ence to "assessing the shipment fee to the account of the person."

in specification).

| **Limitation 4:** *means for securely storing said item until the item is collected by said commercial delivery service;* |
|---|

In showing previously that the defendants overdefine the structure corresponding to this function, we addressed anticipatorily most of the points that the Government and IBM raise in their briefs. *See* Uship Br. 44-46; US Br. 50-53; IBM Br. 67-71. In short, the extraneous doors and mechanisms for moving items that the defendants want to read into the limitation might "enable[]" the function of securely storing the items but do "not actually perform [that] function[]," and therefore are not limitations on the claim. *Asyst*, 268 F.3d at 1371.

Uship previously said that the corresponding structure includes "a security mechanism" that prevents unauthorized access, such as an "appropriately conceived door." Uship Br. 45. IBM responds that "an 'appropriately conceived door' is not structure for purposes of a means plus function claim." IBM Br. 70. In using the phrase "appropriately conceived door," Uship merely intended to summarize the variety of doors recited in the specification that afforded corresponding structure. Central to Uship's analysis was that the mechanized "inner doors" were not the only disclosed structure for the secure storage area; the specification also disclosed a "dump drop," which would employ a "pivotable door" capable of securing the storage area. *See* Uship Br. 45; *Micro Chem.*, 194 F.3d at 1258-59 (claim "embrace[s] each" corresponding structure in specification). Although IBM objects to the phrase "appropriately conceived door," it concedes that the dump drop is "corresponding structure[]." IBM Br. 70. Consequently, IBM's objection is cosmetic, not substantive.

IBM takes this opportunity to reiterate its view that the invention must be physically singular. *See* IBM Br. 68, 70-71. Uship has already rebutted that contention. *See supra* p.28-32. IBM adds a comparison of the language of this claim with the language of claim 3 in the '220

40

patent.  *See* IBM Br. 68.  The comparison is not meaningful because the '220 patent was filed three years after the '464 patent, is not a continuation of the '464 patent, and, unlike the '464, was co-authored by Liles.  *See* IBM Br. 45; US Br. 4.  Moreover, the inference IBM seeks to draw from this comparison is a *non sequitur*: even if the '220 claim's reference to the item's being "taken by an attendant for storage in a secure storage area" implied that that storage area was physically separate from the main part of the unit, it would not follow that the absence of an attendant implied that the storage area was necessarily physically part of the main unit.  Rather, the storage area could be separate but unattended.

| **Limitation 5A:  *means for storing the inputted information once said item is disposed in said secured storage means,*** |
|:---:|

The parties agree that the control means is at least part of the structure for storing the inputted information.  Their disagreement concerns whether the sensors are also corresponding structure that limits the claim.  The defendants argue that the sensors are corresponding structure because the unit stores the inputted information "[w]hen the … sensor … senses the presence of an envelope, parcel or package."  Specification 8:43-47; *see* US Br. 54; IBM Br. 72.  But as Uship has explained, the sensors do not store information and therefore are not part of the structure that corresponds to this function.  *See Asyst*, 268 F.3d at 1371; Uship Br. 48.

The defendants also argue that Uship's construction renders the phrase "once said item is disposed" "superfluous" because it only makes sense to store the inputted information after it has been disposed.  *See* IBM Br. 72, 74; US Br. 55.  The defendants are wrong.  The inputted information must be stored in the control means as soon as it is inputted to be used for any purpose, many of which purposes occur *before* the item is disposed, including, for example, processing destination information and calculating shipping fees.  *See* specification 7:23-8:13 ("Once this information is received by system 100, system 100 will display a screen on terminal 24 which

asks the customer 60 whether the customer would like to change any previous entries.").  Conse-

quently, the phrase "once said item is disposed" as construed by Uship meaningfully clarifies

that the inputted information *continues* to be stored, rather than discarded or erased, *after* the

item is disposed.  *See* Uship Br. 48.  That is, the phrase "once said item is disposed" refers to a

circumstance in which the information is stored rather than to the storage function and therefore

is not a means-plus-function limitation under § 112 ¶ 6.[25]  This case therefore differs from *Lock-

heed Martin Corp. v. Space Systems/Loral, Inc.*, where the district court erred by omitting from

the definition of the function language that further specified *how* the function was actually per-

formed.  324 F.3d 1308, 1315, 1319 (Fed. Cir. 2003), *quoted in* IBM Br. 73-74.

| **Limitation 5B:**  *said information storage means including means for displaying a manifest;* |
| --- |

The only dispute here concerns our contention that the video display terminal is an alter-

native corresponding structure.  *See* Uship Br. 49.  The defendants contend that, although the

video display terminal is "referenced many times in the specification, [it is not] explicitly linked

to displaying a manifest."  US Br. 57; IBM Br. 76.  On the contrary, the specification provides:

"The fourth option that is presented in the screen for the delivery service person is the option to

print the final manifest."  Specification 10:31-44.  As any user of a computer knows, computers

display a document on screen before printing it.

---

[25] Surely, the defendants are not suggesting that the inputted information is stored some-
where else before the item is disposed.  The specification does not refer to any other possible
storage device besides the control means, and the defendants have not pointed to one.  Input de-
vices, such as keyboards and sensors, have no storage capability.  Therefore, if the inputted in-
formation is to be stored at all before the item is disposed, as it must be, then it must be stored in
the same structure in which it is stored after the item is disposed, namely, the control means.

**B.**     <u>Claim 9</u>

> **Limitation:**   *The integrated, automated, unattended unit of claim 7 wherein said means for storing said information further includes means for communicating said information to a remote location staffed by a human operator:*

The specification clearly discloses a means for communicating information that has been inputted to a remote location. *See* Uship Br. 50; "means for communicating and assessing," *supra* p.35-39.  In fact, IBM seems to concede as much. *See* IBM Br. 78 ("[a]lthough the specification may disclose structure for communicating information to a remote location").  Yet, the Government objects that the disclosed structure is inadequate because there is no means for communicating that is explicitly and specifically linked to the function of communicating the inputted information to a "remote location." *See* US Br. 58-59.  The Government sets an artificially high bar.  Surely, the unit need not and would not have two telephone connections.  In fact, figure 10 shows the CPU connecting to a "remote" location via a telephone line.

IBM contends that the structure for communicating discussed in Claim 7 is insufficient here because "Uship's analysis of claim 7 does not describe the 'related hardware and software' or any associated software algorithms." IBM Br. 78.  Curiously, IBM raised no such objection to Uship's construction of the similar limitation in Claim 7. *See* IBM Br. 63-67.  In any event, the objection is not compelling because one skilled in the art would know that, for example, a modem and associated device drivers – well-known structures – would be required for the control means to communicate via telephone line. *See Aristocrat*, 521 F.3d at 1337; *In re Dossel*, 115 F.3d at 946-47.

IBM also argues that the disclosed structure is insufficient because the specification "does not disclose any structure corresponding to the part of the function requiring human staffing – because … [h]umans cannot constitute structure for purposes of § 112 ¶ 6." IBM Br. 78.

Even if humans are not structure, IBM's argument would fail.  Humans are mentioned here not because they are to perform a claimed function but rather because they help describe the recipient of the communication of the information, *communicating* being the claimed function.  If IBM's reading were correct, then a "means for traveling to the moon" would be sufficiently definite only if the moon constituted a corresponding structure.  Moreover, *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, which IBM cites, is inapposite because there, "[e]xcluding the physician, … *no structure* disclosed in the embodiments of the invention actually perform[ed] the claimed dual functions," whereas here the specification discloses ample and adequate non-human structure, and "corresponding structure need not include all things necessary to enable the claimed invention to work."  296 F.3d 1106, 1118-19 (Fed. Cir. 2002) (emphasis added).

C.    <u>**Claim 10**</u>

| Limitation:   *The integrated, automated, unattended unit of claim 9 wherein said unit includes a pivotable door that serves as a slide when said door is opened, said slide serving to transport the item to a storage area for secure storage.* |
| --- |

The defendants maintain that the storage area must be physically within the unit.  *See* US Br. 62-63; IBM Br. 79-80.  Uship addressed the issue of physical singularity above.  *See* "integrated … unit," *supra* p.28-32.  Whereas that is IBM's only disagreement with Uship's construction, the Government has two other points of contention.  First, the Government would require that the slide be "downward-inclined."  US Br. 61.  For the reasons discussed in our opening brief, the Government's construction improperly seeks to import limitations from the specification and to confine the invention to a particular embodiment.  *See* Uship Br. 52-53.  Second, the Government insists that the "secure storage" area be completely "inaccessible to unauthorized persons."  US Br. 63.  As Uship has explained, the Government's question-begging analysis – in effect, arguing that "secure storage" means "inaccessible" because the specification uses the

word "secure" – is unduly restrictive.  Uship Br. 54.

### D.    Claim 15

> **Limitation:**  *The integrated, automated, unattended unit of claim 12 wherein said card reader is adapted to read credit cards issued by any of a plurality of credit card companies and wherein said fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction.*

The defendants claim that their constructions "just restate[] the plain and ordinary terminology of the claim."  IBM Br. 82; US Br. 64.  Perhaps that is what the defendants intended, but, as Uship explained previously, their constructions actually alter the meaning.  Uship Br. 56-58.  IBM also continues erroneously, as Uship has explained, to treat the latter portion of this limitation, beginning with "adapted to communicate selectively," as a means-plus-function limitation.  IBM Br. 82-83; Uship Br. 57-58.

### E.    Claim 16

> **Limitation:**  *The integrated, automated, unattended unit of claim 15 wherein said fee communicating means includes means for validating said credit card prior to issuing the shipping label.*

The parties agree that the control means and card reader are structures that correspond to the means for validating, though the Government still refuses to include the alternative card reader 230 in its construction without explanation.  *See* Uship Br. 59-60; US Br. 65-66; IBM Br. 83.  The Government, however, attempts to read into the limitation the specification's description of the telephone lines as being "dedicated."  The telephone lines, however, are part of the means for communicating, not the means for validating.  And in any evtn, as explained above, the claim itself recites sufficient structure to define the means for communicating, so there is no warrant for reading the specification into the limitation.  *See* "means for communicating and assessing," *supra* p.35-39.

The Government also contends that Uship's construction is "circular" because it "refer-

ences 'means' and 'criteria.' " US Br. 66.  Relatedly, IBM asserts that the disclosed structure is insufficient to perform the validation function.  IBM Br. 84.  But Uship was not suggesting that the criteria are corresponding structure; the criteria are merely data against which the received credit card information is validated, not a function in themselves.  The reason Uship noted the criteria was to explain that the unit will have the ability to perform the validation function by comparing the received credit card information to the criteria.  Because one skilled in the art would know the kind of program needed to perform the comparison, no further structure need be disclosed.  *See Aristocrat*, 521 F.3d at 1337; *In re Dossel*, 115 F.3d at 946-47.  IBM condescendingly accuses Uship of "fail[ing] to understand that [a means-plus-function limitation] necessarily means that it must be construed to include structure disclosed in the specification that corresponds to the claimed function."  IBM Br. 84.  IBM's condescension is gratuitous and mistaken because Uship has repeatedly evinced its understanding of the basic principles of means-plus-function analysis – indeed, like IBM, Uship would read into this claim limitation the control means and card reader described in the specification.  *See* Uship Br. 59 (The "means for validating said credit card" "is a means-plus-function limitation subject to § 112 ¶ 6, and it therefore must be construed to cover the corresponding structure … described in the specification and equivalents thereof.").

**F.**     **Claim 19**

> **Limitation 5:**  *means for storing the inputted information once said item is disposed in said secured storage means, said information storage means including means for transmitting a manifest to a remote location;*

With respect to this limitation, the Government repeats its analysis of Claim 9, *see* US Br. 59-60, and so Uship's response to that analysis applies equally here, *see* "means for communicating," *supra* p.42-44.  IBM contends that Uship's "vague reference to telephone lines, generic hardware and software does not suffice" because "the specification does not provide *any*

*software* for performing the claimed function." IBM Br. 87. IBM's contention is based on its misunderstanding of the claim limitation and Uship's analysis thereof. IBM evidently believes that the means for transmitting the manifest "requires" – and that Uship "concedes" it requires – "some software algorithm structure for creating and sending a 'listing of transactions.'" IBM Br. 88. As explained above, however, the only hardware and software necessary for performing the function of transmitting the manifest is a modem and associated device drivers, which are well-known to one skilled in the art and which therefore need not be further described. *See* "means for communicating," *supra* p.42-44. IBM also maintains that Uship's analysis of the "means for communicating and assessing," *see* Uship Br. 40, 50, 68-69; *supra* p.35-39, is inapposite here because that function "is plainly different [from] 'transmitting a manifest to a remote location.'" IBM Br. 88. IBM's only support for this assertion is that the two functions "are totally different" and that they "are different and unrelated." IBM Br. 88. IBM's conclusory analysis is obviously nonsense because the same structure that communicates the shipment information and the inputted information could and would be used to transmit the manifest. *See* "means for communicating," *supra* p.42-44; "means for communicating and assessing," *supra* p.35-39 & n.24.[26]

## IV.   U.S. PATENT NO. 5,831,220 ('220 PATENT)[27]

The parties' primary remaining disputes with regard to the '220 patent concern the mean-

---

[26] Given the substantial overlap in claim terms between the various claims of the '464 patent, the parties' arguments with respect to the following claims are adequately addressed elsewhere and therefore are not repeated here: **Claim 17** – US Br. 67-68; IBM Br. 84-85; *supra* p.45-46; Uship Br. 61-62; **Claim 18** – US Br. 68-69; IBM Br. 85; *supra* p.45-46; Uship Br. 62-63; **Claim 20** – US Br. 64-65; IBM Br. 88; *supra* p.45-47; Uship Br. 69; **Claim 28** – US Br. 37, 42, 44, 47, 50, 53, 56; IBM Br. 89-90; *supra* p.28-42 & n.24; Uship Br. 71-75; **Claim 29** – US Br. 64-65; IBM Br. 90; *supra* p.45-47; Uship Br. 75-76; **Claim 30** – US Br. 49, 69-70; IBM Br. 90-91; *supra* p. 28-42 & n.24; Uship Br. 76-77; **Claim 34** – US Br. 37, 42, 44, 47, 50, 53, 57, 60; IBM Br. 91-92; *supra* p. 28-44, 46-47 & n.24; Uship Br. 77-81.

[27] A copy of the '220 patent was attached as Exhibit C to our opening brief.

ing of the following terms:  (1) "automated shipping machine"; (2) "package type information"

(3) "destination"; (4) "delivery date"; and (5) "validation."

A.   **Claim 1**

| Preamble:  *A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of:* |
|---|

IBM argues explicitly, and the Government by implication, that the preamble to Claim 1

contains essential claim limitations that must be separately construed.  IBM Br. 95-97; US Br.

78-79.  Notably, however, IBM's own proposed construction of the preamble confirms that the

preamble serves essentially to encapsulate and summarize the limitations appearing in the claim

body; other than substituting the term "automated unit" for "automated shipping machine," all

IBM's construction does is repeat or paraphrase steps that can be found in the limitations that

follow the preamble.  IBM Br. 94.  *See* Uship Br. 81-82.

In any event, even assuming that the preamble needs to be separately construed, Uship's

proposed construction is far more in keeping with the actual language of the claim and the other

intrinsic evidence.  The parties' dispute revolves primarily around the meaning of the term

"automated shipping machine."[28]   Neither defendant directly argues or suggests that Uship's

construction of this term fails to reflect the common, ordinary understanding of standard terms

such as "automated" and "machine."  *See* Uship Br. 84-85.  The defendants' rejection of Uship's

definition therefore necessarily reduces to a claim that a different meaning is compelled by the

specification and prosecution history.  Not only does the intrinsic evidence not support the de-

fendants' constructions, however, to a large extent it undermines those constructions.

The Government construes "automated . . . machine" as requiring a "machine automati-

---

[28] Although IBM complains that there was no need for Uship to propose constructions of
such terms as "mailing" and "parcels and envelopes," IBM Br. 100, neither the Government nor
IBM specifically objects to the substance of Uship's construction of those terms.

cally controlled by mechanical or electronic devices that take the place of humans, unless the step explicitly states otherwise." US Br. 77.  Although, as noted above, IBM merely substitutes "automated unit" for "automated shipping machine," it implicitly equates "automated unit" with something very similar to what the Government's construction explicitly requires, *i.e.*, a machine that, unless a step in the claim explicitly provides otherwise, performs all aspects of all steps without any human involvement.  *See, e.g.*, IBM Br. 98.[29]  Leaving aside the questionable merits of the Government's vague assertion that its construction is "more definitive" than Uship's, US Br. 78, the fact is that the defendants' constructions fly in the face of the specification.

Notably, neither the Government nor IBM can point to any language in the specification that requires that the shipping machine perform every aspect of every step in the claim unless the step explicitly calls for a human.  Nor can the Government identify any language in the specification that supports reading the term "automated shipping machine" as requiring a device that "takes the place" of humans.  Indeed, the Government doesn't even *try* to cite any passage from the specification in support of its constructions, opting instead to focus exclusively on a passage from the prosecution history of a predecessor patent (which we address below).  US Br. 78-79.  IBM does at least make a token effort to discuss specification language, but all it can come up with are statements discussing the use of an "automated shipping machine," IBM Br. 98, which, of course, only begs the claim construction question at issue here.[30]

---

[29] As noted, IBM's construction of the preamble also extracts some (but not all) of the steps described in the body of the claim and imports them into a preamble that does not itself purport to specifically describe such steps.  IBM points to no authority which would authorize such wholesale importation of limitations into claims, IBM Br. 97, and the reason for that omission is simple.  IBM's construction is improper, as it is completely untethered to any "textual reference in the actual language of the claim" provision it is purporting to interpret.  *MBO Labs.*, 474 F.3d at 1330-31 (citations omitted).  *See supra* p.12.

[30] IBM engages in similar question-begging exercises when it repeatedly stresses that the preamble itself describes a method for using a "machine."  *See, e.g.*, IBM Br. 97, 100.  The rele-

The Government and IBM shy away from the specification for good reason, because, as we discussed in our opening brief, the specification contains multiple passages clearly demonstrating that the invention does not require the machine to "take the place of humans."  Rather, the specification specifically contemplates the involvement of humans in several steps, including steps where the claim language undisputedly does not "explicitly" call for such involvement. *See, e.g.*, Uship Br. 86 (discussing specification).  Significantly, although we made this critical point in our opening brief, neither the Government nor IBM addressed it in their responses.

IBM also suggests that under our "current view, … the inventor could have invented a postal clerk using a postage scale to process a package for a customer."  IBM Br. 100.  Curiously, IBM attributes this supposed result not to any feature of our actual proposed construction of the preamble, but instead to a paragraph in our opening brief discussing and paraphrasing certain passages in the specification.  *Id.*  All that needs to be said here is that, leaving aside whether IBM's dubious reading of the prose in our brief has any validity, IBM doesn't even try to suggest that our actual construction – which refers to an "apparatus or device consisting of interrelated parts with separate functions, used in the performance of the task of mailing parcels and envelops, and employing a technique, method, or system of operating and controlling that task *by highly automatic means*, as by electronic devices, *thereby reducing human intervention to a minimum*" – would support its "postal clerk" hypothetical.[31]

---

vant question is what an "automated shipping machine" means in the context of this patent.  The mere fact that the preamble refers to a machine simply does not require some type of device that eliminates human involvement altogether, as required by the Government's construction and IBM's interpretation of its own "automated unit" construction.  All manner of automated machines, from factory machinery to supermarket scanners to ATMs, routinely call for human interaction without thereby losing their status as automated machines.

[31] IBM also makes the curious argument that although it "agrees that ***an*** automated shipping machine is ***an*** apparatus, . . . there is no support for the claimed machine 'consisting of interrelated parts with separate functions.'"  IBM Br. 100 (emphasis in original).  Such support,

Finding no support in the ordinary meaning of this term or in the specification, both the Government and IBM place heavy reliance on a passage from the prosecution history of the predecessor '799 patent.[32]  US Br. 78-79; IBM Br. 98-99.  In the passage at issue, the inventor "disagree[d] with the Examiner's suggestion that the process claimed in independent method claims 1 and 72 can be performed by hand.," and noted that those claims "specifically recite[d] in the preamble a method of mailing parcels and envelopes 'using an automated shipping machine' rather than specifically reciting at each step that the step is performed by the automated shipping machine."  *See, e.g.*, Uship Br. 87.[33]

We fully addressed this prosecution history in our opening brief, Uship Br. 87, and nothing in the defendants' briefs undermines what we said there.  The above statements establish only what the preamble language itself suggests:  that it was contemplated that the steps in the method claim involved some use of an automated shipping machine, and that such steps would not be performed solely by hand.  None of these statements suggest that steps performed by the machine are performed without *any* involvement by humans, as suggested by the Government's "takes the place of humans" formulation and IBM's interpretation of its own "automated unit"

---

however, is clearly found in the definitions of both "machine" ("an apparatus consisting of inter-related parts with separate functions, used in the performance of some kind of work") and "apparatus" ("a group or combination of instruments, machinery, tools, or materials having a particular function").  WEBSTER'S COLLEGE DICTIONARY 787, 64 (Random House 1997) (attached as Exhibit I to our opening brief).  On a more basic level, is IBM really suggesting that an automated shipping machine that, according to the claim, is involved in the performance of multiple functions (such as, for example, weighing an item, calculating postage, etc.) somehow would *not* employ "interrelated parts with separate functions"?  Arguments such as these leave one with the impression that IBM is against certain constructions simply because Uship is for them.

[32] IBM suggests that we have "dismisse[d] the '799 prosecution history as irrelevant to the '220 patent."  IBM Br. 99.  Tellingly, IBM provides the Court no citation of support this assertion.  What we *actually* said was that "[e]ven assuming, for purposes of the claim construction analysis, that [the cited] statement made during the prosecution of the '799 patent should be attributed to the '220 patent, it does not support the Government's analysis."  Uship Br. 87.

[33] The relevant excerpts from the '799 prosecution history were attached as Exhibit N to our opening brief.

construction.  Moreover, these statements certainly do not and cannot contradict the language in the specification, discussed above, that refutes any notion that the patent somehow eliminates the involvement of humans unless a particular step in the claim explicitly requires such involvement. The '799 prosecution history is therefore fully consistent with Uship's construction.  More to the point for purposes of assessing the defendants' argument, this prosecution history can in no way be considered to reflect the type of unambiguous and unmistakable intent on the part of the patentee that is required to restrict or narrow the scope of the term at issue.  *See* Uship Br. 7-8.

| **Limitation 2:**  *receiving package type information identifying a parcel or envelope to be mailed;* |

The parties appear to agree that the only dispute here concerns the term "package type information."  *See* IBM Br. 101.  They also agree that the key passage in the specification pertaining to this term is the statement that "package types include a letter, a pak, or a package or any other package type which may be accepted by the delivery service."  Specification 20:7-9; *see also id.* 27:26-32 (same).[34]  Thus, the specification indicates that the term refers to data relating to the characteristics or properties of the parcel or envelope to be mailed, and that it leaves some room for application of a delivery service's own standards and categories for defining the array of package "types" that it may accept for delivery.  For that reason, Uship has construed the term, consistent with the intrinsic evidence, to refer to data relating to the characteristics or properties of the parcel or envelope to be mailed through use of the invention.  Uship Br. 89-90.

The defendants, on the other hand, have proposed constructions for this term that are unduly restrictive.  This is particularly true of the Government, which equates "package type information" with "data relating to the structure" of the item.  US Br. 74.  The Government elabo-

---

[34] For some reason, when IBM quotes this statement in its brief, it leaves out the concluding phrase "which may be accepted by the delivery service."  IBM Br. 102.

rates in its brief that its definition is meant to "encompass the physical shape and structure of the parcel or envelope." *Id.* This formulation is unsupported by the record, and the Government does not even attempt to explain how the specification statement quoted above can be read to confine the term to information relating to the physical shape and structure of the item. There is nothing about the term "package," for example, that necessarily connotes a particular "shape" or "structure." In adopting such a restrictive definition, the Government is not even importing limitations from the specification, but inventing them out of thin air.

IBM's proposed construction – "data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier" – at least finds some support in the specification. However, it is potentially unduly restrictive to the extent that it seeks to limit the claim term to the examples provided in the specification. IBM does concede that Uship's definition "encompass[es] the specification's use of 'package type,' " but it argues that our definition goes too far by encompassing other possible attributes of the item to be mailed. IBM Br. 102-03. What IBM's criticism overlooks is the specification's clear indication, as discussed above, of an intent to leave room for a carrier to specify the array of package type information that it deems relevant for its own service options.

| **Limitation 4:** *receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed;* |
|---|

It appears that the parties' sole dispute with respect to this limitation revolves around the meaning of the word "destination." *See* IBM Br. 103. In context, and indeed by its plain language, it is clear that this limitation calls for the customer to input destination information into the automated shipping machine. As we discussed in our opening brief, the specification could not be clearer that the only such destination information that is *required* by the invention to be inputted by the customer is the zip code. *See* US Br. 91-92. For that reason, we have construed

this limitation, consistent with the unambiguous intrinsic evidence, to refer to data relating to the location to which the item to be mailed is to be mailed, such as the zip code for that location.

Both the Government and IBM, on the other hand, have proposed constructions of "destination" that would require the customer to input additional information – including the name and street address – into the shipping machine.  US Br. 71-73; IBM Br. 103-04.  The defendants both rely on the same passage from the specification, which, to be sure, describes a scenario in which the customer inputs the additional information described above.  What the Government and IBM gloss over, however, is the fact that the passage on which they rely is by its terms discussing only a single "preferred embodiment."  *See* specification 20:34-50.  By focusing exclusively on this embodiment, the defendants commit the "cardinal sin" of seeking to import limitations from the specification into the claim.  *Phillips*, 415 F.3d at 1320 (citations omitted).

In addition, the defendants' construction simply cannot be reconciled with the remaining intrinsic evidence, and in particular other passages in the specification discussing embodiments in which it is clear that nothing more than the zip code needs to be inputted by the customer.  *See* Uship Br. 92 (discussing specification 8:54, 9:41).  IBM and the Government essentially concede, as they must, that this embodiment does not contemplate, let alone require, the customer to input a name and street address into the shipping machine in the first instance.  US Br. 73; IBM Br. 105.  They therefore cannot dispute that their interpretation of "destination" would exclude this disclosed embodiment from the scope of the invention.  As discussed above, *supra* p.10-11, such a construction is heavily disfavored, and can only be adopted when there is highly persuasive evidence that the embodiment at issue was clearly disclaimed from the scope of the invention.  *See Oatey*, 514 F.3d at 1277; *Vitronics*, 90 F.3d at 1583.

The Government's only response to this point is that the "definition of 'destination of the

54

parcel and envelope to be mailed' cannot be changed because the first embodiment functions with less than a destination." US Br. 73; *see also* IBM Br. 105. Such circular argumentation simply begs the question, and cannot provide the type of clear and unmistakable evidence that is required to read out of the invention an embodiment discussed at length in the specification.

IBM recognizes the dilemma posed by its construction, and so it casts about for *some* role for the excluded embodiment. Significantly, it cannot find a claim that would cover the embodiment elsewhere in the '220 patent, or even in the '220 patent's parent, the '799 patent, or even in the '799 patent's parent, the '948 patent. Rather, it has to reach all the way back to the '464 patent, which was a separate continuation-in-part stemming from the '948 patent. *See, e.g.*, US Br. 4 (presenting ancestry chart describing relationship between Uship patents); IBM Br. 45 (same). According to IBM, the excluded embodiment is covered by claim 7 of the '464 patent, which requires only the entry of "information relating to the destination." IBM Br. 105.

For several reasons, this argument, which is so tenuous that the Government cannot bring itself to join it, is meritless. The '464 patent and '220 patent are not so directly related as to support IBM's effort to draw such dispositive significance from slight differences in claim wording. For one thing, despite IBM's references to "Ramsden" as the inventor of both patents, IBM Br. 105, IBM ignores that Kenneth Liles was a co-inventor on the '220 patent but not the '464 patent. Perhaps more importantly, although both the '464 and the '220 patents describe the embodiment at issue, the specifications of the two patents are in many other respects very different. This is not a case, in other words, in which the applicant merely incorporated wholesale the specification from an earlier patent into a subsequent patent. Ramsden/Liles therefore affirmatively decided to include the embodiment at issue in the '220 specification. That embodiment must therefore have some relevance to the construction of the '220 patent's claims. This fact

alone shows why the defendants' construction, which indisputably excludes the embodiment from the scope of the invention, cannot be adopted.

Furthermore, the fact that the '464 patent uses a slightly different formulation – referring to "information relating to the destination" – does not counsel for the adoption of a construction, such as IBM's, that is at war with the intrinsic evidence pertaining to the '220 patent.  As the defendants themselves recognize elsewhere in their briefs, *see, e.g.*, IBM Br. 9, even within the same patent, it is sometimes the case that an inventor will employ slightly different wording to refer to the same concept.  "Different terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper."  *Nystrom*, 424 F.3d at 1143.[35]  Here, the slightly different wording – appearing in different patents, with different inventors, filed at different times – does not amount to the type of clear and unambiguous disavowal that would justify disregarding the unmistakable evidence in the intrinsic record regarding the meaning of this term.

Finally, in their zeal to import the specification's discussion of a single embodiment into the claim (to the exclusion, as discussed, of other embodiments), the defendants are forced to engage in some creative wordplay.  For example, the Government's and IBM's insistence that the destination must include an inputted "name" raises the obvious question: the "name" of what?  The Government answers this question by proposing that the claim requires the customer to input the "name" of the "place" to which the item is to be mailed.  US Br. 71.  The Government never explains what constitutes the "name" of a "place."  The term doesn't refer to the place's street

---

[35]  *See also Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) ("[T]his court has acknowledged that two claims with different terminology can define the exact same subject matter.") (citations omitted); *Multiform Desiccants, Inc. v. Medzam, LTD*, 133 F.3d 1473, 1480 (Fed. Cir. 1998) (same).

address or the city or state in which the place is located, as the Government contends that those items are different from the "destination name." US Br. 72. The problem for the Government is that outside of fictional plantations like Tara and the occasional landmark (*e.g.*, the Empire State Building), most places don't have names. The only remaining conceivably relevant referent is the name of the person or entity to which the item is to be mailed – *i.e.*, the recipient. IBM makes this point directly, arguing that "destination" includes the "name of the person or organization." IBM Br. 104.[36] But a recipient, whether a person or an organization, is neither a "place" nor, more to the point, a "destination." Moreover, the defendants never suggest how the recipient's name helps advance, or is even relevant to, one of the primary purposes of the requirement that the customer input destination information into the machine: *i.e.*, allowing the computation of the shipping fee. *Cf.* claim 1, limitation 5 ("computing from said … shipping information … a cost for delivery").

> **Limitation 5:** *computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer;*

Other than the terms "package type information" and "destination," which are discussed above, the parties' primary dispute with respect to this limitation concerns what it means to "comput[e] . . . a delivery date." The Government would restrict this term to a computation of the "expected calendar date of delivery," US Br. 75, although IBM would also require the ma-

---

[36] This argument, by the way, reflects a significant, and undisclosed, change in construction by IBM. In the Joint Claim Construction Statement (Docket 34), IBM construed "destination" (at page 29) to refer to the "name, street address, and zip code *of the location* of where the parcel or envelope is to be mailed" (emphasis added). After Uship pointed out, in its opening brief, the problems with a construction requiring the "name" of a "location," Uship Br. 92 n.45, IBM, without noting that it was making a change, dropped the "location" referent in its brief, in favor of the recipient referent it now favors. Curiously, this undisclosed change did not prevent IBM from chastising Uship for changing certain of its constructions (even though Uship, unlike IBM, endeavored to note in its brief those minor changes it was making). *See* IBM Br. 2.

chine to calculate and express the "day of the week" of the expected delivery.  IBM Br. 106.[37]

IBM's argument that "delivery date" includes the "day of the week" is easily disposed of.  IBM's assertion that the word "date" naturally suggests a "specific day of the week," IBM Br. 107, is supported by . . . nothing.  Even more problematic for IBM, the specification itself draws an explicit distinction between the "date of expected delivery" and "what day of the week that will be."  Specification 28:34-36.  The specification therefore refutes, rather than supports, any argument that the expected delivery date includes the day of the week.  *See* Uship Br. 95-96.

The Government's construction presents, admittedly, a closer question, as the specification does contain statements to the effect that software in the shipping machine may take account of "weekends, holidays, and other days in which no delivery service is available" in determining the expected date of delivery.  *See, e.g.*, specification 21:7-9.  Such statements could be read to suggest that the software determines an actual calendar date of delivery.  The claim, however, does not refer to a "calendar date" but rather to a "date."  More importantly, as we discussed in our opening brief, because these statements appear in the context of the specification's discussion of particular embodiments of the invention, the defendants are seeking to import limitations from the specification into the body of the claim and to restrict the claimed invention to those embodiments.  Uship Br. 95.  In addition, the defendants never respond to our argument, *see id.*, that, by relying on a discussion of the contents of software for a particular embodiment, it improperly seeks to restrict a method claim to features that are more appropriately viewed as per-

---

[37] IBM also repeats, once again, its refrain that Uship slices a claim limitation into too many pieces, as we construe "delivery date" when the real issue is the meaning of "computing . . . a delivery date."  IBM Br. 107.  Because we also construed the term "computing," Uship Br. 93-94, and because IBM has raised no substantive objection to that construction, and because IBM has not otherwise explained how construing these terms separately and then combining the constructions differs *substantively* from construing the terms as a single phrase, IBM appears to be complaining for the sake of complaining.

taining to the structure of a device claim.

Finally, neither the Government nor IBM has any real answer to our point that our proposed construction is more consistent with the ordinary understanding of the term "delivery date" to those skilled in the art, because (1) delivery times in the commercial shipping industry are often expressed in terms of the expected length of time it will take for an item to be delivered, as confirmed by (2) statements made by the PTO examiner during the prosecution of the predecessor '799 patent.  *See* Uship Br. 94 & n.47.  With respect to the former point, IBM is silent, and the Government says only that we are attempting to construe the claim in light of the accused device.  US Br. 76.  This is false, as the USPS materials we discussed did not relate directly to the USPS's automated shipping kiosks.

With respect to the latter point, the Government says only that "delivery date" "cannot be expanded to encompass Uship's definition as a result of an unrelated statement by the USPTO during the examination" of the '799 patent.  US Br. 76.  We cannot fathom how the Government can claim the examiner statement at issue is "unrelated" to the present inquiry, as it spoke directly to the concept of "calculating the delivery date."  *See* '799 Patent Pros. History, PTO Office Action (March 11, 1996) at 2 (G002352) (attached as Exhibit Q to opening brief).  And because the Government elsewhere relies heavily upon the '799 patent's prosecution history, it presumably cannot now be contending that that patent is "unrelated" to the '220 patent.  The statement at issue does not "expand" the term "delivery date," but is instead relevant to the analysis of what that term means.  Once again, the Government's argument begs the relevant question.

IBM's only answer to the '799 prosecution history is to assert that "there is no evidence the examiner knew what Post Office practice was."  IBM Br. 109.  This objection is puzzling, to say the least, because the examiner stated he was taking "official notice" that the USPS offered

the option of calculating the delivery date.  Ex. Q at G002352.  Clearly, the examiner knew something about "what the Post Office practice was."  And neither IBM nor the Government offer any evidence to rebut our showing that the USPS practice did not encompass what the defendants now say is required by the "delivery date" limitation.

For the above reasons, the defendants have not rebutted our showing that "delivery date" means the projected or estimated date on which the item to be mailed is to be delivered, expressed either as a specific calendar date or as the number of days it is estimated to take for the items to be delivered.  *See* Uship Br. 93.

| **Limitation 7:**  *printing a shipping label including at least said destination printed thereon;* |
| --- |

The only dispute here concerns the term "destination," which we discuss above.  We add here only that any suggestion that the invention requires the machine to *print* complete addressing information on the shipping label is flatly contradicted by the specification, which discloses, in discussing one embodiment, that once the label is printed the customer will be instructed "to *write* the mailing address onto the label."  Specification 9:39-42 (emphasis added).

| **Limitation 8:**  *printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer;* |
| --- |

Once again, the only dispute here concerns the term "destination," discussed above.

| **Limitation 9:**  *validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed; and* |
| --- |

As we discussed at length in our opening brief, the intrinsic evidence compels the conclusion that "validating receipt," as used in this limitation, means "determining or confirming that the package to be mailed has been received for storage and/or shipment."  *See* Uship Br. 98-100.  And as we anticipated, both the Government and IBM have ripped certain specification passages from their context, and essentially read other passages out of the patent, in support of

their argument that the invention requires more – specifically, that the invention requires that the shipping machine itself verify, through the use of sophisticated sensors or similar devices, that the item being received is the same item for which a shipping label was printed.  US Br. 82-84; IBM Br. 109-11.  The defendants' construction cannot be squared with the intrinsic evidence.

All three parties cite one passage from the specification in support of their respective positions, although they each emphasize different portions.  Given its importance to the analysis, we reproduce it again, with those statements relied upon by the <u>Government underlined</u>, those statements relied upon by *IBM in italics*, and those statements emphasized by **Uship in bold**:

> At this point, <u>a very important *validation step* is performed</u>.  *In particular, the system 310 determines at step 536 whether it has received the correct package. This step <u>is critical</u> since <u>it verifies that the customer did not perform a package switch</u> or <u>forget to replace the package</u>* <u>in the intermediate storage area 334 for shipment</u>.  **[Such validation may be accomplished in several different ways in accordance with the invention.]**  For example, in a simple embodiment, photo cell sensor 344 may simply detect whether **any** package has been placed on the conveyor belt 340.  **If so, it is presumed that the package on the conveyor belt 340 is <u>the appropriate package with the appropriate label</u>.**  On the other hand, in accordance with a preferred embodiment of the invention, *the package is automatically reweighed and/or redimensioned* once the customer has closed the outer door 330 (and hence the parcel or envelope cannot be accessed by the customer). *If the reweighing and redimensioning results in approximately the same readings* as when the package was previously weighed and dimensioned, *it is presumed that the package placed on the conveyor belt 340 is <u>the same package for which the label was printed</u>*.

Specification 21:43-64 (emphases added); *cf.* Uship Br. 99; US Br. 83-84; IBM Br. 110-11.

Perhaps the first thing to note from the above passage is the statement in brackets:  "Such validation may be accomplished in several different ways in accordance with the invention." Tellingly, IBM *omits this critical statement from its block quote*.  IBM Br. 110.  This omission is itself highly instructive about IBM's unduly restrictive approach to validation.

Equally telling is the fact that this passage from the specification appears in a discussion of a particular embodiment of the invention, and in fact the embodiment that discusses the most

61

sophisticated and elaborate system. Notwithstanding that fact, this passage makes clear both that validation of receipt may be "accomplished in several different ways," and, perhaps more importantly, that it is not necessary for the shipping machine itself to confirm that the exact same package has been received. Thus, under this embodiment, it is sufficient that the machine determine that "any" package be received, in which case it will be "presumed" that the package is the appropriate one. Although IBM at times suggests that it agrees that it is sufficient for the machine to determine that a package, rather than the exact same package, has been received, *see* IBM Br. 112, it elsewhere suggests, as does the Government, that the invention requires the machine to verify that the exact same package has been received.[38] The above passage establishes that there is no support for any such suggestion. The defendants' construction elevates *one facet* of the specification's discussion of *one embodiment* into the *sine qua non* of the claimed invention. It thereby improperly imports limitations from the specification into the claim and confines the invention not just to a particular embodiment, but to a subset of a particular embodiment, while all but ignoring other language in the same passage that undercuts their interpretation.

But there is an even more glaring problem with the defendants' construction. Their insistence that the invention requires the shipping machine to itself perform the validation step in all instances ignores that other passages in the specification conclusively establish that this is not the case. The discussion of the fourth embodiment, for example, makes clear that after a shipping label is printed and applied to the item, the item is then taken to an attendant such as a retail clerk "who validates receipt of the package and provides an appropriate receipt to the customer."

---

[38] *See, e.g.*, U.S. Br. 84 ("[T]he specification confirms that the purpose of the validation step is to verify receipt of the *same* package for which the shipping label was printed. . . .") (emphasis added); IBM Br. 110 ("Its meaning is clear that the claim requires validation or verification that the claimed automated shipping machine actually received *the* parcel or envelope for which a shipping label was printed.") (emphasis added).

Specification 25:2-5; *see also id.* 25:42-44; 29:17-22 (same); *see also* specification 25:47-49 ("Obviously, this system is substantially simplified from the embodiments described above because the storage and *validation process is performed by an attendant.*") (emphasis added).

Incredibly, the Government does not even mention this passage in its brief. It just wishes this embodiment away. Although IBM at least acknowledges the discussion of this embodiment, it wishes it away as well, by pretending that it must apply to some other, unasserted, claim. *See* IBM Br. 112 (citing *PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1166 (Fed. Cir. 2008). Notably, IBM never actually identifies such an unasserted claim that would encompass this disclosed embodiment. And IBM simply does not and cannot point to any statement, whether in a claim, the specification, or the prosecution history, that would limit, much less refute, the unambiguous statement that the "validation process [may be] performed by an attendant." Specification 25:47-49. In short, the defendants are pushing for the adoption of a heavily disfavored construction that would exclude a disclosed embodiment from the scope of the invention, without producing *any* support for such a construction. *See also Oatey*, 514 F.3d at 1277; *Vitronics*, 90 F.3d at 1583; *supra* p.10-11.

IBM also suggests that the "storing" limitation of Claim 1 illustrates that when the inventor intended to claim the attendant as performing a step, it knew how to do so explicitly. IBM Br. 112. Leaving aside that this argument simply cannot outweigh the clear specification language acknowledging the attendant's role in the "validation" process, the argument fails as a matter of logic. The "storing" limitation references an "attendant" within the claim language because it *requires* the participation of an attendant. The "validation" limitation does not explicitly reference an attendant in the claim language because this step does not *require* an attendant to perform the step. The specification makes clear, however, that an attendant *may* perform this

step, and therefore fatally undermines the defendants' argument that the claim requires an automated shipping machine to perform it.[39]

**B.**   **Claim 3**

We address below only those disputed terms of Claim 3 that were not discussed above in connection with Claim 1.

> **Limitation 3:**   *processing means for receiving package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, for computing from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer, and for receiving an indication of the delivery service option desired by the customer;*

Once one wades through the parties' discussions of this limitation, it becomes apparent that their dispute revolves more around matters of presentation and organization than matters of substance.  IBM's main complaint, for example, is that we do not "acknowledge the applicability of §112, ¶6" to this limitation, and that we do not "offer a construction of the function, [or] propose which corresponding structure comprises the processing means."  IBM Br. 118.  Although it is true that we did not actually cite the statute in this section of our brief, IBM's other complaints have no merit.  We explicitly noted in our brief that "[t]he term 'processing means' is linked to several different *functions* discussed in this limitation," and we went on to describe and summarize those functions as "receiving package type information and shipping information;

---

[39] In addition, the specification contains other passages that indicate that validation can be performed other than by the shipping machine.  For example, the specification describes a process by which a representative of the delivery service arrives at the machine to review a manifest and reject packages as appropriate.  *See, e.g.*, specification 29:23-31.  This act of inspecting the packages and rejecting (or not rejecting) packages processed by the machine clearly constitutes validation – even under the defendants' conception of the purpose of the validation step – by something other than the machine.

computing a delivery date and cost of delivery, and receiving an indication of the customer's desired delivery service option."  Uship Br. 105 (emphasis added).  These summaries of the three relevant functions correspond closely, though not exactly, with the defendants' own descriptions. *See* IBM Br. 115-16; US Br. 89, 92, 95.  We next proceeded to describe the "*structure*" identified in the specification and drawings, first describing in general terms the control system used to run many of the above features of the shipping machine, and then identifying in some detail the specific structures used to carry out the relevant functions.  Uship Br. 105-07 (emphasis added).

Given all this, the claim that we have "fail[ed] to follow the statutory framework," IBM Br. 118, is true only if the statutory framework required Uship to recite certain magic words in its brief.  It does not, of course.  Notably, the Government seems to have had no trouble concluding that we analyzed this limitation under the correct statutory framework, even if it believes that its analysis was superior to ours.  *See* US Br. 94-95 ("Uship appears to implicitly agree [that this is a MPF limitation].  <u>See</u> Uship Brief at 105 (stating that 'processing means' is linked to different functions and proposing corresponding structure).").  IBM is elevating form over substance.

Turning specifically to the structures that correspond to the three identified functions, it again becomes clear that the parties are not far apart.  With respect to the first function – receiving package type information and shipping information – the Government and IBM identify the structure as comprising a microprocessor connected to a keyboard or touch screen/CRT.  IBM Br. 116; US Br. 89.  We have identified the same structure, as well as a keypad.  *See* Uship Br. 106 n.53.  It appears that a keypad falls within IBM's description of a keyboard.[40]  Although it does not appear that the Government has included a keypad in its identification of corresponding

---

[40] IBM references illustration 28 as an example of a keyboard.  IBM Br. 116.  The specification and drawings, in turn, make clear that illustration 28 is a keypad.  *See* specification 5:43 and Figure 5.

structure, it never explains why. The specification clearly demonstrates that certain embodiments of the invention receive the relevant information through entry from a keypad. *See, e.g.*, specification 8:52-59 (describing entry of zip code information through keypad).

With respect to the second function – computing the delivery date and cost of delivery – both the Government and IBM identify the structure as comprising a microprocessor loaded with fee files. The Government adds a scale, touch screen, and keyboard that are connected to the microprocessor, while IBM adds certain other loaded files and software. *See* US Br. 92; IBM Br. 117. Because the function at issue is limited to computing a delivery date and cost for delivery, we believe that IBM's identification of structure better corresponds to the function than does the Government's, and we in fact identified much of the same structure in our own brief. *See, e.g.*, Uship Br. 106-07 & n.54.[41] Ultimately, however, there is no reason to believe that the relatively slight differences in the corresponding structure for this function identified by the parties should make any substantive difference in the resolution of this case.

With respect to the final function identified in this limitation – receiving an indication of the customer's desired delivery service option – IBM identifies the structure as the same as that for the first function, *i.e.*, the keyboard (which, as discussed above, includes the keypad), CRT/touch screen, and connections to the microprocessor. IBM Br. 118. The Government identifies the same structure, but adds loaded fee files and subtracts the keypad. US Br. 95. Once again, although there is no reason to believe the difference is dispositive, IBM's identification better corresponds to the function at issue than does the Government's. The specification spe-

---

[41] IBM includes in its brief a reproduction of a portion of a figure from the patent depicting the algorithm for the software used to program the microprocessor. IBM Br. 117. We note that, even assuming, for purposes of analysis, the applicability here of the rule discussed in *WMS Gaming Inc. v. International Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999), that rule requires only the disclosure of a processor programmed to perform the algorithm, and does not require that any particular computer program be included in the structure.

cifically identifies a keypad as structure that the customer may use to input his desired service option, *see* specification 9:19-22, and the Government never explains why the loaded fee files are necessary for this function.  The structure Uship identified for this function is quite similar to that identified by IBM.  *See* Uship Br. 106 n.54.[42]

> **Limitation 4:**  *means responsive to said processing means for printing a shipping label including at least said destination printed thereon and for printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; and*

IBM again takes the position that because we did not say the magic words invoking § 112 ¶ 6, we have failed to follow the statute.  IBM Br. 120.  Because we discussed both the relevant functions (printing a shipping label and a shipping receipt), and the corresponding structure disclosed in the specification, IBM is once again elevating form over substance.  *See* US Br. 96 (reading our brief as treating this as a means-plus-function limitation).

When it comes to the substance, however, it is the Government's analysis that is misguided.  The Government insists that because this limitation refers to the printing of receipts and labels, it requires that there be a *single* structure that performs *both* functions.  US Br. 97.  The Government backs up this contention with nothing other than its own *ipse dixit*.  There is nothing in the language of the claim that compels the conclusion that "means … for printing" must constitute a single printer capable of printing both items.  No principle of logic supports that result.  And the Government has not mustered a single piece of legal authority that even arguably supports its position.  The Government's argument seems to be rigged purely to allow it to arbitrarily eliminate from the identification of corresponding structure all of the printers disclosed in

---

[42]  As the citation of our brief shows, the Government's claim that we "completely fail[ed] to identify any structure that corresponds" to this function, US Br. 95, is incorrect.

the specification and drawings that are not clearly capable of printing both labels and receipts.[43]

Tellingly, although it doesn't come right out and say so, it is clear that IBM does not agree with the Government's position.  IBM identifies additional corresponding structure, including a printer that the specification indicates only as a label printer.  *See* IBM Br. 120 (listing "printer 326"); specification 15:41 (referring to "label printer 326").  With one fairly minor exception, IBM identifies the same corresponding structure as Uship did in its opening brief. *Compare* IBM Br. 120 *with* Uship Br. 108.[44]

| Limitation 5: | *means for validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed by said printing means, whereby a validated parcel or envelope is taken by an attendant for storage in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.* |
|---|---|

The parties' appear to agree that the term "validating receipt" as used in this limitation has the same meaning as that term has in the context of Limitation 9 of Claim 1.  *See* US Br. 121. We therefore refer the Court to our earlier discussion of that term, and limit our discussion here to the implications of the fact that the term here appears in the context of an apparatus claim.

The defendants argue that this is a means-plus-function limitation, and that therefore the invention is confined to certain sophisticated sensor structures, identified in connection with the specification's discussion of certain embodiments, that the shipping machine contemplated by those embodiments employs to detect the presence or the weight/dimensions of the item to be mailed.  IBM Br. 121-22; US Br. 99.  This argument must fail for two reasons.  First, although

---

[43] Moreover, even under its own arbitrary and result-driven analysis, the Government omits relevant corresponding structure.  For example, it does not include the printer referenced at illustration 26, even though the specification makes clear that that printer prints both labels and receipts.  *See, e.g.*, specification 9:34 (label); *id.* 10:26 (receipt).

[44] For one of the embodiments, the specification refers to a printer that is not depicted in a drawing.  *See* specification 14:43-45.  Because this printer clearly corresponds to the function at issue, and because there is no requirement under the statute that structure be depicted in a drawing, IBM errs in excluding this printer from its discussion of disclosed structure.

the limitation's use of the "means for" formulation raises a presumption that § 112 ¶ 6 applies,

that presumption is rebutted by other language in the claim – in this case, the "whereby" clause –

that provides the necessary disclosure of how the function at issue is to be performed.  The

"whereby" clause of this limitation itself contemplates that validation can be performed by an

attendant.  *Cf. Phillips*, 415 F.3d at 1311.

Second, even if the statute does apply here, the defendants read the specification's identi-

fication of corresponding "structure" too narrowly.   In addition to the embodiments discussed by

the Government and IBM, as discussed earlier, the specification also fully discloses *other* ways

in which validation can be performed without using such sophisticated sensors or related struc-

tures – including embodiments in which validation is performed by attendants.  *See, e.g.*, specifi-

cation 25:47-49; *see also id.* 29:23-31 (describing "manifest printer 716" used by delivery ser-

vice representative to inspect packages and reject inappropriate ones).  The defendants' only re-

sponse to this point is to cite *dicta* to the effect that humans cannot constitute "structure" under

§ 112 ¶ 6.  IBM Br. 123; US Br. 100.[45]  In any event, as the reference to the manifest printer

shows, we are not contending that the only means disclosed in the specification is a person, and

"corresponding structure need not include all things necessary to enable the claimed invention to

---

[45] Indeed, this issue was expressly not decided in the main case cited by the defendants, *Cardiac Pacemakers*, where the court noted that the plaintiff had "waived" any argument that a reference to a human could satisfy the statute.  296 F.3d at 1116; *see also id.* at 1114 (plaintiff "concedes that the physician cannot be corresponding structure").  Although the Government also cites *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1300 (Fed. Cir. 2005), US Br. 100, that decision in turn relies entirely on *dicta* from a 1969 decision.  *See In re Prater*, 415 F.2d 1393, 1406 (CCPA 1969) (holding only that the apparatus claim *in that case* did not encompass a human being as the "means").  *Default Proof*'s passing remark should not be understood broadly to preclude the use of humans as corresponding structure; all other pertinent decisions of which we are aware merely articulated the much narrower and inapposite "proposition that where a claim contains a means-plus-function limitation and the specification identifies mechanical or electrical structures that correspond to the limitation, a human cannot serve as an equivalent structure covered by the claim."  *See, e.g.*, *Pilley v. United States*, 74 Fed. Cl. 489, 500 (2006).

work." *Cardiac Pacemakers*, 296 F.3d at 1118-19.

## V.       U.S. PATENT NO. 6,105,014 ('014 PATENT)[46]

Given the considerable overlap between many of the claim terms and limitations in this patent and the '220 patent, we will discuss here only those disputed claim terms that we did not address in connection with the '220 patent.

### A.       Claim 1

| |
|---|
| **Limitation 10:   *storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.*** |

The primary dispute here concerns whether this limitation requires the automated shipping machine to itself store the item to be mailed.  The Government's proposed construction explicitly requires that the "automated shipping machine" itself store the item to be mailed, and although IBM's proposed construction is not explicit on this point, IBM argues in its brief that the secure storage area must be "part of" the shipping machine.  *See* US Br. 85-86; IBM Br. 125.  As we demonstrated in our opening brief, Uship Br. 122, the defendants' position conflicts with the intrinsic evidence.  Nothing in the language of the claim mandates that the storage area must be "part of" the machine.  Moreover, the defendants' construction is flatly contradicted by the specification, which explicitly establishes that the shipping machine itself is *not* required to perform the storage step.[47]  IBM seeks to explain away these passages by repeating its observation that there is no legal requirement that claims be construed to cover every embodiment.  IBM Br. 126.  What IBM again refuses to acknowledge, however, is the principle that a construction that would

---

[46] A copy of the '014 patent was attached as Exhibit D to our opening brief.

[47] *See, e.g.*, specification 25:4-6 (for one embodiment, retail clerk "places the package in an appropriate location for subsequent pick-up by a commercial carrier"); 25:40-44 (customer deposits item with attendant, who stores package in secure area); 29:16-18 (same); 25:45-47 (embodiment allows "storage and validation process [to be] performed by an attendant."); Figure 20 (depicting machine without a storage unit).

exclude a disclosed embodiment from the scope of the invention is heavily disfavored, and can only be adopted when there is highly persuasive evidence that the embodiment at issue was clearly disclaimed from the scope of the invention. *See Oatey*, 514 F.3d at 1277; *Vitronics*, 90 F.3d at 1583. Neither defendant has even tried to identify any statement in the intrinsic record that could constitute such a clear disclaimer of scope.

IBM and the Government similarly point to Claim 1 of the '220 patent to suggest that the inventors knew how to call for storage using an attendant when that was their intent. IBM Br. 126; US Br. 85. But Claim 1 of the '220 patent shows only that the inventors knew how to draft claim language *requiring* the attendant to participate in the storage step. It does not and cannot override the unambiguous intrinsic evidence establishing that Claim 1 of the '014 patent *allows for* the attendant to participate in the storage step. In short, the defendants' constructions, by focusing on the embodiments in which the item to be mailed is stored within the shipping machine, improperly seek both to read limitations from the specification into the claim and to artificially confine the invention to particular embodiments.

Finally, the briefing reveals that the Government goes even further in its construction than IBM. The Government argues that this limitation not only requires that the storage area be part of the shipping machine, but also "requires performance and control by and through" the shipping machine. US Br. 85. It then explains what it means by this vague statement: no less than that the storing step "rel[ies] solely on automated aspects of the shipping machine," whereby "storage is automatically controlled by virtue of mechanisms controlled by the shipping machine such as, conveyor belt 340, inner door, 336, and slide lift motor 380," such that "[n]o human intervention is necessary." US Br. 86. Not even IBM can bring itself to go this far. And for good reason, because the Government's position fails on multiple levels of analysis: it im-

properly seeks to (1) limit a *method* claim to a particular description of a particular *apparatus*; (2) graft onto the simple term "storing" all kinds of extraneous activities (such as the automatic control of mechanisms such as conveyor belts, etc.) that do not, under any understanding of the English language, constitute "storing"; (3) import limitations into the claim from the specification; (4) confine the invention to particular embodiments discussed in the specification.

### B.    Claim 2

> **Limitation 3:**  *a processor which receives package type information identifying said parcel or envelope to be mailed, shipping information from said customer including at least a destination of said parcel or envelope to be mailed, computes from said package type information, shipping information, and weight information from said scale, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer, and receives an indication of the delivery service option desired by the customer;*

There do not appear to be any disputed terms relating to this claim that have not already been discussed (e.g., "destination," "delivery date," etc.).  We mention this limitation here only to note that the Government agrees with us that unlike the "processing means" limitation of Claim 3 of the '220 patent, this limitation is *not* a means-plus-function claim subject to § 112 ¶ 6.  US Br. 90, 93.  IBM does not address this issue directly, but it does not appear to argue that the statute applies here.  *See* IBM Br. 127.  (These same points apply to the very similar limitation found in Claim 2 of the '924 patent.  *See* US Br. 90, 93; IBM Br. 129.).

### VI.    U.S PATENT NO. 6,917,924 ('924 PATENT)[48]

Given the considerable overlap between many of the claim terms and limitations in this patent and the '220 and '014 patents, we will discuss here only those disputed claim terms that we have not addressed in connection with those patents.  As it turns out, there is only one such term, and it appears in the second limitation of the first claim:

---

[48] A copy of the '924 patent was attached as Exhibit E to our opening brief.

> **Limitation 2:** *receiving package type information including the dimensions of a parcel or envelope to be mailed;*

The one term from this limitation that has not already been addressed is "dimensions," which is considered a species of "package type information." As we discussed at length in our opening brief, Uship Br. 135-36, this term should be construed to mean "data relating to the magnitude or size of an item, including data relating to the length, width, and/or height of that item." Although the Government proposed a construction for this term in the Joint Claim Construction Statement (Docket 34 at 49), it appears to have withdrawn that construction, and it now proposes the same construction for Limitation 2 as it does for Limitation 2 of the '014 patent (which does not mention "dimensions"). *See* US Br. 80. All the Government says about this term in its brief is that the '924 specification confirms that dimension data includes "information relating to the height, length, **and** width of the package." *Id.* (emphasis in original). As we have already addressed the import of the specification in our opening brief, we will not repeat that discussion here.[49]

IBM does not offer a construction of this term, and it does not address this issue at all in its brief, other than to note that Limitation 3 of claim 2 of the '924 patent, which refers to "dimensions" as a species of "package type information," is "[i]mmaterially different" from claim 2 of the '014 patent, which does not include a reference to "dimensions." IBM Br. 129.

## VII.   CO-INVENTOR TESTIMONY AT THE CLAIM CONSTRUCTION HEARING

In our opening brief, we made clear that Uship did not foresee the need to offer testimony at the claim construction hearing. We noted, however, that because it was not then possible to

---

[49] The Government also makes the cryptic statement that "to the extent Uship's proposal only calls for receipt of one dimension, it should be rejected." US Br. 80. To the extent we understand this argument, we do not believe it merits a response, because we do not believe our construction's reference to "magnitude" or "size" calls for "receipt of one dimension."

fully anticipate the arguments or evidence that the defendants might seek to rely upon in their own briefs, it was "theoretically possible" that Uship could decide to offer limited testimony at the hearing from Kenneth Liles, the co-inventor of three of the patents.  Uship Br. 151.  In an abundance of caution, Uship therefore provided a summary of any such possible testimony.  *Id.*  Proving the maxim that no good deed goes unpunished, the Government and IBM have reacted to Uship's disclosure by attacking Uship for violating the Court's rules and orders and by arguing that any such testimony cannot be admitted in any event.  *See, e.g.*, US Br. 12; IBM Br. 130.

Because our review of the defendants' briefs has confirmed what we've said all along – that we see no need to present witness testimony at the hearing – this issue is moot.  Given the tenor of the defendants' accusations, however, we believe it appropriate to make a few brief points:  (1) Mr. Liles' identity as a co-inventor has long been known by the defendants, and his name was included in Uship's initial discovery disclosures, so the prospect that he might possess relevant information could hardly have come as a surprise; (2) because Mr. Liles would be a fact witness, the Court's rules regarding expert testimony do not apply; (3) the Court's scheduling order (Docket 31) itself draws a distinction between expert and non-expert testimony, and only explicitly called for a description of non-expert testimony in a party's claim construction brief, which is what Uship did here; (4) notably, neither defendant at any time suggested that Uship's reservation, in its earlier proposed claim construction statement, of its right to supplement its disclosure with an identification of "non-expert testimony" somehow violated the Court's rules or orders; and (5) although inventor testimony is not considered as reliable as intrinsic evidence, no authority supports the defendant's position that such testimony is *per se* inadmissible.

## **CONCLUSION**

There is more than a little irony in the Government's and IBM's repeated accusation that Uship has proposed results-driven claim constructions that are designed to draw the defendants' shipping kiosks within the scope of Uship's claims.  If such an accusation can be leveled at any party in this action, it should be leveled at the defendants.  As the discussion above demonstrates, whenever the Government and IBM seek to import limitations from the specification into the claims, they seek to import limitations that they apparently believe cannot be met by the USPS kiosks.  Moreover, the fact that the defendants' arguments are often internally inconsistent reveals their true agenda.  When IBM is not criticizing Uship for *relying* on dictionary definitions, it is chastising Uship for *not relying* on dictionary definitions.  *See, e.g.*, IBM Br. 102.  One minute the defendants are insisting on claim constructions that *include* features found in certain embodiments discussed in the specifications, and the next minute they are insisting on constructions that *exclude* certain other embodiments discussed in the same specifications.  In the end, the defendants' accusation that Uship has conducted a results-driven analysis rings very hollow indeed.

For the reasons discussed above, Uship respectfully requests the Court to adopt both the parties' joint proposed constructions as to certain claim terms and Uship's proposed constructions of those claim terms on which the parties have not reached agreement.

January 22, 2010                                        Respectfully submitted,

                                                            /s/ Charles J. Cooper
                                                            _____
                                                            Charles J. Cooper
                                                            COOPER & KIRK, PLLC
                                                            Vincent J. Colatriano
                                                            Derek L. Shaffer
                                                            David Lehn
                                                            Jesse Panuccio
                                                            1523 New Hampshire Avenue, N.W.
                                                            Washington, DC 20036

Telephone:  (202) 220-9600
Facsimile:   (202) 220-9601
Email:  ccooper@cooperkirk.com

*Counsel for Uship Intellectual Properties, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of January, 2010, I caused to be served by the Court's electronic filing system copies of the foregoing on the following counsel:

Scott David Bolden
U. S. Department of Justice
Civil Div. - Commercial Litigation Br.
1100 L Street, NW
8th Floor
Washington, DC 20530
(202) 307-0262
Fax: (202) 307-0345
Email: scott.bolden@usdoj.gov

Steven C. Cherny
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022
(212) 446-4800
Fax: (212) 446-4900
Email: scherny@kirkland.com

/s/David Lehn