## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

USHIP INTELLECTUAL PROPERTIES, LLC,

           **Plaintiff,**

    **v.**

THE UNITED STATES,

           **Defendant,**

    **And**

INTERNATIONAL BUSINESS MACHINES
CORP.,

           **Third-Party Defendant.**

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No.: 08-537 C**

**Judge Susan G. Braden**

## PLAINTIFF'S POST-HEARING CLAIM CONSTRUCTION BRIEF

Charles J. Cooper
Vincent J. Colatriano
Derek L. Shaffer
David Lehn
Jesse M. Panuccio
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

May 28, 2010           Counsel for Uship Intellectual Properties, LLC

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND BACKGROUND ................................................................1

ARGUMENT ..........................................................................................................4

I.     GENERAL CLAIM CONSTRUCTION PRINCIPLES.................................4

     Intrinsic Evidence – Claim Language. .................................................4

     Intrinsic Evidence – The Specification.................................................7

     Intrinsic Evidence – Prosecution History. .........................................10

     Extrinsic Evidence. ............................................................................11

     Means-Plus-Function Claims.............................................................12

II.    THE '220 AND '014 PATENTS .................................................................12

     A.     Preamble ................................................................................13

     B.     Limitation 1:  Receiving Payment Information ....................18

     C.     Limitation 2:  Receiving "Package Type Information" .........18

     D.     Limitation 3:  Weighing the Parcel or Envelope .................19

     E.     Limitation 4:  Receiving Shipping Information; Destination ...............................20

     F.     Limitation 5:  Computing Delivery Date and Cost for Delivery ...........................25

     G.     Limitation 6:  Receiving Indication of Customer's Chosen Delivery Option .......29

     H.     Limitation 7:  Printing a Shipping Label .............................29

     I.     Limitation 8:  Printing a Shipping Receipt .........................30

     J.     Limitation 9:  Validation......................................................30

               What does validation entail?....................................31

               Who performs "validation"?......................................33

               New argument – Validation is not "Validation". .....34

               New argument – Prosecution History Disclaimer....38

i

K.      Limitation 10:  Storing a Validated Parcel ..............................................................46

III.    THE '464 PATENT..........................................................................................................49

A.      Claim 7 .................................................................................................................49

1)      Preamble ...................................................................................................49

2)      Limitation 1: Weighing the Item...........................................................53

3)      Limitation 2: Inputting Destination Information .......................................53

4)      Limitation 3A: Analyzing and Calculating..............................................55

5)      Limitation 3B: Receiving Credit Card Information...................................60

6)      Limitation 3C: Communicating and Assessing .......................................60

7)      Limitation 4: Securely Storing the Item..................................................64

8)      Limitation 5A: Storing the Inputted Information......................................68

9)      Limitation 5B: Displaying a Manifest .......................................................73

B.      Claim 9..................................................................................................................73

C.      Claim 10................................................................................................................75

D.      Claim 11................................................................................................................76

E.      Claim 12................................................................................................................76

F.      Claim 15................................................................................................................77

G.      Claim 28................................................................................................................77

1)      Limitation 3B: Communicating and Assessing .......................................78

2)      Limitation 3C: Printing Account Charge ..................................................78

H.      Claim 30................................................................................................................79

I.      Claim 34................................................................................................................79

1)      Limitation 4B: Transmitting Information for a Manifest .........................80

CONCLUSION...........................................................................................................................80

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Abbott Labs. v. Sandoz, Inc.*,
   566 F.3d 1282 (Fed. Cir. 2009) ..................................................................8, 11

*Abbott Lab. v. Tor-Pharm, Inc.*,
   300 F.3d 1367 (Fed. Cir. 2002) ..........................................................................41

*Acumed LLC v. Stryker Corp.*,
   483 F.3d 800 (Fed. Cir. 2007) ..........................................................................6, 10

*AllVoice Computing PLC v. Nuance Commc'ns, Inc.*,
   504 F.3d 1236 (Fed. Cir. 2007) ......................................................................56, 57

*Altiris, Inc. v. Symantec Corp.*,
   318 F.3d 1363 (Fed. Cir. 2003) ...........................................................................13

*Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*,
   No. 97-4203, 2000 U.S. Dist. LEXIS 22942 (N.D. Cal. Feb. 28, 2000) ..........................42, 43

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003) ......................................................................11, 41

*Aquatex Indus. v. Techniche Solutions*,
   419 F.3d 1374 (Fed. Cir. 2005) ..........................................................................41

*Aristocrat Techs. Australia PTY Ltd. v. International Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008) ......................................................................57, 59

*Asyst Techs., Inc. v. Empak, Inc.*,
   268 F.3d 1364 (Fed. Cir. 2001) .............................................55, 62, 63, 64, 66, 70

*Atmel Corp. v. Information Storage Devices*,
   198 F.3d 1374 (Fed. Cir. 1999) ...........................................................................59

*Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.*,
   738 F.2d 1237 (Fed. Cir. 1984) ...........................................................................43

*BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*,
   303 F.3d 1332 (Fed. Cir. 2002) ......................................................................66, 69

*Biotec Biologische Naturverpackungen v. Biocorp*,
   249 F.3d 1341 (Fed. Cir. 2001) ..........................................................................41

*Blackboard, Inc. v. Desire2Learn, Inc.*,
   574 F.3d 1371 (Fed. Cir. 2009) ..............................................................56, 57, 59, 72

iii

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,*
334 F. 3d 1294 (Fed. Cir. 2003) ........................................................9

*Callicrate v. Wadsworth Mfs., Inc.,*
427 F.3d 1361 (Fed. Cir. 2005) ........................................................41

*Cardiac Pacemakers, Inc. v. St. Jude Med. Inc.,*
296 F.3d 1106 (Fed. Cir. 2002) ..................................................62, 75

*Cohesive Tech., Inc. v. Waters Corp.,*
543 F.3d 1351 (Fed. Cir. 2008) ..................................................11, 41

*Comaper Corp. v. Antec, Inc.,*
596 F.3d 1343 (Fed. Cir. 2010) ....................................................6, 8

*Cordis Corp. v. Medtronic AVE, Inc.,*
339 F.3d 1352 (Fed. Cir. 2003) ..................................................11, 41

*Cordis Corp. v. Medtronic AVE, Inc.,*
511 F.3d 1157 (Fed. Cir. 2008) ........................................................41

*Creo Prods. v. Presstek, Inc.,*
305 F.3d 1337 (Fed. Cir. 2002) ........................................................65

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.,*
438 F.3d 1374 (Fed. Cir. 2006) ........................................................25

*Decisioning.com, Inc.  v. Federated Dep't Stores, Inc.,*
527 F.3d 1300 (Fed. Cir. 2008) ........................................................8

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.,*
412 F.3d 1291 (Fed. Cir. 2005 ........................................................75

*DSW, Inc. v. Shoe Pavilion, Inc.,*
537 F.3d 1342 (Fed. Cir. 2008) ........................................................8

*E.I. Du Pont De Nemours & Co. v. Phillips Petroleum Co.,*
849 F.2d 1430 (Fed. Cir. 1988) ........................................................5

*Ecolab, Inc. v. FMC Corp.,*
569 F.3d 1335 (Fed. Cir. 2009) ..................................................11, 41

*Elbex Video, Ltd. v. Sensormatic Elec. Corp.,*
508 F.3d 1366 (Fed. Cir. 2007) ..................................................11, 41

*Finisar Corp. v. DirecTV Group, Inc.,*
523 F.3d 1323 (Fed. Cir. 2008) ..............................................56, 57, 59

iv

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
   423 F.3d 1343 (Fed. Cir. 2005) ...............................................................6

*Fuji Photo Film Co. v. ITC*,
   386 F.3d 1095 (Fed. Cir. 2004) .............................................................46

*Generation II Orthotics, Inc. v. Medical Tech., Inc.*,
   263 F.3d 1356 (Fed. Cir. 2001) .............................................................65

*Golight, Inc. v. WalMart Corp.*,
   355 F.3d 1327 (Fed. Cir. 2004) .......................................11, 12, 41, 63, 64, 67

*Honeywell Int'l, Inc. v. United States*,
   66 Fed. Cl. 400 (2005) ..........................................................................4

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
   493 F.3d 1358 (Fed. Cir. 2007) .......................................................11, 41

*i4i Ltd. P'ship v. Microsoft Corp.*,
   589 F.3d 1246 (Fed. Cir. 2009) .........................................................9, 10

*In re Dossel*,
   115 F.3d 942 (Fed. Cir. 1997) ...............................................................58

*In re Gabapentin Patent Litig.*,
   503 F.3d 1254 (Fed. Cir. 2007) ..............................................................41

*In re Hengehold*,
   440 F.2d 1395, 1402-03 (CCPA 1971) ..................................................42

*In re Prater*,
   415 F.2d 1393 (CCPA 1969) .................................................................75

*In re Weber*,
   580 F.2d 455 (CCPA 1978) ...................................................................42

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) ..............................................................41

*Inverness Med. Switzerland v. Princeton Biomeditech*,
   309 F.3d 1365 (Fed. Cir. 2002) ..............................................................41

*Inverness Med. Switzerland v. Warner Lambert Co.*,
   309 F.3d 1373 (Fed. Cir. 2002) ..............................................................41

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
   327 F.3d 1364 (Fed. Cir. 2003) ...............................................................9

*JVW Enters. v. Interact Accessories, Inc.*,
     424 F.3d 1324 (Fed. Cir. 2005) .............................................................65, 72

*Kara Tech., Inc. v. Stamps.com, Inc.*,
     582 F.3d 1341 (Fed. Cir. 2009) .....................................................................8

*L.B. Plastics, Inc. v. Amerimax Home Prods., Inc.*,
     499 F.3d 1303 (Fed. Cir. 2007) .....................................................................6

*Laboratoires Perouse, S.A.S. v. W.L. Gore & Assocs.*,
     528 F. Supp. 2d 362 (S.D.N.Y. 2007) ..................................................... 42, 43

*Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*,
     445 F.3d 1348 (Fed. Cir. 2006) .....................................................................9

*Liebel-Flarsheim Co. v. Mallinckrodt, Inc.*,
     358 F.3d 898 (Fed. Cir. 2004) .......................................................................8

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
     382 F.3d 1354 (Fed. Cir. 2004) ...................................................................61

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
     324 F.3d 1308 (Fed. Cir. 2003) ...............................................65, 66, 69, 72, 74

*Mangosoft, Inc. v. Oracle Corp.*,
     525 F.3d 1327 (Fed. Cir. 2008) .....................................................................6

*Markman v. Westview Instruments, Inc.*,
     517 U.S. 370 (1996) .....................................................................................4

*Martek Biosciences Corp.v. Nutrinova, Inc.*,
     579 F.3d 1363 (Fed. Cir. 2009) .....................................................................8

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
     474 F.3d 1323 (Fed. Cir. 2007) .................................................................4, 9

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
     344 F.3d 1205, 1218 (Fed. Cir. 2003) .........................................................72

*Merck & Co., Inc. v. Mylan Pharm., Inc.*,
     190 F.3d 1335 (Fed. Cir. 1999) ...................................................................43

*Michaels of Oregon Co. v. Clean Gun, LLC*,
     No. 01-1158, 2002 U.S. Dist. LEXIS 20371 (D. Or. July 9, 2002) .................42, 43

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
     194 F.3d 1250 (Fed. Cir. 1999) ...................................................................63

*Middleton, Inc. v. Minnesota Mining & Mfg.,*
   311 F.3d 1384 (Fed. Cir. 2002) ...............................................................11, 40, 41

*Multiform Desiccants, Inc. v. Medzam, Ltd.,*
   133 F.3d 1473 (Fed. Cir. 1998) ..........................................................................25

*Net Moneyin, Inc. v. Verisign, Inc.,*
   545 F.3d 1359 (Fed. Cir. 2008) ..........................................................................59

*Northern Telecom Ltd. v. Samsung Elec. Co.,*
   215 F.3d 1281 (Fed. Cir. 2000) ....................................................................11, 41

*NTP, Inc. v. Research In Motion, Ltd.,*
   418 F.3d 1282 (Fed. Cir. 2005) ......................................................................5, 41

*Nystrom v. Trex Co.,*
   *424 F.3d 1136* (Fed. Cir. 2005) .........................................................................25

*Oatey Co. v. IPS Corp.,*
   514 F.3d 1271 (Fed. Cir. 2008) ..................................................................9, 23, 47

*Old Town Canoe Co. v. Confluence, Holdings Corp.,*
   448 F.3d 1309 (Fed. Cir. 2006) ............................................................................6

*Omega Eng'g, Inc. v. Raytek Corp.,*
   334 F.3d 1314 (Fed. Cir. 2003) ............................................. 11, 18, 40-42, 44, 46

*Ormco Corp. v. Align Techn., Inc.,*
   498 F.3d 1307 (Fed. Cir. 20070) .........................................................................46

*Paice LLC v. Toyota Motor Corp.,*
   504 F.3d 1293 (Fed. Cir. 2007) ..........................................................................41

*Paragon Solutions, LLC v. Timex Corp.,*
   566 F.3d 1075 (Fed. Cir. 2009) ..........................................................................50

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) .......................................4-8, 10-12, 21, 40, 49, 60

*Pilley v. United States*, 74 Fed. Cl. 489 (2006).......................................................75

*Pressure Prod. Med. Supplies, Inc. v. Greatbatch Ltd.,*
   599 F.3d 1308 (Fed. Cir. 2010) ............................................................................6

*R2 Medical Systems, Inc. v. Ketecho, Inc.,*
   931 F. Supp. 1397 (N.D. Ill. 1996).....................................................................42

*Rambus Inc. v. Infineon Tech.,*
   318 F.3d 1081 (Fed. Cir. 2003) ..........................................................................41

*Regents of the Univ. of Cal. v. Dakocytomation Cal., Inc.,*
   517 F.3d 1364 (Fed. Cir. 2008) ...............................................................43

*Rheox, Inc. v. Entact, Inc.,*
   276 F.3d 1319 (Fed. Cir. 2002) ...............................................................46

*Renishaw PLC v. Marposs Societa Per Azioni,*
   158 F.3d 1243 (Fed. Cir. 1998) .................................................................5

*Rowe v. Dror,*
   112 F.3d 473 (Fed. Cir. 1997) .................................................................13

*S3 Inc. v. nVIDIA Corp.,*
   259 F.3d 1364 (Fed. Cir. 2001) ...............................................................56

*Salazar v. Proctor & Gamble Co.,*
   414 F.3d 1342 (Fed. Cir. 2005) ...............................................11, 27, 40, 41

*SanDisk Corp. v. Memorex Prod., Inc.,*
   415 F.3d 1278 (Fed. Cir. 2005) ...................................................11, 41, 43

*SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys. Inc.,*
   242 F.3d 1337 (Fed. Cir. 2001) .............................................................7, 33

*Springs Window Fashions LP v. Novo Indus., L.P.,*
   323 F.3d 989 (Fed. Cir. 2003) .................................................................46

*Sorensen v. International Trade Comm'n,*
   427 F.3d 1375 (Fed. Cir. 2005) ...............................................................41

*Storage Tech. Corp. v. Cisco Sys.,*
   329 F.3d 823 (Fed. Cir. 2003) .................................................................45

*Symantec Corp. v. Computer Assocs. Int'l, Inc.,*
   522 F.3d 1279 (Fed. Cir. 2008) ...............................................................13

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.,*
   222 F.3d 958 (Fed. Cir. 2000) ................................................................. 10

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.,*
   529 F.3d 1364 (Fed. Cir. 2008) .................................................................9

*Titan Tire Corp. v. Case New Holland, Inc.,*
   566 F.3d 1372 (Fed. Cir. 2009) ............................................................... 57

*TriMed, Inc. v. Stryker Corp.,*
   514 F.3d 1256 (Fed. Cir. 2008) ...............................................................61

*University of Pittsburgh v. Hedrick*,
   573 F.3d 1290 (Fed. Cir. 2009) ...................................................................4, 11

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
   473 F.3d 1173 (Fed. Cir. 2006) ..................................................................... 10

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007) ....................................................................... 9

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ...............................................................9, 23, 47

*Voda v. Cordis Corp.*,
   536 F.3d 1311 (Fed. Cir. 2008) .....................................................7, 8, 10, 40, 41

*Wavetronix v. EIS Elec. Integrated Sys.*,
   573 F.3d 1343 (Fed. Cir. 2009) .........................................................................6

*WMS Gaming, Inc. v. International Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999) .......................................................................59

## <u>Statutes</u>

28 U.S.C. § 1498(a) ..............................................................................................1

35 U.S.C. § 112 ¶ 6...........................................................................................12, 54

35 U.S.C. § 121................................................................................................39, 43

**Index of Exhibits**

| | |
|---|---|
| Exhibit A | Uship Patent 5,831,220 |
| Exhibit B | Uship Patent 6,105,014 |
| Exhibit C | Uship Patent 5,481,464 |
| Exhibit D | Uship Patent 5,233,532 |
| Exhibit E | Uship Patent 5,340,948 |
| Exhibit F | Uship Patent 5,656,799 |
| Exhibit G | PTO Final Rejection, 10/17/07, Application 10/363,737 |
| Exhibit H | 5/2/2008 Notice of Abandonment |
| Exhibit I | RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY (1997) |
| Exhibit J | Office Action (March 11, 1996) |
| Exhibit K | United States Postal Service, A Consumer's Guide to Postal Services and Products |
| Exhibit L | United States Postal Service, Domestic Postal Rates and Fees (Simplified) |
| Exhibit M | Office Action (Jan. 8, 1996) and Amendment and Response to Restriction Requirement (Feb. 7, 1996) |
| Exhibit N | RANDOM HOUSE UNABRIDGED DICTIONARY (2d ed. 1993) |
| Exhibit O | PTO Notice re "Restriction Requirement" (Jun. 4, 1993) |
| Exhibit P | UPS, *2010 Daily Rates* |
| Exhibit Q | USPS, *Price List* |

Plaintiff Uship Intellectual Properties, LLC ("Uship") respectfully submits this post-hearing brief on claim construction issues. For the reasons discussed below and at the claim construction hearing, Uship respectfully asks the Court to adopt Uship's proposed constructions of those claim terms on which the parties have not reached agreement, and to reject the competing constructions of those terms offered by the Government and intervenor-defendant International Business Machines Corporation ("IBM").

## INTRODUCTION AND BACKGROUND

As discussed both in Uship's pre-hearing briefs and at the February claim construction hearing, Uship currently holds a portfolio of patents, issued between 1990 and 2005, for various methods and devices related to the shipping of items through the use of automated shipping kiosks.[1]  Uship was assigned certain of these patents by, and is in that sense the successor-in-interest to, predecessor companies that were among the pioneers of the automated shipping kiosk industry. During the 1990s, in large part on the basis of the patents at issue in this case, Uship's predecessors deployed, in hundreds of locations across the United States, some of the very first self-service shipping kiosks.

Over the last several years, the United States Postal Service ("USPS") has deployed its own line of automated shipping kiosks (many of which were designed and manufactured pursuant to the USPS's contracts with IBM). It is Uship's contention that the manufacture, deployment, and use of the USPS kiosks result in the infringement of multiple claims of Uship's patents, and that Uship is therefore entitled, under 28 U.S.C. § 1498(a), to recover its reasonable and entire compensation for the unauthorized use and manufacture of Uship's inventions. Moreover, although knowledge and intent are by no means required elements of a claim under section

---

[1] Copies of relevant patents from Uship's portfolio, including but not limited to the three patents containing the claims that Uship is continuing to assert, are attached as Exhibits A-F.

1

1498(a), it is Uship's contention that the USPS has known of Uship's patent portfolio for years even while it continued infringing. In this regard, it is noteworthy that the United States Patent and Trademark Office ("PTO") rejected a USPS patent application that was directed toward an automated shipping kiosk, and the PTO did so primarily on the basis of U.S. Patent 6,105,014, one of the patents that Uship is asserting in this action.[2]

In April of 2009, Uship identified to the Government and to IBM 23 claims, from five separate patents, that Uship contends have been infringed by the Government. Uship culled those 23 claims from the more than 160 claims appearing in Uship's portfolio of patents relating to the use of automated shipping kiosks. The proper construction of those 23 claims was the subject of the parties' pre-hearing briefs and the February hearing.

Although Uship continues to believe that all 23 of the claims it had originally identified have been infringed by the USPS, Uship, in an attempt to further narrow the issues before the Court has, since the claim construction hearing, cut by more than half the number of claims it is continuing to assert. Thus, Uship has identified 11 claims – five independent claims and six dependent claims – that have been infringed and that need to be construed by the Court. These claims come from three patents – the '464 patent,[3] the '220 patent,[4] and the '014 patent[5] – that are part of a seven-patent family. As discussed at the claim construction hearing and elaborated upon in this brief, although the '220/014 patents, on the one hand, and the '464 patent, on the other, are related, and although their respective specifications share some common passages,

---

[2] *See* PTO Final Rejection, dated October 17, 2007, for U.S. Patent Application 10/363,737 (attached as Exhibit G). The USPS subsequently allowed its rejected patent application to be deemed abandoned. *See* PTO Notice of Abandonment, dated May 2, 2008 (attached as Exhibit H).

[3] U.S. Patent No. 5,481,464 (application filed Feb. 18, 1994) (attached as Exhibit C).

[4] U.S. Patent No. 5,831,220 (application filed Apr. 22, 1997) (attached as Exhibit A).

[5] U.S. Patent No. 6,105,014 (application filed Sept. 29, 1998) (attached as Exhibit B).

these patents are in many respects dissimilar in terms of their claim coverage. The relationship between these patents is illustrated by the following diagram:



As the above diagram shows, the '220 and '014 patents share an inventor (Liles) who was not an inventor on the '464 patent. Moreover, the '464 patent is not a direct ancestor of either the '220 or the '014 patents. Rather, the '220/014 patents share common ancestry with the '464 patent through the '948 patent.

In addition to paring down the list of patent claims it is asserting, Uship has also modified a number of its proposed claim constructions, in an effort both to further narrow the parties' dispute and to take into consideration comments made by the Court during the claim construction hearing. The Government and IBM have also revised certain of their proposed claim constructions. As a result of these revisions (as well as earlier agreements between the parties on the con-

3

struction of certain terms), and as reflected below, the parties have been able to reach agreement on the proper construction of many terms and limitations appearing in these 11 remaining claims. Of course, while the number of claim construction disputes that need to be resolved by the Court has been substantially reduced, there remain a number of significant claim terms and limitations on which the parties have been unable to reach agreement.

## ARGUMENT

## I.   GENERAL CLAIM CONSTRUCTION PRINCIPLES

As this Court has recognized, it is "settled that the meaning and scope of a patent's claims are issues of law to be determined by a federal trial judge." *Honeywell Int'l, Inc. v. United States*, 66 Fed. Cl. 400, 421 (2005); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996); *University of Pittsburgh v. Hedrick*, 573 F.3d 1290, 1296 (Fed. Cir. 2009). In a number of decisions, and most prominently in its *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit has identified the general principles that govern a court's determination of the meaning of a patent claim. In particular, the Federal Circuit has discussed at length the two general categories of "sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," *id.* at 1314 (quotation marks omitted):  so-called "intrinsic" and "extrinsic" evidence.

**Intrinsic Evidence – Claim Language.** As an initial matter, "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (quotation marks omitted). Claim construction begins with the claim language, *id.*, and a court "cannot endorse a construction analysis that does not identify 'a textual reference in the actual language of the claim with which to associate a proffered claim construction.'" *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323,

1330-31 (Fed. Cir. 2007) (citing *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999)). "[A] party wishing to use statements in the written description to confine or otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with which to draw in those statements." *Renishaw PLC v. Marposs Societa Per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998); *see also NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1310 (Fed. Cir. 2005) (same). Because "the claims define the scope of the right to exclude," a claim interpretation "must, in the end, accord with the words chosen by the patentee to stake out the boundary of the claimed property." *Renishaw*, 158 F.3d at 1248. It is, in short, improper to read a limitation from the specification into a claim "wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *E.I. Du Pont De Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).

Moreover, in determining the metes and bounds of the invention as defined by the claim, the words of the claim "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312. Such ordinary and customary meaning is "the meaning that the [claim] term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Id.* at 1313. For purposes of this inquiry, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*; *see also id.* at 1321.

The Federal Circuit in *Phillips* also made clear that "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In such cases, "general

5

purpose dictionaries may be helpful" in confirming the ordinary meaning of claim terms. *Id.*[6]

Consistent with this understanding of the law, Uship has utilized dictionary definitions to help

confirm the ordinary meaning of certain claim terms when a review of the intrinsic evidence in-

dicated, either affirmatively or by implication, that such ordinary meanings were intended.[7]

    The Federal Circuit in *Phillips* also observed that the "context in which a term is used in

the asserted claim," including its juxtaposition with other terms in the same claim, "can be highly

instructive." 415 F.3d at 1314. In addition, other asserted and unasserted claims "can also be

valuable sources of enlightenment as to the meaning of a claim term," both because "the usage of

a term in one claim can often illuminate the meaning of the same term in other claims," and be-

cause "[d]ifferences among claims can also be a useful guide in understanding the meaning of

particular claim terms." *Id.* at 1314.

---

[6] *See also id.* at 1322 ("[W]e do not intend to preclude the appropriate use of dictionaries. Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation."); *id.* at 1322-23 (judges "may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.") (quotation marks omitted).

[7] The Federal Circuit has continued to echo what it said in *Phillips* in confirming the propriety of using dictionaries to help confirm the ordinary meaning of claim terms wherever the intrinsic evidence either indicates that ordinary meaning controls or does not provide specific guidance as to the meaning of the term. *See, e.g., Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 809 n.2 (Fed. Cir. 2007 ("Although in *Phillips* we rejected an approach in which a broad dictionary definition is adopted and then whittled down only if contradicted by the specification, we did not prohibit the use of dictionaries in claim construction, nor did we define at what point in the claim construction analysis they may be consulted.") (citation omitted); *Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1316 (Fed. Cir. 2006) ("The district court's reference to the dictionary was not an improper attempt to find meaning in the abstract divorced from the context of the intrinsic record but properly was a starting point in its analysis, which was centered around the intrinsic record consistent with *Phillips*."). *See also L.B. Plastics, Inc. v. Amerimax Home Prods., Inc.*, 499 F.3d 1303, 1308 (Fed. Cir. 2007); *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1333 (Fed. Cir. 2008); *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348 (Fed. Cir. 2005); *Wavetronix v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1355 (Fed. Cir. 2009); *Pressure Prods. Medical Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1315 (Fed. Cir. 2010); *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010).

**Intrinsic Evidence – The Specification.** Because patent claims "do not stand alone," they must be read "in view of the specification, of which they are a part." *Id.* at 1315 (quotation marks omitted). Indeed, not only is the specification "always highly relevant to the claim construction analysis," it is typically "the single best guide to the meaning of a disputed term." *Id.* (quotation marks omitted). Claim terms should therefore "be construed so as to be consistent with the specification." *Id.* at 1316 (quotation marks omitted). Examples of the application of this general principle include instances where "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," and instances in which the specification "may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* at 1316. In either instance, the inventor's interpretation, as revealed and manifested in the specification, governs. *Id.* With respect to purported disclaimers or disavowals of claim scope, however, the disclaimer must be clear and unambiguous before it will be allowed to restrict or narrow claim coverage. *See, e.g., Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008).

In utilizing the specification as a claim construction tool, moreover, a court must be careful to distinguish between using the specification to help interpret a claim and importing limitations from the specification into the claim. The former practice is not only proper, it is, as discussed above, considered one of the most important tools of claim construction. The latter practice, however, is improper. *See, e.g., Phillips*, 415 F.3d at 1323. Indeed, reading a limitation from the specification into the claims is considered "one of the cardinal sins of patent law." *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys. Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). Thus, the Court of Appeals has "consistently adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification

will not be read into claims, and that interpreting what is *meant* by a word *in* a claim is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1347 (Fed. Cir. 2008) (quotation marks omitted) (emphases in original); *see also Voda*, 536 F.3d at 1320; *Abbott Lab. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009). To be sure, "the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice." *Phillips*, 415 F.3d at 1323. But there are certain practices that provide important signals that a party has crossed the line separating construing a claim from improperly importing new limitations into the claim.

One such practice that is especially disfavored is the attempt to artificially confine claims to the specification's discussion of particular "embodiments" of the invention. As the Federal Circuit emphasized in *Phillips* and numerous other decisions, "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323.[8] "The claims, not specification embodiments, define the scope of patent protection. The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims." *Kara Techn., Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). *See generally Liebel-Flarsheim Co. v. Mallinckrodt, Inc.*, 358 F.3d 898, 906-09 (Fed. Cir. 2004). A construction confining the claim to specific embodiments is appropriate only in cases of unambiguous evidence that the inventor intended such a result.

Another signal that the specification is being misused may be given when a party com-

_____

[8] *See also Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1309 (Fed. Cir. 2008) (invention in that case not limited to preferred embodiment discussed in specification); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380-81 (Fed. Cir. 2009) (same); *Comaper*, 596 F.3d at 1348 (same).

mits the mirror-image offense of adopting claim constructions that would *exclude* from their

scope certain embodiments of the invention discussed in the specification. Although a claim con-

struction excluding disclosed embodiments is sometimes appropriate when it is clear from the

intrinsic evidence either that the inventor disclaimed coverage of those embodiments or that the

disclosed embodiment related only to other, unasserted claims, it is otherwise disfavored. *See,*

*e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We

normally do not interpret claim terms in a way that excludes disclosed examples in the specifica-

tion."); *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("[W]e have interpreted

claims to exclude embodiments of the patented invention where those embodiments are *clearly*

*disclaimed* in the specification ... or prosecution history.") (emphasis added, citations omitted).[9]

A similarly revealing practice is the attempt to interpret claims by reference to certain

supposedly desirable features or benefits of the invention discussed in the specification or prose-

cution history. Absent some clear textual support for such a construction, such an attempt

amounts to an inappropriate importation of limitations into the claims. *See, e.g.*, *Brookhill-Wilk*

*1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003) ("Advantages described

---

[9] *See also id*. ("At leas[t] where claims can reasonably [be] interpreted to include a spe-
cific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent pro-
bative evidence to the contrary."); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583
(Fed. Cir. 1996) (construction that would exclude preferred embodiment "is rarely, if ever, cor-
rect and would require highly persuasive evidentiary support"); *MBO Labs.,* 474 F.3d at 1333
(same); *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, 445 F.3d 1348, 1353-54 (Fed. Cir.
2006) (rejecting trial court's construction in part because it "exclude[d] embodiments disclosed
in the specification"); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1369 (Fed. Cir.
2003) (same); *cf. TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373, 1375
(Fed. Cir. 2008) (rejecting construction that would encompass alternative embodiment where
such a construction "would *contradict* the language of the claims," and noting that "claims need
not be construed to encompass all disclosed embodiments when the claim language is *clearly*
*limited* to one or more embodiments") (emphases added); *i4i Ltd. P'ship v. Microsoft Corp.*, 589
F.3d 1246, 1259 (Fed. Cir. 2009) ("Because the claims themselves do not use the word 'file' and
*the specification discloses embodiments where the storage format is not a file*, we conclude that
'distinct' does not require storage in separate files.") (emphasis added).

in the body of the specification, if not included in the claims, are not per se limitations to the claimed invention.") (citations omitted); *i4i Ltd. P'ship v. Microsoft Corp.*, 589 F.3d 1246, 1259 (Fed. Cir. 2009) ("[N]ot every benefit flowing from an invention is a claim limitation.").[10]

**Intrinsic Evidence – Prosecution History.** The final traditional source of intrinsic evidence is the patent's prosecution history – *i.e.*, the record of the proceedings before the PTO leading up to the issuance of the patent. As the Federal Circuit has noted, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

Once again, however, courts must exercise caution in assessing just how much weight to accord to statements found in a patent's prosecution history: "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* In part for this reason, the Federal Circuit has made clear on numerous occasions that the prosecution history can be utilized to restrict or narrow the scope of a claim term only when the prosecution history reflects an unambiguous and unmistakable intent on the part of the patentee to so restrict or narrow the scope of the term.[11]

---

[10] *See also Acumed*, 483 F.3d at 805 (rejecting construction that "is essentially an assertion that since the patent says [a certain feature] is desirable," claim term "must be construed to cover only embodiments" with that feature; such a construction "is flawed," as "it is an attempt to import a feature from a preferred embodiment into the claims"); *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 966 (Fed. Cir. 2000) (that specification states a feature is "desirable" does not mean the feature is required); *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006) ("When the claim addresses only some of the features disclosed in the specification, it is improper to limit the claim to other, unclaimed features.").

[11] *See, e.g., Voda*, 536 F.3d at 1321 ("This court has emphasized, however, that in order to disavow claim scope during prosecution 'a patent applicant must clearly and unambiguously express surrender of subject matter.'") (quoting *Sorensen v. International Trade Comm'n*, 427

**Extrinsic Evidence.** A court construing a claim may also consider relevant extrinsic evidence, "which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quotation marks omitted). Both the Court of Appeals and this Court have stressed, however, that, for several reasons, such extrinsic evidence is considerably less reliable than intrinsic evidence. *See Phillips*, 415 F.3d at 1318-19 (discussing limitations of extrinsic evidence); *Honeywell*, 66 Fed. Cl. at 422 ("intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language") (quotation marks omitted). Thus, "while extrinsic evi-

---

F.3d 1375, 1378-79 (Fed. Cir. 2005)); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003) ("[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable."); *Abbott Labs.*, 566 F.3d at 1289 ("[O]wing in part to the inherent ambiguities of prosecution history, the doctrine of prosecution disclaimer only applies to unambiguous disavowals."); *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1343 (Fed. Cir. 2009) (holding that patentee's statements during prosecution were "not clear and unmistakable enough to invoke the doctrine of prosecution history disclaimer"); *University of Pittsburgh*, 573 F.3d at 1296-97; *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1327 (Fed. Cir. 2003) ("Although … the prosecution history is always relevant to claim construction, it is also true that the prosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage."); *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1370 (Fed. Cir. 2008) (same); *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003) (disclaimer "requires clear and unmistakable statements of disavowal"); *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007) (alleged "disavowal must be both clear and unmistakable to one of ordinary skill in the art") (citations and internal quotation marks omitted); *Golight, Inc. v. WalMart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004) (same); *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1365 (Fed. Cir. 2007) (ambiguous statement not "sufficiently clear and deliberate … to meet the high standard for finding a disclaimer of claim scope"); *Middleton, Inc. v. Minnesota Mining & Mfg.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002) (looking into whether applicant "clearly and unambiguously disclaimed or disavowed [any interpretation] during prosecution in order to obtain claim allowance") (brackets in original; citations and internal quotation marks omitted); *Northern Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281 (Fed. Cir. 2000) (no clear disclaimer); *NTP*, 418 F.3d at 1308-09 (requiring "words or expressions of manifest exclusion or restriction representing a clear disavowal of claim scope"); *Salazar v. Proctor & Gamble Co.*, 414 F.3d 1342, 1344 (Fed. Cir. 2005) (court considers prosecution history "to determine whether the applicant clearly and unambiguously disclaimed or disavowed any interpretation during prosecution to obtain claim allowance"); *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005) (same).

dence can shed useful light on the relevant art, ... it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (quotation marks omitted). And extrinsic evidence cannot properly be used to support a claim construction that conflicts with the construction mandated by the intrinsic evidence. In short, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

**Means-Plus-Function Claims.** If a claim is "expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, [it] shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6. Accordingly, the court must construe the function of a such a "means-plus-function" limitation "to include the limitations contained in the claim language, and only those limitations." *Golight, Inc. v. WalMart Corp.*, 355 F.3d 1327, 1333 (Fed. Cir. 2004) (quotation marks omitted). "The first step in construing a means-plus-function claim limitation is to define the particular function of the claim limitation. … The next step ... is to look to the specification and identify the corresponding structure for that function." *Id.* at 1333-34.

## II.   THE '220 AND '014 PATENTS

The '220 and '014 patents each contain an independent method claim and an independent device claim. While Uship originally asserted all four of these independent claims, it has now narrowed its case, as to these two patents, to their respective method claims – claim 1 of each patent. Because these method claims are very similar to each other, Uship will (as it did at the claim construction hearing) address them together.[12]

---

[12] The specifications for the '220 and '014 patents are virtually identical. For ease of reading, Uship cites herein to the '220 specification; corresponding passages in the '014 specification in almost all instances can be found within a few lines of the cited location in the '220 specification.

A.    **Preamble**

Because the elements of the '220 and '014 method claims fully and intrinsically capture all of the limitations of the claimed invention, and the preambles merely encapsulate the main limitations found in the claims and describe the invention's purpose and principal use, the preambles do not need to be separately construed.[13]   However, because the Government and IBM have argued that the preambles do need to be construed, Uship, in an abundance of caution and to remove a possible appellate issue, requests that the Court issue constructions for the preamble language. The parties' competing constructions are as follows:

| '220 Preamble: A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of: | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| A method of mailing parcels and envelopes, through the USPS and/or other commercial delivery services, using a shipping apparatus or device consisting of interrelated parts with separate functions and employing a technique, method or system of operating and controlling the mailing task by highly automatic means, comprising the steps of | **A method ...using an automated shipping machine:** Each step of the method requires use of a shipping machine automatically controlled by mechanical or electronic devices, unless the step explicitly states otherwise | A series of steps for mailing parcels and envelopes, wherein each step of the method requires use of a shipping machine automatically controlled by mechanical or electronic devices, unless the step explicitly states otherwise |

| '014 Preamble: A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of: | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| A method of mailing parcels and envelopes, through the USPS and/or other commercial delivery services, using a shipping apparatus or device consisting of interrelated parts with separate functions and employing a technique, method or system of operating and controlling the mailing task by highly automatic means, comprising the steps of | **A method ...using an automated shipping machine:** Each step of the method requires use of a shipping machine automatically controlled by mechanical or electronic devices, unless the step explicitly states otherwise | A series of steps for mailing parcels and envelopes, wherein each step of the method requires use of a shipping machine automatically controlled by mechanical or electronic devices, unless the step explicitly states otherwise |

---

[13] *See, e.g., Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288-89 (Fed. Cir. 2008); *Rowe v. Dror,* 112 F.3d 473, 478 (Fed. Cir. 1997); *Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1371-72 (Fed. Cir. 2003).

The previous briefing[14] and the argument at the claim construction hearing have revealed that the parties' primary dispute with respect to the preamble concerns what it means for the method to use an "automated … machine."[15] That dispute, in turn, revolves primarily around the issue of whether and to what extent the invention *requires* the shipping machine to perform each step of the method. The main issue, in other words, boils down to just how much of the method is to be performed or controlled by the machine and how much human involvement is contemplated. As a practical matter, because the parties have reached agreement on the proper construction of a number of steps of these method claims, the dispute regarding the construction of the preamble primarily affects the resolution of the question of how much, if any, human involvement is contemplated in connection with the "validation" step (Limitation 9) of the '220/014 patents and the "storing" step (Limitation 10) of the '014 patent. While we will therefore treat with this issue at greater length in discussing those specific steps, we here address more generally the basis for Uship's construction of the preamble and the problems underlying defendants' competing constructions.

---

[14] We cite herein to defendants' prehearing briefs as "US Br." and "IBM Br."

[15] The parties' constructions also differ in that Uship's makes explicit that "mailing" encompasses all commercial delivery services, and not just the USPS. Neither the Government nor IBM disputes that the term covers the activities of the USPS. For that reason, it is not critical in this proceeding that the term "mailing" be definitively construed beyond confirming the common-sense proposition that it covers USPS activities. Having said that, we must note that the intrinsic evidence makes crystal clear that the term "mailing" encompasses all commercial delivery services. For example, the abstract refers to terms such as "commercial carrier," "commercial carriers," and "each carrier." Similarly, numerous passages in the specification make clear that the invention relates to the "commercial shipping and delivering industry," to "commercial carriers," to "delivery service[s]," and to "commercial delivery service[s]," thus making clear that "mailing" encompasses more than one possible delivery service and is not limited to mailing through the USPS. *See, e.g.,* specification 1:15-16; 1:21; 1:23-31; 1:37; 1: 40; 1:55; 2:3; 2:8; 2:13; 2:22-23; 2:25; 2:29; 2:38; 2:53; 2:54; 3:1; 3:3-3:4; 3:19-20; 3:25-26; 3:35-36; 3:39; 3:54; 4:8; 5:27-28; 5: 56; 5:62; 6:65; 7:5-6; 8:6-8; 9:20; 11:1; 11:13-14; 11:26; 11:56; 13:64-65; 15:33; 20:9; 21:8-11; 24:56; 25:6-7; 27:64; 28:31-32.

While the Government has retreated from its original construction of the preamble, in which it specified that the invention required the use of a highly automated device that "take[s] the place of humans," it remains the case that both the Government and IBM have advanced constructions that admit of relatively little involvement by humans in the operation of the shipping machine. This is most evident in defendants' insistence on a construction in which each step "requires" use of a machine "automatically controlled by mechanical or electronic devices" "unless the step explicitly states otherwise."

Notably, neither the Government nor IBM can point to any actual preamble language that would require that the shipping machine perform every step in the claim unless the step explicitly calls for a human. Neither can they identify any specification passages that directly support their construction. In fact, the specification is in important respects at war with defendants' position. In particular, the specification underscores both that the invention contemplates the use of a machine that employs several automatic processes and that the invention nevertheless contemplates at least some activity by human actors – *i.e.*, customers and, in some embodiments, attendants such as employees of businesses where the machine is deployed.[16]

Nor is the Government and IBM's interpretation saved by its exception for those activities for which "the step explicitly states otherwise," because the intrinsic evidence makes clear that numerous steps of the method claim contemplate human involvement – and in some cases significant human involvement – even though those steps do not "explicitly" call for the such

---

[16] *See e.g.* specification 24:58-60 (describing system of one embodiment as being "operated by the customer"); 25:8-12 ("The embodiment ...thus differs from the previous embodiments in that it is semi-attended, i.e., a clerk is needed to take the parcel or envelope from the customer, to store the parcel or envelope in a secure storage area, and to validate receipt of the parcel or envelope."); 25:46-51 ("Obviously, this system is substantially simplified from the embodiments described above since the storage and validation process is performed by an attendant. However, the system retains the benefits of the unattended systems described above in that convenience to the customer is greatly enhanced.").

human involvement. Thus, a customer initiates the "weighing" step (specification 8:16-18), provides "package type" and "shipping" information (*id.* 8:52-56, 20:6-12), and provides an indication of the desired delivery service option (*id.* 9:19-21, 21:19-21), even though the language of the claim does not "explicitly" so state. Perhaps most importantly, and as discussed in more detail below, the specification makes clear that, for at least some embodiments of the invention, the "validation" step is performed by a person such as a retail clerk, specification 25:2-12, even though the validation step of the claim does not "explicitly" call for such human involvement.

In addition to being far more faithful to the claim language and the specification than are defendants' constructions, Uship's construction is also fully supported, and reinforced, by the ordinary and common understanding of the phrase "automated shipping machine, " as confirmed by contemporaneous general purpose dictionaries. Thus, "automated" is defined by reference to "automation," which is itself defined as "the technique, method, or system of operating or controlling a process by highly automatic means, as by electronic devices, reducing human intervention to a minimum." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY (1997) at 90 (excerpts attached as Exhibit I). And "machine" is defined as "an apparatus consisting of interrelated parts with separate functions, used in the performance of some kind of work." *Id.* at 787. And the ordinary understanding of these terms is fully consistent with the nature of the claimed invention as disclosed in the intrinsic evidence. To take one example, the notion that the automated shipping machine would employ an "apparatus consisting of interrelated parts with separate functions" makes perfect sense, since, as the claim and specification make clear, the machine is involved in the performance of multiple functions (such as, for example, weighing an item, calculating postage, etc.). Given the relatively sophisticated use to which the machine will be put under the method claims, what would be odd is a construction that would somehow *foreclose* the use of an

apparatus employing "interrelated parts with separate functions."

Neither defendant directly argues or suggests that Uship's construction of this term fails to reflect the common, ordinary understanding of standard terms such as "automated" and "machine." Nor could they. Virtually any machine or function one might commonly refer to as "automated" – *e.g.*, automated check-out at the supermarket, automated deposit at a bank ATM, automated purchase from a vending machine – will entail varied, ongoing interplay between the human being and the machine as a vital component of the overall series of functions; far from being at odds with the notion of "automation," therefore, myriad, fluid contributions by a human being are part and parcel of it.

Defendants' rejection of Uship's construction therefore necessarily reduces to the notion that an aberrant meaning is compelled by the specification and prosecution history. As discussed above, however, the specification not only fails to support defendants' competing constructions, it directly undermines those constructions. That leaves the prosecution history, which, despite defendants' half-hearted nods to the claim language and specification, is what defendants really seek to hang their hats on. Because these particulars are best addressed in construing the "validation" and "storing" limitations, we will defer a more detailed discussion of the prosecution history until our discussion of those limitations a more detailed discussion of the prosecution history. *See infra* at 38-45. For now, it suffices to note that defendants place all of their reliance on what is at best an ambiguous snippet of prosecution history from a predecessor patent; there, the applicant merely responded to a statement made by the examiner in an office action dealing with an administrative matter having absolutely nothing to do with any concerns of patentability. The applicant was therefore *not* distinguishing his claims over the prior art, was *not* seeking to amend his claims in order to overcome a rejection, and was *not* making arguments in support of the pat-

entability of his claims. Thus, in addition to being ambiguous, the snippet on which defendants'
prosecution history argument is based is leagues removed from the types of applicant arguments
and amendments that can constitute grounds for finding a clear disavowal of claim scope. *Cf.*
*Omega*, 334 F.3d at 1324 ("*[W]here the patentee has unequivocally disavowed a certain mean-*
*ing to obtain his patent,* the doctrine of prosecution disclaimer attaches and narrows the ordinary
meaning of the claim congruent with the scope of the surrender") (emphasis added).

### B.   Limitation 1:  Receiving Payment Information

The parties have agreed upon a joint proposed construction for this limitation.

| '220 Limitation 1: **receiving payment information from a customer;** |
|---|
| **Joint Construction** |
| the automated shipping machine obtains data relating to the customer's chosen method of payment |

| '014 Limitation 1: **receiving payment information from a customer;** |
|---|
| **Joint Construction** |
| the automated shipping machine obtains data relating to the customer's chosen method of payment |

### C.   Limitation 2:  Receiving "Package Type Information"

Following the claim construction hearing, both Uship and the Government have revised
their proposed constructions of this limitation. As a result, and as reflected below, the parties'
constructions are now quite similar (and, in the case of the Government and IBM, identical):

| '220 Limitation 2:  **receiving package type information identifying a parcel or envelope to be mailed;** | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| The automated shipping machine obtains data relating to the type of parcel or envelope to be shipped, such as a a letter, pak, package, or any other package types which may be accepted by the delivery service | the automated shipping machine obtains [package type information identifying a parcel or envelope to be mailed]<br><br>**package type information:** data from the customer indicating the type of parcel or envelope to be shipped, such as letter, pak, or package, as defined by the servicing carrier | The automated shipping machine obtains package type information identifying a parcel or envelope to be mailed<br><br>**package type information:** data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier |

| *'014 Limitation 2*:  **receiving package type information identifying a parcel or envelope to be mailed;** | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| The automated shipping machine obtains data relating to the type of parcel or envelope to be shipped, such as a letter, pak, package, or any other package types which may be accepted by the delivery service | the automated shipping machine obtains [package type information identifying a parcel or envelope to be mailed]<br><br>**package type information:** data from the customer indicating the type of parcel or envelope to be shipped, such as letter, pak, or package, as defined by the servicing carrier | The automated shipping machine obtains package type information identifying a parcel or envelope to be mailed<br><br>**package type information:** data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier |

The parties' remaining dispute centers on the meaning of "package type information." Although the intrinsic evidence does not provide a specific definition for this term, the specification does note that "package types include a letter, a pak, or a package *or any other package type which may be accepted by the delivery service*." Specification 20:7-9 (emphasis added); *see also id.* 27:26-32 (same). Thus, the specification indicates that the term refers to data relating to the type of parcel or envelope to be mailed, and that it leaves room for application of a delivery service's own standards and categories for defining the array of package "types" that it may accept for delivery. Uship's proposed construction simply tracks the specification in this regard.

The Government's and IBM's proposed construction, on the other hand, is unduly restrictive in that it can be read to limit the claim term to the examples provided in the specification; it improperly seeks, in that regard, to import limitations from the specification. Yet, defendants' construction overlooks the specification's clear contemplation, as discussed above, that a carrier may specify any array of package type information that it deems relevant for its own service options.

### D.    Limitation 3:  Weighing the Parcel or Envelope

The parties have agreed upon a joint proposed construction for this limitation:

| '220 Limitation 3: **weighing said parcel or envelope to be mailed;** |
|---|
| **Joint Construction** |
| the automated shipping machine obtains the weight of the parcel or envelope to be mailed by use of a scale |

| '014 Limitation 3: **weighing said parcel or envelope to be mailed;** |
|---|
| **Joint Construction** |
| the automated shipping machine obtains the weight of the parcel or envelope to be mailed by use of a scale |

### E.    Limitation 4:  Receiving Shipping Information; Destination

With the exception of one important term – "destination" – the parties have agreed upon

a joint proposed construction for this limitation:

| '220 Limitation 4: **receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed;** | | |
|---|---|---|
| **Joint Construction** | | |
| the automated shipping machine obtains data relating to shipping from the customer including at least the destination of said parcel or envelope to be mailed | | |
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| **destination** - data relating to the location to which the item to be mailed is to be mailed, as required by applicable policies and standards of the delivery service being used, such as the zip code for that location | **destination of the parcel or envelope to be mailed** – the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place | **destination** – the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code |

| '014 Limitation 4: **receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed;** | | |
|---|---|---|
| **Joint Construction** | | |
| the automated shipping machine obtains data relating to shipping from the customer including at least the destination of said parcel or envelope to be mailed | | |
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| **destination** - data relating to the location to which the item to be mailed is to be mailed, as required by applicable policies and standards of the delivery service being used, such as the zip code for that location | **destination of the parcel or envelope to be mailed** – the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place | **destination** – the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code |

The issue with respect to the term "destination" concerns what information the customer

is required by the claimed method to input into the shipping machine. Uship contends that the

intrinsic evidence indicates that, with the possible exception of zip code data, the claim does not itself specify a level of detail regarding the destination information that the customer is *required* to input. Rather, the invention contemplates that the delivery service will itself specify the required information that needs to be entered. Both the Government and IBM, on the other hand, have proposed constructions that would require the customer to input information in addition to the zip code: specifically, the recipient's name and complete mailing address. Defendants' position cannot be squared with the intrinsic evidence.

To be sure, the specification indicates that, *for certain embodiments* of the invention, a customer would input the recipient's name and complete mailing address. *See, e.g.,* specification 14:39-41 (customer enters "complete addressing information"). The specification's discussion of *other* embodiments, however, makes clear that nothing more than the zip code need be inputted by the customer. The specification's discussion of the very first embodiment, for example, indicates that the customer will be prompted only to "enter the desired zip code of the item which is to be mailed." Specification 8:54. The specification makes clear as can be that full address information need not be inputted:  it contemplates that, later in the very same process associated with this embodiment, the shipping machine would print a shipping label, on which the customer would be instructed to "*write* the mailing address." *Id.* 9:41 (emphasis added). Obviously, the complete mailing address is not printed on the shipping label under this embodiment.

In light of the above, there can be no legitimate question that this embodiment does not contemplate, let alone require, the customer to input a name and mailing address into the shipping machine in the first instance. By focusing on the discussion in the specification of other particular embodiments, the Government and IBM have made the dual and related errors, condemned in *Phillips* and numerous other decisions, of seeking to import limitations from the spe-

cification into the claim and seeking to limit the invention to particular embodiments. *See Phillips*, 415 F.3d at 1323; *supra* at 7-9.[17]

In addition, Uship's construction is consistent with the ordinary understanding of the term "destination". Nothing in that term inherently *requires* the entry of a mailing address, much less a name. To take just one example, when customers book travel arrangements with airlines, passenger train lines, bus companies, and the like, they are typically asked for their ultimate "destination." No one understands this to mean the customers must provide the name and street address of the person they are visiting or even of the station at which they are stopping. Rather, it is understood that the customer need only indicate the city to which she is traveling.

In a related vein, the Court was absolutely correct when it observed at the claim construction hearing that the meaning of "destination" may depend on the particular context in which the term is used. *See, e.g.*, Tr. 673. One important aspect of that context, in the case of this limitation, is the purpose for which the customer is asked to input destination information. Here, the purpose is simple:  to allow the shipping machine to calculate the shipping fee. *Cf.* Limitation 5 ("computing from said … shipping information … a cost for delivery"). In this regard, what is relevant to the calculation of the shipping fee is information identifying the metropolitan area to which the package is to be shipped:  *i.e.,* the zip code. The Government and IBM never suggest how the recipient's name and street address helps advance, or is even relevant to, allowing the

---

[17] Defendants pointed out at the hearing that the specification's discussion of the more elaborate embodiment on which they rely refers to "the zip code of the destination" as well as the "destination name and destination street address." *See* Tr. 670, 678-79; specification 20:38, 46-47. Defendants contend that this proves that the zip code is merely a subpart of the "destination" that needs to be inputted by the customer. But this formulation proves, at most, only that *for this embodiment* the zip code is part of the destination information that must be inputted. As noted, it is quite clear that the zip code is the *only* thing that needs to be inputted for other embodiments. At bottom, this argument is merely another manifestation of defendants' efforts to improperly confine this limitation to a particular embodiment.

computation of the shipping fee by the machine.

Stated another way, defendants are confusing two different acts in analyzing this issue: (1) the act of preparing an item for delivery using an automated shipping machine; and (2) the act of actually delivering an item to its intended recipient. The claimed invention deals only with the first of these acts. The shipping machine certainly doesn't actually deliver the item; the claimed method *ends* when an item is deposited for subsequent pick-up by the delivery service. The recipient's name, and certainly his complete mailing address, are, to be sure, needed for the ultimate delivery of the item to be successfully completed. Here, though, the preceding preparation of the item for delivery is what is at issue. All that is *necessary* for that preparation is that the shipping cost be calculated and paid. And all that is *necessary* for that to occur is that the customer enter zip code information.[18]

Defendants concede, as they must, that the specification passages, discussed above, describing embodiments in which nothing more than the zip code needs to be inputted do not contemplate, let alone require, the customer to input a name and street address. US Br. 73; IBM Br. 105. They therefore cannot dispute that their interpretation of "destination" would exclude this disclosed embodiment from the scope of the invention. As discussed above, *supra* at 8-9, such a construction is heavily disfavored. *See Oatey*, 514 F.3d at 1277; *Vitronics*, 90 F.3d at 1583.

The Government's response to this point was that the "definition of 'destination of the parcel or envelope to be mailed' cannot be changed because the first embodiment functions with less than a destination." US Br. 73; *see also* IBM Br. 105. This argument is circular; the point is

---

[18] IBM argued at the claim construction hearing that another purpose of the customer inputting the destination is to facilitate the printing of a shipping label to allow the item to be delivered to the proper address. *See, e.g.*, Tr. 669. *See also* Limitation 7, *infra*. But, as discussed above, the specification makes clear, in its discussion of the first embodiment, that after the label is printed, the customer will "*write* the mailing address onto the label." Specification 9:41-42 (emphasis added).

that this embodiment helps *provide* the meaning of "destination" as the term is used in this claim. Such circular argumentation cannot supply the type of clear and unmistakable evidence that is required to read out of the invention an embodiment discussed at length in the specification.

IBM recognized the dilemma posed by its construction, and so it cast about for *some* role for the excluded embodiment. Significantly, it could not find a claim that would cover the embodiment elsewhere in the '220 patent, or even in the '220 patent's direct ancestors. Rather, it had to reach all the way back to the '464 patent, which was a separate continuation-in-part stemming from the '220 patent's grandparent, the '948 patent. *See* diagram, *supra* at 3. According to IBM, the excluded embodiment is covered by claim 7 of the '464 patent, which requires only the entry of "information relating to the destination." IBM Br. 105.

For several reasons, this argument is meritless. The '464 patent and '220 patent are not so directly related as to support IBM's effort to draw such dispositive significance from slight differences in claim wording. For one thing, the two patents had different inventors; despite IBM's references to "Ramsden" as the inventor of both patents, IBM Br. 105, IBM ignores that Kenneth Liles was a co-inventor on the '220 patent but not the '464 patent. Perhaps more importantly, although both the '464 and the '220 patents describe the embodiment at issue, the specifications of the two patents are in many other respects very different. This is not a case, in other words, in which the applicant merely incorporated wholesale the specification from an earlier patent into a subsequent patent. Ramsden/Liles therefore affirmatively decided to include the embodiment at issue in the '220 specification.

Furthermore, the fact that the '464 patent uses a slightly different formulation – "information relating to the destination" – does not counsel for the adoption of a construction, such as IBM's, that is at war with the intrinsic evidence pertaining to the '220 patent. As defendants

24

themselves recognize elsewhere in their briefs, *see, e.g.*, IBM Br. 9, even within the same patent,

it is sometimes the case that an inventor will employ slightly different wording to refer to the

same concept. "Different terms or phrases in separate claims may be construed to cover the same

subject matter where the written description and prosecution history indicate that such a reading

of the terms or phrases is proper." *Nystrom v. Trex Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005).[19]

Here, the slightly different wording – appearing in different patents, with different inventors,

filed at different times – does not amount to the type of clear and unambiguous disavowal that

would justify disregarding the unmistakable evidence in the intrinsic record regarding the mean-

ing of this term.

## F.   Limitation 5:  Computing Delivery Date and Cost for Delivery

Other than the terms "package type information" and "destination," which have already

been discussed, the parties' primary dispute here concerns what it means for the machine to

"comput[e] ...a delivery date." The parties' competing constructions are as follows:

| '220 Limitation 5: **computing from said package type information, shipping information, and weight informa-tion, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer;** | | |
| --- | --- | --- |
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| the automated shipping machine determines the expected **delivery date** and cost for delivery of the parcel or envelope to said destination for each available delivery service option, as a function of the package type information, shipping information, and weight information | the automated shipping machine calculates [a delivery date] and cost for delivery [of said parcel or envelope to said destination] for each available delivery service option, as a function of [the package type information], shipping information, and weight information | the automated shipping machine determines an expected delivery date, including the day of the week, and associated cost for each delivery service based on the package type information, shipping information, and weight information |
| **delivery date** – the date on which the parcel or envelope is to be received, expressed either as the specific month, day, and year when the parcel or envelope is expected to be | **a delivery date ...of said parcel or envelope to said destination:** the expected calendar date of delivery of the parcel or envelope | |

---

[19] *See also Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) ("[T]his court has acknowledged that two claims with different terminology can define the exact same subject matter.") (citations omitted); *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998) (same).

| received or the number of days it is estimated to take for parcel or envelope to be delivered | | |
|---|---|---|

| '014 Limitation 5: **computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer;** | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| the automated shipping machine determines the expected **delivery date** and cost for delivery of the parcel or envelope to said destination for each available delivery service option, as a function of the package type information, shipping information, and weight information<br><br>**delivery date** – the date on which the parcel or envelope is to be received, expressed either as the specific month, day, and year when the parcel or envelope is expected to be received or the number of days it is estimated to take for parcel or envelope  to be delivered | the automated shipping machine calculates [a delivery date] and cost for delivery [of said parcel or envelope to said destination] for at least two separate delivery service options, as a function of [the package type information], shipping information, and weight information<br><br>**a delivery date ...of said parcel or envelope to said destination:**  the expected calendar date of delivery of the parcel or envelope | the automated shipping machine determines an expected delivery date, including the day of the week, and associated cost for each delivery service based on the package type information, shipping information, and weight information |

Uship contends that "delivery date" means the projected or estimated date on which the item to be mailed is to be delivered, expressed *either* as a specific calendar date *or* as the number of days it is estimated to take for the items to be delivered. While this term admittedly presents a close claim construction issue, Uship's construction is consistent with the ordinary understanding of those skilled in the art, as delivery options in the commercial shipping industry are often expressed in terms of the expected number of days it will take for an item to be delivered (*e.g.,* overnight delivery, second-day delivery, etc.).

This understanding of "delivery date" is also underscored by the prosecution history of the predecessor '799 patent, which contains a similar limitation. In a March 11, 1996 Office Action addressing the application that ultimately led to the issuance of the '799 patent, the PTO had the following to say about another predecessor patent, the '532 patent:

The ['532] patent does not specifically state that the customer is advised of the

shipping cost for each and every service available, nor does the patent specifi-
cally claim calculating the delivery date for the package. However, the examiner
takes official notice that the two options were available from the U.S. Post Office
and therefore would have been obvious to one of ordinary skill in the art at the
time the invention was made to program a shipping machine to include these two
well known standard options.

Office Action (March 11, 1996) at 2 (G002352) (attached as Exhibit J).

This statement by the examiner is a part of the prosecution history and thus constitutes in-

trinsic evidence that, while not binding on the applicant, is nonetheless relevant to the claim con-

struction inquiry. Indeed, "[s]tatements about a claim term made by an examiner during prosecu-

tion of an application may be evidence of how one of skill in the art understood the term at the

time the application was filed." *Salazar*, 414 F.3d at 1347. To be sure, the examiner's statement

did not specify *how* the USPS calculated a delivery date. As noted above, however, the ordinary

understanding of those skilled in the art is consistent with delivery options being expressed in

terms of the expected number of days it will take for an item to be delivered. In fact, contempo-

raneous USPS documents confirm this understanding. *See, e.g.,* USPS, "A Consumer's Guide to

Postal Services and Products" at 5-6 (1996) (attached as Exhibit K) (describing estimated num-

ber of days to ship items under various service options); USPS, "Domestic Postal Rates and Fees

(Simplified)" at 3 (2001) (attached as Exhibit L) (same).[20]  Notably, there is no evidence that the

USPS did anything other than indicate to customers the estimated number of days it would take

to deliver items through most of its offered delivery options. Certainly, neither in their lengthy

briefs nor in their presentations at the hearing did defendants present any contrary evidence. Ac-

---

[20] In both its brief and at the claim construction hearing, the Government complained that
by submitting these contemporaneous USPS documents, Uship was attempting to construe the
claim in light of the accused device. US Br. 76; Tr. 699. This is false, as the USPS materials do
not relate directly to the USPS's automated shipping kiosks. Moreover, where, as here, the rele-
vant art is the commercial shipping of packages, the contemporaneous practices and policies of
an entity such as the USPS is obviously highly pertinent to any effort to analyze what those
skilled in the art ordinarily understand.

cordingly, the PTO effectively acknowledged that providing such information to customers was sufficient to constitute calculating the "delivery date."[21] Most important, the PTO was *right* – and its reasoning would carry the day of its own force. To say that, for instance, specifying "second day" delivery on the device is not contemplated by saying a delivery "date" would be specified runs counter to common sense.

The Government restricts its definition of "delivery date" to the "expected calendar date of delivery," while IBM would also require the machine to calculate and express the "day of the week" of the expected delivery. Both parties rely on statements made in the specification, discussing specific possible embodiments of the invention, that suggest that the machine's software may take account of "weekends, holidays, and other days in which no delivery service is available" in determining the expected date of delivery. *See, e.g.,* specification 21:7-9. Such statements could be read to suggest that the software might determine an actual calendar date of delivery. The claim, however, does not refer to a "calendar date" but rather to a "date." More importantly, because these statements appear in the context of the specification's discussion of particular embodiments of the invention, defendants are seeking to import limitations from the specification into the body of the claim and to restrict the claimed invention to those embodiments. In addition, by relying on a discussion of the contents of software for a particular embodiment, defendants improperly seek to restrict a method claim to features that are more appro-

---

[21] The Government has responded to the prosecution history by asserting only that "delivery date" "cannot be expanded to encompass Uship's definition as a result of an unrelated statement by the USPTO during the examination" of the '799 patent. US Br. 76; Tr. 700. In fact, the examiner's statement is obviously far from "unrelated" to the present inquiry, as he spoke directly to the concept of "calculating the delivery date." Moreover, the statement does not "expand" the term "delivery date," but is instead relevant to the analysis of what that term means. Meanwhile, IBM asserts that "there is no evidence the examiner knew what Post Office practice was." IBM Br. 109. This objection is puzzling because the examiner stated he was taking "official notice" that the USPS offered the option of calculating the delivery date. Ex. J at G002352. Clearly, the examiner knew something about "what the Post Office practice was."

priately viewed as pertaining to the structure of a device claim.

The Government and IBM also seek to rely on the specification's statement, in connection with a discussion of a fourth embodiment of the invention, that the machine will display the "date of expected delivery, what day of the week that will be, and total shipping costs for each selection." Specification 28:34-36. In addition to suffering from the same defects as the other statements from the specification relied upon by the Government and IBM, this statement does not help defendants as it is discussing what the machine will "display," and not what it means for the machine to compute the delivery date. Moreover, if anything, this passage undermines IBM's construction, as it draws an explicit distinction between the "date of expected delivery" and "what day of the week that will be." The specification therefore refutes, rather than supports, any argument that the expected delivery date includes the day of the week.

### G.  Limitation 6:  Receiving Indication of Customer's Chosen Delivery Option

The parties have agreed upon a joint proposed construction for this limitation:

| '220 Limitation 6: **receiving an indication of the delivery service option desired by the customer;** |
|---|
| **Joint Construction** |
| the automated shipping machine obtains the customer's chosen method of delivery |

| '014 Limitation 6: **receiving an indication of the delivery service option desired by the customer;** |
|---|
| **Joint Construction** |
| the automated shipping machine obtains the customer's chosen method of delivery |

### H.  Limitation 7:  Printing a Shipping Label

The parties have agreed upon joint proposed constructions for this limitation (which differs slightly between the two patents):

| '220 Limitation 7:  **printing a shipping label including at least said destination printed thereon;** |
|---|
| **Joint Construction** |
| the automated shipping machine prints at least said destination on a shipping label |

| '014 Limitation 7: **printing a tracking bar code label identifying at least said destination;** |
|---|
| **Joint Construction** |
| the automated shipping machine prints a label including a bar code enabling a delivery service to keep track of a parcel or envelope, the bar code identifying at least said destination |

Although the parties have agreed upon a joint proposed construction, they continue to disagree about the meaning of "destination," which we addressed above in connection with Limitation 4. We add here only that any suggestion that the invention requires the machine to *print* complete addressing information on the shipping label is contradicted by the specification, which discloses, in discussing one embodiment, that once the label is printed the customer will be instructed "to *write* the mailing address onto the label." Specification 9:36-42 (emphasis added).

## I.     Limitation 8:  Printing a Shipping Receipt

The parties have agreed upon joint proposed constructions for this limitation (although they once again disagree as to the meaning of the constituent term "destination"):

| '220 Limitation 8:   **printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer;** |
|---|
| **Joint Construction** |
| the automated shipping machine prints at least the cost of delivering the parcel or envelope to  said destination with the customer's chosen method of delivery |

| '014 Limitation 8:   **printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer;** |
|---|
| **Joint Construction** |
| the automated shipping machine prints at least the cost of delivering the parcel or envelope to  said destination with the customer's chosen method of delivery |

## J.     Limitation 9:  Validation

Although all of the parties have revised their proposed construction of this limitation since the claim construction hearing, they have not been able to reach agreement on what this "validation" step contemplates. The parties' competing constructions are as follows:

| *'220 Limitation 9*:  **validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed; and** | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| the automated shipping machine or an attendant determines or confirms that the parcel or envelope being received for storage and/or shipment is the package for which the shipping label was printed | the automated shipping machine confirms that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed | the automated shipping machine confirms that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed |

| *'014 Limitation 9*:  **validating receipt of said parcel or envelope as the parcel or envelope for which said tracking bar code label was printed; and** | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| the automated shipping machine or an attendant determines or confirms that the parcel or envelope being received for storage and/or shipment is the package for which the tracking bar code label was printed | the automated shipping machine confirms that the parcel or envelope received for storage is the same parcel or envelope for which the tracking bar code label was printed | the automated shipping machine confirms that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed |

At the risk of oversimplification, the parties' dispute with respect to this limitation can be viewed as boiling down to two primary issues:  (1) ***what*** does the validation step entail?; and (2) ***who*** can perform the validation step?  Uship respectfully submits that, on both questions, the intrinsic evidence, and in particular the specification, emphatically supports Uship's construction and not defendants'.

**What does validation entail?**  With respect to the issue of what actions are contemplated by the validation step, the record is clear: this step requires only a determination that the item being received for storage or shipment is the item for which a shipping label (or, in the case of the '014 patent, a tracking bar code label) has been printed. The specification makes quite clear that the invention does not require a particularly sophisticated determination in this regard. While defendants have not been entirely consistent on this point, their constructions, and the arguments in their prehearing briefs, can be read to require much more – in particular, that the shipping machine itself verify, through the use of sophisticated sensors, that the item being received is the "same" item for which a shipping label was printed. The intrinsic evidence rules out any such

31

construction.

It is true that the specification, and certain drawings, indicate that, for some embodiments of the invention, the shipping machine may utilize sensors and other devices to confirm that the same package for which a label was printed is received. But the specification makes explicit that such elaborate steps are *not* required for validation to occur. The most substantial discussion of validation is found in the specification's discussion of a third embodiment of the invention:

> At this point, a very important validation step is performed. In particular, the system 310 determines at step 536 whether it has received the correct package. This step is critical since it verifies that the customer did not perform a package switch or forget to replace the package in the intermediate storage area 334 for shipment. *Such validation may be accomplished in several different ways in accordance with the invention.* For example, in a simple embodiment, photo cell sensor 344 may simply detect whether *any* package has been placed on the conveyor belt 340. *If so, it is presumed that the package on the conveyor belt 340 is the appropriate package with the appropriate label.* On the other hand, in accordance with a preferred embodiment of the invention, the package is automatically reweighed and/or redimensioned once the customer has closed the outer door 330 (and hence the parcel or envelope cannot be accessed by the customer). If the reweighing and redimensioning results in approximately the same readings as when the package was previously weighed and dimensioned, it is presumed that the package placed on the conveyor belt 340 is the same package for which the label was printed.

Specification 21:43-64 (emphases added).

Notably, this passage appears in the specification's discussion of the embodiment that describes the *most* sophisticated and elaborate system. This passage nevertheless makes clear both that validation of receipt may be "accomplished in several different ways," and, perhaps more importantly, that it is not necessary for the shipping machine itself to confirm that the exact same package has been received. Thus, under this embodiment, it is sufficient that the machine determine that "any" package be received, in which case it will be "presumed" that the package is the appropriate one. Although IBM at times suggested, in its brief and at the hearing, that it agrees that it is sufficient for the machine to determine that any package, rather than the exact same package, has been received, *see* IBM Br. 112, Tr. 722, it elsewhere suggested, as did the Gov-

ernment, that the invention requires the machine to verify that the exact same package has been

received. Perhaps more importantly, defendants' revised constructions, which require the ma-

chine to confirm that the item received for storage is the "same" item for which the shipping la-

bel was printed, may be read to suggest that the invention requires the machine to verify that the

exact same package has been received. The above specification passage should, by its terms,

foreclose any such suggestion. To the extent, therefore, that defendants' are proffering such a

construction, they are, once again, committing the "cardinal sin[]" of importing limitations from

the specification into the claim, *SciMed*, 242 F.3d at 1340, and the related sin of confining the

invention to a particular embodiment, and they are compounding those sins by all but ignoring

other language in the *same passage* that defeats their interpretation. [22]

**Who performs "validation"?**   While there may be some lingering doubt about defen-

dants' views regarding *what* is required by the validation step, there is no doubt regarding their

views regarding *who* is to perform that step. According to both the Government and IBM, the

validation step cannot be performed by a human being; rather, only the shipping machine itself

can perform this step. But the specification is, if anything, even more definitive in rejecting any

such notion. In particular, numerous passages in the specification expressly contemplate that the

validation step may be performed through means other than the shipping machine itself. The

specification's discussion of the fourth embodiment, for example, makes clear that after a ship-

ping label is printed and applied to the item, the item is then taken to an attendant such as a retail

clerk "who validates receipt of the package and provides an appropriate receipt to the customer."

---

[22] That the validation step does not require an elaborate system operating within the ship-ping machine is further supported by a comparison of this claim to Claim 30 of the predecessor '799 patent (Ex. F), which calls for "a validation area for accepting said parcel or envelope, *said validation area being inaccessible by said customer* . . .." (emphasis added). Notably, the method claims in the '220 and '014 patents do not contain a similar limitation.

Specification 25:2-5. *See also id.* 25:41-44 ("The attendant then stamps and initials the receipt to validate the shipment and receipt of the parcel or envelope 708 from the customer."); 29:17-22 (same). And were this point not explicit enough in the above passages, the specification goes on to spell out that, "[o]bviously, this system is substantially simplified from the embodiments described above since the storage and *validation process is performed by an attendant.*" Specification 25:47-49 (emphasis added).[23]

The Government did not even see fit to mention these passages in its brief. Although IBM at least acknowledged the specification's discussion of this embodiment, it then attempted to banish it by speculating that it must apply to some other, unasserted, claim. *See* IBM Br. 112. Notably, IBM has never actually identified such an unasserted claim that would encompass this disclosed embodiment. In short, defendants in their briefs pushed for the adoption of a heavily disfavored construction that would exclude a disclosed embodiment from the scope of the invention, without producing *any* support for such a construction.[24]

**New argument – Validation is not "Validation".** Apparently lifting their heads from the sand, the Government and IBM employed a new strategy at the claim construction hearing.

---

[23] In addition, the specification contains other passages that indicate that validation can be performed other than exclusively by the shipping machine. For example, the specification describes a process by which a representative of the delivery service arrives at the machine to review a manifest and reject packages as appropriate. *See, e.g.*, specification 29:23-31. This act of inspecting the packages and rejecting (or not rejecting) packages processed by the machine clearly constitutes validation by something other than the machine acting alone.

[24] IBM also suggested that the "storing" limitation of this claim illustrates that when the inventor intended to claim the attendant as performing a step, the inventor did so explicitly. IBM Br. 112. That argument cannot outweigh the clear specification language acknowledging the attendant's role in the "validation" process. The argument also fails as a matter of logic. The "storing" limitation references an "attendant" within the claim language because it *requires* the participation of an attendant. The "validation" limitation does not explicitly reference an attendant in the claim language because this step does not *require* an attendant to perform the step. What matters is that an attendant *may* perform this step, thereby refuting defendants' argument that the claim depends entirely on validation by way of the automated shipping machine.

34

Rather than simply ignoring the above specification passages, defendants raised two new arguments in an attempt to dodge them. First, defendants argued, incredibly, that the specification passages describing those role of humans in the "validation" step must refer to something different from the "validation" step contemplated by the patent claims. Second, defendants argued, equally incredibly, that even if these clear specification passages were otherwise applicable, their scope and effect were disavowed by the applicant during the prosecution of a predecessor patent. Of course, the fact that defendants did not see fit to develop these arguments in the hundreds of pages of briefing they submitted in advance of the hearing itself speaks volumes regarding their merits.[25]  Even leaving that observation aside, neither argument holds water.

The notion that "validation" as described in the fourth embodiment of the specification is somehow different from "validation" as claimed in the patent and described in the other embodiments disclosed in the specification is untenable. That notion is contradicted by the specification itself, which makes clear again and again that the "validation" step described in the fourth embodiment is the same "validation" step claimed as part of the invention and described in, among other places, the third embodiment. For example, the following passage appears early in the specification's discussion of the fourth embodiment:

> *In this embodiment of the invention*, information provided by the customer is used to generate an appropriate mailing label, which is then applied to the parcel, package or envelope by the customer. The parcel, package or envelope with the label is then provided to a retail clerk who *validates receipt* of the package and provides an appropriate receipt to the customer. The retail clerk then places the package in an appropriate location for subsequent pick-up by a commercial

---

[25] To be fair, the Government made an oblique reference to the prosecution history argument in the validation discussion of its brief. *See, e.g.*, US Br. 83. The argument, however, attained nowhere near the significance or prominence it took on at the claim construction hearing. IBM, on the other hand, has no similar fig leaf to cover its naked resort to new argumentation on the role of the prosecution history in construing this limitation, as it affirmatively acknowledged in its brief (quite correctly) that "[t]he prosecution history *does not address* the meaning of this term [*i.e.,* validation]." IBM Br. 111 (emphasis added).

carrier.

> The [fourth] embodiment … thus differs from the previous embodiments in that it is semi-attended, i.e., a clerk is needed to take the parcel or envelope from the customer, to store the parcel or envelope in a secure storage area, and to *validate receipt* of the parcel or envelope.
>
> *This embodiment is otherwise quite similar to the third embodiment.*

Specification 24:66-25:14 (emphases added). Far from suggesting that validation under the fourth embodiment is somehow divorced from and covers something different from the claimed invention, this passage makes clear that the fourth embodiment, including its description of validation, was part and parcel of that invention.

Lest there be any doubt, this reality underscored and reinforced by a later passage in the specification further elaborating on the mailing process contemplated under the fourth embodiment. That passage includes the following discussion:

> The customer then applies the shipping label to the parcel or envelope 708 to be shipped. The customer then brings the parcel or envelope 708 and receipt to the designated counter for paying the charges for shipment (if cash payment is desired) and deposits the package with the attendant. *The attendant then stamps and initials the receipt to validate the shipment and receipt of the parcel or envelope 708 from the customer.* The attendant then stores the package in a secure area until the carrier retrieves the package for shipment.
>
> Obviously, this system is substantially simplified from the embodiments described above since the storage and *validation process* is performed by an attendant. However, the system 700 retains the benefits of the unattended systems described above in that convenience to the customer is greatly enhanced.

*Id.* 25:36-52 (emphases added). Defendants are asking this Court to conclude that the "validation process" described in this passage is not the same "validating" step claimed in the invention and described elsewhere in the written description. While it is of course possible for the same term to have different meanings depending on the context in which it is used in the patent, there is absolutely no basis for such an assumption in this case, and every reason to conclude from the context here, as described above, that the applicant used "validation" consistently throughout the written description.

IBM has attempted to bolster its new argument that "validation" means different things throughout the written description by noting that the validation step of Claim 1 requires validating receipt of the item as the item "for which said shipping label was printed." According to IBM, machine-performed validation under the third embodiment accomplishes this task while attendant-performed validation under the fourth embodiment does not. *See, e.g.,* Tr. 724-25, 741-43. The Government adopted this argument as well. *See id.* at 727, 733. This new argument is meritless, not only because passages like those described above make clear that "validation" was used consistently throughout the specification, but also because the argument relies on defendants' attempt to erect a highly artificial – in fact, false – dichotomy between validation under the third and fourth embodiments.

As discussed above, even under the relatively elaborate discussion of machine-performed validation under the third embodiment, the specification makes clear that validation "may be accomplished in several different ways in accordance with the invention." Specification 21:49-50. More importantly for present purposes, the specification goes on to describe a "simple embodiment" in which, after a shipping label is printed, the machine may "simply detect whether *any* package has been placed on the conveyor belt 340." *Id.* 21:50-53 (emphasis added). In that event, "it is *presumed* that the package on the conveyor belt 340 is the appropriate package with the appropriate label." *Id.* 21:53-55 (emphasis added). Notably, the machine under this embodiment does not validate by verifying that the package at issue is the exact same package for which the label was printed, or even that the package it detected actually has a shipping label applied to it. Rather, once (1) a label is printed and (2) a package is placed in the machine for storage, the machine, through the presumption described in the specification, (3) "validates" it as the package for which the label was printed.

This process parallels very closely the process described in the specification's discussion of the fourth embodiment. Once again, the machine prepares a shipping label. *See, e.g.,* specification 24:66-25:2; *id.* 28:57-59. "The parcel, package or envelope *with the label is then provided to a retail clerk who validates receipt of the package* and provides an appropriate receipt to the customer." *Id.* 25:2-5 (emphasis added).[26] Thus, as with the third embodiment, once (1) a label is printed and (2) a package is given to the attendant for storage, the attendant (3) "validates" it as the package for which the label was printed. If anything, such attendant-performed validation *better* accomplishes the purpose of validation, as described by defendants, since, unlike the machine in the "simple embodiment" described above, the attendant will be able to actually *see* that a shipping label has been applied to the package. In short, the suggestion that there is a meaningful difference, must less a *dispositive* difference, between machine-performed validation and attendant-performed validation, as contemplated by the patent, is wholly without merit, and serves only to reveal how desperate defendants are to flee the specification's teaching regarding the meaning of the "validating" step, teaching that the Government and IBM know is fatal to their construction.

**New argument – Prosecution History Disclaimer.** The same desperation is evident in defendants' new effort to dig up prosecution history supposedly bearing upon the meaning of validation. As noted previously and detailed below, defendants' prosecution history argument rests entirely on a brief statement made in connection with the predecessor '799 patent in response to a PTO office action dealing with an administrative matter having nothing to do with

---

[26] *See also id.* 25:37-43 ("The customer *then applies the shipping label* to the parcel or envelope 708 to be shipped. The customer then brings the parcel or envelope 708 and receipt to the designated counter … and deposits the package with the attendant. *The attendant then stamps and initials the receipt to validate the shipment and receipt of the parcel or envelope 708 from the customer.*") (emphasis added); *id.* 28:57-62, 29:17-22 (describing similar process).

patentability concerns.[27]  For multiple reasons, this exchange between the examiner and the applicant does not come close to overcoming the overwhelming evidence, discussed above, supporting Uship's construction and undermining that of defendants.

The application for the '799 patent was filed in April 1994. In January of 1996, the examiner notified the applicant that the claims in the application were subject to a "restriction or election" requirement under 35 U.S.C. § 121. Office Action (Jan. 8, 1996) (G002341-42) (Ex. M). Section 121 does not deal with the patentability of inventions, but rather is an administrative provision authorizing the PTO, in cases in which "two or more independent and distinct inventions are claimed in one application," to "require the application to be restricted to one of the inventions." 35 U.S.C. § 121. According to the examiner, because the "process for mailing" as described in the application's method claims "can be preformed [sic] by hand," the method and apparatus claims were distinct. G002342. The applicant was therefore instructed to elect either the method or the apparatus claims for examination in connection with the application. *Id.*

On February 7, 1996, the applicant filed its response to the section 121 restriction requirement. As required, the applicant elected one of the groups of claims – in this case, the apparatus claims – for examination, but it made that election "with traverse," meaning that the applicant disputed the basis for the election/restriction requirement. As explanation, the applicant made the following statement:

> Applicant has elected with traverse because Applicant disagrees with the Examiner's suggestion that the process claimed in independent method claims 1 and 72 can be performed by hand. Both of these claims specifically recite in the preamble a method of mailing parcels and envelopes "using an automated shipping machine" rather than specifically reciting at each step that the step is performed by the automated shipping machine. Applicant submits that if the method were performed by hand as the Examiner suggests, then it would not use an automated shipping machine as set forth in the preamble.

---

[27] The relevant excerpts from the prosecution history are attached as Exhibit M.

Amendment and Response to Restriction Requirement (Feb. 7, 1996) at 2 (G002346) (Ex. M). After this response was filed, the examiner proceeded to examine both the method and apparatus claims. The '799 patent ultimately issued over a year later, in August of 1997.

Defendants argue that the above statement had the effect of withdrawing from the scope of the claim, and in particular, the validation limitation, any embodiment in which an attendant may perform the validation step. They have thus invoked, without calling it as such, the doctrine of prosecution history disclaimer. That doctrine is well established, and operates to "preclud[e] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega*, 334 F.3d at 1323.

What is also well established, however, is the principle that, due to the limitations of the prosecution history as a claim construction tool, *see Phillips*, 415 F.3d at 1317, prosecution history disclaimer applies only when the applicant very clearly did in fact surrender claim scope in an effort to overcome concerns regarding the patentability of his claimed invention. Thus, "where the patentee has *unequivocally disavowed a certain meaning to obtain his patent,* the doctrine of prosecution [history] disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega*, 334 F.3d at 1324 (emphasis added).[28]

Alleged disavowals of claim scope that are ambiguous cannot support application of the doctrine of prosecution history disclaimer. This principle is not only entrenched in the case law,

---

[28] *See also id.* at 1325-26 ("[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable."); *Middleton,* 311 F.3d at 1388 (looking into whether applicant "clearly and unambiguously disclaimed or disavowed [any interpretation] during prosecution in order to obtain claim allowance") (brackets in original; citations and internal quotation marks omitted); *Salazar*, 414 F.3d at 1344 (court considers prosecution history "to determine whether the applicant clearly and unambiguously disclaimed or disavowed any interpretation during prosecution to obtain claim allowance") (quotation marks removed); *Voda*, 536 F.3d at 1321 ("This court has emphasized, however, that in order to disavow claim scope during prosecution, 'a patent applicant must clearly and unambiguously express surrender of subject matter.'").

but also vigorously enforced. The Court of Appeals has noted time and again that where the statement relied upon is subject to multiple reasonable interpretations, at least one of which would not amount to a surrender of claim scope, the doctrine is inapplicable. *See, e.g., Cordis*, 339 F.3d at 1359; *Golight*, 355 F.3d at 1332; *Northern Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1295 (Fed. Cir. 2000); *Omega*, 334 F.3d at 1330. As the Federal Circuit aptly put it in a 2005 decision:

> An ambiguous disclaimer … does not advance the patent's notice function or justify public reliance, and the court will not use it to limit a claim term's ordinary meaning. There is no "clear and unmistakable" disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term.

*SanDisk*, 415 F.3d at 1287 (citations omitted). Consistent with this understanding of the doctrine, the Federal Circuit has not hesitated to find that numerous prosecution history statements, arguments, and other actions are too ambiguous to amount to the type of unmistakable disavowal that would support the application of prosecution history disclaimer.[29]

For at least three separate reasons, the doctrine of prosecution history disclaimer is inapplicable here.

---

[29] A representative sampling of such decisions just from the last decade would include the following: *Abbott Labs. v. Tor-Pharm, Inc.*, 300 F.3d 1367, 1372 (Fed. Cir. 2002); *Amgen*, 314 F.3d at 1327-28; *Aquatex Indus. v. Techniche Solutions*, 419 F.3d 1374, 1381 (Fed. Cir. 2005); *Biotec Biologische Naturverpackungen v. Biocorp*, 249 F.3d 1341, 1348 (Fed. Cir. 2001); *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1370-71 (Fed. Cir. 2005); *Cohesive Techs.*, 543 F.3d 1361, 1370; *Cordis*, 339 F.3d at 1359; *Cordis Corp. v. Medtronic AVE, Inc.*, 511 F.3d 1157, 1177-78 (Fed. Cir. 2008); *Ecolab*, 569 F.3d at 1343; *Elbex*, 508 F.3d at 1371-72; *Golight*, 355 F.3d at 1332-33; *Honeywell*, 493 F.3d at 1365; *In re Gabapentin Patent Litig.*, 503 F.3d 1254, 1264 (Fed. Cir. 2007); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1124 (Fed. Cir. 2004); *Inverness Med. Switzerland v. Princeton Biomeditech*, 309 F.3d 1365, 1372 (Fed. Cir. 2002); *Inverness Med. Switzerland v. Warner Lambert Co.*, 309 F.3d 1373, 1382 (Fed. Cir. 2002); *Middleton*, 311 F.3d at 1388-89; *Northern Telecom*, 215 F.3d at 1295; *NTP*, 418 F.3d at 1297, 1309; *Omega*, 334 F.3d at 1330; *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1311 (Fed. Cir. 2007); *Rambus Inc. v. Infineon Tech.*, 318 F.3d 1081, 1090 (Fed. Cir. 2003); *Salazar*, 414 F.3d at 1344; *SanDisk*, 415 F.3d at 1287-90; *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005); *Voda*, 536 F.3d at 1321.

*First*, at the threshold, the applicant statement at issue was not made "to obtain [the] patent." *Omega*, 334 F.3d at 1324. The applicant was not making an argument, or an amendment, in order to overcome a patentability rejection or to address patentability concerns raised by the examiner; he was not, for example, seeking to overcome or distinguish prior art that would render his invention obvious or anticipated. Rather, the applicant was merely responding to a section 121 restriction requirement, which has nothing to do with patentability. *See, e.g., In re Weber*, 580 F.2d 455, 458-59 (CCPA 1978) (section 121 is not a proper ground for rejection); *In re Hengehold*, 440 F.2d 1395, 1402-03 (CCPA 1971) (restriction requirement not same as a rejection). A restriction requirement is "primarily an administrative tool" designed to advance efficient case management by the PTO and to ensure that the agency collects the proper amount of filing fees. *See, e.g. Laboratoires Perouse, S.A.S. v. W.L. Gore & Assocs.*, 528 F. Supp. 2d 362, 374 (S.D.N.Y. 2007); *R2 Med. Sys., Inc. v. Ketecho, Inc.*, 931 F. Supp. 1397, 1438 (N.D. Ill. 1996).[30]   That a restriction requirement does not speak to patentability is underscored by section 121 itself, which notes that the "validity of a patent shall not be questioned for failure of the Director to require the application to be restricted to one invention." 35 U.S.C. § 121. *Cf. Michaels*

---

[30] The district court in *Michaels of Oregon Co. v. Clean Gun, LLC* explained restriction requirements as follows:

> Restriction requirements do not constitute a substantive claim construction doctrine. Instead, restriction practice is a procedural tool that may be implemented when the PTO finds that an applicant has two distinctly patentable inventions in the same application. Unlike a rejection for obviousness or anticipation, the inclusion of two or more inventions in the same application does not render the inventions unpatentable. … Restriction practice (1) facilitates administration in the PTO; and (2) allows the PTO to obtain additional filing and maintenance fee revenue that would be lost if an applicant were always permitted to obtain a patent covering any number of distinct inventions.

No. 01-1158, 2002 U.S. Dist. LEXIS 20371, *23-24 (D. Or. July 9, 2002); *see also Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, No. 97-4203, 2000 U.S. Dist. LEXIS 22942, *46 (N.D. Cal. Feb. 28, 2000) (describing election requirement as "purely administrative").

*of Oregon Co. v. Clean Gun, LLC*, No. 01-1158, 2002 U.S. Dist. LEXIS 20371, *24 (D. Or. July 9, 2002) (citing statute).

Accordingly, neither the restriction requirement issued by the examiner in connection with the '799 application nor the applicant's response to that requirement could possibly constitute the type of patentability-related prosecution history statements that would support the invocation of the doctrine of prosecution history disclaimer. *See Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.*, No. 97-4203, 2000 U.S. Dist. LEXIS 22942, *46 (N.D. Cal. Feb. 28, 2000) (questioning relevance of restriction requirement and response); *Laboratoires*, 528 F.Supp. 2d at 374 (same); *Michaels*, 2002 U.S. Dist. LEXIS 20371 at *24 (same). In short, because the applicant was not making "clear and unmistakable prosecution arguments limiting the meaning of a claim term *in order to overcome a rejection*" or to otherwise support patentability, prosecution history disclaimer does not apply. *SanDisk*, 415 F.3d at 1286 (emphasis added).[31]

*Second*, even leaving this threshold point aside, defendants' prosecution history cannot be understood as speaking to any given step that is here being construed.[32] Again, the election in

---

[31] We note that decisions addressing the relevance of responses to restriction requirements under the doctrine of prosecution history estoppel (which is distinct from, but related to, the doctrine of prosecution history disclaimer at issue here) are to like effect. *See, e.g., Merck & Co., Inc. v. Mylan Pharm., Inc.*, 190 F.3d 1335, 1340-41 (Fed. Cir. 1999) (because claim scope was narrowed in order to overcome patentability rejection rather than in response to election requirement, doctrine of prosecution history estoppel applied); *Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.*, 738 F.2d 1237, 1243 (Fed. Cir. 1984) ("[L]imiting the claims because of a restriction requirement, as occurred here, would not necessarily invoke file history estoppel."). *See also Regents of the Univ. of Cal. v. DakoCytomation Cal., Inc.*, 517 F.3d 1364, 1378 (Fed. Cir. 2008) (amending claims in order to "facilitate prosecution" by electing which claims to pursue "is clearly nonsubstantive and does not help us in our analysis" of prosecution history estoppel).

[32] Certainly the applicant's response to the restriction requirement did not "unequivocally" disavow a construction along the lines proposed by Uship. *Omega*, 334 F.3d at 1324. For one thing, even assuming, *arguendo*, that the occurrence of the statement outside any discussion of patentability does not foreclose reliance upon it for prosecution history disclaimer, its context remains critical. The applicant was not attempting to distinguish his invention from the prior art,

question was one that PTO was requiring with respect to the patent claims overall. The statement at issue was made in response to the examiner's statement that the "process" claimed in the method claim was performed by hand. By expressing its disagreement with this statement, the applicant was merely making the point that the "process" was not performed entirely by hand. In that context, the applicant simply noted the basic fact that it had not "recit[ed] at each step that the step is performed by the automated shipping machine," while observing "that if the method were performed by hand as the Examiner suggests, then it would not use an automated shipping machine as set forth in the preamble." The simple point here was that the automated shipping machine would need to play at least *some* role in *some* aspects of the process. By no means does it follow naturally, much less inexorably (as the Defendants would contend), that the automated shipping machine must itself perform *each* and *every* aspect of the process. Thus, when it comes to construing the role of the automated machine in validation or any other aspect of the multi-step process, this statement from the prosecution history is at most ambiguous (*i.e.*, it might have applied to that step, some other step, or the steps as a whole) and therefore thoroughly unillumi-nating for present purposes.

   *Third*, even had the statement cited by the Defendants arisen in the context of prosecuting patentability, and even had it specifically addressed validation or some other aspect of the claim construction now at issue, it could not do the work that the Defendants would task it with. The maximum suggestion that might be squeezed from the statement – in the face of ambiguity that is rife, as explained above – is that validation would not be performed entirely "by hand." (Notably, that formulation adds further ambiguity insomuch as the role of a human attendant in performing

and was not otherwise seeking in any way to convince the examiner of the patentability of the invention.  Read in this context, there is no way that the statements can be read to constitute a clear and unmistakable surrender of claim scope.

validation as contemplated by one of the embodiments was in part a *visual* one.) This would sim-

ply mean that the machine was to play *some* role in validation, not the *exclusive* role. And even

in the fourth embodiment, the machine does perform some role in validation, as it prints the ship-

ping label that is, as defendants stress, the focus of the validation inquiry. In this sense, automa-

tion and the machine would still be contributing to the validation process under Uship's con-

struction, which is perfectly consistent with what the applicant told the PTO by any reading, as to

any step. In sum, this prosecution history, had it arisen in the context of patentability and had it

specifically concerned validation, would still be no basis for any patent history disclaimer – for it

is in harmony with the construction here advanced.

For these reasons, the prosecution history is no basis for the argument the Defendants are

attempting to build from it. Even were Defendants' reading of the relevant statements plausible,

that would not help the Defendants; as discussed above, there exist alternative readings that are

at least equally plausible and in no way at odds with the clear scope of the claim as described in

both the claim and the specification is. Thus, the prosecution history falls well short, in several

respects, of signaling the type of unambiguous and unmistakable intent on the part of the pat-

entee that would be required to restrict or narrow the scope of the term at issue. *Cf. Storage Tech.*

*Corp. v. Cisco Sys.*, 329 F.3d 823, 833 (Fed. Cir. 2003) (alleged disclaimer was not "a clear and

unambiguous disavowal of claim scope as required to depart from the meaning of the term pro-

vided by the written description").[33]

---

[33] At the claim construction hearing, the Government relied upon a number of Federal
Circuit decisions as support for its prosecution history disclaimer argument. Uship urges the
Court to closely study these decisions, for it will, we respectfully submit, find that none helps
defendants. For one thing, all of the decisions involved amendments or arguments made by the
applicant in order to distinguish prior art or otherwise overcome a rejection by the examiner. In
addition, all of them involved amendments or arguments that were clear and unmistakable, of a
stripe categorically different from the ambiguous passage relied upon by defendants in this case.

K.        **Limitation 10:  Storing a Validated Parcel**

The parties have reached agreement on a joint proposed construction for the "storing" li-

mitation of the '220 patent, but have not been able to agree on the proper construction of the dif-

ferently-worded "storing" limitation of the '014 patent.

| '220 Limitation 10: **an attendant of said customer storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.** |
|---|
| **Joint Construction** |
| a person assisting the customer stores the validated parcel or envelope in a secure storage area until a commercial delivery person picks up the parcel or envelope |

| '014 Limitation 10: **storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.** | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| storing a validated parcel or envelope in a secure storage area until a commercial delivery person picks up the parcel or envelope | the automated shipping machine stores the validated parcel or envelope in a secure storage area until a commercial delivery person picks up the parcel or envelope | the automated shipping machine stores the validated parcel or envelope in a secure storage area until a commercial delivery person picks up the parcel or envelope |

The primary dispute with respect to the "storing" limitation of the '014 patent concerns

whether it requires the shipping machine to itself store the item to be mailed. The Government's

and IBM's proposed construction answers this question in the affirmative. Their construction,

however, is contradicted by the specification, which could not be clearer in specifying that the

shipping machine itself is *not* necessarily required to perform the storage step. *See, e.g.,* specifi-

cation 25:4-6 (for one embodiment, retail clerk "places the package in an appropriate location for

subsequent pick-up by a commercial carrier"); 25:40-44 (customer deposits item with attendant,

who stores package in secure area); 29:16-18 (same). As the specification says, the system dis-

closed in one embodiment "is substantially simplified from the [other discussed embodiments]

---

*See Omega,* 334 F.3d at 1324 (discussed at Tr. 630); *Ormco Corp. v. Align Techn., Inc.*, 498 F.3d 1307, 1314-16 (Fed. Cir. 20070) (discussed at Tr. 630); *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325-27 (Fed. Cir. 2002) (discussed at Tr. 636, 638, 731); *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989 (Fed. Cir. 2003) (discussed at Tr. 804); *Fuji Photo Film Co. v. ITC*, 386 F.3d 1095, 1100 (Fed. Cir. 2004) (discussed at Tr. 732).

since the storage and validation process is performed by an attendant." Specification 25:45-47.

And the drawing that relates to this embodiment (Figure 20) depicts a shipping machine *without a storage unit*. Defendants' constructions, by focusing on the embodiments in which the item is stored within the shipping machine, improperly seek both to read limitations from the specification into the claim and to artificially confine the invention to particular embodiments.

IBM in its pre-hearing brief sought to explain away these passages by repeating its observation that there is no legal requirement that claims be construed to cover every embodiment. IBM Br. 126. That is true only as far as it goes. For a construction that would exclude a disclosed embodiment from the scope of the invention is legally disfavored, and can be adopted only if there is highly persuasive evidence that the embodiment at issue was clearly disclaimed from the scope of the invention. *See Oatey*, 514 F.3d at 1277; *Vitronics*, 90 F.3d at 1583. Neither defendant has even tried to identify any statement in the intrinsic record that could constitute such a clear disclaimer of scope.

IBM and the Government also pointed to Claim 1 of the '220 patent to suggest that the inventors knew how to call for storage using an attendant when that was their intent. IBM Br. 126; US Br. 85. But Claim 1 of the '220 patent shows only that the inventors knew how to draft claim language *requiring* the attendant to participate in the storage step. It does not and cannot override the unambiguous intrinsic evidence establishing that Claim 1 of the '014 patent *allows for* the attendant to participate in the storage step.

At the claim construction hearing, both the Government and IBM placed their primary emphasis on the same prosecution history from the '799 patent that they rely upon in connection with their "validation" argument. Tr. 799-805. For the same reason defendants' err in relying on the applicant's response to the restriction requirement in connection with the "validation" step,

they err with respect to this step as well. As discussed in detail above, because the applicant's response was not made in support of the patentability of the claims at issue, and because it does not come close to constituting a clear and unmistakable disclaimer of the claim scope disclosed in the written description, defendants' prosecution history argument must fail. In this regard, we note that just as the response to the restriction requirement does not suggest that the machine must *always* perform the validation step *in every aspect*, neither does it suggest that the machine must *always* perform the storing step *in every aspect*.[34]

---

[34] Finally, we note that while its proposed construction is itself silent on the point, the Government in its pre-hearing brief argued that the "storing" limitation not only requires that the storage area be part of the shipping machine, but also "requires performance and control by and through" the shipping machine. US Br. 85. It went on to explain that this means that "storage is automatically controlled by virtue of mechanisms controlled by the shipping machine such as, conveyor belt 340, inner door, 336, and slide lift motor 380," such that "[n]o human intervention is necessary." US Br. 86. It is not clear whether this remains the Government's position. If it does, it fails on multiple levels of analysis:  it improperly seeks to (1) limit a *method* claim to a particular description of a particular *apparatus*; (2) graft onto the simple term "storing" all kinds of extraneous activities (such as the automatic control of mechanisms such as conveyor belts, etc.) that do not, under any understanding of the English language, constitute "storing"; (3) import limitations into the claim from the specification; (4) confine the invention to particular embodiments discussed in the specification.

### III.   The '464 PATENT

### A.   Claim 7

#### 1)   Preamble

| | | |
|---|---|---|
| *Preamble*: **An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services: said automated unit comprising** | | |
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| An apparatus, machine, or system of machines for collecting and securely holding items for collection and shipment by commercial delivery services (including the USPS), which apparatus, machine, or system of machines is (1) incorporated into a unified or interrelated whole; (2) automatically controlled by mechanical or electronic devices; and (3) capable of being used by a customer when no attendant is present | **integrated:** incorporated into a unified whole<br><br>**automated:** automatically controlled by mechanical or electronic devices<br><br>**unattended:** no attendant is present<br><br>**unit:** a single apparatus | An integrated, automated, and unattended single apparatus for automatically collecting and securely holding items for collection and shipment by commercial delivery services, the automated single apparatus including: |

Uship has revised its proposed construction in order to eliminate unnecessary disputes among the parties and to account for the feedback offered by the Court at the hearing.[35] The principal remaining issue of contention is whether, as defendants contend, the term "integrated" or "unit" *requires* the entire invention to be contained within a single container. Recognizing that those terms also encompass a device whose elements are functionally harmonious and physically coordinated but not necessarily within a single physical container, Uship would modify the Government's construction of "integrated" – "incorporated into a unified whole" – by inserting "interrelated" as an alternative to "unified." And Uship would construe "unit" to mean "an apparatus, machine, or system of machines" rather than, as defendants do, "a single apparatus."

Although a dictionary must not be privileged over the specification when construing a patent, the Federal Circuit has made clear that it is entirely appropriate for "a judge [to] consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before

---

[35] After exchanging constructions with defendants on May 21, 2010, Uship again revised this construction in a further attempt to reach agreement on the proper construction.

reviewing the remainder of the patent to determine how the patentee has used the term." *Phillips*, 415 F.3d at 1324. Here, the dictionary affords useful insight into understanding the patentee's use of the terms at issue. The term "integrated" may refer to "combining or coordinating separate elements so as to provide a harmonious, interrelated whole" or "organized or structured so that constituent units function cooperatively." RANDOM HOUSE UNABRIDGED DICTIONARY 990 (2d ed. 1993) (attached as Exhibit N). Likewise, the term "unit" may refer to "a single thing," but also to "any group of things or persons regarded as an entity" or "a machine, part, or system of machines having a specified purpose." RANDOM HOUSE UNABRIDGED DICTIONARY 2074. Indeed, looking at another patent, the Federal Circuit recently held that the term "unit" encompassed "separate physical structures." *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1083-87 (Fed. Cir. 2009) (construing both "data acquisition unit" and "display unit").

With this understanding of the terms "integrated" and "unit" in mind, one can see that the patent encompasses the full range of these meanings, reflected in Uship's proposed construction, and that defendants' arguments beg the question. The specification portrays the invention as having myriad components and functions, all working harmoniously. *See, e.g.*, specification 2:7, 10, 17, 21, 26, 31, 51; 3:40-4:3, 10:55-11:18; Figures 1-10. The specification also uses the terms "unit" and "system" interchangeably. For example, the term "system" is used in the title of the patent – "System for Collecting and Shipping Items" – and in the three preferred embodiments, *see, e.g.*, specification 3:43-44 ("a system 10, constructed according to a first embodiment of the invention"); *id*. 10:45-47 ("second embodiment" described as being a "system"); *id*. 10:56-57 ("a system 210 constructed according to a third, preferred, embodiment"). Yet, the abstract's first sentence refers to the invention as a "unit," as do more than half of the 34 claims in the patent.

Further support for Uship's construction is found in the second embodiment of the inven-

tion, which depicts elements of the invention as being within separate physical containers. Specification 10:46-47 ("an adjunct packaging supply unit 120 is positioned to one side of the system 10"). This is not to say that the claim would cover any collection of elements no matter how disparate. Rather, as the second embodiment illustrates, the elements need still be physically and functionally coordinated – the adjunct unit sits next to the rest of the invention and provides "packaging materials such as wrapping material, heavy tape, or writing implements," which naturally complement the other functions provided by an apparatus for shipping packages.

Defendants' arguments boil down to stressing repeatedly that the claim refers to a *unit* and that the invention is *integrated*. For example, defendants highlight the passage in the abstract that describes an "integrated … unit" having "various pieces." Tr. 293, 302-03. Such circular analysis ignores the reality, noted above, that the terms "integrated" and "unit" are not necessarily restricted to a thing within a single physical container. After all, a scale, a computer, a card reader, and a secured storage zone all could be within separate containers and still be integrated into an harmonious, functionally interrelated, physically proximate whole.

The second significant issue regarding the preamble is how to construe "automated." Uship is willing to adopt the Government's construction: "automatically controlled by mechanical or electronic devices." The specification clearly describes an invention that, to a significant but not exclusive extent, uses mechanical or electronic devices to perform various functions. For example, the specification describes an embodiment containing a "control system," such as a "central processing unit (CPU)," which coordinates various input and output devices. *See, e.g.*, specification 3:50-67, 5:50-6:25, 10:62-11:7; Figures 1-6 (illus. 16, 22, 24, 26, 28, 30, 90, 102, 104, 106, 108); Figures 7-8, 10 (illus. 90, 102, 104, 106, 108, 218, 222, 224, 226, 230). The Government originally concluded its construction with the phrase "that take the place of hu-

mans." Uship would not include that phrase – and the Government's revision of this construction shows that it no longer would, either – because, as the Court observed at the claim construction hearing, "we don't have support for that [phrase] directly." Tr. 285-87, 308. Indeed, humans must participate in many of the functions that the invention performs, such as placing the package on the scale, swiping a credit card, entering the zip code, and placing the package in the storage zone. *See* specification 6:43-44, 6:62-63, 7:21-22, 7:56-57, 8:9-13.

The third significant dispute between the parties relates to the meaning of the term "unattended." Whereas the Government's construction focuses on whether an attendant is actually present or not, Uship's focuses on whether the presence of an attendant is necessary for the invention to function. In describing "unattended drop-boxes in which a customer may place a pre-addressed package or letter," the specification explains that such devices typically "cannot provide full insurance protection or verification that the package was in fact mailed, since no attendant is present to verify that the letter was actually placed in the box." Specification 1:37-40. (This passage provides the only reference in the specification to the presence of an attendant.) Such unattended drop-boxes are undoubtedly *capable* of being used when no attendant is present – the customer surely can place the pre-addressed package or letter in the box without help. It is reasonable to presume that "no attendant is present" given that the drop-box is capable of being used when no attendant is present, but that natural presumption must not be turned into a limitation on the claim. Reading the claim to require that no attendant *actually* be present would absurdly ascribe to the patentee the intention to have the success of a potential infringement claim depend upon whether the infringer happens to have assigned someone to stand next to the infringing shipping kiosk (regardless of whether the kiosk was capable of operating without someone standing nearby). An accused device would then shift between infringing and noninfringing

52

depending upon such vagaries as whether the attendant was taking a bathroom break.

Finally, Uship's construction would make clear that the USPS qualifies as a "commercial delivery service" covered by the claim. The PTO acknowledged during prosecution of the parent patent (5,340,948) that that patent's claims were "drawn to a postal system for processing parcels for mailing." PTO Notice re "Restriction Requirement" (G000581) (Jun. 4, 1993) (attached as Exhibit O). Defendants do not seem to disagree with this clarification, but Uship would make explicit the reach of this term in order to eliminate any potential doubt.

### 2) Limitation 1: Weighing the Item

The parties have agreed upon a joint proposed construction for this limitation.

| *Limitation 1*: **means for weighing the item to be shipped** |
| --- |
| **Joint Construction** |
| **function:** weighing the item to be shipped<br>**structure:** electronic scale 22 or 222 |

### 3) Limitation 2: Inputting Destination Information

| *Limitation 2*: **means for inputting information relating to the destination to which the item is to be shipped** | | |
| --- | --- | --- |
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| **Function:** inputting information relating to the destination to which the item is to be shipped | **Function:** to input information relating to the place to which the item is to be shipped | **function:** inputting information relating to the place to which the item is to be shipped |
| **Corresponding Structure:** keypad (2) or keyboard (226) or voice-recognition mechanism; and equivalents | **Corresponding Structure:** keypad (28); keyboard (226) | **structure:** keypad 28 or keyboard 226 |

The parties agree that this is a means-plus-function claim limitation subject to § 112 ¶ 6, and they agree that the function is "inputting information relating to the destination to which the item is to be shipped," except that the Government and IBM would substitute the word "place" for the word "destination" in the function. In the context of the '220 and '014 patents, the Government and IBM define "destination" as "the place to which the parcel or envelope is to be mailed, including at least the name, street address, and zip code of the place." In its treatment of

the those patents, Uship shows that defendants' construction of "destination" is wrong and that zip code is all that "destination" requires. *See supra* at 20-25. If defendants' use of "place" here (and in other constructions of '464 claims) is intended to smuggle in their construction of "destination" from the other patents, then it is similarly wrong in the context of the '464 patent. *See* specification 8:9-12 ("control system … instructs the customer to take the label from the printer, to write the mailing address onto the label [and] to place the label on the package"); *id*. 13:14 ("customer enters complete addressing information").[36]

The parties are in accord that the corresponding structure as described in the specification includes, alternatively, a key pad (28) and a keyboard (226). *See, e.g.*, specification 2:38-41, 58-61, 3:66, 5:50-6:13, 7:20-25, 13:13-15; *see also, e.g.*, Figures 5, 10. Uship would include a third alternative structure found in the specification: a "mechanism that recognizes voices and is adapted to be controlled by the spoken words." *See* specification 5:50-56.[37] The next sentence of the specification establishes the link between the voice-recognition mechanism and the destination information: "For example, the Name and address of the recipient may be inputted by vocal-

---

[36] Defendants have criticized Uship repeatedly for "truncat[ing]" the functions in means-plus-function limitations. *See, e.g.*, Tr. 344. As Uship has said before, this is a mere technicality because the portions of the claim limitations after the "means for" phrase that Uship omitted from its prior function definitions do not affect the construction. In any event, except where otherwise noted below, Uship has revised its proposed constructions to include all of the terms after the "means for" phrases in the asserted claims. It is notably strange that defendants would attempt to replace the word "destination" with the word "place" in this limitation, particularly given their insistence that the function is "the part that comes after the for. And you've got to stick exactly to the function." Tr. 332.

[37] Uship's construction for this limitation and all other means-plus-function limitations also makes explicit what is statutorily mandated: that the corresponding structure also includes "equivalent" structures. *See* § 112 ¶ 6 (claim "shall be construed to cover the corresponding structure … described in the specification *and equivalents thereof*") (emphasis added).

izing the name and address of the recipient." Specification 5:55-56.[38]

### 4)   Limitation 3A: Analyzing and Calculating

| | | |
|---|---|---|
| *Limitation 3A*: **control means for analyzing the inputted information and calculating the fee for shipment of the item** | | |
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| **Function:** analyzing the inputted information and calculating the fee for shipment of the item<br><br>**Corresponding Structure:** control system (100) including: CPU (102) in two-way communication with PLC (104); zone and weight charts and corresponding fee files; and equivalents | **Function:** to analyze the inputted information relating to the place to which the item is to be shipped, and to calculate the shipment fee<br><br>**Corresponding Structure:** control system (100) including: (1) CPU (102) in two-way communication with PLC (104); and connections to scale (22) and keypad (28) / keyboard (226)<br><br>*The means-plus-function limitation lacks sufficient corresponding structure* | **function:** analyzing the inputted information relating to the place to which the item is to be shipped, and calculating the fee for shipment of the item<br><br>**structure:** control system 100 including: (1) CPU 102 in two-way communication with PLC 104; and (2) connections to scale 22 and keypad 28 / keyboard 226<br><br>[lacks sufficient structure for analyzing the inputted information and calculating the fee] |

The parties agree that this is a means-plus-function limitation, and that the corresponding structure for the control means includes a central processing unit ("CPU") in two-way communication with the program logic controller ("PLC"). *See* specification 5:61-64. But the parties disagree about the corresponding structure in two respects. First, unlike defendants, Uship would not include the "connections" between the control system and the various input devices, such as the scale and keypad.[39]  The connections are not properly considered corresponding structure because, although they might "enable[]" the analyzing and calculating, they do "not actually perform [those] functions." *Asyst Tech., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370-71 (Fed. Cir. 2001) ("notwithstanding that other components of the system enable the data processor to operate in the intended fashion, we do not regard those components – or the connections between

_____

[38] That the voice-recognition mechanism is used in an example to collect "name and address" does not mean that "information relating to the destination" necessarily requires a full address rather than merely a zip code, as just discussed.

[39] If the connections are included as corresponding structure, then the connection to the voice-recognition mechanism must also be included as alternative structure. *See supra* at 54-55.

those components and the data processor, such as [the communication] line 51 – to be part of the structure that performs the functions identified in the 'data processing means' limitation").

Second, defendants contest the sufficiency of the specification in disclosing corresponding structure. Specifically, they maintain that the specification discloses a general purpose computer (the CPU) but not the requisite algorithm for performing the claimed functions of analyzing and calculating. In cataloguing the corresponding structures disclosed in the specification, however, defendants turn a blind eye to a critical set of structures, namely, the zone and weight charts and corresponding fee files. As explained presently, the specification's description of those charts and files provides adequate definition to the corresponding structures.

"It is well settled that 'if one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language.'" *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009) (quoting *In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (*en banc*)). This requirement derives not from paragraph 6 of § 112 – the means-plus-function paragraph – but rather from paragraph 2 of that section. *See id.* "Claim definiteness … depends on the skill level of a person of ordinary skill in the art." *AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007). Although a disclosure is not sufficient just because "an ordinarily skilled artisan might be able to design" a structure to perform the function, *Blackboard*, 574 F.3d at 1385, the standard is "not lofty," *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1341 (Fed. Cir. 2008). A disclosure is sufficient if "a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification. If the claims when read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more." *S3 Inc. v. nVIDIA*

*Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001) (quotation marks omitted).

Thus, "when a computer is referenced as support for a function in a means-plus-function claim, [§ 112 ¶ 2 requires] some explanation of how the computer performs the claimed function." *Blackboard*, 574 F.3d at 1384. "[T]he structure disclosed in the specification [must] be more than simply a general purpose computer or microprocessor"; it must include "an algorithm for performing the claimed function." *Id.* (quotation marks omitted). But, consistent with the general principles just recited, the specification need not disclose actual computer code or the entire algorithm. *See Aristocrat Techs. Australia PTY Ltd. v. International Game Tech.*, 521 F.3d 1328, 1338 (Fed. Cir. 2008) ("not required to produce a listing of source code or a highly detailed description of the algorithm to be used to achieve the claimed functions").[40]  Rather, "[i]n software cases …, algorithms in the specification need only disclose adequate defining structure to render the bounds of the claim understandable to one of ordinary skill in the art." *AllVoice Computing*, 504 F.3d at 1245. Thus, "[t]he correct inquiry is to look at the disclosure of the patent and determine if one of skill in the art would have understood that disclosure to encompass software for [performing the function] and been able to implement such a program …." *Blackboard*, 574 F.3d at 1385 (quotation marks and emphasis omitted); *Aristocrat*, 521 F.3d at 1337 ("the sufficiency of the disclosure of algorithmic structure must be judged in light of what one of ordinary skill in the art would understand the disclosure to impart").

Defendants bear the burden of proving by clear and convincing evidence that the specification fails to satisfy this standard for definiteness. *AllVoice Computing*, 504 F.3d at 1245; *see Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376-77 (Fed. Cir. 2009) ("an al-

---

[40] *See also Finisar*, 523 F.3d at 1340 ("This court permits a patentee to express that algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.") (citation omitted); *AllVoice Computing*, 504 F.3d at 1245.

leged infringer who raises invalidity as an affirmative defense has the ultimate burden of persuasion to prove invalidity by clear and convincing evidence, as well as the initial burden of going forward with evidence to support its invalidity allegation").

Here, defendants cannot carry their heavy burden of proving indefiniteness. The specification discloses that the control system is "programmed" with "the appropriate zone and weight charts for all client delivery services … [and] the corresponding fee files which correspond to each client delivery service at that desired location." Specification 6:30-36. The control system "analyzes" the inputted information by using the destination information to look up the corresponding zone on the zone chart.[41] Next, once the weight of the item to be shipped has been obtained, the control system will "automatically calculate the charges that are to be applied to the credit or debit card account." Specification 7:48-55. The control system does this by, again, looking up the shipment fees on the zone and weight charts and corresponding fee files – the combination of the zone and the item's weight defines a set of fees for the available services (*e.g.*, ground, overnight).[42]  A "table lookup" is a well-known and foundational programming operation, which needs no elaboration for one skilled in the art. *See* Wikipedia, "Table Lookup," *at* <http://en.wikipedia.org/wiki/Lookup_table>. The descriptions relating to the zone and weight charts and fee files, therefore, disclose enough about the algorithm to enable one skilled in the art to understand and implement this program.

Ample precedent supports this conclusion. For example, in *In re Dossel*, the patent claimed "a device that receives digital data words from a memory and data input from a user"

---

[41] For examples of zone charts for commercial delivery services, see USPS, "Postal Zone Charts," *at* <http://postcalc.usps.gov/zonecharts/>, and UPS, *2010 Daily Rates*, p.27 (attached as Exhibit P).

[42] For examples of rate charts for commercial delivery services, see USPS, *Price List*, p.2 (attached as Exhibit Q), and UPS, *2010 Daily Rates*, p.28 (Ex. P).

and "then computes, from the received data, the current distribution by mathematical operations including a matrix inversion or pseudo inversion, and then outputs the result to a display." 115 F.3d 942, 946-47 (Fed. Cir. 1997). The functions were to be "implemented by or on a general or special purpose computer." *Id*. at 947. The Court of Appeals observed: "While the written description does not disclose exactly what mathematical algorithm will be used to compute the end result, it does state that 'known algorithms' can be used to solve standard equations which are known in the art." *Id*. at 946. This disclosure, the court held, was "adequate" to satisfy § 112 ¶ 2. *Id*. at 947. Likewise, in *Atmel Corp. v. Information Storage Devices*, the Court of Appeals found adequate a specification that merely stated, "known Circuit techniques are used to implement high-voltage circuit" and cited an academic article. 198 F.3d 1374, 1382 (Fed. Cir. 1999).

IBM's assertion that the Court of Appeals' later decision in *Aristocrat* "extinguished" *Dossel*, Tr. 360, is demonstrably false. *Aristocrat* actually *dis*tinguished *Dossel*. Whereas the specification in *Dossel* disclosed some structure, the specification in *Aristrocrat* disclosed "no algorithm at all" – it only specified a "standard microprocessor" with "appropriate programming." *Aristocrat*, 521 F.3d at 1334-37. Indeed, the total absence of any algorithm in the specification is the element common to the decisions finding insufficient the disclosure of structure for a means-plus-function claim implemented by or on a computer. *See Blackboard*, 574 F.3d at 1383 ("The specification contains no description of the structure or the process that the access control manager uses to perform the 'assigning' function.").[43]   In contrast, the specification here

---

[43] *See also Finisar*, 523 F.3d at 1340-41 ("[T]his passage provides no algorithm or description of structure corresponding to the claimed function. … Simply reciting 'software' without providing more detail about the means to accomplish the function is not enough."); *Net Moneyin, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1367-68 & n.3 (Fed. Cir. 2008) (plaintiff conceded that "[t]here is nothing in the written description that expressly states what is going on inside that bank computer"); *WMS Gaming, Inc. v. International Game Tech.*, 184 F.3d 1339,

discloses significant corresponding structure, beyond a general purpose computer, for analyzing the inputted information and calculating the shipment fee.

### 5)   Limitation 3B: Receiving Credit Card Information

The parties have agreed upon a joint proposed construction for this limitation.

| *Limitation 3B*: **said control means further including means for receiving credit card information and** |
|---|
| **Joint Construction** |
| **[Means-plus-Function]**<br><br>**Function:** to receive credit card information<br><br>**Corresponding Structure:** card reader (30, 230) |

### 6)   Limitation 3C: Communicating and Assessing

| *Limitation 3C*: **means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines** | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| **PRIMARY CONSTRUCTION:**<br><br>Telephone lines used to communicate and assess the shipment fee to the account of the person owning the credit card<br><br>**ALTERNATIVE CONSTRUCTION:**<br><br>**Function:** communicating and assessing the shipment fee to the account of the person owning the credit card<br><br>**Corresponding Structure:** telephones lines connected to control system (100); or telephone lines connected to card reader (30, 230); and equivalents | **Function:** to communicate and assess the shipment fee to the account of the person owning the credit card<br><br>**Corresponding Structure:** card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card | **function:** communicating and assessing the shipment fee to the account of the person owning the credit card<br><br>**structure:** magnetic card reader 30 or 230 connected to a dedicated telephone line |

The parties agree that this limitation is implemented by telephone lines, but they do not agree on much else regarding this limitation. The principal disagreement is about whether the telephone line must be "dedicated." That disagreement, in turn, revolves around a dispute regard-

---

1348-49 (Fed. Cir. 1999) (reference in specification to "an algorithm executed by a computer" was inadequate).

ing whether and how the means-plus-function statute (§ 112 ¶ 6) applies here. "Use of the word 'means' in claim language creates a presumption that § 112 P 6 applies. [But] [i]f, in addition to the word 'means' and the functional language, the claim recites sufficient structure for perform-ing the described functions in their entirety, the presumption of § 112 P 6 is overcome – the limi-tation is not a means-plus-function limitation." *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008) (citation omitted); *see Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004); *Phillips*, 415 F.3d at 1311 ("Means-plus-function claim-ing applies only to purely functional limitations that do not provide the structure that performs the recited function."). Here, the limitation's use of "means" and subsequent functional language creates a presumption that § 112 ¶ 6 applies, but that presumption is rebutted because the claim itself explicitly identifies "telephone lines" as the structure performing the stated function. Con-sequently, there is no warrant for reading the specification's description of the invention into the claim with respect to this limitation.

Defendants disagree that the presumption § 112 ¶ 6 has been overcome. They maintain that the recitation of "telephone lines" in the claim limitation "does not disclose enough structure to do the entirety of the function here" because, although telephone lines "communicate," they don't "do assessing." Tr. 373. Defendants thus would grant themselves license under § 112 ¶ 6 to read into the claim limitation the specification's description of the card reader "connected to a *dedicated* telephone line." Specification 7:1-2 (emphasis added). But defendants err in assuming that the telephone lines are not up to the task of assessing the shipment fee. The telephone lines "assess" the fee by communicating the charge information to the appropriate processor (*e.g.*, the bank or credit card company); the telephone lines are the mechanism by which the invention causes the fee to be assessed to the card owner's account. *See* specification 7:1-4.

Even if defendants were right that the telephone lines are insufficient to perform the "assessing" function, and therefore that the means-plus-function presumption obtains, their effort to treat the "dedication" of the telephone line and the card reader as corresponding structure would still be misguided. Defendants' argument depends upon the assumption that there is a single means performing both the assessing function and the communicating function. This assumption is false. The word "means" standing alone may be either singular or plural, and consequently, a claim referring to "a means for doing x and y … could potentially be ambiguous about whether the limitation required one means for performing both functions x and y, or simply one means for performing function x and one (potentially different) means for performing function y." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1115 (Fed. Cir. 2002). But if, as defendants contend, "communicating" and "assessing" are truly distinct functions (rather than, as explained above, two dimensions of the same transmission of information across telephone lines), then the balance of the limitation compels the conclusion that there must be a distinct means for each function because the claim explicitly states that the "means for communicating" – rather than the "means for communicating and assessing" – is the "telephone lines." Consequently, a separate means-plus-function analysis would be necessary for each of these means.[44]

Uship here provides a separate means-plus-function analysis for each means as an alternative construction to its primary construction detailed above. With respect to the "means for communicating," the claim would overcome the means-plus-function presumption of § 112 ¶ 6

---

[44] In contrast, the Court of Appeals has found the word "means" to be singular despite being followed by two distinct functions when, unlike here, it was modified by an adjective that unambiguously implied that there was only one means performing both functions. *See Cardiac Pacemakers*, 296 F.3d at 1115 ("the language of the claim" – "*third* monitoring means for monitoring ... [and] for activating" – "compels the conclusion that the same means must perform both functions") (emphasis added and omitted); *Asyst*, 268 F.3d at 1372 ("The '*fourth* means' assigns two functions to the means – controlling activities on the workstation and transmitting information to the transportable container.") (emphasis added).

because the "telephone lines" explicitly recited in the claim afford sufficient structure for per-

forming the "communicating" function in its entirety. Thus, again, there would be no warrant for

reading the specification into the claim limitation in this context and therefore no basis for re-

quiring the telephone lines to be "dedicated." With respect to the distinct "means for … assess-

ing," the presumption of § 112 ¶ 6 would not be rebutted because no part of the claim would re-

cite distinct structure for that function, and therefore we would need to turn to the specification.

Defendants are partially correct in identifying the card reader as corresponding structure. The

specification states that the card reader "*may* be connected" to a telephone line, specification 7:1-

4, but the specification also depicts the telephone line being connected directly to the control sys-

tem, fig. 10. Consequently, the corresponding structure for the "means for assessing" would be

both the card reader and the control means (as alternatives). *See Micro Chem., Inc. v. Great*

*Plains Chem. Co.*, 194 F.3d 1250, 1258-59 (Fed. Cir. 1999) (claim "embrace[s] each" corre-

sponding structure in specification).

       Finally, even if the recitation of "telephone lines" in this claim limitation did not rebut the

presumption of § 112 ¶ 6, defendants would still be wrong to construe the claim to require that

the telephone lines be "dedicated." "Section 112 paragraph 6 does not permit incorporation of

structure from the written description beyond that necessary to perform the claimed function."

*Asyst*, 268 F.3d at 1369-70 (quotation marks omitted); *see also, e.g.*, *Golight*, 355 F.3d at 1334

("these structures are superfluous to our claim construction analysis because they are not re-

quired for performing the claimed function"). The telephone lines are capable of communicating

(and assessing) the shipment fee regardless of whether the lines are "dedicated." Indeed, figure

10 of the specification depicts the telephone lines without any indication that they are "dedi-

cated." Because they are unnecessary to perform the claimed function, the "dedication" of the

telephone lines cannot be part of the corresponding structure.[45]

### 7)     Limitation 4: Securely Storing the Item

| *Limitation 4*: **means for securely storing said item until the item is collected by said commercial delivery service;** | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| **Function:** securely storing the item<br><br>**Corresponding Structure:** storage area (14) secured by inner doors (52, 54); or storage area (276) secured by inner door (246); or a collection space (96) secured by dump drop (92); and equivalents[46]<br><br>**until the item is collected by said commercial delivery service:** *Plain meaning* | **Function:** to securely store said item in a secured area for storage until the item is collected by said commercial delivery service<br><br>**Corresponding Structure:** storage area (14) defined within outer housing (12), security mechanism (50), a pair of inner doors (52, 54);<br><br>**or**<br><br>storage area (276) defined within outer housing (211), outer door (234), inner door (246);<br><br>**or**<br><br>collection space (96) defined within outer housing (12), access door (86), lock (87) | **function:** securely storing the item in a secured area for storage until the item is collected by said commercial delivery service;<br><br>**structure:** outer door 42; inner doors 52 and 54, stepper motor 58, secure zone 14, guide structure 74<br><br>OR<br><br>outer door 234, temporary holding space 240, inner door 246, stepper motor 248, secure zone 276, powered conveyer 242, passive parcel distribution device 264<br><br>OR<br><br>dump drop 92, incline chute 94, collection space 96 |

The parties agree that this is a means-plus-function limitation, but they have only partial

agreement on the function and corresponding structure. We begin with the function. Defendants

---

[45] IBM maintains that Uship cites *Asyst* "incorrectly"; according to IBM, "what *Asyst* stands for is that [if] the specification … discloses a number of structures that are associated with that function, and some of them are necessary and some of them are optional or would just be helpful[,] [t]hen you don't go beyond the ones that are identified as necessary." Tr. 377. *Asyst*, however, says nothing of the sort. Rather, *Asyst* and other authorities make clear that if the specification discloses sufficient structure to perform the function, further disclosed structure that is unnecessary to perform the function is not "corresponding structure" under § 112 ¶ 6. Put another way, unnecessary structure is not "clearly linked" to the function. *See Golight*, 355 F.3d at 1334-35 ("[T]o the extent the assembly contains particular structures for permitting rotation through 360 degrees, such as the follower pin 64 and slot 65, these structures are superfluous to our claim construction analysis because they are not required for performing the claimed function.") (citing *Asyst*, 268 F.3d at 1370). But even if the Government's reading of *Asyst* were correct, it would still yield the same result because, as explained in text, the specification discloses two telephone line structures – one "dedicated," specification 7:2, and one not, fig.10 – and therefore, because the "dedication" is unnecessary, "you don't go beyond" the undedicated one when identifying the corresponding structure.

[46] After exchanging constructions with defendants on May 21, 2010, Uship revised this construction in a further attempt to reach agreement on the proper construction.

contend that Uship is improperly truncating the function by omitting the phrase "until the item is collected by said commercial delivery service." *See* Tr. 398-99. According to IBM, the statement of the function "comes after [the means] for" in a claim limitation and "[y]ou can't stop" after that – that is, all the words after the phrase "means for" are part of the function. Tr. 397-98. Defendants have offered several authorities in support of their approach to defining the function for a means-plus-function claim, but not one pans out. Rather, passages from those decisions upon which defendants rely establish two more modest propositions: (1) "The phrase 'means for' … is typically followed by the recited function and claim limitations," *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003) (emphasis omitted); and (2) "[i]n identifying the function of a means-plus-function claim, a claimed function may not be improperly narrowed or limited beyond the scope of the claim language," *id*.[47]

In defining the function by reference to some but not all of the words after the phrase "means for," Uship violates neither of these principles. Indeed, *Lockheed*, defendants' principal authority in this context, itself violated defendants' purported rule that the function is defined by all the words after the phrase "means for" when it held: "The function [there] is properly identified as the language after the 'means for' clause *and before the 'whereby' clause, because a whereby clause that merely states the result of the limitations in the claim adds nothing to the substance of the claim*." 324 F.3d at 1319 (emphasis added). *Lockheed* thus illustrates the more

---

[47] *See also JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1331 (Fed. Cir. 2005) (A "court may not construe a means-plus-function limitation by adopting a function different from that explicitly recited in the claim. … Because there is no indication from the claim language that the structure must allow for the 'unlocking' or 'releasing' of the controller, the district court's first construction cannot stand.") (quotation marks omitted); *Creo Prods. v. Presstek, Inc.*, 305 F.3d 1337, 1346 (Fed. Cir. 2002) ("[I]t is improper to restrict a means-plus-function limitation by adopting a function different from that explicitly recited in the claim."); *Generation II Orthotics, Inc. v. Medical Tech., Inc.*, 263 F.3d 1356, 1364 (Fed. Cir. 2001) (district court erred in "restrict[ing] the meaning of 'controlled' to require control of the inclination of the arms 'throughout the range of motion of the pivotable joint'").

pertinent command – with which only Uship's statement of the function complies – that only those words that recite a *function* are part of the definition of the function, for only those words "add[] … to the substance of the claim." *Id*. The phrase "until the item is collected by said commercial delivery service" describes the duration for which items may be securely stored, which is a result of their being securely stored in the meantime; the moment of collection is merely the consequence of when the delivery service happens to arrive to collect the items, not a consequence of any particular structure in the invention. Therefore, the phrase "until the item is collected by said commercial delivery service" is not part of the function for purposes of § 112 ¶ 6. *See BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1343-44 (Fed. Cir. 2002) (phrase "positioned for electrostatically charging the filaments … before they are deposited on said collection surface to form a web" was not part of function for purposes of § 112 ¶ 6 even though it followed "means" because it described where means was "located").

As for the corresponding structure, the parties agree that it includes a storage area (14, 276), which is secured by either a pair of inner doors (52, 54) or a single inner door (246), or a collection space (96).[48] *See* specification 4:25-26, 5:32-45, 11:25, 11:39, 11:54-60; Figures 1, 3, and 6-9. Uship and IBM further agree that the collection space is secured by a dump drop (92). *See* specification 5:35-38. But defendants would also incorrectly include a number of other structures found in the specification. Consider first the access door (86) and lock (87), which would be included by the Government. These structures are not corresponding structure because they do "not actually perform [the] function[]" of securely storing the item. *Asyst*, 268 F.3d at 1370; *see also id.* at 1369-70 ("Section 112 paragraph 6 does not permit incorporation of structure from the written description beyond that necessary to perform the claimed function") (quotation marks

---

[48] For clarity and convenience, Uship uses the phrase "storage zone" to encompass both the storage areas (14, 276) and the collection space (96).

omitted); *Golight*, 355 F.3d at 1334 ("these structures are superfluous to our claim construction analysis because they are not required for performing the claimed function"). In fact, they are hardly related to that function. Rather, they address how the commercial delivery service accesses the items in the storage zone and removes those items from the storage zone. *See* specification 5:21-27.[49]

Most of the additional structures identified by defendants – outer door (42, 234), stepper motor (58, 248), guide structure (74), temporary holding space (240), powered conveyer (242), passive parcel distribution device (264), and incline chute (94) – are means not for securely storing the item but for transferring the item into the secure storage zone, either directly from the customer or through a temporary storage space, or distributing the items in a particular way within the storage area. *See* specification 4:18-5:20, 8:21-55, 11:7-12:36. It is the "inner door," and not these peripheral items, that, as IBM put it at the claim construction hearing, "keeps [the item] secure so that you can't get your hands in there." Tr. 401. Consequently, although these other structures may "enable[]" the secure storage of the item, they are not corresponding structure because they, again, do "not actually perform [that] function[]" and are unnecessary to that function. *Asyst*, 268 F.3d at 1369-71; *see Golight*, 355 F.3d at 1334. IBM seemed to maintain at the hearing that Uship's omission of the "until" clause from the function causes Uship to err by also omitting these additional structures. *See* Tr. 398-405. That argument is a *non sequitur* – these structures either have nothing to do with the duration of the storage or relate to *temporary* storage that ends when the item is moved into the permanent (or indefinite) storage zone for later

---

[49] If, however, the phrase "until the item is collected by said commercial delivery service" should be included in the function (and it should not, as shown above), then Uship concedes that the access door (86) and lock (87) may be corresponding structure. But in that event, the corresponding structure should also include, alternatively, a door (36, 278) with a "key-type lock" or a "combination or code type lock." Specification 4:5-9, 5:17-20, 12:37-41.

collection by the delivery service. As IBM recognized at the hearing, a "temporary area" cannot be corresponding structure for the function of securely storing the item until it is collected by the delivery service (it is thus unclear why IBM continues to include such structures in its construction of this limitation). Tr. 398, 404-05. Therefore, regardless of whether the "until" clause is part of the function, these structures are not corresponding structure.[50]

Finally, IBM and Uship are in accord that the outer housing (12, 211) is not properly considered corresponding structure. The Government, however, would include the outer housing with respect to the two alternative constructions it proposes involving the storage area (14, 276). Regardless of whether the Government is right to include the outer housing, two qualifications must be understood. First, all parties seem to agree that the third alternative structure, involving the collection space (96) (and, at least according to Uship and IBM, the dump drop), does not include the outer housing. The specification makes no reference to an outer housing in the context of describing the collection space. *See* specification 5:39-49, 8:13-19. Second, even if an outer housing were corresponding structure for the storage area or collection space, it would not follow that the storage area or collection space was required to be within a single container with all the other components of the invention, for reasons explained in the discussion above of the terms "integrated" and "unit" in the preamble. *See supra* at 49-51.

### 8)      Limitation 5A: Storing the Inputted Information

| Limitation 5A: **means for storing the inputted information once said item is disposed in said secured storage means,** | | |
| --- | --- | --- |
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| **Function:** storing the inputted information<br><br>**Corresponding Structure:** control | **Function:** to store the inputted information relating to the place to which the item is to be shipped once | **function:** storing the inputted information relating to the place to which the item is to be shipped once the |

---

[50] The Government would also include the security mechanism (50). This adds nothing to the structure, however, because that term is used by the specification merely to encompass other structures already identified by the Government. *See* specification 4:26-39.

| | | |
|---|---|---|
| system (100) including CPU (102) in two-way communication with PLC (104); and equivalents<br><br>**once said item is disposed in said secured storage means:** *Plain meaning* | the item is disposed in said secured storage means<br><br>**Corresponding Structure:** control system (100) including: (1) CPU (102) with CPU memory in two-way communication with PLC (104); and (2) PLC (104) connected to first sensor (112) or third sensor (116) | machine determines that the item was disposed in the secured storage means<br><br>**structure**: control system 100 including: (1) CPU 102 with memory in two-way communication with PLC 104; and (2) PLC 104 connected to first sensor 112 or third sensor 116 |

The parties agree that this is a means-plus-function limitation, but they have only partial agreement on the function and corresponding structure. The pattern of this dispute is quite similar to the dispute with respect to the previous limitation. Again, defendants contend that Uship is improperly truncating the function, this time by omitting the phrase "once said item is disposed in said secured storage means." *See* Tr. 419-20, 434. But as shown above, omitting some language after the "means for" phrase from the definition of the function is a sin only if that language adds to the substance of the claim by reciting an actual function. *See Lockheed*, 324 F.3d at 1319; *supra* at 65-66. The "once" clause here does not. Rather, it identifies a moment when the real function – storing the inputted information – is operating. The composition of this limitation is therefore similar to that of the limitation in *BBA Nonwovens Simpsonville*, which stated: "corona means [*i.e.*, means for forming a corona,] cooperating with said attenuator and positioned for electrostatically charging the filaments … before they are deposited on said collection surface to form a web." 303 F.3d at 1343-44. The Court of Appeals held: "Rather than reciting the function of the corona means, the expression following the word 'positioned' describes where the corona means is located and is a separate limitation not subject to section 112, paragraph 6. What the 'corona means' is and where it is located are two different things." *Id*. at 1344. Similarly, what the "means for storing the inputted information" is and when it may be operating are two different things. Therefore, the "once" clause is not part of the function for purposes of

§ 112 ¶ 6.

As for the corresponding structure, the parties agree that it encompasses the control system (100), including the CPU (102) in two-way communication with the PLC (104). Uship would go no further because these are the only structures in the specification that are described as having memory in which to store information and thus the only structures that are linked to the function. *See* specification 6:12-13, 7:1, 10:26-30. Defendants agree that only the control system has memory in which to store information. *See* Tr. 419, 422-23. Yet, they insist that the corresponding structure includes sensors (112, 116). Defendants' theory is that the control system's storage of inputted information is triggered for the first time by a sensor's detection of an item being deposited in the storage zone. *See* Tr. 421-27. In defendants' view, the sensors are corresponding structure because they are linked to the phrase "*once* said item is disposed in said secured storage means," which they in effect construe to mean "*after and not until* said item is disposed in said secured storage means." Defendants' argument fails, therefore, because, as just explained, the "once" clause is not part of the function and therefore structures described in the specification that (purportedly) correspond to it may not be read into the limitation. *See, e.g.*, *Asyst*, 1370 ("Structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations.").

But even if the "once" clause were part of the function, the sensors still would not qualify as corresponding structure. The specification provides no warrant for construing the phrase "*once* said item is disposed in said secured storage means" to mean "*after and not until* said item is disposed in said secured storage means." In fact, the specification contradicts such a construction. The specification describes a multi-step process in which various information is input prior to the deposit of the item to be shipped, for example: the customer places the item on the scale,

which obtains the weight of the item, specification 6:39-58; then the customer swipes a credit card through the card reader, which obtains information relating to the card and account, specification 6:54-7:13; then the customer enters the zip code, specification 7:20-24; then the system "evaluates the [zip] code against certain criteria," specification 7:24-30; then, after the customer enters the size of the package, the system "re-weigh[s]" it in order to "determine[ whether] the weight of the package has changed since the original weighing," specification 7:41-44; then the system calculates the shipping charges, which depend upon the weight of the package and the zip code, specification 7:48-51; then the system asks the customer to review and either approve or change "any previous entries," specification 7:59-8:3; and then, using "previously input information," the system determines whether the package is an envelope, package, or parcel and directs the customer to the appropriate deposit location, specification 8:13-25. Finally, after this long process, the specification provides: "When the first sensor 112 (or the third sensor 116 in the case of the dump drop) senses the presence of an envelope, parcel or package, control system 100 stores information relating to the transaction in CPU 102." Specification 8:43-47.

These passages from the specification make clear that the sensors are not triggering the storage of information in the control system for the first time, but rather that the information is being stored in the control system as soon as it is being input and retained until the deposit of an item is sensed. If the control system did not store the inputted information until the deposit of the item was sensed, as defendants maintain, it could not store the information at the time the deposit is sensed, either, because that information, much of which was entered long before the deposit, would have vanished by then. The information can be available at the time of the deposit of the item only if it was stored when it was initially input. Indeed, throughout this lengthy process, the system performs operations using previously entered information, such as comparing the current

and previous weights of the item, evaluating the zip code against certain criteria, calculating the shipping charges using the zip code and weight, and allowing the customer to review and alter previous entries. These operations would be impossible if the information were not already stored prior to the detection of the item being deposited. In short, by in effecting converting "once" to "after and not until," defendants improperly "narrow [and] limit [the function] beyond the scope of the claim language" – which is the genuine sin found in the decisions defendants miscited for the purpose of criticizing Uship's alleged improper "truncating" of functions. *Lockheed*, 324 F.3d at 1319; *see also, e.g.*, *JVW Enters.*, 424 F.3d at 1331; *supra* at 64-65.[51]

Defendants have objected that Uship's construction renders the "once" clause superfluous because if the information was stored when input, there is no reason to say it is stored once the item is deposited. Their objection may have facial appeal, but, as just explained, their alternative construction plainly contradicts the specification, which is the more serious defect, and thus at worst Uship's construction is the lesser of two evils. But in fact Uship's construction does not render the "once" clause superfluous; rather, it clarifies that the inputted information *continues* to be stored after the item is disposed. This is meaningful because the invention might otherwise be designed to discard or erase the inputted information as soon as it detects the deposit of the item.

---

[51] At the claim construction hearing, defendants compounded their error by hypothesizing that the inputted information might be stored in "temporary" memory from the time it is entered until the sensors detect the deposit of the item, at which time the inputted information would be stored in "permanent" memory. *See* Tr. 421-22, 427, 442-46. Regardless of whether their hypothesis is technologically plausible, it is not one reflected in the claim or the specification and therefore violates the fundamental principleS that "a court may not construe a means-plus-function limitation by adopting a function different from that explicitly recited in the claim," *JVW Enters.*, 424 F.3d at 1331 (quotation marks omitted), and that "[i]t is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent," *Blackboard*, 574 F.3d at 1385 (quotation marks omitted). *See also Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1218 (Fed. Cir. 2003) (court errs when it "identifie[s] a broad array of possible structures not mentioned anywhere in the specification") (quotation marks omitted).

Continued storage of information enables the system to later perform such functions as offering the customer a streamlined process for shipping additional packages, *see* specification 8:58-64, printing a receipt for the customer, *see* specification 8:64-66, and providing manifests and credit card logs, *see* specification 9:16-20, 9:28-31, 10:31-35.

### 9)   Limitation 5B: Displaying a Manifest

| *Limitation 5B*: **said information storage means including means for displaying a manifest,** | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| **Function:** displaying a listing of all transactions which pertain to the particular commercial delivery service<br><br>**Corresponding Structure:** manifest printer (90 or 280); and equivalents | **Function:** to display a listing of all transactions which pertain to the particular commercial delivery service<br><br>**Corresponding Structure:** manifest printer (90, 280) | **function**: displaying a listing of all transactions which pertain to the particular commercial delivery service<br><br>**structure**: manifest printer 90, 280 |

Uship has revised its construction to accord with the constructions proposed by the Government and IBM. There is, therefore, no outstanding dispute with respect to this means-plus-function limitation.

### B.   <u>Claim 9</u>

| *Claim*: **The integrated, automated, unattended unit of claim 7 wherein said means for storing said information further includes means for communicating said information to a remote location staffed by a human operator.** | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| **Function**: communicating said information to a remote location<br><br>**Corresponding Structure**: telephone lines connected to control system (100); and equivalents | **Function:** to communicate the stored information relating to the place to which the item is to be shipped to a place removed from the site in which the unit is deployed that is staffed by a human operator<br><br>**Corresponding Structure:** *The means-plus-function limitation lacks sufficient corresponding structure* | **function**: communicating said information to a remote location staffed by a human operator<br><br>**structure**: [lacks sufficient structure for communicating the information to a remote location staffed by a human operator] |

The parties agree that this is a means-plus-function limitation but otherwise disagree substantially. Defendants would incorrectly include the phrase "staffed by a human operator" in the function. That phrase describes the recipient of the communicated information, but the commu-

nication occurs in the same way regardless of the particulars of the recipient. (Consider that one goes about calling a friend and an automated banking system in the same way.)  Thus the phrase "staffed by a human operator" adds no substance to the claimed function and therefore is not part of the function for purposes of § 112 ¶ 6. *See Lockheed*, 324 F.3d at 1319; *supra* at 65-66.[52]

The corresponding structure is the telephone lines connected to the control system, which, as explained above, is the means for storing information. *See* fig. 10; *supra* at 62-64, 70. For reasons discussed in the context of Claim 7, the telephone lines need not be "dedicated." *See supra* at 62-64. The Government has objected that the disclosure of telephone lines is inadequate because "no structure, including the telephone lines, is ever linked to 'communicating said information to a remote location staffed by a human operator.'" US Br. 58-59. But the specification need not do so because, as explained above, the phrase "staffed by a human operator" is not part of the function for purposes of § 112 ¶ 6. IBM submits the same objection, but for a different reason: "Humans cannot constitute structure for purposes of § 112, ¶ 6." IBM Br. 78 (citing *Cardiac Pacemakers*, 296 F.3d at 118-19). But it does not matter whether humans can be corresponding structure for purposes of § 112 ¶ 6 because, again, the phrase "staffed by a human operator" is not part of the function. If IBM's analysis were correct, then a "means for traveling to the moon" would be sufficiently definite only if the moon constituted a corresponding structure – which is patently absurd.

In any event, IBM's point that humans cannot constitute structure is incorrect. The passage IBM cited from *Cardiac Pacemakers* was not, as IBM said, a "holding" but rather dicta

---

[52] Another difference among the parties regarding the function is that Uship and IBM would rely upon the plain meaning of the phrase "remote location," whereas the Government would construe that term to mean "a place removed from the site in which the unit is deployed." Uship does not object to the Government's construction of "remote location" – in fact, before the claim construction hearing, Uship proposed the same construction and subsequently abandoned it in favor of the plain meaning only in an effort to reduce the need for terms to be construed.

predicated upon the plaintiff's decision to "waive[]" the argument that a reference to a human could satisfy § 112 ¶ 6. 296 F.3d at 1116; *see also id.* at 1114 (plaintiff "concedes that the physician cannot be corresponding structure").[53]  Moreover, *Cardiac Pacemakers* is inapposite because there, "[e]xcluding the [human], … *no structure* disclosed in the embodiments of the invention actually perform[ed] the claimed dual functions," whereas here the specification discloses adequate non-human structure (namely, telephone lines). *See Cardiac Pacemakers*, 296 F.3d at 1118-19 ("corresponding structure need not include all things necessary to enable the claimed invention to work") (emphasis added).

## C.   Claim 10

| *Claim*: The integrated, automated, unattended unit of claim 9 wherein said unit includes a pivotable door that serves as a slide when said door is opened, said slide serving to transport the item to a storage area for secure storage. | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| The integrated, automated, unattended unit includes a **pivotable door** that operates as a chute or a smooth surface on which items can glide or pass smoothly and which door serves to transport the item to a storage area for secure storage | **serves as a slide:** operates as downward-inclined chute with a flat bed<br><br>**serving to transport:** operating to convey from one place to another<br><br>**a storage area:** a space for storing items within the outer housing of the unit<br><br>**for secured storage:**  stored in a manner that is inaccessible to unauthorized persons | The integrated, automated, unattended unit has a [**pivotable door**] that has a slide to transport the item to the secured storage area of the unit.<br><br>a storage area: a space for storing items within the outer housing of the unit<br><br>for secured storage:  stored in a manner that is inaccessible to unauthorized persons |

---

[53] In the context of another claim that is no longer at issue, the Government previously made a similar point (that humans cannot be corresponding structure for purposes of § 112 ¶ 6), citing *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1300 (Fed. Cir. 2005). *See* US Br. 100. But that decision relied entirely on dicta from the 1969 decision in *In re Prater*, 415 F.2d 1393, 1406 (CCPA), which held narrowly that the apparatus claim in that case did not encompass a human being as the "means." *Default Proof*'s passing remark should not be understood broadly to preclude the use of humans as corresponding structure. Indeed, all other decisions dealing with humans as structure of which we are aware have merely articulated the much narrower and inapposite "proposition that where a claim contains a means-plus-function limitation and the specification identifies mechanical or electrical structures that correspond to the limitation, a human cannot serve as an equivalent structure covered by the claim." *See, e.g.*, *Pilley v. United States*, 74 Fed. Cl. 489, 500 (2006).

| Joint Construction |
|---|
| **pivotable door** - door for receiving items into the unit that opens and shuts by turning on a pivot |

The principal dispute between the parties with respect to this claim is whether the storage area must be physically within the same container as the rest of the invention. *See* US Br. 62-63; IBM Br. 79-80. Defendants attempt to capture this concept in their proposed constructions by stating that the storage area is "within the outer housing of the unit." But even if that is so, it does not follow that the storage area must be within a single container together with all the other components of the invention, for reasons explained in the discussion of the terms "integrated" and "unit" in the preamble. *See supra* at 49-51.[54]

### D.   Claim 11

The parties have agreed upon a joint proposed construction for this limitation.

| *Claim*: **The integrated, automated, unattended unit of claim 10 wherein said door serves to secure said storage area when said door is opened.** |
|---|
| Joint Construction |
| **serves to secure said storage area when said door is opened:** operates to bar access to the storage area through the door opening |

### E.   Claim 12

The parties have agreed upon a joint proposed construction for this limitation.

| *Claim*: **The integrated, automated, unattended unit of claim 7 wherein said means for receiving said credit card information comprises a magnetic card reader.** |
|---|
| Joint Construction |
| **comprises a magnetic card reader:** *Plain Meaning* – comprises a magnetic card reader |

---

[54] There are other, minor differences between the parties' constructions. First, the Government would require that the slide be "downward-inclined." But a slide need not go downward – after all, one can slide *across* a surface. *See* RANDOM HOUSE UNABRIDGED DICTIONARY 1798 ("slide": "2. to move along in continuous contact with a smooth or slippery surface … 12. a smooth surface for sliding on ….") (Ex. N). Second, whereas Uship would give the plain meaning to the term "secure storage," defendants would specifically construe it. Either way, the core concept, which is reflected in the parties' joint construction for Claim 11, is that access is barred.

## F.      Claim 15

| *Claim*: The integrated, automated, unattended unit of claim 12 wherein said card reader is adapted to read credit cards issued by any of a plurality of credit card companies and wherein said fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction. | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| the card reader is adapted to read one or more credit card companies' credit cards | *Plain Meaning* – the card reader is adapted to read credit cards issued by more than one credit card company and the fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction | *Plain Meaning* – the card reader is adapted to read credit cards issued by more than one credit card company and the fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction |

In order to bridge the gap with defendants, Uship has revised its proposed construction of this limitation to rely upon the plain meaning of the terms in this claim, except for one phrase. Specifically, Uship construes the phrase "credit cards issued by any of a plurality of credit card companies" to mean "one or more credit card companies' credit cards." Defendants take the same general approach, but construe that phrase differently: "credit cards issued by more than one credit card company." Defendants' construction may be subject to two erroneous interpretations. First, it could be understood to require that the card reader support at least two types of credit cards, *e.g.*, Visa *and* MasterCard. But the claim's use of the word "any" implies that the claim also covers a system that supports only one type of credit card, *e.g.*, an American Express-only machine. Second, defendants' construction could be understood to require that the card reader support credit cards that are jointly issued by multiple companies, *e.g.*, a Visa-MasterCard credit card. Uship doubts defendants intend either of these interpretations (jointly issued credit cards may not even exist), but for clarity Uship prefers its construction.

## G.      Claim 28

The limitations in Claim 28 largely repeat limitations found in Claim 7 of the '464 patent.

Below, Uship addresses the substance of only the limitations that are unique to Claim 28 and otherwise refers to the corresponding discussions in the context of Claim 7.

### 1) Limitation 3B: Communicating and Assessing

| Limitation 3B: **said control means further including means for communicating and assessing the shipment fee to the account of the person,** | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| **Function**: communicating and assessing the shipment fee to the account of the person<br><br>**Corresponding Structure**: telephones lines connected to control system (100); or telephone lines connected to card reader (30, 230); and equivalents | **Function**: to communicate and assess the shipment fee to the account of the person<br><br>**Corresponding Structure:** card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges | **function:** communicating and assessing the shipment fee to the account of the person owning the credit card<br><br>**structure:** magnetic card reader 30 or 230 connected to a dedicated telephone line |

This limitation is the same as Limitation 3C of Claim 7, except that it omits the phrase "said means for communicating the shipment fee being by telephone lines." As a result, the means-plus-function presumption of § 112 ¶ 6 is not overcome by the claim's language (in contrast to Limitation 3C of Claim 7), and thus all the parties agree that this is a means-plus-function limitation. Accordingly, the "alternative" analysis presented in the context of Limitation 3C of Claim 7 is the controlling here. In short:  The corresponding structure includes telephone lines, which need not be "dedicated," and which are (alternatively) connected to the card reader or the control system. *See supra* at 62-64.[55]

### 2) Limitation 3C: Printing Account Charge

The parties have agreed upon a joint proposed construction for this limitation.

---

[55] This limitation also omits the phrase "owning the credit card," which in Limitation 3C of Claim 7 modifies the word "person," to whom the account belongs. This difference is inconsequential; the only person whose account could conceivably be charged here is the person who owns the credit card.

| Limitation 3C: **said means assessing comprising means for printing a hard copy of said account charge for said person,** |
| --- |
| **Joint Construction** |
| [Means-plus-Function]<br><br>**function:** printing a hard copy of the account charge for the person<br><br>**structure:** printer 26 |

## H.   Claim 30

| Claim: **The integrated, automated, unattended unit of claim 28 including means for communicating said account charge to a remote location.** | | |
| --- | --- | --- |
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| **Function:** communicating said account charge to a remote location<br><br>**Corresponding Structure:** telephones lines connected to control system (100); or telephone lines connected to card reader (30, 230); and equivalents | **Function:** to communicate and assess the account charge to a remote location<br><br>**Corresponding Structure:** card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges | **function:** communicating the account charge to a remote location<br><br>**structure:** magnetic card reader 30 or 230 connected to a dedicated telephone line |

The parties are in accord on this means-plus-function claim limitation, with two exceptions. For reasons discussed in the context of Claim 7, the telephone lines need not be "dedicated," and, in the alternative to being connected to the card reader, the telephone lines may be connected to the control system. *See supra* at 62-64.

## I.   Claim 34

The limitations in Claim 34 largely repeat limitations found in Claim 7 of the '464 patent. Below, Uship addresses the substance of the limitation that is unique to Claim 34 and otherwise refers to the corresponding discussions in the context of Claim 7.[56]

---

[56] Limitation 2B of this claim, which provides, "said control means further including means for communicating and assessing the shipment fee to the account of the person, said means for communicating the shipment fee being by telephone lines," differs from Limitation 3C of Claim 7 only in that it omits the phrase "owning the credit card," which in Limitation 3C of Claim 7 modifies the word "person," to whom the account belongs. As noted above, this difference is inconsequential. *See supra* at 78 n.55.

### 1)      Limitation 4B: Transmitting Information for a Manifest

| *Limitation 4B*: **said information storage means including means for transmitting information that may be used to prepare a manifest to a remote location.** | | |
|---|---|---|
| **Uship Construction** | **Government Construction** | **IBM Construction** |
| **Function:** Transmitting information that may be used to prepare a listing of all transactions that pertain to a particular commercial delivery service to a remote location<br><br>**Corresponding Structure:** telephone lines connected to control system (100); and equivalents | **Function:** to transmit information that may be used to prepare a listing of all transactions which pertain to the particular commercial delivery service to a place removed from the site in which the unit is deployed<br><br>**Corresponding Structure:** *The means-plus-function limitation lacks sufficient corresponding structure* | **function:**  transmitting information that may be used to prepare a manifest to a remote location.<br><br>**structure:** [lacks sufficient structure for transmitting information for preparing a manifest to a remote location] |

The parties agree that this is a means-plus-function limitation and substantially agree on the function, but disagree greatly about the corresponding structure.[57]  The corresponding structure is the telephone lines connected to the control system, *see* fig. 10, which stores the information for preparing a manifest, *see* specification 8:43-47 ("control system 100 stores information relating to the transaction in CPU 102"). And for reasons discussed in the context of Claim 7, the telephone lines need not be "dedicated." *See supra* at 62-64.

### CONCLUSION

For the reasons discussed above, Uship respectfully requests the Court to adopt both the parties' joint proposed constructions as to certain claim terms and Uship's proposed constructions of those claim terms on which the parties have not reached agreement.

---

[57] After exchanging constructions with defendants on May 21, 2010, Uship revised its construction of this function in a further attempt to reach agreement on the proper construction. The remaining differences are slight. IBM would evidently rely upon the plain meaning of the term "manifest," whereas Uship and the Government would construe that term according to the definition provided by the specification: "a listing of all transactions that pertain to a particular commercial delivery service." Specification 10:33-34. The parties also take different approaches to the phrase "remote location," but as explained in the context of Claim 9, this difference is not significant. *See supra* at 74 n.52.

May 28, 2010                                Respectfully submitted,

                                            /s/ Charles J. Cooper
                                            _____
                                            Charles J. Cooper
                                            COOPER & KIRK PLLC
                                            Vincent J. Colatriano
                                            Derek L. Shaffer
                                            David Lehn
                                            Jesse Panuccio
                                            1523 New Hampshire Avenue, N.W.
                                            Washington, DC 20036
                                            Telephone:  (202) 220-9600
                                            Facsimile:  (202) 220-9601
                                            Email:  ccooper@cooperkirk.com

                                            *Counsel for Uship Intellectual Properties, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of May 2010, I caused to be served by the Court's electronic filing system copies of the foregoing on the following counsel:

Scott David Bolden
U. S. Department of Justice
Civil Div. - Commercial Litigation Br.
1100 L Street, NW
8th Floor
Washington, DC 20530
(202) 307-0262
Fax: (202) 307-0345
Email: scott.bolden@usdoj.gov

Steven C. Cherny
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022
(212) 446-4800
Fax: (212) 446-4900
Email: scherny@kirkland.com

/s/ David Lehn