IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| USHIP INTELLECTUAL PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | No. 08-537 C |
| | ) | |
| Defendant, | ) | Judge Susan G. Braden |
| | ) | |
| and | ) | |
| | ) | |
| INTERNATIONAL BUSINESS MACHINES | ) | |
| CORPORATION, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

---

**DEFENDANT'S POST-HEARING BRIEF ON CLAIM CONSTRUCTION**

---

TONY WEST
Assistant Attorney General

JOHN J. FARGO
Director

Of Counsel:                          SCOTT BOLDEN
GARY L. HAUSKEN                       Senior Trial Counsel
DAVID M. RUDDY                        Commercial Litigation Branch
Department of Justice                 Civil Division
MICHAEL F. KIELY                      Department of Justice
United States Postal Service          Washington, DC  20530
                                      Telephone:    (202) 307-0262
July 9, 2010                          Facsimile:    (202) 307-0345

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

CLAIM CONSTRUCTION STANDARDS ARE STRAIGHTFORWARD . . . . . . . . . . . . . . 4

MEANS-PLUS-FUNCTION CLAIMS ARE LIMITED TO THE CORRESPONDING
STRUCTURE IN THE SPECIFICATION AND EQUIVALENTS THEREOF . . . . . . . . . . . . 7

USHIP MISAPPLIES SETTLED LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.     The Federal Circuit Rejected Uship's Claim Construction Methodology
            in <u>Phillips</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.     Contrary to Uship's Assertions, the Preambles Recite Essential Structure
            and Limit the Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      C.     Uship's Proposed Constructions Frequently Lack Antecedent Basis . . . . . . . . . 11

CLAIM CONSTRUCTION ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.      RAMSDEN 5,418,464 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.     Independent Claim 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            1.     Preamble Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                  a.     "integrated" - incorporated into a unified whole . . . . . . . . . . . . . 15

                  b.     "automated" - automatically controlled by mechanical
                        or electronic devices [Undisputed] . . . . . . . . . . . . . . . . . . . . . . . 18

                  c.     "unattended" - no attendant is present . . . . . . . . . . . . . . . . . . . . . 18

                  d.     "unit" - a single apparatus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            2.     "Means for Weighing the Item to be Shipped" [Undisputed] . . . . . . . . 22

3.    "Means for Inputting Information Relating to the Destination to Which the Item Is to Be Shipped" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

4.    "Control Means for Analyzing the Inputted Information and Calculating the Fee for Shipment of the Item" . . . . . . . . . . . . . . . . . . . . 23

5.    "Means for Receiving Credit Card Information" [Undisputed] . . . . . . . 28

6.    "Means for Communicating and Assessing the Shipment Fee . . ." . . . . 28

7.    "Means for Securely Storing Said Item until the Item Is Collected by Said Commercial Delivery Service" . . . . . . . . . . . . . . . . . 33

8.    "Means for Storing the Inputted Information Once Said Item Is Disposed in Said Secured Storage Means" . . . . . . . . . . . . . . . . . . . . . . . 38

9.    "Means for Displaying a Manifest" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

B.    Dependent Claim 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

C.    Dependent Claim 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

D.    Dependent Claim 11 *[Undisputed]* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

E.    Dependent Claim 12 *[Undisputed]* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

F.    Dependent Claim 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

G.    Independent Claim 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

1.    "Means for Communicating and Assessing the Shipment Fee to the Account of the Person" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

2.    "Means for Printing a Hard Copy of Said Account Charge for Said Person" [Undisputed] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

H.    Dependent Claim 30 – "Means for Communicating Said Account Charge to a Remote Location" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

I.    Independent Claim 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

1.    "Means for Communicating and Assessing the Shipment Fee to the Account of the Person, Said Means for Communicating the Shipment Fee Being by Telephone Lines" . . . . . . . . . . . . . . . . . . . . . . . 52

2.    "Means for Transmitting Information That May Be Used to
Prepare a Manifest to a Remote Location" . . . . . . . . . . . . . . . . . . . . . . . 53

II.   RAMSDEN & LILES 5,831,220; 6,105,014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

A.    Preamble Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

B.    "Receiving Payment Information from a Customer" *[Undisputed]* . . . . . . . . . 61

C.    "Receiving Package Type Information . . ." . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

D.    "Weighing Said Parcel or Envelope to Be Mailed" *[Undisputed]* . . . . . . . . . . 62

E.    "Receiving Shipping Information from Said Customer Including at
Least a Destination of Said Parcel or Envelope to Be Mailed" . . . . . . . . . . . . . 63

F.    "Computing from Said . . . Information, a Delivery Date and Cost . . ." . . . . . . . 67

G.    "Receiving an Indication of the Delivery Service Option Desired by
the Customer" *[Undisputed]* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

H.    "Printing a . . . Label . . ." *[Undisputed]* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

I.    "Printing a Shipping Receipt . . ." *[Undisputed]* . . . . . . . . . . . . . . . . . . . . . . . . 72

J.    "Validating Receipt of Said Parcel or Envelope as the Parcel or Envelope
for Which Said . . . Label Was Printed" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

1.    By Allowing for Attendant-Performed Validation, Uship Fails to
Give Effect to All Terms in the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . 73

2.    Statements and Amendments Presented During Prosecution Clearly
Reflect That the Applicants Understood Their Invention Was
Directed to Machine-Performed Validation . . . . . . . . . . . . . . . . . . . . . . 77

3.    Uship's Construction Improperly Conflicts with the Public Record,
on Which the Defendants Are Entitled to Rely . . . . . . . . . . . . . . . . . . . . 84

K.    "Storing a Validated Parcel or Envelope in a Secure Storage Area until
Said Parcel or Envelope Is Subsequently Picked up . . ." . . . . . . . . . . . . . . . . . 87

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

## TABLE OF AUTHORITIES

**CASES**

800 Adept, Inc. v. Murex Securities, Ltd.,
    539 F.3d 1354 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 82, 83

Acco Brands, Inc. v. Micro Security Devices, Inc.,
    346 F.3d 1075 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 81

Agilent Techs., Inc. v. Affymetrix, Inc.,
    567 F.3d 1366 (Fed. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Altiris, Inc. v. Symantec Corp.,
    318 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.,
    521 F.3d 1328 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-28

Aristocrat Techs. Australia Pty Ltd. v. Multimedia Games, Inc.,
    266 Fed. Appx. 942 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Asyst Techs., Inc. v. Empak, Inc.,
    268 F.3d 1364 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 32

Atmel Corp. v. Information Storage Devices, Inc.,
    198 F.3d 1374 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 54

B. Braun Medical, Inc. v. Abbott Labs.,
    124 F.3d 1419 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 41, 45, 55

BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC,
    303 F.3d 1332 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 39

Bell Communications Research, Inc. v. Vitalink Communications Corp.,
    55 F.3d 615 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Bicon, Inc. v. Straumann Co.,
    441 F.3d 945 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 42, 73

Callicrate v. Wadsworth Mfg.,
    427 F.3d 1361 (Fed. Cir. 2005), 427 F.3d 1361 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 19

Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.,
    289 F.3d 801 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,
    424 F.3d 1293 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Curtiss-Wright Flow Control Corp. v. Velan, Inc.,
    438 F.3d 1374 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cybor Corp. v. FAS Techs., Inc.,
    138 F.3d 1448 (Fed. Cir. 1998) (*en banc*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 32

E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,
    849 F.2d 1430 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 82

Ecolab, Inc. v. Paraclipse, Inc.,
    285 F.3d 1362 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Fonar Corp. v. Gen. Elec. Co.,
    107 F.3d 1543 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fuji Photo Film Co., Ltd. v. International Trade Com'n,
    386 F.3d 1095 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Furnace Brook LLC v. Overstock.com, Inc.,
    230 Fed. Appx. 984 (Fed. Cir. 2007) (*nonprecedential*) . . . . . . . . . . . . . . . . . . . . . . . . 23

Hakim v. Cannon Avent Group, PLC,
    479 F.3d 1313 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,
    222 F.3d 951 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Honeywell Int'l, Inc. v. ITT Indus., Inc.,
    452 F.3d 1312 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

In re Cruciferous Sprout Litigation,
    301 F.3d 1343 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 14, 58

In re Donaldson Co.,
    16 F.3d 1189 (Fed. Cir. 1994) (*en banc*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

In re Dossel,
    115 F.3d 942 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,
    381 F.3d 1111 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Johnson & Johnston Associates Inc. v. R.E. Service Co., Inc.,
    285 F.3d 1046 (Fed. Cir. 2002) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 85

Laitram Corp. v. Morehouse Indus., Inc.,
    143 F.3d 1456  (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 82

Lockheed Martin Corp. v. Space Systems/Loral, Inc.,
    324 F.3d 1308 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 37, 39, 45

Markman v. Westview Instruments, Inc.,
    52 F.3d 967 (Fed. Cir. 1995) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

McClain v. Ortmayer,
    141 U.S. 419 (1891) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Medrad, Inc. v. MRI Devices Corp.,
    401 F.3d 1313 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

MercExchange, LLC v. eBay, Inc.,
    401 F.3d 1323 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Microsoft Corp. v. Multi-Tech Systems, Inc.,
    357 F.3d 1340 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

NeoMagic Corp. v. Trident Microsystems, Inc.,
    287 F.3d 1062 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

NTP, Inc. v. Research In Motion, Ltd.,
    418 F.3d 1282 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Oak Tech., Inc. v. Int'l Trade Com'n,
    248 F.3d 1316 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Ormco Corporation v. Align Technology, Inc.,
    498 F.3d 1307 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Paragon Solutions, LLC v. Timex Corp.,
    566 F.3d 1075 (Fed. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Phillips v. AWH Corp.,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Pitney Bowes, Inc. v. Hewlett-Packard Co.,
       182 F.3d 1298 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Regents of University of Cal. v. Dakocytomation Cal., Inc.,
       517 F.3d 1364 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 81

Salazar v. Procter & Gamble Co.,
       414 F.3d 1342 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,
       242 F.3d 1337 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Springs Window Fashions L.P. v. Novo Indus., L.P.,
       323 F.3d 989 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 85

SRI Int'l v. Matsushita Elec. Corp. of Am.,
       775 F.2d 1107 (Fed. Cir. 1985) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 71

Texas Digital Systems, Inc. v. Telegenix, Inc.,
       308 F.3d 1193 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16, 20

TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc.,
       529 F.3d 1364 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

TriMed, Inc. v. Stryker Corp.,
       514 F.3d 1256 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Ventana Medical Systems, Inc. v. Biogenex Labs., Inc.,
       473 F.3d 1173 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Vitronics Corp. v. Conceptronic, Inc.,
       90 F.3d 1576 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 84

Warner-Jenkinson Co. v. Hilton Davis Chemical Co.,
       520 U.S. 17 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

WMS Gaming, Inc. v. Int'l Game Tech.,
       184 F.3d 1339 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**STATUTES**

28 U.S.C. § 1498 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

35 U.S.C. § 103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

35 U.S.C. § 112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

35 U.S.C. § 120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

**OTHER AUTHORITIES**

MPEP § 2173.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**TABLE OF EXHIBITS**

| Exhibit | Document | Appendix Page |
|---|---|---|
| A | Asserted Patent No. 5,481,464 (Ramsden) | A1 |
| B | Asserted Patent No. 5,831,220 (Ramsden, Liles) | A21 |
| C | Asserted Patent No. 6,105,014 (Ramsden, Liles) | A66 |
| D | Patent No. 5,233,532 (Ramsden) | A110 |
| E | Patent No. 5,656,799 (Ramsden, Liles) | A123 |
| F | Prosecution History for Patent No. 5,233,532 (excerpted) | A171 |
| G | Prosecution History for Patent No. 5,656,799 (excerpted) | A188 |
| H | Prosecution History for Patent No. 5,831,220 (excerpted) | A203 |
| I | May 14, 2010 Email | A213 |
| J | Mailomat Documents | A216 |
| K | Webster's Third New International Dictionary, Unabridged (1993) | A218 |
| L | Webster's Ninth New Collegiate Dictionary (1990) | A227 |
| M | McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed. 2003) | A236 |
| N | Patent No. 5,340,948 (Ramsden) | A240 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| USHIP INTELLECTUAL PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | No. 08-537 C |
| | ) | |
| Defendant, | ) | Judge Susan G. Braden |
| | ) | |
| and | ) | |
| | ) | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

**DEFENDANT'S POST-HEARING BRIEF ON CLAIM CONSTRUCTION**

Pursuant to the Court's Scheduling Order of May 11, 2010, Defendant, the United States ("the government"), hereby submits its claim construction brief in response to Plaintiff's Post-Hearing Claim Construction Brief, filed May 28, 2010.

**INTRODUCTION**

This is a suit brought under 28 U.S.C. § 1498(a) by Plaintiff Uship Intellectual Properties, LLC ("Uship") for the government's alleged infringing use of the Automated Postal Center, a self-service postal kiosk deployed by the United States Postal Service. Uship asserts infringement of 11 claims of three patents. The supplier of accused devices, International Business Machines Corporation ("IBM"), joined the case to assert its interest in this litigation. Consistent with the Court's orders, the parties exchanged proposed claim construction statements; met and conferred on the proper construction of the claim terms at issue; and participated in a three-day claim

construction hearing between February 16-18, 2010.  The issue of the proper construction of the disputed limitations of the asserted claims is before the Court.

## STATEMENT OF THE QUESTION PRESENTED

What is the proper construction of the disputed limitations of the asserted claims of U.S. Patent Nos. 5,481,464; 5,831,220; and 6,105,014?

## BACKGROUND

Upon information and belief, Uship Intellectual Properties, LLC is a non-practicing entity that exists solely to hold and enforce the rights to a portfolio of patents.  Uship characterizes the technology claimed in the patent portfolio as "relat[ing] to the shipping of items through the use of automated shipping kiosks."  Uship Br. at 1.  To support its claim that the patents-in-suit are novel, Uship broadly argues that its "predecessor companies . . . were among the pioneers of the automated mailing/shipping kiosk industry" during the early 1990s, and that they "deployed . . . some of the very first self-service shipping kiosks."  Id.  Uship, however, has provided no evidence to support its claim that its kiosk technology was pioneering.  Indeed, the idea of an automated postal kiosk was not novel when the earliest ancestor to Uship's asserted patents was filed in 1991.  Approximately fifty years earlier, Pitney-Bowes Postage Meter Company had already created and deployed a self-service postal kiosk.  See Figure 1; A216-17[1].

---

[1] "A___" refers to the corresponding page number in the attached Appendix.



## The "MAILOMAT"

. . . is a coin-operated U. S. mailbox for people who have letters to mail—and no stamps. It is a "self-service postoffice" that mails your letters without need of adhesive stamps.

To mail a letter you (1) drop money in coin slot (2) dial correct postage denomination (3) insert letter in letter slot. The machine does the rest; automatically takes your letter, *prints* postage and postmark on it, and holds it for collection . . . provides postage from 1c to 32c, including Air Mail, Special Delivery, etc., with no premium for postage. *Metered* mail needs less postoffice handling, often catches earlier trains and planes, starts on its way sooner.

The "Mailomat" is a pre-war invention of Pitney-Bowes Postage Meter Co., Stamford, Conn., now converted to war production; was developed in cooperation with the U. S. Post Office Dept. to facilitate public use of the mails in post office lobbies, railway terminals, etc. Manufacturing will begin when the war is won. Try this new "stampless" postal service now. Use this card to say "hello" to that boy in Service. And when using the mails these days, at home or office, remember to *mail early and often* . . . to help clear the track for war mail . . . and to help the P. O. help you!



*Collection of mail from coin-operated letter box*

**Figure 1.** An example of a self-service postal kiosk unveiled in Manhattan's General Post Office in May 1939.

The prosecution histories of the patents-in-suit[2] are convoluted, but highly relevant to the proper construction of the asserted claims. On April 10, 1991, Gary Ramsden filed a patent application for a "System for Mailing and Collecting Items." That application, which later matured into U.S. Patent No. 5,233,532 (unasserted), was the ancestor to a family of patents. See Uship Br. at 3; see also A110-122 (U.S. Patent No. 5,233,532). In particular, that initial application spawned the application that matured into U.S. Patent No. 5,481,464 ("the '464 patent" and "the Ramsden patent"). The initial application also spawned U.S. Patent Nos. 5,831,220 ("the '220 patent"), and

---

[2] U.S. Patent Nos. 5,481,464, 5,831,220, and 6,105,014 are collectively referred to as "the patents-in-suit" or "the asserted patents." Uship has abandoned its claims of infringement with respect to five other patents. See Complaint Counts III-VI, VIII; Uship Br. at 2; see also A213-15 (May 14, 2010 email).

6,105,014 ("the '014 patent").  The '220 patent and the '014 patent identify Gary Ramsden and Kenneth Liles as the named co-inventors (collectively "the Ramsden / Liles patents").  The rights in the patents-in-suit were ultimately assigned to Uship.

On July 23, 2008, Uship filed its Complaint against the government in this Court.  Uship brought its suit under 28 U.S.C. § 1498(a) for the government's alleged infringing use of the Automated Postal Center, a self-service postal kiosk manufactured by IBM and deployed by the United States Postal Service.  Uship contends that the government has infringed nine claims from the '464 patent, one claim from the '220 patent, and one claim from the '014 patent.  See Uship Br. at 2; see also A213-15 (May 14, 2010 email) (identifying the claims-in-suit and dropping the remaining claims from the patents asserted in the Complaint).

## LEGAL STANDARD

## CLAIM CONSTRUCTION STANDARDS ARE STRAIGHTFORWARD

Claim construction is a question of law.  See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).  The scope of a patented invention is defined by the words of the claims.  See Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Courts must construe any disputed claim terms from the perspective of "a person of ordinary skill in the art in question at the time of the invention."  Phillips, 415 F.3d at 1313; Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004).

Beyond these initial concepts, the Federal Circuit has established other principles that are important to note in this case.  In particular, three key principles, as identified below, provide

additional guidance with respect to identifying the relevant disputed terms and arriving at the proper construction:

**First, a court <u>must</u> interpret claim terms by reference to the intrinsic evidence.**  <u>See</u> <u>Phillips</u>, 415 F.3d at 1313 ("the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").  The intrinsic evidence includes three main parts:

- **The claims** – "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms . . . . the context in which a term is used in the asserted claim can be highly instructive."  <u>Id.</u> at 1314.

- **The specification** – The claims, however, "must be read in view of the specification, of which they are a part."  <u>Id.</u> at 1315 (quoting <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), <u>aff'd</u>, 517 U.S. 370 (1996)).  The Federal Circuit stressed the primacy of the specification, stating that it

   > is **always highly relevant** to the claim construction analysis. Usually, it is dispositive; it is **the single best guide** to the meaning of a disputed term.

   <u>Phillips</u>, 415 F.3d at 1315 (emphasis added).[3]

- **The prosecution history** – The claims should also be interpreted in light of the prosecution history, because it "can often inform the meaning of the claim language

---

[3] In certain circumstances, the specification can limit the scope of a disputed claim to a particular "critical" feature or single embodiment. <u>See</u> <u>Curtiss-Wright Flow Control Corp. v. Velan, Inc.</u>, 438 F.3d 1374, 1378-79 (Fed. Cir. 2006); <u>see also</u> <u>Honeywell Int'l, Inc. v. ITT Indus., Inc.</u>, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (limiting a claim term because of the specification's use of "this invention" and "the present invention"); <u>SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 242 F.3d 1337, 1343 (Fed. Cir. 2001) (construing term to include feature characterized as "the present invention").

by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. at 1317 (citing Vitronics, 90 F.3d at 1582-83).

**Second**, **a court may consider extrinsic evidence, but intrinsic evidence is controlling.** Extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." Phillips, 415 F.3d at 1317. Because of the inherent unreliability of extrinsic evidence, such as dictionaries, extrinsic evidence "cannot overcome art-specific evidence of the meaning of a claim term." Id. at 1321-22.

**Third**, **a patentee's statements regarding the scope of the invention during prosecution are always relevant.** See Microsoft Corp. v. Multi-Tech Systems, Inc., 357 F.3d 1340, 1350 (Fed. Cir. 2004). Statements concerning the claimed invention by the patent applicant during prosecution can serve to clarify the proper scope of the claim language. Because such statements represent the patentee's own understanding of the claim scope, the public is entitled to "take the patentee at its word," and it is therefore improper to construe the scope of . . . claims more broadly than the patentee itself clearly envisioned." Id. at 1349; see also 800 Adept, Inc. v. Murex Securities, Ltd., 539 F.3d 1354, 1365 (Fed. Cir. 2008) (using applicant's statements during prosecution "as support for the construction already discerned from the claim language and confirmed by the written description"); Laitram Corp. v. Morehouse Indus., Inc., 143 F.3d 1456, 1462  (Fed. Cir. 1998) (a patentee's statements during prosecution are relevant to claim interpretation, regardless of whether the examiner relied on them); E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d

1430, 1438 (Fed. Cir. 1988) ("arguments made during prosecution shed light on what the applicant meant by its various terms.").

**MEANS-PLUS-FUNCTION CLAIMS ARE LIMITED TO THE CORRESPONDING STRUCTURE IN THE SPECIFICATION AND EQUIVALENTS THEREOF**

A "means-plus-function" claim limitation serves as "a purely functional placeholder in which structure is filled in by the specification." Phillips, 415 F.3d at 1311. Claim terms that are drafted in "means-plus-function" format are in a special category of claim construction that is governed by Paragraph 6 of Section 112 of Title 35:

> An element in a claim for a combination may be expressed as a means . . . for performing a specified function without the recital of structure . . . and such claim shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.

35 U.S.C. § 112 ¶ 6. Prior to 1994, the United States Patent and Trademark Office interpreted means-plus-function limitations as reading on **any** known prior art means which performed the recited function, without regard for the corresponding structure described in the specification.[4] In 1994, an *en banc* panel of the Federal Circuit categorically rejected that approach, and held that means-plus-function limitations must be interpreted in light of the corresponding structure described in the specification, as "statutorily mandated in" Paragraph 6 of Section 112. In re Donaldson Co., 16 F.3d 1189, 1193-95 (Fed. Cir. 1994) (*en banc*). Thus, for the past 16 years, means-plus-function

---

[4] See, e.g., Examination Guidelines for Claims Reciting a "Means or Step Plus Function" Limitation in Accordance with 35 U.S.C. § 112, 6th Paragraph (April 20, 1994) at http://www.uspto.gov/web/offices/com/sol/og/con/files/cons089.htm.

limitations are interpreted as limited to the corresponding structure described in the specification, and equivalents thereof.[5]

A patentee's use of the word "means" raises a rebuttable presumption that the claim limitation is a "means-plus-function" limitation governed by Paragraph 6 of Section 112. See Callicrate v. Wadsworth Mfg., 427 F.3d 1361, 1368 (Fed. Cir. 2005). If Paragraph 6 of Section 112 applies, a court must apply a two-step process to construe the limitation. First, the court must identify the recited function. See Asyst Techs., Inc. v. Empak, Inc., 268 F.3d 1364, 1369 (Fed. Cir. 2001). The recited function "must be construed to include the limitations contained in the claim language." Lockheed Martin Corp. v. Space Systems/Loral, Inc., 324 F.3d 1308, 1319 (Fed. Cir. 2003). Second, the court must identify the corresponding structure in the specification. See Asyst, 268 F.3d at 1369. "[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." B. Braun Medical, Inc. v. Abbott Labs., 124 F.3d 1419, 1424 (Fed. Cir. 1997). If the specification does not identify structure corresponding to the recited function, the claim is indefinite pursuant to Paragraph 2 of Section 112. See Donaldson, 16 F.3d at 1195.

---

[5] Ramsden filed his application for the '464 patent on February 18, 1994, four days after an *en banc* panel of the Federal Circuit issued its decision in Donaldson. As described *infra*, many of Uship's constructions mirror the approach rejected in Donaldson of construing means-plus-function limitations as incorporating any known prior art means without regard for corresponding structure described in the specification.

**USHIP MISAPPLIES SETTLED LAW**

Uship's lengthy discussion of patent law in its Brief contains several errors. Some of Uship's errors arise repeatedly throughout the Uship's analysis. Several of the repeated errors are identified below.

**A.    The Federal Circuit Rejected Uship's Claim Construction Methodology in Phillips**

Uship critically errs throughout its Brief by construing the disputed terms with the same methodology advanced in <u>Texas Digital</u> and rejected by an *en banc* panel of the Federal Circuit in <u>Phillips</u>. <u>See</u> <u>Phillips</u>, 415 F.3d at 1319-20; <u>compare with</u> <u>Texas Digital Systems, Inc. v. Telegenix, Inc.</u>, 308 F.3d 1193, 1202-04 (Fed. Cir. 2002). In many constructions, Uship cites definitions provided by general purpose dictionaries as the initial and primary source for ordinary meaning. <u>See, e.g.</u>, Uship Br. at 16, 51-52. As a result, Uship relegates the specification to a secondary role as a check on the dictionary definition. The Federal Circuit explicitly rejected this approach in <u>Phillips</u>:

> [<u>Texas Digital</u>] suggested a methodology for claim interpretation in which the specification should be consulted only after a determination is made, whether based on a dictionary, treatise, or other source, as to the ordinary meaning . . . . Even then, recourse to the specification is limited to determining whether the specification excludes one of the meanings derived from the dictionary, whether the presumption in favor of the dictionary definition of the claim term has been overcome by "an explicit definition of the term different from its ordinary meaning," or whether the inventor "has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." . . . **That approach, in our view, improperly restricts the role of the specification in claim construction**.

<u>Phillips</u>, 415 F.3d at 1320 (emphasis added). Starting with the broad dictionary definition and failing to "appreciate how the specification implicitly limits that definition" will result in "systematic overbreadth" and "unduly expansive" constructions. <u>Id.</u> at 1321. Despite the Federal

Circuit's warning, Uship adopted the discredited <u>Texas Digital</u> approach with respect to several of its constructions.

### B.      Contrary to Uship's Assertions, the Preambles Recite Essential Structure and Limit the Claims

In its Brief, Uship contends that the terms in the preambles to the asserted claims of the '220 and '014 patents are not limitations.  Uship's contention is directly contradicted by established Federal Circuit precedent, which holds that "a preamble limits the claimed invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." <u>In re Cruciferous Sprout Litigation</u>, 301 F.3d 1343, 1347 (Fed. Cir. 2002) (citations omitted). Therefore, determining the import of a claim's preamble requires an analysis of the particular language as used in the overall context of the claim:

> [A] claim preamble has the import that the claim as a whole suggests for it. In other words, when the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects.

<u>Bell Communications Research, Inc. v. Vitalink Communications Corp.</u>, 55 F.3d 615, 620 (Fed. Cir. 1995).

Under this framework, a preamble can be limiting in circumstances pertinent to the patents-in-suit.  In particular, "dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention." <u>Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.</u>, 289 F.3d 801, 808 (Fed. Cir. 2002) (<u>citing</u> <u>Bell Communications</u>, 55 F.3d at 620).  Similarly, "when the preamble is essential to understand limitations or terms in the claim body, the preamble limits claim scope." <u>Id.</u> (<u>citing</u> <u>Pitney Bowes, Inc. v. Hewlett-Packard Co.</u>, 182 F.3d 1298, 1306 (Fed. Cir. 1999)).  Finally,

a patentee's reliance on the preamble during prosecution supports the conclusion that the preamble is limiting. See Cruciferous Sprout, 301 F.3d at 1347-48 (finding the preamble limiting where the patentee relied upon the preamble phrase "rich in glucosinolates" during prosecution).

## C.   Uship's Proposed Constructions Frequently Lack Antecedent Basis

Uship's proposed constructions are often flawed because the constructions ignore terms that were explicitly defined earlier in the claims. In patent claims, new elements are often introduced by an indefinite article (e.g., "a" or "an"). Once an element has been introduced, that element may be referred to using a definite article (e.g., "the" or "said"). See MercExchange, LLC v. eBay, Inc., 401 F.3d 1323, 1337- 38 (Fed. Cir. 2005), vacated on other grounds, 547 U.S. 388 (2006) (noting that use of the definite article "the" in conjunction with a claim term indicates a reference to the same, previously-introduced element). A patentee must provide "antecedent basis" for an element preceded by a definite article; otherwise, the claim risks indefiniteness. See MPEP § 2173.05(e); see also Bicon, Inc. v. Straumann Co., 441 F.3d 945, 954 (Fed. Cir. 2006) (holding that "'the abutment' . . . refers to the particular abutment described in the preamble of the claim, not to any structure that could conceivably serve as an abutment"); NTP, Inc. v. Research In Motion, Ltd., 418 F.3d 1282, 1306 (Fed. Cir. 2005) (construing claim term employing definite article "the" as requiring an antecedent basis). The disputed limitations in the claims-in-suit use terms such as "the inputted information," "said information," and "said destination";

7. An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services: said automated unit comprising,

    means for weighing the item to be shipped;
    means for inputting information relating to the destination to which the item is to be shipped;
    control means for analyzing the inputted information and calculating the fee for shipment of the item; said control means further including means for receiving credit card information and means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines;
    means for securely storing said item until the item is collected by said commercial delivery service;
    means for storing the inputted information once said item is disposed in said secured storage means, said information storage means including means for displaying a manifest.

**Figure 2.** In claim 7 of the '464 patent, "the inputted information" refers back to the "inputt[ed] information relating to the destination to which the item is to be shipped."

and proper construction of the disputed limitations must account for the antecedent basis for these terms.  See, e.g., Figure 2.

<h2 style="text-align:center">CLAIM CONSTRUCTION ARGUMENTS</h2>

**I.     RAMSDEN 5,418,464**

U.S. Patent No. 5,481,464 ("the '464 patent") issued on January 2, 1996 and was originally filed as application No. 198,872 on February 18, 1994.[6]  The issued patent contains 34 claims, and Uship asserts that the government has infringed 9 of them.  As described in the very first sentence of the abstract, the invention "is an integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services."  A1 ('464 Abstract); see also A12 ('464 Spec. 1:13-16).  FIG. 1 of the '464 patent[7] depicts the disclosed "integrated, automated, unattended unit":



**Figure 3.**  FIG. 1 of the '464 patent depicts the claimed "integrated, automated, unattended unit."

---

[6] In all previous briefs and during the claim construction hearing, the parties presented their respective claim construction arguments chronologically with respect to the asserted patents.  In this Brief, the government has maintained that chronological order.  In its most recent Brief, Uship has reversed the chronological order without explanation.

[7] "FIG. __" refers to the corresponding figure in the referenced patent; "Figure __" refers to the corresponding figure in this Brief.

Notably, Ramsden distinguished his "integrated, automated, unattended unit" from two prior art solutions.  First, Ramsden argued that his invention was superior to shipping solutions that used "unattended drop-boxes in which a customer may place a pre-addressed package or letter."  A12 ('464 Spec. 1:31-32).  Second, Ramsden argued that his invention was superior to shipping solutions that used "staffed offices."  A12 ('464 Spec. 1:50-52).



**Figure 4.**  Ramsden distinguished his "integrated, automated, unattended unit" from two well-known shipping methods.  <u>See</u> Govt. '464 Present. 3-4; A12 ('464 Spec. 1:31-61).

Turning to the language and structure of the asserted claims, each of the 9 asserted claims are apparatus claims, as opposed to method claims.  In addition, most of the asserted claims from the '464 patent include means-plus-function limitations pursuant to Paragraph 6 of Section 112 of Title 35.

### A.      Independent Claim 7

#### 1.      *Preamble Limitations*

| |
|---|
| **'464 Independent Claim 7** |
| **'464 Independent Claim 28** |
| **'464 Independent Claim 34** |
| *Disputed Preamble Limitations* |

-13-

| An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services: said automated unit comprising, | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| An apparatus, machine, or system of machines for collecting and securely holding items for collection and shipment by commercial delivery services (including the USPS), which apparatus, machine, or system of machines is (1) incorporated into a unified or interrelated whole; (2) automatically controlled by mechanical or electronic devices; and (3) capable of being used by a customer when no attendant is present | **integrated**: incorporated into a unified whole <br><br> **automated**: automatically controlled by mechanical or electronic devices <br><br> **unattended**: no attendant is present <br><br> **unit**: a single apparatus | An integrated, automated, and unattended single apparatus for automatically collecting and securely holding items for collection and shipment by commercial delivery service, the automated single apparatus including: |

The preambles in asserted independent claims 7, 28, and 34 are identical. The first issue for the Court is whether the preambles are limitations because they recite "essential structure" or they "give life, meaning, and vitality to the claim[s]." Cruciferous Sprout, 301 F.3d at 1347; see also Catalina Marketing Int'l, 289 F.3d at 808. The preambles do indeed limit these three claims, because they describe essential structure of the invention, as demonstrated by the language in the specification and the claims. See A12 ('464 Spec. 1:12-16) (characterizing "[t]his invention" as relating to the "automated, unattended unit"); A1 ('464 Abstract) (same); A18-19 ('464 Claims 7, 10) (preamble provides antecedent basis for "said commercial delivery service" and "said unit").

Uship concedes that the Court should construe the disputed terms in the preambles. See Tr. at 19:24-20:23; 290:8-14; 305:11-14. Furthermore, Uship appears to have conceded that the disputed terms are claim limitations by declining to argue the issue in its Brief. See Uship Br. at 49. Accordingly, the Court should treat the disputed preamble terms as claim limitations.

-14-

### a. "integrated" - incorporated into a unified whole

The parties dispute three distinct terms within the preamble.[8]  With respect to the first distinct term, the intrinsic language in patent abstract equates "integrated" with the incorporation of different subparts into a single unit:

> Disclosed is **an integrated, automated, unattended unit** for collecting and securely holding items . . ., **the unit including** *[subpart 1]* a scale for weighing the item to be shipped, *[subpart 2]* a computer for inputting information relating to the destination to which the item is to be shipped and for analyzing the inputted information including calculating the fee for shipment of the item, *[subpart 3]* a card reader for receiving bank credit card information and for communicating and assessing the shipment fee to the account of the person, and *[subpart 4]* secured storage, the computer being adapted for communicating the shipment fee by telephone lines.

A1 ('464 Abstract) (emphasis, annotations added).  Thus, according to the Abstract, the unit is "integrated" because the scale, the computer, the card reader, and the secured storage have been incorporated into the unit.  Ramsden describes first and second aspects of his invention that support the statement in the Abstract.  See A12 ('464 Spec. 2:30-67) (describing how these subparts have been incorporated into the inner surface of a single kiosk).  Thus, integrated means "incorporated into a unified whole."  The extrinsic evidence also supports this construction.[9]

---

[8]  The three disputed terms are "integrated," "unattended," and "unit."  As described in the next subsection, the parties have agreed that "automated" means "automatically controlled by mechanical or electronic devices."

[9]  See A222 (integrated: "1: characterized by integration: a: composed of separate parts united together to form a more complete, harmonious, or coordinated entity" Webster's Third New International Dictionary, Unabridged 1174 (1993));

see also A232 (integrate: "1: to form, coordinate, or blend into a functioning or unified whole: UNITE . . . 3b: to incorporate into a larger unit" Webster's Ninth New Collegiate Dictionary 628 (1990)).

In its Brief, Uship has combined each of the individual constructions that it presented in prior briefs and during the hearing.  The individual disputed terms in Uship's construction are annotated below:

> [unit:] An apparatus, machine, or system of machines for collecting and securely holding items for collection and shipment by commercial delivery services (including the USPS), which apparatus, machine, or system of machines is (1) [integrated:] incorporated into a unified or interrelated whole; (2) [automated:] automatically controlled by mechanical or electronic devices; and (3) [unattended:] capable of being used by a customer when no attendant is present

Uship Br. at 49 (annotations added).

With respect to the first term, "integrated," the dispute between the government and Uship relates to Uship's inclusion of the phrase "or interrelated" in its construction.  Uship finds no support in the specification for its inclusion of this phrase; instead, Uship copied this phrase directly from a general purpose dictionary.  See Uship Br. at 50 (citing dictionary).  After copying this phrase from the dictionary, Uship consulted the intrinsic evidence to determine how the dictionary definition had been modified.  See id. ("With this understanding of the [dictionary definitions], one can see that the patent encompasses the full range of these meanings . . . .").  Uship's approach is deeply flawed; indeed, the Federal Circuit unequivocally rejected Uship's "dictionary first" approach in Phillips, as seen in comparison with the arguments advanced by Uship during the claim construction hearing:

| *The* en banc *Federal Circuit rejects the Texas Digital approach for claim construction* | *Uship uses the rejected Texas Digital approach for claim construction* |
|---|---|
| [Texas Digital] suggested a methodology for claim interpretation in which the specification should be consulted only after a determination is made . . . based on a dictionary . . . as to the ordinary meaning . . . .  [R]ecourse to the specification is limited to determining whether | MR. LEHN: . . . .  **I'd like to begin with the dictionary** for support, and we have caught flak for doing that and probably will again today.  But I think it's helpful in this context to begin with an understanding of the possible and plausible meanings of |

-16-

| the specification excludes one of the meanings derived from the dictionary, whether the presumption in favor of the dictionary definition of the claim term has been overcome by "an explicit definition of the term different from its ordinary meaning," or whether the inventor "has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." . . . **That approach, in our view, improperly restricts the role of the specification in claim construction**.<br><br>Phillips, 415 F.3d at 1320 (emphasis added). | the terms integrated and unit.<br><br>    The dictionary defines integrated as combining or coordinating separate elements so as to provide a harmonious, interrelated whole . . .<br><br>    **With those definitions in mind, we can turn to the spec.  Nothing in the spec forecloses a functional understanding of these terms.**<br><br>Tr. at 268:19-69:12 (emphasis added); see also Uship Br. at 50. |

    The intrinsic evidence does not support Uship's inclusion of the phrase "or interrelated." In particular, the "adjunct packaging supply unit" does not support Uship's contention that "integrated" in the patent means "incorporated into . . . [an] interrelated whole."  The "adjunct packaging supply unit" is simply as described in the specification – it is a different "unit" that is "adjunct" to the claimed "unit," rather than "integrated" into the unit.  See A16 ('464 Spec. 10:45-55); A7 ('464 Fig. 6).  The "adjunct packaging supply unit" does not share functionality with the claimed unit, and it does not "work[] harmoniously" with the claimed unit.  Uship Br. at 50.  As such, the existence of the "adjunct packaging supply unit" has no relation to the construction of "integrated" in the specification.[10]

---

    [10]  A plain reading of the intrinsic evidence suggests that Ramsden did not consider the "adjunct packaging supply unit" to be "integrated." The Abstract identifies the scale, computer, card reader, and storage as being "integrated" into the unit, but it does not mention the "adjunct packaging supply unit."  See A1 ('464 Abstract).  Similarly, none of the claims in the '464 patent that use the word "integrated" mention the "adjunct packaging supply unit."  See A18-20 ('464 Claims 7-21; 28-34).

Finding no intrinsic support for its construction of "integrated," Uship ultimately resorts to speculation: "After all, a scale, a computer, a card reader, and a secured storage zone all could be within separate containers and still be integrated into an [*sic*] harmonious, functionally interrelated, physically proximate whole."  Uship Br. at 51.  Uship's unsupported speculation cannot rebut intrinsic evidence.  Furthermore, the patentee's statements during prosecution of the grandparent application directly contradict Uship's "separate containers" speculation.  When the USPTO initially rejected the '532 patent claims as an indefinite "aggregation of parts," Ramsden amended the claims "to an **integrated** system, not an 'aggregation of parts.'"  See A183 (G1144); A179 (G1137) (emphasis added).  Uship's construction of "integrated," however, improperly seeks to resurrect the rejected and abandoned "aggregation of parts" concept.  Accordingly, the Court should construe "integrated" to mean "incorporated into a unified whole."[11]

> b.      *"automated" - automatically controlled by mechanical or electronic devices [Undisputed]*

As a result of the parties' arguments and Court comments during the claim construction hearing, IBM, Uship, and the government agree that "automated" means "automatically controlled by mechanical or electronic devices."  See, e.g., Uship Br. at 51 ("Uship is willing to adopt the Government's construction.").

> c.      *"unattended" - no attendant is present*

The dispute between the government and Uship with respect to "unattended" relates to Uship's inclusion of the introductory phrase "capable of being used by a customer when" in its

---

[11]   During the claim construction hearing, the Court cited the government's construction of "integrated."  See Tr. at 281:12-18.

construction.  The word "unattended" is explicitly discussed in the specification, leading to the conclusion that "unattended" simply means "no attendant is present":

> Some delivery services operate **unattended** drop-boxes . . . .  Such schemes, however, cannot provide full insurance protection or verification that the package was in fact mailed, since **no attendant is present** to verify that the letter was actually placed in the box.  In addition, present-day **unattended** drop-boxes generally are not suitable for accepting packages because **packages need to be pre-weighed and sized** before they can be accepted for shipment.

A12 ('464 1:31-43) (emphasis added).  Thus, according to the intrinsic evidence, "unattended" means "no attendant is present."[12]

Despite the unequivocal construction in the specification, Uship, argues that "unattended" means "*capable of being used by a customer when* no attendant is present."  Uship Br. at 50, 52-53 (emphasis added to illustrate difference).  Uship's inclusion of the introductory phrase finds absolutely no support in the intrinsic or extrinsic evidence, and Uship does not purport to cite any evidence.  As noted by Uship in its pre-hearing Brief and during the hearing, its proposed definition of "unattended" "does not preclude the presence of an attendant."  Uship Pre-Hearing Br. at 29; <u>see also</u> Tr. at 288:19.  Thus, Uship's interpretation should be rejected because it would essentially eliminate a claim term.  <u>See</u> Uship Br. at 52 (arguing that "unattended" is a "natural presumption" rather than "a limitation"); <u>see, e.g.</u>, <u>Callicrate</u>, 427 F.3d at 1369 (reading out the "preformed" limitation resulted in an overbroad claim construction).  Uship's remaining arguments boil down to an explicit plea to construe the term to bolster its burden of proving infringement.  <u>See</u> Uship Br. at 52-53; Tr. at 288:22-89:5.  In light of the Federal Circuit's instruction that "claims are not construed 'to cover' or 'not to cover'" allegations of infringement, the Court should construe

---

[12]  <u>See also</u> A225 (unattended: "1. Not attended : a: lacking a guard, escort, caretaker, or other watcher" <u>Webster's Third New International Dictionary, Unabridged</u> 2482 (1993)).

"unattended" to mean "no attendant is present."  SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1118 (Fed. Cir. 1985) (*en banc*).

> d.    *"unit" - a single apparatus*

The government disputes Uship's inclusion of a "system of machines" within its construction of the term "unit."  The word "unit" appears repeatedly throughout the claims, but otherwise the word appears infrequently in the Abstract and in the specification.  See A18-20 ('464 Claims 7-21, 28-34); A1 ('464 Abstract).  Where it does appear in the specification, "unit" is repeatedly revealed to be "a single apparatus" operating with a specific set of functions.  See, e.g., A14 ('464 Spec. 5:63) (a central processing unit); A16 ('464 Spec. 10:46-47) (an adjunct packaging supply unit); A17 ('464 Spec. 12:48) (a climate control unit); A17 ('464 Spec. 12:63) (an air conditioner unit).  This definition of "unit" is also supported by the extrinsic evidence.[13]

As discussed above with respect to the construction of "integrated," Uship's approach to construing "unit" is deeply flawed.  Uship begins its analysis by citing the first, second, and ninth definitions of "unit" provided by the Random House Unabridged Dictionary.  See Uship Br. at 50; Uship Br. Ex. N at 2074.  Having begun its construction with the dictionary definitions, Uship parrots the discredited Texas Digital approach by claiming that the "patent encompasses the full

---

[13] See A226 (unit: "1a(1): the first natural number : a number that is the least whole number and is expressed by the numeral 1 (2): a single thing (as a magnitude or number) that constitutes an undivided whole . . . 2d: a piece or complex of apparatus serving to perform one particular function" Webster's Third New International Dictionary, Unabridged 2500 (1993));

      see also A235 (unit: "1a: the first and least natural number: ONE . . . 3c: a piece or complex of apparatus serving to perform one particular function" Webster's Ninth New Collegiate Dictionary 1291 (1990)).

range of these" definitions.   Uship Br. at 50.   Pursuant to <u>Phillips</u>, Uship's "dictionary first" approach must be rejected.

Uship also argues that "unit" should encompass "separate physical structures" or a "physically proximate" system of machines because the Federal Circuit held that "data acquisition unit" and "display unit" could each comprise physically separate structures in <u>Paragon Solutions, LLC v. Timex Corp.</u>, 566 F.3d 1075, 1083-87 (Fed. Cir. 2009).   <u>See</u> Uship Br. at 50.   This argument is without merit.   First, the Court cannot treat an unrelated decision involving an exercise monitoring system as extrinsic or intrinsic evidence with respect to the proper construction of "unit" in a patent involving automated shipping kiosks.   Second, the Federal Circuit acknowledged that "unit" normally "might suggest . . . a single structure" in <u>Paragon Solutions</u>, but held that the intrinsic claim language, drawings, and specification "suggest[ed] persuasively that the data acquisition unit may be multiple structures."   <u>Id.</u> at 1084.   The intrinsic claim language, drawings, and specification of the '464 patent, however, confirm the "normal suggestion" that "unit" is a single apparatus.   <u>See also</u> <u>Agilent Techs., Inc. v. Affymetrix, Inc.</u>, 567 F.3d 1366, 1376-77 (Fed. Cir. 2009) (holding that a district court erred by interpreting "a closed chamber" as "a system of enclosures").

Substantively, Uship's construction is sound to the extent that it recognizes that "apparatus" or "machine" is a single apparatus – as described above, the specification discloses that several functional subparts have been incorporated into a single apparatus.   But Uship then becomes unmoored by construing "unit" to be a system of physically proximate machines.   Uship's speculation that a "unit" could encompass "a scale, a computer, a card reader, and a secured storage zone all . . . within separate containers" is unsupported by any intrinsic or extrinsic evidence.   Uship Br. at 51.

-21-

### 2. *"Means for Weighing the Item to be Shipped" [Undisputed]*

The parties have agreed to a joint construction for "means for weighing the item to be shipped" in claim 7 of the '464 patent.  See Uship Br. at 53.

### 3. *"Means for Inputting Information Relating to the Destination to Which the Item Is to Be Shipped"*

| '464 Independent Claim 7<br>'464 Independent Claim 28<br>'464 Independent Claim 34<br>*Disputed Independent Claim Limitation*<br>means for inputting information relating to the destination to which the item is to be shipped; | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **Function:** inputting information relating to the destination to which the item is to be shipped<br>**Corresponding Structure:** keypad (2) or keyboard (226) or voice-recognition mechanism; and equivalents | [Means-plus-Function]<br>**Function:**<br>to input information relating to the place to which the item is to be shipped<br>**Corresponding Structure:**<br>keypad (28); keyboard (226) | **function:**  inputting information relating to the place to which the item is to be shipped<br>**structure:** keypad 28 or keyboard 226 |

The government disputes Uship's inclusion of a nonspecific "voice-recognition mechanism" within its construction of the corresponding structure in this limitation.  Each of the asserted independent claims in the '464 patent contains this limitation.

First, the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112.  See Means-Plus-Function Section, *supra* p. 7.  The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation.  Uship agrees.  See Uship Br. at 53.

Second, the function recited in the claim is "inputting information relating to the destination to which the item is to be shipped."  Within this function, the government construes "the destination to which the item is to be shipped" to be "the place to which the item is to be shipped."  The parties dispute the meaning of "destination," and that dispute is discussed in detail in Section II.E below.

Third, the specification identifies a total of two structures that correspond to the recited function:

    1.  keypad (28) (See A15 ('464 Spec. 7:21-28)); and

    2.  keyboard (226) (See A12, 18 ('464 Spec. 2:38-41, 13:12-15)).

Uship agrees that these two structures correspond to the recited function. See Uship Br. at 53-54. No other specific structures discussed in the specification correspond to the function of "inputting information relating to the place to which the item is to be shipped."

Uship's proposed construction of this limitation is flawed with respect to the inclusion of a nonspecific "voice-recognition mechanism" within the corresponding structure. The specification's single ambiguous reference to a generic voice-control "mechanism" is insufficient to provide corresponding structure. See Fonar Corp. v. Gen. Elec. Co., 107 F.3d 1543, 1551-52 (Fed. Cir. 1997) (holding that a group of nonspecific "other wave forms" could not constitute corresponding structure); see also Furnace Brook LLC v. Overstock.com, Inc., 230 Fed. Appx. 984, 988 (Fed. Cir. 2007) (*nonprecedential*). Instead, "voice-recognition mechanism" provides only a vague function without providing any actual structure. Thus, the corresponding structure should be limited to keypad (28) and keyboard (226).

### 4.    *"Control Means for Analyzing the Inputted Information and Calculating the Fee for Shipment of the Item"*

| '464 Independent Claim 7 '464 Independent Claim 28 '464 Independent Claim 34 *Disputed Independent Claim Limitation* control means for analyzing the inputted information and calculating the fee for shipment of the item; | | |
| --- | --- | --- |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **Function:** analyzing the inputted information and calculating the fee for shipment of the item | **[Means-plus-Function] Function:** to analyze the inputted information | **function:** analyzing the inputted information relating to the place to which the item is to be shipped, and |

| | | |
|---|---|---|
| **Corresponding Structure:** control system (100) including: CPU (102) in two-way communication with PLC (104); zone and weight charts and corresponding fee files; and equivalents | relating to the place to which the item is to be shipped, and to calculate the shipment fee **Corresponding Structure:** control system (100) including: (1) CPU (102) in two-way communication with PLC (104); and (2) connections to scale (22) and keypad (28) / keyboard (226)<br><br>*The means-plus-function limitation lacks sufficient corresponding structure* | calculating the fee for shipment of the item **Corresponding Structure:** control system 100 including: (1) CPU 102 in two-way communication with PLC 104; and (2) connections to scale 22 and keypad 28 / keyboard 226<br><br>[lacks sufficient structure for analyzing the inputted information and calculating the fee] |

The parties dispute three issues with respect to this limitation: (1) what constitutes the recited function; (2) what constitutes the corresponding structure; and (3) whether this means-plus-function limitation is indefinite because it claims a general purpose computer without disclosing an algorithm. Each of the asserted independent claims in the '464 patent contains this limitation.

The parties agree that the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112. The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation. See Uship Brief at 55.

First, this disputed limitation contains two different recited functions. The functions recited are "**analyzing** the inputted information and **calculating** the fee for shipment of the item." (emphasis added). The antecedent basis for "the inputted information" referred to in this function is the information relating to the place to which the item is to be shipped, discussed above in Section I.A.3. Thus, for a means to correspond to both functions, it must: (1) analyze the inputted information relating to the place to which the item is to be shipped ("analysis function"); and (2) calculate the shipment fee ("calculate function"). Uship, IBM, and the government generally agree that the limitation recites two functions. The primary difference is that IBM and the government specifically identify the "inputted information" analyzed by the control means by reference to the

-24-

antecedent basis; whereas Uship does not identify the inputted information at the heart of the analysis function.

Second, the specification identifies only a partial structure capable of performing both the analysis and calculate functions. Uship, the government, and IBM agree that the corresponding structure has to include at least: a "control system (100) including: CPU (102) in two-way communication with PLC (104)." See Uship Br. at 55; A6, 11 ('464 Figs. 5, 10); A12 ('464 Spec. 2:41-43, 61-63). The government and IBM, however, contend that "connections to scale (22) and keypad (28) / keyboard (226)" must also be part of any corresponding structure.

The connections to the scale and the keypad / keyboard are required corresponding structure. Without the connections, control system (100) could not calculate a shipment fee because it would not have the inputted destination information or the weight of the item. This requirement is reflected in the specification. See A12 ('464 Spec. 2:41-43) ("a controller for calculating a shipment fee for the parcel, the controller being in communication with the scale and the keyboard"); A12 ('464 Spec. 2:61-63) ("control structure for calculating a shipment fee for the parcel, the control structure being in communication with the scale and the keyboard"). Uship disagrees, but it fails to identify and distinguish the relevant portions of the specification.[14]

_____

[14] During the claim construction hearing, Uship appeared not to oppose the inclusion of the connections to the scale and the keyboard in the corresponding structure to this limitation:

> THE COURT: So your problem goes to the connected to?

> MR. LEHN: Well, if it's just a matter of the structure being connected to those devices, I don't know that it's the connection itself that we a problem with.

Tr. at 327:11-15; see also Tr. at 317:20-21 ("This is a computer basically that can interface with input devices."); Tr. at 326:3-10 (arguing that corresponding structure included "necessary components like the wiring cables, things like that"). Uship does not explain why it changed its

Third, even with the inclusion of the connections, the patent fails to disclose sufficient corresponding structure pursuant to <u>Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.</u>, 521 F.3d 1328 (Fed. Cir. 2008). In particular, the patent's disclosure is insufficient in light of Uship's assertion that the disclosed structure is no more than a general purpose computer. During the claim construction hearing, Uship repeatedly asserted that control system (100) was equivalent to a general purpose computer. <u>See</u> Tr. at 317:20-21; 319:22-23; 320:4-10; 323:4-11. The Federal Circuit has "consistently required that the structure disclosed in the specification be more than simply a general purpose computer" in a means-plus-function limitation. <u>Aristocrat</u>, 521 F.3d at 1333. In order to qualify as corresponding structure under Section 112 Paragraph 6, the general purpose computer must, in effect, be transformed into a "special purpose computer programmed to perform the disclosed algorithm." <u>See</u> <u>id.</u> (quoting <u>WMS Gaming, Inc. v. Int'l Game Tech.</u>, 184 F.3d 1339, 1348 (Fed. Cir. 1999)). The '464 patent does not disclose an algorithm that corresponds to the functions of "analyzing the inputted information [relating to the place to which the item is to be shipped] and calculating the fee for shipment of the item." Accordingly, the means-plus-function limitation is indefinite. <u>See</u> <u>id.</u> at 1337-38.

Uship fails to show that this means-plus function limitation is not indefinite through its citation of "zone and weight charts and corresponding fee files." First, as cited above, Uship repeatedly asserted that control system (100) was equivalent to a general purpose computer. <u>See</u> Tr. at 317:20-21; 319:22-23; 320:4-10; 323:4-11; <u>compare with</u> <u>Aristocrat</u>, 521 F.3d at 1336 ("flatly reject[ing]" counsel's contention during oral argument that any general purpose computer would infringe if it performed the claimed functions). Second, the specification never identifies how the

_____

position in its Brief.

control system uses the "zone and weight charts and corresponding fee files."  In the absence of such information, Uship cannot simply supply an explanation with unsupported attorney speculation.  See Uship Br. at 58 ("The control system does this by, again, looking up the shipment fees . . . .").  Third, Uship cannot broadly claim that the disclosure enables one skilled in the art to implement the algorithm without: (1) identifying the relevant art; and (2) providing testimony from a person skilled in the art.[15]

Finally, Uship's arguments in its Brief mirror the arguments rejected by the Federal Circuit in Aristocrat.  For example, Uship asserts that the specification implicitly discloses an algorithm by referring to "appropriate zone and weight charts" and that "the control system will automatically calculate the charges that are to be applied."  Uship Br. at 58.  The text cited by Uship, however, describes the function to be performed by the control system, rather than the algorithm used.  See A14-15 ('464 Spec. 6:30-36; 7:48-55).  Uship is essentially arguing that "devising an algorithm to perform that function would be within the capability of one of skill in the art, and . . . it was not necessary for the patent to designate any particular algorithm."  Aristocrat, 521 F.3d at 1334.  According to Aristocrat, "that argument is contrary to this [Federal Circuit] law."  Id.  Uship further cites In re Dossel to support its argument, much like the plaintiff in Aristocrat cited Dossel.  See Uship Br. at 58-59; compare with Aristocrat, 521 F.3d at 1335-36 (discussing In re Dossel, 115 F.3d 942 (Fed. Cir. 1997)).  As explained by the Federal Circuit, Dossel does not support Uship's argument; instead, Dossel illustrates the indefiniteness of this means-plus-function limitation.  Aristocrat, 521 F.3d at 1336.  Contrary to the present case, the Dossel application identified "the

---

[15] Attorney argument and a previously undisclosed Wikipedia article do not constitute proof that one skilled in the art would be able to understand and implement the vague disclosure in the '464 patent as of its effective filing date.

particular equation" and "described in great detail the components of that equation" used to perform the claimed function.  Id.  The '464 patent's nonspecific disclosure of "appropriate zone and weight charts" mirrors the "appropriate programming" language ruled indefinite in Aristocrat, rather than the "extremely detailed disclosure of all information necessary to perform the function" in Dossel. Id.  Thus, this Court should conclude that this means-plus-function limitation is indefinite because it lacks sufficient corresponding structure pursuant to Aristocrat.

### 5.    *"Means for Receiving Credit Card Information" [Undisputed]*

The parties have agreed to a joint construction for "means for receiving credit card information" in claim 7 of the '464 patent.  See Uship Br. at 60.

### 6.    *"Means for Communicating and Assessing the Shipment Fee . . ."*

| '464 Independent Claim 7 |
| --- |
| *Disputed Independent Claim Limitation* |
| means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines; |

| Uship Constructions | Government Constructions | IBM Constructions |
| --- | --- | --- |
| **PRIMARY CONSTRUCTION:** Telephone lines used to communicate and assess the shipment fee to the account of the person owning the credit card **ALTERNATIVE CONSTRUCTION:** **Function:** communicating and assessing the shipment fee to the account of the person owning the credit card **Corresponding Structure:** telephones lines [*sic*] connected to control system (100); or telephone lines connected to card reader (30, 230); and equivalents | [Means-plus-Function] **Function:** to communicate and assess the shipment fee to the account of the person owning the credit card **Corresponding Structure:** card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card | **function:** communicating and assessing the shipment fee to the account of the person owning the credit card **structure:** magnetic card reader 30 or 230 connected to a dedicated telephone line |

The parties dispute two issues with respect to this limitation:  (1) whether the disputed limitation is a means-plus-function limitation; and (2) whether the corresponding structure is limited

-28-

to the only structure identified as being capable of performing both the communicating and assessing functions in the specification.  Each of the other asserted independent claims in the '464 patent contains a limitation similar to the present limitation, but each will be discussed separately to account for the differences.

As an initial matter, the disputed limitation is a means-plus-function limitation that is subject to Paragraph 6 of Section 112.  The limitation uses the word "means," raising the presumption that this is a means-plus-function limitation.  Uship acknowledges that the presumption attaches to this limitation, but argues that the presumption is rebutted because the "telephone lines" in the claim perform both recited functions.  Uship Br. at 61.  The two functions recited in the claim 7 are "**communicating** and **assessing** the shipment fee to the account of the person owning the credit card."  A18 ('464 Claim 7) (emphasis added).

Uship's argument that means-plus-function treatment is rebutted is incorrect.  According to the Federal Circuit, the presumption of means-plus-function treatment is overcome if "the claim recites sufficient structure **for performing the described functions in their entirety**."  <u>TriMed, Inc. v. Stryker Corp.</u>, 514 F.3d 1256, 1259 (Fed. Cir. 2008) (emphasis added).   Uship's argument is flawed because – according to the explicit claim language – the telephone lines relate **only** to the communication function.  <u>See</u> A18 ('464 Claim 7) ("said means for communicating the shipment fee being by telephone lines").  A partial recitation of structure cannot rebut the means-plus-function presumption.  <u>See</u> <u>Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.</u>, 424 F.3d 1293, 1307-08 (Fed. Cir. 2005) (holding that the claim's recitation of threads was insufficient to perform the "securing means" function); <u>Altiris, Inc. v. Symantec Corp.</u>, 318 F.3d 1363, 1375-76 (Fed. Cir. 2003) (concluding that "means of booting" was a means-plus-function limitation because the recited

"commands" were "not sufficient structure to perform the entirety of the function"); see also
Aristocrat Techs. Australia Pty Ltd. v. Multimedia Games, Inc., 266 Fed. Appx. 942, 945-946 (Fed.
Cir. 2008) (*nonprecedential*) (concluding that means-plus function treatment applied because the
subsidiary structures were not "capable of performing all of the functions associated with the parent
means"). Ultimately, Uship improperly resorts to reading out the "assessing" function by claiming
that "communicating" and "assessing" are equivalent. See Uship Br. at 61 ("The telephone lines
'assess' the fee by communicating the charge . . . ."); compare with Mangosoft, Inc. v. Oracle Corp.,
525 F.3d 1327, 1330-31 (Fed. Cir. 2008) (rejecting a proposed construction that "ascribe[d] no
meaning to the term . . . not already implicit in the rest of the claim"). Thus, Uship cannot rebut the
presumption, and the Court should reject its "Primary Construction," which does not properly treat
this limitation as a means-plus-function limitation.

Only one structure is identified as being capable of performing both the communicating and
assessing functions in the specification:

> System 10 may be compatible with at least one commercial bank card . . . . After the
> customer has passed the magnetic card through reader 30, control system 100
> evaluates the information received from card reader 30 . . . . **The reader 30 may be
> connected to a dedicated telephone line that communicates with a central
> location for processing charges on the bank card**.

A14-15 ('464 Spec. 6:59-7:4) (emphasis added). Other than this structure, no other structure in the
specification corresponds to "communicating and assessing the shipment fee to the account of the
person." Accordingly, the proper corresponding structure is: card reader (30) connected to a
dedicated telephone line that communicates with a central location for processing charges on the
card.

-30-

Uship also proposes an "Alternative Construction" where the telephone lines are connected to control system (100) or to card reader (30, 230). This construction is flawed because it is contrary to the identified structure in the specification. Uship's proposed structures fail to account for the only structure identified as being capable of performing both functions in the specification: the card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card. In addition, Uship misrepresents FIG. 10 of the '464 patent as depicting a "telephone line being connected directly to the control system." See Uship Br. at 63; see also Tr. at 489:7-8. FIG. 10 depicts only a "Remote Service Center" as being connected directly to the control system. FIG. 10 is an abstract schematic chart relating only to the third embodiment of the invention, and the specification does not link FIG. 10 with the communicating and assessing functions.[16] Substantively, FIG. 10 does not identify a telephone line as part of the structure – Uship simply speculates that the connection between the control system and the "Remote Service Center" is a telephone line. During the claim construction hearing, Uship appeared to concede that FIG. 10 does not depict a telephone line, and depicts – at most – a nonspecific "means for communicating externally with the remote service center":

> THE COURT: The telephone line is between the telephone and remote service center?
>
> MR. LEHN: Well, I think that it's not artfully drawn. I think that telephone, the line that connects the CPU to the remote service center, I think the idea is that that continues on then. This thing about telephone on top, I think the idea is it's trying to communicate that you're using the telephone system to communicate with the remote service center.

---

[16] See A13 ('464 Spec. 3:28-37); Tr. at 491:11-13 ("I don't think [the specification] specifically addresses the telephone aspect of Figure 10.").

THE COURT:  I don't have any problem with that.  What I'm having trouble with is figuring out whether there's a telephone line to the CPU or not.

. . .

THE COURT:  I mean, the CPU does stuff and it has output.  But it doesn't have to go necessarily over a telephone wire.

MR. LEHN:  Well, the CPU, I mean, there's an equivalent structure to the telephone wire.  There's fiber optics and I don't know what, but there's a means for communicating externally with the remote service center.

THE COURT:  Okay, that I'll give you.

Tr. at 490:19-91:8; 493:4-12.  The Court discussed FIG. 10 at length with both Uship and the government.  See Tr. at 490:3-94:5; 498:15-99:25; Govt. '464 Present. at 39; 65.

Accordingly, the only means capable of communicating and assessing the shipment fee to the customer's account is a card reader connected to a dedicated telephone line that communicates with a central location for processing charges.  See, e.g., Asyst Techs., 268 F.3d at 1372 (holding that the "fourth means" must both "control" and "transmit," thus the corresponding structure "consists of the entire complex" that performs both functions).  Uship errs by reading out the dedicated telephone line connected to the card reader that communicates with a central location.  See, e.g., Cybor Corp., 138 F.3d at 1458 n.7 (noting that it is error to read out of the scope of corresponding structure any necessary structure shown in the specification).



**Figure 5.**  FIG. 10 of the '464 patent does not depict "telephone lines" or "a telephone wire."  See A11 ('464 Fig. 10); Govt. '464 Present. at 39; 65; see also Tr. at 490:3-94:5; 498:15-99:25.

7.       *"Means for Securely Storing Said Item until the Item Is Collected by Said Commercial Delivery Service"*

| '464 Independent Claim 7<br>'464 Independent Claim 28<br>'464 Independent Claim 34<br>*Disputed Independent Claim Limitation*<br>means for securely storing said item until the item is collected by said commercial delivery service; | | |
| --- | --- | --- |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **Function:** securely storing the item<br>**Corresponding Structure:** storage area (14) secured by inner doors (52, 54); or storage area (276) secured by inner door (246); or a collection space (96) secured by dump drop (92); and equivalents<br><br>**until the item is collected by said commercial delivery service:**<br>*Plain meaning* | **[Means-plus-Function]**<br>**Function:**<br>to securely store said item in a secured area for storage until the item is collected by said commercial delivery service<br>**Corresponding Structure:**<br>storage area (14) defined within outer housing (12), security mechanism (50), a pair of inner doors (52, 54);<br>**or**<br>storage area (276) defined within outer housing (211), outer door (234), inner door (246)<br>**or**<br>collection space (96) defined within outer housing (12), dump drop (92), access door (86), lock (87) | **function:** securely storing the item in a secured area for storage until the item is collected by said commercial delivery service;<br>**structure:** outer door 42; inner doors 52 and 54, stepper motor 58, secure zone 14, guide structure 74<br>OR<br>outer door 234, temporary holding space 240, inner door 246, stepper motor 248, secure zone 276, powered conveyer 242, passive parcel distribution device 264<br>OR<br>dump drop 92, incline chute 94, collection space 96 |

The parties dispute two issues with respect to this limitation:  (1) whether Uship has improperly truncated the recited function; and (2) whether the government has correctly identified the corresponding structure in the specification.  Each of the three asserted independent claims in the '464 patent contains this limitation.

The parties agree that the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112.  The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation.  See Uship Brief at 64.

-33-

First, the function recited in the claim is "securely storing said item until the item is collected by said commercial delivery service." Thus, the claim language of the function anticipates: (1) moving the item into secure storage; and (2) keeping the item in secure storage until it is collected.

Second, the specification identifies a total of three structures that correspond to the recited function:

1.    storage area (14) defined within outer housing (12), security mechanism (50), a pair of inner doors (52, 54); or

2.    storage area (276) defined within outer housing (211), outer door (234), inner door (246); or

3.    collection space (96) defined within outer housing (12), access door (86), lock (87).

The specification of the '464 patent discloses different embodiments which securely store items until they are collected by a commercial delivery service. Each of the relevant embodiments repeatedly stress that a storage area, defined within the outer housing of the unit, is key to securely storing items until collection. See, e.g., A12 ('464 Spec. 2:34-36, 54-56) (describing first and second aspects of the invention that both use an "inner surface [of the outer housing] defining a storage area which is constructed and sized to store a multiplicity of parcels"); A13 ('464 Spec. 3:44-46) ("a first embodiment of the invention . . . includes an outer housing 12 which defines a storage area 14 for holding items"); A17 ('464 Spec. 11:39-40) (the third embodiment stores items "within a storage area 276 defined within outer housing 211"); A14 ('464 Spec. 5:21-22) (access door 86, which secures collection space 96, "is provided in a forward wall of outer housing 12"). Thus, a storage

-34-

area (14, 276, 96), defined within the outer housing of the unit (12, 211), is a necessary structure for securely storing the parcel until it is collected by said commercial delivery service.[17]

Each of the three corresponding structures use different mechanisms to secure items until subsequent collection. The parties agree that the first corresponding structure includes inner doors (52, 54), but the specification also clearly links security mechanism (50) with the recited function:

> To prevent unauthorized access to storage area 14, a security mechanism 50 includes a pair of inner doors 52, 54 which are openable and closable by an inner door closing mechanism 56.

A13 ('464 Spec. 4:26-29). Thus, the first corresponding structure includes at least: a storage area (14) defined within outer housing (12), a security mechanism (50), and a pair of inner doors (52, 54).

Similarly, the parties agree that the second corresponding structure includes inner door (246), but the specification also clearly links outer door (234) with the recited function:

> an improved security deposit system 238 includes a sliding outer door 234 . . . . Improved security deposit system 238 utilizes a temporary holding space 240 which is partially defined by sliding outer door 234 and a hinged inner door 246

A17 ('464 Spec. 11:8-13). Thus, the second corresponding structure includes at least: a storage area (276) defined within outer housing (211), an outer door (234), and an inner door (246). Finally, the parties agree that the third corresponding structure includes dump drop (92),[18] but the specification also links access door (86) and lock (87) with the recited function:

---

[17] Uship previously contended that "the outer housing combined with [other structures] provides adequate security for the storage area," and was thus corresponding structure. Uship Pre-Hearing Br. at 45. Uship fails to explain why it no longer considers outer housing (12, 211) to be part of the corresponding structure. See Uship Br. at 68.

[18] The government has slightly edited its proposed construction of this limitation because the parties agree that the third corresponding structure includes dump drop (92). See Uship Br. at 64, 68.

Referring now to FIGS. 1, 3 and 4, a manifest access door 86 is provided in a forward wall of outer housing 12 . . . .  Manifest access door 86 is provided with a lock 87 which is, preferably, openable only by service personnel or representatives of client delivery services.

> . . .

Looking now to FIG. 4, system 10 further includes a dump drop option . . . .  When an envelope is placed in the pivotable drawer of dump drop 92 and the drawer is allowed to pivot back to its closed position, an envelope will fall onto the incline chute 94 and slide downwardly, finally dropping into the collection space 96.  Chute 94 is positioned beneath the slidable platform 88 for the manifest printer 90, which are not shown in FIG. 4 for purposes of clarity.

A14 ('464 Spec. 5:21-49).  As described in the specification above, FIG. 4 of the '464 patent depicts the structure that corresponds to securely storing items until collection.  FIG. 4 confirms that collection space (96) is defined within the outer housing, and securely stores items until collection through restricted access through access door (86) and lock (87):



**Figure 6.**  FIG. 4 of the '464 patent depicts collection space (96, purple) defined within the outer housing, secured by access door (86, green) and lock (87, red).

-36-

Uship's proposed construction of this limitation is flawed with respect to both function and means.  First, Uship truncates the function of this limitation to "securely storing the item," effectively reading out the function claim limitation "until the item is collected by said commercial delivery service."   See Lockheed Martin Corp., 324 F.3d at 1319.  Uship's reliance on BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC, 303 F.3d 1332 (Fed. Cir. 2002), for support is misplaced.  In that case, the Federal Circuit held that the phrase "positioned for electrostatically charging the filaments . . ." was means-focused and not part of the function "forming a corona."  Id. at 1343-44.  Indeed, the Federal Circuit's means-focused interpretation is explicitly supported by the plain language of the limitation: the word "positioned" directly modifies the word "means" and does not modify the function-verb "forming."   Id.  In the present case, however, the phrase "until the item is collected by said commercial delivery service" is function-focused.  The "until" phrase directly modifies the function-verb "storing" by explaining how long the item is to be stored.  Since the phrase at issue is function-focused, rather than means-focused, the Court must consider the phrase to be part of the function, as the Federal Circuit did in the Lockheed and *en banc* Donaldson decisions.   See Lockheed, 324 F.3d 1308, 1319 (holding that a district court erred by truncating a



*Means-focused:*
corona means cooperating with said attenuator and positioned for electrostatically charging the filaments . . . .
BBA Nonwovens, 303 F.3d at 1343-44

*Function-focused:*
means for rotating said wheel in accordance with a predetermined rate schedule which varies sinusoidally over the orbit at the orbital frequency of the satellite
Lockheed, 324 F.3d at 1315, 1319

*Function-focused:*
means for securely storing said item until the item is collected by said commercial delivery service
'464 Claims 7, 28, 34

**Figure 7.**   The limitation at issue here is function-focused, as in Lockheed, rather than means-focused, as in BBA Nonwovens.

function to "rotating said wheel," reading out the function-focused, responsive "in accordance with a predetermined rate schedule which varies sinusoidally . . ."); Donaldson, 16 F.3d at 1195-97 (construing the phrase "responsive to pressure increases in said chamber . . ." to be part of the function, and reversing a prior art rejection based upon a structure that did not correspond to the "responsive" function).

As a result of misconstruing the recited function, Uship omits necessary corresponding structure described in the specification for each of the three alternative structures. Uship's construction ignores structures that the patent links to the function of securely storing items until collection. Accordingly, the Court should construe this limitation with the full recited function and with the structures that correspond to the function of securely storing the items until collection.

### 8. *"Means for Storing the Inputted Information Once Said Item Is Disposed in Said Secured Storage Means"*

| ‘464 Independent Claim 7 ‘464 Independent Claim 28 ‘464 Independent Claim 34 *Disputed Independent Claim Limitation* means for storing the inputted information once said item is disposed in said secured storage means, | | |
| --- | --- | --- |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **Function:** storing the inputted information **Corresponding Structure:** control system (100) including CPU (102) in two-way communication with PLC (104); and equivalents<br><br>**once said item is disposed in said secured storage means:** *Plain meaning* | **[Means-plus-Function] Function:** to store the inputted information relating to the place to which the item is to be shipped once the item is disposed in said secured storage means **Corresponding Structure:** control system (100) including: (1) CPU (102) with CPU memory in two-way communication with PLC (104); and (2) PLC (104) connected to first sensor (112) or third sensor (116) | **function:** storing the inputted information relating to the place to which the item is to be shipped once the machine determines that the item was disposed in the secured storage means **structure:** control system 100 including: (1) CPU 102 with memory in two-way communication with PLC 104; and (2) PLC 104 connected to first sensor 112 or third sensor 116 |

The parties dispute two issues with respect to this limitation:  (1) whether Uship has improperly truncated the recited function; and (2) whether the government has correctly identified the corresponding structure in the specification.  Each of the three asserted independent claims in the '464 patent contains this limitation.

The parties agree that the disputed limitation is a means-plus-function limitation governed by Paragraph 6 of Section 112.  The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation.  See Uship Br. at 69.

First, the function recited in the claim is "storing the inputted information once said item is disposed in said secured storage means."  The antecedent basis for "the inputted information" referred to in this function is the information relating to the place to which the item is to be shipped, discussed above in Section I.A.3.  Uship disagrees that the function includes the phrase "once said item is disposed in said secured storage means," but its reliance on BBA Nonwovens is once again misplaced.  In the present case, the phrase "once said item is disposed in said secured storage means" is function-focused.  The word "once" directly modifies the function-verb "storing," and the claimed unit performs the information storage function in response to the disposal in the secured storage.  Since the phrase at issue is function-focused, rather than means-focused, the Court must consider the phrase to be part of the function.  See Lockheed, 324 F.3d 1308, 1319 (holding that a district court erred by truncating a function to "rotating said wheel," reading out the function-focused, responsive "in accordance with a predetermined rate schedule which

Function-focused:
means for storing the inputted information (relating to the place to which the item is to be shipped) once said item is disposed in said secured storage means

'464 Claims 7, 28, 34

**Figure 8.** The limitation here is function-focused.

varies sinusoidally . . ."); <u>Donaldson</u>, 16 F.3d at 1195-97 (construing the phrase "responsive to pressure increases in said chamber . . ." to be part of the function, and reversing a prior art rejection based upon a structure that did not correspond to the "responsive" function).

Second, the specification identifies only one structure capable of performing the function of "storing the inputted information (relating to the place to which the item is to be shipped) once said item is disposed in said secured storage means."  In fact, only once sentence in the specification discusses this function and the corresponding structure:

> When the first sensor 112 (or the third sensor 116 in the case of the dump drop) senses the presence of an envelope, parcel or package, control system 100 stores information relating to the transaction in CPU 102.

A15 ('464 Spec. 8:43-47).  Other than this single reference, the text of the specification never again mentions storing inputted information when the item is disposed in the secure storage means.  In FIG. 5, the patent provides a diagram of the structure described above:



**Figure 9.** "When the first sensor 112 (or the third sensor 116 in the case of the dump drop) senses the presence of an envelope, parcel or package, control system 100 stores information relating to the transaction in CPU 102."  A6 ('464 Fig. 5) (highlighting added); A15 ('464 Spec. 8:43-47).

-40-

Thus, as described in the specification and as depicted in FIG. 5, the only structure capable of storing inputted information is control system (100) including: (1) CPU (102) with CPU memory in two-way communication with PLC (104); and (2) PLC (104) connected to first sensor (112) or third sensor (116).

As discussed above, Uship gravely errs by both ignoring the antecedent basis for "the inputted information" and by truncating the function of this limitation. As a result, Uship's citations to the specification are clearly incorrect because they do not correspond to:  (1) the destination information stored by the function; and (2) the function-focused, responsive phrase "once said item is disposed in said secured storage means." <u>See</u> A14 (Spec. 6:12-13) ("receiv[ing] programming input," not destination information); A15 (Spec. 7:1) (containing "bad" credit cards in memory, not destination information); A16 (Spec. 10:26-30) ("stor[ing] the number of the rejected package," not destination information). Uship then manufactures a narrative for its limited structure by speculating that the invention could not operate unless the Court adopts its construction. <u>See</u> Uship Br. at 70-72 ("If the control system did not store the inputted information until the deposit . . . it could not store the information at the time the deposit is sensed, either . . . . These operations would be impossible if the information were not already stored . . . ."). Despite laboriously citing to the specification for most of its narrative, Uship then abandons the specification in favor of speculation when discussing the only legally relevant part – the information storage aspect of the unit. Uship's speculative narrative is directly contradicted by Federal Circuit precedent, which requires that the specification clearly link corresponding structure with the recited function. <u>See</u> <u>B. Braun Medical, Inc.</u>, 124 F.3d at 1424.

Ultimately, according to Uship's interpretation, the "once said item is disposed" claim language actually has nothing to do with the disposal of the item – a result that is simultaneously unsupported and illogical.  See Uship Br. at 72.  Recognizing this, Uship argues that "at worst Uship's construction is the lesser of two evils" because the government's "construction plainly contradicts the specification."  Uship's argument is flawed for at least two reasons.  First, as described above, the government's construction is consistent with the specification; the proper construction merely contradicts Uship's speculative narrative.  Second, Uship's construction effectively reads a limitation out of a claim – a result that is absolutely not permitted.  See Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention . . . ."); Bicon, Inc., 441 F.3d at 950-52 ("Allowing a patentee to argue that [claim limitations] are merely superfluous would render the scope of the patent ambiguous . . . .").  Indeed, Uship's argument is strikingly similar to an argument rejected in Oak Tech., Inc. v. Int'l Trade Com'n, 248 F.3d 1316, 1328-39 (Fed. Cir. 2001).  In that case, the plaintiff argued that a limitation that required error detection "after" error correction could cover devices in which error detection began before error correction.  See id.  The Federal Circuit disagreed, holding that the specification did not support plaintiff's argument.  See id.  Furthermore, even if plaintiff's argument had been supported by the specification, the patentee's use of the word "after" in the claim specifically trumped any alternate embodiments.  See id.

Accordingly, the Court should construe the structure consistent with the only sentence in the specification that corresponds to "storing the inputted information [relating to the place to which the

item is to be shipped] once said item is disposed in said secured storage means."  A15 ('464 Spec.

8:43-47).

## 9.    *"Means for Displaying a Manifest"*

| '464 Independent Claim 7<br>'464 Independent Claim 28<br>*Disputed Independent Claim Limitation*<br>said information storage means including <u>means for displaying a manifest</u>. | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **Function:** displaying a listing of all transactions which pertain to the particular commercial delivery service<br>**Corresponding Structure:** manifest printer (90 or 280); and equivalents | **[Means-plus-Function]**<br>**Function:**<br>to display a listing of all transactions which pertain to the particular commercial delivery service<br>**Corresponding Structure:** manifest printer (90, 280) | **function:** displaying a listing of all transactions which pertain to the particular commercial delivery service<br>**structure:** manifest printer 90, 280 |

Uship revised its construction of this limitation and has agreed that manifest printer (90, 280)

is the corresponding structure for this limitation in claims 7 and 28 of the '464 patent.  <u>See</u> Uship

Br. at 73.

## B.    Dependent Claim 9

| '464 Dependent Claim 9<br>*Disputed Dependent Claim Limitation*<br>The integrated, automated, unattended unit of claim 7 wherein said means for storing said information further includes <u>means for communicating said information to a remote location staffed by a human operator</u>. | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **Function:**  communicating said information to a remote location<br>**Corresponding Structure:** telephone lines connected to control system (100); and equivalents | **[Means-plus-Function]**<br>**Function:**<br>to communicate the stored information relating to the place to which the item is to be shipped to a <u>remote location</u> staffed by a human operator<br>**Corresponding Structure:**<br>*The means-plus-function limitation lacks sufficient corresponding structure* | **function:**  communicating said information to a remote location staffed by a human operator<br>**structure:** [lacks sufficient structure for communicating the information to a remote location staffed by a human operator] |

The parties dispute two issues with respect to dependent claim 9:  (1) the meaning of "said information"; and (2) whether this means-plus-function limitation is indefinite because the specification fails to disclose sufficient corresponding structure.

The parties agree that the disputed limitation in claim 9 – "means for communicating said information to a remote location staffed by a human operator" – is a means-plus-function limitation governed by Paragraph 6 of Section 112.  The limitation uses the word "means" and there is no evidence to rebut the presumption that this is a means-plus-function limitation.  See Uship Br. at 73.

First, the function recited in the claim is "communicating said information to a remote location staffed by a human operator."  The antecedent basis for "said information" referred to in this function is the "inputt[ed] information relating to the destination to which the item is to be shipped," discussed above in Section I.A.3 with respect to claim 7 of the '464 patent.[19]  Uship does not explicitly define "said information"; its citation to its previous arguments indicates that Uship does not acknowledge the antecedent basis for the phrase.  See Uship Br. at 74.

Second, the specification fails to identify any structure that communicates the stored inputted destination information to a remote location staffed by a human operator.  To the extent that the manifest contains the inputted destination information, the specification mentions this function only once, in passing, without disclosing any specific structure:

> The system 10 may be capable of transmitting the manifest to a remote location such
> as a central office for the carrier.

---

[19]  The government has slightly edited its proposed construction of this limitation because the parties agree that the phrase "remote location" does not need to be construed.  See Uship Br. at 74 n.52.

A16 ('464 Spec. 9:57-60).   This meager disclosure is incapable of providing corresponding structure.  See generally Atmel Corp. v. Information Storage Devices, Inc., 198 F.3d 1374, 1382 (Fed. Cir. 1999) ("Fulfillment of the § 112, ¶; 6 tradeoff cannot be satisfied when there is a total omission of structure.  There must be structure in the specification.").  Accordingly, the claim is indefinite pursuant to Paragraph 2 of Section 112.  See Donaldson, 16 F.3d at 1195.

Uship again errs by truncating the function of this limitation, reading out "staffed by a human operator."  See Lockheed Martin Corp., 324 F.3d at 1319.  The modifying phrase "staffed by a human operator" is an inseparable part of the prepositional phrase "to a remote location staffed by a human operator," which directly modifies the function-verb "communicating."  As such, it is a necessary part of the function.  By cutting out this necessary phrase, Uship seeks support for its argument that "telephone lines" constitute corresponding structure.  See Uship Br. at 74.  Uship, however, errs again by failing to cite any support from the specification for its corresponding structure.  As noted above, the specification's vague statement that "system 10 may be capable" of performing the function is indefinite with respect to the corresponding structure.  Furthermore, the abstract schematic chart in FIG. 10 is similarly indefinite with respect to identifying specific corresponding structure.  See supra Section I.A.6.  Thus, claim 9 is indefinite because no structure – including "telephone lines" – is ever linked to  "communicating said information [relating to the place to which the item is to be shipped] to a remote location staffed by a human operator."  A19 ('464 Claim 9); B. Braun Medical, 124 F.3d at 1424.

### C.   Dependent Claim 10

**'464 Dependent Claim 10**
*Disputed Dependent Claim Limitation*
The integrated, automated, unattended unit of claim 9 wherein said unit includes a pivotable door that serves as a slide when said door is opened, said slide serving to transport the item to a storage area for secure storage.

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| The integrated, automated, unattended unit includes a **pivotable door** that operates as a chute or a smooth surface on which items can glide or pass smoothly and which door serves to transport the item to a storage area for secure storage | **serves as a slide:** operates as a downward-inclined chute with a flat bed<br><br>**a storage area:** a space for storing items within the outer housing of the unit<br><br>**for secured storage:** stored in a manner that is inaccessible to unauthorized persons | The integrated, automated, unattended unit has a [pivotable door] that has a slide to transport the item to the secure storage area of the unit.<br><br>**a storage area:** a space for storing items within the outer housing of the unit<br><br>**for secured storage:** stored in a manner that is inaccessible to unauthorized persons |

Claim 10 of the '464 patent does not invoke means-plus-function treatment under Paragraph 6 of Section 112. Uship and the government, however, dispute the proper construction of three of the limitations in this dependent claim.[20]

First, the phrase "serves as a slide" should be interpreted to mean "operates as a downward-inclined chute with a flat bed." Turning first to the specification, the pivotable door is discussed at length in one key paragraph:

> Dump drop 92 includes a pivotable door or drawer which has a handle 98 and is similar to the drawers on commercial drop-boxes or those which are used by the U.S. Postal Service. . . . Positioned beneath the pivotable drawer is an **inclined low friction chute 94 which inclines downwardly** to a location above a collection space 96. When an envelope is placed in the pivotable drawer of dump drop 92 and the drawer is allowed to pivot back to its closed position, an envelope will fall onto the incline chute 94 and **slide downwardly**, finally dropping into the collection space 96.

A14 ('464 Spec. 5:34-46) (emphasis added); see also A5 ('464 Fig. 4) (depicting above). Even though the "sliding" in this paragraph is taking place on low friction chute 94, rather than on the pivotable door itself, the specification clearly associates a "slide" with "an inclined low friction

_____

[20]  The government has slightly edited its proposed construction of this limitation because the parties appear to agree that the phrase "serving to transport" does not need to be construed.

chute which inclines downwardly." This implicit definition in the specification is strongly supported by extrinsic evidence, such as technical and general purpose dictionaries.  See A239 (slide: "1. A sloping chute with a flat bed."  McGraw-Hill Dictionary of Scientific and Technical Terms 1949 (6th ed. 2003))."[21]  Uship's proposed construction[22] is unduly broad, essentially equating "slide" with "a chute or a smooth surface."  Because Uship's expansive definition is unsupported by the intrinsic evidence, and because its construction would necessarily include items that are clearly not slides – such as air hockey tables and horizontal panes of glass – the Court should adopt the government's construction of this phrase.

Second, "a storage area" should be construed to mean "a space for storing items within the outer housing of the unit."  The claims and the specification repeatedly and consistently define the storage area as being within the outer housing of the unit, for the purpose of storing items.  See, e.g., A18 ('464 Claim 1) ("a storage area defined by said outer housing"); A12 ('464 Spec. 2:34-36, 53-56) ("the inner surface [of the outer housing] defining a storage area which is constructed and sized to store a multiplicity of parcels"); A13 ('464 Spec. 3:45-47) (the first embodiment "includes an outer housing 12 which defines a storage area for holding items"); A17 ('464 Spec. 11:40-41) ("a storage area 276 defined within outer housing 211").  Uship's construction errs by failing to

---

[21]  See also A224 (slide: "5c: a sloping trough down which objects are carried by gravity" Webster's Third New International Dictionary, Unabridged 2142 (1993));

A234 (slide: "4c: a sloping trough down which objects are carried by gravity" Webster's Ninth New Collegiate Dictionary 1108 (1990)).

[22]  As Uship notes in a footnote, its construction is purely derived from the second and twelfth definitions of "slide" provided by an extrinsic dictionary.  See Uship Br. at 76 n.54.  Uship does not address the intrinsic evidence.

acknowledge that the storage area is defined by the outer housing of the unit, and its "separate containers" theory finds no support in the specification.

Finally, "for secured storage" should be construed to mean "stored in a manner that is inaccessible to unauthorized persons." The specification equates "secure" with specific measures taken to render the packages inaccessible to unauthorized persons. <u>See</u> A17 ('464 Spec. 12:4-5) ("the secure zone, where the parcel is stored until it is picked up"); A17 ('464 Spec. 12:38-40) ("Door 278 is preferably secured by a combination or code type lock, which can be opened by authorized personnel"). This definition also parallels the extrinsic evidence.[23]

### D.    Dependent Claim 11 *[Undisputed]*

The parties have agreed to a joint construction for "serves to secure said storage area when said door is opened" in claim 11 of the '464 patent. <u>See</u> Uship Br. at 76.

### E.    Dependent Claim 12 *[Undisputed]*

The parties have agreed to a joint construction for "comprises a magnetic card reader" in claim 12 of the '464 patent. <u>See</u> Uship Br. at 76.

### F.    Dependent Claim 15

| '464 Dependent Claim 15 |
| --- |
| *Disputed Dependent Claim Limitation*<br>The integrated, automated, unattended unit of claim 12 wherein said card reader is adapted to read credit cards issued by any of a plurality of credit card companies and wherein said fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction. |

---

[23] <u>See</u> A223 (secure: "2c: affording safety : INVIOLABLE . . . e: strong, stable, or firm enough to ensure safety : SOLID, UNASSAILABLE" <u>Webster's Third New International Dictionary, Unabridged</u> 2053 (1993));

A233 (secure: "1a: to relieve from exposure to danger : act to make safe against adverse contingencies b: to put beyond hazard of losing or of not receiving : GUARANTEE" <u>Webster's Ninth New Collegiate Dictionary</u> 1062 (1990)).

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| the card reader is adapted to read one or more credit card companies' credit cards | *Plain Meaning* - the card reader is adapted to read credit cards issued by more than one credit card company and the fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction | *Plain Meaning* - the card reader is adapted to read credit cards issued by more than one credit card company and the fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction |

With respect to dependent claim 15 of the '464 patent, the government contends that the ordinary meaning of the claim language, as understood by a person of skill in the art, is readily apparent.  See Phillips, 415 F.3d at 1314.  Accordingly, there is no need for the Court to construe any limitations within this claim.

**G.   Independent Claim 28**

**1.   *"Means for Communicating and Assessing the Shipment Fee to the Account of the Person"***

**'464 Independent Claim 28**
*Disputed Independent Claim Limitation*
'464/28:          means for communicating and assessing the shipment fee to the account of the person

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **Function:** communicating and assessing the shipment fee to the account of the person **Corresponding Structure:** telephones lines [*sic*] connected to control system (100); or telephone lines connected to card reader (30, 230); and equivalents | **[Means-plus-Function]** **Function:** to communicate and assess the shipment fee to the account of the person **Corresponding Structure:** card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card | **function:** communicating and assessing the shipment fee to the account of the person owning the credit card **structure:** magnetic card reader 30 or 230 connected to a dedicated telephone line |

There are two substantive differences between the "means for communicating and assessing . . ." limitations in claim 28 and claim 7.  First, in comparison with claim 7, the limitation in claim 28 omits the modifying phrase "owning the credit card" from the function-focused phrase "to the account of the person owning the credit card."  Uship and the government both reflect this omission in the recited functions in their respective constructions.  Second, in comparison with claim 7, the limitation in claim 28 omits the phrase "said means for communicating the shipment fee being by telephone lines."  Without this partial recitation of structure in the claim, Uship agrees that this is a means-plus-function limitation.



**Figure 10.**  The government identified the substantive differences between the disputed "means for communicating and assessing . . ." means-plus-function limitations during the claim construction hearing.  See Govt. '464 Present. at 34.

Otherwise, the parties contend that this limitation must be subjected to the same analysis presented with respect to the similar limitation in claim 7.  See Uship Br. at 78.  As previously discussed, the patent identifies only one structure as being capable of performing both of the communicating and assessing functions in the specification:

> After the customer has passed the magnetic card through reader 30, control system 100 evaluates the information received from card reader 30 . . . .  **The reader 30 may be connected to a dedicated telephone line that communicates with a central location for processing charges on the bank card**.

A14 ('464 Spec. 6:59-7:4) (emphasis added).  Other than this structure, no other structure in the specification corresponds to "communicating and assessing the shipment fee to the account of the

person." Accordingly, the corresponding structure is: card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card.

> **2.**     ***"Means for Printing a Hard Copy of Said Account Charge for Said Person" [Undisputed]***

The parties have agreed to a joint construction for "means for printing a hard copy of said account charge for said person" in claim 28 of the '464 patent. See Uship Br. at 78-79.

**H.    Dependent Claim 30 – "Means for Communicating Said Account Charge to a Remote Location"**

| '464 Dependent Claim 30 | | |
|---|---|---|
| *Disputed Dependent Claim Limitation* | | |
| The integrated, automated, unattended unit of claim 28 including <u>means for communicating said account charge to a remote location</u>. | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **Function:** communicating said account charge to a remote location **Corresponding Structure:** telephones lines [*sic*] connected to control system (100); or telephone lines connected to card reader (30, 230); and equivalents | **[Means-plus-Function] Function:** to communicate the account charge to a remote location **Corresponding Structure:** card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges | **function:** communicating the account charge to a remote location **structure:** magnetic card reader 30 or 230 connected to a dedicated telephone line |

The parties dispute one issue with respect to this limitation – whether the corresponding structure is limited to the only structure identified as being capable of performing the communicating function in the specification. The parties agree that dependent claim 30 contains a means-plus-function limitation, and that this limitation must be subjected to the same analysis presented with respect to the similar limitation in claim 7. See Uship Br. at 79. The disputed

limitation contains one recited function – "communicating said account charge to a remote location."[24]

As discussed above in Section I.A.6, the specification provides only one structure that communicates the assessed shipment fee to a remote location:

> After the customer has passed the magnetic card through reader 30, control system 100 evaluates the information received from card reader 30 . . . . **The reader 30 may be connected to a dedicated telephone line that communicates with a central location for processing charges on the bank card**.

A14-15 ('464 Spec. 6:59-7:4) (emphasis added).  Accordingly, the corresponding structure is:  card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card.

## I.     Independent Claim 34

### 1.     *"Means for Communicating and Assessing the Shipment Fee to the Account of the Person, Said Means for Communicating the Shipment Fee Being by Telephone Lines"*

| '464 Independent Claim 34 | | |
|---|---|---|
| *Disputed Independent Claim Limitation*<br>means for communicating and assessing the shipment fee to the account of the person, said means for communicating the shipment fee being by telephone lines; | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **PRIMARY CONSTRUCTION:**<br>Telephone lines used to communicate and assess the shipment fee to the account of the person<br>**ALTERNATIVE CONSTRUCTION:**<br>**Function:** communicating and assessing the shipment fee to the account of the person<br>**Corresponding Structure:** | [Means-plus-Function]<br>**Function:**<br>to communicate and assess the shipment fee to the account of the person<br>**Corresponding Structure:**<br>card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card | **function:** communicating and assessing the shipment fee to the account of the person owning the credit card<br>**structure:** magnetic card reader 30 or 230 connected to a dedicated telephone line |

---

[24] Thus, the "and assess" language in the government's initial construction of the recited function is unnecessary.

| telephones lines [*sic*] connected to control system (100); or telephone lines connected to card reader (30, 230); and equivalents | | |
|---|---|---|

Once again, claim 34 contains a limitation that is similar to the "means for communicating and assessing . . ." limitation from claim 7.  The only substantive difference between the "means for communicating and assessing . . ." limitations in claim 34 and claim 7 is that claim 34 omits the modifying phrase "owning the credit card" from the prepositional phrase "to the account of the person owning the credit card."  The parties have each reflected this change in their respective constructions.

Otherwise, the parties contend that this limitation must be subjected to the same analysis presented with respect to the similar limitation in claim 7.  See Uship Br. at 79 n.56.  As previously discussed, the patent identifies only one structure as being capable of performing both the communicating and assessing functions in the specification:  card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card.  See A14-15 ('464 Spec. 6:59-7:4)

2.  ***"Means for Transmitting Information That May Be Used to Prepare a Manifest to a Remote Location"***

| '464 Independent Claim 34 | | |
|---|---|---|
| *Disputed Independent Claim Limitation* | | |
| said information storage means including <u>means for transmitting information that may be used to prepare a manifest to a remote location.</u> | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **Function:**  Transmitting information that may be used to prepare a listing of all transactions that pertain to a particular commercial delivery service to a remote location<br>**Corresponding Structure:** telephone lines connected to | **[Means-plus-Function]**<br>**Function:**<br>to transmit information that may be used to prepare a listing of all transactions which pertain to the particular commercial delivery service to a <u>remote location</u><br>**Corresponding Structure:** | **function:** transmitting information that may be used to prepare a manifest to a remote location<br>**structure:** [lacks sufficient structure for transmitting information for preparing a manifest to a remote location] |

| control system (100); and equivalents | *The means-plus-function limitation lacks sufficient corresponding structure* | |
|---|---|---|

This disputed limitation in independent claim 34 is very similar to the disputed limitation in dependent claim 9.  See A19 ('464 Claim 9) ("means for communicating said information to a remote location staffed by a human operator"); compare with A20 ('464 Claim 34) ("means for transmitting information that may be used to prepare a manifest to a remote location").  The parties agree that this is a means-plus-function limitation governed by Paragraph 6 of Section 112.  See Uship Br. at 80.  In addition, the parties essentially agree that the function recited in the claim is "to transmit information that may be used to prepare a listing of all transactions which pertain to the particular commercial delivery service to a remote location."[25]

As discussed in conjunction with claim 9, the specification fails to identifies any structure that transmits information used to prepare a manifest[26] to a remote location.  The specification mentions this function only once, in passing, without disclosing any specific structure:

> The system 10 may be capable of transmitting the manifest to a remote location such as a central office for the carrier.

A16 ('464 Spec. 9:57-60).  This meager disclosure is incapable of providing corresponding structure.  See generally Atmel Corp., 198 F.3d at 1382 ("Fulfillment of the § 112, ¶; 6 tradeoff

---

[25]  The government has slightly edited its proposed construction of this limitation because the parties agree that the phrase "remote location" does not need to be construed.  See Uship Br. at 74 n.52.

[26] The parties agree that a manifest is "a listing of all transactions which pertain to the particular commercial delivery service."

cannot be satisfied when there is a total omission of structure."). Accordingly, the claim is indefinite pursuant to Paragraph 2 of Section 112. See Donaldson, 16 F.3d at 1195.

Uship errs again by failing to cite any support from the specification for its corresponding structure. As noted above, the specification's vague statement that "system 10 may be capable" of performing the function is indefinite with respect to the corresponding structure. Furthermore, the abstract schematic chart in FIG. 10 is similarly indefinite with respect to identifying specific corresponding structure. See supra Section I.A.6. Thus, claim 34 is indefinite because no structure – including "telephone lines" – is ever linked to "transmitting information that may be used to prepare a manifest to a remote location." A20 ('464 Claim 34); B. Braun Medical, 124 F.3d at 1424.

## II.    RAMSDEN & LILES 5,831,220; 6,105,014

U.S. Patent Nos. 5,831,220 ("the '220 patent"), and 6,105,014 ("the '014 patent") issued on November 3, 1998, and August 15, 2000, respectively. Both patents are very similar – they have nearly identical specifications because they derive from consecutive continuation applications from a common parent application that later matured into U.S. Patent No. 5,656,799 ("the '799 patent") which Uship is not asserting. Uship asserts that the government has infringed one claim from the '220 patent and one claim from the '014 patent. Both of the claims are method claims, and both claims contain nearly identical limitations. As these claims are nearly identical, they should be similarly construed except where the claim language differs.

### A.    Preamble Limitations

| |
|---|
| **'220 Independent Claim 1**<br>**'014 Independent Claim 1**<br>*Disputed Preamble Limitation*<br>A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of: |

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| A method of mailing parcels and envelopes, through the USPS and/or other commercial delivery services, using a shipping apparatus or device consisting of interrelated parts with separate functions and employing a technique, method or system of operating and controlling the mailing task by highly automatic means, comprising the steps of | **A method . . . using an automated shipping machine**: Each step of the method requires use of a shipping machine automatically controlled by mechanical or electronic devices, unless the step explicitly states otherwise | A series of steps for mailing parcels and envelopes, wherein each step of the method requires use of a shipping machine automatically controlled by mechanical or electronic devices, unless the step explicitly states otherwise |

In its Brief, Uship has abandoned its previous construction for this preamble language, which had proposed distinct interpretations for three discrete portions of the claim language.  See Uship Br. at 13-14; compare with Uship Pre-Hearing Br. at 81-85.  Previously, Uship only sought to construe the terms "mailing," "parcels and envelopes," and "automated shipping machine."  Id.  By its latest proposal, Uship attempts to construe the full language of the preamble, but fails in this task by presenting a passage that does nothing more than add significant ambiguity.

Uship's construction provides, in part, "using a shipping apparatus or device consisting of interrelated parts with separate functions."  This language clarifies nothing.  No context or scope is apparent concerning these "interrelated parts" and "functions."  It is simply unclear as to what these terms require.  Similarly ambiguous is the term "controlling the mailing task by highly automated means."  Again, it is unclear as to what constitutes the scope of "the mailing task."  Moreover, the proposal is vague and ambiguous by use of the term "highly automated means."  Rather than resolve, such proposals serve only confuse and complicate the task of claim interpretation.

In part, the ambiguity of Uship's construction is a direct result of its complete reliance on "contemporaneous general purpose dictionaries" for "automated" and "machine."  Uship Br. at 16.  Uship's flawed claim construction approach goes even beyond the discredited Texas Digital

approach, because Uship does not even attempt to cite the specification for support of its construction of these terms.  In addition, Uship's construction of "automated" in the '220 patent is at odds with its construction of "automated" in the '464 patent,[27] despite the fact that the specification from the '464 patent was largely incorporated into the '220 patent.

Uship's most significant error concerning its preamble construction, however, is that it ignores the clear import of the prosecution history.  Uship previews its arguments concerning the validating step, below, by explaining its disregard for the prosecution history because "the applicant merely responded to a statement made by the examiner in an office action dealing with an administrative matter having absolutely nothing to do with any concerns of patentability."  Uship Br. at 17.  As will be more fully explained in Section II. J., *infra*, Uship cannot ignore the statements presented by the applicant concerning the preamble because "**[a]ny statement** of the patentee in the prosecution of a related application as to the scope of the invention [is] relevant to claim construction."  Microsoft Corp., 357 F.3d at 1350 (emphasis added).  Unlike Uship's construction, the government's construction properly accounts for the prosecution history and the appropriate meaning of the word "automated."

Statements during prosecution of U.S. Patent No. 5,656,799, from which the '220 and '014 patents originated, indicate exactly how the inventors interpreted the method claim preamble language, "using an automated shipping machine."  See A64 ('220 Claim 1).  It is proper to consider the prosecution of earlier related applications since "the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same

---

[27]   The parties jointly agreed that "automated" means "automatically controlled by mechanical or electronic devices" in connection with the '464 patent.  See Uship Br. at 51 ("Uship is willing to adopt the Government's construction.").

parent application." <u>Microsoft Corp.</u>, 357 F.3d at 1349 (Fed. Cir. 2004); <u>see also</u> <u>Ormco</u>

<u>Corporation v. Align Technology, Inc.</u>, 498 F.3d 1307, 1314 (Fed. Cir. 2007).

During prosecution of the '799 patent, the inventors accused the patent examiner of

improperly ignoring this same preamble language when the examiner issued a restriction

requirement.  The relevant remarks read as follows:

> Applicant disagrees with the Examiner's suggestion that the process claimed in
> independent method claims 1 and 72 can be performed by hand.  **Both of these**
> **claims specifically recite in the preamble** a method of mailing parcels and
> envelopes "using an automated shipping machine" **rather than specifically reciting**
> **<u>at each step</u> that the step is performed by the automated shipping machine.**
> Applicant submits that if the method were performed by hand as the Examiner
> suggests, then it would not use an automated shipping machine as set forth in the
> preamble.

A193 (G002346) (emphasis added).

The applicants explicitly disputed the interpretation that the claimed process can be

performed by hand, stating "if the method were performed by hand . . . it would not use an

automated shipping machine as set forth in the preamble."  <u>Id.</u>  The inventors understood this

preamble language to require any action performed by the automated shipping machine to

presumptively exclude manual performance.  Indeed, in the applicants' own words "at each step . . .

the step is performed by the automated shipping machine."  <u>Id.</u>  In making this argument, the

applicants conceded that the preamble acts as a limitation by providing "essential structure."

<u>Cruciferous Sprout</u>, 301 F.3d at 1347; <u>compare with</u> A193 (G2346) (arguing that "the automated

shipping machine" acts as a limitation "at each step").

Since the applicants argued that "each step" of the method is "performed by the automated

shipping machine," the claims must be interpreted accordingly.  Therefore, each method step

presumptively requires performance by the automated shipping machine and not a person.  This

-58-

conclusion is supported by the fact that, concurrent with these statements, the applicants amended the claims to explicitly recite where *a person* performed a particular method step.

Specifically, the applicant amended method claim 72 of the application giving rise to the '799 patent to insert "an attendant or said customer" before the "storing . . ." step.  See A192 (G002345).  Two images from the relevant prosecution history of the '799 patent detailing this amendment are presented below.



**Figure 11.**  Applicants amended claim 72 from "storing a validated parcel or envelope . . ." to "*an attendant or said customer* storing a validated parcel or envelope . . .".  A192 (G002345).  Notably, the applicants did not amend any other step, including the "validating . . ." step.  See A195-96 (G001844-45).

Application claim 72 was later cancelled from the '799 patent application.  See A197-98 (G002713-14).  In cancelling this claim, the applicants "reserve[d] the right to pursue the invention of claims 72-75 in a continuation application."  A198 (G002714).  Thereafter, the applicants filed the continuation application giving rise to the '220 patent, which again presented the same claim for examination.  See A210-11 (G003261-62).  Significantly, the applicants **again** amended method

claim 72 to insert "an attendant or said customer"[28] before the "storing . . ." step.  See A203

(G004000).  Two images from the relevant prosecution history of the '220 patent detailing this

amendment are presented below.

 

**Figure 12.**  Applicants amended claim 72 from "storing a validated parcel or envelope . . ." to "*an attendant or said customer* storing a validated parcel or envelope . . .".  A203 (G004000).  Notably, the applicants again did not amend any other step, including the "validating . . ." step.  See A210-11 (G003261-62).

Application claim 72 was renumbered as claim 1 upon issuance of the '220 patent.  See A212

(G004230).   Accordingly,  as  evidenced  above,  the  very  same  amendment  was  made  by  the

applicants during prosecution of the '220 patent.  Thus, as to the storing step, the applicants rebutted

the presumption established by the prosecution history statements, thereby clarifying that a person,

and not the automated shipping machine, performed the "storing . . ." step.  The applicants knew

how to rebut this presumption and claim performance by a person.  For these reasons, the

government's construction recites that "each step of the method requires use of a shipping machine

. . . **unless the step explicitly states otherwise**."   While the applicants chose to "state otherwise"

---

[28]  This language presents a minor inconsistency with the claim 1 of the printed '220 patent, which instead reads "an attendant *of* said customer." (Emphasis added).

by amending the claimed "storing . . ." steps in the '799 patent and the '220 patent, they conspicuously chose not to do so for the other steps.

Uship cannot simply ignore the unambiguous declarations by the applicants during prosecution.  See Springs Window Fashions L.P. v. Novo Indus., L.P., 323 F.3d 989, 995 (Fed. Cir. 2003) ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.  A patentee may not state during prosecution that the claims do not cover a particular device and then change position [during litigation]. . . .").  Accordingly, the Court should reject Uship's construction since it fails to account for these declarations.

**B.**     **"Receiving Payment Information from a Customer"** *[Undisputed]*

The parties have agreed to a joint construction for "receiving payment information from a customer" in claim 1 of both the '220 and '014 patents.  See Uship Br. at 18.

**C.**     **"Receiving Package Type Information . . ."**

| '220 Independent Claim 1<br>'014 Independent Claim 1<br>*Disputed Independent Claim Limitation*<br>receiving <u>package type information identifying a parcel or envelope to be mailed</u>; | | |
|---|---|---|
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| The automated shipping machine obtains data relating to the type of parcel or envelope to be shipped, such as a a [*sic*] letter, pak, package, or any other package types which may be accepted by the delivery service | the automated shipping machine obtains [package type information identifying a parcel or envelope to be mailed]<br><br>**package type information identifying a parcel or envelope to be mailed:**  data from the customer indicating the type of parcel or envelope to be mailed, such as letter, pak, or package, as defined by the servicing carrier | The automated shipping machine obtains package type information identifying a parcel or envelope to be mailed<br><br>**package type information:** data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier |

The government disputes Uship's inclusion of any "data **relating to** the type of parcel or envelope to be shipped" within its construction of this limitation.  The '220 patent and the '014 patent both contain this limitation.

According to the specification, "package type information identifying a parcel or envelope to be mailed" is a unique phrase used by the patentee to encompass data received from the customer that indicates the type of parcel or envelope to be mailed:

> Once photo cell sensor 344 detects the presence of the parcel or envelope 378, the customer is instructed at step 512 to select a package type.  For example, package types include a letter, a pak or a package or any other package type which may be accepted by the delivery service.

A59 ('220 Spec. 20:5-9).  Other than the discussion above, the specification is silent as to the meaning of "package type information . . ." and the parties have cited no other relevant intrinsic or extrinsic evidence.  The constructions provided to by the government and by IBM are both true to the disclosure in the specification.

Despite Uship's claim that its construction "simply tracks the specification," there is no support for Uship's broad inclusion of any "data **relating to**" the disclosure in the specification.  In addition, Uship arbitrarily converts "any other package type" from the specification to "any other package type**s**" without justification.  Thus, the Court should reject Uship's attempt to expand "package type information . . ." beyond the scope of the specification.

### D.    "Weighing Said Parcel or Envelope to Be Mailed" *[Undisputed]*

The parties have agreed to a joint construction for "weighing said parcel or envelope to be mailed" in claim 1 of both the '220 and '014 patents.  <u>See</u> Uship Br. at 19-20.

### E. "Receiving Shipping Information from Said Customer Including at Least a Destination of Said Parcel or Envelope to Be Mailed"

| '220 Independent Claims 1 | | |
|---|---|---|
| '014 Independent Claims 1 | | |
| *Disputed Independent Claim Limitation* | | |
| receiving shipping information from said customer including at least <u>a destination of said parcel or envelope to be mailed;</u> | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| **destination**: data relating to the location to which the item to be mailed is to be mailed, as required by applicable policies and standards of the delivery service being used, such as the zip code for that location | **destination of the parcel or envelope to be mailed:** the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place | **destination**: the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place |

The parties' dispute with respect to this limitation focuses on one issue: what is the correct construction of "a destination of said parcel or envelope to be mailed"? The '220 patent and the '014 patent both contain this limitation. In addition, later limitations within each of the asserted claims use the phrase "said destination." The phrase "said destination" refers back to "a destination of said parcel or envelope to be mailed." <u>See</u> Figure 13.

According to the specification of the '220 and '014 patents, the destination of the item to be mailed should be construed as "the place or location to which the item is to be mailed; including at least the name, street address, and zip code of the place." The government's proposed construction is strongly



**Figure 13.** In claim 1 of the '220 patent, "said destination" refers back to "a destination of said parcel or envelope to be mailed."

supported by a passage in the specification that indicates that the destination includes characteristics

such as name, street address, and zip code:

> For example, a screen is displayed which requests the customer to enter **the zip code of the destination of the item to be mailed**. In a preferred embodiment, an automatic zip code check routine is invoked for automatically providing the **destination city and state** from the zip code information . . . . The customer is . . . then asked to input the **destination name and destination street address** for the item to be shipped. The zip code and other destination information is preferably inputted into the system via the keyboard 324, although the information may also be provided via the touch screen of CRT 322. The zip code and other information may be evaluated against certain criteria . . . . This process is repeated until the **destination name, street address**, value and contents are properly entered.

A59 ('220 Spec. 20:36-65) (emphasis added). Thus, according to the specification, characteristics

of the destination include at least a "destination name," a "destination street address," and a

destination zip code. Other characteristics of the destination may also include the destination city

and state. After the destination (including these characteristics) has been inputted by the customer,

the automated shipping machine creates a shipping label – with the destination – which is applied

to the item and inserted into the machine:

> In a preferred embodiment, the system 310 may automatically provide, or the customer may elect to provide, tracking information on the label of the parcel or envelope being shipped. This is accomplished by printing a bar code on the label in addition to the destination information . . . .
>
> Once all of the label information has been verified by the customer, the label is printed and applied to the parcel or envelope by the customer. The customer is then instructed to reposition the parcel or envelope on markings 342 of the conveyor belt 340 (if the package was removed to apply the label) and to close the outer door 330.

A60 ('220 Spec. 21:27-31). After that, if the customer wants to ship another item, the automated

shipping machine "repopulates the [name, address, and zip code] **input fields** in order to minimize

the customer's input time (since more than one package is often sent to the same **destination**)." A60

('220 Spec. 22:50-53) (emphasis added). In each case, the patent indicates that the destination is

the ultimate place to which the item is to be shipped, which must include characteristics such as the name, address, and zip code.  This construction is also supported by the relevant extrinsic evidence.[29]

Uship's construction of "destination" is completely flawed.  Indeed, Uship mischaracterizes the relevant issue that the Court must address.  Contrary to Uship's assertion, the issue with respect to the disputed term is not "what information the customer is required by the claimed method to input into the shipping machine"; the proper issue is the construction of the phrase "a destination of said parcel or envelope to be mailed."  Uship Br. at 20.  By mischaracterizing the relevant issue, Uship ignores the specification's use of the word "destination" in an attempt to broadly equate "destination" with "zip code."  Uship's argument is directly contradicted by the language of the specification and Federal Circuit precedent.

As recited previously, the specification clearly indicates that a zip code is a part of the destination, but not the entire destination.  See A59 ('220 Spec. 20:36-39) ("the zip code of the destination of the item to be mailed"); see also A53 ('220 Spec. 8:55-58) ("The customer then enters the destination zip code through key pad 28 . . . .").  The specification similarly identifies that, at a minimum,[30] name and address are also part of the "destination."  See A59 ('220 Spec. 20:36-65).  Thus, according to the specification, a "destination of the parcel or envelope to be mailed" is a broad

---

[29]  See A221 (destination: "3: a place which is set for the end of a journey or to which something is sent" Webster's Third New International Dictionary, Unabridged 614 (1993));

A231 (destination: "3: a place to which one is journeying or to which something is sent" Webster's Ninth New Collegiate Dictionary 345 (1990)).

[30]  As described above, the zip code may be used to populate the city and state input fields of the "destination," but does not populate the name or address input fields.

description of the place to which the parcel or envelope is to be mailed, composed of a number of discrete items of information.

Next, Uship points to the language of the specification, citing to an embodiment that functions with a zip code, rather than the destination.  See A53 ('220 Spec. 8:55-58) (hereinafter "the zip code embodiment").  Uship's argument misses the point.  By using the term "destination zip code" rather than the broader term "destination," the patentees signaled that the zip code embodiment functioned with less than a full destination.  See, e.g., Phillips, 415 F.3d at 1314 ("To take a simple example . . . 'steel baffles' . . . strongly implies that the term 'baffles' does not inherently mean objects made of steel.").  Uship's argument implies that the claims in the '220 and '014 patents must cover every embodiment disclosed in the specification, but "[n]othing is better settled in the law of patents than that [if a patentee claims] only a part of his invention . . . he is presumed to have abandoned the residue to the public."  McClain v. Ortmayer, 141 U.S. 419, 423-24 (1891); see also Ecolab, Inc. v. Paraclipse, Inc., 285 F.3d 1362, 1373–74 (Fed. Cir. 2002) (holding that an "internal reflecting surface" must be part of the device's housing, despite an embodiment that disclosed a reflecting surface separate from the housing).

Furthermore, a direct ancestor to both the '220 and '014 patents covers the zip code embodiment.  Unasserted U.S. Patent No. 5,340,948 contains the description of the zip code embodiment in the specification and claims the embodiment with the limitation "means for inputting information relating to the destination of the parcel from the customer."  See A257-58 ('948 Claims 1, 12).  Thus, the plain language of the specification proves that where the patentee sought to claim the zip code embodiment, he used the phrase "information relating to the destination of the parcel" as opposed to "a destination of said parcel or envelope to be mailed."  Uship dismisses these

"slightly different formulations" as meaningless, but these differences are substantively and legally significant.  Uship Br. at 24-25; compare with Phillips, 415 F.3d at 1314.

Ultimately, Uship's construction of "destination . . ." is nothing more than an attempt to broaden the ordinary meaning to encompass a single item of information about the recipient.  By broadly incorporating "data relating to the location . . . as required by applicable policies and standards of the delivery service . . .", Uship proposes a construction dependent upon the policies of the accused infringer, rather than dependent upon the intrinsic evidence.  Accordingly, the Court should interpret "destination of the parcel or envelope to be mailed" and "said destination" to mean "the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place."

### F.   "Computing from Said . . . Information, a Delivery Date and Cost . . ."

| **'220 Independent Claim 1** | | |
|---|---|---|
| *Disputed Independent Claim Limitation* | | |
| computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via each delivery service option available to said customer; | | |
| **Uship Constructions** | **Government Constructions** | **IBM Constructions** |
| the automated shipping machine determines the expected **delivery date** and cost for delivery of the parcel or envelope to said destination for each available delivery service option, as a function of the package type information, shipping information, and weight information | the automated shipping machine calculates [a delivery date] and cost for delivery [of said parcel or envelope to said destination] for each available delivery service option, as a function of [the package type information], shipping information, and weight information | The automated shipping machine determines an expected delivery date, including the day of the week, and associated cost for each delivery service based on the package type information, shipping information, and weight information |
| **delivery date** – the date on which the parcel or envelope is to be received, expressed either as the specific month, day, and year when the parcel or envelope is expected to be received or the number of days it is estimated to take for parcel [*sic*] or envelope to be | **a delivery date . . . of said parcel or envelope to said destination:** the expected calendar date of delivery of the parcel or envelope | |

| delivered | | |
|---|---|---|

| '014 Independent Claim 1 |
|---|
| *Disputed Independent Claim Limitation*<br>computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer; |

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| the automated shipping machine determines the expected **delivery date** and cost for delivery of the parcel or envelope to said destination for each available delivery service option, as a function of the package type information, shipping information, and weight information<br><br>**delivery date** – the date on which the parcel or envelope is to be received, expressed either as the specific month, day, and year when the parcel or envelope is expected to be received or the number of days it is estimated to take for parcel [*sic*] or envelope to be delivered | the automated shipping machine calculates [a delivery date] and cost for delivery [of said parcel or envelope to said destination] for at least two separate delivery service options, as a function of [the package type information], shipping information, and weight information<br><br>**a delivery date . . . of said parcel or envelope to said destination:** the expected calendar date of delivery of the parcel or envelope | The automated shipping machine determines an expected delivery date, including the day of the week, and associated cost for each delivery service based on the package type information, shipping information, and weight information |

The parties' dispute with respect to this limitation revolves around one issue:  what is the correct construction of "a delivery date . . . of said parcel or envelope to said destination"?  In particular, the government disagrees with Uship's assertion that "delivery date" means "the number of days it is estimated to take for parcel [*sic*] or envelope to be delivered."  As depicted above, the '220 patent and the '014 patent both contain this disputed phrase in two very similar limitations.[31]

The specification defines "delivery date . . ." in two critical passages:

_____

[31] Claim 1 of the '220 patent uses the phrase "via each delivery service option," and claim 1 of the '014 patent uses the phrase "via at least two delivery service options."  Otherwise, the limitations are identical.

> Once all of the shipping information has been properly entered, the delivery date and cost for each delivery service available to the customer is computed at step 526. **In computing the delivery date, the software takes into account weekends, holidays and other days in which no delivery service is available when calculating for each service when the package can be expected to be delivered** . . . . The delivery date and cost for all available service options are then displayed to the customer on the CRT 322.

A60 ('220 Spec. 21:4-26) (emphasis added).

> After the shipping and package information is entered, system 700 then rates the package by computing the delivery date and cost for each delivery service at step 838 . . . . The displayed information includes **the date of expected delivery, what day of the week that will be**, and total shipping costs for each selection.

A63 ('220 Spec. 28:31-40) (emphasis added). Accordingly, "a delivery date . . . of said parcel or envelope to said destination" must mean "the expected calendar date of delivery of the parcel or envelope." The government's proposed definition would encompass the specification's disclosure of a date calculation that "takes into account weekends, holidays and other days" and is separate from the "day of the week that [the expected delivery] will be." Uship apparently agrees with the government's proposed construction, because the first part of Uship's construction includes "the date on which the parcel or envelope is to be received, expressed . . . as the specific month, day, and year when the parcel or envelope is expected to be received." The first part of Uship's construction is essentially identical to "the expected calendar date of delivery of the parcel or envelope."

Uship, however, offers an alternative construction that has no basis in the specification. Uship finds absolutely no valid intrinsic or extrinsic support for expanding the definition of "delivery date . . ." to encompass "the number of days it is estimated to take for parcel [*sic*] or envelope to be delivered." Instead, Uship's alternative construction is based on three unsupportable premises:

1.  *Uship claims that comments by a patent examiner in a grandparent patent can expand the scope of a claim term beyond its ordinary meaning.*  See Uship Br. at 27.

*False* - Uship cites to the <u>Salazar</u> case, but <u>Salazar</u> simply stands for the proposition that an examiner's comments during prosecution can **narrow** the scope of a claim term in certain circumstances.  See <u>Salazar v. Procter & Gamble Co.</u>, 414 F.3d 1342, 1346-47 (Fed. Cir. 2005). There is no legal support for Uship's contention that an examiner's comments in a grandparent application can **expand** the scope of a claim term beyond its ordinary meaning, as defined by the claims and the specification.

2.  *Uship claims that the Postal Service documents are "contemporaneous."*  See Uship Br. at 27.

*False* - Uship relies on two Postal Service documents that were first identified in Uship's first claim construction brief.  The patentees and the patent examiner never considered or cited either of these Postal Service documents.  Indeed, neither document existed at the time the examiner rejected claims from the '799 patent.  As such, the documents are not appropriately considered as "contemporaneous," much less as intrinsic evidence.  As described below, the documents are also not appropriately considered as extrinsic evidence because they do not contain the term "delivery date."

3.  *Uship contends that the Postal Service documents equate delivery date with "the number of days it is estimated to take for the parcel or envelope to be delivered."*  See Uship Br. at 27-28.

*False* - As demonstrated by the government during the claim construction hearing, neither document equates delivery date with Uship's alternative definition.  Indeed, neither document appears to use the word "date" at all.  See Figure 14.

Ultimately, Uship's reliance upon Postal Service documents that did not exist at the time of the examiner's comments and that do not use the word "date" is no more than a thinly-veiled attempt to construe claim terms in light of the accused device.[32] See NeoMagic Corp. v. Trident Microsystems, Inc., 287 F.3d 1062, 1074 (Fed. Cir. 2002) ("It is well settled that claims may not be construed by reference to the accused device") (citing SRI Int'l, 775 F.2d at 1118). Accordingly, "a delivery date . . . of said parcel or envelope to said destination" means "the expected calendar date of delivery of the parcel or envelope."



**Figure 14.** Neither document cited by Uship uses the term "delivery date" or the word "date." See Govt. '220 Present. at 55; Uship Ex. K (previously Ex. O); Uship Ex. L (previously Ex. P).

### G.   "Receiving an Indication of the Delivery Service Option Desired by the Customer" *[Undisputed]*

The parties have agreed to a joint construction for "receiving an indication of the delivery service option desired by the customer" in claim 1 of both the '220 and '014 patents. See Uship Br. at 29.

### H.   "Printing a . . . Label . . ." *[Undisputed]*

The parties have agreed to a joint construction for "printing a shipping label including at least said destination printed thereon" in claim 1 of the '220 patent and "printing a tracking bar code

---

[32] Uship argues that it is actually attempting to construe the claim in light of the Postal Service's "practices and policies," rather than in light of the accused device. Uship Br. at 27 n.20. Uship's distinction is without merit given Federal Circuit precedent, and given that the accused device likely operates in accordance with Postal Service "practices and policies."

label identifying at least said destination" in claim 1 of the '014 patent, with the exception of the term "said destination" discussed above.  <u>See</u> Uship Br. at 29-30.

      **I.**      **"Printing a Shipping Receipt . . ."** *[Undisputed]*

The parties have agreed to a joint construction for "printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer" in claim 1 of both the '220 and '014 patents, with the exception of the term "said destination" discussed above.  <u>See</u> Uship Br. at 30.

      **J.**      **"Validating Receipt of Said Parcel or Envelope as the Parcel or Envelope for Which Said . . . Label Was Printed"**

**'220 Independent Claim 1**
**'014 Independent Claim 1**
*Disputed Independent Claim Limitation*

220:             validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed;

014:             validating receipt of said parcel or envelope as the parcel or envelope for which said tracking bar code label was printed; and

| Uship Constructions | Government Constructions | IBM Constructions |
| --- | --- | --- |
| the automated shipping machine or an attendant determines or confirms that the parcel or envelope being received for storage and/or shipment is the package for which the [shipping / tracking bar code] label was printed | the automated shipping machine confirms that the parcel or envelope received for storage is the same parcel or envelope for which the [shipping / tracking bar code] label was printed | the automated shipping machine confirms that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed |

In its Brief, Uship argues that the government is attempting to improperly restrict the scope of the claim term at issue.  Uship repeatedly characterizes the government's approach as "narrow[ing] the ordinary meaning of the claim" or "withdrawing [certain embodiments] from the scope of the claim."  Uship Br. at 40.  Uship, however, misses the point.  Rather than narrowing or limiting the scope of the claim, the government's construction merely interprets this limitation by accounting for *all terms in the claim* consistent with claim amendments and applicants' own

expressed understanding of their invention during prosecution.  Stated differently, it is the intrinsic evidence, beginning with the claim language itself, that supports the government's construction.

As will be described below, Uship ignores the actual language of the claims and presents a construction incompatible with prosecution history statements and claim amendments within the intrinsic record.  Uship eviscerates critical language of the claim by construing this limitation to encompass embodiments that fail to perform the function required by the claim.  See Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("It is . . . entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language . . . . We cannot look at the ordinary meaning of the term . . . in a vacuum.  Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history.").  Accordingly, for the reasons that follow, Uship's construction is improper as a matter of law.

### 1. By Allowing for Attendant-Performed Validation, Uship Fails to Give Effect to All Terms in the Claim

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Philips at 1312 (internal citations omitted), see also, Bicon, Inc., 441 F.3d at 950 ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.").  In its entirety, the complete claim limitation at issue here reads "validating receipt of said parcel or envelope *as the parcel or envelope for which said shipping label* (in claim 1 of the '220 patent) [or] *said tracking bar code label* (in claim 1 of the '014 patent) *was printed.*" A64, A109 ('220 Claim 1; '014 Claim 1) (emphasis added).  The emphasized claim language therefore requires, consistent with the specification and prosecution history, a "validation," (i.e., a confirmation) that the parcel or envelope received for storage is the same parcel or envelope for which the shipping (or tracking bar code) label was printed.

Uship, however, misconstrues the critical language, italicized above, to encompass validating *receipt* of a parcel or envelope without a determination that the package presented is the same one for which the label was previously printed.  Notably, Uship repeatedly characterizes the pertinent question as: "what does the *validation* step entail?" or "what does *validation* entail," without concern for the full claim limitation.  See Uship Br. at 31 (emphasis added).  In other words, Uship mistakenly concludes that "the applicant used 'validation' consistently throughout the written description."  Uship Br. at 36.  In reality, however, the specification discloses at least two[33] independent and distinct types of validation, one of which is covered by the complete claim limitation, and one which is not.

In particular, the specification discloses:  (1) a first function of validating receipt of a parcel or envelope by confirming that the parcel or envelope received is the same parcel or envelope for which a shipping or tracking bar code label was previously printed; and (2) a second function of validating or certifying that a parcel or envelope has been *received for storage*.  See A60 ('220 Spec. 21:38-22:10) (first function); A62, 64 ('220 Spec. 25:37-46; 29:8-22) (second function).

The specification characterizes this first function as a "very important" and "critical" step performed by the automated shipping machine.  A60 ('220 Spec. 21:38-22:10).  In particular, the specification provides that the automated shipping machine accomplishes this function by obtaining additional data concerning the package presented for storage (whether by subsequent detection or by some other means, such as re-dimensioning or re-weighing).

---

[33]  For example, beyond these two validation functions, the written description describes the automated shipping machine as "validat[ing]" a customer's credit card.  A59 ('220 Spec. 19:33-35, 60-61).

In particular, after the shipping label is printed, the specification explains the first function

as follows:

> At this point, **a very important validation step is performed**. In particular, the system 310 determines at step 536 **whether it has received the correct package**. This step **is critical since it verifies that the customer did not perform a package switch or forget to replace the package in the intermediate storage area 334 for shipment**. Such validation may be accomplished in several different ways in accordance with the invention. For example, in a simple embodiment, photo cell sensor 344 may simply detect whether any package has been placed on the conveyor belt 340. If so, it is presumed that the package on the conveyor belt 340 is **the appropriate package with the appropriate label**. On the other hand, in accordance with a preferred embodiment of the invention, the package is automatically reweighed and/or redimensioned once the customer has closed the outer door 330 (and hence the parcel or envelope cannot be accessed by the customer). If the reweighing and redimensioning results in approximately the same readings as when the package was previously weighed and dimensioned, it is presumed that the package placed on the conveyor belt 340 is **the same package for which the label was printed**.

A60 ('220 Spec. 21:38-22:10) (emphasis added). Thus, the specification confirms that the purpose

of the first function is to verify receipt of the same package for which the shipping label was printed

(thereby preventing a package switch and assuring the presence of the package). And, this

verification requires that the automated shipping machine perform additional detection, which then

either confirms or refutes receipt of the appropriate package and label. Notably, the language "same

package for which the label was printed," A60 ('220 Spec. 21:63-64), concluding the above quoted

specification passage comports with the specific language of the *full claim limitation* requiring

validation that the package received is "the parcel or envelope for which said shipping label [or said

tracking bar code label] was printed." A64, A109 ('220 Claim 1; '014 Claim 1).

By contrast, the specification describes the second validation function in accordance with

a "semi-attended" embodiment whereby an attendant receives the package or parcel. See A61-64

('220 Spec. 25:9; 24:50 - 29:47). According to the specification, in the semi-attended embodiment:

> [t]he customer then brings the parcel or envelope 708 and receipt to the designated counter for paying the charges for shipment (if cash payment is desired) and deposits the package with the attendant. **The attendant then stamps and initials the receipt to validate the shipment and receipt of the parcel or envelope 708 from the customer**. The attendant then stores the package in a secure area until the carrier retrieves the package for shipment.

A62 ('220 Spec. 25:37-46) (emphasis added); see also id. at A64 ('220 Spec. 29:8-22) (explaining that the receipt 852 "is initialed by the person receiving the package for secure deposit."). In this embodiment, the specification makes clear this second type of validation is performed by an attendant. See id. at A62 ('220 Spec. 25:48-49). In this type of validation, the attendant merely stamps and initials the receipt document for the customer.

Accordingly, the function of this second type of validation only certifies that a package or parcel has been *received for storage*. Unlike the function of the first validation, there is no discussion or disclosure of the attendant confirming that the parcel or envelope received is the same parcel or envelope for which a shipping or tracking bar code label was previously printed. Thus, this second validation function clearly fails to comport with the specific language of the full claim limitation. Indeed, the specification provides no indication as to whether an attendant ever inspects the package at all. The only disclosed interaction between the attendant and the mail item relates to the function of storing the package. Nor is this validation function concerned with preventing a package switch by comparing two measurements as in the first validation function. Instead, the customer transports the mail item from a first system 700 where it was weighed and deposits the package with an attendant who had no previous interaction or connection with the package. See A62 ('220 Spec. 38-46).

Therefore, contrary to Uship's conclusion, the applicants did not use "validation" consistently throughout the specification. Uship ignores the significant distinctions in function and

purpose between the first – machine-performed validation – and the second – attendant-performed

validation.  Because attendant-performed validation is unconcerned with any determination that the

package presented is the same one for which the label was previously printed, only the first,

machine-performed validation comports with the language of the full claim limitation.[34]  See

Medrad, Inc., 401 F.3d at 1319 (Fed. Cir. 2005) ("It is . . . entirely proper to consider the functions

of an invention in seeking to determine the meaning of particular claim language. . . .We cannot look

at the ordinary meaning of the term . . . in a vacuum.  Rather, we must look at the ordinary meaning

in the context of the written description and the prosecution history.").

> **2.**    ***Statements and Amendments Presented During Prosecution Clearly Reflect***
> ***That the Applicants Understood Their Invention Was Directed to Machine-***
> ***Performed Validation***

As explained above in Section II.A, statements by the applicants during prosecution of the

'799 patent, from which the '220 and '014 patents originated, indicate exactly how the inventors

understood the scope of their method claims.

These prosecution statements from the applicants to the examiner clearly concern the scope

of the invention at issue here and are therefore pertinent to claim construction.  More specifically,

these statements provide further support for the conclusion that the asserted method claims require

the automated shipping machine, and not a person, to perform the function of validating the package

---

[34] Uship appears to contend that some claim of the '220 or '014 patents must encompass the attendant-performed validation embodiment.  See Uship Br. at 34.  This contention runs afoul of settled patent law because there is no requirement that a patent drafter write claims to cover every aspect and embodiment disclosed in the patent's written description.  See Johnson & Johnston Associates Inc. v. R.E. Service Co., Inc., 285 F.3d 1046, 1055 (Fed. Cir. 2002) (en banc) ("when a patent drafter discloses but declines to claim subject matter . . . this action dedicates that unclaimed subject matter to the public"); see also TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc., 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("Our precedent is replete with examples of subject matter that is included in the specification, but is not claimed.").

or parcel as the same parcel for which a label was previously printed.  Uship contends that these statements are irrelevant and can be ignored because they were presented by the applicants to the examiner in response to a restriction requirement.  <u>See</u> Uship Br. at 42-43.  In addition, Uship asserts these statements are irrelevant since they "cannot be understood as speaking to any given step that is here being construed" and because "the applicant [*sic*] was merely making the point that the 'process' was not performed entirely by hand."  Uship Br. at 43-44.  These arguments are without merit and easily refuted.

During prosecution of the '799 patent, the applicants accused the examiner of improperly ignoring the claimed preamble language while issuing a restriction requirement.  The relevant remarks read as follows:

> Applicant disagrees with the Examiner's suggestion that the process claimed in independent method claims 1 and 72 can be performed by hand.  **Both of these claims specifically recite in the preamble** a method of mailing parcels and envelopes "using an automated shipping machine" **rather than specifically reciting <u>at each step</u> that the step is performed by the automated shipping machine.** Applicant submits that if the method were performed by hand as the Examiner suggests, then it would not use an automated shipping machine as set forth in the preamble.

A193 (G002346) (emphasis added).

The applicants explicitly disputed the interpretation that the claimed process can be performed by hand.  As support, they explained that "if the method were performed by hand . . . it would not use an automated shipping machine as set forth in the preamble."  <u>Id.</u>  The inventors understood this preamble language to require any action performed by the automated shipping machine to presumptively exclude manual performance.  Indeed, "at each step . . . the step is performed by the automated shipping machine."  <u>Id.</u>

Since the applicants argued that "each step" of the method is "performed by the automated shipping machine," in the absence of any other specific recitation, the claims must be interpreted accordingly. Therefore, each method step presumptively requires performance by the automated shipping machine and not a person. This conclusion is supported by the fact that concurrent with these statements, the applicants amended the claims to explicitly recite where *a person* performed a particular method step.

Specifically, concurrent with that above-quoted statements, the applicants amended claim 72 of the '799 patent application to insert "an attendant or said customer" before the "storing . . ." step. See *supra* Figure 11 (reproducing the amendment from the '799 patent prosecution history, A192 (G002345)). As noted above, the very same amendment was made by the applicants in prosecuting the '220 patent. See *supra* Figure 12 (reproducing the amendment from the '220 patent prosecution history, A203 (G4000)). Thus, as to the storing step in the '220 patent, the applicants rebutted the presumption established by the prosecution history statements, thereby clarifying that a person performed the storing step, and not the automated shipping machine. The applicants knew how to rebut this presumption and claim performance by a person. While applicants chose to do so for the storing step in the '799 patent and the '220 patent, they conspicuously chose not to claim performance by a person for the validating step, thereby requiring performance of this step by the automated shipping machine.

Uship first denies that this prosecution history has any impact on the claims because it was presented in response to a restriction requirement from the Patent Office. See Uship Br. at 43. More specifically, Uship contends these statements are irrelevant because "[t]he applicant [*sic*] was not making an argument, or an amendment, in order to overcome a patentability rejection or to address

patentability concerns raised by the examiner." Uship Br. at 42. As support for this contention Uship cites a number of district court cases describing restriction requirements as an administrative procedural tool used for purposes of case management by the USPTO, unrelated to patentability. See Uship Br. at 42-43. First, none of these district court cases are binding precedent for this court. Second, and more importantly, by focusing on the administrative aspect of a restriction requirement, Uship fails to recognize the distinguishing facts of this case.

While a restriction requirement, viewed in isolation, does have a case management aspect to it, an applicant's actions, or even inactions, in response to a restriction requirement have been viewed by the Federal Circuit as relevant and sometimes dispositive to the resolution of claim scope. As a result, the effect of the restriction requirement is no longer "purely administrative," as suggested by Uship.

For example, in Acco Brands, Inc. v. Micro Security Devices, Inc., 346 F.3d 1075 (Fed. Cir. 2003), the Federal Circuit refused to allow a patent's claims to encompass and cover a disclosed, unclaimed embodiment as a result of a restriction requirement. There, the examiner issued the restriction requirement because the original claims were drawn to two independent and distinct embodiments, thereby requiring prosecution in separate patent applications. In response, the patent owner chose to pursue claims drawn to only the first embodiment in a divisional patent application that became the patent-in-suit. In light of the restriction requirement, the Federal Circuit held that the presence of such a disclosed, but unclaimed embodiment "does not serve to broaden the scope of the [patent-in-suit] claims that were the subject of the divisional application." Id. at 1079.

Similarly, in Regents of University of Cal. v. Dakocytomation Cal., Inc., 517 F.3d 1364, 1369 (Fed. Cir. 2008), the Federal Circuit construed claims as being limited to certain embodiments

based on statements from the patentee in a parent application as to the scope of claims it intended to pursue in a later filed divisional application, which became the patent in suit.  ("During prosecution of the '841 patent, the patentees indicated that the claims of the patent were limited to the blocking embodiment.  They further indicated that claims to the other major embodiment . . . would be pursued in another [divisional] patent application.").

Finally, in <u>Ventana Medical Systems, Inc. v. Biogenex Labs., Inc.</u>, 473 F.3d 1173, 1183 (Fed. Cir. 2006), the Federal Circuit relied upon the examiner's restriction requirement as further evidence of what the proper claim scope would be.  In <u>Ventana</u>, the claims at issue did not exclude certain specification embodiments in light of the restriction requirement.  In particular, the Federal Circuit stated:

> With respect to the application claims that eventually resulted in claims 1 and 5 of the '861 patent, the examiner observed [in requiring restriction] that 'the process as claimed can be practiced by another materially different apparatus or by hand, such as a manual pipette means.'  This statement shows that the patent examiner did not consider the 'dispensing' claim term to be limited to the 'direct dispensing' embodiment disclosed in the specification.

<u>Id.</u>  Thus, the restriction requirement, acquiesced to by the applicant, supported a construction covering embodiments beyond the "direct dispensing embodiment" in the specification.  <u>Ventana</u> is significant for two points.  Along with <u>Acco Brands</u> and <u>Dakocytomation</u>, <u>Ventana</u> provides further evidence that a restriction can be relevant to the resolution of claim scope.  Further, the facts in <u>Ventana</u> are distinguishable from the present case because here the applicants' statements are clearly relevant since the applicants refuted the basis of a restriction requirement with unequivocal statements reflecting their understanding of the claims.

Stated another way, Uship cannot ignore the applicants' statements simply because they were not presented in response to a prior art rejection.  Instead, any statement presented by an applicant

to the Patent Office that reflects claim scope is relevant to claim construction because "[the Federal Courts] cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the [Patent Office]." Microsoft Corp., 357 F.3d at 1349.  Such statements do not necessarily invoke the doctrine of prosecution disclaimer rather than inform the proper *interpretation* of claim language because it constitutes a representation of the applicant's own understanding of the claim scope.  See 800 Adept, Inc. v. Murex Securities, Ltd., 539 F.3d 1354, 1365 (Fed. Cir. 2008) (relying on an applicant's statements during prosecution "as support for the construction already discerned from the claim language and confirmed by the written description," and not for the purpose of prosecution disclaimer).  The legal rationale in such cases "take[s] the patentee at its word and [the courts] will not construe the scope of the claims . . . more broadly than the patentee envisioned." Microsoft Corp., 357 F.3d at 1350.

In Microsoft Corp., the Federal Circuit interpreted the claims as being limited to certain features disclosed in the specification based on the applicant's statements as to the scope of the invention presented to the Patent Office during prosecution of related applications.  Id. at 1349 (relying on statements presented by the applicant in "a 'summary of the invention' before addressing the § 103 rejection.").   In relying on statements from the applicant as to claim scope, both before and after the patent in suit was issued, the Federal Circuit made clear that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation." Id. at 1350; see also Laitram Corp., 143 F.3d at 1462 ("The fact that an examiner placed no reliance on an applicant's statement distinguishing prior art does not mean that the statement is inconsequential for purposes of claim construction."); E.I. du Pont de Nemours, 849 F.2d at 1438 ("[A]rguments made during prosecution shed light on what the applicant meant by its various

terms."); 800 Adept, Inc., 539 F.3d at 1365.  Therefore, the applicants' statements here are relevant

to claim construction because they implicate the scope of the claims as understood by the inventors.

Indeed, as the Federal Circuit made clear:

> **Any statement of the patentee** in the prosecution of a related application as to the
> scope of the invention **would be relevant to claim construction**, and the relevance
> of the statement made in this instance is enhanced by the fact that it was made in an
> official proceeding in which the patentee had every incentive to exercise care in
> characterizing the scope of its invention.

Microsoft Corp., 357 F.3d at 1350 (emphasis added).

Uship also asserts that these statements are irrelevant since they "cannot be understood as

speaking to any given step that is here being construed."  Uship Br. at 43.  Instead, according to

Uship, "the applicant was merely making the point that the 'process' was not performed *entirely* by

hand."  Uship Br. at 44 (emphasis added).  Uship further argues that:

> The simple point here was that the automated shipping machine would need to play
> at least **some role** in **some aspects** of the process.  By no means does it follow
> naturally, much less inexorably (as the Defendants would contend), that the
> automated shipping machine must itself perform each and every aspect of the
> process.

Uship Br. at 44.  This interpretation cannot be squared with the plain language of the statement

presented during prosecution.  Again, the relevant remarks read as follows:

> Applicant disagrees with the Examiner's suggestion that the process claimed in
> independent method claims 1 and 72 can be performed by hand.  **Both of these
> claims specifically recite in the preamble** a method of mailing parcels and
> envelopes "using an automated shipping machine" **rather than specifically reciting
> at each step that the step is performed by the automated shipping machine.**
> Applicant submits that if the method were performed by hand as the Examiner
> suggests, then it would not use an automated shipping machine as set forth in the
> preamble.

A193 (G002346) (emphasis added).  By its interpretation, Uship ignores the clear language from the

applicants providing that "**at each step** . . . the step is performed by the automated shipping

machine." Id. (emphasis added).  Moreover, the applicants broadly characterized the restriction as being based upon "the Examiner's suggestion that **the process claimed** in independent method claim 1 and 72 can be performed by hand."  Id. (emphasis added).  Thus, the applicants unequivocally understood – and argued – that each step of the claimed process was performed by the automated shipping machine, rather than a person.

When the applicants found it necessary to claim a human-performed step, they specifically filed claim amendments to explicitly state that modification.  While they chose to do so for the storing step in the '799 patent and the '220 patent, they conspicuously chose not to do so for the validating step, thereby requiring performance of this step by the automated shipping machine. Furthermore, this choice is consistent with the specification and claim language because, as explained above, only the machine-performed validation comports with the validation claim limitation in its entirety.  Accordingly, for the reasons presented above, Uship's proposed construction is improper because it suggests that an attendant can perform the claimed validating step, which is contrary to the intrinsic evidence.

### 3.    *Uship's Construction Improperly Conflicts with the Public Record, on Which the Defendants Are Entitled to Rely*

"The claims, specification, and file history . . . constitute the public record of the patentee's claim, a record on which the public is entitled to rely."  Vitronics, 90 F.3d at 1583.  Thus, all three components serve the purpose of providing notice to the public of the patent and its scope of protection.  "[C]ompetitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention, and, thus, design around the claimed invention."  Id.  For this reason, "[t]he public notice function of a patent and its

prosecution history requires that a patentee be held to what he declares during the prosecution of his patent." Springs Window Fashions, 323 F.3d at 995.

"The prosecution history constitutes a public record of the patentee's representations concerning the scope and the meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct." Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc., 222 F.3d 951, 957 (Fed. Cir. 2000). Therefore, courts refuse to allow a patentee, during litigation, to renounce, or retreat from, the clear import of declarations made in the prosecution history because it "would undercut the public's reliance on a statement that was in the public record and upon which reasonable competitors formed their business strategies." Id.

The law places the burden of altering, editing, or recanting such statements or representations squarely on the shoulders of the patent applicant during prosecution. See Fuji Photo Film Co., Ltd. v. International Trade Com'n, 386 F.3d 1095, 1100 (Fed. Cir. 2004) ("[A]s between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for particular subject matter."); Springs Window Fashions, 323 F.3d at 995 ("If the applicant mistakenly disclaimed coverage of the claimed invention, then the applicant should have amended the file to reflect the error, as the applicant is the party in the best position to do so."); Johnson & Johnston Associates Inc., 285 F.3d at 1055 ("A patentee who inadvertently fails to claim disclosed subject matter, however, is not left without remedy. Within two years from the grant of the original patent, a patentee may file a reissue application . . . In addition, a patentee can file a separate application claiming the disclosed subject matter under 35 U.S.C. § 120."); Hakim v. Cannon Avent Group, PLC, 479 F.3d 1313, 1317-18 (Fed. Cir. 2007). Cf. Microsoft 357 F.3d at 1350 (explaining that in

-85-

any statement presented to the Patent Office, a patentee has "every incentive to exercise care in characterizing the scope of its invention.").   Accordingly, any such amendment or retraction, whether by reissue or continuation application, must occur through examination proceedings at the Patent Office.



**Figure 15.**  The applicants never recanted its broad statements to the examiner during the prosecution of the '799 patent application.  See Govt. '220 Present. at 26; Tr. at 638-641.

As explained by the government in slide 26 of its Markman presentation on February 18, 2010, reproduced above, the applicants never altered, edited, or recanted any of their statements concerning the shipping machine's performance of each method step through three consecutive continuation applications.  See Tr. at 638-641.  Nor did the applicants ever seek to amend the file through the reissue process.  The applicants never attempted to use these opportunities and under

the law the public "take[s] the patentee at its word and [the courts] will not construe the scope of the claims . . . more broadly than the patentee envisioned." Id. at 1350.

Accordingly, a reasonable competitor, after reviewing the public record here, would be entitled to take the patentees at their word and rely on the statement that "at each step . . . the step is performed by the automated shipping machine." A193 (G002346). A reasonable competitor also would be entitled to rely on the fact that concurrent with these statements, the applicants of the asserted patents amended the claims clarifying where a person, and not the automated shipping machine, performed a particular method step. Finally, a reasonable competitor would recognize that, through three continuation applications, the applicants never altered, edited, or recanted any of their statements concerning claim scope. As such, a reasonable competitor would understand that attendant-performed validation was not covered by the complete validation claim limitation.

For all the reasons presented above, by encompassing attendant-performed validation, Uship's proposed construction conflicts with the claim language, specification, and prosecution history. Accordingly, the government's construction should be adopted in favor of Uship's.

**K.**    **"Storing a Validated Parcel or Envelope in a Secure Storage Area until Said Parcel or Envelope Is Subsequently Picked up . . ."**

| ‘014 Independent Claim 1 |
|---|
| *Disputed Independent Claim Limitation* |
| 014:          storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person. |

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| storing a validated parcel or envelope in a secure storage area until a commercial delivery person picks up the parcel or envelope | the automated shipping machine stores the validated parcel or envelope in a secure storage area until a commercial delivery person picks up the parcel or envelope | the automated shipping machine stores the validated parcel or envelope in a secure storage area until a commercial delivery person picks up the parcel or envelope |

Consistent with the preamble interpretation, the government's proposal provides that the automated shipping machine stores the validated parcel or envelope in a secure storage area until it is subsequently picked up. This limitation incorporates the requirement that the storage step be performed by the automated shipping machine from the preamble, as dictated by the prosecution history. Uship's construction, by contrast, does not require the automated shipping machine to perform this step. Instead, again relying on the "semi-attended" embodiment of FIGS. 20-22C, they argue in support of a construction encompassing both the semi-attended embodiment, where a person performs the storing step, and embodiments wherein the automated shipping machine performs this function. Uship Br. at 46-48.

Once again, Uship fails to acknowledge the effect of the applicants' statements and amendments from the prosecution history. The government does not dispute that in the "semi-attended" embodiment of FIGS. 20-22C, an attendant performs the storing step. What is clear, however, is that the applicants understood claim 1 of the '014 patent to require performance of the storing step by the automated shipping machine.

As explained above, the applicants explicitly disputed the interpretation that the claimed process can be performed by hand. As support, they explained that "if the method were performed by hand . . . it would not use an automated shipping machine as set forth in the preamble." A193 (G002346). The inventors understood this preamble language to require any action performed by the automated shipping machine to presumptively exclude manual performance. Indeed, the applicants argued that "each step" of the method is "performed by the automated shipping machine," Id. Where the applicants intended to rebut this presumption they presented claims explicitly reciting where *a person* performed a particular method step.

-88-

No such recitation appears in claim 1 of the '014 patent.  Unlike claim 1 of the '220 patent, the language of claim 1 in the '014 patent does not rebut this presumption and call for an "attendant of said customer" to perform the storing function.  Compare A109 ('014 Claim 1), with A64 ('220 Claim 1).   Accordingly, claim 1 of the '014 patent implicitly excludes the "semi-attended" embodiment of FIGS. 20-22C.  See A107 ('014 Spec. 25:7-12).  As stated above in Section II. A., for this reason, the government's construction recites that "each step of the method requires use of a shipping machine automatically . . . **unless the step explicitly states otherwise**."  While the applicants chose to "state otherwise" by amending the claimed storing step in the '799 patent and the '220 patent, they conspicuously chose not to do so for the storing step in the '014 patent.

The government's construction is consistent with the prosecution history because the public is entitled to take the patentee at his word, see Microsoft 357 F.3d at 1350, and rely on the statement that "at each step . . . the step is performed by the automated shipping machine."[35] A193 (G002346).  Since Uship's construction impermissibly ignores these statements, it must be rejected.

---

[35]  Uship contends that the government's construction improperly requires the storing step to be performed using specific mechanisms disclosed in the specification, e.g., conveyor belt 340, inner door, 336, and slide lift motor 380.  Uship Br. at 48 n.34.  This is untrue.  The government cited particular specification passages as a contextual example merely to reflect that, in performing the storing limitation, the automated shipping machine requires no human intervention.  See A105 ('014 Spec. 21:35-22-50).  Rather than importing limitations from the specification, the citation of this example provides further support for the government's construction, consistent with the prosecution history, requiring the *automated shipping machine,* and not a person, to perform the storing limitation.

## CONCLUSION

The disputed claim terms of the '464, '220, and '014 patents should be construed as set forth above.

Respectfully submitted,

TONY WEST
Assistant Attorney General

JOHN J. FARGO
Director

  s/Scott Bolden

| | |
|---|---|
| Of Counsel: | SCOTT BOLDEN |
| GARY L. HAUSKEN | Senior Trial Counsel |
| DAVID M. RUDDY | Commercial Litigation Branch |
| Department of Justice | Civil Division |
| MICHAEL F. KIELY | Department of Justice |
| United States Postal Service | Washington, DC  20530 |
| | Telephone:    (202) 307-0262 |
| July 9, 2010 | Facsimile:    (202) 307-0345 |