## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| USHIP INTELLECTUAL PROPERTIES, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 08-537 C |
| THE UNITED STATES, | ) ) | Judge Susan G. Braden |
| Defendant, | ) ) | |
| and | ) ) | |
| INTERNATIONAL BUSINESS MACHINES CORP., | ) ) | |
| Third-Party Defendant. | ) ) | |

## IBM'S RESPONSIVE POST-HEARING CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

Page

I.   INTRODUCTION & BACKGROUND ........................................................1

II.  LEGAL PRINCIPLES .........................................................................6
     A.  Intrinsic Evidence .....................................................................7
         1.  Claims ...........................................................................7
         2.  Specification ..................................................................8
         3.  Prosecution History........................................................10
         4.  Abstract .......................................................................11
     B.  Extrinsic Evidence ...................................................................11
         1.  Dictionaries ..................................................................12
     C.  Means-Plus-Function Claims .....................................................12
         1.  Construing The Function. ................................................12
         2.  Identifying The Corresponding Structure ............................13

III. THE ASSERTED PATENTS ................................................................14

IV.  RAMSDEN AND LILES PATENTS, U.S. PATENT NOS. 5,831,220 AND
     6,105,014...................................................................................15
     A.  Claim 1 Of The '220 Patent......................................................18
         1.  A method of mailing parcels and envelopes using an automated
             shipping machine, comprising the steps of:..............................18
             a.  The Preamble Is A Limitation ....................................18
             b.  Construction Of The Preamble ...................................22
                 i.    Claim Language ..............................................23
                 ii.   Specification .................................................23
                 iii.  Prosecution History.........................................24
                 iv.   Uship's Construction ......................................25
         2.  receiving payment information from a customer;.....................30
         3.  receiving package type information identifying a parcel or
             envelope to be mailed; .....................................................30
             a.  Claim Language.....................................................31
             b.  Specification.........................................................31
             c.  Prosecution History ...............................................31
             d.  Uship's Construction ..............................................31
         4.  weighing said parcel or envelope to be mailed;.......................32
         5.  receiving shipping information from said customer including at
             least a destination of said parcel or envelope to be mailed;.....................32
             a.  Claim Language.....................................................33
             b.  Specification.........................................................33
             c.  Prosecution History ...............................................34
             d.  Uship's Construction ..............................................34
         6.  computing from said package type information, shipping
             information, and weight information, a delivery date and cost for

# TABLE OF CONTENTS
## (continued)

Page

delivery of said parcel or envelope to said destination via each
delivery service option available to said customer; ...................37
    a.    *Claim Language*......................................................*38*
    b.    *Specification*............................................................*38*
    c.    *Prosecution History* .............................................*39*
    d.    *Uship's Construction* ...........................................*39*
7.    receiving an indication of the delivery service option desired by the
customer;...............................................................................40
8.    printing a shipping label including at least said destination printed
thereon; ................................................................................40
9.    printing a shipping receipt for an amount including at least the cost
of delivering said parcel or envelope to said destination via the
delivery service chosen by said customer;.................................41
10.    validating receipt of said parcel or envelope as the parcel or
envelope for which said shipping label was printed; ................41
    a.    *Claim Language*......................................................*41*
    b.    *Specification*............................................................*42*
    c.    *Prosecution History* .............................................*43*
    d.    *Uship's Construction* ...........................................*44*
        i.    The Claim Requires Validation That The Parcel Or
Envelope Received For Storage Is The Same Parcel
Or Envelope For Which The Shipping Label Was
Printed ......................................................................45
        ii.    The Automated Shipping Machine Performs The
Validation Step.........................................................47
11.    and an attendant of said customer storing a validated parcel or
envelope in a secure storage area until said parcel or envelope is
subsequently picked up by a commercial delivery person.........50
B.    Claim 1 Of U.S. Pat. No. 6,105,014 .......................................50
1.    printing a tracking bar code label including at least said destination
printed thereon; ......................................................................51
2.    storing a validated parcel or envelope in a secure storage area until
said parcel or envelope is subsequently picked up by a commercial
delivery person......................................................................51
    a.    *Claim Language*......................................................*52*
    b.    *Specification*............................................................*53*
    c.    *Prosecution History* .............................................*54*
    d.    *Uship's Construction* ...........................................*54*

**V.    THE RAMSDEN PATENT, U.S. PAT. NO. 5,481,464.......................55**
A.    The Asserted Claims .............................................................57
B.    Independent Claim 7 And Dependent Claims 9-12 And 15 ................57
1.    Independent Claim 7 .............................................................57

# TABLE OF CONTENTS
## (continued)

Page

a.   *An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services: said automated unit comprising,*....................................................................*57*
    i.   The Preamble Is A Limitation.............................................58
    ii.   Construction Of The Preamble ..........................................58
        (A)   Claim language ....................................................58
        (B)   Specification ........................................................59
        (C)   Prosecution History.............................................60
        (D)   Uship's Construction ...........................................61
b.   *means for weighing the item to be shipped;*...............................65
c.   *means for inputting information relating to the destination to which the item is to be shipped;*................................................65
    i.   Function Of "means for inputting information relating to the destination to which the item is to be shipped" ......................................................................65
    ii.   Corresponding Structure ...................................................66
d.   *control means for analyzing the inputted information and calculating the fee for shipment of the item;*....................67
    i.   Function Of "control means for analyzing the inputted information and calculating the fee for shipment of the item".......................................................67
    ii.   Corresponding Structure ...................................................68
e.   *said control means further including means for receiving credit card information and*.........................................................70
f.   *said control means further including . . . means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines;*...............................................................................71
    i.   This Is A Means-Plus-Function Limitation Governed By § 112, ¶ 6 ....................................................71
    ii.   Function Of "communicating and assessing the shipment fee to the account of the person owning the credit card"..................................................................72
    iii.   Corresponding Structure ...................................................72
g.   *means for securely storing said item until the item is collected by said commercial delivery service;* ...........................73
    i.   Function Of "means for securely storing said item until the item is collected by said commercial delivery service" ...............................................................74
    ii.   Corresponding Structure ...................................................76

# TABLE OF CONTENTS
## (continued)

Page

h. *means for storing the inputted information once said item is disposed in said secured storage means,* ......................................77
  i. Function Of "means for storing the inputted information once said item is disposed in said secured storage means"....................................................78
  ii. Corresponding Structure ...................................................81
i. *said information storage means including means for displaying a manifest.* ..................................................83
2. Dependent Claim 9 ......................................................83
  i. Function Of "communicating said information to a remote location staffed by a human operator"..................84
  ii. Corresponding Structure ...................................................85
3. Dependent Claim 10 ....................................................85
4. Dependent Claim 11 ....................................................87
5. Dependent Claim 12 ....................................................87
6. Dependent Claim 15 ....................................................88
C. Independent Claims 28 And 34 And Their Dependent Claims ............................89
1. Independent Claim 28 [And Dependent Claim 30] ..................................90
  a. *Independent Claim 28*....................................................90
  b. *Dependent Claim 30* ....................................................92
2. Independent Claim 34 ....................................................92
  a. *said information storage means including means for transmitting information that may be used to prepare a manifest to a remote location*........................................................93

VI. **CONCLUSION** ................................................................................**94**

# TABLE OF AUTHORITIES

Page

**Cases**

*800 Adept, Inc. v. Murex Securities, Ltd.*,
    539 F.3d 1354 (Fed. Cir. 2008)..................................................................... 49

*Agilent Techs, Inc. v. Affymetrix, Inc.*,
    567 F.3d 1366 (Fed. Cir. 2009)................................................... 3, 7, 62, 63

*Altiris, Inc. v. Symantec Corp.*,
    318 F.3d 1363 (Fed. Cir. 2003)............................................................. 12, 72

*Am. Seating Co. v. Kustom Seating Unlimited, Inc.*, Case No. 1:07-cv-1284.
    2010 WL 489521 (W.D. Mich. Feb. 4, 2010)................................................ 32

*Amado v. Microsoft Corp.*, Case No. SACV 03-0242 DOCANX, 2004 WL 5683568
    (C.D. Cal. Aug. 20, 2004).......................................................................... 76

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)............................................................. 10, 48

*Antonious v. Spalding & Evenflo Cos., Inc.*,
    275 F.3d 1066 (Fed. Cir. 2002)................................................................... 1

*Application of Deters*,
    515 F.2d 1152 (C.C.P.A. 1975) ................................................................. 88

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008)............................................... 68, 69, 70, 93

*Atmel Corp. v. Info. Storage Devices, Inc.*,
    198 F.3d 1374 (Fed. Cir. 1999)............................................................. 66, 70

*Baxter Healthcare Corp. v. Fresenius Medical Care Holdings, Inc.*,
    Case No. C 07-1359 PJH, 2009 WL 330950 (N.D. Cal. Feb. 10, 2009) .......... 68

*Bicon, Inc. v. Starumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006)................................................................... 78

*Biomedino, LLC v. Waters Techs. Corp.*,
    490 F.3d 946 (Fed. Cir. 2007)............................................................. 13, 14

*Blackboard, Inc. v. Desire2Learn, Inc.*,
    574 F.3d 1371 (Fed. Cir. 2009)............................................................. 68, 70

*Boss Indus., Inc. v. Yamaha Motor Corp. U.S.A., Inc.*,
    333 Fed. Appx. 531 (Fed. Cir. 2009) ........................................................ 35

# TABLE OF AUTHORITIES
## (continued)

Page

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
  296 F.3d 1106 (Fed. Cir. 2002)........................................................................ 8, 13, 85

*Cat Tech LLC v. TubeMaster, Inc.*,
  528 F.3d 871 (Fed. Cir. 2008)..................................................................................... 72

*Chamberlain Group, Inc. v. Lear Corp.*,
  516 F.3d 1331 (Fed. Cir. 2008)..................................................................................... 7

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
  358 F.3d 1371 (Fed. Cir. 2004)................................................................................... 46

*Computer Docking Station Corp. v. Dell, Inc.*,
  519 F.3d 1366 (Fed. Cir. 2008).............................................................................. 8, 19

*Creo Prods., Inc. v. Presstek, Inc.*,
  305 F.3d 1337 (Fed. Cir. 2002)............................................................................. 74, 84

*CVI/Beta Ventures, Inc. v. Tura LP*,
  112 F.3d 1146 (Fed. Cir. 1997)............................................................................. 10, 24

*Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*,
  243 Fed. Appx. 603 (Fed. Cir. 2007)......................................................................... 89

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc. (d/b/a The Home Depot)*,
  412 F.3d 1291 (Fed. Cir. 2005)............................................................................. 85, 94

*Edwards Lifesciences LLC*,
  582 F.3d 1322 (Fed. Cir. 2009)..................................................................................... 9

*Every Penny Counts, Inc. v. Am. Express Co.*,
  563 F.3d 1378 (Fed. Cir. 2009)................................................................................... 28

*Finisar Corp. v. DirecTV Group, Inc.*,
  523 F.3d 1323 (Fed. Cir. 2008)................................................................................... 64

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
  423 F.3d 1343 (Fed. Cir. 2005)................................................................................... 12

*Generation II Orthotics Inc. v. Medical Tech. Inc.*,
  263 F.3d 1356 (Fed. Cir. 2001)............................................................................. 13, 74

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Gobeli Research Ltd. v. Apple Computer, Inc.*,
  384 F. Supp. 2d 1016 (E.D. Tex. 2005) ........................................................ 84

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
  —F.3d—, 2010 WL 2179158 (Fed. Cir. June 2, 2010) ............................... 7, 46

*Hearing Components, Inc. v. Shure Inc.*,
  600 F.3d 1357 (Fed. Cir. 2010) .................................................................. 8, 19

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
  527 F.3d 1379 (Fed. Cir. 2008) ............................................................ 9, 35, 54

*Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.*,
  209 F.3d 1337 (Fed. Cir. 2000) ..................................................................... 11

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*,
  222 F.3d 951 (Fed. Cir. 2000) ................................................................. 10, 50

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
  452 F.3d 1312 (Fed. Cir. 2006) ....................................................................... 9

*In re Hyatt*,
  708 F.2d 712 (Fed. Cir. 1983) ...................................................................... 78

*Innogenetics, N.V. v. Abbott Labs.*,
  512 F.3d 1363 (Fed. Cir. 2008) ................................................................. 7, 29

*Israel v. Cresswell*,
  166 F.2d 153 (1948) ...................................................................................... 75

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*,
  302 F.3d 1352 (Fed. Cir. 2002) ..................................................................... 10

*Jonsson v. Stanley Works*,
  903 F.2d 812 (Fed. Cir. 1990) ...................................................................... 56

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
  424 F.3d 1324 (Fed. Cir. 2005) ................................................................. 12, 13

*K-2 Corp. v. Salomon S.A.*,
  191 F.3d 1356 (Fed. Cir. 1999) ..................................................................... 3, 4

*Kara Tech. Inc. v. Stamps.com Inc.*,
  582 F.3d 1341 (Fed. Cir. 2009) ....................................................................... 7

# TABLE OF AUTHORITIES
## (continued)

Page

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*,
  285 F.3d 1353 (Fed. Cir. 2002)..................................................................... 88

*Lexion Medical, LLC v. Northgate Techs., Inc.*,
  292 Fed. Appx. 42 (Fed. Cir. 2008) ............................................................. 48

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
  324 F.3d 1308 (Fed. Cir. 2003)............................................................. passim

*Mangosoft, Inc. v. Oracle Corp.*,
  525 F.3d 1327 (Fed. Cir. 2008)............................................................. 24, 60

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996) ......................................................................... 7, 11, 32

*Masimo Corp. v. Mallinckrodt Inc.*,
  18 Fed. Appx. 852 (Fed. Cir. 2001) ............................................................ 28

*Massachusetts Institute of Tech. and Electronics For Imaging, Inc. v. Abacus Software*,
  462 F.3d 1344 (Fed. Cir. 2006).................................................................... 66

*Maurice Mitchell Innovations, L.P. v. Intel Corp.*,
  249 Fed. Appx. 184 (Fed. Cir. 2007) ..................................................... 66, 94

*Medical Instrumentation and Diagnostics Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003).................................................................... 13

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005)...................................................................... 3

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
  194 F.3d 1250 (Fed. Cir. 1999).................................................................... 75

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
  357 F.3d 1340 (Fed. Cir. 2004)............................................................... 9, 60

*Minks v. Polaris Indus., Inc.*,
  546 F.3d 1364 (Fed. Cir. 2008)....................................................... 13, 65, 73

*Netword, LLC v. Centraal Corp.*,
  242 F.3d 1347 (Fed. Cir. 2001)...................................................................... 8

*North Am. Container, Inc. v. Plastipak Packaging, Inc.*,
  415 F.3d 1335 (Fed. Cir. 2005).................................................................... 44

**TABLE OF AUTHORITIES**
(continued)

Page

*Nystrom v. TREX Co., Inc.*,
424 F.3d 1136 (Fed. Cir. 2005)................................................................. 29, 33

*O.I. Corp. v. Tekmar Co.*,
115 F.3d 1576 (Fed. Cir. 1997)................................................................. 94

*Ormco Corp. v. Align Techs., Inc.*,
498 F.3d 1307 (Fed. Cir. 2005)................................................................. 11, 56

*Paragon Solutions, LLC v. Timex Corp.*,
566 F.3d 1075 (Fed. Cir. 2009)................................................................. 63

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)................................................................. passim

*PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*,
525 F.3d 1159 (Fed. Cir. 2008)................................................................. 54

*Research Plastics, Inc. v. Fed. Packaging Corp.*,
421 F.3d 1290 (Fed. Cir. 2005)................................................................. 10

*Rolls-Royce, PLC v. United Techs. Corp.*,
603 F.3d 1325 (Fed. Cir. 2010)................................................................. 10

*SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys.*,
242 F.3d 1337 (Fed. Cir. 2001)................................................................. 9, 23

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
511 F.3d 1132 (Fed. Cir. 2007)................................................................. 54

*Sjolund v. Musland*,
847 F.2d 1573 (Fed. Cir. 1988)................................................................. 88

*SourceOne Global Partners, LLC v. KGK Synergize, Inc.*, Case No. 08 C 7403,
2010 WL 2232944 (N.D. Ill. June 3, 2010)............................................. 29, 49

*Southwall Techs. Inc. v. Cardinal LG Co.*,
54 F.3d 1570 (Fed. Cir. 1995)................................................................. 10

*Springs Window Fashions LP v. Novo Inus. LLP*,
323 F.3d 989 (Fed. Cir. 2003)................................................................. 10, 28

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
775 F.2d 1107 (Fed. Cir. 1985)................................................................. 4

**TABLE OF AUTHORITIES**
(continued)

Page

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
  329 F.3d 823 (Fed. Cir. 2003)......................................................... 5, 8, 9

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*,
  222 F.3d 958 (Fed. Cir. 2000) ............................................................. 11

*Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n,*
  988 F.2d 1165 (Fed. Cir. 1993)........................................................ 4, 75

TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.,
  529 F.3d 1364 (Fed. Cir. 2008)................................................ 4, 9, 10, 26

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
  587 F.3d 1339 (Fed. Cir. 2009)....................................................... 28, 48

*Vitronics Corp. v. Conceptronic*,
  90 F.3d 1576 (Fed. Cir. 1996)............................................................. 10

*Welker Bearing Co. v. PHD, Inc.*,
  550 F.3d 1090 (Fed. Cir. 2008)........................................................... 73

*White v. Dunbar*,
  119 U.S. 47 (1886)............................................................................ 8

*WMS Gaming, Inc. v. Int'l Game Tech.*,
  184 F.3d 1339 (Fed. Cir. 1999)........................................................... 68

**Statutes**

35 U.S.C. § 112................................................................................ passim

**Other Authorities**

U.S. PTO Glossary............................................................................ 56

# I.      INTRODUCTION & BACKGROUND

Uship Intellectual Properties, LLC ("Uship") initially sued the United States Post Office ("Post Office" or "the government") alleging that the Automated Postal Center ("APC") manufactured by International Business Machines Corp. ("IBM") infringed 8 patents containing 166 claims.[1]  As a result of the claim construction process thus far, Uship has dropped 5 of the 8 patents and 155 of the 166 claims it initially asserted.  But the final 3 patents Uship asserts and 11 remaining claims do not withstand scrutiny any more than the multitude of patents and claims it already has jettisoned.  When construed pursuant to the governing case law in light of the intrinsic record the remaining claims are no more infringed than the ones Uship dropped.

Before initiating this suit, Uship had a duty to analyze the meaning of its patent claims and determine that it had a reasonable basis to assert the APC infringed the claims.[2]  That initial analysis has gone by the wayside because Uship has changed its claim construction positions repeatedly and significantly throughout this case.  Although all parties have made at least some minor edits to their proposed constructions in efforts to compromise and narrow the issues, Uship's repeated and wholesale repositioning has made the claim construction process a moving target.  Uship's case now bears little relationship to the case it brought and Uship's focus now is nothing more than a results-oriented attempt to construe its remaining claims to create infringement regardless of the caselaw or intrinsic record.

---

[1]  Uship is not a competitor of either IBM or the Post Office and does not make or sell its own postal machines.  In fact Uship has no business at all other than to purchase and hold patents that it then asserts against other entities to extract revenues.

[2] *See e.g.*, *Antonious v. Spalding & Evenflo Cos., Inc.*, 275 F.3d 1066, 1072 (Fed. Cir. 2002) ("This court has construed Rule 11, in the context of patent infringement actions, to require that an attorney interpret the pertinent claims of the patent in issue before filing a complaint alleging patent infringement.").

Uship's latest claim construction positions continue to be fundamentally flawed.  Uship impermissibly continues to delete or "read out" limitations that are explicitly recited in the asserted claims.  For example, Uship's constructions when taken together seek to rewrite asserted claim 7 of the '464 patent as follows:

> 7. ~~An integrated, automated, unattended unit~~ **[AN APPARATUS, MACHINE, OR SYSTEM OF MACHINES]** for collecting and securely holding items for collection and shipment by commercial delivery services:
>
> means for weighing the item to be shipped;
>
> means for inputting information relating to the destination to which the item is to be shipped;
>
> control means for analyzing the inputted information and calculating the fee for shipment of the item; said control means further including means for receiving credit card information and means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines;
>
> means for securely storing said item ~~until the item is collected by said commercial delivery service~~;
>
> means for storing the inputted information ~~once said item is disposed in said secured storage means~~, said information storage means including means for displaying a manifest.

Likewise, in the asserted claims of the '220 and '014 patents, Uship asks the Court to (1) delete the entire preamble ("A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of:"); (2) rewrite "date" to mean "number of days"; and most notably (3) give no meaning to the highlighted portion of the element "validating receipt of said parcel or envelope *as the parcel or envelope for which said shipping label was printed*." Uship's approach ignores the claims' statutory role of "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. § 112, ¶ 2. If patentees could rewrite claims during litigation, then no one in the field could ascertain with

any certainty the scope of the patentee's property right.  But the Federal Circuit has made clear that "[c]ourts do not rewrite claims; instead we give effect to the terms chosen by the patentee," *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999), and that "[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not," *Agilent Techs, Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1378 (Fed. Cir. 2009) (quoting *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005)).

Uship advances a number of flawed theories in support of its constructions.  First, Uship continues to derive its constructions from the broadest definitions it can find in general purpose dictionaries and other extrinsic sources like the present-day Wikipedia website.[3]  The Federal Circuit specifically rejected Uship's approach in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) where that court explicitly held that the ordinary meaning of a claim term is best determined by consulting a patent's intrinsic record—not cherry-picked extrinsic dictionary definitions.  Just as *Phillips* warned, Uship's approach predictably results in abstract definitions that are untethered to "what the inventors actually invented and intended to envelop with the claim."  *Id.* at 1316.  Uship's continued reliance on extrinsic evidence is surprising given the Court's admonition at the *Markman* hearing:

> THE COURT:  . . . Mr. Colatriano, I think that by now you've gotten the gist when you go back and review the transcripts and what you have that the Court really wants to stay within the bounds of the patent and the spec. . . MR. COLATRIANO: I understand, Your Honor. THE COURT:—and the prosecution history unless there is nothing there.

2/18/2010 Tr. 700:21-701:3.

---

[3] *See* Uship Post-Hearing Br. at 58 (citing Wikipedia as support for Uship's proposed corresponding structure for "control means for analyzing the inputted information and calculating the fee for shipment of the item").

Second, Uship misleadingly asserts that its constructions are proper because there are alleged embodiments in the specification that do not include the limitations in its claims. This is doubly wrong. First, "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312. The words of the claim may be construed but the explicit words of the claim chosen by the patentee govern and cannot simply be deleted or rewritten. *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[C]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth."); *K-2 Corp.*, 191 F.3d at 1364; *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) ("Specifications teach. Claims claim."). Also, there is no rule that every claim must cover every embodiment or that every embodiment must be claimed—if that were the case there would be no need for claims at all. In fact, the Federal Circuit's "precedent is replete with examples of subject matter that is included in the specification, but is not claimed." *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1375 (Fed. Cir. 2008). Any contrast between the explicit claim language and the embodiments Uship cites only emphasizes that the applicants' claim limitations were intentional and that Uship may not now discard those explicit limitations.

Third, with respect to the means-plus-function terms, Uship asks the Court to ignore explicit functional claim language that Uship has concluded "adds nothing to the substance of the claim." There is no legal or factual basis for this argument. Patentees may not provide carefully written and detailed claims to the Patent Office to obtain allowance of those claims only to later declare that language meaningless during litigation. Uship's very insistence that the language must be deleted is at odds with its own assessment that the language "adds nothing." Moreover, the cases upon which Uship relies, *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324

4

F.3d 1308, 1319 (Fed. Cir. 2003), and others, only confirm that what Uship is doing is impermissible—the Court may not adopt a function different from that explicitly recited in the claim, and may not broaden the claimed function by construing less than the whole function. Uship again ignores established claim construction principles requiring all claim language to be deemed to have meaning and to avoid constructions that render claim language meaningless or superfluous.

Uship continues reflexively to criticize IBM's every reliance on the intrinsic record while generally failing to provide any support from that public record for its constructions. Uship improperly confuses using the intrinsic record to construe claim limitations—as mandated by the Federal Circuit—with "importing" limitations. What Uship ignores is that IBM's constructions *interpret* explicit claim limitations instead of importing additional limitations. *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003) ("[I]nterpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation . . . .'"). IBM's constructions pay the claims and the intrinsic record the deference they are due, whereas Uship's constructions delete claim limitations wholesale and are driven more by result than by caselaw or the intrinsic evidence. This is Uship's case. Instead of criticizing IBM for relying on the intrinsic record, Uship should have provided support for its proposed constructions from that record. But the intrinsic record does not support Uship so it attacks IBM for relying on it.

IBM construes the claims by rigorously applying the dictates of *Phillips* and other controlling Federal Circuit precedent. The intrinsic evidence supports each of its constructions and resolves the disputed issues without ambiguity, rendering resort to extrinsic evidence unnecessary. IBM respectfully requests that the Court adopt its proposed constructions.

For the Court's convenience, below is the subset of terms IBM believes are most likely to be dispositive of this action.  With respect to the '220 and '014 patents:

- The construction of the preambles.  *See infra*, § IV.A.1.

- The construction of "receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed."  *See infra*, § IV.A.5.

- The construction of "validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed."  *See infra*, § IV.A.10.

With respect to the '464 patent:

- The construction of the preamble.  *See infra*, § V.B.1.a.

- The construction of "control means for analyzing the inputted information and calculating the fee for shipment of the item."  This term presents an invalidity issue that may render construction of the remaining terms in all of the asserted '464 patent claims unnecessary.  *See infra*, § V.B.1.d.

- The construction of "means for securely storing said item until the item is collected by said commercial delivery service."  *See infra*, § V.B.1.g.

- The construction of "means for storing the inputted information once said item is disposed in said secured storage means."  *See infra*, § V.B.1.h.

## II.    LEGAL PRINCIPLES

To construe patent claims, the court may consult two categories of evidence:  the intrinsic evidence, which consists of the claims, specification, abstract, and prosecution histories; and extrinsic evidence, which consists of dictionaries and other sources outside the public record of the patent.  The Federal Circuit continues to "look primarily to the intrinsic evidence" to determine the meaning of a disputed claim limitation.  *See, e.g.*, *Innogenetics, N.V. v. Abbott*

*Labs.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008).   "Intrinsic evidence, that is the claims, written description, and the prosecution history, is a more reliable guide to the meaning of a claim term than are extrinsic sources like technical dictionaries, treatises, and expert testimony." *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008).   Reliance on extrinsic evidence is disfavored because it threatens to undermine the public notice function of patents. *Id.* at 1319; *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996) ("[A] patent must . . . apprise the public of what is still open to them.").

### A.   Intrinsic Evidence

#### 1.   Claims

Patent claims are required to "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention."   35 U.S.C. § 112, ¶ 2.   The claims "define the metes and bounds of the patentee's invention," *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347 (Fed. Cir. 2009), and function "to give notice to the public, including potential competitors, of the patentee's right to exclude," *Haemonetics Corp. v. Baxter Healthcare Corp.*,—F.3d—, 2010 WL 2179158, *3 (Fed. Cir. June 2, 2010).   Thus, "the Supreme Court [has] made clear that the claims are of primary importance, in the effort to ascertain precisely what it is that is patented." *Phillips*, 415 F.3d at 1312 (internal quotations omitted).

Claim terms are given their ordinary and customary meaning—*i.e.*, the "meaning that the term would have to a person of ordinary skill in the art." *Id.* at 1313.   Courts "construe claims with an eye toward giving effect to all of their terms." *Haemonetics*, 2010 WL 2179158 at *3. Patent claims' notice function "would be undermined" "if courts construed claims so as to render physical structures and characteristics specifically described in those claims superfluous." *Id.* As such, "[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so." *Agilent Tech.*, 567 F.3d at 1378; *White v. Dunbar*, 119 U.S. 47, 52

(1886) ("[I]t is unjust to the public, as well as an evasion of law, to construe [a claim] in a manner different from the plain import of its terms."). Courts "will not rewrite claims." *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1115 (Fed. Cir. 2002).

A claim's preamble often is properly construed as a limitation, such as when it provides "a necessary and defining aspect of the invention," *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008), or when it provides a limitation that is not duplicative of other language in the claim, *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1366 (Fed. Cir. 2010) ("We do not consider the "readily installed" phrase [in the preamble] to be duplicative of other language in the claim. . . . We thus conclude that the "readily installed" phrase is a claim limitation."). If the patent applicant relied on the preamble during prosecution, the preamble is a limitation. *Storage Tech.*, 329 F.3d at 835.

## 2.    Specification

"The claims, of course, do not stand alone, [but] must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (internal citations omitted). The specification provides "a written description of the invention." 35 U.S.C. § 112, ¶ 1. In light of this statutory directive, the "specification necessarily informs the proper construction of the claims," *Phillips*, 415 F.3d at 1316, and the claims do not have meaning outside of the context of the specification, *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001). Accordingly, "the specification is always highly relevant to the claim construction analysis [and] is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal citations omitted). The specification provides context and "acts as a dictionary" so that one of skill in the art may understand the scope of the claimed invention. *Id*. at 1321. Although it is improper to import limitations from the specification into the claims, using the

specification to "interpret[] what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation.'"  *Storage Tech.*, 329 F.3d at 831.

The specification can provide a claim term's scope by defining or explaining "the invention" or "the present invention."  *See, e.g.*, *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (construing "fuel injection system component" as "fuel filter" because the written description indicated that the "invention" was a fuel filter); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) (holding that specification statements, including those found in the "Summary of the Invention," that "broadly describe the overall invention[]" are limiting).  If a given structure is characterized as part of the "invention[, this is] **strong evidence** that the claims should not be read to encompass the opposite structure." *SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001)[4]. Moreover, when the specification consistently uses a term in a specific manner the term is not entitled to broader scope.  *See e.g.*, *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009) (construing "graft" to be an "intraluminal graft").

It is not necessary to construe claims to cover every embodiment disclosed in the specification.  *See TIP Sys.,* 529 F.3d at 1375.  The Federal Circuit's "precedent is replete with examples of subject matter that is included in the specification, but is not claimed."  *Id.*  (citing cases).  And "[i]t is often the case that different claims are directed to and cover different disclosed embodiments."  *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008). "Therefore, the mere fact that there is an alternative embodiment disclosed in the [] patent that is not encompassed by [a] district court's claim construction does not outweigh the language of the claim, especially when the court's construction is supported by the intrinsic

---

[4] All emphasis is added unless otherwise noted.

evidence." *TIP Sys.*, 529 F.3d at 1375; *see Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1334-35 (Fed. Cir. 2010).

### 3. Prosecution History

"[T]he prosecution history is always relevant to claim construction." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1327 (Fed. Cir. 2003). "Like the specification, the prosecution history provides evidence of how the Patent Office and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. Thus, claims "must be construed with reference to" the prosecution history. *Research Plastics, Inc. v. Fed. Packaging Corp.*, 421 F.3d 1290, 1296 (Fed. Cir. 2005). As "the record before the Patent and Trademark Office[, the prosecution history] is often of **critical significance** in determining the meaning of the claims." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

"The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims." *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000). "Competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *Id.* A patentee, therefore, must "be held to what he declares during the prosecution of his patent." *Springs Window Fashions LP v. Novo Indus. LLP*, 323 F.3d 989, 995 (Fed. Cir. 2003). Where an applicant "commit[s] to a particular meaning for a patent term, [that] meaning is then binding in litigation." *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1158 (Fed. Cir. 1997); *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1359 (Fed. Cir. 2002) (finding "no reason to deviate from the definition espoused by the applicant during prosecution"). "[A]bsent a clear indication to the contrary," the patent applicant's statements about the meaning of a term are relevant to "every claim of the patent," *Southwall Techs. Inc. v. Cardinal LG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995), and related patents, *Ormco Corp. v. Align*

*Techs., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2005) ("[T]he prosecution history can often inform *the meaning of the claim language* by demonstrating how the inventor understood the invention and whether the inventor limited the invention . . . . Thus, we turn to the prosecution history of the Ormco patents, and other patents from the same family.") (emphasis in original).

### 4.   Abstract

The Abstract, found on a patent's cover is a "potentially helpful source of intrinsic evidence as to the meaning of claims." *Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.1 (Fed. Cir. 2000). For this reason, courts have "frequently looked to the abstract to determine the scope of the invention." *Id.*; *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 966 n.2 (Fed. Cir. 2000).

### B.   Extrinsic Evidence

A court is permitted to consider certain "extrinsic evidence," including "expert and inventor testimony, dictionaries and learned treatises"; however, the Federal Circuit has warned that "extrinsic evidence in general is less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 317-18 (internal citations omitted). "[E]xtrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning." *Id.* For this reason, extrinsic evidence may not be used in derogation of the "indisputable public records"—*i.e.*, intrinsic evidence. *Id.* at 1319 (internal citations removed); *see also Markman*, 52 F.3d 967, 981 (Fed. Cir. 1995) (holding that extrinsic evidence cannot contradict the "construction of the claims based on the specification and prosecution history").

11

### 1.     Dictionaries

Technical dictionaries may sometimes be helpful to a court to understand the underlying technology at issue. *Phillips*, 415 F.3d at 1318.  By contrast, "[g]eneral [purpose] dictionaries, in particular, strive to collect all uses of particular words." *Id*. at 1321-22.  Importantly, to the extent a court uses a dictionary, it does not mean that a "term will presumptively receive its broadest dictionary definition or the aggregate of multiple dictionary definitions." *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348 (Fed. Cir. 2005).  As the Federal Circuit warned in *Phillips*:

> The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

415 F.3d at 1321-22.

### C.     Means-Plus-Function Claims

A number of elements or limitations in the asserted claims are written in "means-plus-function" format.  Such elements are expressed as a "***means*** . . . for performing a specified ***function*** without the recital of structure." 35 U.S.C. § 112, ¶ 6.  A claim element that contains the word 'means' and recites a function is presumed to be drafted in means-plus-function format under 35 U.S.C. § 112, ¶ 6.  *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003).  This presumption can be rebutted but only if "the claim, in addition to the functional language, recites structure sufficient to perform the claimed function *in its entirety*." *Id.*

### 1.     Construing The Function.

The first step in construing claim elements written in means-plus-function form is to construe the specified function. *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).  The function of a means-plus-function limitation "is properly identified

as the language after the 'means for' clause and before the 'whereby' clause [if any]" in the claim. *Lockheed Martin Corp.*, 324 F.3d at 1319. "The function of a means-plus-function claim must be construed to include the limitations contained in the claim language." *Id.* In this regard, a court may not adopt "a function different from that explicitly recited in the claim," *JVW Enters.*, 424 F.3d at 1331, and may not "broaden the scope of the claimed function by ignoring clear limitations in the claim language," *Cardiac Pacemakers,* 296 F.3d at 1113. "Correctly identifying the claimed function is important, because '[a]n error in identification of the function can improperly alter the identification of the structure . . . corresponding to that function.'" *Generation II Orthotics Inc. v. Medical Tech. Inc.*, 263 F.3d 1356, 1363 (Fed. Cir. 2001).

## 2.     Identifying The Corresponding Structure

The second step in construing means-plus-function elements is to "identify the corresponding structure in the written description that performs that function." *JVW Enters.*, 424 F.3d at 1330. "In order to qualify as corresponding, the structure must not only perform the claimed function, but ***the specification must clearly associate the structure with performance of the function***." *Cardiac Pacemakers, Inc.*, 296 F.3d at 1113; *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1377 (Fed. Cir. 2008) (disclosed structure is corresponding "only if the specification or prosecution history ***clearly links or associates*** that structure to the function recited in the claim'"). Indicating in the specification "what structure constitutes the means" is "often referred to as the *quid pro quo* for the convenience of employing § 112, ¶ 6." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 n.1 (Fed. Cir. 2007). "The public should not be required to guess as to the structure for which the patentee enjoys the right to exclude. ***The public instead is entitled to know precisely what kind of structure the patentee has selected for the claimed functions, when claims are written according to section 112, paragraph 6***." *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1220 (Fed. Cir. 2003). If

13

the applicant fails to clearly disclose structure in the specification corresponding to the claimed function, then the claim is invalid for indefiniteness under § 112, ¶ 6. *Biomedino, LLC*, 490 F.3d at 950. This is true regardless of whether the knowledge of one of ordinary skill in the art can supply sufficient corresponding structure. *Id*. at 950-953.

## III.   THE ASSERTED PATENTS

The asserted claims come from one patent issued to Gary Ramsden as the sole inventor ("the '464 patent" or "the Ramsden patent") and two patents issued to Gary Ramsden and Kenneth Liles as joint inventors ("the '220 patent" and "the '014 patent," collectively, "the Ramsden/Liles patents"). The asserted patents are all related and the figure below illustrates the genealogy of the Ramsden patents, with the three asserted patents shaded in gray:



As shown above, the asserted patents purport to descend from the '532 patent and, as a result, the asserted patents share subject matter and written description. The '220 and '014 patents are continuation applications and therefore the Ramsden/Liles patents have essentially

identical specifications.[5]  The '464 patent is related to the Ramsden/Liles patents and contains overlapping subject matter with those patents.[6]  Because Uship's post-hearing *Markman* brief first construes the disputed terms of the Ramsden/Liles patents, IBM will follow that order and construe those terms first, *infra* § IV, and then construe the disputed terms of the Ramsden patent, *infra* § V.  Because many of the disputed terms recur throughout the asserted patents, IBM will avoid repetition and indicate when a term has been previously construed.

## IV.  RAMSDEN AND LILES PATENTS, U.S. PATENT NOS. 5,831,220 AND 6,105,014

The '220 and '014 patents issued to Ramsden and Liles.  Uship asserts only independent claim 1 from each patent, each of which is a method claim.  Both patents contain nearly identical specifications, and, as shown below, are related to each other as continuations:



---

5 "A continuation is a second application for the same invention claimed in a prior nonprovisional application and filed before the original prior application becomes abandoned or patented . . . .  The disclosure presented in the continuation must be the same as that of the original application; *i.e.*, the continuation should not include anything which would constitute new matter if inserted in the original application."  MPEP § 201.07.

6 The '464 patent and the parent of the '220 and '014 patents are both continuations-in-part of the unasserted '948 patent.  A continuation-in-part is an application filed during the lifetime of an earlier application that repeats some substantial portion or all of the earlier application and *adds matter not disclosed* in the earlier application.  MPEP § 201.08.

The '220 and '014 patents purport to improve upon prior art shipping machines such as "unattended drop boxes." '220 patent, 1:37-39.[7]   According to the patents, "[c]ommercial delivery services compete intensely both in terms of pricing and service. . . .  Price competition . . . is very intense, and it is particularly important that shipped items be collected, transported and distributed quickly and on a cost-effective basis."  *Id.* 1:27-36.  The patents acknowledge that, prior to their invention, "[s]ome delivery services operate[d] unattended drop-boxes" in which a customer could deposit an envelope.  *Id.* 1:37-43.  But, the patents explain, these prior art systems were deficient because they could not perform certain services normally offered by "staffed offices" such as "accept[ing] items of most sizes for shipments, and giv[ing] verified receipts to the customer."  *Id.* 1:55-57.  As a result, commercial delivery services were required to "operate staffed offices" that "have a relatively high overhead cost for the company that operates them."  *Id.* 1:55-63.

The '220 and '014 patents purport to address the "long and unfulfilled need[s] in the art" created by these deficiencies.  Accordingly, the patents are directed to "an automated package shipping machine" and a "method implemented by an automated shipping machine."  *Id.* Title, 2:39-41.  As the "Summary of the Invention" explains, to achieve the "objects of the invention" the machine is used to perform several mailing-related functions:

> "Such a method is implemented by ***an automated shipping machine including*** a device for ***receiving payment information*** . . . ; a scale for ***weighing*** . . .; a measuring apparatus for determining length, width and height . . .; a processing system for ***receiving package type information*** [and] . . .for ***computing  . . . a delivery date and cost for delivery*** . . .; a printer responsive to the processing system for ***printing a shipping label*** . . .and for ***printing a shipping receipt*** . . .; a validation area for accepting the parcel or envelope, the validation area being inaccessible by the customer and comprising a system for ***validating whether the parcel or envelope received therein is the parcel or envelope for which the***

---

[7] In this section, IBM cites only to the specification of the '220 patent, but in each case, the '014 contains identical language.

>*shipping label was printed* by the printer; and a secure storage area adjacent to validation area and a secure storage area adjacent the validation area for securely storing the parcel or envelope validated by the validating system, the secure storage area *storing the validated parcel or envelope until the parcel or envelope is subsequently picked up by a commercial delivery person*."

*Id.* 2:39-40, 3:5-36.

As recited above, one of the steps performed by the machine is "*validating whether the parcel or envelope received therein is the parcel or envelope for which the shipping label was printed by the printer* . . . ." *Id.* 21:43-49.  The applicants identified this "validation" step as "very important" because it "determines . . . whether [the system] has received the correct package." *Id.*  Another important feature that the applicants emphasized was the ability of the automated machine to provide a "verified receipt."  According to the patents, prior art "schemes" could not "provide full insurance protection or verification that the package was in fact mailed, since no attendant is present to verify that the letter was actually placed in the box." *Id.* 1:43-46.  The applicants' invention, however, "provid[es] a mechanism for verified receipt of an item to be shipped." *Id.* 2:30-35.  Specifically, the system of the invention "includes safeguards which prevent unauthorized access to the storage area, and will not provide a receipt to the customer until internal sensors verify deposit of the item." *Id.* Abstract, 2:39-65.

The asserted claims of these patents substantially overlap.  IBM first will address the disputed terms in the '220 patent and then will provide a chart indicating which terms in the '014 patent overlap with claim 1 of the '220 patent and which do not, and then IBM will provide its construction of those additional terms of the '014 patent not found in claim 1 of the '220 patent.

17

A.    Claim 1 Of The '220 Patent

1.    A method of mailing parcels and envelopes using an automated
shipping machine, comprising the steps of:

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| A method of mailing parcels and envelopes, through the USPS and/or other commercial delivery services, using a shipping apparatus or device consisting of interrelated parts with separate functions and employing a technique, method or system of operating and controlling the mailing task by highly automatic means, comprising the steps of | Each step of the method requires use of a shipping machine automatically controlled by mechanical or electronic devices, unless the step explicitly states otherwise | A series of steps for mailing parcels and envelopes, wherein each step of the method requires use of a shipping machine automatically controlled by mechanical or electronic devices, unless the step explicitly states otherwise |

The preamble identifies what is claimed: a "method of mailing parcels and envelopes using an automated shipping machine."  As discussed below, the preamble is a limitation that provides the structure—an "automated shipping machine"—for performing the claimed steps.

a.    The Preamble Is A Limitation

Uship again asserts that the preamble "do[es] not need to be separately construed." Uship Post-Hearing Br. at 13.  The parties spent substantial time at the *Markman* hearing arguing the meaning of the preamble terms.  *See* 2/18/2010 Tr. 587:24-646:9.  Indeed, at the hearing, IBM understood that Uship retreated from its argument that the preamble was not limiting.  *See id.* 611:24 ("On the slide there is the preamble, which we all agree should be construed now."). Uship, however, again argues that the preamble is not a limitation, but provides only a single conclusory statement in support of its position.  Uship then spends over four pages arguing the meaning of the terms in the preamble under the auspices of "remov[ing] a possible appellate issue."  Uship Post-Hearing Br. at 13.

The preamble is a limitation because it provides "a necessary and defining aspect of the invention," specifically the "automated shipping machine." *Computer Docking Station*, 519 F.3d at 1375.  Without the automated shipping machine, the method steps are divorced from their context and recite a method of mailing that has been performed by postal employees for decades: "receiving payment information from a customer," "weighing said parcel or envelope to be mailed," "receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed," "computing . . . a delivery date and cost for delivery . . .," "receiving an indication of the delivery service option desired by the customer," "printing a shipping label including at least said destination printed thereon," etc.  That is not what the inventors assert in the patent that they invented.  '220 patent, 1:16-21 ("*[T]his invention relates to an automated unit for* preparing an appropriate mailing label, for validating receipt from a customer of a parcel, package, letter or other item for shipment, and/or for collecting and holding parcels, packages, letters and other items for pick-up by one or more commercial delivery services.").  The "automated shipping machine" is not mentioned in the body of the claim and is not merely "duplicative of other language."  *Hearing Components*, 600 F.3d at 1366 ("We do not consider the "readily installed" phrase [in the preamble] to be duplicative of other language in the claim. . . . We thus conclude that the "readily installed" phrase is a claim limitation.").  Accordingly, the preamble is a limitation and must be construed.

The applicants' representations to the Patent Office during prosecution confirm that the preamble is a limitation.  Claim 1 of the '220 patent originally was filed as claim 72 of the application for its parent '799 patent.[8]  During prosecution, the Examiner issued a "Restriction

---

[8]  The '220 patent includes the prosecution history of its parent '799 patent and disclaimers made during the prosecution of the '799 patent apply with equal force when construing the '220 patent. *Microsoft Corp.*, 357 F.3d at 1350.

Requirement" refusing to allow the applicants to combine claim 72 and other method claims together in the same patent with claims "drawn to a shipping apparatus" because it appeared to the Examiner that the claimed "process for mailing can be p[e]rformed by hand" and therefore was a "distinct" invention from the shipping apparatus.  '799 pros., 12/2/95 Office Action, at 2, G002342.  The applicants disagreed, telling the Examiner that the preamble is "a limitation" and, because the preamble was "a limitation," "each step . . . is performed by the automated shipping machine":

> Applicant disagrees with the Examiner's suggestion that the process claimed in independent method claims 1 and 72 can be performed by hand.  ***Both of these claims specifically recite in the preamble a method of mailing parcels and envelopes "using an automated shipping machine" rather than specifically reciting at each step that the step is performed by the automated shipping machine***.  Applicant submits that if the method were performed by hand as the Examiner suggests, then it would not ***use an automated shipping machine as set forth in the preamble.***  Moreover, while the Examiner may ignore limitations in a preamble under certain circumstances when construing the scope of a claim, ***<u>Applicant submits that it is improper to read a limitation out of a claim . . . merely because such limitation is in the preamble</u>***.  Accordingly, Applicant submits that the Restriction Requirement was issued in error and that all claims should be examined in this application.

'799 pros., 2/7/1996 App. Remarks at 2-3, G002346-47.  The applicants' arguments were successful as the Examiner allowed the claims to be prosecuted together.  *See* '799 pros., 3/11//96 Office Action at 2, G002352 ("The rejection requirement has been overcome by the applicants' traverse.").

When the Examiner refused to allow the applicants to prosecute their method claims together with their apparatus claims, the applicants had a choice:  they could have either given in to the Examiner and split up their claims into different patent applications or tried to change the Examiner's mind.  They chose the latter route.  They told the Examiner that they disagreed with him, that their claimed method could not be performed by hand, that the preamble must be interpreted as a limitation, and that the preamble means "each step" is performed by the

automated shipping machine.  Only then did the Examiner allow the applicants to combine their method and apparatus claims into one application.  But for the applicants' representations, the applicants would have had to file a separate application for their method claims and incur the expense and delay associated with filing a new application.

Were the Court to decide now that the preamble is not a limitation despite the applicants' representations to the contrary, the asserted claims would read on a method that an ordinary postal clerk could perform by hand.  A postal clerk can "receiv[e] payment information from a customer," "weigh[] said parcel or envelope to be mailed," "receiv[e] shipping information from said customer including at least a destination of said parcel or envelope to be mailed," "comput[e] . . . a delivery date and cost for delivery . . .," and so on.  But a method that a postal clerk can perform by hand is exactly what the applicants told the Patent Office their claims did not cover because of the preamble.  The preamble should be construed as a limitation consistent with the applicants' representations.

Further support is found in the applicants' negotiations with the Patent Office regarding the patent's title.  The applicants originally titled their application, "Improved System for Mailing and Collecting Items."  '799 pros., App. Serial No. 08/235,290 at 1, G001772.  During prosecution of the '799 patent, the Examiner objected to that title and required the applicants to change the title of the application to be "clearly indicative of the invention to which the claims are directed."  '799 Pros., 3/1/96 Office Action at 2, G002352.  In response, the applicants changed the title to "Automated Package Shipping Machine," and stated that the new title was "clearly indicative of the invention to which the claims are directed."  '799 pros, 4/10/96 Amendment at 1-2, G002704-05.  Uship cannot now run from what the inventors told the Patent

Office years ago by arguing that the preamble, the only place where "automated shipping machine" is recited, is not part of the "invention."

As before, Uship still provides only a conclusory analysis as to why the preamble should not be construed. Uship asserts that "the elements of the '220 and '014 method claims fully and intrinsically capture all of the limitations of the claimed invention, and the preambles merely encapsulate the main limitations found in the claims and describe the invention's purpose and principal use." Uship Post-Hearing Br. at 13. But Uship ignores that the automated shipping machine is found only in the claim's preamble. Thus, the preamble does more than "encapsulate" other limitations and the other limitations do not "capture" everything. And the preamble does not just describe the invention's purpose and principal use, it *is* "the invention." *E.g.*, '220 patent, 1:16-21; '799 pros, 4/10/96 Amendment at 1-2, G002704-05. The patent makes clear that the "invention" is a method of using an automated shipping machine, not a method of doing steps by hand. *See* '220 patent, 3:5-35. Uship's unsupported characterization is wrong and the preamble is limiting.

### b.       Construction Of The Preamble

The primary dispute among the parties is whether the preamble requires that one automated shipping machine presumptively performs each claimed method step. That is exactly what the applicants told the Patent Office the preamble means and what the other intrinsic evidence requires. Uship agrees for the most part, but crafts an exception for the "validation" step which Uship contends can be performed by a human (in addition to the claimed "storing" step, which specifically requires human performance). Uship Post-Hearing Br. at 16, 30-45; *see also* 2/18/2010 Tr. at 641:12-642:1 ("THE COURT: Well, maybe I've missed something completely, but I thought they [Uship] agreed that all the steps down to the last one were being done by the machine . . . MR. COLATRIANO: I need to amend what you said in one respect,

but otherwise I agree with that. THE COURT: Well, what's the little amendment here? MR.

COLATRIANO: Yes. No. This goes to validation.").

### i.   Claim Language

"[T]he claims themselves provide substantial guidance" as to the meaning of "[a] method

of mailing parcels and envelopes using an automated shipping machine."  *See Phillips*, 415 F.3d

at 1314.  Claim 1 states that the method is performed "using ***an automated shipping machine***"—

not a system of machines or a group of machines, but one machine that performs the recited

steps.  If the claimed machine is not required to perform the steps of the method, then the claim

would allow a human to perform the steps and the claim would cover the age-old work of postal

clerks.  The fact that claim 1 specifically requires that "an attendant" perform the last step

strongly suggests that the prior steps are not performed by "an attendant."

### ii.   Specification

The specification confirms that a single automated shipping machine performs the claim

steps unless otherwise stated.  The specification defines the "invention" as "an automated unit

for" performing mailing steps:

> This invention relates to the commercial shipping and delivering industry.  More
> specifically, ***this invention relates to an automated unit for*** preparing an
> appropriate mailing label, for validating receipt from a customer of a parcel,
> package, letter or other item for shipment, and/or for collecting and holding
> parcels, packages, letters and other items for pick-up by one or more commercial
> delivery services.

'220 patent, 1:16-21.  The applicants' characterization of their "invention" as "an automated

unit" for performing the recited steps is "strong evidence that the claims should not be read to

encompass the opposite structure."  *SciMed Life Sys.*, 242 F.3d at 1343.  The specification

additionally explains that the "objects of the invention" are achieved by a "***method***" in which all

of the steps recited in claim 1—including the step of "validating whether the parcel or envelope

received therein is the parcel or envelope for which the shipping label was printed"—are "*implemented by the automated shipping machine.*" '220 patent, 2:39-40, 3:5-36.   This description supports IBM's proposed construction.  *See Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1331 (Fed. Cir. 2008) (finding district court's construction was supported by specification's description of "object of the invention" and "summary of the invention").

### iii.    Prosecution History

The prosecution history resolves any doubt that the automated shipping machine performs each of the claimed method steps unless the claim explicitly states otherwise.   As discussed above, to overcome the Examiner's Restriction Requirement, the applicants specifically told the Patent Office that the method of claim 1 of the '220 patent (formerly claim 72 of the '799 patent) could not be "performed by hand."   In doing so, the applicants told the Examiner exactly what the preamble meant—that "each step" is "performed by the automated shipping machine":

> Applicant disagrees with the Examiner's suggestion that the process claimed in independent method claims 1 and 72 can be performed by hand.  ***Both of these claims specifically recite in the preamble a method of mailing parcels and envelopes "using an automated shipping machine" rather than specifically reciting at each step that the step is performed by the automated shipping machine***.

'799 pros., 2/7/1996 App. Remarks at 2-3, G002346-47.  The applicants did not say that multiple machines or a collection of parts can perform the steps.   Instead, they said "each step" "*is* performed by *the* automated shipping *machine*."  *Id.*  The applicants "commit[ted] to a particular meaning" for the preamble and this meaning is "binding in litigation."  *CVI/Beta Ventures*, 112 F.3d at 1158.   But for the applicants' representations as to this meaning of the preamble, the Examiner would not have allowed them to prosecute their method claims together in the same application as the applicants' other claims.   At the same time they made these remarks, the

24

applicants amended the claim to insert "an attendant o[f] said customer"[9] before "storing" to require that the last storing step be performed by a person.  *Id.* at 1, G002345.  The Examiner allowed this amendment.  Thus, the applicants made clear that, aside from the "storing" step, the remaining elements must be performed by a single automated shipping machine, not an aggregated collection of machines or by hand.  The Patent Office relied on the representation and permitted the applicants to proceed with the prosecution of all claims in a single application.  Uship is bound by the applicants' statements, and the public is similarly entitled to rely upon them.  IBM's proposed construction mirrors the applicants' explicit representations to the Patent Office and amendment.

### iv.    Uship's Construction

Uship agrees that all of the method steps that do not explicitly state otherwise must be performed by an "apparatus or device," but proposes that a human can perform the following step:

> validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed;

*See* 2/18/2010 Tr. at 641:12-642:1; Uship Post-Hearing Br. at 14.  There is no basis for Uship's exception.  The "validating" step is written no differently than the other claim steps that Uship agrees must be performed by the automated shipping machine.

Uship argues that the claim as a whole contemplates "human involvement" because the specification contemplates that a customer can "provide[] 'package type' and 'shipping information'" and "initiate[]" weighing.  Uship Post-Hearing Br. at 16.  But the claim does not say *"**providing**" information"* or *"**initiating*** weighing."  The claim is written from the

---

[9] Apparently due to a printing error, the limitation reads "an attendant of said customer" rather than "an attendant or said customer" as originally submitted by the applicants.  This difference does not affect the parties' arguments.

perspective of the steps performed by the machine and the actual claim steps are "***receiving***" and "***weighing***"—steps that the machine performs, not humans.   Regardless, these are steps that Uship already has conceded must be performed by the machine.   *See* 2/18/2010 Tr. at 641:12-642:1.

Uship also asserts that the specification "makes clear that, for at least some embodiments of the invention, the 'validation' step is performed by a person."   Uship Post-Hearing Br. at 16. Uship actually cites only one embodiment, and in that embodiment, a person does ***not*** "validat[e] receipt of said parcel or envelope ***as the parcel or envelope for which said shipping label was printed***" as the claim requires.   A clerk merely "validates receipt of the package."   '220 patent, 25:2-12.   Validating mere receipt of a package is significantly different from the validating step in the claim because there is no determination of whether the *correct* package has been received—the validation step that the applicants claimed and described as "very important" to their invention.   *Id.* 21:43-49.   The specification nowhere describes a person performing any such step.   *Id.* at passim.   Although Uship does not point to any embodiments that support its position, the mere fact that a patent specification describes an embodiment does not mean that every one or even any of the patent claims must cover that embodiment.   *See TIP Sys.*, 529 F.3d at 1375 ("[O]ur precedent is replete with examples of subject matter that is included in the specification, but is not claimed.").   It is well-established that embodiments can be disclosed but not claimed, and those embodiments are dedicated to the public.   *Miller v. Bridgeport Brass Co.*, 104 U.S. 350, 352 (1881) ("But it must be remembered that the claim of a specific device or combination, and an omission to claim other devices or combinations apparent on the face of the patent, are, in law, a dedication to the public of that which is not claimed.

26

It is a declaration that that which is not claimed is either not the patentee's invention, or, if his, he dedicates it to the public."); *see Johnson & Johnston Associates Inc. v. R.E. Service Co., Inc.*, 285 F.3d 1046, 1055 (Fed. Cir. 2002) (*en banc*) ("[W]hen a patent drafter discloses but declines to claim subject matter . . . this action dedicates that unclaimed subject matter to the public."). Thus the applicants' decision to disclose an embodiment in which a human attendant "validates receipt" of a package does not mean that the asserted claims must be stretched to cover that embodiment, much less overcome all of the intrinsic evidence indicating that is not what the asserted claims cover.  Moreover, although a construction that excludes a "preferred embodiment" may be disfavored, *see Vitronics Corp.* 90 F.3d at 1583 (cited in Uship Post-Hearing Br. at 9 n.9), that guideline does not apply here because there is no doubt IBM's proposed construction *includes* the embodiment that the specification describes as "preferred," namely that in which the automated shipping machine reweighs and redimensions a package to validate that the package is the same one for which said shipping label was printed:

> On the other hand, in accordance with a ***preferred embodiment*** of the invention, the package is automatically reweighed and/or redimensioned once the customer has closed the outer door 330 (and hence the parcel or envelope cannot be accessed by the customer). If the reweighing and redimensioning results in approximately the same readings as when the package was previously weighed and dimensioned, it is presumed that ***the package placed on the conveyor belt 340 is the same package for which the label was printed***.

*See* '220 patent, 21:55-64.  By contrast, the embodiment Uship identifies is not described as "preferred."  *See id.* 25:2-12.

Uship's proposal also contradicts the applicants' representation to the Patent Office that the automated shipping machine performs "each step."  Uship asks the Court to ignore the applicants' clear representations during prosecution because those representations allegedly were too "ambiguous" to rise to the level of a disclaimer.  But the prosecution history serves a broader

role than just as a record of patentee disclaimers—it also provides a contemporaneous record of how the inventor and the Patent Office understood the patent.  *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1347 (Fed. Cir. 2009) (citing *Phillips*, 415 F.3d at 1317) ("'Like the specification, the prosecution history provides evidence of how the [Patent Office] and the inventor understood the patent.'").  Like the other parts of the intrinsic record the prosecution history serves a critical role of showing how a patentee used a disputed claim term.  *See Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1382 (Fed. Cir. 2009) (internal quotations omitted) ("Again, we focus[] at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.").

Here the applicants represented to the Patent Office—and the ***public***—that the preamble required "each step" of the claimed method to be "performed by the automated shipping machine."  Before they explained this meaning of the preamble, the Examiner refused to allow the applicants to combine their method and apparatus claims in a single patent application.  The Examiner allowed the applicants to combine the claims ***only*** after the applicants defined the preamble.  Thus, both the applicants and the Examiner understood the preamble to mean each step of the method is performed by the automated shipping machine (unless stated otherwise).  *See Masimo Corp. v. Mallinckrodt Inc.*, 18 Fed. Appx. 852, 855-56 (Fed. Cir. 2001) (finding "prosecution history supports the conclusion that the claims . . . are limited to an adaptive noise canceller" where patentee, "in response to the examiner's initial rejection for failure to provide proper antecedent basis for the term 'adaptive filter'" said "a 'noise canceler' is a filter'").  To allow Uship to retreat from the applicants' representations would vitiate the public notice function of prosecution history.  *Springs Window Fashions*, 323 F.3d at 995 ("The public notice

function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.").

Regardless, there is nothing "ambiguous" about the applicants' explicit representation to the Patent Office that the preamble recites "using an automated shipping machine" "rather than specifically reciting at each step that the step is performed by the automated shipping machine." '799 pros., 2/7/1996 App. Remarks at 2-3, G002346-47.  Nor has Uship ever identified anything ambiguous about this statement.  And there is no doubt that the Examiner was not going to permit the applicants to prosecute their method claims in the same patent as their apparatus claims had the applicants failed to clarify that they were not seeking an interpretation where the method steps could be performed by hand.  To the extent the applicants could have prosecuted a claim where the steps were done by hand it willingly gave up the right to do so when it told the Patent Office and the public that each step of asserted claim 1 is performed by the "automated shipping machine."  *See SourceOne Global Partners, LLC v. KGK Synergize, Inc.*, Case No. 08 C 7403, 2010 WL 2232944, *6 (N.D. Ill. June 3, 2010) (finding "a 'clear and unmistakable disclaimer" where "the examiner issued a restriction requirement," and "[t]o continue prosecuting the application, the applicant made an election in response to that restriction requirement.").

The remainder of Uship's construction—"consisting of interrelated parts with separate functions and employing a technique, method or system of operating and controlling the mailing task by highly automatic means"—is manufactured from dictionary definitions and whole cloth. It is impermissibly abstract and divorced from the patents-in-suit.  *See e.g., Innogenetics, N.V.*, 512 F.3d at 1370; *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005) ("[I]n the absence of something in the written description and/or prosecution history to provide explicit or

implicit notice to the public . . . it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source."). It also does not address the parties' principal dispute relating to this term—whether a human instead of the automated shipping machine can perform the "validation" claim step. The Court should reject Uship's construction.

2. **receiving payment information from a customer;**

| Joint Proposal of Parties |
|---|
| the automated shipping machine obtains data relating to the customer's chosen method of payment |

3. **receiving package type information identifying a parcel or envelope to be mailed;**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| The automated shipping machine obtains data relating to the type of parcel or envelope to be shipped, such as a letter, pak, package, or any other package types which may be accepted by the delivery service | the automated shipping machine obtains [package type information identifying a parcel or envelope to be mailed]<br><br>package type information: data from the customer indicating the type of parcel or envelope to be mailed, such as letter, pak, or package, as defined by the servicing carrier | the automated shipping machine obtains package type information identifying a parcel or envelope to be mailed<br>package type information: data from the customer indicating the type of parcel to be shipped, such as letter, pak, or package, as defined by the servicing carrier. |

The parties dispute the meaning of "package type information" in this limitation. IBM and the Government propose that "package type information" is data "from the customer indicating the type of parcel to be shipped." Uship proposes that "package type information" can be any data "*relating to* the type of parcel or envelope to be shipped."

30

### a.     Claim Language

IBM and the Government's proposed construction stays true to the claim language, which requires "package type information" to "identify[] a parcel or envelope to be mailed."  By requiring data "indicating" the package type, IBM and the Government's proposed construction neither broadens nor narrows the claim words' meaning.

### b.     Specification

The specification, which "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication," confirms that "package type information" is data obtained by the machine from the customer indicating the type of parcel to be shipped. *Phillips*, 415 F.3d at 1321.  The specification clarifies that "the customer" provides the package type information and defines "package type" to be "a letter, a pak or a package or any other package type which may be accepted by the delivery service":

> Once photo cell sensor 344 detects the presence of the parcel or envelope 378, the ***customer is instructed at step 512 to select a package type***. For example, ***package types include a letter, a pak or a package or any other package type which may be accepted by the delivery service***. Once the 10 ***customer selects the package type*** at step 512, the parcel or letter is weighed by scale 356 and its dimensions are repeatedly taken by dimensioning sensors 346 at step 514.

'220 patent, 20:5-12.  The specification's definition is dispositive.  *Phillips*, 415 F.3d at 1315.

### c.     Prosecution History

The prosecution history does not address the meaning of this term.

### d.     Uship's Construction

Uship construes "package type information" to cover any "data *relating to* the type of parcel or envelope to be shipped."  Such a construction would encompass any conceivable attribute of a package and does nothing to help define the metes and bounds of this claim. Nothing in the intrinsic evidence supports such a broad reading.  The specification specifically

defines "package type information" as the category of package to be shipped, such as an envelope, package or pak.   '220 patent, 20:5-12.   Uship cites no evidence—not even dictionaries—suggesting that package type information also includes some undefined "data relating to the type of parcel or envelope to be shipped."

There also is no clear limit to Uship's construction.  Does it cover the color?  What about the thickness?  Uship's construction simply is "too vague to serve the public notice function a patent provides."  *Am. Seating Co. v. Kustom Seating Unlimited, Inc.*, Case No. 1:07-cv-1284, 2010 WL 489521, *3 (W.D. Mich. Feb. 4, 2010) (citing *Markman,* 517 U.S. at 373) (rejecting vague construction).   Because Uship's construction is wholly unsupported and hopelessly ambiguous the Court should reject it.

### 4.    weighing said parcel or envelope to be mailed;

| Joint Proposal of Parties |
| --- |
| the automated shipping machine obtains the weight of the parcel or envelope to be mailed by use of a scale |

### 5.    receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed;

| Joint Proposal of Parties |
| --- |
| the automated shipping machine obtains data relating to shipping from the customer including at least the destination of said parcel or envelope to be mailed |

| Uship Constructions | Government Constructions | IBM Constructions |
| --- | --- | --- |
| **destination** - data relating to the location to which the item to be mailed is to be mailed, as required by applicable policies and standards of the delivery service being used, such as the zip code for that location | destination: the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place | destination: the place to which the parcel or envelope is to be mailed; including at least the name, street address, and zip code of the place |

The dispute here is whether the "destination" of the parcel or envelope to be mailed includes a name, a street address, and a zip code.  IBM and the Government agree that it does.

32

Uship disagrees and argues that the "destination" of the parcel or envelope can be *any* "data relating to the location to which the item is to be mailed."

### a.    Claim Language

The "destination of a parcel or envelope to be mailed" is a specific person or organization at a specific address and zip code. It is not an entire zip code or country or some undefined "data relating to" the location. Moreover, the asserted claims refer to "printing a shipping label including at least *said destination* printed thereon." The shipping label is what the mail carrier uses to deliver the package and therefore must have printed on it a name, a street address, and a zip code. A carrier would not know where to find the intended recipient if the only "data relating to the location" printed on the parcel was "20015" or "France."

"Differences among claims can be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Claim 1 of the related '464 patent refers to "*information relating to the destination* of the item." The '464 patent shares an inventor (Gary W. Ramsden) with the '220 and '014 patents. Thus, the applicants knew how to claim "information relating to the destination" but decided not to do so in the '220 and '014 patents. The applicant instead specified that the customer must provide at least the "destination" itself. "Information relating to the destination" is not the same as "data relating to shipping from the customer including *at least the destination of said parcel or envelope to be mailed*." *Nystrom*, 424 F.3d at 1143 ("When different words or phrases are used in separate claims, a difference in meaning is presumed."). Information "relating to the destination" can be less than the destination, whereas "at least the destination" means the destination or more.

### b.    Specification

The specification reinforces IBM and the Government's proposed construction. The specification explains that the "amount of time that it takes a commercial delivery service to

deliver an item to its destination is critical." '220 patent, 1:28-30.  The "critical" delivery time is

the time it takes to deliver the item to a specified recipient and address—not to the edge of a zip

code or to any "data relating to the location to which the item is to be mailed."  The specification

further explains that:

> Once the weight and dimensions of the package have been determined at steps 514 through 518, the customer is prompted to provide the ***necessary shipping information.***  For example, a screen is displayed which requests the customer to enter the ***zip code of the destination*** of the item to be mailed. In a preferred embodiment, an automatic zip code check routine is invoked for automatically providing the destination city and state from the zip code information by searching a data base of zip codes. This routine saves the customer from having to enter the city and state information. ***The customer is next asked*** whether the recipient's shipping address is a commercial or residential location and then asked ***to input the destination name and destination street address for the item to be shipped. The zip code and other destination information*** is preferably inputted into the system via the keyboard 324 . . . .

*Id.,* 20:37-49.   The specification's reference to the "zip code of the destination" and "the

destination name and destination street address" makes clear that the name, address and zip code

are each part of the destination.   Additionally, the fact that the customer is asked to enter the

recipient's name and street address ***after*** the zip code is entered (regardless of whether the

machine uses the zip code to "automatically provid[e] the destination city and state) confirms

that the zip code alone is insufficient.   The specification makes clear that the name, street

address, and zip code all are included within the "necessary shipping information" that the

customer must input.

### c.      Prosecution History

The prosecution history does not address this term.

### d.      Uship's Construction

Uship argues that "destination" means any "data relating to the location to which the

parcel or envelope is to be mailed."   Uship's proposed construction remains unchanged after the

*Markman* hearing despite the Court's caution that it "didn't like Plaintiff's construction," 2/18/10 Tr. at 667:25-668:1, and despite Uship's own admission that its proposed construction "was not as precise as it needs to be," *id.* at 653:4-13; 658:23-659:4.

Uship contends its construction is correct because the "first embodiment" in the specification "indicates that the customer will be prompted only to 'enter the desired zip code of the item which is to be mailed.'"   Uship Post-Hearing Br. at 21 (citing '220 patent, 8:54).   But Uship concedes that in this one embodiment the patent does not explicitly describe entry of complete addressing information, and ***the destination is not printed on the shipping label*** as the asserted claim requires.   '220 patent, 8:54.   Instead, as Uship acknowledges, "the customer would be instructed to '*write* the mailing address."   Uship Post-Hearing Br. at 21; '220 Patent, 9:41.   Thus, the applicants clearly did not intend to cover this embodiment with the asserted claims.   Rather, "this case presents a clear example of the situation in which, although alternatively disclosed embodiments are not encompassed by the current claim construction, other [ ] claims cover those alternative embodiments."   *Boss Indus., Inc. v. Yamaha Motor Corp. U.S.A., Inc.*, 333 Fed. Appx. 531, 541 (Fed. Cir. 2009) (nonprecedential); *Helmsderfer*, 527 F.3d at 1383 ("It is often the case that different claims are directed to and cover different disclosed embodiments.").   The embodiment upon which Uship relies appears in the specifications of all the asserted patents and is covered by claim 1 of the '464 patent, which requires only that "information relating to the destination" be input by the customer.   There are other embodiments that require that "at least the destination information be printed on" because the machine is printing the shipping label and that information is necessary for delivery.   '220 patent, 2:55-56, 3:20-26.

Also, the portion of the specification upon which Uship relies does not equate the "destination" with a "zip code"; instead, it refers to entry of the "destination zip code." '220 patent, 8:54-55. Thus, just like the rest of the specification, this passage makes clear that the zip code is only part of the "destination." When the specification states that the zip code *and other destination information* is . . . inputted" it makes clear that the zip code is one of a number of pieces of information that "relate" to the destination but are not the destination itself.

Uship further argues that "destination" does not necessarily require a name and mailing address because in the context of "travel arrangements with airlines" and "the like" passengers are asked only for the cities to which they are traveling. Uship Post-Hearing Br. at 22. Travel arrangements, however, is not the pertinent context and Uship's argument highlights the danger of interpreting claims in a vacuum using abstract definitions. The relevant "destination" here is the "destination *of said parcel or envelope to be mailed.*" Unlike airline carriers, which only transport a customer part of the way to their destination (unless the airline customer does not intend to leave the airport), mail's destination is a specific person at a specific address. *See* '220 patent, 1:23-26 ("Individuals and companies rely heavily on commercial delivery services to transport letters and packages to intended addresses and recipients throughout the world."). Uship's attempt to give the claim terms an abstract meaning that is wholly divorced from their particular context should be rejected. *See Phillips*, 415 F.3d at 1321 (rejecting claim construction method that "risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context").

Uship also asserts that the "destination's" only purpose in the claimed invention is "to allow the shipping machine to calculate the shipping fee." Uship Post-Hearing Br. at 22. Like Uship's other arguments, this one falls apart upon review. First, Uship's definition of the

"purpose" is incorrect.  The claim clearly requires that the destination also is to be printed "on

the shipping label."   '220 patent, claim 1.  Thus, the full destination must be input into the

machine so that the machine can print a shipping label bearing that destination.  That label will

then be used by the mail carrier to deliver the item.  Uship admitted that to deliver a package a

mail carrier is "going to need your complete address."  2/18/2010 Tr. at 656:21-24; *see also id.* at

654:10-11 ("COURT: . . .You need the street address so the postal guy knows exactly where to

go.").  Thus, under Uship's own theory, "the purpose for which the customer is asked to input

destination information" supports IBM and the Government's proposed construction, not

Uship's.  Second, even if the destination's only purpose were to calculate the shipping fee,

Uship's proposed construction would not make sense in that context.  Uship proposes that ***any***

"data relating to the location" can be the "destination."  That is so expansive that it purports to

cover "data" such as "west of a river," "blue house," and "Elevation, 5280 feet."  It is a mystery

how or why such data could be used to calculate a shipping fee.

> **6.**   **computing from said package type information, shipping information,
> and weight information, a delivery date and cost for delivery of said
> parcel or envelope to said destination via each delivery service option
> available to said customer;**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| the automated shipping machine determines the expected **delivery date** and cost for delivery of the parcel or envelope to said destination for each available delivery service option, as a function of the package type information, shipping information, and weight information | the automated shipping machine calculates [a delivery date] and cost for delivery [of said parcel or envelope to said destination] for each available delivery service option, as a function of [the package type information], shipping information, and weight information | The automated shipping machine determines an expected delivery date, including the day of the week, and associated cost for each delivery service based on the package type information, shipping information, and weight information |
| **delivery date** – the date on which the parcel or envelope is to be received, expressed | delivery date: the expected calendar date of delivery of the parcel or envelope | **"package type information" and "destination" construed above** |

| either as the specific month, day, and year when the parcel or envelope is expected to be received or the number of days it is estimated to take for the parcel or envelope  to be delivered | | |
| --- | --- | --- |

The disputed aspect of this claim limitation concerns the meaning of "computing . . . a delivery date . . . for delivery of said parcel or envelope."  IBM and the Government agree that this limitation means what it says and requires a delivery *date* to be computed.  Uship, on the other hand, seeks to expand "delivery date" to include either a date or "the number of days it is estimated to take for parcel or envelope to be delivered."

### a.        Claim Language

The claim language expressly addresses what is being computed and it requires computation of a delivery "date."  The claim's use of the term "computing" is significant.  It strongly implies that the machine performs a calculation using the package type, weight, and shipping information provided to give a date.  A system that simply presents a "number of days" would require the customer to perform the computation to determine the date when the package or envelope would arrive.

### b.        Specification

Like the claims, the specification confirms that the "delivery date" is a specific day that the automatic shipping machine calculates from other information.   For example, the specification provides:

> Once all of the shipping information has been properly entered, the ***delivery date*** and cost *for each delivery service* available to the customer ***is computed*** at step 526.  ***In computing the delivery date, the software takes into account weekends, holidays and other days in which no delivery service is available when calculating*** for each service when the package can be expected to be delivered. . . .   The customer then selects the desired service option at 528. For example, ***the customer may select second day air*** for Saturday delivery.

38

'220 patent, 21:4-21.   Were the machine to simply present a "number of days," it would be unclear whether that number took "into account weekends, holidays and other days in which no delivery service is available." *Id.*   Moreover, as seen in this passage, the specification indicates that the delivery date is computed *from* such information as "second day air." *Id*.   Thus, the specification confirms that the delivery date is different from the number of days it is estimated that a package will take to be delivered.

### c.    Prosecution History

The prosecution history does not address the meaning of this term.

### d.    Uship's Construction

Uship admits that its construction at best presents "somewhat of a close question." 2/18/2010 Tr., 683:14-20 ("This is one that I will admit presents somewhat of a close question."); Uship Post-Hearing Br. at 26 ("this term admittedly presents a close claim construction issue.").   But it is not close and Uship's construction finds no support in either the claim language or the specification.   Uship argues its construction is correct because, during prosecution of the '799 patent, the Examiner stated that the Postal Service "calculat[es] the delivery date for the package" and it would have been obvious to add such a feature to the claims of the '532 patent.   *Id.* at 28.   The '532 patent is a parent to both the '220 patent and the '799 patent.   In the passage of the '799 patent prosecution history to which Uship points, the Examiner was rejecting the claims of the application for the '799 patent as obvious over claims in Uship's earlier '532 patent.   Although the claims of the '532 patent did not explicitly recite the step of "calculating the delivery date for the package," the Examiner took notice that such a feature was available from the U.S. Post Office.   '532 Pros., at G002352.   Uship concedes, as it must, that the Examiner's rejection was silent as to "***how*** the USPS calculated a delivery date."

Uship Post-Hearing Br. at 27.  The passage is therefore irrelevant and unsupportive of Uship's construction.

Uship ineffectively tries to manufacture a relevant connection between the prosecution history and the disputed issue by citing to two extrinsic United States Postal Service documents that "describe the number of days it takes to ship items under various service options."  Uship Post-Hearing Br. at 27.  The applicants did not submit either of these documents to the Examiner during prosecution of the '799 patent and there is no evidence that the Examiner considered them.  Thus, there is no connection whatsoever between the documents and the Examiner's rejection.  Most importantly, the documents never equate "date" to a number of days.  Uship's argument is circular.  It cites extrinsic USPS documents that discuss options where the number of days is specified instead of a date and then uses that extrinsic document to argue that the claims must be read to cover USPS options where a number of days is specified for delivery instead of a date.  But the USPS documents are not the claim and do not redefine calculating the date to mean setting forth a number of days for delivery.  Instead, those documents are consistent with the constructions IBM and the Government propose here.  Thus, Uship's construction is entirely devoid of support and should be rejected.

> **7.     receiving an indication of the delivery service option desired by the customer;**

| Joint Proposal of Parties |
|---|
| the automated shipping machine obtains the customer's chosen method of delivery |

> **8.     printing a shipping label including at least said destination printed thereon;**

| Joint Proposal of Parties |
|---|
| the automated shipping machine prints at least said destination on a shipping label |

As discussed above, this limitation confirms that the "destination" must include a name, address, and zip code because the "destination" is printed on a shipping label. A postal carrier could not deliver the package if the label contained less than the whole destination.

> **9.** **printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer;**

| Joint Proposal of Parties |
| --- |
| the automated shipping machine prints at least the cost of delivering the parcel or envelope to said destination with the customer's chosen method of delivery |

> **10.** **validating receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed;**

| Uship Constructions | Government Constructions | IBM Constructions |
| --- | --- | --- |
| the automated shipping machine or an attendant determines or confirms that the parcel or envelope being received for storage and/or shipment is the package for which the shipping label was printed | the automated shipping machine confirms that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed | the automated shipping machine confirms that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed |

The parties primarily dispute whether this claim step (1) requires confirmation that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed; and (2) must be performed by the automated shipping machine. The answer to both of these questions is yes.

### a.    Claim Language

Claim 1 requires validation of more than just receipt of any parcel or envelope, it requires validation of receipt "of **said** parcel or envelope **as the parcel or envelope for which said shipping label was printed**." IBM's construction gives meaning to this explicit claim language by requiring validation that the received parcel or envelope "is the same parcel or envelope for which the shipping label was printed." This construction makes perfect sense in the context of

the claim as a whole.  In the claimed "method of mailing," the shipping label has the parcel or envelope's "destination" "printed thereon" and the "validated parcel or envelope" is "subsequently picked up by a commercial delivery person."  IBM's construction ensures that the right label goes with the right package so that the package picked up for delivery has the correct destination printed on it.  A different construction would leave open the possibility that a package is delivered to the wrong place.

The claims also make clear that the automated shipping machine, not a human, "validat[es] receipt of said parcel or envelope as the parcel or envelope for which said shipping label was printed."  The preamble is explicit that the method is performed "using an automated shipping machine."  The fact that the last element specifies that "an attendant of said customer" stores the validated parcel further indicates that the remaining steps, including the validation step, are performed by the machine.

### b.        Specification

The specification strongly supports IBM's proposed construction.   The specification explains the purpose of the claimed "validation step" as follows:

> ***Once all of the label information has been verified by the customer, the label is printed and applied to the parcel or envelope by the customer.*** The customer is then instructed to reposition the parcel or envelope on markings 342 of the conveyor belt 340 (if the package was removed to apply the label) and to close the outer door 330.  At this point, a very important validation step is performed.  In particular, ***the system 310 determines at step 536 whether it has received the correct package***.  This step is ***critical*** since it ***verifies that the customer did not perform a package switch or forget to replace the package in the intermediate storage area 334 for shipment***.

'220 patent, 21:38-49. The purpose of the claimed validation step is clear:  to determine whether the correct package has been received and prevent a package switch or the failure to replace a package for which the label has been printed.  *Id.*  IBM's proposed construction fulfills these purposes because it requires validation that the package received is the same package for which

42

the shipping label has been printed.  Consistent with IBM's construction, the specification also

clarifies that the "system," not a human, performs validation.  *Id.*

The specification further explains that "[s]uch validation may be accomplished in several

different ways in accordance with the invention."  *Id.* 21:49-50.  By "such validation," the

specification refers back to the "critical" validation step performed by "the system" which

"determines whether it has received the correct package."  *Id.* 21:43-50.  Two ways of

accomplishing such validation are disclosed.  First is the "simple embodiment":

> For example, in a simple embodiment, ***photo cell sensor 344*** may simply detect
> whether any package has been placed on the conveyor belt 340.  If so, it is
> presumed that ***the package on the conveyor belt 340 is the appropriate package
> with the appropriate label***.

*Id.* 21:49-55.  Next is the "preferred embodiment":

> On the other hand, in accordance with a preferred embodiment of the invention,
> the package is automatically reweighed and/or redimensioned ***once the customer
> has closed the outer door 330 (and hence the parcel or envelope cannot be
> accessed*** by the customer). If the reweighing and redimensioning results in
> approximately the same readings as when the package was previously weighed
> and dimensioned, it is presumed that ***the package placed on the conveyor belt
> 340 is the same package for which the label was printed***.

*Id.* 21:55-64.  In both of these embodiments, the machine performs the validation step and does

so by confirming that the package received on the conveyor belt "is the same package for which

the label was printed."  Neither embodiment provides any way for a human attendant to

determine whether the package received is the same package for which the label was printed.

### c.      Prosecution History

The prosecution history also dictates that the automated shipping machine must perform

the step of "validating receipt of said parcel or envelope as the parcel or envelope for which said

shipping label was printed."  As discussed above, the applicants originally filed what is now

claim 1 of the '220 patent as claim 72 of the '799 patent application.  On review, the Examiner

insisted that the applicants could not prosecute claim 72 together with claims "drawn to a shipping apparatus" because "the process as claimed [in claim 72] can be practiced by another materially different apparatus or by hand." '799 pros., 12/27/1995 Office Action, at 1-2, G002341-42.   In response the applicants argued that they "***disagree[d] with the Examiner's suggestion that the process claimed in independent method claims 1 and 72 can be performed by hand.***   Both of these claims specifically recite in the preamble a method of mailing parcels and envelopes '***using an automated shipping machine' rather than specifically reciting at each step that the step is performed by the automated shipping machine***."   '799 pros., 2/7/1996 Response to Office Action, at 1-2 (G002345-46).

The applicants told the Patent Office—and the public—how their claims should be interpreted: the phrase "using an automated shipping machine" was put in the preamble to signify that the automated shipping machine performs "each step."   The validating step is one of those steps and the applicants should be taken at their word.   *See, e.g.*, *North Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1348 (Fed. Cir. 2005) ("The strongest confirmation of the district court's construction of "re-entrant portion," however, comes from the applicant's own statement in the prosecution history.").

### d.  Uship's Construction

According to Uship, despite the clear words in the claim the "validating" step does not require confirmation that the parcel or envelope received for storage is the same parcel or envelope for which the shipping label was printed and does not need to be performed by the automated shipping machine.   Uship is wrong on both points.

**i.      The Claim Requires Validation That The Parcel Or Envelope Received For Storage Is The Same Parcel Or Envelope For Which The Shipping Label Was Printed**

According to Uship, "it is sufficient for the machine to determine that 'any' package be received," rather than the same package for which the shipping label was printed.  Uship Post-Hearing Br. at 32.  But that is not what the claim says, it requires validation that a particular parcel or envelope has been received—"the same parcel or envelope for which the shipping label was printed."  The inventors did not purport to invent a machine that validates the receipt of any package, including the wrong package.  They purport to have invented a very specific machine designed to prevent "a package switch."  But under Uship's construction the claim would on its face cover such package switches.  This makes no sense.

Uship tries to justify its interpretation by focusing on the words "any package" in the specification's description of the "simple embodiment."  *See* Uship Post-Hearing Br. at 37.  Uship strips these words of their important context.  The '220 patent states "in a simple embodiment, photo cell sensor 344 may simply detect whether any package has been placed on the conveyor belt 340.  ***If so, it is presumed that the package on the conveyor belt 340 is the appropriate package with the appropriate label***."  The machine plainly is not looking to validate receipt of ***any*** package, it is attempting to validate receipt of the appropriate package with the appropriate label.  The machine that performs the validation step is the same machine that prints the shipping label.  *See* '220 patent, 21:38-43 (explaining that once the machine prints the label, the customer applies the label to the package then "repositions the parcel or envelope" on the machine at which time validation occurs).  Validation occurs immediately after the shipping label is printed.  *Id.* 21:43-44 ("At this point, a very important validation step is performed.").  In the simple embodiment, when the machine senses a package on its conveyor belt right after the label has printed, it presumes "the package on the conveyor belt is the appropriate package with

45

the appropriate label." *Id.* 21: 53-55.  Although not foolproof, the machine is using its sensors and the fact that it has just printed the label to validate that it has received the *correct* package. The preferred embodiment is more likely to achieve the goal of the invention by reimaging the package in order to confirm it is the right package—but it too is not foolproof; a person could deliberately switch the labeled package for one with identical dimensions.  The point is not whether either embodiment is infallible but that these are the only embodiments  designed to validate receipt of the same package for which the label was printed—an explicit requirement of the claim.

Tellingly, Uship never attempts to explain how its interpretation accounts for the claim phrase "of said parcel or envelope as the parcel or envelope for which said shipping label was printed."  Uship wants to ignore these words entirely because its construction cannot be squared with them.  If, as Uship proposes, it is sufficient that the machine merely validate receipt of any package, then the phrase "as the parcel or envelope for which said shipping label was printed" improperly would be rendered entirely superfluous.  *Haemonetics*, 2010 WL 2179158 at *3 ("Patent claims function to delineate the precise scope of a claimed invention and to give notice to the public, including potential competitors, of the patentees' right to exclude. This notice function would be undermined, however, if courts construed claims so as to render physical structures and characteristics specifically described in those claims superfluous.").  "[I]n accord with the Federal Circuit's settled practice," courts "construe the claim as written, not as the patentees wish they had written it."  *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

### ii.    The Automated Shipping Machine Performs The Validation Step

Uship also contends that the step of *validating receipt of said parcel or envelope as the parcel or envelope for which the shipping label was printed* can be performed by a human being because, Uship asserts, the fourth embodiment disclosed in the specification describes a human attendant performing "*validation*."   Uship Post-Hearing Br. at 33-34.   This is a red herring.   In the fourth embodiment, the attendant validates nothing more than receipt of ***a*** package, the attendant does not validate receipt of a package ***as the package for which the shipping label was printed*** as the asserted claims require:

> In this embodiment of the invention, information provided by the customer is used to generate the appropriate mailing label, which is then applied to the parcel, package or envelope by the customer.   The parcel, package or envelope with the label is then provided to a retail clerk who ***validates receipt of the package*** and provides an appropriate receipt to the customer.

'220 patent, 24:66-25:14.   The mere fact that the word "validate" appears does not mean that the embodiment is describing the specific validation step that is claimed.   In fact the specification uses the word "validate" in many different ways, including to "validate[]" a credit card.   *Id*. 19:30-35.   The specification discloses ***no*** embodiment in which a human validates that the package received is the package for which the shipping label was printed.   Indeed, the "attendant" in the fourth embodiment could not perform that step because he or she has no way of knowing where the shipping label came from or whether that label was applied to the correct package.

Uship's proposal also ignores the specification's description of the purposes of the invention.   The applicants described their invention as improving upon prior art drop boxes that could not perform services normally offered by "staffed offices."   *Id.* 1:55-60, 2:1-8.   If a human performed the validation step, a commercial delivery service would have to operate the same

staffed offices with the "high overhead cost" that the applicants disparaged.  *Id.* 1:55-67.  The Court should decline to adopt a construction that departs from these primary purposes of the invention.  *Lexion Medical, LLC v. Northgate Techs., Inc.*, 292 Fed. Appx. 42, 50 (Fed. Cir. 2008) (rejecting "proposed construction [that] contradicts th[e] intrinsic evidence and also departs from the primary purpose of the invention").

Uship argues that the Court should ignore the prosecution history.  This is not surprising as the prosecution history does not support Uship's construction in the slightest.  The thrust of Uship's argument again is that the prosecution history contains no "clear disclaimer or disavowal."  The prosecution history however is always relevant to claim interpretation regardless of whether there is a clear disclaimer or disavowal.  *See Ultimax Cement Mfg.*, 587 F.3d at 1347 (citing *Phillips,* 415 F.3d at 1317) ("'Like the specification, the prosecution history provides evidence of how the [Patent Office] and the inventor understood the patent.'"); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1327 (Fed. Cir. 2003) ("the prosecution history is always relevant to claim construction").  As the Federal Circuit explained in *Microsoft*:

> "***Any statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction***, and the relevance of the statement made in this instance is enhanced by the fact that it was made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention."

*Microsoft Corp.*, 357 F.3d at 1350.  The applicants' statements here are relevant to the proper interpretation of the claim because they reflect the applicants' own understanding of the claimed invention and were made in a formal written communication with the Examiner when the applicants had every incentive to characterize their claims carefully.  Under such circumstances, the Court must "take the patentee at its word and [] not construe the scope of the [asserted] patent's claims more broadly than the patentee itself clearly envisioned."  *Id.* at 1350.

48

Furthermore, a "clear disclaimer or disavowal" needs to be shown only when arguing for an interpretation of a claim term that differs from the meaning it would otherwise possess.

> Adept argues that it is improper to rely on these statements from the prosecution history because they are too ambiguous to serve as a "clear and unmistakable" disavowal of claim scope. . . . ***The doctrine of prosecution disclaimer to which Adept refers is typically invoked to limit the meaning of a claim term that would otherwise be read broadly***. . . . In this case, however, we do not consult the prosecution history for that purpose. ***We simply use it as support for the construction already discerned from the claim language and confirmed by the written description***, *i.e.*, that all calculations necessary to assign a service location telephone number to a potential caller are completed before any call is placed.

*800 Adept, Inc. v. Murex Securities, Ltd.*, 539 F.3d 1354, 1364-65 (Fed. Cir. 2008),  and cases cited therein.  Here, the claim explicitly states that the method is performed "using an automatic shipping machine."  Thus, the prosecution history is material because it provides additional support for the construction that is required by the other intrinsic evidence.

Regardless, there is nothing unclear about the applicants' representation to the Patent Office that "these claims specifically recite in the preamble a method of mailing parcels and envelopes 'using an automated shipping machine' rather than specifically reciting at each step that the step is performed by the automated shipping machine."  The validating step is one of the claimed steps and accordingly must be performed by the automated shipping machine.

Uship further represents that "neither the restriction requirement issued by the Examiner in connection with the application that issued as the '799 patent nor the applicant's response to that requirement could possibly constitute the type of patentability-related prosecution history statements that would support the invocation of the doctrine of prosecution history disclaimer."  Uship Post-Hearing Br. at 43.  That is not the law.  A response to a restriction requirement can result in a disclaimer or disavowal.  *See SourceOne Global Partners*, 2010 WL 2232944 at *6 (finding "a 'clear and unmistakable disclaimer'" where "the examiner issued a restriction

49

requirement," and "[t]o continue prosecuting the application, the applicant made an election in response to that restriction requirement").  There is no doubt the applicants' response here meets the test for a disclaimer.  The statement that the steps are done by the automated shipping machine and not by hand is unambiguous and had the applicants refused to make that key clarification it would not have been allowed to prosecute its claim in the '799 patent application. The applicants, however, unequivocally stated that the steps of the claimed method are performed by the automated shipping machine and were allowed to continue prosecuting their claims in their application.  The public is "entitled to rely on those representations." *Hockerson-Halberstadt*, 222 F.3d at 957.

> **11.** **and an attendant of said customer storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person**

| Joint Proposal of Parties |
|---|
| a person assisting the customer stores the validated parcel or envelope in a secure storage area until a commercial delivery person picks up the parcel or envelope |

## B.    Claim 1 Of U.S. Pat. No. 6,105,014

| Claim 1 | Arguments |
|---|---|
| A method of mailing parcels and envelopes using an automated shipping machine, comprising the steps of: | *Same as '220 patent, claim 1.* *See supra* § IV.A.1 |
| receiving payment information from a customer; | *Same as '220 patent, claim 1.* *See supra* § IV.A.2 |
| receiving package type information identifying a parcel or envelope to be mailed; | *Same as '220 patent, claim 1.* *See supra* § IV.A.3 |
| weighing said parcel or envelope to be mailed; | *Same as '220 patent, claim 1.* *See supra* § IV.A.4 |
| receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed; | *Same as '220 patent, claim 1.* *See supra* § IV.A.5 |
| computing from said package type information, shipping information, | *Immaterially different* |

| | |
|---|---|
| and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer; | *from '220 patent, claim 1. See supra § IV.A.6* |
| receiving an indication of the delivery service option desired by the customer; | *Same as '220 patent, claim 1. See supra § IV.A.7* |
| printing a tracking bar code label including at least said destination printed thereon; | *New: See Below* |
| printing a shipping receipt for an amount including at least the cost of delivering said parcel or envelope to said destination via the delivery service chosen by said customer; | *Same as '220 patent, claim 1. See supra § IV.A.9* |
| validating receipt of said parcel or envelope as the parcel or envelope for which said tracking bar code label was printed; and | *Immaterially different from '220 patent, claim 1. See supra § IV.A.10* |
| storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person. | *New: See Below* |

Only the following two limitations must be addressed here—all others are incorporated by reference:

> **1.  printing a tracking bar code label including at least said destination printed thereon;**

| **Joint Proposal of Parties** |
|---|
| the automated shipping machine prints a label including a bar code enabling a delivery service to keep track of a parcel or envelope, the bar code identifying at least said destination[10] |

> **2.  storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| storing a validated parcel or envelope in a secure storage area until a commercial | the automated shipping machine stores the validated parcel or envelope in a secure | the automated shipping machine stores the validated parcel or envelope in a secure |

---

[10] The parties dispute the meaning of "destination," but agree that the arguments are the same as those set forth *supra* § IV.A.6.

| delivery person picks up the parcel or envelope | storage area until a commercial delivery person picks up the parcel or envelope | storage area until a commercial delivery person picks up the parcel or envelope |
|---|---|---|

The dispute here concerns whether the automated shipping machine must store the validated parcel or envelope in the secure storage area. IBM and the Government agree that it must. Uship argues that this limitation allows a human attendant to store the parcel or envelope instead of the automatic shipping machine.

### a.    Claim Language

IBM and the Government's proposed construction is supported by the claim language. What is claimed is a "method of mailing parcels and envelopes ***using an automated shipping machine***, comprising the steps of . . . storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person." Uship agrees that the automated shipping machine must perform nearly all of the recited method steps. *See, e.g.*, Uship Post-Hearing Br. at 18 ("receiving payment information from a customer" defined to mean "***the automated shipping machine*** obtains data relating to the customer's chosen method of payment").[11] This requirement comes from the phrase "using an automated shipping machine" in the preamble and applies to all of the recited method steps equally. There

---

[11] *See also* Uship Post-Hearing Br. at 19 ("receiving package type information identifying a parcel or envelope  to be mailed" means "***The automated shipping machine*** obtains data relating to the type of parcel or envelope to be shipped . . ."), 20 ("weighing said parcel or envelope to be mailed" means "***the automated shipping machine*** obtains the weight of the parcel or envelop to be mailed by use of a scale"), 20 ("receiving shipping information from said customer including at least a destination of said parcel or envelope to be mailed" means "***the automated shipping machine*** obtains data relating to shipping from the customer including at least the destination of said parcel or envelope to be mailed"), 25 ("computing from said package type information, shipping information, and weight information, a delivery date and cost for delivery of said parcel or envelope to said destination via at least two delivery service options available to said customer" means "***the automated shipping machine*** determines the expected delivery date and cost for delivery of the parcel or envelope . . .").

is no basis in the claim language to cherry-pick steps that are performed by the automated shipping machine.

The language of related claims—which are "valuable sources of enlightenment as to the meaning of a claim term"—confirms that IBM and the Government's construction is correct. *Phillips*, 415 F.3d at 1314. Claim 2 of the '014 patent states:

> whereby a validated parcel or envelope ***is taken by an attendant for storage*** in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.

Likewise, claim 1 of the '220 patent recites nearly the exact limitation at issue but states that "an attendant" performs the storage step:

> ***an attendant of said customer*** storing a validated parcel or envelope in a secure storage area until said parcel or envelope is subsequently picked up by a commercial delivery person.

The fact that other related claims explicitly require the storing step to be performed by "an attendant" strongly indicates that the storing step in claim 1 of the '014 patent, like the other steps of that claim, is performed by the "automated shipping machine."

### b.    Specification

The specification confirms that the automated shipping machine performs the storing step. The "Summary of the Invention" section describes the method of the invention as follows:

> Such a ***method*** is implemented by ***an automated shipping machine including*** . . . ***a secure storage area*** adjacent the validation area for securely storing the parcel or envelope validated by the validating system, the secure storage area storing the validated parcel or envelope until the parcel or envelope is subsequently picked up by a commercial delivery person.

'014 patent, 3:5-36. The Summary of the Invention thus makes clear that, in the method of the invention, the storage area is physically adjacent to the validation area and included within the automated shipping machine.

### c.      Prosecution History

The prosecution history resolves any doubt that the storing step is performed by the automated shipping machine and not by a human hand.  As explained above, the applicants successfully argued to the Patent Office that their method claims "specifically recite in the preamble a method of mailing parcels and envelopes 'using an automated shipping machine' rather than *specifically reciting at each step that the step is performed by the automated shipping machine*."  '799 pros. history, 2/07/96 Amendment at 2, G002346.  Claim 1 of the '014 patent descends from the '799 patent and recites the same preamble relied upon by the applicants.  It should be interpreted consistently with the applicants' representations.

### d.      Uship's Construction

Uship finds no support for its construction in either the claim language or the prosecution history.  The only argument that Uship offers in support of its own construction is that "the system disclosed in *one embodiment* 'is substantially simplified from the [other discussed embodiments] since the storage and validation process is performed by an attendant.'"  Uship Post-Hearing Br. at 46-47 (citing '014 patent, 25:45-47).  Citing *Oatey,* Uship again resorts to its misunderstanding that every claim must cover every embodiment disclosed in the specification. That is not the law.  *PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1166 (Fed. Cir. 2008) ("*Oatey* is not a panacea, requiring all claims to cover all embodiments"); *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138-39 (Fed. Cir. 2007) (claims can be construed to exclude embodiments where multiple embodiments are disclosed).  "It is often the case that different claims are directed to and cover different disclosed embodiments." *Helmsderfer*, 527 F.3d at 1383.  That is precisely the situation here.  As noted above, both claim 1 of the '220 patent and claim 2 of the '014 patent specifically recite that an attendant performs the storage step.

Instead of showing support for its own construction, Uship criticizes IBM and the Government's reliance on the prosecution history for the same reasons addressed in connection with the construction of "validating  receipt of said parcel or envelope as the parcel or envelope for which the shipping label was printed."  For the reasons discussed in that section, its criticisms are to no avail.  *See* § IV.A.10.c, *supra*.

## V.   THE RAMSDEN PATENT, U.S. PAT. NO. 5,481,464

The '464 patent, entitled "System for Collecting and Shipping Items," issued on January 2, 1996.  The '464 patent describes the patented invention as "an automated, unattended unit for collecting and holding parcels, letters and other items for one or more commercial delivery services."  '464 patent, 1:13-16 ("Field of the Invention").  Like the '220 and '014 patents, the '464 patent purports to improve upon prior art shipping systems such as "unattended drop boxes."  *Id.* 1:31-33.  According to the '464 patent, the prior art devices were inferior because:

> [s]uch [prior art] schemes, however, cannot provide full insurance protection or verification that the package was in fact mailed, since no attendant is present to verify that the letter was actually placed in the box.

*Id*. 1:37-40.  The '464 patent purports to improve on these prior art devices by providing all of the functions of a commercial delivery office in a single, integrated, automated unattended unit:

> Disclosed is an ***integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services,*** the unit including a scale for weighing the item to be shipped, a computer for inputting information relating to the destination to which the item is to be shipped and for analyzing the inputted information including calculating the fee for shipment of the item, a card reader for receiving bank credit card information . . . , and secured storage . . . .

*Id*., Abstract.  Figure 1 of the '464 patent depicts the patented shipping unit incorporating these features:



*Id.*, Fig. 1.   Consistent with the description of the invention in the specification, all of the asserted claims are directed to an "integrated, automated, unattended unit for collecting and securely holding items for collection and shipment."  *Id.*, claims 7, 9, 10, 11, 12, 15, 28, 30, 34.

The prosecution history of the '464 patent is consistent with the claims and specification of the '464 patent.  The Patent Office rejected the original claims in the chain of applications that issued as the '464 patent as indefinite[12] because the Examiner believed the claims covered just "an aggregation of parts."  '532 Pros. Hist., 5/22/92 O.A. at 2, G001144.   In response, the applicant said:

> Applicant respectfully submits that claim 1 as amended is directed to an integrated system, ***not "an aggregation of parts,"*** any longer.

*Id.*, 10/7/92 App. Remarks at 9, G001137.  This concept is reflected in the asserted claims of the '464 patent, which each define the claimed invention as an ***"integrated, automated, unattended***

---

[12] The '464 patent's prosecution history includes the prosecution histories of its ancestor patents. *See, e.g., Ormco*, 498 F.3d at 1314-15 ("We have held that prosecution disclaimer may arise from disavowals made during the prosecution of ancestor patent applications"); *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990) (applying prosecution history evidence from a patent to a descendent CIP patent).

*unit"* to make clear that all of the functionality of the patented system is contained in an integrated unit as opposed to an aggregation of parts.

## A.  The Asserted Claims

Uship asserts three independent claims[13] of the '464 patent: claims 7, 28, and 34, and a total of 6 dependent claims[14] that "depend" from these independent claims.  The dependent claims each include all the limitations of the claim from which they depend and then add an additional limitation.  To assist in parsing the asserted claims, IBM organizes its arguments into two subsections, one for independent claim 7 and the asserted claims that depend from it and one for independent claims 28 and 34 and claim 30 which depends from claim 28.

Additionally, there is a great deal of repetition between the disputed elements of the asserted independent claims—claims 7, 28 and 34.  Such limitations are presumed to have the same construction.  *Phillips*, 415 F.3d at 1314-15.  To reduce repetition, therefore, IBM's arguments with respect to disputed terms in claim 7 will not be repeated for identical limitations of claims 28, and 34, but will be incorporated by reference in separate sections for those claims.

## B.  Independent Claim 7 And Dependent Claims 9-12 And 15

### 1.  Independent Claim 7

#### a.  An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services: said automated unit comprising,

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| An apparatus, machine, or system of machines for | integrated: incorporated into a unified whole | An integrated, automated, and unattended single apparatus |

---

[13] An "independent claim" is "a claim that does not refer back to or depend on another claim." *See* U.S. PTO Glossary.

[14] Dependent claims incorporate all of the limitations of the claims from which they depend.  *See* MPEP § 608.01(n).  A dependent claim can depend from another dependent claim, but a "chain" of dependent claims must ultimately depend from an independent claim.

| collecting and securely holding items for collection and shipment by commercial delivery services (including the USPS), which apparatus, machine, or system of machines is (1) incorporated into a unified or interrelated whole; (2) automatically controlled by mechanical or electronic devices; and (3) capable of being used by a customer without assistance from an attendant | automated: automatically controlled by mechanical or electronic devices<br><br>unattended: no attendant is present<br><br>unit: a single apparatus | for automatically collecting and securely holding items for collection and shipment by commercial delivery services, the automated single apparatus including: |
| --- | --- | --- |

### i.      The Preamble Is A Limitation

Before the *Markman* hearing, Uship argued that the preamble is not a limitation.  Uship now has abandoned that argument.  Uship Post-Hearing Br. at 49-53; *see also* 2/17/2010 Tr. 267:1-4 ("There is [sic] really three issues in this preamble, three issues of contention. The first is the meaning of the phrase integrated unit. The second is automated and the third is unattended."), 290:8-15, 305:11-14.  Thus, the parties are all now in agreement that the preamble is a limitation.

### ii.      Construction Of The Preamble

The parties principally dispute whether the preamble requires all of the recited claim elements, including the "means for securely storing said item until the item is collected by said commercial delivery service," to be included in a single apparatus.

### (A)      Claim language

The preamble requires "[a]n integrated, automated, unattended unit . . . said automated unit comprising" the other claim elements.  This language is clear:  "An integrated . . . unit" means one unit, not a "system of machines."  The preamble further states that the "integrated, automated, unattended unit" is "for collecting and securely holding items for collection and

shipment." The claims therefore are explicit that "the unit" must include the secure storage means.

### (B)      Specification

The specification consistently describes the invention as a single apparatus that includes all of the other claim elements. For example, the Abstract describes the invention as "*an integrated, automated, unattended unit* for collecting and *securely holding items* for collection and shipment by commercial delivery services, the unit including a *scale for weighing* . . . a computer for *inputting information relating to the destination* and for . . . *calculating the fee for shipment*, a *card reader* for . . .  assessing the shipment fee . . . and *secured storage*." '464 patent, Abstract.

The "Summary of the Invention" similarly describes a single integrated machine as achieving "the objects of the invention." In both aspects of the invention, all of the elements recited in claim 7 are included in the same "outer housing." This includes the "storage area" which is "define[d]" by the inner surface of the outer housing:

### SUMMARY OF THE INVENTION

* * *

> ***In order to achieve the above and other objects of the invention***, a system for accepting and storing parcel packages, according to a <u>first aspect</u> of the invention, for subsequent pickup by a commercial carrier ***includes an outer housing*** having inner and outer surfaces, ***the inner surface defining a storage area*** . . .;  a scale . . . for ***weighing*** . . .; a keyboard  . . . for ***inputting information relating to the destination*** of the parcel . . . ; a controller for ***calculating a shipment fee*** for the parcel, . . .; payment structure . . . for ***accepting payment identity information from the customer, e.g. a bank card***; deposit structure . . . for permitting a customer to securely deposit the parcel into the storage area, whereby the volume within the storage space is utilized more efficiently for storing the parcels then would otherwise be possible.

> A system for accepting and storing parcel packages for subsequent pickup by a commercial carrier includes, according to a <u>second aspect</u> of the invention, ***an outer housing having inner and outer surfaces, the inner surface defining a***

> *storage area which is constructed and sized to store a multiplicity of parcels*; a scale . . . for *weighing* . . .; a keyboard . . ., for *inputting information relating to the destination* . . .; control structure for *calculating a shipment fee* . . .; payment structure . . . for *accepting payment identity information from the customer*; deposit structure, enabled by the control structure, for permitting a customer to securely deposit the parcel into the storage area; and climate control structure for maintaining the storage area at a safe temperature which will not damage the parcel.

'464 patent, 2:30-50.  These "statements, found in the 'Summary of the Invention' portion of the specification, are not limited to describing a preferred embodiment, but more broadly describe the overall inventions . . . ."  *Microsoft Corp.*, 357 F.3d at 1348; *see Mangosoft*, 525 F.3d at 1331 (construing claim consistently with aspects described in Summary of the Invention noting, "[e]ven if we assume this language properly addresses only an 'aspect' of the invention . . . this is precisely the aspect of the invention at issue.").  Indeed, the specification nowhere suggests that the storage structure is detached from the remainder of the unit—it is always contained within the outer housing.  '464 patent, at *passim*.  Thus, the specification leads to the "inescapable conclusion" that the claim elements including the storage means are part of a single unit.  *Microsoft Corp.*, 357 F.3d at 1348 (refusing to construe term to include communication over packet-switched network where "[n]owhere does [the specification] even suggest the use of a packet-switched network.").

### (C)     Prosecution History

As discussed above, the Patent Office rejected the applicant's claims where they appeared to be directed to an "aggregation of parts."  Specifically, the Patent Office found the applicant's claims unpatentable where "not all of the recited claim limitations have explicitly recited interconnections or the disclosed structural relationships."  '532 pros., 5/12/92 Office Action, at 2-3 (G0001144-45).  The Patent Office explained that although some of the "means are interconnected the exact location of these devices is not known."  *Id.* at 3 (G0001145).  The

60

Patent Office's concern about "location" shows that the relevant connections between the "means" were physical, not merely functional.

In response, the applicant disagreed with the Examiner's characterizations and told the Patent Office that his claims were "directed to an integrated system, not an 'aggregation of parts.'" '532 pros., 10/7/1992 Resp. to Office Action, at 9 (G0001137).  Only then did the Patent Office withdraw its rejection.  '532 pros., 1/27/1993 Examiner's Amendment, at 1, G0001150 ("The following is an Examiner's Statement of Reasons for Allowance:  A) In an interview on January 27th, 1993, Mr. Knoble: (1) argued that claim 1 was not an aggregation of parts . . . .").  In light of the applicant's representations, the asserted claims cannot be construed to cover a mere "system" made up of an "aggregation of parts."  The recited elements physically must be *integrated*.

### (D)     Uship's Construction

Uship asks this Court to rewrite the claims to cover a "system of machines" instead of "[a]n integrated . . . unit."  This proposal is inexplicably inconsistent with the plain meaning of "[a]n integrated . . . unit" and with the claims' plain statement that "said unit . . . comprises" the other elements.

Uship's proposal to rewrite the claims also lacks support in the specification.  The specification never once mentions that any of the elements in claim 7 can be its own machine, physically separate from the other elements.  Like the claims, the specification describes the elements as physically part of the same apparatus.  '464 patent, 2:30-50.  Uship asserts that the specification's use of the word "system" means the claims cover multiple "machines."  But the asserted claims do not say "system"; they require a "unit."  Moreover, each "system" Uship cites is described and depicted as a single apparatus having an outer housing within which all of the claimed "means" are contained not the physically disaggregated system of machines with

portions inside and outside the outer housing of the unit.  For example, Uship cites "system 10"

described in column 3.  Uship Post-Hearing Br. at 50.  That system is depicted in the Figures and

described as including one "outer housing 12 which defines a storage area 14 for holding items

such as packages or parcels."  '464 patent, 3:40-48.  The same outer housing is depicted and

described as "includ[ing]" other claim elements such as a "scale 22," "card reader 30," a "key

pad 28," and so forth:



*Id.* 3:43, 62-67, Fig. 1.  The other "systems" Uship cites are the same.  *See id.* 10:56-61 ("Except

as specifically described 60 herein, system 210 is identical to the system described above in

reference to the first embodiment of the invention.").

Uship's construction is similar to that which the Federal Circuit rejected in *Agilent Tech.*

*v. Affymetrix, Inc.*, 567 F.3d 1366 (Fed. Cir. 2009).  In *Agilent*, the district court construed "a

closed chamber" to mean "a system of enclosures."  *Id.* at 1376.  The Federal Circuit held that

the specification "impeach[ed] the [district] court's definition" where it described the apparatus as "comprising a first substrate having an inner surface and a substantially parallel second substrate having an inner surface that defines a closed chamber there between" and described "the closed chamber [a]s 'define[d]' by two substantially parallel substrates with inner surfaces." *Id.* In light of this description, the Federal Circuit found, the closed chamber was not "a system of enclosures." *Id.* at 1376-77. "Rather it [wa]s *an* enclosure." *Id.* Likewise, the specification of the '464 patent demonstrates that the claimed "integrated unit" is *an apparatus*, not a system of machines, by describing the machine as having an outer housing within which all of the other elements are contained including a storage area that is "defined" by the inner surface of the outer housing.[15]

Uship also asserts that the specification discloses an "adjunct packaging supply unit." Uship Post-Hearing Br. at 50-51. But the supply unit is not one of the elements in the asserted claims. In fact, none of the '464 patent claims that claim an integrated unit even mention an adjunct packaging supply unit. '464 patent, claims 1-19, 28-34. The specification's reference to an ***adjunct*** packaging supply unit merely reinforces IBM's proposed construction because it shows that the applicants knew how to describe a component as "adjunct" to and therefore not

---

[15] Uship cites to *Paragaon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1083-87 (Fed. Cir. 2009) as supporting its position because there the Federal Circuit "held that the term 'unit' encompassed 'separate physical structures.'" Uship Post-Hearing Br. at 50. However, in *Paragon Solutions*, the Federal Circuit, among other things, specifically pointed to the fact that one of the dependent claims recited that one component was "*removably secured*" to another; the specification "strong[ly] support[ed]" the position, stating that the claimed structure "may even comprise multiple structures which are physically separate from each other"; and the prosecution history supported multiple structures. 566 F.3d at 1083-87. None of those situations is present here. Instead, ***the specification of the patent in suit*** specifically requires that the claimed unit be housed within an outer housing and that the inner and outer surfaces define the boundaries of the unit as well as the storage area and location for interface with the unit. ***This patent*** does not allow for or describe a "unit" composed of removable parts, and the patent in the *Paragon Solutions* case is wholly extrinsic to the interpretation of the asserted patent.

part of the claimed "unit."   The specification specifically states that "an ***adjunct*** packaging supply unit 120 is positioned to ***one side*** of the system 10."   *Id.* 10:44-47.   System 10, as designated by Figure 1, is the claimed unit defined by the "outer housing."   The adjunct packaging supply unit is not part of the claimed unit, it is adjunct to that unit and positioned to one side of the outer housing.

Uship further relies heavily on an assortment of dictionary definitions.   These general purpose dictionary definitions "cannot overcome [the] more persuasive intrinsic evidence." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1328 (Fed. Cir. 2008).   Uship's approach is flawed for the additional reasons that it separately defines "integrated" and "unit"—without ever trying to construe the actual clause "integrated, automated, unattended unit"—and cherry-picks the broadest definitions it can find for those terms.   For example, the No. 1 definition of "unit" found in Uship's dictionary is "a single thing" and other definitions include "a machine" and "apparatus."   But Uship unaccountably proposes that the court should adopt the ninth definition of "unit": "system of machines."   This approach ignores the dictates of *Phillips* where the Federal Circuit warned:

> The problem is that if the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.

415 F.3d at 1321.   Under Uship's approach, the claim, uninformed by the intrinsic evidence, becomes "unduly expansive" and covers the same "aggregation of parts" that the Patent Office told the applicants was unpatentable.   *Id.*   Accordingly, the Court should reject Uship's construction.

b.      **means for weighing the item to be shipped;**

| Joint Proposal of Parties |
|---|
| **function:** weighing the item to be shipped<br>**structure:** electronic scale 22 or 222 |

c.      **means for inputting information relating to the destination to which the item is to be shipped;**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **Function:** inputting information relating to the destination to which the item is to be shipped<br><br>**Corresponding Structure:** keypad (2) or keyboard (226) or voice-recognition mechanism; and equivalents | Function: to input information relating to the place to which the item is to be shipped<br><br>Corresponding Structure: keypad (28); keyboard (226) | function: inputting information relating to the place to which the item is to be shipped<br><br>structure: keypad 28 or keyboard 226 |

All parties agree that this is a means-plus-function limitation that must be construed pursuant to § 112, ¶ 6.  As discussed in § II.C, *supra*, means-plus-function elements represent a different form of claiming where instead of identifying structure in a claim, the patentee uses the word "means" to indicate that the element covers a structure or structures specifically identified in the specification as performing that function.  The word "means" by itself is just a structure-less placeholder to be filled in by structure linked to the claimed function in the specification. The claim element must be construed to cover only those structures that the specification "clearly links" to the claimed function.  *Minks*, 546 F.3d at 1377.

i.      **Function Of "means for inputting information relating to the destination to which the item is to be shipped"**

The parties agree that the claimed function is "inputting information relating to the destination to which the item is to be shipped."  This claimed function is unambiguous and means inputting information relating to the place to which the item is shipped.

65

### ii.      Corresponding Structure

The parties agree that the corresponding structure includes a key pad (28) and a keyboard (226).  The specification clearly links these structures to the claimed function.  *See* '464 patent, 7:23-25 ("The customer then enters a destination zip code through key pad 28"), 13:14-15 (inputting information through keyboard 226).

However, Uship proposes that the corresponding structure also includes a "voice-recognition mechanism."  Notably, Uship's originally proposed construction did not mention anything about voice recognition.  Uship Pre-Hearing Br. at 43.  Regardless, "for a claim to meet the particularity requirement of ¶ 2, the corresponding structure(s) of a means-plus-function limitation must be disclosed in the written description in such a manner that one skilled in the art will know and understand what structure corresponds to the means limitation."  *Atmel Corp. v. Info. Storage Devices, Inc.,* 198 F.3d 1374, 1382 (Fed. Cir. 1999).  "Specificity in reciting structure" is part of "the quid pro quo for using a means-plus-function limitation."  *Maurice Mitchell Innovations, L.P. v. Intel Corp.*, 249 Fed. Appx. 184, 188 (Fed. Cir. 2007).  Although the '464 patent specification contains a single reference to a "mechanism that recognizes voices," there is no indication what structure that "mechanism" has.  Indeed, the Federal Circuit has held that the term "mechanism" "connotes no more structure than the term 'means.'"  *Massachusetts Institute of Tech. and Electronics For Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006). The specification's reference to a mechanism that recognizes voices is not definite enough to suffice as corresponding structure for purposes of 35 U.S.C. § 112, ¶ 6 and should not be included in the construction of this element.

### d. control means for analyzing the inputted information and calculating the fee for shipment of the item;

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **Function**: analyzing the inputted information and calculating the fee for shipment of the item<br><br>**Corresponding Structure**: control system (100) including: CPU (102) in two-way communication with PLC (104); zone and weight charts and corresponding fee files; and equivalents | **Function**:  to analyze the inputted information relating to the place to which the item is to be shipped, and to calculate the shipment fee<br><br>**Corresponding Structure**: control system (100) including: (1) CPU (102) in two-way communication with PLC (104); and (2) connections to scale (22) and keypad (28) / keyboard (226) *The means-plus-function limitation lacks sufficient corresponding structure* | **Function**: analyzing the inputted information relating to the place to which the item is to be shipped, and calculating the fee for shipment of the item<br><br>**Corresponding Structure**: control system 100 including: (1) CPU 102 in two-way communication with PLC 104; and (2) connections to scale 22 and keypad 28 / keyboard 226<br><br>[lacks sufficient structure for analyzing the inputted information and calculating the fee] |

As with the previous limitation, the parties agree that this is a means-plus-function element that must be construed under § 112, ¶ 6.  Accordingly, the function is construed first, followed by identifying the structure that corresponds to the claimed function.

### i. Function Of "control means for analyzing the inputted information and calculating the fee for shipment of the item"

The claimed function is: "analyzing the inputted information and calculating the fee for shipment of the item"  *See Lockheed Martin*, 324 F.3d at 1319 ("The function of the limitation "is properly identified as the language after the 'means for' clause.").  This function is unambiguous.  "[T]he inputted information" plainly refers to the information input via the previous element.  The proper construction therefore is "analyzing the inputted information relating to the place to which the item is to be shipped and calculates the fee for shipment of the item."

## ii.    Corresponding Structure

The parties agree that the corresponding structure for this "control means" limitation is at least the control system 100 including general purpose computers, namely CPU ("central processing unit") 102 and PLC ("program logic controller") 104.

Where, as here, the specification identifies a general purpose computer as performing the function of a means-plus-function claim term, the Federal Circuit "has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1338 (Fed. Cir. 2008).  Because general purpose computers can be programmed to perform very different tasks in very different ways, "simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to the corresponding structure, material, or acts that perform the function, as required by section 112 paragraph 6." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1383 (Fed. Cir. 2009).  Consequently, a claim containing a means-plus-function element for which the disclosed structure is a general purpose computer "is invalid if the specification fails to disclose an algorithm for performing the claimed function." *Id.* at 1383.  "An algorithm is a set of well-defined rules for the solution of a problem in a finite number of steps." *Baxter Healthcare Corp. v. Fresenius Medical Care Holdings, Inc.*, Case No. C 07-1359 PJH, 2009 WL 330950, * 17 (N.D. Cal. Feb. 10, 2009).  "A general purpose computer, or microprocessor, programmed to carry out an algorithm creates 'a new machine, because . . . [t]he instructions of the software program that carry out the algorithm electrically change the general purpose computer by creating electrical paths within the device." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999).

There is no algorithm disclosed in the '464 patent for performing the claimed function of analyzing the inputted information and calculating the fee for shipment of the item.   Uship contends that the following statement is an algorithm:

> the appropriate zone and weight charts for all client delivery services…[and] the corresponding fee files which correspond to each client delivery service at that desired location

Uship Post-Hearing Br. at 58.   This is not an algorithm, it is data.   It is not a series of steps, rules, or instructions and does not specify how the computer is to do anything, much less perform the claimed function.   In fact the reference to "appropriate zone and weight charts" is nearly identical to the disclosure of "appropriate programming" that the Federal Circuit held was insufficient for purposes of 35 U.S.C. § 112, ¶ 6 in *Aristocrat Technologies.* 521 F.3d at 1336 (rejecting "claim that a reference to a general purpose computer with 'appropriate programming' discloses sufficient structure for section 112 paragraph 6").

Uship also purports to describe "well-known" ways in which a system could perform the claimed function by using information and documents outside of the patent, such as a page from the Post Office website or Wikipedia.   Uship Post-Hearing Br. at 58 & n. 41-42 (citing Wikipedia, Table Lookup," at http://en.wikipedia.org/wiki/Lookup_table; USPS, "Postal Zone Charts," at http://postcalc.usps.gov/zonecharts).   According to the Federal Circuit, however, such alleged knowledge may not be used as a substitute for providing a specific algorithm in specification:

> A patentee cannot avoid providing specificity as to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function.   To allow that form of claiming under section 112, paragraph 6, would allow the patentee to claim all possible means of achieving a function.

*Blackboard,* 574 F.3d at 1385; *Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1380 (Fed. Cir. 1999) ("consideration of the understanding of one skilled in the art in no way relieves the patentee of adequately disclosing sufficient structure in the specification").

Uship lastly relies on the following quote from *In re Dossel* to argue that the specification's reference to "appropriate zone and weight charts" is a sufficient algorithm: "While the written description does not disclose exactly what mathematical algorithm will be used to compute the end result, it does state that 'known algorithms' can be used to solve standard equations which are known in the art.'" Uship Br. at 59 (citing *In re Dossel*, 115 F.3d at 946). But, in *Aristocrat*, the Federal Circuit rejected the exact same argument based on *Dossel*:

> [The application at issue in *In re Dossel*] **provided the particular equation** . . . **and it described in great detail the components of that equation**. Accordingly, while providing a detailed explanation of how the claimed device would perform the claimed function, the specification left the mathematical techniques used to solve the recited equations to persons of ordinary skill in the art. **That is what this court referred to when it stated that the application stated "that 'known algorithms' can be used to solve standard equations which are known in the art."** *Dossel,* 115 F.3d at 946. . . . **Far from supporting Aristocrat's claim that a reference to a general purpose computer with "appropriate programming" discloses sufficient structure for section 112 paragraph 6,** the *Dossel* case provides an example of an extremely detailed disclosure of all information necessary to perform the function, except for basic mathematical techniques that would be known to any person skilled in the pertinent art.

*Aristocrat Techs.*, 521 F.3d at 1335-36. *In re Dossel* is inapposite; the '464 patent discloses no equation or algorithm and the claim is invalid as indefinite.

> **e.     said control means further including means for receiving credit card information and**

| Joint Proposal of Parties |
|---|
| **Function**: to receive credit card information **Corresponding Structure**: card reader (30, 230) |

f.   **said control means further including . . . means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines;**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **PRIMARY CONSTRUCTION**:<br><br>Telephone lines used to communicate and assess the shipment fee to the account of the person owning the credit card<br><br>**ALTERNATIVE CONSTRUCTION**:<br><br>**Function**:  communicating and assessing the shipment fee to the account of the person owning the credit card<br><br>**Corresponding Structure**: telephones lines connected to control system (100);  or telephone lines connected to card reader (30, 230); and equivalents | **means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines**: [Means-plus-Function]<br><br>**Function**: to communicate and assess the shipment fee to the account of the person owning the credit card<br><br>**Corresponding Structure**: card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges on the card | **means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines**:<br><br>**Function**: communicating and assessing the shipment fee to the account of the person owning the credit card<br><br>**Corresponding structure**: magnetic card reader 30 or 230 connected to a dedicated telephone line |

The parties dispute whether this is a means-plus-function element that is governed by § 112, ¶ 6.  They also dispute the scope of the corresponding structure.

### i.   This Is A Means-Plus-Function Limitation Governed By § 112, ¶ 6

All parties agree that § 112, ¶ 6 presumptively applies because the term uses "means" followed by a function.  *See* Uship Post-Hearing Br. at 61.  Uship contends that this presumption is overcome because the claim element recites "telephone lines."

Uship cannot meet its burden of overcoming the presumption.  To avoid means-plus-function treatment, the claim must recite "sufficient structure to perform the entirety of the

71

claimed function." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1376 (Fed. Cir. 2003) (citations omitted).   The parties agree that the function claimed here includes both communicating ***and assessing*** a shipment fee.   There is no structure recited in the claim for assessing a shipment fee.   Uship argues without support that "telephone lines 'assess' the fee by communicating" it.   Uship Post-Hearing Br. at 61.   But equating communicating and assessing would render the explicit term "assessing" in the claim meaningless.   Such a construction is strongly disfavored.   *See, e.g.*, *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (rejecting construction that "renders an important claim limitation . . . functionally meaningless").   The specification further makes clear that the telephone lines do not perform the assessing function—a card reader does.   *See* '464 patent, Abstract ("a *card reader* for receiving bank credit card information and for communicating and *assessing the shipment fee* to the account of the person, and secured storage, the computer being adapted for communicating the shipment fee by telephone lines.").   Because the claim element does not recite sufficient structure, Uship has not overcome the presumption and § 112, ¶ 6 applies.

> ii.     **Function Of "communicating and assessing the shipment fee to the account of the person owning the credit card"**

The function of this element is "communicating and assessing the shipment fee to the account of the person owning the credit card."   *See Lockheed Martin*, 324 F.3d at 1319.   This term is clear on its face and requires no further construction.

> iii.     **Corresponding Structure**

Consistent with IBM's proposed construction, the specification clearly links a magnetic card reader connected to a dedicated telephone line to the functions of communicating and assessing a fee:

The **reader 30 may be connected to a dedicated telephone line** that **communicates** with a central location for **processing charges** on the bank card.

'464 patent, 7:1-8.

Uship contends that the corresponding structure should be construed to include "telephone lines connected to control system (100)."  Uship, however, identifies nothing in the specification that links such structure to the claimed function.  It merely argues that "the specification also depicts the telephone line being connected directly to the control system, fig. 10."  Uship Post-Hearing Br. at 63.  Mere depiction of a structure is not enough.  *Minks*, 546 F.3d at 1377 (corresponding structure must be "clearly linked" to the claimed function).

Although Uship agrees that a card reader connected to "telephone lines" is corresponding structure, it argues that "dedicated telephone lines" are not necessary.  Where "[n]othing in the specification suggests any other structure for" performing the claimed function, it would be erroneous to construe the corresponding structure to include anything other than a card reader connected to a dedicated telephone line.  *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1098 (Fed. Cir. 2008) (rejecting argument that district court's "construction [wa]s erroneous because the specification teaches that a "rotating central post" is not necessary to accomplish the claimed function" where that was the only structure disclosed).

g.      **means for securely storing said item until the item is collected by said commercial delivery service;**

| Uship Constructions | Government Constructions | IBM Constructions |
| --- | --- | --- |
| **Function:**  securely storing the item<br><br>**Corresponding Structure:** storage area (14, 276) secured by: dump drop (92); or pair of inner doors (52, 54); or inner door (246); and equivalents | **Function**:  to securely store said item until the item is collected by said commercial delivery service<br><br>**Corresponding Structure**: storage area (14) defined within outer housing (12), | **Function**: securely storing the item in a  secured area for storage until the item is collected by said commercial delivery service;<br><br>**Corresponding structure**: outer door 42; inner doors 52 |

73

| until the item is collected by said commercial delivery service: *Plain meaning* | security mechanism (50), a pair of inner doors (52, 54); **or** storage area (276) defined within outer housing (211), outer door (234), inner door (246) **or** collection space (96) defined within outer housing (12), access door (86), lock (87) | and 54, stepper motor 58, secure zone 14, guide structure 74 OR outer door 234, temporary holding space 240, inner door 246, stepper motor 248, secure zone 276, powered conveyer 242, passive parcel distribution device 264 OR dump drop 92, incline chute 94, collection space 96. |

All parties agree that this is a means-plus-function term that is to be construed pursuant to § 112, ¶ 6.  Accordingly, the function must be construed first, followed by the corresponding structure.

### i.   Function Of "means for securely storing said item until the item is collected by said commercial delivery service"

"The function of a means-plus-function limitation . . . must come from the claim language itself."  *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337 (Fed. Cir. 2002).  "Correctly identifying the claimed function is important, because '[a]n error in identification of the function can improperly alter the identification of the structure . . . corresponding to that function.'"  *Generation II Orthotics*,  263 F.3d at 1363.  The claimed function here is: "securely storing said item *until the item is collected by said commercial delivery service*."   The meaning of this function is clear and requires storing the item in a secured area for storage until the item is collected by the commercial delivery service.

Uship's proposed construction truncates the claimed function to "securely storing the item."  Uship admits that it is "defining the function by reference to some but not all of the words after the phrase 'means for.'"  Uship Post-Hearing Br. at 65.  The statute "does not permit" this approach.  *Generation II Orthotics*,  263 F.3d at 1363 (citing *Micro Chem., Inc. v. Great Plains*

74

*Chem. Co., Inc.*, 194 F.3d 1250, 1257 (Fed. Cir. 1999)) ("As we stated in *Micro Chem*, '[§ 112, ¶ 6] does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim.'").

Uship argues that its approach is proper in light of *Lockheed*, 324 F.3d 1308 (Fed. Cir. 2003). Uship Post-Hearing Br. at 65. In *Lockheed*, however, the Federal Circuit held that "the district court erred by 'reading out' the limitations contained in the claim language." *Lockheed*, 324 F.3d at 1319. That is exactly what Uship does here: it reads out the claim language "until the item is collected by said commercial delivery service." In *Lockheed*, the Federal Circuit found that a "whereby" clause was not part of the claimed function, *id.*, but there is no "whereby" clause in what Uship seeks to delete.

Nor is there any basis to analogize the "whereby clause" in *Lockheed* to the phrase "until the item is collected by said commercial delivery service" in this claim. "Whereby" clauses receive special treatment in patent law. Since at least 1948 the Federal Circuit and its predecessor court have held that "[a] 'whereby' clause that merely states the result of the limitation in the claim adds nothing to the patentability or substance of the claim." *Israel v. Cresswell,* 166 F.2d 153, 156 (1948); *see also Tex. Instruments Inc. v. Int'l Trade Com'n*, 988 F.2d 1165, 1172 (Fed. Cir. 1993). It is for this reason alone that the court in *Lockheed* found the "whereby clause" did not limit the claimed function. *Lockheed*, 324 F.3d at 1319 (citing *Tex. Instruments,* 988 F.2d at 1172 (Fed. Cir. 1993)) ("The function is properly identified as the language after the "means for" clause and before the "whereby" clause, ***because a whereby clause that merely states the result of the limitations in the claim adds nothing to the substance of the claim.***"). No such rule exists for "until" clauses. "Until the item is collected by said commercial delivery service" is not a whereby clause and does not state a result. As Uship

75

concedes, it "describes the duration for which items [are] securely stored."  Uship Post-Hearing Br. at 66.  This temporal limitation is properly included as part of the claimed function.  As the court in *Amado v. Microsoft Corp.*, Case No. SACV 03-0242 DOCANX, 2004 WL 5683568 (C.D. Cal. Aug. 20, 2004), explained:

> *[T]he Court finds that the temporal limitation is properly incorporated into the function.*  . . . To truncate the "while the spreadsheet program is in execution" language from the definition of the function would improperly ignore the interactions between the spreadsheet and database programs. Therefore, the Court adopts Microsoft's proposed function which includes the "while said spreadsheet program is in execution" portion of the claim limitation.

*Id.*  Likewise, to truncate the "until the item is collected by said commercial delivery service" language from the definition of the function would improperly ignore the relationship between the item's storage and collection.  Uship's proposed function should not be adopted.

### ii.    Corresponding Structure

The parties agree that the following should be required as part of the corresponding structure:  a secure zone (14 or 276) secured by inner doors (52 and 54 together or 246), or a collection space (96).  *See* Uship Post-Hearing Br. at 66.  The parties disagree, however, as to whether the remaining structures identified by IBM and the government are also part of the corresponding structures.   The specification makes clear they are.   Specifically, the first embodiment describes the necessary structure for securely storing an item until it is picked up by a commercial delivery service as at least:  outer door 42; inner doors 52 and 54, stepper motor 58, secure zone 14, and guide structure 74.  '464 patent, 4:17-5:20.  In this embodiment, outer door 42 prevents access to secure area 14, while inner doors 52 and 54 operate in conjunction with stepper motor 58 and guide structure 74 to move the item into the secure area 14.  *See id.*  In the second embodiment, the necessary structure similarly includes outer door 234, temporary holding space 240, inner door 246, stepper motor 248, secure zone 276, powered conveyer 242,

and passive parcel distribution device 264, which are described in nearly the same way. *Id.* 11:8-67. The third structure disclosed is the combination of a dump drop 92, incline chute 94, and collection space 96. *See id.* 5:40-46.

Uship asserts that the only required structures are a "storage area" with "inner doors." *See* Uship Post-Hearing Br. at 66. But that is not how the inventor described the secure storage mechanism in his patent. Secure storage is essential to this patented invention—an "unattended unit for collecting and holding parcels." *See* '464 patent, 1:10-16. Indeed, the inventor devoted paragraph after paragraph of the '464 patent to what he believed was a better mechanism for accomplishing this goal than the prior art "drop boxes" that he was attempting to improve upon. *See, e.g., id.* 1:32-49, 4:17-5:20, 11:8-67. The mechanisms he described for secure storage include more than simply a storage area with some inner doors or a dump drop—the features of a common drop box. Instead, the inventor included additional security mechanisms like the outer door and the conveyor and stepper motor. The claimed means-plus-function element should be interpreted accordingly.

> **h.**   **means for storing the inputted information once said item is disposed in said secured storage means,**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **Function:** storing the inputted information<br><br>**Corresponding Structure**: control system (100) including CPU (102) in two-way communication with PLC (104); and equivalents<br><br>**once said item is disposed in said secured storage means:** *Plain meaning* | **[Means-plus-Function]** Function: to store the inputted information relating to the place to which the item is to be shipped once the item is disposed in said secured storage means<br><br>Corresponding Structure: control system (100) including: (1) CPU (102) with CPU memory in two-way communication with PLC (104); and (2) PLC (104) | function: storing the inputted information relating to the place to which the item is to be shipped once the machine determines that the item was disposed in the secured storage means<br><br>structure: control system 100 including: (1) CPU 102 with memory in two-way communication with PLC 104; and (2) PLC 104 connected to first sensor 112 or third sensor |

| | connected to first sensor (112) or third sensor (116) | 116 |
|---|---|---|

All parties agree that this is a means-plus-function term construed pursuant to § 112, ¶ 6. Accordingly, the function must be construed first, followed by the corresponding structure.

### i. Function Of "means for storing the inputted information once said item is disposed in said secured storage means"

The functional part of this limitation is "storing the inputted information once said item is disposed in said secured storage means." *See Lockheed Martin*, 324 F.3d at 1319 ("The function of the limitation "is properly identified as the language after the 'means for' clause."). The function here must be construed as requiring that the previously inputted information relating to the destination to which the item is to be shipped is stored in the disclosed "means" *once* the item is disposed in the secured storage means. Such information cannot be stored before the item is stored in the unit or if the item is never stored in the unit. The claim language is clear and unequivocal and cannot be understood any other way. Any other reading would impermissibly violate the precepts of English grammar. *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983) ("A claim must be read in accordance with the precepts of English grammar."). If the previously inputted information were stored before the item was disposed in the storage area or if the item were never disposed, then the word *once* would have no meaning and be rendered impermissibly superfluous. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).

The surrounding claim words confirm IBM's construction is correct. The claim states that "said information storage means includ[es] means for displaying a manifest." The manifest is what the commercial delivery service person uses to confirm that he retrieves all of the deposited packages that have been designated for his particular delivery service. '464 patent, 9:52-57. According to the claim, the same "information storage means" that stores information

78

relating to the transaction (CPU 102) is used to prepare the manifest. Thus, it makes perfect sense that the claim would require storage to occur only after an item is actually deposited; otherwise the manifest may list a package that is not there.

> The specification confirms the temporal relationship clearly set forth in the claims:
>
> When the first sensor 112 (or the third sensor 116 in the case of the dump drop) senses the presence of an envelope, parcel or package, control system 100 stores information relating to the transaction in CPU 102.

'464 patent, 8:43-47. Thus, the inputted information is not stored in CPU 102 until the claimed unit determines that the item has been deposited—as IBM's proposed construction makes clear. Additionally, the specification repeatedly emphasizes that one of the "objects of the invention" is to provide a shipping machine "which can give a verified deposit of receipt to a customer." '464 patent, 1:8-17, 2:21-24. If storage of the information relating to the transaction is not triggered until an item is actually deposited, the machine can verify that an item is deposited before it prints a receipt for the customer.

Uship again asks the Court to adopt a truncated function for this term: "storing the inputted information." Uship knows that the accused APC does not store inputted information once an item is disposed in a secured storage means so it simply deletes the latter part of that function. Just like the last term, Uship's only argument for doing so is its independent assessment that the phrase "once said item is disposed in a secured storage means" does not "add to the substance of the claim." Uship Post-Hearing Br. at 69. It is difficult to reconcile Uship's insistence that these words must be deleted if Uship really believed they added no substance. Regardless, Uship's approach is impermissible for the same reasons discussed in connection with the "means for securely storing said item until the item is collected by said commercial delivery service" limitation above.

Uship again points to *Lockheed* as allegedly supporting its position.  *Id.* at 69 (citing *Lockheed*, 324 F.3d at 1319).  Once more, however, the claim language Uship seeks to delete in this means-plus-function element is not part of a "whereby" clause and, as detailed in Section IV.B.1.g *supra*, "whereby" clauses are provided special treatment in patent law.  Thus, *Lockheed* is inapplicable in this regard.

Uship also points to *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332 (Fed. Cir. 2002).  Uship Post-Hearing Br. at 69.  In *BBA Nonwovens*, the Federal Circuit dealt with the means-plus-function element "corona means positioned for electrostatically charging the filaments . . . before they are deposited on said collection surface to form a web." 303 F.3d at 1343-44.  In that case, the Federal Circuit found that "[r]ather than reciting the function of the corona means, the expression following the word 'positioned' describes where the corona means is located and is a separate limitation not subject to section 112, paragraph 6. What the 'corona means' is and where it is located are two different things."  *Id*. at 1344. Conversely, here, the functional language Uship asks the Court to ignore—"once said item is disposed in the secured storage means"—is a temporal limitation; it describes what the "means" is doing and has nothing to do with the location of the "means."  *When* the means performs the function is part of the function; the location of the means has nothing to do with the function. This case provides no support for Uship's continued attempts to rewrite its claims to delete portions of the claimed function.[16]

---

[16] *BBA Nonwovens* further provides no support for Uship's attempt to ignore the limitation "once said item is disposed in the secured storage means" entirely.  Although the court found that the "positioned" language was not part of the *function* of the means-plus-function element, it still found that the "positioned" language was a *limitation*.  330 F.3d at 1344.  In contrast, Uship's proposal gives the language "once said item is disposed in the secured storage means" no limiting effect at all.

As in *Amado*, *BBA Nonwovens* is inapplicable and the "temporal limitation" here is part of the claimed function.   *See Amado*, 2004 WL 5683568 at *7-8 (C.D. Cal. 2004) (distinguishing *BBA Nonwovens Simpsonville* and finding that "the temporal limitation [at issue] [wa]s properly incorporated into the function"); *see also Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384 (Fed. Cir. 1992) (construing claimed function to include the temporal limitation "instantaneous"); *Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1161, 1187 (N.D. Cal. 2003) (finding *"BBA Nonwovens* does not address language related to timing" and that "the language in the claims describing *when* the function occurs should be considered part of the function and that failure to include this language would impermissibly broaden the scope of the claims" (emphasis in original)).

### ii.       Corresponding Structure

The parties agree that the corresponding structure includes "control system (100) including CPU (102) in two-way communication with PLC (104)."  This structure performs half of the recited function:  storing the inputted information.  IBM and the Government propose that the corresponding structure for the remainder of the function includes the first sensor 112 or the third sensor 116 because only those structures are described as causing storage of the inputted information "once said item is disposed in a secured storage means."  Uship proposes that no additional corresponding structure is necessary.

The corresponding structure to the claimed function is clearly identified in the specification.  Again, it is not until "the first sensor 112 (or the third sensor 116 in the case of the dump drop) senses the presence of an envelope, parcel or package, [that] control system 100 stores information relating to the transaction in CPU 102." '464 patent, 8:43-48.  Because the sensor is necessary to the claimed function, it must be included as part of the corresponding structure.  Thus, the structure for storing once said item is disposed, is the sensor 112 or 116 for

determining that the item has been disposed in the secured storage area, and the control system 100/CPU 102, for doing the actual storage of information as IBMs' proposed construction requires.  There is no other structure disclosed that performs the function explicitly required by the claim.

Uship proposes that the corresponding structure does not require any sensors.  Uship bases its position on its construction of the claimed function to exclude "once said item is disposed in a secured storage means."  Not surprisingly, if one simply and impermissibly truncates the claimed function then the structures specifically linked to the discarded function fall by the wayside.  But Uship cannot just truncate the function and it must include the structure explicitly identified as performing that function.

As a fall-back argument, Uship contends that "once said item is disposed" merely indicates that "the inputted information *continues* to be stored after the item has been disposed." Uship Post-Hearing Br. at 72.  Uship offers no support for this argument.  In fact, Uship agrees that the specification shows that "various information is input *prior* to the deposit of the item to be shipped" and that only *after* all of this information is inputted and deposit of the package is sensed, does storage in CPU 102 occur.  *See id.* at 71.  This description is consistent with the claim language and IBM's proposed construction.

Nonetheless, Uship argues that if "the control system did not store the inputted information until the deposit of the item was sensed . . . it could not store the information at the time deposit is sensed, either, because that information . . . would have vanished by then."  Uship Post-Hearing Br. at 71.  This is a red herring.  There is nothing precluding the machine from temporarily storing information *somewhere other than the CPU 102*.  The claims only require that the information cannot be stored in the CPU 102—the structure all parties agree corresponds

to the claimed "means for storing information"—until the machine senses that an item has been

deposited.

       i.      **said information storage means including means for displaying a manifest.**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **Function:** displaying a listing of all transactions that pertain to a particular commercial delivery service<br><br>**Corresponding Structure:** manifest printer (90 or 280); and equivalents | **[Means-plus-Function]** Function: to display a listing of all transactions which pertain to the particular commercial delivery service<br><br>Corresponding Structure: manifest printer (90, 280 | function: displaying a listing of all transactions which pertain to the particular commercial delivery service<br><br>structure: manifest printer 90, 280 |

Uship "revised its construction to accord with the constructions proposed by the

Government and IBM" and now agrees that the manifest printer is the claimed means.  Uship

Post-Hearing Br. at 73.

    2.      **Dependent Claim 9**

Dependent claim 9 depends from claim 7—therefore incorporating all of its limitations—

and adds one additional limitation: "The integrated, automated, unattended unit of claim 7

wherein said means for storing said information further includes means for communicating said

information to a remote location staffed by a human operator."

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **Function:** communicating said information to a remote location<br><br>**Corresponding Structure:** telephone lines connected to control system (100); and equivalents | **[Means-plus-Function]** **Function:** to communicate the stored information relating to the place to which the item is to be shipped to a place removed from the site in which the unit is deployed that is staffed by a human operator **Corresponding Structure:** *The means-plus-function* | function:  communicating said information to a remote location staffed by a human operator<br><br>structure: [lacks sufficient structure for communicating the information to a remote location staffed by a human operator] |

83

| | *limitation lacks sufficient corresponding structure* | |
|---|---|---|

The parties agree that this element is a means-plus-function limitation, so the correct construction must adhere to § 112, ¶ 6.  Because there is no structure to satisfy § 112, ¶ 6 the claim is indefinite and invalid.

### i.  Function Of "communicating said information to a remote location staffed by a human operator"

The function is set forth in the claim: "communicating said information to a remote location staffed by a human operator."  This function is unambiguous and requires no further construction.

Uship proposes that the claimed function is "communicating said information to a remote location."  It thus rewrites the element to delete "staffed by a human operator."  Uship again "is improperly broadening the function by ignoring clear limitations contained within the claim language."  *Gobeli Research Ltd. v. Apple Computer, Inc.*, 384 F. Supp. 2d 1016, 1022 (E.D. Tex. 2005).  There is no basis to delete "staffed by a human operator," which comes after the term "means."  *Lockheed*, 424 F.3d at 1319.  Had the applicants intended this "means" element to require communication to any remote location, they would not have included those words in their claim.

Uship offers no support for its construction other than its bald assertion that "the communication occurs in the same way regardless of the particulars of the recipient."  Uship Post-Hearing Br. at 73-74.  Uship cites no authority suggesting that it is permissible to ignore a part of a claimed function simply because Uship's proposed function could be performed "in the same way."  That is not the test.  "The function of a means-plus-function limitation . . . must come from the claim language itself."  *Creo Prods.*, 305 F.3d at 1344.  Uship's unsupported

84

assertion cannot overcome the clear claim language requiring that the remote location be "staffed by a human operator."

### ii.        Corresponding Structure

The specification discloses no structure for communicating information to a remote location staffed by a human operator.  Uship does not dispute this.  *See* Uship Post-Hearing Br. at 74 (citing USPS Pre-hearing Br. at 58-59).  Nor could it.  Humans cannot constitute structure for purposes of 35 U.S.C. § 112, ¶ 6.  *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc. (d/b/a The Home Depot)*, 412 F.3d 1291, 1300 (Fed. Cir. 2005) (rejecting argument that corresponding structure "can entail human (or 'merchant') participation or a human being manually operating an apparatus," finding "a human being cannot constitute a "means"); *Cardiac Pacemakers*, 296 F.3d at 1118-19 (human could not satisfy structural requirements of means-plus-function claims).  Because the specification does not disclose any corresponding structure for performing the claimed function, this claim element is indefinite and claim 9 is invalid.  *See Id.* at 1114 ("If, however, this inquiry reveals that no embodiment discloses corresponding structure, the claim is invalid for failure to satisfy the definiteness requirement of § 112, ¶ 2.").

### 3.        Dependent Claim 10

Dependent claim 10 depends from claim 9—therefore incorporating all of its limitations—and adds one additional limitation:  "The integrated, automated, unattended unit of claim 9 wherein said unit includes a pivotable door that serves as a slide when said door is opened, said slide serving to transport the item to a storage area for secure storage."

| Joint Proposal of Parties |
|---|
| pivotable door - door for receiving items into the unit that opens and shuts by turning on a pivot |

| Uship Construction | Government Construction | IBM Construction |
|---|---|---|
| The integrated, automated, | Serves as a slide: operates as a | The integrated, automated, |

| | | |
|---|---|---|
| unattended unit includes a **pivotable door** that operates as a chute or a smooth surface on which items can glide or pass smoothly and which door serves to transport the item to a storage area for secure storage | downward-inclined chute with a flat bed<br><br>Serving to transport: operating to convey from one place to another<br><br>A storage area: a space for storing items within the outer housing of the unit<br><br>For secured storage: stored in a manner that is inaccessible to unauthorized persons | unattended unit has a [pivotable door] that has a slide to transport the item to the secured storage area of the unit.<br><br>a storage area: a space for storing items within the outer housing of the unit<br><br>for secured storage:  stored in a manner that is inaccessible to unauthorized persons |

The only material dispute for this claim is whether the pivotable door and the secured storage area required by this claim must be within the "integrated, automated, unattended unit" of claim 9 (itself dependent on claim 7).  The issues here are no different than the underlying dispute regarding what the term "integrated, automated, unattended unit" means.  *See supra* § V.B.1.a.  Uship argues that the storage area need not be together with the other components of the claimed invention; but, as discussed above, the intrinsic record contradicts Uship's position. *See id*.  The conclusion that all the required elements must be "integrated" into a single "unit" is only bolstered by the patent's discussion of the pivotable door, which shows that the pivotable door and storage area are part of a single overall integrated unit—not a physically disparate system.



'464 patent, Fig. 4 (pivotable door 92 emphasis added), 5:34-35.

### 4.    Dependent Claim 11

Dependent claim 11 depends from claim 10—therefore incorporating all of its limitations—and adds one additional limitation: "The integrated, automated, unattended unit of claim 10 wherein said door serves to secure said storage area when said door is opened."  The parties agree on the construction of this additional limitation.

| Joint Proposal of Parties |
|---|
| **serves to secure said storage area when said door is opened**: operates to bar access to the storage area through the door opening |

### 5.    Dependent Claim 12

Dependent claim 12 depends from claim 7—therefore incorporating all of its limitations—and adds one additional limitation: "The integrated, automated, unattended unit of claim 7 wherein said means for receiving said credit card information comprises a magnetic card reader."  The parties agree on the construction of this additional limitation.

| Joint Proposal of Parties |
|---|
| **comprises a magnetic card reader:** *Plain Meaning* - comprises a magnetic card reader |

### 6.    Dependent Claim 15

Dependent claim 15 depends from claim 12—therefore incorporating all of its limitations—and adds one additional limitation: "The integrated, automated, unattended unit of claim 12 wherein said card reader is adapted to read credit cards issued by any of a plurality of credit card companies and wherein said fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction."

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| the card reader is adapted to read one or more credit card companies' credit cards | *Plain Meaning* – the card reader is adapted to read credit cards issued by more than one credit card company and the fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction | *Plain Meaning* – the card reader is adapted to read credit cards issued by more than one credit card company and the fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction |

The parties dispute whether the card reader must be adapted to read credit cards issued by more than one credit card company.

The claim states that the reader is adapted to read credit cards issued by "any of a plurality of credit card companies." A "plurality" means more than one. *Sjolund v. Musland*, 847 F.2d 1573, 1579-80 (Fed. Cir. 1988) ("[C]laim 7 of the '071 patent claims a "plurality" of panels-that is to say, more than one . . . ."); *Application of Deters*, 515 F.2d 1152, 1157 (C.C.P.A. 1975) ("Claim 2, requiring "at least one" longitudinally displaced surface on the guide means, reads on one such surface; the patent claims, by claiming a "plurality," *i.e.*, more than one, of such surfaces, do not."). The fact that "companies" is plural also indicates that the reader must read cards from more than one company. *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1357 (Fed. Cir. 2002) ("At the outset, the claim recites "support wires" in the plural, thus requiring more than one welded "support wire.").

88

Uship's construction rewrites the claim to state "one or more credit card companies' credit cards." Had the applicant intended to cover a card reader that reads cards from only one credit card company, it could have written this limitation to state exactly that, or to state "adapted to read credit cards issued by a credit card company." Uship's construction renders the phrase "of a plurality" superfluous and should not be adopted. *See Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*, 243 Fed. Appx. 603, 606 (Fed. Cir. 2007) (construing "one of at least two rounds" to require "at least two rounds" because a reading of the claim to require only one round "would render the 'of at least two rounds' clause superfluous"). Moreover, the rest of the claim, which Uship ignores, requires that the "communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction." If the claim envisioned a single company, then it would be unnecessary for the communicating means to "communicate selectively" with the issuing credit card company because there would only be one credit card company.

As mentioned, Uship's ignores part of the element, namely the following: "and wherein said fee communicating means is adapted to communicate selectively with the credit card company issuing the card being used in the transaction." Although that phrase is unambiguous and needs no further construction, it still must be included as part of any claim construction. Thus, Uship's construction is wrong on several fronts.

## C.    Independent Claims 28 And 34 And Their Dependent Claims

This section contains IBM's arguments for independent claims 28 and 34 of the '464 patent. There are a large number of overlapping terms between and among these claims and previously discussed claim 7. For each of these claims, IBM provides a chart identifying which elements already have been construed and which remaining element(s) require construction.

## 1. Independent Claim 28 [And Dependent Claim 30]

### a. Independent Claim 28

| Claim 28 | Arguments |
|---|---|
| An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services: said automated unit comprising, | *Same as claim 7. See supra* § V.B.1.a (cl. 7) |
| means for weighing the item to be shipped; | *Same as claim 7. See supra* § V.B.1.b (cl. 7) |
| means for inputting information relating to the destination to which the item is to be shipped; | *Same as claim 7. See supra* § V.B.1.c (cl. 7) |
| control means for analyzing the inputted information and calculating the fee for shipment of the item; | *Same as claim 7. See supra* § V.B.1.d (cl. 7) |
| said control means further including means for communicating and assessing the shipment fee to the account of the person, said means assessing comprising means for printing a hard copy of said account charge for said person | *New: See Below* |
| means for securely storing said item until the item is collected by said commercial delivery service; | *Same as claim 7. See supra* § V.B.1.g (cl. 7) |
| means for storing the inputted information once said item is disposed in said secured storage means, | *Same as claim 7. See supra* § V.B.1.h (cl. 7) |
| said information storage means including means for displaying a manifest. | *Same as claim 7. See supra* § V.B.1.i (cl. 7) |

Only the following limitation must be addressed here—all others are incorporated by reference: "said control means further including means for communicating and assessing the shipment fee to the account of the person, said means assessing comprising means for printing a hard copy of said account charge for said person."

| Joint Proposal of Parties |
|---|
| **Means for printing a hard copy of said account charge for said person:** <br><br> **function:** printing a hard copy of the account charge for the person <br> **structure:** printer 26 |

—

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **said control means further including means for communicating and assessing the shipment fee to the account of the person:** | **said control means father including means for communicating and assessing the shipment fee to the account of the person:** | **said control means father including means for communicating and assessing the shipment fee to the account of the person:** |
| Function: communicating and assessing the shipment fee to the account of the person | Function: to communicate and assess the shipment fee to the account of the person | Function: communicating and assessing the shipment fee to the account of the person owning the credit card |
| Corresponding Structure: telephones lines connected to control system (100); or telephone lines connected to card reader (30, 230); and equivalents | Corresponding Structure: card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges | Corresponding Structure: magnetic card reader 30 or 230 connected to a dedicated telephone line |

This element of claim 28 is nearly the same as the following limitation of claim 7:  "said control means further including . . . means for communicating and assessing the shipment fee to the account of the person owning the credit card, said means for communicating the shipment fee being by telephone lines," except that here the element does not recite "said means for communicating the shipment fee being by telephone lines."  All parties agree this limitation is a means-plus-function limitation and should be construed in accordance with 35 U.S.C. § 112 ¶ 6.  *See* Uship Post-Hearing Br. at 78.  And IBM's analysis for this element is the same as that for claim 7.  *See* § V.B.1.f *supra*.  As demonstrated above, IBM's proposed construction is correct and should be adopted.

### b.    Dependent Claim 30

Dependent claim 30 depends from claim 28—therefore incorporating all of its limitations—and adds one additional limitation: The integrated, automated, unattended unit of claim 28 including means for communicating said account charge to a remote location."

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| [Similar to alternative construction for term in Claim 7 and to term in Claim 28]<br><br>**Function**: communicating said account charge to a remote location<br><br>**Corresponding Structure**: telephones lines connected to control system (100); or telephone lines connected to card reader (30, 230); and equivalents | [Means-plus-Function]<br>**Function**: to communicate and assess the account charge to a remote location<br><br>**Corresponding Structure:** control system (100) including CPU (102) connected to card reader (30), and card reader (30) connected to a dedicated telephone line that communicates with a central location for processing charges | **function**: communicating the account charge to a remote location owning<br><br>**structure**: magnetic card reader 30 or 230 connected to a dedicated telephone line |

This claim element is redundant with the "means for communicating" limitation of its base claim which is construed *supra* § V.C.1.a, and is the same as the similar limitation construed above in claim 7, *see supra* § V.B.1.f.

### 2.    Independent Claim 34

| Claim 34 | Arguments |
|---|---|
| An integrated, automated, unattended unit for collecting and securely holding items for collection and shipment by commercial delivery services: said automated unit comprising, | *Same as claim 7. See supra* § V.B.1.a (cl. 7) |
| means for inputting information relating to the destination to which the item is to be shipped; | *Same as claim 7. See supra* § V.B.1.c (cl. 7) |
| control means for analyzing the inputted information and calculating the fee for shipment of the item; | *Same as claim 7. See supra* § V.B.1.d (cl. 7) |
| said control means further including means for communicating and assessing the shipment fee to the account of the person, said means for communicating the shipment fee being by telephone lines; | *Same as claim 7. See supra* § V.B.1.f (cl. 7) |

| | |
|---|---|
| means for securely storing said item until the item is collected by said commercial delivery service; | *Same as claim 7. See supra* § V.B.1.g (cl. 7) |
| means for storing the inputted information once said item is disposed in said secured storage means, | *Same as claim 7. See supra* § V.B.1.h (cl. 7) |
| said information storage means including means for transmitting information that may be used to prepare a manifest to a remote location. | *New: See Below* |

There is one additional limitation that must be addressed here—all others are incorporated by reference.

> a.   **said information storage means including means for transmitting information that may be used to prepare a manifest to a remote location.**

| Uship Constructions | Government Constructions | IBM Constructions |
|---|---|---|
| **Function**: Transmitting information that may be used to prepare a listing of all transactions that pertain to a particular commercial delivery service<br><br>**Corresponding Structure**: telephone lines connected to control system (100); and equivalents | **[Means-plus-Function]** **Function**: to transmit information that may be used to prepare a listing of all transactions which pertain to the particular commercial delivery service to a place removed from the site in which the unit is deployed<br><br>**Corresponding Structure**: *The means-plus-function limitation lacks sufficient corresponding structure* | function: transmitting information that may be used to prepare a manifest to a remote location.<br><br>structure: [lacks sufficient structure for transmitting information for preparing a manifest to a remote location] |

The issue with respect to this limitation is whether there is sufficient structure disclosed in the specification for purposes of satisfying § 112, ¶ 6.  The most the specification says is that "[t]he system 10 may be capable of transmitting the manifest to a remote location such as a central office for the carrier.  '464 patent, 9:58-60.  This is not structure—it is a restatement of the function; accordingly claim 34 is invalid for indefiniteness.  *Aristocrat*, 521 F.3d at 1337-38.

93

Uship argues that the corresponding structure is "telephone lines connected to control system (100)." Uship Post-Hearing Br. at 80. But the specification does not ever link this structure to what the parties agree is the claimed function (transmitting information that may be used to prepare a listing of all transactions that pertain to a particular commercial delivery service). Uship does not even argue that the requisite "link" exists. The "duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112, ¶ 6." *See O.I. Corp. v. Tekmar Co.,* 115 F.3d 1576, 1583 (Fed. Cir. 1997). "Fulfillment of the § 112, ¶ 6 trade-off cannot be satisfied when there is a total omission of structure." *Default Proof Credit Card Sys.*, 412 F.3d at 1298. Where the applicant did "not carry out its part of the quid pro quo bargain" this Court must "find that claim is indefinite under [35] U.S.C. § 112, ¶ 2." *Maurice Mitchell Innovations, L.P.*, 249 Fed. Appx. at 188. As mandated by the Federal Circuit, because the patent does not link any structure to the claimed function, claim 34 is invalid as a matter of law under § 112, ¶ 2.

## VI.   CONCLUSION

IBM has offered proposed constructions in accordance with established legal principles concerning, most importantly, the supremacy of intrinsic evidence and section 112, paragraph 6. In contrast, Uship has followed a haphazard analysis that accomplishes nothing except making things as broad and ambiguous as possible to preserve its meritless infringement case. In addition, its constructions only create unnecessary ambiguity and burden the Court. For the reasons discussed herein, IBM respectfully submits that its proposed constructions be adopted.

Date:   July 9, 2010                    Respectfully submitted,


                                        s/ Steven C. Cherny
                                        by s/ Edward H. Meyers
                                        Steven C. Cherny
                                        KIRKLAND & ELLIS LLP
                                        Citigroup Center
                                        153 East 53rd Street
                                        New York, NY 10022
                                        (212)446-4800

                                        *Attorney for Third-Party Defendant*
                                        ***International Business Machines Corp.***


*Of Counsel:*
D. Sean Trainor
William Fink
Edward H. Meyers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Amanda Hollis
KIRKLAND & ELLIS LLP
300 N. LaSalle Dr.
Chicago, IL 60654
(312) 862-2000

John Desmarais
JOHN DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212) 351-3400